Rosemary Dettling, Esq.
Admitted Pro Hac Vice
Federal Employee Legal Services Center
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 390-4741
Facsimile: (202) 379-9772
Email: rdettling@felsc.com

Sara L. Bloom, Esq.
Admitted Pro Hac Vice
Law Office of Sara Bloom
1120 Huffman Rd Ste 24-785
Anchorage, AK 99515
Telephone: (907) 519-3613
Facsimile: (907) 345-8570
Email: sara@907lawyer.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROYLAN G. DAMWYK,<br><br>Plaintiff,<br><br>v.<br><br>FRANK KENDALL, III,<br>in his official capacity<br>as the Secretary of the U.S. Air Force.,<br><br>Defendant | Case No.: 2:22-cv-04424-HDV-SK<br><br>NOTICE OF MOTION AND MOTION FOR ATTORNEY FEES AND COSTS<br><br>HEARING DATE: APRIL 10, 2025<br>HEARING TIME: 10:00 A.M.<br>COUTROOM: 5B<br><br>HONORABLE HERNÁN D. VERA<br>UNITED STATES DISTRICT JUDGE |

PLEASE TAKE NOTICE that on April 10, 2025, at 10:00 a.m. in Courtroom 5B of the above-captioned court, located at 350 West First Street, Los Angeles, California 90012. Plaintiff Roylan G. Damwyk will, and hereby does, move for attorneys' fees pursuant to 29 U.S.C. § 794a. Plaintiff makes this motion because Plaintiff prevailed on her failure to accommodate claim filed under the Rehabilitation Act of 1973. Plaintiff's counsel provides with this motion extensive evidence of the number of hours reasonably spent to bring this case to its successful conclusion, as well as evidence and case citations of the reasonable hourly rates of Los Angeles area attorneys.

    This motion is based upon this notice of motion and motion, as well as the memorandum of points and authorities, the Declaration of Rosemary Dettling, Declaration of Sara L. Bloom, Declaration of Roylan Damwyk, and Declaration of Paula Pearson, and all exhibits filed simultaneously herewith. This motion is also based on all other matters of which the Court may take notice, the oral argument of counsel, pleadings already on file with the Court, and all other evidence that may be presented at the hearing on this matter

    This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on February 11, 2025.

Date: March 6, 2025

                Respectfully,

                */s/ Rosemary Dettling*
                Rosemary Dettling, Esq.
                Federal Employee Legal Services Center
                Admitted Pro Hac Vice
                1629 K Street, NW, Suite 300
                Washington, DC 20006
                Telephone: (202) 390-4741

                Counsel for Plaintiff

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES..................................................................................iii

I.     INTRODUCTION……………………………………………………………1

II.    RELIEF SOUGHT……………………………………......………………….2

III.   BACKGROUND……………………………………………....……………2

IV.    LEGAL STANDARD…………………………………………………….3

V.     ARGUMENT……………………………………………………...……..4

       A.     Plaintiff is Entitled to Reasonable Fees as the Prevailing Party…………...4

              1.     Experience of Counsel…………………………………………5

                     a.  Ms. Dettling …………………………………………5

                     b.  Ms. Bloom………………………………………...…6

              2.     Rates in the Relevant Community………………………...…………7

                     a.  Ms. Dettling……………………………………………8

                     b.  Ms. Bloom…………………………………………11

              3.     Lodestar Analysis…………………………………………11

              4.     Hours Billed…………………………………………………11

                     a.  Administrative Proceeding……………………..……………12

                     b.  Federal Case……………………………..………………14

VI.    RESULTS ACHIEVED…………………………………………………17

VII.   RISK OF LITIGATION………………………………………………18

VIII.  DEDUCTIONS…………………………………………………..……18

       A.     Voluntary Deductions…………………………………..………………18

       B.     Unsuccessful Claims……………………………………..………………19

1. Hostile Work Environment Claim……………………………….……19

2. Disability Discrimination Claim……………………………………..19

3. Retaliation Claim…………………………………………...……20

IX.    ACROSS-THE-BOARD DEDUCTIONS…………...……………………20

X.    COSTS…………………………………………………………………20

XI.    CONCLUSION…………………………………………….……..21

1

**TABLE OF AUTHORITIES**

2

**CASES:**                                                                 **Page(s)**

*Barjon v. Dalton*,

 132 F.3d 496, 500 (9th Cir. 1997)…………………………...……………..8

*California Ass'n of Physically Handicapped, Inc. v. F.C.C.*,

 721 F.2d 667, 669 n. 4 (9th Cir.1983)…………………………………….4

*C.L., an individual, v. Del Amo Hospital, Inc., et al.*,

 Case No. 8:18-CV-00475-DOC (DFMX)………………………….…..10

*Contreras v. Kelly Pipe Co.*,

 Case No. 21STCV17933, 2023 Cal. Super. LEXIS 64818.......................9

*Costa v. Comm'r of Soc. Sec. Admin.*,

 690 F.3d 1132, 1135 (9th Cir. 2012)……………………………………11

*Craig v. County of Orange*,

 2019 WL 12378994, at *2 (C.D. Cal. Sep. 5, 2019)………………………8

*Farrar v. Hobby*,

 506 U.S. 103, 111-12 (1992)……………………………………………4

*Paola French v. City of Los Angeles (French II)*,

 EDCV 20-0416 JGB (SPx) (C.D. Cal. Feb. 21, 2024)………………..……9

*Glenna O. Air Force*,

 EEOC Appeal Number 0720180030 (August 20, 2019)……………...…….1, 6

*Gonzalez v. City of Maywood*,

 729 F.3d 1196, 1200 (9th Cir. 2013)…………………………………….7

*Guam Society of Obstetricians & Gynecologists v. Ada*,

 100 F.3d 691, 702 (9th Cir. 1996)……………………………….......10

*Hensley v. Eckerhart*,

 461 U.S. 424, 433 (1983)……………………………………………..4, 11

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**CASES:**                                                                    **Page(s)**

*Hicks v. Toys 'R' Us-Del., Inc.,*

    2014 WL 4670896, at *1 (C.D. Cal. Sept. 2, 2014)………………………………10

*"John Doe" v. DOT, FAA,*

    *MSPB* Docket Number SF-0752-22-0425-I-1 (January 22, 2024)…………………2

*"John Doe" v. Department of Justice,*

    MSPB Docket Number AT-0752-17-0799-A-1 (August 30, 2024)…………...…1, 6

*"John Doe" v. Voice of America,*

    EEOC No. 570-2019-01608X (July 27, 2022)……………………………...……1, 6

*Kyle S. v. Dept of Agriculture,*

    EEOC Appeal No. 2019005694 (July 26, 2021)………………………………1, 7

*McKibben v. McMahon,*

    2019 WL 1109683, at *14 (C.D. Cal. Feb. 28, 2019………………………………...8

*Miele v. New York State Teamsters Conference Pension & Ret. Fund,*

    831 F.2d 407, 408-409 (2d Cir. 1987)………………………………...…………10

*Moore v. Jas. H. Matthews & Co.,*

    682 F.2d 830, 839 (9th Cir. 1982)………………………………………………12

*New York Gaslight Club, Inc., v. Carey,*

    447 U.S. 54, 67 (1980)………………………………………………………...4

*Porter v. Winter,*

    603 F.3d. 1113, 1115 (9th Cir. 2010)………….…………………………………4

*Schwarz v. Secretary of Health & Human Servs.,*

    73 F.3d 895, 906 (9th Cir. 1995)…………………………………………………8

*Scoggins v. Department of the Air Force,*

    MSPB Docket Number CH-1221-14-0228-W-2……………………………………2

# TABLE OF AUTHORITIES

**CASES:** Page(s)

*Viveros v. Donahue*,

    2013 WL 1224848, at *2 (C.D. Cal. Mar. 27, 2013)……………….………………..8

*United States v. $28,000 in Currency*,

    802 F.3d 1100, 1107 (9th Cir. 2015)……………………………….………8


**STATUTES:**

Rehabilitation Act…………………………………...………………………….4, 7, 17, 20

Rehabilitation Act of 1973, § 505(b)…………………………………..……17

Rehabilitation Act of 1973…………………………………...……………………1, 3

Section 501 of the Rehabilitation Act……………………………….……………1

Title VII……………………………………………………………………3


**RULES:**

Federal Rule of Civil Procedure 54……………………….……………..……20


**UNITED STATES CODE:**

29 U.S.C.A. § 794a(b)……………………………………...…17

29 U.S.C. § 794…………………………………………….…....3

42 USC 2000e-5(k)………………………………………….…..3


**CONSTITUTION:**

U.S. Const. amend. XIV, § 5……………………………….…………4

**OTHER AUTHORITIES:**

2023 Real Rate Report: An Analysis of Law Firm Rates, Trends, and Practices,

WOLTERS KLUWER (2023 ed.)……………………………………….....1, 10

Fitzpatrick Matrix…………………………………………………………1, 2, 5

*Laffey* Matrix…………………………………………………………1, 2, 5, 6

LSI Laffey Matrix…………………………………………………………1, 6

Legal-10…………………………………………………………....……1, 10

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS

Plaintiff Roylan G. Damwyk sued the United States Secretary of the Air Force, Frank Kendall, III ("Defendant"), under Section 501 of the Rehabilitation Act of 1973 for failure to accommodate her disabilities. Following a four-day trial, the jury returned a verdict in favor of Plaintiff and awarded her $250,000 in compensatory damages. Dkt. 142. The Court awarded $74,641.30 in backpay and $2,998.35 in lost retirement benefits. Dkt. 153. On February 5, 2025, the Court entered judgment in favor of Plaintiff. Dkt. 167. As the prevailing party, Plaintiff requests reasonable attorneys' fees and costs.

## I.    INTRODUCTION

After voluntary deductions made by Plaintiff's counsel, the attorneys' fees and costs in this motion represent nearly seven and a half years of litigation. Plaintiff provides the following documents to support her motion for fees and costs: Declaration of Rosemary Dettling; Declaration of Sara L. Bloom; Declaration of Roylan G. Damwyk; and Declaration of Paula Pearlman.

The following documents are attached to lead counsel Dettling's declaration ("Decl."): Ex. A, the Fitzpatrick Matrix; Ex. B, the *Laffey* Matrix; Ex. C, the LSI Laffey Matrix; Ex. D, *Kyle S. v. Dept of Agriculture*, EEOC Appeal Number Appeal No. 2019005694 (July 26, 2021); Ex. E, "*John Doe" v. Voice of America*, EEOC No. 570-2019-01608X (July 27, 2022); Ex. F, *Glenna O. Air Force*, EOC Appeal Number 0720180030 (August 20, 2019); Ex. G, "*John Doe" v. Federal Bureau of Intelligence*, MSPB Docket Number AT-0752-17-0799-A-1 (August 30, 2024); Ex. H, "*John Doe" v. Dept. of Veterans Affairs*, MSPB Docket Number DE-1221-20-0280-W-5 (January 31, 2024); Ex. I, the 2023 Real Rate Report; Ex. J, Legal-10; Ex. K, contemporaneous billing records from the administrative proceeding; Ex. L, contemporaneous billing records from the federal case; Ex. M,

1

reasonable travel and copy costs; Ex. N, an invoice for a PowerPoint presentation that was submitted with the Bill for Costs; and Ex. O, a Chart of Fees.

Ms. Bloom entered an appearance on October 17, 2024. The following documents are attached to her request for fees. Bloom Decl., Ex. A1 and 2, Billing Invoices; Ex. B, a litigation case list; Ex. C, "*John Doe" v. DOT, FAA,* MSPB Docket Number SF-0752-22-0425-I-1 (January 22, 2024); Ex. D, the Fitzpatrick Matrix; Ex. E, the *Laffey* Matrix, Ex. F, *Scoggins v. Department of the Air Force*, MSPB Docket Number CH-1221-14-0228-W-2.

## II.    RELIEF SOUGHT

Plaintiff seeks $1000 per hour for lead counsel Rosemary Dettling  (nearly 34 years of experience) and $700 for co-counsel Sara L. Bloom (30 years of experience). Plaintiff seeks $232,030 (232.03 hours x $1000) for Ms. Dettling's work on the administrative proceeding, $473,720 (473.72 x $1000) for Ms. Dettling's work on the federal proceeding (which includes $94,380 in travel time), and $61,789 (88.27 hours x $700) for Ms. Bloom's work on the federal proceeding. Plaintiff also seeks $13,841.06 in out-of-pocket costs.

## III.    BACKGROUND

In September 2017, Plaintiff contacted Ms. Dettling and discussed the prospect of filing a failure to accommodate complaint. Dettling Decl., ¶ 19. Plaintiff paid a minimal fee. *Id.* at ¶ 20. Since October 2017, Ms. Dettling has represented Plaintiff on a pro bono basis. *Id.* at ¶ 23.

On October 3, 2017, Plaintiff contacted Defendant's EEO Office and informed the EEO Director that her managers failed to accommodate her disabilities dating back to June 28, 2016. *Id.* at ¶ 20. On November 22, 2017, Ms. Dettling filed a formal EEO complaint, repeating the failure to accommodate allegation. *Id.* Instead of accepting the claim, Defendant accepted three issues that Plaintiff never raised. *Id.* at ¶ 41.

The majority of the hours worked during the administrative proceeding, from October 3, 2017, to April 5, 2022, were spent trying to convince Defendant, and then the Equal Employment Opportunity Commission ("EEOC"), that the issue Plaintiff raised with the EEO Office was whether Defendant failed to accommodate her disabilities from June 2016 to November 2017. *Id.* After Plaintiff requested a hearing before an EEOC Administrative Judge, Defendant continued to argue that Plaintiff failed to exhaust her administrative remedies. *Id.* Defendant argued that her complaint was untimely and argued that she should be limited to the three issues raised by the EEO Office. *Id.* These arguments resulted in protracted litigation at the administrative level.

On June 28, 2022, Plaintiff filed a Complaint in the Central District of California to correct her claim and get it resolved on the merits. Dkt. 1. Since filing suit in this Court, Defendant has vigorously defended its case at every turn, and has consistently tried to get the case dismissed on procedural grounds. Dettling Decl., ¶ 25. Defendant made exhaustion, claim preclusion, and timeliness arguments in its Motion to Dismiss, Reply to Plaintiff's Opposition to Motion to Dismiss, Motion for Summary Judgment, Reply to Opposition to Motion for Summary Judgment, Memorandum of Conclusion of Facts and Law, Amended Memorandum of Conclusion of Facts and Law, Motion for Reconsideration, Joint Pre-trial Report, and Post-trial Brief. The Court rejected Defendant's procedural arguments on four occasions. Dkt. 64, 90, 136 166. The reasonableness of Defendant's procedural arguments and their repetition should be considered when evaluating the time counsel spent opposing the arguments.

## IV.    LEGAL STANDARD

The Rehabilitation Act of 1973 permits the "prevailing party" to recover both its costs of a federal suit as well as reasonable attorneys' fees. *See* 29 U.S.C. § 794, 42 U.S.C. 2000e-5(k) (Title VII attorneys' fees provision). A prevailing

plaintiff is also entitled to an award of fees for work performed during an earlier administrative proceeding. *New York Gaslight Club, Inc., v. Carey*, 447 U.S. 54, 67 (1980) (authorizing attorney's fees for prevailing Title VII claimant in state administrative and judicial proceedings despite lack of state law authorization because "Congress' power under § 5 of the Fourteenth Amendment ... overrides any interest the State might have in not authorizing awards for fees." *See also Porter v. Wi*nter, 603 F.3d. 1113, 1115 (9th Cir. 2010) ("[F]ee awards are authorized for legal work done in 'proceedings' other than court actions, including federal and state administrative proceedings); *California Ass'n of Physically Handicapped, Inc. v. F.C.C.*, 721 F.2d 667, 669 n. 4 (9th Cir.1983) (the legislative histories and wording of Title VII and the Rehabilitation Act attorneys' fees sections compel the conclusion that the courts must interpret the 'any action or proceeding' language of both statutes in the same manner").

## V.    ARGUMENT

### A.    Plaintiff is Entitled to Reasonable Fees as the Prevailing Party

Under the Supreme Court's "generous formulation" of the term "prevailing party," "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on *any* significant issue in litigation which achieves some of the benefits the parties sought in bringing suit.' " *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)) (emphasis added). Indeed, when "actual relief on the merits of [Plaintiff's] claim materially alters the legal relationship between the parties by modifying Defendant's behavior in a way that directly benefits the plaintiff," the plaintiff prevails. *Id.*

Plaintiff is the prevailing party because the award of compensatory damages, backpay, and retirement benefits altered her legal relationship with Defendant. Recovering $250,000 in damages – not including attorneys' fees and costs – is an

4

excellent result for a federal employee. Jury awards for psychological injuries in this District are known to be most often well below six figures.

### 1.    Experience of Counsel

#### a.  Ms. Dettling

As detailed in her declaration, Ms. Dettling has close to thirty-four (34) years of experience in complex employment discrimination matters. After graduating from Notre Dame Law School in 1991, Ms. Dettling worked for the U.S. Department of Justice, Civil Rights Division ("DOJ"), Office of Special Counsel for Immigration-Related Unfair Employment Practices. *Dettling Decl.,* ¶ 6-7. She later worked in DOJ's Complaint Adjudication Office. *Id.* at ¶ 7. She was employed by DOJ from 1991 to 2000. *Id.* From 2000 to 2002, Ms. Dettling worked at the U.S. Department of Commerce, defending the agency in EEOC cases and Merit Systems Protection Board (MSPB) appeals. *Id.* at ¶9. From 2002 to December 2006, Ms. Dettling worked at the U.S. Department of Transportation ("DOT"), defending DOT in EEOC and MSPB cases. *Id.* at ¶10.

In January 2007, Ms. Dettling founded the Federal Employee Legal Services Center (FELSC). FELSC is a public interest law firm located in Washington, DC. Ms. Dettling provides representation to individuals whose civil rights and civil liberties have been violated. *Id.* at ¶ 11. By the time counsel took on Ms. Damwyk's case in October 2017, she had already gained extensive experience litigating employment discrimination matters. *Id.* at ¶ 14, 18, 29, 32.

In the Washington, DC, metropolitan area, where Ms. Dettling practices in administrative forums like the EEOC and MSPB, she is awarded fees under the Fitzpatrick Matrix. *Id.* at ¶ 27, Ex. A. The Fitzpatrick Matrix is used by DOJ's U.S. Attorney's Office for the District of Columbia, Civil Division, in complex litigation in the District of Columbia. *Id.* Her current Fitzpatrick rate—based on the 2024 matrix—is $861 per hour. Dettling Decl. *Id.* at ¶ 28. Around 2021-2022,

courts and administrative forums in DC started using the Fitzpatrick Matrix instead of DOJ's prior *Laffey* Matrix. *Id.* at ¶ 27, Ex. B. The Fitzpatrick rates are higher than DOJ's prior *Laffey* Matrix but lower than the LSI Laffey Matrix used by many employment/labor attorneys. Under the LSI Laffey Matrix, Ms. Dettling could request $1141 an hour. *Id.* at ¶ 28, Ex. C.

Ms. Dettling has been awarded fees in complex employment cases. In *Kyle S. v. Dept. of Agriculture*, EEOC Appeal No. 2019005694 (July 26, 2021), the EEOC awarded Ms. Dettling $621 per hour (Ms. Dettling's 2021 *Laffey* rate) in a failure to accommodate case. *Id.* at 29, Ex. D. In *"John Doe" v. Voice of America*, EEOC Case No. 570-2019-01608X (July 27, 2022), the EEOC awarded Ms. Dettling $752 per hour (her 2022 Fitzpatrick Matrix rate) in a Title VII retaliation case (no reduction in fees). *Id.*, Ex. E. In *Glenna O. v. Air Force*, EEOC Appeal No. 0720180030 (June 23, 2020), the EEOC awarded Ms. Dettling $572 per hour (the 2020 *Laffey* Matrix rate) after prevailing in a sexual harassment, retaliation, and constructive discharge case (no reduction in fees). *Id.*, Ex. F.

The last attorney fee award Ms. Dettling received was on August 30, 2024, in *"John Doe" v. Department of Justice*, AT-0752-17-0799-A-1 (2024). *Id.*, Ex. G. The MSPB awarded Ms. Dettling $690 per hour (the requested rate) based on the rate quoted in the client's 2018 retainer agreement. *Id.*

On January 31, 2024, in *"John Doe" v. Department of Veterans Affairs*, Ms. Dettling prevailed in a complex whistleblower protection case. *Id.*, Ex. H. Attorney fees have not yet been awarded because the VA appealed the decision to the MSPB.

### b. Ms. Bloom

Ms. Bloom is a 1992 graduate from the University of Kansas Law School and is a member in good standing in the DC, Maryland, and Alaska state and federal bars. *See* Bloom Decl., ¶¶ 4, 6. Ms. Bloom started her career as a trial

6

attorney for State Farm. *Id.* She worked for a small firm for three years and then worked as a trial defense attorney for the Washington Metropolitan Area Transit Authority (WMATA). *Id.* During her thirteen years at WMATA, she litigated tort and employment cases. *Id.* She represented the country of Palau in litigation for three years and the Alaska State Commission for Human Rights. *Id.* She started an employment practice in Alaska in 2017, handling a variety of employment matters. *Id.* at ¶¶ 3, 4, 6-14. She has first chaired over 150 jury trials in D.C. and Maryland. *Id.* at ¶8. She has litigated several employment and tort cases in state and federal court, primarily in Alaska. *Id.* Her practice also extends to federal sector cases, having handled several cases against the Federal Aviation Administration and the Department of the Army. *Id.* at ¶12.

Ms. Bloom recently won a reasonable accommodation case under the Rehabilitation Act, which was upheld on appeal. *Id.* at ¶12. Ms. Bloom has represented hundreds of employees in a wide range of matters, including discrimination, retaliation, defamation, infliction of emotional distress, breach of implied covenant of good faith and fair dealing, violations under FMLA, worker's compensation, OSHA, labor, and due process violations. *Id.* at ¶¶12-14.

Like Ms. Dettling, Ms. Bloom represented Plaintiff on a pro bono basis. Ms. Bloom's involvement was invaluable. She provided critical trial advocacy skills that supplemented Ms. Dettling's skills, but did not duplicate them. She helped prepare witnesses and participated in the trial. She questioned Plaintiff's witnesses and cross-examined Defendant's witness. She was instrumental in getting Plaintiff's exhibits into the record.

### 2.    Rates in the Relevant Community

The reasonable hourly rate is the rate prevailing in the community for similar work. *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1200 (9th Cir. 2013) ("[T]he court must compute the fee award using an hourly rate that is based

7

on the prevailing market rates in the relevant community."); *Viveros v. Donahue*, 2013 WL 1224848, at *2 (C.D. Cal. Mar. 27, 2013) ("The court determines a reasonable hourly rate by looking to the prevailing market rate in the community for comparable services."). The relevant community is the community in which the court sits. *See Schwarz v. Secretary of Health & Human Servs.*, 73 F.3d 895, 906 (9th Cir. 1995).

### a. Ms. Dettling

Ms. Dettling requests $1000 per hour. *Id.* at ¶ 34. The hourly rate is commensurate with her nearly 34 years of legal experience in federal sector employment law and is consistent with rates awarded to other attorneys practicing employment law in Los Angeles. *See Craig v. County of Orange*, 2019 WL 12378994, at *2 (C.D. Cal. Sep. 5, 2019) ($1,000 per hour is a reasonable hourly rate for an attorney with thirty-five years of experience); *see also McKibben v. McMahon*, 2019 WL 1109683, at *14 (C.D. Cal. Feb. 28, 2019 (approving adjusted lodestar rates of $887 to $1,230 per hour for attorneys practicing civil rights litigation with 26 to 49 years of experience and the range of $738 to $1,200 per hour for attorneys practicing civil rights litigation with 23 to 33 years of experience). *See also United States v. $28,000 in Currency*, 802 F.3d 1100, 1107 (9th Cir. 2015) ("[R]ate determinations in other cases are satisfactory evidence of the prevailing market rate."); *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997) (the "relevant community" is generally where the district court in the matter sits).

Paula Pearlman, Esq., a distinguished disability and civil rights attorney in Los Angeles, and fee specialist, reviewed Ms. Dettling's qualifications and case wins and compared them to awards granted to other employment attorneys in the Central District. Pearlman Decl., ¶¶ 1-24. She recommended that Ms. Dettling be awarded $1000 per hour. *Id.* at 21. Ms. Pearlman stated that:

8

As a 1991 graduate, practicing for approximately 33-34 years, it is my understanding that Ms. Dettling is requesting an hourly rate of $1000. In my experience, the $1000/hour rate for Ms. Dettling is well within the range for the current reasonable rate for an attorney of her skill, experience and reputation in Los Angeles, if not somewhat low. My opinion is based on comparisons to rates approved for attorneys of comparable skill, experience and reputation in the Los Angeles legal market and my review of past fee awards.

*Id.* at ¶ 21. Ms. Pearlman further stated that:

Based on my review of the docket in the case, motions and orders that were provided to me and which I retrieved from Pacer, Ms. Dettling has specialized knowledge of both disability rights employment law, and federal employment practices. I am of the opinion that she is a highly skilled and experienced attorney in the area of disability rights and employment litigation.

*Id.* at ¶ 20.

In support of her recommendation, Ms. Pearlman provided a 2023 Order from the Los Angeles Superior Court awarding fees in *Contreras v. Kelly Pipe Co.*, Case No. 21STCV17933, 2023 Cal. Super. LEXIS 64818, to attorneys at Shegerian & Associates in an employment discrimination case. *Id.*, Ex. B. The four top billing attorneys in *Contreras* and the rates approved were Carney Shegerian at $1350 an hour; Anthony Nguyen at $1100 an hour; (3) Mahru Madjidi at $900 an hour; and Bryan Kirsh at $825 an hour. *Id.* at 20, 28. The Court's decision notes the experience of each: Carney Shegerian – over 30 years; Anthony Nguyen – almost 15 years; Mahru Madjidi – 10 years; and Bryan Kirsh – 6 years. *Id.* at 20.

Ms. Pearlman also referenced two other cases when evaluating Ms. Dettling's rate. *Id.*, Ex. C. Ms. Pearlman's referred to an order awarding attorney fees in *Paola French v. City of Los Angeles (French II)*, EDCV 20-0416 JGB (SPx) (C.D. Cal. Feb. 21, 2024). *Id.* In *French*, the Court approved fees for attorneys at the Law Office of Dale Galipo. *Id.* The approved 2023 rate for John

9

Fattahi was $975 an hour. *Id.* He is a 2006 graduate. *Id.* The rate approved for Mr. Fattahi in *French II* is just under the same rate now requested for Ms. Dettling, who has significantly more years of experience. *Id.* In *C.L., an individual, v. Del Amo Hospital, Inc., et al.*, Case No. 8:18-CV-00475-DOC (DFMX), also relied upon by Ms. Pearlman, the court found $1000 per hour reasonable for 28-year-old attorney Christopher Knauf, a 1996 graduate. *Id.*, Ex. D.

Ms. Dettling's rate is comparable to the rates listed in the 2023 Real Report. Dettling Decl., ¶ 39, Ex. I (2023 Real Rate Report: An Analysis of Law Firm Rates, Trends, and Practices, WOLTERS KLUWER (2023 ed.) (the "Real Rate Report")). The 2023 Real Rate Report for Los Angeles-based employment attorneys states that $981 per hour is an appropriate rate for someone with less experience than Ms. Dettling. *Id.* The Real Rate Report is a useful guidepost to assess the reasonableness of hourly rates in the Central District of California. *Id.* The Real Rate Report identifies attorney rates by location, experience, firm size, areas of expertise, and industry, as well as specific practice areas, and is based on actual legal billing, matter information, and paid and processed invoices from more than 80 companies. *Id.*; *see Hicks v. Toys 'R' Us-Del., Inc.,* No. CV 1302 DSF (JCGx), 2014 WL 4670896, at *1, 19-20 (C.D. Cal. Sept. 2, 2014). According to Legal-IO, employment practitioners in Los Angeles with 25+ years of experience charge up to $1070 per hour. https://www.legal.io/pricing-tool/hourly-rates/los-angeles/employment-and-labor-law. Dettling Decl., Ex. J.

Although Ms. Dettling's firm is a public interest firm, the Ninth Circuit has upheld the award of "big firm" rates to public interest organizations. *Guam Society of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 702 (9th Cir. 1996). *See also Miele v. New York State Teamsters Conference Pension & Ret. Fund*, 831 F.2d 407, 408-409 (2d Cir. 1987) (although a district court has discretion in setting the rates for public interest attorneys, "the discretion must be exercised on the basis

of rates charged to clients of private law firms"). Given Ms. Dettling's experience in disability discrimination sand civil rights cases, it is not unreasonable for her to charge rates commensurate with those charged by large law firms.

### b.  Ms. Bloom

Ms. Bloom requests $700 per hour. She entered the case pro hac vice on October 17, 2024. Bloom Decl. Ms. Bloom's rates are lower than the 2023 Real Rate Report, the Legal-10 rates, and the rates awarded in the Ninth Circuit to other attorneys with similar litigation experience. *Id.* The requested rates are appropriate given Ms. Bloom's skill and experience, her 30 years of litigation experience, and because this case qualifies as complex federal litigation in this District. *Id.*

### 3.    Lodestar Analysis

Once a party establishes its entitlement to attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable.' " *Hensley v. Eckerhart*, 461 U.S. 424 (1983). Courts generally apply the lodestar method to determine the reasonableness of requested attorney's fees. *Id.* Plaintiff provides the following schedule of rates:

| Billing Professional | Title | Rate |
|---|---|---|
| Rosemary Dettling | Lead Counsel | $1000 |
| Sara L. Bloom | Co-Counsel | $700 |

For the reasons described below, Plaintiff requests that the Court use these rates when assessing the appropriate lodestar.

### 4.    Hours Billed

An attorney's fee award should include compensation for all hours reasonably expended prosecuting the matter, but "hours that are excessive, redundant, or otherwise unnecessary" should be excluded. *Costa v. Comm'r of Soc. Sec. Admin.*, 690 F.3d 1132, 1135 (9th Cir. 2012). "[T]he standard is whether a reasonable attorney would have believed the work to be reasonably expended in

11

pursuit of success at the point in time when the work was performed." *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982).

### a.    Administrative Proceeding

Plaintiff requests $232,030 (232.03 hours x $1000) for work performed in the administrative proceeding. Dettling Decl., ¶ 41, 42, Ex. K. In bringing Plaintiff's failure to accommodate case to a successful conclusion after seven and a half years, Ms. Dettling logged in 232.03 hours at the administrative level. *Id.* Although Plaintiff was not successful at the administrative level, the arguments she made during the administrative proceeding were validated by the Court and by the jury. *Id.* at ¶ 43. The Court agreed that Plaintiff exhausted her administrative remedies and filed a timely EEO complaint. The Court agreed that Plaintiff was not limited to the three "accepted" issues raised by Defendant. The Court agreed that Plaintiff's failure to accommodate claim went back to June 2016. The jury concluded that Plaintiff was subjected to discrimination.

Reasonable fees were spent on the following stages of the administrative proceeding:

Building a Case: Plaintiff requests 29.28 hours for evaluating Plaintiff's case, participating in the informal complaint process; compiling information, facts, and evidence to support her claims; gathering documents; consulting with Plaintiff; consulting with Defendant's EEO Office; filing a hearing request; writing letters and emails to Plaintiff; and writing emails and letters objecting to the accepted issues.

EEO Investigation: Plaintiff requests 11.06 hours for participating in Defendant's investigation and preparing Plaintiff for the investigation.

Discovery: Plaintiff requests 65.64 hours for drafting discovery requests, following up on discovery, compelling disclosure of documents, taking depositions, answering deposition questions, and reviewing deposition transcripts.

12

Ms. Dettling had to zealously compile relevant documents and engage in discovery to obtain the information Ms. Damwyk needed to prevail in her case. The investigative report was not helpful because Defendant investigated the wrong issues. Ms. Dettling traveled to Lompoc, California, in October 2018 to conduct depositions. Because the deposition testimony was useful and used in her opposition to summary judgment [Dkt. 76], she did not need to take depositions in the federal case. Discovery was not duplicated. The deposition transcripts were submitted to the Court as potential trial exhibits for impeachment purposes.

Motions Practice: Plaintiff requests 54.48 hours for filing the following motions with the EEOC: Response to Agency's Response to Administrative Judge's Initial Order (2.50); Response to AJ's Order (10.55); Motion for Summary Judgment (18.75); Motion for Default Judgment (18.12); and Motion for Stay (4.56).

Settlement: Plaintiff requests 10.37 hours for the settlement phase of litigation. The settlement phase involved regular communication with Plaintiff through email, telephone, and other written correspondence, and with opposing counsel and the EEOC.

EEOC/OFO Appeal: Plaintiff requests 20.22 hours for time spent analyzing the entire record again in 2020, researching OFO case law, writing an appeal to the EEOC's Office of Federal Operations, and reviewing Defendant's response.

Miscellaneous: Plaintiff requests 15.40 hours of time spent reviewing court orders, corresponding with the EEOC, researching procedural issues raised by Defendant, corresponding with Defendant and the EEOC, reading the report of investigation, filing notices of representation, and reading submissions.

Travel: Plaintiff requests 26.40 hours for travel from Washington, DC, to Los Angeles, then to Lompoc, California, for depositions, and back again.

Total: 232.03 hours x $1000 = $232,030.

13

*Id.* at ¶ 42, Ex. K.

Total Fees for Rosemary Dettling/Administrative Case: $232,030

### b.    Federal Case

Plaintiff requests 473.72 hours for Ms. Dettling's time on the federal case and 88.27 for Ms. Bloom's time. Dettling Decl., ¶ 44, Ex. L. Based on Ms. Dettling's review of the time records, the breakdown in the federal case is as follows:

Motions Practice:  Plaintiff requests 80.88 hours for motions practice. This time includes successfully opposing Defendant's Motion to Dismiss (23.75 hours) and Motion for Summary Judgment (35.29 hours). The opposition to summary judgment was difficult because Defendant raised 130 "undisputed" facts. These facts required a significant amount of time consulting with Plaintiff and cross-checking documents before responding and providing citations to the Court. Plaintiff successfully opposed Defendant's Motion in Limine #1 (7.2 hours), Defendant's Motion in Limine #2 (8.34 hours), and Defendant's Motion for Reconsideration (6.3 hours). This critical phase of the litigation involved extensive drafting and reviewing of Plaintiff's opposition papers. It involved follow-up legal and factual research and analysis. The review and research began during the administrative proceeding, but because the rules and case precedent were different in the Central District, the opposition motions required an entirely new set of research. The significant expenditure of attorney attention was required because of the importance of keeping the case from getting dismissed. All of the response motions required tight deadlines, oral arguments, and travel to Los Angeles.

Discovery: Plaintiffs requests 43.98 hours devoted to the discovery phase of litigation. Ms. Dettling's billing includes time spent drafting discovery, responding to discovery requests, attending Plaintiff's deposition, preparing for Plaintiff's deposition, and reviewing Plaintiff's discovery responses. Discovery was

14

contentious due to Defendant's failure to respond to any of Plaintiff's discovery questions. Instead of filing a motion to compel with a magistrate judge, Plaintiff first sent two letters to Defendant—one 12 pages and another 32 pages—explaining in detail each reason Defendant's objections were inappropriate. She did this in an attempt to resolve the discovery dispute informally, without involving the Court.

Settlement: Plaintiff requests 16.89 hours for time spent on settlement negotiations. The parties attended a Court-ordered mediation on September 11, 2024. This involved preparation for the mediation, a mediation statement, attendance at the mediation, and a follow-up emails to Defendant in an attempt to continue negotiations. The parties attended a second court-ordered settlement conference with Magistrate Judge Karen L. Stevenson on November 2, 2024. The settlement conference required preparation and settlement statements. The statement submitted to Judge Stevenson was very detailed, according to her instructions. Ms. Dettling spent time on settlement discussions with Ms. Damwyk before and after the settlement conferences. Plaintiff's counsel also conducted research to see if the Ninth Circuit permitted settlement on the merits with the attorney fees claim being resolved by the Court. Research was also conducted regarding Ninth Circuit precedent on payment of fees for administrative proceedings.

Trial Preparation: Plaintiff seeks recovery of 161.34 hours for pre-trial work. The breakdown is as follows: 113.07 hours Ms. Dettling's time drafting and revising key trial documents, including her Exhibit List, Amended Exhibit List, Witness List, Amended Witness List, Evidentiary Appendix, Verdict Form, Proposed Jury Instructions, Amended Jury Instructions, Proposed Pre-trial Order, as well as subpoenas, witness questions, an objection to Defendant's Amended Memorandum of Point's and Authority of Facts and Law. Time was spent

15

meeting with witnesses and prepping Plaintiff for trial. Time was spent reviewing Defendant's drafts and amended drafts. Ms. Dettling drafted trial questions for Roylan G. Damwyk, Martin Damwyk, Neil Damwyk, Richard Nocis, Hank Dederding (no charge), Betsy Torres, Patrick Maloy, Robert Corser, Jason Turner, Thomas Chiavacci, Arlene Quichocho, and Jolene Cantrell. Ms. Bloom billed 48.27 hours for pre-trial work after she entered the case on October 17, 2024. She spent this time reviewing key documents and preparing witnesses.

Trial: Ms. Dettling billed 40.39 hours for trial (32.50  hours in trial and an additional 7.89 hours preparing for trial on the evenings of November 12, 13, and 14, 2024). Ms. Bloom billed 37.75 hours (32.50 hours in trial and 5.25 hours preparing for trial on the evenings of November 12, 13, and 14, 2024).

Post-trial Brief: Plaintiff requests recovery of 20.57 hours of time spent working on the Post-trial Brief (18.4 hours for Ms. Dettling and 2.17 hours for Ms. Bloom's time reviewing it).

Motion for Reconsideration: Plaintiff requests 20.57 hours for time spent on her Motion for Reconsideration (18.4 hours for Ms. Dettling) and .57 hours for Ms. Bloom.

Attorneys' Fees Motion: Plaintiff requests 31.18 hours for time spent filing the fee petition (27.18 hours for Ms. Dettling's work on the motion, her declaration, and attachments), plus 4.0 hours for Ms. Bloom's time preparing her declaration. Ms. Dettling's time includes time spent conducting legal research; drafting, reviewing, and revising Plaintiff's motion and supporting papers; corresponding with Plaintiff; preparing and securing signed declarations; preparing documentary evidence; and meeting to discuss arguments.

Case Management: Plaintiff's counsel spent 19.18 hours performing a myriad other tasks necessary to the successful management of any case. Ms. Detting and Plaintiff met to discuss strategy and arguments, deadlines, and division of tasks.

16

They also corresponded by phone and email to strategize and brainstorm case theories and arguments; communicated with Plaintiffs as needed to inform them of case status and discuss case goals and strategies; and prepared motions affecting the briefing schedule. Ms. Dettling prepared the Bill for Costs. She also served Initial Disclosures and Amended Initial Disclosures.

<u>Travel</u>: Ms. Dettling spent 94.38 hours traveling to Los Angeles for the oral arguments and trial. Plaintiff requests reimbursement for this time because four trips were due to Defendant's motions. Plaintiff hired out-of-town counsel because she was unable to find a local attorney who specialized in federal sector employment discrimination and who was willing to represent Plaintiff on a pro bono basis. Damwyk Decl., ¶¶ 3, 5-8; Dettling Decl., ¶¶ 22, 45.

Attorney Paula Pearlman supported Plaintiff's need for out-of-town counsel when she stated:

> Ms. Dettling practices in a very specialized area of law. There are very few employment attorneys in the Los Angeles area that represent federal employees. I am regularly asked to consider a disability employment case, or make an appropriate referral to a lawyer for a federal employee. I have found it exceedingly difficult to refer people making these inquiries to the plaintiff's employment bar because there are so few attorneys that represent federal employees.

Pearlman Decl., ¶ 19.

## VI.    RESULTS ACHIEVED

The most critical factor to assess reasonable attorneys' fees under the Rehabilitation Act is the degree of success obtained and the number of damages awarded. Rehabilitation Act of 1973, § 505(b), 29 U.S.C.A. 794a(b). Plaintiff's counsel obtained an excellent result for Plaintiff. Plaintiff received almost full relief for her failure to accommodate the claim. She received $250,000

17

in compensatory damages, which is on the high end of compensatory damages awards to federal employees. The plaintiff also received lost back pay and retirement benefits.

## VII.    RISK OF LITIGATION

Plaintiff's lead counsel, Ms. Dettling, represented Plaintiff for over seven years with no guarantee of getting paid. Defendant's counsel vigorously defended itself throughout the seven-plus years at each stage in the litigation. Dettling Decl. ¶ 24, Ms. Dettling turned away many potential clients because of the demands of this case. *Id*. In order to get the case to trial, Ms. Dettling incurred out-of-pocket expenses, knowing she would not recoup any expenses if Plaintiff did not prevail. *Id.* at ¶ 52. Since Plaintiff's counsel took the case on a pro bono basis, Plaintiff requests that the Court approve her fees. This will encourage other pro bono and public interest attorneys to fight for civil rights and take on cases that are otherwise undesirable.

## VIII.   DEDUCTIONS

### A.    Voluntary Deductions

Plaintiff deleted 1.6 hours on the administrative invoice for a conversation with witnesses in April 2018 because the entry was vague and did not name the witnesses. Dettling Decl., ¶ 47. She deleted work performed by FELSC attorney, Kristen Farr, Esq., on the administrative case because it was duplicative. *Id*.

On the federal invoice, Plaintiff deleted all work that could be considered secretarial or paralegal. *Id.* at ¶ 48. She deleted hours spent preparing photocopies and chamber copies of filings. *Id.* She deleted payments to the Clerk for Ms. Dettling's admission pro hac vice and Ms. Bloom's admission pro hac vice ($1000). *Id.* She deleted time researching pro hac vice admission in the Ninth Circuit, reading the Court's decisions, and analyzing Court Orders. *Id.* She deleted time drafting Ms. Dettling application pro hac vice, researching the Local Rules,

18

drafting Ms. Bloom's application, and reviewing the Federal Rules of Civil Procedure. *Id.* She deleted fees paid to the DC Bar, New York Bar, Maryland Bar, and Alaska Bar for Certificates of Good Standing. *Id.* She deleted time spent on emails to the Court Reporter, Clerk's Office, Attorney Admissions, and Deputy Clerk. *Id.* She reduced her travel time. Most trips to Los Angeles are more than ten hours door-to-door. When she did travel to Los Angeles, she used the "airplane" time to prepare for oral arguments.[1] *Id.* Ms. Dettling deleted time spent preparing and filing the G-120 Form and drafting subpoenas. *Id.* She deleted most time spent responding to Defendant's 120+ emails. She deleted numerous email communications with Plaintiff and Ms. Bloom.

### B.    Unsuccessful Claims

#### 1.    Hostile Work Environment Claim

The hostile work environment claim was raised in the Complaint while Plaintiff represented herself pro se.  Dkt. 1. Ms. Dettling did not bill for any time that predated her admission to the case pro hac vice. Dettling Decl., ¶ 49. The hostile work environment claim was raised in Defendant's Motion to Dismiss. In Plaintiff's opposition motion, Ms. Dettling addressed the hostile work environment claim on six pages. Dkt. 52, pp. 26-31. This time was deducted from the invoice (1.45 hours).

#### 2.    Disability Discrimination Claim

Plaintiff addressed the disability discrimination claim in five pages in her Opposition to Motion to Dismiss [Dkt. 52, pp. 27-31] and in one paragraph in her

---

[1] In the federal case, the trips to Los Angeles originated from the New York area. As stated in Ms. Dettling's prior filing [Dkt 126], she has been working on pro bono cases in New York since 2022. She still maintains her practice in Washington, DC.

19

opposition to Motion for Summary Judgment. Dkt. 76, p. 55. *Id.* Ms. Dettling deducted 3.45 hours. *Id.*

### 3.    Retaliation Claim

Counsel has not reduced time spent on the retaliation claim because that claim is pending a decision on the Motion for Reconsideration. Plaintiff's counsel addressed the retaliation claim in three pages in her Opposition to Motion to Dismiss (1.3 deducted hours). Dkt, 52, pp. 1-11, 22**.** Plaintiff addressed the claim in one paragraph in her Opposition to Motion for Summary Judgment (.45 deducted minutes). Dkt. 76, pp. 57-58.

## IX.    AN ACROSS-THE-BOARD REDUCTION

An across-the-board deduction is not warranted based on the unsuccessful claims because the hostile work environment and disability discrimination claims have already been deducted from the invoice. Dettling Decl., ¶ 50. The successful failure to accommodate claim and the unsuccessful retaliation claim are so factually interrelated that it would be impossible to separate one claim from another. The claims are not distinct and separate for attorneys' fee purposes. The only fees that are based solely on the retaliation claim is time spent on the Post-trial Brief [Dkt. 162] and Motion for Reconsideration [Dkt. 172].

## X.    COSTS

Plaintiff filed an Application to Tax Costs pursuant to Federal Rule of Civil Procedure 54 on February 19, 2025. That Application seeks reimbursement of costs that fall within the ambit of Rule 54. Plaintiff seeks herein any costs which are not taxed pursuant to Federal Rule of Civil Procedure 54. The instant Motion seeks recovery of costs ($13,841.06) incurred since October 2017 that are not compensable pursuant to Rule 54, but which would constitute compensable litigation costs and expenses pursuant to the Rehabilitation Act.

20

Plaintiff requests $12,871.46 in travel costs and $469.60 for copies of exhibits used at trial by counsel. Dettling Decl., ¶ 52. The travel was for the following six trips to Los Angeles between 2017 and 2025: (1) November 7-16, 2024 (Jury Trial/Bench Trial), November 12-15, 2024, Total: $6,629.59; (2) October 20-22, 2024 (Motions in Limine Oral Argument, Pre-trial Conference), October 21, 2024), Total: $1,510.45; (3) Travel August 27-28, 2024 (Motion for Summary Judgment, Oral Argument), Total:$1,276.78; (4) Travel October 25-26, 2023 (Scheduling Conference, October 26, 2023), Total: $841.91; (5) Travel July 26-29, 2023: (Motion to Dismiss, Oral Argument), Total: $934.09; (6) Travel October 10-13, 2018 (Depositions, October 11-12, 2018), Total: $1,678.65. *Id.*, Ex. M. One trip to Los Angeles in April 2018 was to depose Defendant's witnesses. One trip to California was for a status conference. Dettling Decl., ¶ 53. Ms. Dettling traveled to Los Angeles on three other occasions to attend oral arguments that Defendant initiated: Defendant's Motion to Dismiss, Defendant's Motion for Summary Judgment, Defendant's Motion in *Limine* #1, and Defendant's Motion in *Limine* #2. *Id.* Ms. Dettling traveled to Los Angeles for the trial. Each of these appearances was mandatory. *Id.* Ms. Dettling incurred these costs because Plaintiff was not able to find a local attorney who would take the case. Dettling Decl., ¶ 23.

Plaintiff also incurred $500 for a PowerPoint presentation used at trial. *Id.* at ¶ 54, Ex. N.

## XI.    CONCLUSION

For the above-stated reasons, Plaintiff respectfully requests that the Court award Plaintiff:

- $232,030 in attorney fees for the administrative proceeding,

- $473,720 for Ms. Dettling's work on the federal case (which includes $94,380 in travel time);

- $61,789 for Ms. Bloom's work on the federal case; and

1    - $13,841.06 in costs.

2    Total attorney fees: $767,539.00.

3    Total Costs: $13,841.06.

4    Total fees and costs: $781,380.06. Plaintiff included a Chart of Fees and

5    provided an Excel copy to Chambers. Dettling Decl., Ex. O.

6    The amount requested in attorney fees and costs is reasonable for the stated

7    reasons in the declarations and in those set above.

8    Date: March 6, 2025

9

10                              Respectfully Submitted,

11                              */s/ Rosemary Dettling*
                                Rosemary Dettling, Esq.
12                              Admitted Pro Hac Vice
                                Federal Employee Legal Services Center
13                              1629 K Street, NW, Suite 300
                                Washington, DC 20006
14                              Tel. 202-390-4741
                                rdettling@felsc.com
15

16

17                              Attorney for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5

# **CERTIFICATE OF SERVICE**

6
7
8

I certify that on March 6, 2025, the Motion for Attorney Fees was served on the Court and the following Defendant's representatives per the Court's e-file system:

9
10
11

JONATHAN RUSSELL BLAKEY
Assistant United States Attorney
Attorney for Defendant

12
13
14

MATTHEW SMOCK
Assistant United States Attorney
Attorney for Defendant

15
16

*/s/ Rosemary Dettling*

17
18
19
20
21
22
23
24
25
26
27
28

23

Rosemary Dettling, Esq.
Admitted Pro Hac Vice
Federal Employee Legal Services Center
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 390-4741
Email: rdettling@felsc.com

Sara L. Bloom, Esq.
Admitted Pro Hac Vice
Law Office of Sara Bloom
1120 Huffman Rd Ste 24-785
Anchorage, AK 99515
Telephone: (907) 519-3613
Email: sara@907lawyer.com

Counsel for Plaintiff Roylan G. Damwyk

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROYLAN G. DAMWYK,<br><br>Plaintiff,<br>v.<br>FRANK KENDALL, III., ET AL.,<br>Defendants | Case No.: 2:22-cv-04424-GW-SK<br><br>**DECLARATION OF ROSEMARY DETTLING IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>**Hearing Date: April 10, 2025**<br>**Hearing Time: 10 a.m.**<br>**Ctrm: 5B**<br><br>**Honorable Hernán D. Vera**<br>**United States District Judge** |

1

**DECLARATION OF ROSEMARY DETTLING IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

I, Rosemary Dettling, Esq., declare as follows:

1.      I am an attorney admitted pro hac vice in the *Damwyk v. Kendall, III*, case. I have represented Plaintiff Roylan G. Damwyk since October 2017.  I make this Declaration in support of Plaintiff's Motion for Attorney Fees and Costs as the prevailing party in her failure to accommodate case under the Rehabilitation Act of 1973.

2.      I have personal knowledge of the facts set forth herein and, if called as a sworn witness, could and would testify competently. I have served as lead counsel throughout Ms. Damwyk's representation.

3.      I have actively practiced employment law since 1991.  I am currently admitted to the District of Columbia Bar and the New York Bar. I divide my practice between DC and New York.

4.      I am admitted to practice before the U.S. Court of Appeals, District of Columbia; the Federal Circuit; the District of Columbia District Court; the District of Columbia Superior Court; and all New York state courts.

5.      I spoke with Defendant's counsel about this motion on February 11, 2025, for 47 minutes prior to filing it. The parties were unable to come to a resolution.

**Education and Work Experience**

6.      In September 1988, I entered law school at Notre Dame Law School. I graduated in 1991. Prior to graduation, I interned with the Summit County Prosecutor's Office in Akron, Ohio. I interned with Judge William K. Thomas of the U.S. District Court for the Northern District of Ohio. I also worked at Latham & Watkins LLP in Chicago, Illinois.

2

7. After graduation from law school, I accepted an offer with the U.S. Department of Justice (DOJ), Civil Rights Division, in Washington, DC. While at DOJ, I worked in the Office of Special Counsel for Immigration-Related Unfair Employment Practices and later in the Complaint Adjudication Office. I was employed by DOJ from 1991 to 2000.

8. While working at DOJ, I handled outside pro bono cases with the Washington Area Lawyers for the Arts and earned a Master of Arts degree in Literature from American University in 1998.

9. From 2000 to 2002, I worked at the U.S. Department of Commerce, Office of Chief Counsel. I defended the agency in Equal Employment Opportunity Commission (EEOC) cases and Merit Systems Protection Board (MSPB) appeals. The Department assigned me first chair responsibility in trying these cases, and I was successful in all of them.

10. From 2002 to December 2006, I worked at the U.S. Department of Transportation. I defended the agency in EEOC and MSPB cases. The Department assigned me first chair responsibility in trying these cases. I was successful in all of them.

**Federal Employee Legal Services Center**

11. In January 2007, I founded the Federal Employee Legal Services Center (FELSC). FELSC is a public interest law firm located in Washington, DC. *See* www.felsc.com. It was my aim in creating FELSC to provide the same caliber of representation to individuals whose civil rights and civil liberties have been violated as they would receive from private attorneys.

12. The great majority of my clients who have been fired or otherwise discriminated against are unable to pay hourly fees or virtually any attorneys' fees.

I accept cases from clients unable to pay my fees, such as Ms. Damwyk, expecting to obtain a fee only by prevailing. I do this because of my personal commitment to civil rights and workplace fairness, and in anticipation that I will be awarded appropriate compensation by the courts and agencies where I appear through statutory fees. Because of the time and energy I spend on each case, I am not able to take on that many cases.

13.     Based on my ability and experience, I could command market rates for attorneys in complex litigation on a regular basis if I did not choose to devote my time to representing indigent, low-income, and middle-class victims of discrimination.

14.     I have helped hundreds of federal employees in EEOC discrimination cases, MSPB appeals, disciplinary responses, disciplinary appeals, mediations, arbitrations, settlement negotiations, retirement applications, immigration appeals, veterans' appeals, OPM appeals, labor disputes, union grievances, wage disputes, FMLA requests, accommodation requests, CIA investigations, USERRA appeals, and workers' compensation applications.

15.     I have three contract attorneys, a paralegal, and a secretary.

16.     I obtain referrals from law firms, courts, and clients.

**Experience in Federal Court**

17.     The majority of my work takes place before the EEOC and MSPB in bench trials.

18.     I settled two federal court cases in the U.S. District Court, District of Columbia (*Degefu v. Veterans Administration*, 1:2020cv03548, and *Munro v. LaHood*, 1:2011cv00098). Both cases were filed under the Rehabilitation Act. In March 2024, I filed a cross-motion for summary judgment in *Grindstaff v.*

4

*Guzman*, 1:2021cv02373, in the District Court in DC. The case was filed under the Rehabilitation Act. The cross-motion is pending. I had one prior jury trial.

### Facts Related to *Damwyk v. Kendall, III*

19.    I performed all legal work in Ms. Damwyk's case from October 2017 until Sara Bloom, Esq. was admitted pro hac vice in October 2024. Another attorney, Kristen Farr, Esq., worked on the case in 2018 during the administrative proceeding, but I deducted her time from the invoice.

20.    In September 2017, Ms. Damwyk asked me to represent her in a failure to accommodate case. She paid a minimal retainer fee.

21.    On October 3, 2017, Ms. Damwyk timely contacted the agency's EEO Office to allege failure to accommodate dating back to June 2016. I repeated the allegation when I filed her formal complaint. When the agency refused to accept the failure to accommodate claim dating back to June 2016, I had no choice but to zealously represent Ms. Damwyk and do whatever I could to get the agency, and later the EEOC, to correct the accepted issues.

22.    When Ms. Damwyk expressed interest in filing her case in federal court, I encouraged her to find a trial attorney in Los Angeles who had trial experience in the Central District of California. I helped Ms. Damwyk compile a list of law firms to contact. Ms. Damwyk told me she contacted numerous firms but was unable to secure representation.

23.    I agreed to file an application for admission pro hac vice in April 2023, ten months after Ms. Damwyk filed her Federal Complaint, because she said she was unable to find an attorney in Lompoc, California, or Los Angeles, who would take her case on a pro bono or contingency basis. Damwyk Decl., p. 1. Based on what

5

Ms. Damwyk told me, the case was not desirable to local attorneys. I agreed to represent her on a pro bono basis after October 2017.

24.    I worked on Ms. Damwyk's case for over seven years without any guarantee of being paid. From 2017 to 2025, I turned away many potential clients due to the expenditure of time.

25.    This case was complex because of Defendant's repeated attempts to get the case dismissed and its refusal to accept the correct claim. Defendant's counsel vigorously represented Defendant throughout the seven and a half years. The case was also difficult because so much time had elapsed between the events in 2016 and the jury trial in November 2024. Some witnesses were no longer available. Other witnesses could not remember facts.

26.    The case required an attorney who was familiar with the Rehabilitation Act, federal sector accommodation policies, and the responsibilities of federal agency managers.

**Customary Fees and Submission of Accurate Records**

27.    In the Washington, DC metropolitan area, I am awarded fees under the Fitzpatrick Matrix. **Exhibit A**. The Fitzpatrick Matrix is used by DOJ's U.S. Attorney's Office for the District of Columbia, Civil Division, in complex litigation in the District of Columbia. *Id.* In 2022, the courts began using the Fitzpatrick Matrix instead of DOJ's prior *Laffey* Matrix. **Exhibit B**. I am routinely awarded Fitzpatrick rates in administrative cases outside of DC, just as I was previously awarded *Laffey* rates outside of DC.

28.    My current Fitzpatrick rate is $861 per hour. **Exhibit A**. The Fitzpatrick rates are higher than DOJ's prior *Laffey* Matrix, but lower than the LSI Laffey Matrix used by many employment/labor attorneys. Under the LSI Laffey Matrix, I

6

could request $1141 an hour. **Exhibit C**.

29.     Although I have not been awarded fees in the Central District, I have received awards of attorney fees in numerous other complex employment cases. Some examples are:

>   A.     In *Kyle S. v. Dept. of Agriculture*, EEOC Appeal No. 2019005694 (July 26, 2021), an EEOC Administrative Judge from San Francisco awarded me $621 per hour (my requested *Laffey* rate) in a failure to accommodate case that arose in Jackson Hole, Wyoming. **Exhibit D**. The Administrative Judge did not reduce my fees, although the OFO reduced fees on appeal. *Id.*

>   B.     In *"John Doe" v. Voice of America*, EEOC Case No. 570-2019-01608X (July 27, 2022), an EEOC Administrative Judge in Washington, DC, awarded me $752 per hour (my requested rate) based on the 2022 Fitzpatrick Matrix. **Exhibit E**. The Administrative Judge did not reduce my attorney fees. *Id*. The case was filed under Title VII. *Id.*

>   C.     In *Glenna O. v. Air Force*, EEOC Appeal No. 0720180030 (June 23, 2020), an EEOC Administrative Judge in Washington, DC, awarded me $563 per hour (my requested rate) based on the 2019 *Laffey* Matrix. **Exhibit F.** My fees were reduced by less than 2%. After the OFO denied the agency's appeal, the OFO increased my hourly rate to $572 per hour. *Id.*

30.     The last attorney fee award I received was on August 30, 2024. **Exhibit G**. In *"John Doe" v. Federal Bureau of Investigation/DOJ*, AT-0752-17-0799-A-1 (2024), an MSPB Administrative Judge from Atlanta, Georgia, awarded me $690 per hour (my requested rate) based on the rate quoted in my client's 2018 retainer agreement. Unlike the EEOC, the MSPB now awards fees based on the hourly rate agreed upon by the client in the retainer agreement.

31.    The Air Force is aware of my experience and billing rates. In *Glenna O. v. Air Force*, *supra*, the EEOC determined that the U.S. Air Force subjected my client to sexual harassment, retaliation, and constructive discharge. **Exhibit F.** The EEOC ordered the Air Force to reinstate my client, reinstate her licensing privileges, provide back pay for five years, and reimburse her for adverse tax consequences. *Id.* The judge also ordered the Air Force to promote my client or provide ten years of front pay. *Id.* The judge awarded $125,000 in compensatory damages, expert witness fees, interest on fees, travel fees to and from the United Kingdom, expungement of my client's personnel records, attorney fees, costs, witness fees, and attorney fees as a discovery sanction. *Id.*

32.    My experience in employment litigation is not limited to Title VII and Rehabilitation Act cases. On January 31, 2024, in "*John Doe" v. Department of Veterans Affairs*, the Chief Judge of the MSPB's Denver Regional Office determined that the VA terminated my client after he reported fraud and abuse. **Exhibit H**. Attorney fees have not yet been awarded because the agency's appeal is pending.

### Prevailing Market Rates in Los Angeles

33.    I am aware that in determining the appropriate hourly rate, the "relevant community" is the district in which the lawsuit is pending. In this case, the Central District of California is the appropriate community.

34.    I request an hourly rate of $1000. $1000 is consistent with awards in other civil rights cases. *See Craig v. County of Orange*, 2019 WL 12378994, at *2 (C.D. Cal. Sep. 5, 2019) ($1,000 per hour is a reasonable hourly rate for an attorney with thirty-five years of experience); *see also McKibben v. McMahon*, 2019 WL 1109683, at *14 (C.D. Cal. Feb. 28, 2019 (approving adjusted lodestar rates

8

of $887 to $1,230 per hour for attorneys practicing civil rights litigation with 26 to 49 years of experience, and the range of $738 to $1,200 per hour for attorneys practicing civil rights litigation with 23 to 33 years of experience).

35.     I discussed hourly rates with civil rights attorneys in the Central District prior to submitting this petition. Paula Pearlman, Esq., a distinguished disability rights attorney in Los Angeles and a fee specialist, reviewed my qualifications and compared them to awards granted to employment attorneys in the Central District. Pearlman Decl., ¶¶ 22-24. She agreed that an award of $1000 per hour was an appropriate hourly rate, if not low. *Id.* at 21. She stated that:

> As a 1991 graduate, practicing for approximately 33-34 years, it is my understanding that Ms. Dettling is requesting an hourly rate of $1000. In my experience, the $1000/hour rate for Ms. Dettling is well within the range for the current reasonable rate for an attorney of her skill, experience and reputation in Los Angeles, if not somewhat low. My opinion is based on comparisons to rates approved for attorneys of comparable skill, experience and reputation in the Los Angeles legal market and my review of past fee awards.

*Id.*

36.     Ms. Pearlman stated that:

> Based on my review of the docket in the case, motions and orders that were provided to me and which I retrieved from Pacer, Ms. Dettling has specialized knowledge of both disability rights employment law, and federal employment practices. I am of the opinion that she is a highly skilled and experienced attorney in the area of disability rights and employment litigation.

*Id.* at 20. Ms. Pearlman also stated that:

> For this case, both Richard Pearl and Carol Sobel, recognized experts in attorney's fees motions, provided me with their most recently filed declarations, with attachments including court orders, to review to form an opinion regarding Rosemary Dettling's hourly rate and to prepare this declaration.

*Id.* at 16.

37.     In support of her recommendation, Ms. Pearlman provided a 2023 Order from the Los Angeles Superior Court awarding fees in *Contreras v. Kelly Pipe Co.*, Case No. 21STCV17933, 2023 Cal. Super. LEXIS 64818, to attorneys at Shegerian & Associates in an employment discrimination case. *Id.*, Exhibit B. The four top billing attorneys in *Contreras* and the rates approved were Carney Shegerian at $1350 an hour; Anthony Nguyen at $1100 an hour; (3) Mahru Madjidi at $900 an hour; and Bryan Kirsh at $825 an hour. *Id. at* 20, 28.  The experience of each attorney is: Carney Shegerian – over 30 years; Anthony Nguyen – almost 15 years; Mahru Madjidi – 10 years; and Bryan Kirsh – 6 years. *Id.* 20.

38.     Ms. Pearlman relied on two other cases when assessing my hourly rate. Ms. Pearlman referred to an order awarding attorney fees in *Paola French v. City of Los Angeles (French II)*, EDCV 20-0416 JGB (SPx) (C.D. Cal. Feb. 21, 2024). Pearlman Decl., Exhibit C. In *French*, the Court approved fees for attorneys at the Law Office of Dale Galipo. *Id.* The approved 2023 rate for John Fattahi was $975 an hour, who is a 2006 graduate. *Id.* The rate approved for Mr. Fattahi in *French II* is just under the same rate now requested here, even though I have significantly more years of experience. *Id.* Ms. Pearlman also based her recommendation on *C.L., an individual, v. Del Amo Hospital, Inc., et al.*, Case No. 8:18-CV-00475-DOC (DFMX). *Id.*, Exhibit D. In *C.L.*, the Central District found $1000 per hour

reasonable for 28-year-old attorney, Christopher Knauf, who is a 1996 graduate. *Id.*

39.     The 2023 Real Rate Report for Los Angeles-based employment attorneys states that $981 per hour is an appropriate "2023" rate for someone with my experience. **Exhibit I** (2023 Real Rate Report: An Analysis of Law Firm Rates, Trends, and Practices, WOLTERS KLUWER (2023 ed.) (the "Real Rate Report"). The site Legal-10 shows that employment practitioners in Los Angeles with 25+ years' experience charge up to $1070 per hour. https://www.legal.io/pricing-tool/hourly-rates/los-angeles/employment-and-labor-law, **Exhibit J**.

40.     In lieu of an upward adjustment, I request current rather than historical rates. The seven-and-a-half-year delay in payment is significant.

### Reasonableness of Fees in the Administrative Case

41.     Ms. Damwyk requests $232,030 for work completed during the administrative proceeding (232.03 hours x $1000). **Exhibit K**. I performed all the invoiced work at the administrative level. The fees were based solely on the "failure to accommodate" claim. Reasonable fees were spent on the following stages of litigation:

Building a Case: Ms. Damwyk requests 29.28 hours for time spent evaluating her case, participating in the informal complaint process, compiling information, facts, and evidence to support her claims, gathering documents, consulting with Ms. Damwyk, consulting with Defendant's EEO Office, filing a hearing request, writing letters and emails to the EEO Office, and writing emails and letters objecting to the accepted issues.

EEO Investigation: Ms. Damwyk requests 11.06 hours for time spent participating in Defendant's investigation and preparing Ms. Damwyk for the investigation.

Discovery: Ms. Damwyk requests 65.64 hours for time spent drafting discovery requests, following up on discovery, informally compelling disclosure of documents, taking depositions, discussing depositions with Ms. Damwyk and the agency, and reviewing deposition transcripts. I had to zealously engage in discovery to obtain the information Ms. Damwyk needed to prevail in her case. The investigative report was not helpful because the investigator investigated three issues that Ms. Damwyk never raised. I traveled to Lompoc, California, in October 2018 to conduct depositions. Because the deposition testimony was used in Ms. Damwyk's opposition to Defendant's Motion for Summary Judgment [Dkt. 76], I did not need to take depositions in the federal case. Discovery was not duplicated. The deposition transcripts were submitted to the Court as potential trial exhibits in case Ms. Damwyk needed them for impeachment.

Motions Practice: Ms. Damwyk requests 54.48 hours for time spent filing motions with the EEOC and responding to motions: Response to Agency Response to Administrative Judge's Initial Order (2.50); Response to AJ's Order (10.55); Motion for Summary Judgment (18.75); Motion for Default Judgment (18.12); and Motion for Stay (4.56).

Settlement: Ms. Damwyk requests 10.37 hours for time spent during the settlement phase of litigation. This phase involved regular communication with Ms. Damwyk through email, telephone, and other written correspondence, as well as with opposing counsel and the EEOC.

12

EEOC/OFO Appeal: Ms. Damwyk requests 20.22 hours for time spent analyzing the entire record, researching case law, writing an appeal to the EEOC's Office of Federal Operations, and reviewing Defendant's response.

Case Management: Ms. Damwyk requests 15.40 hours of time spent reviewing court orders, corresponding with the EEOC, researching the procedural issues raised by Defendant, corresponding with agency counsel, Ms. Damwyk, and the EEOC, reading the report of investigation, and filing and reading notices of representation.

Travel: Ms. Damwyk requests 26.40 hours of time spent traveling from Washington, DC, to Los Angeles, and then to Lompoc, California, for depositions, and back again.

Total: 232.03 hours x $1000 = $232,030. **Exhibit K**.

42.    During the litigation of the administrative proceeding, a reasonable amount of time was spent opposing Defendant's procedural arguments.

43.    Although Ms. Damwyk was not successful at the administrative level, the arguments she made during the administrative proceeding were validated by the Court and by the jury. The Court agreed that Ms. Damwyk exhausted her administrative remedies and filed a timely EEO complaint. The jury concluded that Defendant failed to accommodate Ms. Damwyk. Plaintiff's counsel should not be penalized for how long this process took—if the agency had corrected the accepted issues in January 2018 after it issued its incorrect "acceptance letter," the case may have been resolved in 2018, and the Court could have preserved its judicial resources.

**Reasonableness of Fees in the Federal Case**

44.    Reasonable fees were spent on the following stages of the federal case:

13

<u>Motions Practice</u>: Ms. Damwyk requests 80.88 hours for motions practice. This time includes successfully opposing Defendant's Motion to Dismiss (23.75 hours) and Motion for Summary Judgment (35.29) hours). The opposition to the Motion for Summary Judgment was difficult because Defendant raised 130 "undisputed" facts. The facts required a significant amount of time consulting with Ms. Damwyk and cross-checking documents before responding and providing citations to the Court. Ms. Damwyk successfully opposed Defendant's Motion in Limine #1 (7.2 hours), Defendant's Motion in Limine #2 (8.34 hours), and Defendant's Motion for Reconsideration (6.3). This critical phase of the litigation involved extensive drafting and reviewing of Ms. Damwyk's opposition papers. It involved follow-up legal and factual and legal research and analysis. The review and research began during the administrative process, but because the rules and case precedent were different in the Central District, the opposition motions required new research. The significant expenditure of attorney attention was required because of the importance of keeping the case from getting dismissed. All of the response motions required tight deadlines, oral arguments, and travel to Los Angeles. Although I did not bill for this time, I spent a significant amount of time memorizing the Local Rules, the Court's Orders, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.

<u>Discovery</u>: Ms. Damwyk requests 43.98 hours devoted to the discovery phase of litigation. My billing includes time spent drafting discovery, responding to discovery requests, attending Ms. Damwyk's deposition, preparing Ms. Damwyk for her deposition, and reviewing Ms. Damwyk's discovery responses. Discovery was contentious due to Defendant's failure to respond to any of Ms. Damwyk's discovery questions. Instead of filing a motion to compel with a magistrate judge, I

14

called Defendant's counsel and set up a meet and confer. I then sent two letters to Defendant, one 32-pages, explaining in great detail each reason Defendant's objections were inappropriate. I wanted to resolve the discovery dispute informally, without involving the Court. My efforts were successful, as Defendant finally complied with my requests and supplemented its discovery.

Settlement: Ms. Damwyk requests 16.89 hours for time spent on settlement negotiations. The parties attended a Court-ordered mediation on September 11, 2024. This involved preparation for the mediation with Ms. Damwyk, a mediation statement, attendance at the mediation, and a follow-up email to Defendant in an attempt to continue negotiations., in addition to phone calls with the mediator. The parties attended a second formal court-ordered settlement conference with Magistrate Judge Karen L. Stevenson on November 2, 2024. The settlement conference required preparation and settlement statements. The statement I submitted to Judge Stevenson was very detailed, according to her instructions. I spent time on settlement discussions with Ms. Damwyk before and after the settlement conference. I conducted research to see if the Ninth Circuit permits settlement on the merits with the attorney fees being resolved by the Court. I thought that would be a good way to settle the case without going to trial. Research was also conducted regarding Ninth Circuit precedent on payment of fees for administrative proceedings. I counseled Plaintiff on the benefits of settlement.

Trial Preparation: Ms. Damwyk seeks recovery of 161.34 hours for pre-trial work. The breakdown is as follows: She requests 113.07 hours for my time drafting and revising of key trial documents, including her Exhibit List, Amended Exhibit List, Witness List, Amended Witness List, Evidentiary Appendix, Verdict Form, Proposed Jury Instructions, Amended Jury Instructions, Proposed Pre-trial

15

Order, as well as subpoenas, witness questions, an objection to Defendant's Amended Memorandum of Point's and Authority of Facts and Law. Time was spent meeting with witnesses and prepping Ms. Damwyk for trial. Time was spent reviewing Defendant's drafts and amended drafts. I drafted trial questions for Roylan G. Damwyk, Martin Damwyk, Neil Damwyk, Richard Nocis, Hank Dederding (deducted), Betsy Torres, Charles Smith (deducted), Patrick Maloy, Robert Corser, Jason Turner, Thomas Chiavacci, Arlene Quichocho, and Jolene Cantrell.

Ms. Bloom billed 48.27 hours for pre-trial work after she entered the case on October 17, 2024. She spent this time reviewing trial documents and preparing witnesses.

Trial: I billed 40.39 hours for trial (32.50  hours in trial and an additional 7.89 hours preparing for trial on the evenings of November 12, 13, and 14, 2024).

Ms. Bloom billed 37.75 hours (32.50 hours in trial and 5.25 hours preparing for trial on the evenings of November 12, 13, and 14, 2024).

Post-trial Brief: Ms. Damwyk requests recovery of 20.57 hours of time spent working on the Post-trial Brief (18.4 hours for my time) and 2.17 hours for Ms. Bloom's time reviewing it.

Motion for Reconsideration: Ms. Damwyk requests 20.57 hours for time spent drafting and filing her Motion for Reconsideration (18.4 hours for the time I worked) and .57 hours for Ms. Bloom. I spent far more time on this motion, but after looking at attorney fees awards in the Central District, I decided to reduce my hours.

Attorneys' Fees Motion: Ms. Damwyk requests 31.18 hours for time spent filing the fee petition (27.18 hours for my work on the motion, my declaration, and attachments), plus 4.0 hours for Ms. Bloom's time preparing her declaration. My

16

time includes time spent conducting legal research; drafting, reviewing, and revising Ms. Damwyk's motion and supporting papers; corresponding with Ms. Damwyk; preparing and securing signed declarations; preparing documentary evidence; and meeting to discuss arguments, strategy, and division of tasks.

Case Management: Ms. Damwyk's counsel spent 19.18 hours performing a myriad other tasks necessary to the successful management of any case. Ms. Detting and Ms. Damwyk met to discuss strategy and arguments, deadlines, and division of tasks. They also corresponded by phone and email to strategize and brainstorm case theories and arguments. I communicated with Ms. Damwyk frequently, as she wanted to be, and deserved to be, informed case development. We discussed case goals and strategies; and discussed motions and the briefing schedule. I prepared the Bill for Costs. I drafted and served Ms. Damwyk's Initial Disclosures and Amended Initial Disclosures.

Travel: I spent 94.38 hours traveling to Los Angeles for trial, for a scheduling conference, and for oral arguments on four of Defendant's motions. The travel was necessary because all appearances were mandatory. Ms. Damwyk hired me in 2017 because I had experience litigating federal sector EEOC complaints. The regulations that apply to federal employees are very different from the regulations that apply to private sector employes. She told me she was not able to find any attorneys who litigated cases before EEOC administrative judges. After Ms. Damwyk filed a Complaint, pro se, in this Court , I encouraged her to find a local attorney in Los Angeles who had litigation experience in federal court and who had prior cases in the the Central District. Ten months after Plaintiff filed her Complaint, I agreed to seek admission pro hac vice. I knew she would not be able to respond to Defendant's Motion to Dismiss. I knew I was making a significant

17

financial investment in the case with no guarantee of recouping any fees or costs. Ms. Damwyk provided a declaration stating she was unable to find a local attorney who specialized in federal sector employment discrimination who could represent her on a pro bono or contingency basis. *See* Declaration of Roylan G. Damwyk, . Ms. Damwyk also stated it was difficult to find an attorney who specialized in federal sector employment discrimination. *Damwyk Decl.,* ¶¶ 3, 5-8. Given my years working for the federal government and my years working for federal employees, I have a unique skillset..

46.    Attorney Paula Pearlman addressed the need for out-of-town counsel when she stated in her declaration that:

> Ms. Dettling practices in a very specialized area of law. There are very few employment attorneys in the Los Angeles area that represent federal employees. I am regularly asked to consider a disability employment case, or make an appropriate referral to a lawyer for a federal employee. I have found it exceedingly difficult to refer people making these inquiries to the plaintiff's employment bar because there are so few attorneys that represent federal employees.

Pearlman Decl., at ¶ 19.

## Deductions from Invoices

47.    I deleted 1.6 hours from the administrative invoice for conversation with witnesses in April 2018 because the entry was vague and did not name the witnesses. I deleted work performed by FELSC attorney Kristen Farr, Esq.

48.    I deleted entries on the federal invoice that occurred before I was admitted pro hac vice. I did not bill for assistance offered to Ms. Damwyk between Dkt. 1 and Dkt. 42. I deleted all work that could be considered secretarial or paralegal. I deleted hours spent preparing photocopies and chamber copies of filings. I deleted

18

payments to the Clerk for my admission pro hac vice and Ms. Bloom's admission pro hac vice ($1000). I deleted time researching pro hac vice admission in the Ninth Circuit. I deleted time drafting my application pro hac vice, researching the Local Rules as they apply to pro hac vice admission, drafting Ms. Bloom's application, and reading and re-reading the Court's Orders. I deleted fees paid to the DC Bar, New York Bar, Maryland Bar, and Alaska Bar for certificates of good standing. I deleted time spent on emails to the Court Reporter, Clerk's Office, the Court's Chambers, Attorney Admissions, and the Deputy Clerk. I deleted time spent preparing and filing the G-120 Form.

**Unsuccessful Claims**

49.    I deleted the following entries that relate to the unsuccessful claims:

      A.    Hostile Work Environment Claim

The hostile work environment claim was raised in the Complaint while Ms. Damwyk represented herself pro se.  Dkt. 1. I did not bill for any time that predated my admission to the case pro hac vice. The hostile work environment claim was raised in Defendant's Motion to Dismiss. In the opposition motion, I addressed the hostile work environment claim on six pages. Dkt. 52, pp. 26-31 and very briefly at oral argument (one or two questions). The time was deducted from the invoice (1.45 hours).

      B.    Disability Discrimination Claim

The disability discrimination claim was raised in response to Defendant's Motion to Dismiss and Motion for Summary Judgment. I addressed the claim in five pages in my Opposition to Defendant's Motion to Dismiss [Dkt. 52, pp. 27-31] and addressed it in one paragraph in my Opposition to Defendant's Motion for Summary Judgment. Dkt. 76, p. 55. I deducted 3.45 hours.

### C.      Retaliation Claim

Counsel has not reduced the time spent on the retaliation claim because that claim is pending a decision on the Motion for Reconsideration. I addressed the claim on three pages in the Opposition to Motion to Dismiss (1.3 hours). Dkt, 52, pp. 1-11, 22**.** I also addressed the claim in one paragraph in my Opposition to Motion for Summary Judgment (.45 minutes). Dkt. 76, pp. 57-58. The only fees that were based solely on the retaliation claim were fees related to the Post-trial Brief and Motion for Reconsideration. Dkt. 162, 172. No questions were asked at trial that pertained solely to the retaliation claim.

### An Across-the-Board Reduction

50.     An across-the-board reduction is not warranted based on unsuccessful claims because the hostile work environment claim and disability discrimination claim were deducted from the invoice. The successful failure to accommodate claim and the unsuccessful retaliation claim were interrelated and involved the exact same set of facts. Each fact that was relevant to the accommodation claim was relevant to the retaliation claim. The claims are not distinct and separate for attorneys' fee purposes. As noted above, the only fees which were based solely on the retaliation claim were the Post-trial Brief and Motion for Reconsideration.

### Costs

51.     I filed an Application to Tax Costs pursuant to Federal Rule of Civil Procedure 54 on February 19, 2025. That Application seeks reimbursement of costs that fall within the ambit of Rule 54. The instant Motion seeks recovery of costs ($13,841.06) incurred since October 2017. They constitute compensable litigation costs and expenses pursuant to the Rehabilitation Act.

20

52.     Ms. Damwyk requests $12,871.46 in out-of-pocket travel costs and $469.60 for copies of s used at trial by counsel. **Exhibit M**. The travel was for the following six trips to Los Angeles between 2017 and 2025: (1) November 7-16, 2024 (Jury Trial/Bench Trial), November 12-15, 2024, Total: $6,629.59; (2) October 20-22, 2024 (Motions in Limine Oral Argument, Pre-trial Conference), October 21, 2024), Total: $1,510.45; (3) Travel August 27-28, 2024 (Motion for Summary Judgment, Oral Argument), Total: $1,276.78; (4) Travel October 25-26, 2023 (Scheduling Conference, October 26, 2023), Total: $841.91; (5) Travel July 26-29, 2023: (Motion to Dismiss, Oral Argument), Total: $934.09; (6) Travel October 10-13, 2018 (Depositions, October 11-12, 2018), Total: $1,678.65. *Id.,* pp. 1-3.

53.     One trip to Los Angeles in April 2018 was to depose Defendant's witnesses. One trip to California was for a status conference. I traveled to Los Angeles on three occasions for oral arguments on Defendant's Motion to Dismiss, Motion for Summary Judgment, Motion in Limine 1, and Motion in Limine 2. I flew to Los Angeles for the Pre-trial Conference. Finally, I traveled to Los Angeles for the trial. Each of these appearances was mandatory. I incurred this travel because Ms. Damwyk was not able to find a local attorney who would take the case on contingency or pro bono. Damwyk Decl., ¶¶ 3, 508, Exhibit A.

54.     Ms. Damwyk also included an invoice for a $500 for a PowerPoint presentation. **Exhibit N**. This was included in the Bill for Costs but Defendant objected to it. Finally, she included a Chart of Fees. **Exhibit O**.

### Authentication of Billing

55.     My billing records are attached to this declaration. **Exhibits K, L**. I regularly use Bill4Time.com and Practice Panther to generate billing reports. The billing

records in this matter are the business records of FELSC, and they are kept in the regular course of the firm's billing.

56.    The billing records were prepared using Bill4Time, which is a software program that tracks time and expense entries. I use Bill4Time to generate billing reports that indicate the date on which the task was performed, the name of the billing professional who performed the task, a description of each task performed, and the amount of time spent on each task. All time entries are entered on the day the work is completed.

57.    The billing records include detailed descriptions of the work I performed on this matter and the time spent on each task, as well as the work I performed on the fee motion.

58.    I have examined the services and hours spent on this matter as reflected in the attached invoices to ensure that they comport with contemporaneous records, documents, and correspondence in my litigation file. I reviewed each entry to determine if it was duplicative.

### Degree of Success

59.    The most critical factor to a reasonable attorneys' fee under the Rehabilitation Act is the degree of success obtained, and the amount of damages awarded. Rehabilitation Act of 1973, § 505(b), 29 U.S.C.A. § 794a(b). In this case, the jury returned a quick, unanimous verdict in favor of Ms. Damwyk's failure to accommodate case. The jury awarded Ms. Damwyk $250,000 in compensatory damages. That is an excellent result for a federal employee. All of the time expended was reasonable and necessary to prevail on behalf of Ms. Damwyk.

### Sara Bloom, Esq.

22

60.    Sara L. Bloom, Esq. entered the case pro hac vice on October 17, 2024. She also participated in the case on a pro bono basis. Ms. Bloom provided critical skills in trial advocacy.

61.    Ms. Bloom did not bill for any time prior to entering the case pro hac vice.

62.    I reviewed Ms. Bloom's invoice and determined that it was accurate.

## Lodestar

63.    The lodestar is:

| Billing Professional | Title | Rate |
|---|---|---|
| Rosemary Dettling | Senior Counsel | $1000 |
| Sara L. Bloom | Co-counsel | $700 |

## Total Relief Sought

64.    Plaintiff provided a Chart of Fees at **Exhibit O** and an Excel version. Multiplying the hours reasonably spent by the reasonable hourly rate for each attorney, the Court should calculate the lodestar as follows:

- $232,030 in attorney fees for Ms. Dettling's work during the administrative proceeding,

- $473,720 for Ms. Dettling's work on the federal case (which includes $94,380 in travel time);

- $61,789 for Ms. Bloom's work on the federal case; and

- $13,841.06 in costs,

Total attorney fees: $767,539.00

Total fees and costs: $780,505.06.

Ms. Damwyk respectfully requests that the Court award Ms. Damwyk

the requested attorney fees and costs. They are reasonable based on counsel's experience, the duration of the litigation dating back to 2017, similar awards to comparable attorneys, and the benefits Ms. Damwyk received.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 6, 2025.

*/s/ Rosemary Dettling*
Rosemary Dettling, Esq.
Pro Hac Vice
Federal Employee Legal Services Center
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 390-4741
Email: rdettling@felsc.com

24

## **CERTIFICATE OF SERVICE**

I certify that on March 6, 2025, the Declaration of Rosemary Dettling, Esq. was served on the Court and the following parties by electronic filing through the Court's ECF System:

Jonathan Blakey, Esq.
Matthew Smock, Esq.

Attorneys for Defendant
Frank Kendall, III, in his
official capacity as the
Secretary of the U.S. Air Force

*/s/ Rosemary Dettling*
Rosemary Dettling

25

EXHIBIT A

## THE FITZPATRICK MATRIX

Hourly Rates ($) for Legal Fees for Complex Federal Litigation in the District of Columbia

| Years Exp. / Billing Yr. | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35+ | 535 | 563 | 591 | 619 | 647 | 675 | 703 | 731 | 736 | 760 | 807 | 864 |
| 34 | 534 | 562 | 590 | 618 | 646 | 674 | 702 | 729 | 734 | 758 | 805 | 862 |
| 33 | 532 | 560 | 588 | 616 | 644 | 672 | 700 | 728 | 733 | 757 | 804 | 861 |
| 32 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 726 | 730 | 754 | 801 | 858 |
| 31 | 527 | 555 | 583 | 611 | 639 | 667 | 695 | 723 | 728 | 752 | 799 | 856 |
| 30 | 524 | 552 | 580 | 608 | 636 | 664 | 692 | 720 | 725 | 749 | 795 | 851 |
| 29 | 521 | 549 | 577 | 605 | 633 | 661 | 689 | 717 | 721 | 745 | 791 | 847 |
| 28 | 517 | 545 | 573 | 601 | 629 | 657 | 685 | 713 | 717 | 741 | 787 | 843 |
| 27 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 708 | 713 | 736 | 782 | 838 |
| 26 | 508 | 536 | 564 | 592 | 620 | 648 | 676 | 704 | 708 | 731 | 776 | 831 |
| 25 | 502 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 703 | 726 | 771 | 826 |
| 24 | 497 | 525 | 553 | 581 | 609 | 637 | 665 | 693 | 697 | 720 | 765 | 819 |
| 23 | 491 | 519 | 547 | 575 | 603 | 630 | 658 | 686 | 691 | 714 | 758 | 812 |
| 22 | 484 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 684 | 707 | 751 | 804 |
| 21 | 477 | 505 | 533 | 561 | 589 | 617 | 645 | 673 | 677 | 699 | 742 | 795 |
| 20 | 470 | 498 | 526 | 553 | 581 | 609 | 637 | 665 | 670 | 692 | 735 | 787 |
| 19 | 462 | 490 | 518 | 546 | 574 | 602 | 630 | 658 | 662 | 684 | 726 | 778 |
| 18 | 453 | 481 | 509 | 537 | 565 | 593 | 621 | 649 | 653 | 675 | 717 | 768 |
| 17 | 445 | 473 | 500 | 528 | 556 | 584 | 612 | 640 | 645 | 666 | 707 | 757 |
| 16 | 435 | 463 | 491 | 519 | 547 | 575 | 603 | 631 | 635 | 656 | 697 | 746 |
| 15 | 426 | 454 | 482 | 510 | 538 | 566 | 593 | 621 | 626 | 647 | 687 | 736 |
| 14 | 416 | 443 | 471 | 499 | 527 | 555 | 583 | 611 | 615 | 635 | 674 | 722 |
| 13 | 405 | 433 | 461 | 489 | 517 | 545 | 573 | 601 | 605 | 625 | 664 | 711 |
| 12 | 394 | 422 | 450 | 478 | 506 | 534 | 562 | 590 | 594 | 614 | 652 | 698 |
| 11 | 382 | 410 | 438 | 466 | 494 | 522 | 550 | 578 | 582 | 601 | 638 | 683 |
| 10 | 371 | 399 | 427 | 455 | 483 | 510 | 538 | 566 | 570 | 589 | 625 | 669 |
| 9 | 358 | 386 | 414 | 442 | 470 | 498 | 526 | 554 | 558 | 576 | 612 | 655 |
| 8 | 345 | 373 | 401 | 429 | 457 | 485 | 513 | 541 | 545 | 563 | 598 | 640 |
| 7 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 528 | 532 | 550 | 584 | 625 |
| 6 | 319 | 347 | 375 | 403 | 431 | 458 | 486 | 514 | 518 | 535 | 568 | 608 |
| 5 | 305 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 504 | 521 | 553 | 592 |
| 4 | 290 | 318 | 346 | 374 | 402 | 430 | 458 | 486 | 489 | 505 | 536 | 574 |
| 3 | 275 | 303 | 331 | 359 | 387 | 415 | 443 | 471 | 474 | 490 | 520 | 557 |
| 2 | 260 | 287 | 315 | 343 | 371 | 399 | 427 | 455 | 458 | 473 | 502 | 538 |
| 1 | 244 | 272 | 300 | 328 | 356 | 384 | 412 | 439 | 442 | 457 | 485 | 519 |
| 0 | 227 | 255 | 283 | 311 | 339 | 367 | 395 | 423 | 426 | 440 | 467 | 500 |
| P* | 130 | 140 | 150 | 160 | 169 | 179 | 189 | 199 | 200 | 207 | 220 | 236 |

* = Paralegals/Law Clerks

*Published by the U.S. Attorney's Office for the District of Columbia, Civil Division*

## Explanatory Notes

1. This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared to assist with resolving requests for attorney's fees in complex civil cases in District of Columbia federal courts handled by the Civil Division of the United States Attorney's Office for the District of Columbia. It has been developed to provide "a reliable assessment of fees charged for complex federal litigation in the District [of Columbia]," as the United States Court of Appeals for the District of Columbia Circuit urged. *DL v. District of Columbia*, 924 F.3d 585, 595 (D.C. Cir. 2019). The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, nor has it been adopted by other Department of Justice components.

2. The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees. *E.g.*, 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b). A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). The matrix is not intended for use in cases in which the hourly rate is limited by statute. *E.g.*, 28 U.S.C. § 2412(d).

3. For matters in which a prevailing party agrees to payment pursuant to this fee matrix, the United States Attorney's Office will not request that a prevailing party offer the additional evidence that the law otherwise requires. *See, e.g., Eley v. District of Columbia*, 793 F.3d 97, 104 (D.C. Cir. 2015) (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (requiring "evidence that [the] 'requested rates are in line with those prevailing in the community for similar services'")).

4. The years in the column on the left refer to an attorney's years of experience practicing law. Normally, an attorney's experience will be calculated based on the number of years since an attorney graduated from law school. If the year of law school graduation is unavailable, the year of bar passage should be used instead. Thus, an attorney who graduated from law school in the same year as the work for which compensation is sought has 0 years of experience. For all work beginning on January 1 of the calendar year following graduation (or bar admission), the attorney will have 1 year of experience. (For example, an attorney who graduated from law school on May 30 will have 0 years of experience until December 31 of that same calendar year. As of January 1, all work charged will be computed as performed by an attorney with 1 year of experience.) Adjustments may be necessary if an attorney did not follow a typical career progression or was effectively performing law clerk work. *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate).

5. The data for this matrix was gathered from the dockets of cases litigated in the U.S. District Court for the District of Columbia using the following search in July 2020 in Bloomberg Law: keywords ("motion n/5 fees AND attorney!") + filing type ("brief," "motion," or "order") + date ("May 31, 2013 – May 31, 2020" under "Entries (Docket and Documents)"). This returned a list of 781 cases. Of those, cases were excluded if there was no motion for fees filed, the motions for fees lacked necessary information, or the motions involved fees not based on hourly rates, involved rates explicitly or implicitly based on an existing fee matrix, involved rates explicitly or implicitly subject to statutory fee caps (e.g., cases subject to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)), or used lower rates prescribed by case law (*e.g., Eley*, 793 F.3d at 105 (Individuals with Disabilities in Education Act cases)). After these excisions, 86 cases, many

of which included data for multiple billers (and 2 of which only provided hourly rate data for paralegals), remained.

6. The cases used to generate this matrix constitute complex federal litigation—which caselaw establishes as encompassing a broad range of matters tried in federal court. *E.g.*, *Reed v. District of Columbia*, 843 F.3d 517, 527-29 (D.C. Cir. 2016) (Tatel, J., concurring) (noting that cases arising under the Freedom of Information Act, Title VII, the Americans with Disabilities Act, Constitutional Amendments, antitrust statutes, and others have been deemed complex, and even "relatively small" cases can constitute complex federal litigation, as they too require "specialized legal skills" and can involve "complex organizations," such as "large companies"); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 14-16, 17 (D.D.C. 2008) (prevailing market rates for complex federal litigation should be determined by looking to "a diverse range of cases"). That the attorneys handling these cases asked the court to award the specified rates itself demonstrates that the rates were "'adequate to attract competent counsel, [while] not produc[ing] windfalls to attorneys.'" *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). As a consequence, the resulting analysis yields the "prevailing market rate[] in the relevant community" for complex litigation undertaken in federal courts in the District of Columbia. *See Blum*, 465 U.S. at 895.

7. From these 86 complex federal cases, the following information was recorded for 2013 and beyond: hourly rate, the calendar year the rate was charged, and the number of years the lawyer was out of law school when the rate was charged (or, if law school graduation year was unavailable, years since bar passage), as defined above. If the graduation or bar passage year was not stated in a motion or its exhibits, then the lawyer's biography was researched on the internet. Although preexisting fee matrices for the District of Columbia provide for mid-year rate changes, very few lawyers in the data submitted rates that changed within a calendar year. For this reason, the matrix was modeled using one rate for each calendar year. On the occasions when a lawyer expressed an hourly rate as a range or indicated the rate had increased during the year, the midpoint of the two rates was recorded for that lawyer-year.

8. The matrix of attorney rates is based on 675 lawyer-year data points (one data point for each year in which a lawyer charged an hourly rate) from 419 unique lawyers from 84 unique cases. The lawyer-year data points spanned from years 2013 to 2020, from $100 to $1250, and from less than one year of experience to 58 years.

9. Paralegal/law clerk rates were also recorded. The following titles in the fee motions were included in the paralegal/law clerk data: law clerk, legal assistant, paralegal, senior legal assistant, senior paralegal, and student clerk. The paralegal/law clerk row is based on 108 paralegal-year data points from 42 unique cases. They spanned from 2013 to 2019 and from $60 to $290. (It is unclear how many unique persons are in the 108 data points because paralegals were not always identified by name.)

10. The matrix was created with separate regressions for the lawyer data and the paralegal data. For the paralegal data, simple linear least-squares regression was used with the dependent variable hourly rate and the independent variable the year the rate was charged subtracted from 2013; years were combined into one variable and subtracted from 2013 rather than modeled as separate indicator variables to constrain annual inflation to a constant, positive number. The resulting regression formula was rate =

129.8789 + 9.902107 * (year-2013).  For the lawyer data, least-squares regression was used with the dependent variable hourly rate and independent variables the year the rate was charged and the number of years of experience of the lawyer when the rate was charged.  The year the rate was charged was subtracted from 2013 and modeled linearly as with the paralegal data.  The number of years out of law school (or since year of bar passage) was modeled with both linear and squared terms, as is common in labor economics to account for non-linear wage growth (e.g., faster growth earlier in one's career than at the end of one's career).  *See, e.g.*, Jacob Mincer, *Schooling, Experience, and Earnings* (1974).  The resulting regression formula was rate = 227.319 + 16.54492 * experience - 0.2216217 * experience ^ 2 + 27.97634 * (year-2013).  Regressions were also run with log transformed rates and with a random-effect model (to account for several lawyers appearing more than once in the data), but both alternatives resulted in mostly lower rates than those reflected here; in order to minimize fee disputes, these models were therefore rejected in favor of the more generous untransformed, fixed-effect model.  Rates from one case comprised 20% of the data; the regression was also run without that case, but the resulting rates were mostly lower and therefore rejected, again to minimize fee disputes.

11. The data collected for this matrix runs through 2020.  To generate rates after 2020, an inflation adjustment (rounded to the nearest whole dollar) has been added.  The United States Attorney's Office determined that, because courts and many parties have employed the legal services index of the Consumer Price Index to adjust attorney hourly rates for inflation, this matrix would do likewise.  *E.g.*, *Salazar v. District of Columbia*, 809 F.3d 58, 64-65 (D.C. Cir. 2015); *Eley*, 793 F.3d at 101-02; *DL*, 924 F.3d at 589-90.  That was the approach followed for the years 2021 through and including 2023.  However, the Bureau of Labor Statistics has now ceased consistently publishing monthly data for the legal services index of the Consumer Price Index.  As an alternative, the legal services index of the Producer Price Index, which continues regularly to provide updated data, has been used to generate the rates for 2024.

12. This matrix was researched and prepared by Brian Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt Law School, with the help of his students.

13. This matrix and an alternative, preexisting matrix were extensively examined, and, based on that analysis, this matrix was the one selected for computation of the hourly rates for the attorneys' fees awarded in *J.T. v. District of Columbia*, 652 F. Supp. 3d 11 (D.D.C. 2023) (Howell, C.J.), and in *Brackett v. Mayorkas*, Civ. A. No. 17-0988, 2023 WL 5094872 (D.D.C. Aug. 9, 2023) (Boasberg, C.J.).

EXHIBIT B

# USAO ATTORNEY'S FEES MATRIX — 2015-2021

*Revised Methodology starting with 2015-2016 Year*

Years (Hourly Rate for June 1 – May 31, based on change in PPI-OL since January 2011)

| Experience | 2015-16 | 2016-17 | 2017-18 | 2018-19 | 2019-20 | 2020-21 |
|---|---|---|---|---|---|---|
| 31+ years | 568 | 581 | 602 | 613 | 637 | 665 |
| 21-30 years | 530 | 543 | 563 | 572 | 595 | 621 |
| 16-20 years | 504 | 516 | 536 | 544 | 566 | 591 |
| 11-15 years | 455 | 465 | 483 | 491 | 510 | 532 |
| 8-10 years | 386 | 395 | 410 | 417 | 433 | 452 |
| 6-7 years | 332 | 339 | 352 | 358 | 372 | 388 |
| 4-5 years | 325 | 332 | 346 | 351 | 365 | 380 |
| 2-3 years | 315 | 322 | 334 | 340 | 353 | 369 |
| Less than 2 years | 284 | 291 | 302 | 307 | 319 | 333 |
| Paralegals & Law Clerks | 154 | 157 | 164 | 166 | 173 | 180 |

*Explanatory Notes*

1.    This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia (USAO) to evaluate requests for attorney's fees in civil cases in District of Columbia courts.  The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees.  *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b) (Equal Access to Justice Act).  The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, or by other Department of Justice components, or in other kinds of cases.  The matrix does **not** apply to cases in which the hourly rate is limited by statute.  *See* 28 U.S.C. § 2412(d).

2.    A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases.  *See, e.g., Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010).  Consistent with that definition, the hourly rates in the above matrix were calculated from average hourly rates reported in 2011 survey data for the D.C. metropolitan area, which rates were adjusted for inflation with the Producer Price Index-Office of Lawyers (PPI-OL) index.  The survey data comes from ALM Legal Intelligence's 2010 & 2011 Survey of Law Firm Economics.  The PPI-OL index is available at http://www.bls.gov/ppi.  On that page, under "PPI Databases," and "Industry Data (Producer Price Index - PPI)," select either "one screen" or "multi-screen" and in the resulting window use "industry code" 541110 for "Offices of Lawyers" and "product code" 541110541110 for "Offices of Lawyers."  The average hourly rates from the 2011 survey data are multiplied by the PPI-OL index for May in the year of  the update, divided by 176.6, which is the PPI-OL index for January 2011, the month of the survey data, and then rounding to the nearest whole dollar (up if remainder is 50¢ or more).

3.    The PPI-OL index has been adopted as the inflator for hourly rates because it better reflects the mix of legal services that law firms collectively offer, as opposed to the legal services that typical consumers use, which is what the CPI-

Legal Services index measures.  Although it is a national index, and not a local one, *cf. Eley v. District of Columbia*, 793 F.3d 97, 102 (D.C. Cir. 2015) (noting criticism of national inflation index), the PPI-OL index has historically been generous relative to other possibly applicable inflation indexes, and so its use should minimize disputes about whether the inflator is sufficient.

4.    The methodology used to compute the rates in this matrix replaces that used prior to 2015, which started with the matrix of hourly rates developed in *Laffey v. Northwest Airlines, Inc.* 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985), and then adjusted those rates based on the Consumer Price Index for All Urban Consumers (CPI-U) for the Washington-Baltimore (DC-MD-VA-WV) area.  The USAO rates for years prior to and including 2014-15 remains the same as previously published on the USAO's public website.

5.    The various "brackets" in the column headed "Experience" refer to the attorney's years of experience practicing law.  Normally, an attorney's experience will be calculated starting from the attorney's graduation from law school.  Thus, the "Less than 2 years" bracket is generally applicable to attorneys in their first and second years after graduation from law school, and the "2-3 years" bracket generally becomes applicable on the second anniversary of the attorney's graduation (*i.e.*, at the beginning of the third year following law school).  *See Laffey*, 572 F. Supp. at 371.  An adjustment may be necessary, however, if the attorney's admission to the bar was significantly delayed or the attorney did not otherwise follow a typical career progression.  *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate); *EPIC v. Dep't of Homeland Sec.*, 982 F. Supp. 2d 56, 60-61 (D.D.C. 2013) (same).  The various experience levels were selected by relying on the levels in the ALM Legal Intelligence 2011 survey data.  Although finer gradations in experience level might yield different estimates of market rates, it is important to have statistically sufficient sample sizes for each experience level.  The experience categories in the current USAO Matrix are based on statistically significant sample sizes for each experience level.

6.    ALM Legal Intelligence's 2011 survey data does not include rates for paralegals and law clerks.  Unless and until reliable survey data about actual paralegal/law clerk rates in the D.C. metropolitan area become available, the USAO will compute the hourly rate for Paralegals & Law Clerks using the most recent historical rate from the USAO's former *Laffey* Matrix (*i.e.*, $150 for 2014-15) updated with the PPI-OL index.  The formula is $150 multiplied by the PPI-OL index for May in the year of the update, divided by 194.3 (the PPI-OL index for May 2014), and then rounding to the nearest whole dollar (up if remainder is 50¢ or more).

7.    The attorney's fees matrices issued by the United States Attorney's Office are intended to facilitate the settlement of attorney's fees claims in actions in which the United States may be liable to pay attorney's fees to the prevailing party and the United States Attorney's Office is handling the matter.  The United States Attorney's Office is presently working to develop a revised rate schedule, based upon current, realized rates paid to attorneys handling complex federal litigation in the District of Columbia federal courts.  This effort is motivated in part by the D.C. Circuit's urging the development of "a reliable assessment of fees charged for complex federal litigation in the District." *D.L. v. District of Columbia*, 924 F.3d 585, 595 (D.C. Cir. 2019).  This new matrix should address the issues identified by the majority in *D.L.*, but it is expected that it will be some time before a new matrix can be prepared.  In the interim, for matters in which a prevailing party agrees to payment pursuant to the matrices issued by the United States Attorney's Office, the United States Attorney's Office will not demand that a prevailing party offer the additional evidence that the law otherwise requires.  *See Eley*, 793 F.3d at 104 (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995)) (requiring "evidence that [the] 'requested rates are in line with those prevailing in the community for *similar services*'").

EXHIBIT C

# LAFFEY MATRIX

History

Case Law

See the Matrix

Contact us

Home

| Year | Adjustmt Factor** | Paralegal/ Law Clerk | Years Out of Law School * | | | | |
|---|---|---|---|---|---|---|---|
| | | | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/24- 5/31/25 | 1.080182 | $258 | $473 | $581 | $839 | $948 | $1141 |
| 6/01/23- 5/31/24 | 1.059295 | $239 | $437 | $538 | $777 | $878 | $1057 |
| 6/01/22- 5/31/23 | 1.085091 | $225 | $413 | $508 | $733 | $829 | $997 |
| 6/01/21- 5/31/22 | 1.006053 | $208 | $381 | $468 | $676 | $764 | $919 |
| 6/01/20- 5/31/21 | 1.015894 | $206 | $378 | $465 | $672 | $759 | $914 |
| 6/01/19- 5/31/20 | 1.0049 | $203 | $372 | $458 | $661 | $747 | $899 |
| 6/01/18- 5/31/19 | 1.0350 | $202 | $371 | $455 | $658 | $742 | $894 |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |

| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g.,DL v. District of Columbia, 267 F.Supp.3d 55, 69 (D.D.C. 2017)

* ï¿½Years Out of Law Schoolï¿½ is calculated from June 1 of each year, when most law students graduate. ï¿½1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). ï¿½4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier ï¿½1-3" from June 1, 1996 until May 31, 1999, would move into tier ï¿½4-7" on June 1, 1999, and tier ï¿½8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

EXHIBIT D



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Denver Field Office**

303 East 17th Avenue, Suite 410
Denver, CO 80203
Direct Dial: (303) 866-1313
TTY (303) 866-1950
FAX (303) 866-1197
Website: www.eeoc.gov
lucila.rosas@eeoc.gov

|  |  |
|---|---|
| ▇▇▇▇▇▇▇▇▇▇<br>Complainant,<br><br>v.<br><br>Sonny Perdue, Secretary,<br>US Department of Agriculture,<br>Agency. | ) EEOC No. 541-2015-00153X<br>) Agency No. FS-2015-00095<br>)<br>)<br>)<br>) Lucila G. Rosas<br>) Supervisory Administrative Judge<br>)<br>) Date: September 3, 2019 |

### Hearing Decision Part 2: Attorney's Fees and Costs; Entry of Judgment

On August 4, 2019, I issued my decision finding the Agency discriminated against Complainant on all counts and ordered the Agency to reinstate complainant, pay him compensatory damages, as well as other relief.

Through this decision, I hereby enter my order regarding attorney's fees and costs.

**I.    Attorney's Fees**

On July 15, 2019, Complainant submitted his Application for Attorney Fees and Costs, to which is attached both an Affidavit by Complainant's counsels, Rosemary Dettling and Kristen Farr, along with a several exhibits. The Agency filed its Response on August 12, 2019; Complainant filed her Reply on August 26, 2019. I have reviewed the submission and find Complainant is entitled to attorneys' fees and costs as set forth below.

Under the Rehabilitation Act, a successful complainant may recover from the Agency both attorney's fees and costs. 29 C.F.R. § 1614.501(e); *see also* MD-110, Chapter 11, Section VI (G). A finding of discrimination creates a presumption of entitlement to fees and costs. *Williamson v. Dep't of the Treasury*, EEOC App. No. 0720070056 (Feb. 4, 2010). An attorney's fee award is typically determined calculating the "lodestar" by multiplying a reasonable number of hours spent on the case by a reasonable hourly rate. *See* 29 C.F.R. § 1614.501(e)(2)(ii)(b); *Williamson*, EEOC App. No. 0720070056 (citing *Hensley v. Eckerhart*, 461 U.S. 424 (1983)). It is the burden of the attorney requesting the fees to provide adequate information to establish that he or she is entitled to such payment, and the fee award may be reduced in the absence of such information. *Brown v. U.S. Postal Serv.*, EEOC Appeal No. 07A30050 (July 14, 2004).

## A.    Analysis – Hourly Rate

The reasonable hourly rate is generally the prevailing market rate in the relevant legal community for similar services by attorneys in similar cases. *Cox v. Social Security Admin.*, EEOC App. No. 0720050055 (Dec. 24, 2009) (citing EEOC MD 110 at 11-6). However, if a party does not find local counsel readily available with the requisite skill level, the party may find an attorney elsewhere and the hourly rate will be calculated based on the attorney's location. *Jackson v. Dep't of Air Force*, EEOC App. No. 0720110036 (Mar. 3, 2012). The burden is on the agency to show that Complainant's decision to retain out-of-town counsel was unreasonable. *Jackson*, EEOC App. No. 0720110036; *Moore v. Dep't of Justice*, EEOC Appeal No. 0120072439 (July 31, 2007).

Here, the Agency does not dispute that the *Laffey* matrix should be applied in this case. *See Laffey v. Northwest Airlines*, 572 F. Supp. 354 (D.D.C 1983), *aff'd in part. rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984). Instead, it argues that the appropriate rate is the rate over the period of time that this case was litigated, i.e., 2014 – 2018. (*See* Agency's Response at 4). However, Complainant argues, and the court agrees, that the current 2019 *Laffey* matrix rate for the D.C. area should be applied. (*See* Complainant's Motion at 11-12 and Reply at 5). Awarding fees at the current rate is consistent with EEOC precedent. *Moore v. Dep't of Air Force*, EEOC Appeal No. 0720180030 (Aug. 20, 2019); *Rowland v. Dep't of Agriculture*, EEOC Appeal No. 20120113022 (Feb. 8, 2012); *see also Huyck v. Dep't of Defense*, EEOC Appeal No. 01952015 (Oct. 31, 1997) (current rates are applied "[i]n order to ensure that counsel is not deprived of the value of her fees owing to a delay in the resolution of a case.").

Since the filing of Complainant's motion, the *Laffey* Matrix was updated and thus Complainant's counsels' fees are updated as follows: Ms. Dettling's rate is $595 and Ms. Farr's rate is $510. Complainant's counsels submitted affidavits which detailed their extensive experience in federal sector employment law. In addition, Complainant has provided a list of cases where his attorneys have been awarded the current *Laffey* rates, even in cases where the events arise outside of the Washington DC Metropolitan area.

Therefore, Complainant will be awarded fees at the hourly rates reflected in the updated *Laffey* matrix: $595 for Ms. Dettling and $510 for Ms. Farr.

## B.    Analysis – Hours Expended

All hours reasonably spent on litigating the case are compensable, and the number of hours claimed should not include excessive, redundant, or otherwise unnecessary hours. *Cox v. Social Security Adm.*, EEOC App. No. 0720050055 at *12 (Dec. 24, 2009)(citing EEOC MD 110 at 11-5 (citing *Hensley,* 461 U.S at 434)). The fee petition must "contain sufficiently detailed information regarding the hours logged and the work performed" to permit the determination of the correct award. *Huee Tan v. U.S. Postal Serv.*, EEOC Petition No. 0420060032 (Dec. 21, 2006); *see also Renwick v. Dep't of the Navy*, EEOC App. No. 0120112665 (Oct. 20, 2011). Excessive, redundant, unnecessary, or inadequately-documented expenditures of time may result in an across the board, or item-by-item, reduction in fees. *Jackson*, EEOC App. No. 0720110036.

Based on my complete review of the attorneys' fees petition and my knowledge of the course of the proceedings in this action, I find that the hours expended by Complainant's counsel are very reasonable for a case that encompassed discovery, a settlement conference, a dispositive motion, and a hearing. Complainant's counsel's descriptions are brief but sufficient. The only challenge by the Agency is for services rendered during the pre-complaint process. Complainant is billing 3.38 hours of attorney's fees for time spent assessing the merits of the case during the informal stage. I find this amount to be reasonable. Complainant shall be compensated for these hours.

The Agency also challenged Complainant's fee petition entries of work performed for drafting closing argument dated March 26, 2019 – April 1, 2019. In its Reply, Complainant clarifies that the date in these entries was a typo in the billing entry. The closing briefs were due and submitted in 2018, not 2019. Since the work was performed and hours expended is reasonable, I hereby find the entry for work performed is compensable.

The Agency also challenges the number of hours (49.86) billed for drafting the fee petition as excessive. Complainant's counsel contends she legitimately spent that amount of time drafting the fee petition and compiling attachments. I find the hours spent to be reasonable and not excessive. Complainant's brief was very detailed and well written. It cited to supporting documentation and relevant case law. In addition, several exhibits and affidavits were provided in support of his motion. Thus, Complainant's counsel should be compensated for 49.86 hours billed.

### C. Conclusion

The total attorneys' fees award is as follows:

> Attorney's fees w/ updated rates: $196,004.90

> Additional attorney's fees for drafting & filing Reply: (3 hours x $595): $1,785.00

**The total attorney's fees award to Complainant is: $197,789.90.**

## II.    Costs

EEOC regulations also provide for the recovery of costs by prevailing parties. 29 C.F.R. 1614.501(e). Adequate documentation of the expense incurred and the nature of the expense is required in order to receive reimbursement of costs. Failure to submit copies of applicable bills justifies denial of reimbursement for the costs. *Williams v. Dep't of Homeland Security*, EEOC Petition No. 04A40047 (June 30, 2005); *Constant v. Dept. of Energy*, EEOC App. No. 01924621 (April 5, 1993).

The Agency argued that certain out-of-pocket costs should be eliminated from the petition. Specifically, two entries related to parking at the airport on 6/25/19 and the car

3

rental entry for witness Mark Edinger.  Complainant's counsel clarified that one of the parking entries should have been for travel to Wyoming for depositions in October 2016. She contends the entry date was a typo.  She also admits that no receipts were submitted for the parking expenses and therefore, Complainant withdraws those costs.  Similarly, Complainant withdraws the rental car expense.

**Therefore, the Agency shall pay Complainant the total costs of $3,154.20.**

## III.    Entry of Judgment

Judgment is entered for Complainant in accordance with the initial hearing decision dated August 4, 2019, and this decision on attorney's fees and costs.  **The total attorney's fees and costs awarded is: $200, 944.10.**[1]

The Agency shall comply with the remedies ordered within the time allotted.  A notice of appeal rights follows.

It is so ORDERED.

For the Commission:              /s/ Lucila G. Rosas

                                         Lucila G. Rosas
                                         Supervisory Administrative Judge
                                         303-866-1313
                                         lucila.rosas@eeoc.gov

---

[1] Complainant's Reply brief summed up the total fees and costs as $201,244.10. This appears to be $300 over what I have calculated.

4

## <u>NOTICE TO THE PARTIES</u>

***TO THE AGENCY***:

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. 1614.403, and append a copy of your appeal to your final order. *See* EEOC Management Directive 110, August 5, 2015, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

***TO THE COMPLAINANT***:

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision. 29 C.F.R. § 1614.110(a). From the time you receive the agency's final order, you will have thirty (30) days to file an appeal. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. *See* EEO MD-110, 9-3. In either case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the agency.

***WHERE TO FILE AN APPEAL***:

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

BY MAIL:
Director, Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

<u>BY PERSONAL DELIVERY</u>:

U.S. Equal Employment Opportunity Commission
Office of Federal Operations
131 M Street, NE
Suite 5SW12G
Washington, DC  20507

<u>BY FACSIMILE</u>:

Number: (202) 663-7022

*Facsimile transmissions of more than ten (10) pages will not be accepted.*

## COMPLIANCE WITH AN AGENCY FINAL ACTION

Pursuant to 29 C.F.R. § 1614.504, an agency's final action that has not been the subject of an appeal to the Commission or a civil action is binding on the agency.  If the complainant believes that the agency has failed to comply with the terms of this decision, the complainant shall notify the agency's EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance.  The agency shall resolve the matter and respond to the complainant in writing.  If the agency has not responded to the complainant, in writing, or if the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the agency has complied with the terms of its final action.  The complainant may file such an appeal 35 days after serving the agency with the allegations of non-compliance, but must file an appeal within 30 days of receiving the agency's determination.  A copy of the appeal must be served on the agency, and the agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

## CERTIFICATE OF SERVICE

For timeliness purposes, it shall be presumed that the parties received the foregoing ORDER within five (5) calendar days after the date it was sent *via* first class mail and one (1) day after it was sent via facsimile or e-mail. I certify that, on September 3, 2019, the foregoing ORDER was uploaded to Fed/SEP and emailed to the following:



**Complainant's Representative**
Kristen Farr, Esq.
Rosemary Dettling, Esq.
Federal Employees Legal Services Center
1629 K Street, NW
Washington, DC  20006
kfarr@felsc.com
rdettling@felsc.com

**Agency's Representative**
Christian E. Pagán
USDA Office of General Counsel
Civil Rights, Labor, & Employment Law -- Litigation Section
christian.pagan@ogc.usda.gov

*/s/ Lucila G. Rosas*
Lucila G. Rosas
Supervisory Administrative Judge
303-866-1313
lucila.rosas@eeoc.gov



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P.O. Box 77960
Washington, DC 20013

, a/k/a
Kyle S.,[1]
Complainant,

v.

Tom J. Vilsack,
Secretary,
Department of Agriculture
(Forest Service),
Agency.

Appeal No. 2019005694

Hearing No. 541-2015-00153X

Agency No. FS-2015-00095

<u>DECISION</u>

Following its September 11, 2019 final order, the Agency filed a timely appeal with the Equal Employment Opportunity Commission (EEOC or Commission) pursuant to 29 C.F.R. § 1614.403(a). On appeal, the Agency requests that the Commission affirm its rejection of an EEOC Administrative Judge's (AJ) finding of discrimination in violation of Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 et seq. The Agency also requests that the Commission affirm its rejection of the relief ordered by the AJ. In opposition, Complainant asks the Commission to affirm the AJ's finding of discrimination and award of remedial relief but add an award of backpay. In addition, Complainant asks EEOC to adjust attorneys' fees.

<u>BACKGROUND</u>

In January 2014, Complainant began employment as an Engineering Technician, GS-0802-09, at the Agency's Bridger-Teton National Forest in Jackson, Wyoming.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

2                                                          2019005694

On December 22, 2014, Complainant filed an equal employment opportunity (EEO) complaint alleging that the Agency subjected him to discrimination on the bases of disability (disabled veteran - neurological condition) and reprisal (requesting reasonable accommodation) when:

1.    on October 6, 2014, his request for reasonable accommodations in the form of telework and/or extended use of Leave Without Pay (LWOP) was denied;

2.    on October 15, 2014, he was terminated from his Engineering Technician position, effective October 16, 2014; and

3.    from about July 7, 2014 until his termination, he was subjected to additional harassing treatment, including his supervisor constantly asking to be kept informed of his wellbeing and activities and then falsely accused Complainant of failing to do so.

The Agency accepted the complaint and conducted an EEO investigation. Thereafter, the Agency provided Complainant with a copy of the report of investigation and notice of his right to request a hearing before an EEOC AJ. Complainant timely requested a hearing. The AJ held a hearing on March 6, 7, and 16, 2018, and issued a decision on August 4, 2019, concluding that Complainant had proven discrimination as alleged.

The evidence developed during the investigation and hearing shows that, on January 26, 2014, Complainant began working at the Agency in an excepted service position, subject to a two-year probationary period. Complainant's duties required him, among other things, to drive to remote locations, walk and inspect facilities, and use power tools.[2] Specifically, Complainant's supervisor (Supervisor1)[3] stated that Complainant performed some maintenance himself but also worked with others to perform maintenance for Agency facilities. Supervisor1 stated, during the winter months, a lot of work is done inside rather than in the field. Also, Supervisor1 stated, in the beginning, Complainant worked inside primarily as he got acclimated to the position and gained access to Agency systems. Supervisor1 stated, during the summer, all facilities are accessible and there is more work done in the field. Supervisor1 stated that Complainant seemed to perform his duties well and they had a professional and friendly relationship.

---

[2] The physical demands section in the position description for Engineering Technician, GS-9, state: "The work requires some physical exertion such as long periods of standing, walking, and carrying moderately heavy items over rough, uneven, mountainous, or rocky surfaces."

[3] Complainant's immediate supervisor, Supervisor1, became a first-time supervisor shortly before Complainant was hired. He did not recall receiving any supervisory or EEO training prior to supervising Complainant.

3                                                                    2019005694

The Agency appointed Complainant using the Veterans Recruitment Act (VRA) hiring authority. Upon being hired, Complainant provided the Agency with his Department of Veterans Affairs (VA) summary of benefits information indicating that he has a combined service-connected disability rating of 90%. The record shows Complainant was diagnosed with █████████████████████████████████████████████████████████████████████████████████████████████████ The responsible management officials testified they were aware of Complainant's medical condition and his status as a disabled veteran.

On July 7, 2014, Complainant was crossing the parking lot at work when he apparently experienced a dizzy spell, lost his balance, and tripped on a curb.[5] He received treatment that day at an urgent care facility in Jackson, Wyoming. It is undisputed that he called Supervisor1 the next day and stated he had been in the emergency room the night before and could not come in. The supervisor told him to take care of himself and keep him informed.

On July 11, 2014, Complainant and Supervisor1 spoke again on the telephone. Complainant stated that he was going to the VA Medical Center in Salt Lake City for some tests due to what he believed were increased neurological symptoms. His absence was recorded as excused on his time sheet and approved by management. Supervisor1 received further text messages indicating Complainant was ill on July 16 and 17. Complainant left a message for the supervisor on July 17, 2014, indicating he had just left a doctor's appointment and had more appointments coming up and stated he would have to use LWOP and would keep the supervisor informed. On July 18, Supervisor1 left a message for Complainant asking if he might be interested in the leave donation program. The next day, Complainant left the supervisor a message indicating he was having therapy and did not want leave donations.

On July 21, 2014, Supervisor1 asked Complainant to call him back. Complainant left a return message on July 22, stating he was still waiting for medical results and again asked about LWOP. Supervisor1 returned the call and left message to call him back.

On July 22, 2014, Complainant called the Deputy Forest Manager, his third-level supervisor (Manager1), about his medical condition. Complainant told him that he was dizzy, had headaches and was getting advanced medical care at the Mayo Clinic. Manager1 explained various options that might be available, including LWOP, teleworking and light duty. Manager1 said he would discuss the situation with Human Resources and Supervisor1.

---

[4]  Complainant stated that he may have an urgency to get to the nearest restroom and he carried an emergency toiletry kit.

[5] Complainant did not return to work following the July 7, 2014 incident through the termination of his employment.

4                                                                2019005694

On July 24, 2014, Supervisor1 sent an email to Complainant with detailed information regarding the Agency's leave options, including a leave request form, and asked him to provide documentation from a medical professional stating that he is or has been under their care and has not been able to come to work or telework. In the email, Supervisor1 stated: "If you do not report to work or request leave (with appropriate documentation if you request sick leave or absence due to a medical condition), disciplinary actions may be taken."

On July 24, 2014, Complainant's wife responded to Supervisor1's email stating that Complainant was undergoing tests and scans on his heart, nerves and brain, and discussed his medical condition, including his difficulty focusing and his intermittent spells of dizziness. She added that they did not know what was causing the health problems but would let Supervisor1 know as soon as they had more information. At the hearing, Complainant's wife stated that the Agency did not indicate allowing Complainant to remain on LWOP would be an undue hardship. Complainant stated that Manager1 later apologized for the harshness of Supervisor1's email.

On August 5, 2014, Complainant submitted a request for LWOP for the period of July 22, 2014 to February 27, 2015.[6] He indicated that he was a disabled veteran needing medical treatment and referenced his 90% service-connected disability rating and included a VA Benefits Summary Letter.

On August 25, 2014, Complainant's supervisor responded with a request for medical documentation to support Complainant's request for the extended LWOP. He cited the Agency's policy allowing LWOP for a disabled veteran to seek treatment for a disability arising from military service and indicated that administratively-acceptable evidence was needed to support Complainant's absence from duty and listed the required information. He further indicated that Complainant's physician's reply was required to be postmarked by September 8, 2014. Finally, the response stated that someone would be contacting Complainant regarding the reasonable accommodation process.

On September 4, 2014, Complainant sent an email in response to the request for medical documentation and stated that there were still medical tests to complete and it was difficult to tell when he would be back to work full-time. He attached a Hospital History of Encounters, documenting appointments between July 8 and August 25, 2014, at the Salt Lake City VA Medical Center, and a notification of an appointment for a neurological evaluation at the Mayo Clinic for September 10, 2014. This response was sent to a Human Resources/Employee Relations Specialist (HR Specialist) and the Agency's Director of Civil Rights. The HR Specialist responded to Complainant the next day and stated that the information he provided did not provide sufficient information for management to make a decision on his LWOP request and asked Complainant to provide more specific medical documentation.

---

[6] Complainant stated one reason he needed time off was because Salt Lake City VAMC was a five-hour trip one way so, including roundtrip travel and medical visits, he could be gone three days at a time.

5                                                          2019005694

Complainant testified that he did not believe he had to provide medical documentation to obtain LWOP because, according to the Agency's policy that Manager1 emailed him on August 5, 2014, he was a certified disabled veteran who was entitled to leave as a matter of right.[7] He stated that he relied on this information. However, on September 11, 2014, Complainant submitted a note from his doctor excusing him from work from September 7 - 29, 2014. Complainant's wife stated that the Mayo Clinic Neurologist stated he could not provide diagnoses or potential limitations prior to examining Complainant.

On September 5, 2014, an HR Reasonable Accommodation Specialist (RA Specialist) testified that she opened Complainant's reasonable accommodation case.  She notified Complainant via email that she would be setting up a conference call with Complainant and Supervisor1 to discuss reasonable accommodation. She provided Complainant with various forms and instructions to submit to her on or before October 6, 2014. After sending the email, the RA Specialist spoke to Complainant via telephone. She confirmed he had received her message and the materials she sent him. RA Specialist testified, when she started to explain the reasonable accommodation process to Complainant, he became agitated and stated that everybody wanted him to provide different types of documentation. He told her he wanted to focus on getting better and wished everybody would leave him alone. She stated he then told her to "fuck off."[8] The RA Specialist stated, based on this conversation with Complainant, she took no further action and never set up a meeting to discuss possible accommodations for Complainant. The RA Specialist stated that she did not inform Supervisor1 of Complainant's comment. Both Supervisor1 and Complainant's second-level supervisor stated they did not believe a first-level supervisor could approve a subordinate's reasonable accommodation request. On October 6, 2014, the RA

---

[7] Manager1 sent Complainant Chapter 30 (Absence Leave) from the Pay Administration, Attendance, and Leave section - FSH 6109.11 - of the Forest Service Handbook (06/17/2006). Provision 33.1(2), states in pertinent part: "The granting of leave without pay is a matter of administrative discretion. Employees, with a few exceptions, cannot demand that they be granted leave without pay as a matter of right. The exceptions where LWOP will be granted are in the cases of:  a. Disabled veterans needing medical treatment."

Also, an Occupational Safety and Health Specialist/Veterans Special Emphasis Program Manager (OSHA Specialist) stated, if a disabled veteran gets "ill due to a service-connected disability, they have to be granted leave without pay." OSHA Specialist stated that the Agency treated everyone like a family so that benefit was afforded to everyone. OSHA Specialist stated that he was on LWOP from May 2014 to November 2014 based on a verbal request for relocation to New Mexico and just submitted his payroll with leave as needed. He stated that Manager1, Complainant's third level supervisor, approved it. Manager1 was OSHA Specialist's supervisor.

[8] Complainant denies telling RA Specialist "fuck off," but acknowledges he was consumed with handling his medical testing and found the contact by various Agency people "extremely confusing."

6                                                          2019005694

Specialist sent Complainant notification that she was closing his reasonable accommodation case.

During the hearing, the RA Specialist stated that she was unsure if awarding Complainant continued LWOP would have been an undue hardship on the Agency and that is a determination to be made by an immediate supervisor. HR Specialist stated that it would have been a hardship for Complainant to be absent because the remaining unit employees would have to cover Complainant's duties. She stated, however, the Agency was willing to accommodate him if he provided medical documentation. HR Specialist stated, "if medical documentation is provided to show the need for the leave without pay, even if it's a hardship the Agency will make accommodation and support that need." HR Specialist stated that Complainant failed to provide medical documentation, so the Agency did not reach the stage to assess undue hardship.

During the hearing, Supervisor1 stated that he and other employees performed some of Complainant's duties and that some of Complainant's work was not performed right away. Supervisor1 stated that he does not recall discussing with other management whether it would be an undue hardship to the Agency for Complainant to remain on leave without pay.

A Notice of Termination dated October 15, 2014, from the Acting Forest Supervisor provided that Complainant was being terminated, effective October 16, 2014, because he failed to report for work since July 7, 2014 and had been in a continuous absent without leave (AWOL) status since July 16, 2014. It noted that, although Complainant provided documentation regarding his absence, it was not sufficient. It also provided that Complainant was informed by the Mission Area Designee regarding placement in the Reasonable Accommodation program and the requirement to provide appropriate medical documentation, but he had not provided sufficient documentation by the deadline to be considered for the program. It provided that, because Complainant failed to utilize proper leave requesting procedures and provide administratively-acceptable evidence to support his need to be absent, Complainant was charged approximately 504 hours of AWOL from July 16, 2014 through the effective date of termination.

Based on this evidence, the AJ concluded the Agency violated its duties to Complainant under the Rehabilitation Act.  First, the AJ determined that it was undisputed that Complainant was a qualified individual with a disability. All the responsible management officials were aware of Complainant's service-connected neurological disability. The AJ stated Complainant was substantially limited in the major life activities of walking, driving, and going to the bathroom. Moreover, the Agency conceded that Complainant had been performing well in his position prior to his absence from work and was not terminated for performance issues.  Next, the AJ determined that the Agency failed to engage in the interactive process with Complainant and provide him with the reasonable accommodation of LWOP while he was resolving his medical issues. The AJ determined that the involved management officials were all aware of Complainant's medical issues and that he was undergoing a series of medical evaluations during the period at issue. It was also clear that Complainant was requesting LWOP during this period. The AJ further concluded that Complainant's termination only occurred because of the failure to accommodate which resulted in his absences being charged as AWOL rather than LWOP.

The AJ also concluded that Supervisor1 discriminatorily harassed Complainant by repeatedly threatening him unless he returned to work.

To remedy Complainant for the discrimination, the AJ ordered the Agency to retroactively reinstate Complainant to his position. However, the AJ declined to award Complainant back pay because she determined he failed to mitigate his damages by not seeking alternative employment. The AJ further ordered the Agency to provide Complainant $200,000 in nonpecuniary compensatory damages to compensate Complainant for his emotional distress and its manifestations. The AJ determined that such an award was supported by substantial evidence, concluding there was established sufficient causation established between the Agency's actions and Complainant's resulting depression, anxiety, feelings of worthlessness, social isolation, physical and mental maladies, and suicidal ideation.

The hearing record shows, on May 16, 2016, a year and a half after his termination, Complainant began meeting with a Licensed Professional Counselor (LPC1). During the hearing, LPC1 stated that she diagnosed Complainant with Major Depressive Disorder and Post Traumatic Stress Disorder (PTSD) and they were caused by Complainant's removal. LPC1 stated that Complainant was sad almost daily; did not gain pleasure from things that used to make him happy; had disrupted sleep; felt others would judge him about his termination; and experienced feelings of guilt, low self-worth, extreme fatigue, and suicidal ideation. LPC1 stated that she met with Complainant 43 times and continues to see him because he has not recovered from his depression and other conditions. LPC1 stated that she uses cognitive behavioral therapy and trauma-related therapy with Complainant.

At the hearing, Complainant testified, following his termination, he lapsed into a depressed state. He stated that many residents of his town work for the Agency and he did not want to go in public because he would encounter Agency employees who were aware of his termination. He stated that he lost confidence; worried about others' judgment of him; second guessed himself; experienced depression, anxiety, guilt, and suicidal thoughts; and feared not being able to provide for his family.

Complainant's wife (CW1) testified, following his termination, Complainant was no longer himself and was "a shell of himself." She stated that he had anxiety, had a hard time getting out of bed, did not want to leave the house for fear of encountering someone from work, and she feared he was suicidal. (CW1 stated that she ensured that the guns in their home were secure.) CW1 stated that Complainant sought therapy after he realized he did not have everything under control and needed help. CW1 stated, prior to therapy, Complainant was drinking alcohol and "self-medicating." CW1 stated that Complainant's symptoms "wane" but are still there.

The AJ determined that the evidence, "establishes that the Agency's discriminatory conduct . . . caused Complainant's emotional harm, loss of enjoyment of life, anxiety, depression [,] suicidal ideation, and mental anguish." The AJ found that the record clearly showed that Complainant was a different person prior to his removal from employment. The AJ found the nature, severity, and duration of the harm warranted $200,000 when compared to similar cases.

8                                                              2019005694

The AJ also awarded $200,944.10 in attorney's fees and costs. Finally, the AJ ordered the Agency to provide EEO training to the responsible management officials.

Subsequently, the Agency issued a final order rejecting the AJ's finding that Complainant proved that the Agency subjected him to discrimination as alleged and filed the instant appeal. On appeal, the Agency argues that the AJ's decision contains numerous mistakes of material fact and law. The Agency asserts that sustaining the decision would require that the Commission conclude that Complainant is a qualified individual with a disability and that he showed a nexus between his alleged disabling condition and request for LWOP as a reasonable accommodation. The Agency also argues that it had legitimate and nondiscriminatory reasons for terminating Complainant and that Complainant was not subjected to harassment. The Agency asserts there is insufficient evidentiary support for the AJ's decision.

The Agency also argues that it acted in good faith in its effort to reasonably accommodate Complainant and, therefore, it should be able to avoid liability for compensatory damages. Alternatively, it argues that the AJ's award of $200,000 in compensatory damages is excessive and inconsistent with awards in similar cases. It also argues the attorneys' fees and costs awarded are excessive.

In response, Complainant reiterates prior contentions, including noting the facts as stipulated and as found by the AJ. Complainant reiterates the AJ's rationale and conclusions, including with respect to damages. However, Complainant asks the Commission to reverse the AJ's denial of back pay, citing an error in fact and law. Complainant stated that the Agency has the burden to show a complainant failed to mitigate damages, and the Agency failed to do so here. Complainant stated that he attempted to obtain employment by speaking with the town Mayor about openings in the city, as well as the Undersheriff. Complainant stated that no one was receptive to hiring someone in litigation about employment termination. Complainant stated, as a result, he worked for his family's car wash and lube business. He stated that he earned $29,875.16 in 2015, $31,858.48 in 2016, and $33,318.21 in 2017. Complainant stated that he entered the job market by working for his family business as they would have had to pay someone else to perform his duties. Complainant stated, "it shows that [he] was willing to do anything to earn an income for his family." Complainant stated that the AJ erred in assuming that applying for federal jobs is the only way to enter the job market. He stated that he lives in a small town and obtaining employment is different there, such that directly asking others about employment and working for a family business are appropriate. Complainant added, due to depression, withdrawal, and suicidal ideation, it was normal for him not to want to apply for other Agency positions. Complainant stated that the Agency failed to show that there were suitable positions available for which he was qualified and failed to apply.

Also, Complainant asked the Commission to award attorney's fees at the current "Laffey" rates rather than the rates in place when the AJ decision was issued in 2019. Complainant stated that current rates address the delay in payment to legal representation. Complainant requested a total of $254,289.96 for his attorney, including fees and costs.

9                                        2019005694

Specifically, Complainant requested:

| | |
|---|---|
| **Total hours awarded by AJ**: | 336.13 |
| Attorney 1: | 310.16 hours x $621 per hour (current Laffey rate) |
| Attorney 2: | 25.97 hours x $591 per hour (current Laffey rate) |
| | |
| **Total fees awarded by AJ** **at updated Laffey rate:** | $207,957.63 |
| **Total costs awarded by AJ**: | +   3,154.20 (airfare/car rental/lodging) |
| | $211,111.83 |
| **Total fees-Complainant's appeal:** | 1,863.00 (3 hours x $621 per hour) |
| **Total fees-Opposition Response:** | 40,694.13 (65.53 hours x $621 per hour) [9] |
| **Total - attorneys' fees motion:** | +   621.00 (1 hour x $621 per hour) |
| | $254,289.96 Total Fees & Costs Requested |

Complainant stated that his counsel, Attorney1 and Attorney2, represented him from October 24, 2014 through July 15, 2019, and then for the instant appeal. Complainant stated that his attorneys "expended a great deal of time and effort over the last five years responding to written orders, filing motions and arguments, attending a deposition in Jackson, Wyoming, responding to Agency motions, and representing Complainant at his hearing." Complainant stated, "[d]ue to the nature of the proceedings, the numerous witnesses involved, the Agency decision to contest every aspect of this case, the undersigned counsel had no choice but to vigorously litigate the case." Complainant noted that he was always open to settlement and mitigation of damages. Complainant stated that his attorneys frequently represent complainants before the Commission and current Laffey rates are customary in Commission litigation. Complainant stated that the facts for all three claims were interrelated. Complainant stated that he prevailed in this matter and achieved "an excellent result" and his attorneys' fees are reasonable. Complainant stated that he hired his attorneys because he wanted an experienced employment attorney with federal sector EEO experience and could not locate one in or near Jackson. Attorney1 provided an affidavit stating that she practiced exclusively in federal sector EEO law since 1991 and Attorney2 provided an affidavit stating that she practiced labor and employment law since 2008.

---

[9] On appeal, Complainant provided the dates in October 2019 and number of hours worked each date on his opposition response.

10                                                          2019005694

## ANALYSIS AND FINDINGS

*Standard of Review*

Pursuant to 29 C.F.R. § 1614.405(a), all post-hearing factual findings by an AJ will be upheld if supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 477 (1951) (citation omitted). A finding regarding whether or not discriminatory intent existed is a factual finding. See Pullman-Standard Co. v. Swint, 456 U.S. 273, 293 (1982). An AJ's conclusions of law are subject to a de novo standard of review, whether or not a hearing was held.

An AJ's credibility determination based on the demeanor of a witness or on the tone of voice of a witness will be accepted unless documents or other objective evidence so contradicts the testimony, or the testimony so lacks in credibility, that a reasonable fact finder would not credit it. See Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), Chapter 9, at § VI.B. (August 5, 2015).

*Denial of Reasonable Accommodation*

Under the Commission's regulations, an agency is required to make reasonable accommodation to the known physical and mental limitations of a qualified individual with a disability unless the agency can show that accommodation would cause an undue hardship. 29 C.F.R. §§ 1630.2(o) and (p).

After receiving a request for reasonable accommodation, the employer should engage in an informal process with the disabled individual to clarify what the individual needs and identify the appropriate reasonable accommodation. See EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act (Enforcement Guidance on Reasonable Accommodation), EEOC Notice No. 915.002 (October 17, 2002); see also, Abeijon v. Dep't of Homeland Security, EEOC Appeal No. 0120080156 (Aug. 8, 2012). Protected individuals are entitled to reasonable accommodation, but they are not necessarily entitled to their accommodation of choice. Castaneda v. U.S. Postal Service, EEOC Appeal No. 01931005 (February 17, 1994).

Qualified Individual with a Disability

We find there is substantial evidence of record to support the AJ's conclusion that Complainant was a qualified individual with a disability within the meaning of the Rehabilitation Act.

An individual with a disability is one who: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. Melanie F. v. Dept. of Homeland Security, EEOC Appeal No. 0120150163 (May 19, 2017) (citing 29 C.F.R. § 1630.2(g)).

11                                                        2019005694

Here, the record shows that both parties stipulated that Complainant was hired as a disabled veteran through the Veteran's Recruitment Act hiring authority, with 90% service-connected disability rating. While this, in and of itself, is not conclusive as to the matter of whether Complainant was an individual with a disability, for the purposes here, it is highly suggestive, especially when viewed in light of the other evidence of record. The Occupational Safety and Health Specialist/Veterans Special Emphasis Program Manager, OSHA Specialist, attested that management was aware that Complainant was disabled because Complainant discussed his condition with them. Complainant attested that he discussed his medical condition with management, including telling them he had neurological problems. OSHA Specialist testified that Complainant's disability was obvious at work, including his limp, tremors, symptoms of eye-twitching, lips quivering, and difficulty speaking. Complainant's therapist and his wife also attested that Complainant visibly shook and had tremors. Therefore, we find the record is sufficient to support the AJ's finding that Complainant was an individual with a disability, as defined above.

A qualified individual with a disability is an "individual with a disability who satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position. 29 C.F.R. § 1630.2(m). The physical demands section in the position description for Engineering Technician, GS-9 state: "The work requires some physical exertion such as long periods of standing, walking, and carrying moderately heavy items over rough, uneven, mountainous, or rocky surfaces." Complainant's supervisor, Supervisor1, stated that Complainant performed some maintenance himself but also worked with others to perform maintenance for Agency facilities. He added, initially, Complainant worked inside as he got acclimated to the position and gained access to Agency systems. Supervisor1 stated, during the winter months, a lot of work is done inside rather than in the field compared to the summer when all facilities are accessible and there is more work done in the field. Supervisor1 stated that Complainant seemed to perform his duties well.  We find the record sufficiently supports the AJ's finding that Complainant was a qualified individual with a disability. Accordingly, we find the Agency had an obligation to provide reasonable accommodation absent a showing of undue hardship.

                    Reasonable Accommodation – Undue Hardship

We also find the record sufficiently supports the AJ's finding that the Agency failed to provide Complainant reasonable accommodation. While it appears Agency officials made various attempts to engage in an interactive process with Complainant, the Agency has failed to show granting the reasonable accommodation of LWOP would have caused undue hardship.

The record shows Complainant's health was declining related to a service-connected disability for which the Agency generally had information as he was hired under the VRA. Complainant was going through testing to find out why he had increased dizziness that caused the July 2014 tripping incident, and he did not have any definitive diagnosis or prognosis to immediately offer the Agency as he was undergoing extensive medical testing.

12                                                                                2019005694

Complainant stated, in July 2014, he began going to Salt Lake City VAMC to "see why my disability was changing so rapidly." Complainant's wife informed Agency management he was having numerous scans on his heart and brain. Complainant stated, between July and October 2014, no one ever told him that his LWOP was denied or that he was placed on AWOL retroactively, until he received an October termination letter. Complainant stated that his biweekly payroll of LWOP was approved and submitted regularly. Complainant stated, on August 5, 2014, he completed a request for LWOP for the period of July 22, 2014 to February 27, 2015, and provided verification of his 90% veterans disability status. Complainant stated that it became "extremely confusing" when other people from the Agency began contacting him for medical information and documentation.

The instant case appears to be a matter of several managers involved and no one quite sure how to handle the circumstances. The AJ stated, "[a]t the hearing, the managers pointed the finger at each other" regarding how the matter was handled. The record shows the Agency accommodated Complainant by allowing him to be on LWOP and then it stopped and switched his leave to AWOL. On July 8, 2014, Supervisor1 told Complainant to take care of himself and keep him informed. On July 18, Supervisor1 left a message for Complainant asking if he might be interested in the leave donation program. On July 21, 2014, Supervisor1 asked Complainant to call him back and several days later returned Complainant's call. On July 22, 2014, after Complainant informed Manager1 about his medical condition, Manager1 explained various options that might be available, including LWOP, teleworking and light duty. Manager1 also informed Complainant he would discuss his circumstances with Human Resources and Supervisor1.

On July 24, 2014, Supervisor1 sent an email to Complainant with detailed information regarding the Agency's leave options, including a leave request form, and asked him to provide documentation from a medical professional stating that he is or has been under their care and has not been able to come to work or telework. Supervisor1 informed Complainant disciplinary action could result if he did not report to work or request leave. On August 25, 2014, Complainant's supervisor responded with a request for medical documentation to support Complainant's request for extended LWOP. He informed Complainant that someone from the Agency would contact him regarding the reasonable accommodation process.

On September 5, 2014, HR Specialist informed Complainant that additional medical documentation was required. Also, the RA Specialist opened Complainant's reasonable accommodation case, notified him that she would be setting up a conference call with Complainant and Supervisor1 to discuss reasonable accommodation, and provided various forms to submit to her by October 6, 2014. Subsequently, RA Specialist spoke to Complainant via telephone to explain the reasonable accommodation process. She testified that Complainant became agitated and stated that everybody wanted him to provide different types of documentation, and later told her to "fuck off." On October 6, 2014, the RA Specialist sent Complainant notification that she was closing his reasonable accommodation case.

13                                                    2019005694

During the hearing, the RA Specialist stated that she was unsure if awarding Complainant continued LWOP would have been an undue hardship on the Agency and that is a determination to be made by an immediate supervisor. HR Specialist stated that it would have been a hardship for Complainant to be absent because the remaining unit employees would have to cover Complainant's duties. She stated, however, the Agency was willing to accommodate him if he provided medical documentation. HR Specialist stated, "if medical documentation is provided to show the need for the leave without pay, even if it's a hardship the Agency will make accommodation and support that need." HR Specialist stated that Complainant failed to provide medical documentation, so the Agency did not reach the stage to assess undue hardship.

During the hearing, Supervisor1 stated that he and other employees performed some of Complainant's duties and that some of his work was not performed right away. Supervisor1 stated that he does not recall discussing with other management whether it would be an undue hardship to the Agency for Complainant to remain on LWOP.

We note also that emails of record show that, in response to Complainant's requests for an accommodation, management assured Complainant that the paperwork would be taken care of and encouraged Complainant to focus on his well-being. Management completed and approved Complainant's timesheets and initially granted him LWOP. However, subsequently, his timesheets were amended to place him on AWOL, and he was terminated as a result.

Based on the above, we find the record sufficiently supports the AJ's finding that the Agency is liable for its failure to reasonably accommodate Complainant's disability. The Agency has failed to provide case-specific evidence proving that granting Complainant reasonable accommodation in the form of LWOP would have caused an undue hardship in these particular circumstances. See U.S. Airways, Inc. v. Barnett, 535 U.S. 391 (2002). While agencies are obligated to provide reasonable accommodation to a qualified individual with disability, the Rehabilitation Act allows agencies to raise an affirmative defense that the accommodation would impose an undue hardship. See Preston v. U.S. Postal Service, EEOC Appeal No. 0120054230 (August 9, 2007); Enforcement Guidance on Reasonable Accommodation. Generalized conclusions will not suffice to support a claim of undue hardship. Rather, a showing of undue hardship must be based on an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause significant difficulty or expense. See Julius C. v. Dep't of the Air Force, EEOC Appeal No. 0120151295 (June 16, 2017); Enforcement Guidance on Reasonable Accommodation. The Agency should have considered and addressed how granting extended LWOP while Complainant and his doctors tried to determine a diagnosis and prognosis would have affected the Agency. They did not do so here.

14                                          2019005694

*Disparate Treatment Claims*

Complainant has alleged that the Agency treated him disparately based on disability and in retaliation for his request for a reasonable accommodation. A claim of disparate treatment is examined under the three-part analysis first enunciated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). For a complainant to prevail, he must first establish a prima facie case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination, i.e., that a prohibited consideration was a factor in the adverse employment action. <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567 (1978). The burden then shifts to the agency to articulate a legitimate, nondiscriminatory reason for its actions. <u>See</u> <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>. 450 U.S. 248, 253 (1981). Once the agency has met its burden, the complainant bears the ultimate responsibility to persuade the fact finder by a preponderance of the evidence that the agency acted on the basis of a prohibited reason. <u>See</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993).

Here, we find the record sufficiently supports the AJ's findings that the Agency discriminated against Complainant because of his disability and its proffered reasons for the disputed actions were a pretext designed to mask discrimination and/or retaliatory animus. As discussed above, Complainant was a qualified individual with a disability, was subjected to the adverse actions of denial of telework and LWOP, and ultimately was terminated by the Agency. The Agency offers as its reason for the adverse actions essentially that Complainant stopped coming to work, failed to keep them informed of the circumstances of his absence, and failed to provide sufficient medical documentation to support his request for LWOP and/or telework. However, the record shows that an OSHA Specialist, a non-disabled employee, was granted LWOP without any supporting paperwork or medical documentation and that Complainant was in frequent, if not constant, communication with the Agency's management throughout this time. Complainant also informed management that he did not yet have a diagnosis to form the basis of the requested medical documentation, was treated at a VA hospital, and was transferred to the Mayo Clinic for neurological testing and evaluation. He produced as much medical evidence as he had to support his request. Agency policies allowed for the granting of LWOP under such circumstances and the Agency failed to follow its own policies. OSHA Specialist stated that Manager1, who is Complainant's third level supervisor and engaged Complainant regarding his LWOP, approved OSHA Specialist's nonmedical LWOP. Therefore, we find the record sufficiently supports the AJ's finding that the Agency is liable for treating Complainant disparately based on disability.

*Harassment Claim*

Complainant also alleged the Agency subjected him to harassment. In considering whether the alleged actions, whether individually or collectively, constitute harassment, the Commission notes that, in <u>Harris v. Forklift Systems</u>, the Supreme Court reaffirmed the holding of <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57 (1986), that harassment is actionable if it is sufficiently severe or pervasive that it results in an alteration of the conditions of the complainant's employment <u>See</u> <u>Enforcement Guidance on Harris v. Forklift Systems, Inc.</u>, EEOC Notice No. 915.002 at 3 (March 8, 1994). To establish a claim of harassment a complainant must show that:

15                                                      2019005694

(1) he belongs to a statutorily protected class; (2) he was subjected to unwelcome verbal or physical conduct involving the protected class; (3) the harassment complained of was based on the statutorily protected class; (4) the harassment had the purpose or effect of unreasonably interfering with his work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. See McCleod v. Social Security Administration, EEOC Appeal No. 01963810 (August 5, 1999) (citing Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982).

Furthermore, in assessing whether the complainant has set forth an actionable claim of harassment, the conduct at issue must be viewed in the context of the totality of the circumstances, considering, *inter alia*, the nature and frequency of offensive encounters and the span of time over which the encounters occurred. See 29 C.F.R. § 1604.11(b); EEOC Policy Guidance on Current Issues of Sexual Harassment, N 915 050, No. 137 (March 19, 1990); Cobb v. Department of the Treasury, Request No. 05970077 (March 13, 1997). However, as noted by the Supreme Court in Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998): "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment." The Court noted that such conduct "must be both objectively and subjectively offensive, [such] that a reasonable person would find [the work environment to be] hostile or abusive, and . . . that the victim in fact did perceive to be so." Id.; see also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 752 (1998); Clark County School Dist. v. Breeden, 532 U.S. 268 (2001).

Here, we find the record sufficiently supports the AJ's finding that the Agency subjected Complainant to a hostile work environment because of his disability. Our finding is based on management continuing to make demands and threaten disciplinary action by telephone and email, knowing that Complainant had a serious medical condition and needed more testing and evaluation in order to provide a specific diagnosis. Complainant had a neurological condition that, at least on July 7, 2014, began to show symptoms of deteriorating. On July 7, he had the dizzy spell that caused him to trip on the curb. He sought to find out what was causing intermittent dizziness, headaches, difficulty focusing and to see if it could be corrected to return to a normal life including returning to work. He was seeing neurologists for his condition, including the one who sent the request for September absence. Complainant sought to show the Agency that he was actively trying to find out the problem in hopes that he could return to work. During that time, Agency management was giving Complainant conflicting information and pressing him for medical information and documentation he did not have. We agree with the AJ's determination that, from the perspective of a reasonable person, the Agency subjected Complainant to a hostile work environment and, because he was also terminated, is vicariously liable.

16                                                      2019005694

## REMEDIES

*Reinstatement and Backpay*

The AJ ordered the Agency to reinstate Complainant to the position of Engineering Technician, GS-09, or a substantially equivalent position, at the grade and step where he would have been absent the discriminatory termination. EEOC Regulation 29 C.F.R. § 1614.501 provides for such reinstatement when there has been a finding of discrimination.

The purpose of a backpay award is to restore a complainant to the income he would have otherwise earned but for the discrimination found. See Albemarle Paper Co. v. Moody, 442 U.S. 405, 418-19 (1975); Davis v. U.S. Postal Service, EEOC Petition No. 0490010 (Nov. 29, 1990). A backpay claimant generally has a duty to mitigate damages. However, the Agency has the burden to establish, by a preponderance of the evidence that a complainant has failed to mitigate his damages. See 29 C.F.R. 1614.501(d); McNeil v. U.S. Postal Service, EEOC Petition No. 04990007 (December 9, 1999). The Commission recognizes that precise measurement cannot always be used to remedy the wrong inflicted, and therefore, the computation of back pay awards inherently involves some speculation. Hanns v. U.S. Postal Service, EEOC Petition No. 04960030 (September 18, 1997). However, uncertainties involved in a backpay determination should be resolved against the Agency which has already been found to have committed the acts of discrimination. Id.; see also Davis v. U.S. Postal Service, EEOC Petition No. 04900010 (November 29, 1990). If an agency believes that a complainant did not do enough to mitigate lost wages, it must prove so by a preponderance of the evidence. See, e.g., McNeil v. U.S. Postal Service, EEOC Petition No. 04990007 (December 9, 1999); Beaton v. Department of Justice, EEOC Petition No. 04A30044 (January 13, 2004); Arica C. v. Department of the Army, EEOC Appeal No. 2019002357 (September 22, 2020).

In opposition to the Agency's appeal, Complainant stated that the Agency has the burden to show he failed to mitigate damages, and that it failed to do so here. Complainant stated that he attempted to obtain employment by speaking with the town Mayor and Undersheriff about openings in the city. Complainant stated that no one was receptive to hiring someone in litigation about employment termination. Complainant stated, as a result, he worked for his family's car wash and lube business. He stated that he earned $29,875.16 in 2015, $31,858.48 in 2016, and $33,318.21 in 2017. Complainant stated that he entered the job market by working for his family business as they would have had to pay someone else to perform his duties. Complainant stated, "it shows that [he] was willing to do anything to earn an income for his family." Complainant stated that the AJ erred in assuming that applying for federal jobs is the only way to enter the job market. He stated that he lives in a small town and obtaining employment is different there, such that directly asking others about employment and working for a family business are appropriate. Complainant added, due to depression, withdrawal, lack of confidence, and suicidal ideation, it was normal for him not to want to apply for other Agency positions. Complainant argued that the evidence did not show that there were suitable positions available for which he was qualified and failed to apply. In addition, Complainant noted that he initially thought that his termination would be resolved quickly.

17                                    2019005694

We find that the AJ erred in not awarding Complainant backpay. The Agency failed to prove, by a preponderance of the evidence, that Complainant did not do enough to mitigate lost wages. The record shows that Complainant worked for his family's "business enterprise"[10] and earned $29,875.16 in 2015, $31,858.48 in 2016, and $33,318.21 in 2017. We find that Complainant is entitled to backpay from the effective date of termination to the date Complainant ceased working for and earning wages at his business enterprise or alternative outside employment, the date of reinstatement, or the date he declined reinstatement, whichever is earliest. We acknowledge that Complainant requested LWOP from July 22, 2014 through February 27, 2015 so that should be considered in backpay calculations, as appropriate.

*Nonpecuniary Damages*

Compensatory damages are awarded to compensate a complaining party for losses or suffering inflicted due to a discriminatory act or conduct. See Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110) at Chapter 11, § VII (citing Carey v. Piphus, 435 U.S. 247, 254 (1978) (purpose of damages is to "compensate persons for injuries caused by the deprivation of constitutional rights"). Types of compensatory damages include damages for past pecuniary loss (out-of-pocket loss), future pecuniary loss, and nonpecuniary loss (emotional harm). See EEO MD-110 at Chapter 11, § VII.B.

Non-pecuniary losses are losses that are not subject to precise quantification, including emotional pain and injury to character, professional standing, and reputation. See EEO MD-110 at Chapter 11, § VII.B (internal citations omitted). There is no precise formula for determining the amount of damages for non-pecuniary losses except that the award should reflect the nature and severity of the harm and the duration or expected duration of the harm. See Loving v. Dep't of the Treasury, EEOC Appeal No. 01955789 (August 29, 1997). The Commission notes that non-pecuniary compensatory damages are designed to remedy the harm caused by the discriminatory event rather than to punish the agency for the discriminatory action. Furthermore, compensatory damages should not be motivated by passion or prejudice or be "monstrously excessive" standing alone but should be consistent with the amounts awarded in similar cases. See Ward-Jenkins v. Dep't of the Interior, EEOC Appeal No. 01961483 (March 4, 1999).

In the instant case, the Agency appeals the AJ's award of $200,000 for Complainant's non-pecuniary losses. The Agency stated that Complainant is not entitled to compensatory damages because it acted in good faith to provide Complainant reasonable accommodation. The Agency stated that it engaged in the interactive process with Complainant and, at some point, he became upset and refused to participate in the interactive process. Further, the Agency stated that Complainant failed to establish a nexus between his emotional distress and other mental health conditions with the Agency's adverse actions. The Agency stated that Complainant's emotional harm was due to uncertainty from his neurological condition (fear that it would be life-long and he would be bound to a wheelchair), and Complainant sought mental health care more than a year after his termination solely for the purpose of this litigation.

---

[10] See 5 C.F.R. § 550.805(e)(1).

18                                                2019005694

The Agency stated that LPC1's testimony was not credible as she admitted that she did not take into consideration the uncertainty of Complainant's neurological condition in her assessments. The Agency stated that the AJ's award was "monstrously excessive" and not consistent with similar cases. The Agency stated, if compensatory damages are warranted, they should be no more than $10,000 considering that Complainant's primary concern was the uncertainty of his neurological condition.

Where a discriminatory practice involves the provision of a reasonable accommodation, compensatory damages may be awarded if the Agency fails to demonstrate that it made a good faith effort to provide the individual with a reasonable accommodation for his disability. 42 U.S.C. § 1981a(a)(3); Gunn v. U.S. Postal Service, EEOC Appeal No. 0120053293 (June 15, 2007). While we have concerns regarding the Agency's managerial confusion in handling the instant matter, we are not inclined to find that the Agency acted in bad faith, as the record clearly shows that the Agency sought to assist Complainant with various options for his absences, at least until Complainant told the RA Specialist to leave him alone. Complainant asserted that he was consumed with handling his medical testing and found the contact by various Agency people "extremely confusing." Based on our finding that the Agency engaged in the interactive process in good faith, we find Complainant is not entitled to compensatory damages for denial of reasonable accommodation.

However, we find that Complainant is entitled to compensatory damages for discriminatory disparate treatment and harassment. We find that $100,000 is appropriate to compensate Complainant for the nature, severity, and duration of harm experienced here. The record sufficiently supports the AJ's finding that the Agency's discrimination and harassment caused Complainant to experience emotional harm, loss of enjoyment of life, anxiety, loss of confidence, depression, suicidal ideation, PTSD, and mental anguish. The record contains testimony from Complainant, his spouse, and the Licensed Professional Counselor with whom Complainant began therapy sessions on May 16, 2016. The record shows, prior to starting therapy and immediately after his termination, Complainant self-medicated - drinking alcohol. Self-medicating delayed Complainant's start of therapy. Complainant had more than 43 sessions with LPC1 and, as of the hearing in 2018, she continued sessions with him, stating he still had symptoms of depression and PTSD. LPC1 testified that Complainant's mental health symptoms resulted from his termination.

The award of $100,000 is consistent with awards in other cases where complainants suffered similar symptoms. See, e.g., Karry S. v. Dep't of the Air Force, EEOC Appeal No. 0120182301 (November 21, 2019) ($100,000.00 in non-pecuniary compensatory damages where Complainant suffered a tarnished reputation, anxiety, mental anguish, stress, weight loss, night sweats, insomnia and physical effects related to discriminatory harassment and removal); and Margaret L. v. Dep't of Veterans Affairs, EEOC Appeal Nos. 0120150582 (April 17, 2018) ($100,000 in non-pecuniary compensatory damages awarded where Agency's harassment and subsequent termination caused depression, anxiety, crying spells, paranoia, trouble concentrating, isolation, and the need for mental health counseling).

19                                                    2019005694

*Other Remedial Relief*

The AJ also ordered the Agency to post notice of the finding of discrimination; provide Complainant an accommodation, if needed, upon reinstatement; and conduct training to all staff, including managers, regarding the Rehabilitation Act and reasonable accommodation process, as well as additional training for management on processing reasonable accommodation requests. We find these remedies to be appropriate as ordered.

*Attorney's Fees and Costs*

In appropriate circumstances, this Commission may award a complainant reasonable attorney's fees and other costs incurred in the processing of a complaint regarding allegations of discrimination in violation of the Rehabilitation Act. See 29 C.F.R. § 1614.501(e)(1). Indeed, a finding of discrimination raises a presumption of entitlement to an award of attorney's fees, and any such award of attorney's fees or costs must be paid by the agency that committed the unlawful discrimination in question. See 29 C.F.R. §§ 1614.501(e)(1)(i), (ii).

To determine the precise amount of fees and costs due, the complainant's attorney must submit to the agency a verified statement of attorney's fees (including witness fees, if applicable) and other costs, as appropriate. See 29 C.F.R. § 1614.501(e)(2)(i). This statement must be accompanied by an affidavit executed by the attorney of record itemizing the attorney's charges for legal services. Id. The agency or an EEOC Administrative Judge must then issue a decision determining the amount of attorney's fees or costs it deems to be due and include in this decision the specific methods applied in determining the amount of this award. See 29 C.F.R. § 1614.501(e)(2)(ii)(A). If the complainant is dissatisfied with this decision, he may appeal it to EEOC. Id.

The precise amount of attorney's fees due in these situations is typically determined by multiplying the number of hours reasonably expended by the attorney in question by a reasonable hourly rate. See 29 C.F.R. § 1614.501(e)(2)(ii)(B); see also Hensley v. Eckerhart, 461 U.S. 424, 434 (1983). This amount is often referred to as the "lodestar." "There is a strong presumption that this amount represents the reasonable fee," though "[i]n limited circumstances, this amount may be reduced or increased in consideration of the degree of success, quality of representation, and long delay caused by the agency." 29 C.F.R. § 1614.501(e)(2)(ii)(B). All hours reasonably spent in processing the complaint are compensable, but the number of hours should not include excessive, redundant or otherwise unnecessary hours. EEO MD-110 at Chapter 11, § VI.F. A reasonable hourly rate is based on prevailing market rates in the relevant community for attorneys of similar experience in similar cases. Id.

Pursuant to EEOC Regulation 29 C.F.R. § 1614.501(e)(i), the assigned AJ awarded Complainant attorney's fees of $197,789.90 and $3,154.20 in costs, for $200,944.10 total fees and costs. In so doing, the AJ used current *Laffey* Matrix rates[11] for attorneys in the D.C. area.[12]

---

[11] The Laffey Matrix is a "matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks . . . prepared by the Civil Division of the United States Attorney's Office

20                                                    2019005694

The AJ noted that, based on her review of the attorneys' fee petition and her knowledge of the course of the proceedings, the hours expended by Complainant's counsel were very reasonable for a case that encompassed discovery, a settlement conference, a dispositive motion, and a hearing.

The Agency does not dispute the hourly rate awarded based on the *Laffey* Matrix but asserted "excessive and redundant billing" for hours expended. The Agency requests, if discrimination is found, a 20% across-the-board reduction in fees.

Conversely, Complainant asked the Commission to award $254,289.96 in attorneys' fees and costs. Complainant requested:

| | |
|---|---|
| **Total hours awarded by AJ**: | 336.13 |
| Attorney 1: | 310.16 hours x $621 per hour (updated Laffey rate) |
| Attorney 2: | 25.97 hours x $591 per hour (updated Laffey rate) |

| | |
|---|---|
| **Total fees awarded by AJ** | |
| **at updated Laffey rate:** | $207,957.63 |
| **Total costs awarded by AJ**: | +    3,154.20 |
| | $211,111.83 |

| | |
|---|---|
| **Total fees-Complainant's appeal:** | 1,863.00 (3 hours x $621 per hour) |
| **Total fees-Opposition Response:** | 40,694.13 (65.53 hours x $621 per hour) |
| **Total fees-attorneys' fees motion:** | +    621.00 (1 hour x $621 per hour) |

$254,289.96 TOTAL FEES AND COSTS

---

for the District of Columbia (USAO) to evaluate requests for attorney's fees in civil cases in District of Columbia courts. The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees." USAO Attorneys Fees Matrix — 2015-2021, Explanatory Note 1.

[12] The Commission has held that if a party does not find counsel readily available in the locality of the case with whatever degree of skill that may reasonably be required, it is reasonable for the party to go elsewhere to find an attorney. See Harden v. Social Security Administration, EEOC Appeal No. 0720080002 (August 12, 2011). The burden is on the agency to show that a complainant's decision to retain out-of-town counsel was unreasonable. Id. Complainant stated that he could not find experienced federal EEO representation in or near Jackson, Wyoming.

Complainant stated that his two attorneys represented him from October 24, 2014 through July 15, 2019[13] and then for the instant appeal. Attorney1 was his primary attorney logging 310.16 hours and Attorney2 was secondary accruing 25.97 hours. Complainant stated that his attorneys "expended a great deal of time and effort over the last five years responding to written orders, filing motions and arguments, attending a deposition in Jackson, Wyoming, responding to Agency motions, and representing Complainant at his hearing." Complainant stated, "[d]ue to the nature of the proceedings, the numerous witnesses involved, the Agency decision to contest every aspect of this case, the undersigned counsel had no choice but to vigorously litigate the case." Complainant noted that he was always open to settlement and mitigation of damages. Complainant stated that his attorneys frequently represent complainants before the Commission and current Laffey rates are customary in Commission litigation. Complainant stated that the facts for all three claims were interrelated. Complainant stated that he prevailed in this matter and achieved "an excellent result" and his attorneys' fees are reasonable. Complainant stated that he hired his attorneys because he wanted an attorney with Federal Sector EEO experience (Attorney1 has practiced exclusively in federal sector EEO law since 1991) and he could not locate one in or near Jackson, Wyoming.

Based on the above, we find the AJ's award of attorneys' fees (based on hours expended prior to appeal) reasonable and at the current Laffey rate of $621 for Attorney1 and $532 for Attorney 2.[14] We also find Complainant is entitled to additional attorney's fees and costs related to this appeal. However, the submission for 65.53 hours expended on opposition to Agency appeal are not detailed as those previously submitted at the hearing stage and seem somewhat unnecessary on their face. Hence, we find a 20% across-the-board reduction of Total Fees – Opposition Response of 40,694.13 (65.53 hours x $621 per hour) is appropriate, which results in $32,555.30 (reduction of $8,138.83) for Total Fees – Opposition Response.

As outlined below, we find $244,618.90 appropriate for Total Fees and Costs through appeal:

|  |  |
|---|---|
| **Total hours awarded by AJ**: | 336.13 |
| Attorney1: | $192,609.36 (310.16 hours x $621 per hour) |
| Attorney2: | +  13,816.04 (25.97 hours x $532 per hour) |
| **Total fees for Attorneys**: | $206,425.40 |
| **Total costs awarded by AJ**: | +    3,154.20 |
|  | $209,579.60 |

---

[13] Complainant provided an invoice for services from October 14, 2014 through July 14, 2019. The invoice also contained expenses for airfare, lodging, car rental for travel to Jackson for Attorney1 and a witness for depositions and EEOC hearing.

[14] The USAO Attorney's Fees Matrix for 2020-21 is $621 per hour for 21-30 years of experience (Attorney1) and $532 for 11-15 years of experience (Attorney2).

22                                              2019005694

**Total fees-Complainant's appeal:**      1,863.00 (3 hours x $621 per hour)
**Total fees-Opposition Response:**      32,555.30 (65.53 hours x $621 per hour – 20%)
**Total fees-attorneys' fees motion:** +      621.00 (1 hour x $621 per hour)

$244.618.90 **TOTAL FEES & COSTS**

<u>CONCLUSION</u>

Based on a thorough review of the record and the contentions on appeal, including those not specifically addressed herein, we MODIFY the Agency's final order and REMAND the matter to the Agency for remedial relief.

<u>ORDER</u>

To the extent it has not already done so, the Agency shall provide the following remedial relief **within sixty (60) calendar days, unless otherwise noted, of the date of this decision.**

I.      The Agency shall pay Complainant $100,000.00 in nonpecuniary, compensatory damages.

II.     The Agency shall reinstate Complainant to the position of GS-9, Engineering Technician or a substantially equivalent position, at the grade and step where he would have been absent the discrimination. The Agency's job offer of reinstatement shall include a notice that, if Complainant either does not respond or declines the job offer within 15 days of receipt, his right to receive further back pay and other benefits based on the job offer shall terminate as of that date. If the offer is accepted, the Agency shall place Complainant into the position no later than 30 days from that date of acceptance.

III.    Upon reinstating Complainant to his position, the Agency shall immediately initiate the reasonable accommodation process with Complainant to assist him in identifying any accommodation he may need and accommodate him accordingly.

IV.     The Agency shall determine the appropriate amount of back pay, with interest, and other benefits due Complainant, pursuant to 29 C.F.R. § 1614.501, no later than 60 calendar days from the date of this decision. Back pay shall be paid from the effective date of Complainant's termination in October 2014 through the date Complainant ceased working for and earning wages at his business enterprise or alternative outside employment, the date of his reinstatement, or the date he declined reinstatement, whichever is earliest. The Complainant shall cooperate in the Agency's efforts to compute the amount of back pay and benefits due, and provide all relevant information requested by the Agency. If there is a dispute regarding the exact amount of back pay and/or benefits, the Agency shall issue a check to the Complainant for the undisputed amount within 60 calendar days of

23                                                    2019005694

the date the Agency determines the amount it believes to be due.  The Complainant may petition for enforcement or clarification of the amount in dispute.  The petition for clarification or enforcement must be filed with the Compliance Officer, at the address referenced in the statement entitled "Implementation of the Commission's Decision."

V.       The Agency shall provide 16 hours of mandatory in-person training on the Rehabilitation Act to Supervisor1, the Deputy Forest Supervisor, and the Acting Forest Supervisor as well as the RA Specialist. The training must include how to process reasonable accommodation requests from employees.

VI.      The Agency shall consider disciplinary action against Supervisor1, the Deputy Forest Supervisor, and the Acting Forest Supervisor, if they are still employed by the Agency. The Commission does not consider training to be a disciplinary action. If the Agency decides to take disciplinary action, it shall identify the actions taken. If the Agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to impose discipline. If any of them has left the Agency's employ, the Agency shall furnish documentation of the departure date(s).

VII.     The Agency shall pay Complainant $244,618.90 in attorney's fees and costs for representation through the instant appeal.

The Agency is further directed to submit a report of compliance in digital format as provided in the statement entitled "Implementation of the Commission's Decision."  The report shall be submitted via the Federal Sector EEO Portal (FedSEP).  See 29 C.F.R. § 1614.403(g).

## POSTING ORDER (G0617)

The Agency is ordered to post at its Bridger-Teton National Forest facility copies of the attached notice.  Copies of the notice, after being signed by the Agency's duly authorized representative, shall be posted **both in hard copy and electronic format** by the Agency within 30 calendar days of the date this decision was issued, and shall remain posted for 60 consecutive days, in conspicuous places, including all places where notices to employees are customarily posted.  The Agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material.  The original signed notice is to be submitted to the Compliance Officer as directed in the paragraph entitled "Implementation of the Commission's Decision," within 10 calendar days of the expiration of the posting period.  The report must be in digital format and must be submitted via the Federal Sector EEO Portal (FedSEP).   See 29 C.F.R. § 1614.403(g).

## IMPLEMENTATION OF THE COMMISSION'S DECISION (K0719)

Under 29 C.F.R. § 1614.405(c) and §1614.502, compliance with the Commission's corrective action is mandatory.  Within seven (7) calendar days of the completion of each ordered corrective action, the Agency shall submit via the Federal Sector EEO Portal (FedSEP)

24                                                      2019005694

supporting documents in the digital format required by the Commission, referencing the compliance docket number under which compliance was being monitored. Once all compliance is complete, the Agency shall submit via FedSEP a final compliance report in the digital format required by the Commission. See 29 C.F.R. § 1614.403(g). The Agency's final report must contain supporting documentation when previously not uploaded, and the Agency must send a copy of all submissions to the Complainant and his/her representative.

If the Agency does not comply with the Commission's order, the Complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The Complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the Complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File a Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). **If the Complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated**. See 29 C.F.R. § 1614.409.

Failure by an agency to either file a compliance report or implement any of the orders set forth in this decision, without good cause shown, may result in the referral of this matter to the Office of Special Counsel pursuant to 29 C.F.R. § 1614.503(f) for enforcement by that agency.

25                                                          2019005694

<u>STATEMENT OF RIGHTS - ON APPEAL</u>
<u>RECONSIDERATION</u> (M0920)

The Commission may, in its discretion, reconsider this appellate decision if Complainant or the Agency submits a written request that contains arguments or evidence that tend to establish that:

1. The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2. The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests for reconsideration must be filed with EEOC's Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision.   If the party requesting reconsideration elects to file a statement or brief in support of the request, **that statement or brief must be filed together with the request for reconsideration**.   A party shall have **twenty (20) calendar days** from receipt of another party's request for reconsideration within which to submit a brief or statement in opposition.   <u>See</u> 29 C.F.R. § 1614.405; <u>Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614</u> (EEO MD-110), at Chap. 9 § VII.B (Aug. 5, 2015).

Complainant should submit his or her request for reconsideration, and any statement or brief in support of his or her request, via the EEOC Public Portal, which can be found at https://publicportal.eeoc.gov/Portal/Login.aspx

Alternatively, Complainant can submit his or her request and arguments to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, via regular mail addressed to P.O. Box 77960, Washington, DC 20013, or by certified mail addressed to 131 M Street, NE, Washington, DC 20507.   In the absence of a legible postmark, a complainant's request to reconsider shall be deemed timely filed if OFO receives it by mail within five days of the expiration of the applicable filing period.   <u>See</u> 29 C.F.R. § 1614.604.

An agency's request for reconsideration must be submitted in digital format via the EEOC's Federal Sector EEO Portal (FedSEP).   <u>See</u> 29 C.F.R. § 1614.403(g).   Either party's request and/or statement or brief in opposition must also include proof of service on the other party, unless Complainant files his or her request via the EEOC Public Portal, in which case no proof of service is required.

Failure to file within the 30-day time period will result in dismissal of the party's request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request.   **Any supporting documentation must be submitted together with the request for reconsideration.**   The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances.   <u>See</u> 29 C.F.R. § 1614.604(c).

26                                                          2019005694

<u>COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION</u> (T0610)

This decision affirms the Agency's final decision/action in part, but it also requires the Agency to continue its administrative processing of a portion of your complaint.  You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision on both that portion of your complaint which the Commission has affirmed and that portion of the complaint which has been remanded for continued administrative processing.  In the alternative, you may file a civil action **after one hundred and eighty (180) calendar days** of the date you filed your complaint with the Agency, or your appeal with the Commission, until such time as the Agency issues its final decision on your complaint.  If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title.  Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.  If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint**.

<u>RIGHT TO REQUEST COUNSEL</u> (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests. Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:


_Carlton M. Hadden_
Carlton M. Hadden, Director
Office of Federal Operations


<u>July 26, 2021</u>
Date

EXHIBIT E



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

131 M Street, N. E., Suite 4NW02F
Washington, D. C.  20507
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Washington Direct Dial: (202) 921-2970
FAX: (202) 827-2349
Website: www.eeoc.gov

|  |  |
|---|---|
| ██████████, | ) |
|      Complainant, | ) |
| | ) |
| v. | ) |
| | ) |
| Kelu Chao, Acting Chief Executive Officer, | ) |
| U.S. Agency for Global Media, | ) |
|      Agency. | ) |

EEOC No.   570-2019-01608X
Agency No. OCR-18-16

Administrative Judge Sarah McKinin

Date:   July 27, 2022

## ORDER ENTERING JUDGMENT AND CERTIFICATION OF BENCH DECISION

     For the reasons set forth in the enclosed Bench Decision, judgment is hereby entered. A Decision and Order on Relief and Notice To The Parties explaining their appeal rights and responsibilities is attached to this Order. The hearing record has been uploaded to the EEOC electronic portal. Due to restrictions associated with the COVID-19 pandemic, I am away from my office printers and scanners. Consequently, in place of my usual hand-written edits to typographical errors in the Bench Decision transcript provided by the court reporting company, I have conducted these edits via electronic notation with inclusion of my electronic initials. I hereby CERTIFY that the enclosed Bench Decision, as edited, is a true and accurate version of the Decision I delivered to the Parties during the teleconference on June 8, 2022.

          **It is so ORDERED.**

*Sarah McKinin*

For the Commission:

Sarah McKinin, Administrative Judge
Telephone: (202) 419-0736
Sarah.McKinin@EEOC.gov

Copies Via Email and Upload to EEOC:
**For the Complainant**
Complainant's Representative, Rosemary Dettling, rdettling@felsc.com
████████████████████████████████

**For the Agency**
Agency Representative, Jessie James, Jr., jjames@usagm.gov



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

131 M Street, N. E., Suite 4NW02F
Washington, D. C.  20507
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
Washington Direct Dial:  (202) 921-2970
FAX:  (202) 827-2349
Website:  www.eeoc.gov

|  |  |
|---|---|
| ███ ███ )<br>　　Complainant, )<br>　　 )<br>v. )<br>　　 )<br>Kelu Chao, Acting Chief Executive Officer, )<br>U.S. Agency for Global Media, )<br>　　　Agency. )<br>　　 ) | EEOC No.   570-2019-01608X<br>Agency No. OCR-18-16<br><br>Administrative Judge Sarah McKinin<br><br>Date:   July 27, 2022 |

<u>**DECISION & ORDER ON RELIEF**</u>

On May 16, 17, and 18, 2022, I held a hearing on liability and damages in the above-captioned matter. On June 8, 2022,  I convened with the Parties and a court reporter at which time I issued the enclosed Bench Decision partially in favor of Complainant in connection with Complainant's Claims 1 and 2, concluding that the Agency violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-17 (2016) (as amended) when he was subjected to unlawful retaliation for protected EEO activities. Specifically, I found that the Agency was liable for retaliating against Complainant when in May 2018, the Agency detailed[1] Complainant to Operations and when the Agency issued Complainant a Minimally Successful Fiscal Year ("FY") 2018 Performance Rating in reprisal for Complainant's engagement in oppositional EEO activity.

In accordance with the enclosed Bench Decision, I set deadlines for Complainant to submit a Verified Petition for Attorneys Fees and Costs and for the Agency to respond. I also ordered Complainant to separately address the extent to which Complainant is seeking reinstatement to the position he occupied prior to the retaliatory reassignment, *i.e.,* Executive Producer, Kurdish Service, or seeking reassignment to a substantially similar position, and for the Parties to identify any known, vacant substantially similar positions available for potential reassignment options. On June 14, 2022, Complainant provided his Post-Decision Response Regarding Reassignment Remedy ("Compl. PDR"). On June 28, 2022, the Agency provided its Post-Decision Response Regarding Reassignment Remedy ("Agency PDR"). On June 28, 2022,

---

[1] For clarity of the record, I note that Complainant's detail was repeatedly extended and at the time of the hearing Complainant continued to work in a position other than the position from which he was detailed, thereby effectively transforming the detail into a reassignment. Accordingly, there are occasions when the undersigned and the Parties refer to this "detail," as a "reassignment," throughout the record.

Complainant submitted an Attorney Fee Petition. The Agency did not respond to Complainant's Fee Petition.   Wherefore this DECISION and ORDER now follows.

## I.  Entitlement to Relief & Complainant's Remedies Request

Where discrimination is found, the Agency must provide complainant with a remedy that constitutes full, make-whole relief to restore Complainant as nearly as possible to the position Complainant would have occupied absent the discrimination. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 764 (1976); *Albemarle Paper Co. v. Moody*, 442 U.S. 405, 418-419 (1975); *Adesanya v. United States Postal Serv.*, EEOC Appeal No. 01933395 (July 21, 1994). However, a complainant found to be a victim of discrimination is not entitled to placement in a better position than Complainant would have been in but for the discrimination. *Campbell v. Tennessee Valley Authority*, 613 F. Supp. 611, 615 (D.C. Tenn. 1985).

Pursuant to Complainant's April 27, 2022, Prehearing Report, Complainant seeks the following relief in this matter:

> Complainant requests 150k in compensatory damages; expungement of his record if there is negative information in his OPF file; a change in his rating to Highly Successful; attorney fees; a promotion to a GS-14; and requests that the Commission order the agency to place him in one of the GS-14 positions he applied to.

*See* Compl.'s Prehearing Report (Apr. 27, 2022) at 11. In accordance with Compl.'s PDR, Complainant identified four options for reassignment, one being reinstating Complainant to his former position of Executive Producer, Kurdish Service. *See* Compl.'s PDR, *supra*. Complainant sought $141,248.16 in attorney fees. *See* Fee Petition.

Here, I found Complainant prevailed at hearing on Claims 1 and 2, regarding a retaliatory involuntary reassignment and retaliatory minimally successful performance rating, thereby entitling Complainant to make-whole relief with respect to these claims only. Complainant is not entitled to relief on claims in which he did not prevail, including non-selection to the positions of Supervisory Executive Producer, and Multi-Media Producer. My rulings with respect to the specific relief that shall be awarded is based upon these principles and detailed further below.

## II.  Decision on Relief

### A.  Requested Remedy 1: Compensatory Damages

Section 102(a) of the Civil Rights Act of 1991, 105 Stat. 1071, Pub. L. No. 102-166, codified as 42 U.S.C. 1981a, authorizes an award of compensatory damages as part of the "make whole" relief for intentional discrimination in violation of Title VII. The Commission has held that compensatory damages are recoverable in the administrative process. *Jackson v. United States Postal Serv.*, EEOC Appeal No. 01923399 (Nov. 12, 1992), *request to reopen denied*, EEOC Request No. 05930306 (Feb. 1, 1993).

Pecuniary damages may be awarded for losses that are directly or proximately caused by the agency's discriminatory conduct. *See* EEOC Enforcement Guidance: Compensatory and Punitive Damages Available Under Section 102 of the Civil Rights Act of 1991. Pecuniary losses are out-of-pocket expenses incurred as a result of the agency's unlawful action, including job-hunting expenses, moving expenses, psychiatric expenses, physical therapy expenses, and other quantifiable out-of-pocket expenses. *Id.*

Non-pecuniary losses include intangible injuries of emotional harm, such as emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. Other nonpecuniary losses could include injury to professional standing, injury to character and reputation, injury to credit standing, loss of health, and any other nonpecuniary losses that are incurred as a result of the discriminatory conduct. An award of non-pecuniary compensatory damages is warranted if there is a sufficient causal connection between the agency's illegal actions and complainant's injury. EEOC Enforcement Guidance: Compensatory and Punitive Damages Available under Section 102 of the Civil Rights Act of 1991, Section II (A) (2) (citing *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977)). An award of non-pecuniary compensatory damages should reflect the extent to which the agency's discriminatory action directly or proximately caused the harm as well as the extent to which other factors also caused the harm. *Johnson v. Department of the Interior,* EEOC Appeal No. 01961812 (June 18, 1998). It is the complainant's burden to provide objective evidence in support of her claim and proof linking the damages to the alleged discrimination. *Papas v. U.S. Postal Serv.,* EEOC Appeal No. 01930547 (Mar. 17, 1994); *Mims v. Dep't. of the Navy,* EEOC Appeal No. 01933956 (Nov. 24, 1993).

The Commission has stated that an appropriate award of non-pecuniary compensatory damages "must meet two goals: that it not be 'monstrously excessive' standing alone, and that it be consistent with awards made in similar cases." *Portier v Dep't of the Army*, EEOC Appeal No. 01A05954 (Feb. 28, 2001) (*citing Cygnar v. City of Chicago,* 865 F.2d 827, 848 (7th Cir. 1989)); *see also Nannie D. v. Dep't of the Army*, EEOC Appeal No. 0720150021 (Apr. 28, 2016) *citing Ward-Jenkins v. Dep't of the Interior*, EEOC Appeal No. 01961483 (Mar. 4, 1999) (espousing similar criteria with the addition that the award should not be the product of passion or prejudice). The appropriate calculation should consider the severity and duration of the harm. *See Nannie D.*, *supra*. Section 1981a(b)(3) of the Civil Rights Act of 1991 limits the total amount of compensatory damages that may be awarded to each complaining party for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, according to the number of persons employed by the respondent employer. The limit for an employer with more than 500 employees, such as the Agency, is $300,000.00. 42 U.S.C. 1981a(b)(3)(D).

Here, Complainant sought an award of $150,000 in non-pecuniary damages, and did not put forth any request to be awarded pecuniary losses. Complainant's damages request was supported at hearing through his testimony, as well as the testimony of Complainant's witnesses, including his estranged wife, Ferdaws Seraj.

At hearing, Complainant testified that working as an Executive Producer in the Kurdish Service was his "dream job," having allowed him the opportunity to draw upon his Kurdish identity to benefit the Service, the Agency, and the viewing material of the audience. Prior to his

reassignment, Complainant testified that he felt that they, in the Kurdish Service, were trying to make "magic" happen. Complainant discussed, however, that the Agency's decision to detail him from his position in the Kurdish Service in retaliation for his protected activity impacted every aspect of his life. For example, Complainant testified that he became ███████████ ████████████████████████████████████████████████████ that following the retaliation, he suffered from feelings of depression, felt sick daily, had a pit in his gut, and jus ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

Complainant's estranged wife, Ms. ██████ corroborated Complainant's testimony with respect to the detrimental impact of Complainant's having lost his position in the Kurdish Service upon Complainant and t████████████, Ms. ██████ remembered that Complainant being hired into his position in the Kurdish Service was an "exciting time," that was celebrated. Ms. ██████ testified that Complainant had always wanted to occupy a position where he could give back to the Kurdish viewers. She recalled when Complainant started in this position, he would come home excited, working on different ideas for the production of the Service. Ms. ██████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

Additional witnesses testified to witnessing Complainant's negative response to being reassigned out of the Kurdish Service, including ███████████ and ███████████. Ms. ██████ testified that everyone was shocked by Complainant's removal, and that Complainant was devastated and very hurt by it, and was not doing well. Mr. Saleh testified that Complainant appeared to be sad about the decision.

Given the aforementioned testimony, I find that Complainant is entitled to $150,000 in non-pecuniary compensatory damages. This award is consistent with damages awards issued in similar circumstances, not monstrously excessive standing alone, and not the product of passion

or prejudice. *See e.g., Miquel G. v. U.S. Postal Serv.,* EEOC Appeal No. 2020000182 (Mar. 4, 2020)($150,000 in nonpecuniary damages awarded based upon complainant's and his wife's credible testimony that complainant suffered emotional distress, a change in character, and dissolution of their marriage as a result of the discrimination); *VanDesande v. U.S. Postal Serv.,* EEOC Appeal No. 07A40037 (Sept. 28, 2004) ($150,000 in nonpecuniary damages awarded based upon damages evidence showing in part, that complainant suffered loss of self-esteem, withdrew from his extended family, and experienced a ruined marriage and relationship with his children as a result of the discrimination); *see also Franklin v U.S. Postal Serv.,* EEOC Appeal No. 01A03882 (Jan. 19, 2001)(affirming award of $150,000 in nonpecuniary damages, finding that the "agency's conduct caused extensive symptoms of emotional distress, resulting in changes in complainant's personality, the ending of his marriage, severe strains in his relationships with those close to him, including his children, and diminished enjoyment of life.").

I find this award appropriately remedies the injury Complainant suffered as a result of the retaliatory reassignment, for which there has been a finding of liability. Notwithstanding the fact that Complainant prevailed on only a portion of his claims, the retaliatory reassignment clearly played a chief role in the suffering Complainant endured. Complainant's testimony and those of his witnesses make clear that the retaliatory reassignment for which Complainant established liability was the impetus for Complainant's damages.

**Wherefore, within 60 days of issuing a Final Decision in this case, the Agency is ORDERED to pay to Complainant $150,000 in non-pecuniary compensatory damages.**

## B. Requested Remedy 2: Alteration of Records

One form of equitable relief is the expungement of adverse materials related to the discriminatory personnel actions from the Agency's records, and the amendment of records to eliminate negative information and confer upon complainant the employment records that they would have received absent the discrimination. *See* MD-110, Ch. 11, Sec. V, *citing Sipriano v. Dep't. of Homeland Security,* EEOC Appeal No. 0120103167 (Jan. 20, 2011), *req. for recon. denie*d, EEOC Request No. 0520110313 (May 12, 2011) (ordering the agency to expunge all documentation relating to a discriminatory termination from complainant's records); *see also Porter v. Dep't of the Navy,* EEOC Appeal No. 07A20080 (Jul. 16, 2003) (ordering the agency to rewrite or remove negative performance review narratives); *Williams v. Small Bus'n Assoc.,* EEOC Appeal No. 01996635 (Jan. 30, 2002)(ordering the agency to expunge complainant's previous performance evaluation and change it to Exceeds Fully Successful). As such, I find Complainant's request for "expungement of his record if there is negative information in his OPF file; [and] a change in his rating to Highly Successful," to be an appropriate remedy warranted under the circumstances of Complainant's case. I separately note that Complainant testified credibly that since receipt of his Minimally Successful rating, the lowest rating he received was at least Highly Successful.

**Wherefore, within 60 calendar days of issuing a Final Decision on this case, the Agency is ORDERED to (1) expunge from Complainant's Official Personnel File (OPF), (electronic and hard copy, if any), and all other Agency systems of record, the 2018 Minimally Successful Performance Rating and all documentation that refers to the**

Minimally Successful rating; (2) replace the expunged 2018 Rating, with a retroactive 2018 Rating reflecting Highly Successful ratings for all elements and overall rating of High Successful, omitting his supervisors narrative comments, and including Complainant's self assessment/employee's comments.

### C.  Requested Remedy 3: Promotion & Placement into GS-14 Position Unwarranted, But Reassignment is Proper

As an initial matter, Complainant failed to establish a *prima facie* case of reprisal with respect to his non-selections, and  accordingly, Complainant is not entitled to relief associated with Claims 3 and 4. Thus, Complainant's request of  "a promotion to a GS-14; and […] place[ment] [of Complainant] in one of the GS-14 positions he applied to," is DENIED.

By contrast, Complainant did prevail on Claim 1, regarding the Agency's retaliatory reassignment. In cases involving retaliatory reassignments, the Commission has awarded reinstatement of complainant to their prior position. *See e.g., Winifred M. v. Dep't of the Navy*, EEOC Appeal No. 07A30054 (Apr. 23, 2003). The Commission, however, has also recognized certain circumstances where a transfer or reassignment to a different position than the one complainant occupied at the time of the discriminatory event was properly awarded in accordance with the Commission's broad powers to fashion equitable relief and eliminate the unlawful practice complained of, for which there has been a finding of liability. *See e.g., Gordon v. U.S. Dep't of the Army*, EEOC Appeal No. 0720120040 (Aug. 27, 2013); *Shaffer v. U.S. Postal Serv.*, EEOC Request No. 05A40070 (Nov. 19, 2003); *Kubiak v. U.S. Postal Serv.*, EEOC Appeal No. 01891205 (Aug. 21, 1989).

Here, I contemplated that Complainant's reinstatement into his prior position of Executive Producer, Kurdish Service, may not necessarily provide Complainant the most effective equitable relief, considering the cross-allegations of harassment amongst Complainant and his supervisors in the Kurdish Service and vice versa raised at hearing. At least one of these supervisors, Ms. Shirwani, continues to hold a management position in the Kurdish Service. Ms. Shirwani in particular made several alarming accusations of Complainant, which I did not find credible. Accordingly, as noted previously, I instructed the Parties to submit pleadings addressing Complainant's interest in reinstatement or alternative reassignment options with respect to a substantially similar position as the one Complainant previously occupied.

Complainant indicated his preference for reassignment as follows: (1) Executive Producer, Africa Division,  if vacant ("Reassignment Option 1"); (2) Supervisory Managing Editor, Kurdish Division, DE-11446460-22-SG ("Reassignment Option 2"); (3) Executive Producer, Eurasia or Asia Division ("Reassignment Option 3"); or (4) reinstatement to former position of Executive Producer, Kurdish Division ("Reassignment Option 4" or simply "Reinstatement").[2] *See* Compl.'s PDR, *supra*. Complainant attached the Vacancy Announcement for Reassignment Option 2 to his response. *See id.* at 4-9.  It is unclear whether Reassignment Options 1 and 3 are vacant. Complainant also noted that Complainant's placement in

---

[2] Based upon Complainant's inclusion of reinstatement to his former position in his list of reassignment options, I have concluded that Complainant does not object to reinstatement as a potential remedy in this matter.

Reassignment Option 2 would avoid the need for the Agency to "bump" the current Kurdish Service Executive Producer. *Id.* at 2.

The Agency offered Complainant to either be: (5) placed in the position of Executive Producer, VOA Bangladesh ("Reassignment Option 5"); or (6) continue to maintain Complainant in his current position ("Reassignment Option 6" or simply "Status Quo"). *See* Agency PDR, *supra*. The Agency objected to Complainant's list of reassignment options, stating "the three positions given by Complainant are grade GS-14, and at the time of his detail, the position Complainant held was a grade GS-13 with no promotion." *See id.* However, the Vacancy Announcement for Reassignment Option 2 clearly shows the position to be graded as a GS-13, with promotion potential of GS-13 only. Compl.'s PDR at 4-5. While the Agency did not raise an objection that any of the positions listed by Complainant were otherwise not similarly situated, with respect to Reassignment Option 2, I note that the position summary and description of duties as detailed below, appear similar to those listed within Complainant's Executive Producer Position Description:

> This position [Supervisory Managing Editor] serves as a supervisory team leader, editor, and producer and is responsible for assigning, conceiving and coordinating/directing the development and production of radio, television programs and multimedia content on multiple digital platforms, including desktop, mobile and social media properties.
>
> […]  Duties include, but are not limited to:
>
> - Oversees creation and management of the production process and all writing and copy editing of scripts in a style suitable for broadcast on all digital platforms.
> - Coordinates the work of writers, reporters, and producers involved in the preparation and production of digital content, including ensuring that website headlines and teasers are clear and interesting and materials prepared for TV rewritten into s style suitable for digital publication; check content for substance, accuracy and balance, as well as clear style.
> - Assign work to subordinates based on priorities, selective consideration of the difficulty and requirements of assignments, and the capabilities of employees. Prepares Performance Elements and Standards and files annual Performance Appraisal reports for staff members.
> - Works with executive producer, producers and reporters and other staff to create appealing line-ups, prepare news-worthy reports, and book credible guests.

*Contra* Compl.'s PDR at 4-9; Report of Investigation ("ROI") at 149- 153.

Based upon the foregoing, I find that the circumstances present in this case warrant ordering the Agency to offer Complainant a choice between reinstatement and some of the reassignment options for which the record demonstrates are substantially similar. In particular, Reassignment Options 2 and 5 appear substantially similar based upon the information the

Parties proffered. *See* Compl. PDR and Agency PDR. However, despite providing Complainant an opportunity to address the substantially similar nature of his preferred reassignment options, Complainant has failed to put forth sufficient information to establish that Reassignment Options 1 and 3 are substantially similar positions to the one he occupied at the time of the retaliatory reassignment. Moreover, given that Reassignment Option 2 is a position within the Kurdish Service, and that the genesis of seeking reassignment options stemmed from a concern that returning Complainant to the Kurdish Service could be an ineffective remedy in this case, I find that the Agency only need offer Complainant Reassignment Option 2, if it is a mutually agreeable alternative to reinstatement. In other words, if Complainant chooses Reassignment Option 2, in accordance with the below instructions for the Agency to offer Complainant a choice between reinstatement or reassignment to Reassignment Options 2 and 5, the Agency may opt to reinstate Complainant to his former position, if Reassignment Option 2 is not mutually agreeable. However, if Complainant chooses either reinstatement or Reassignment Option 5, the Agency is bound to effect Complainant's election.

**Wherefore, within 14 calendar days of issuing a Final Decision on this case, the Agency is ORDERED to, (i) offer Complainant *his choice* of reinstatement to the position of Executive Producer Kurdish Service, or reassignment to the position of Supervisory Managing Editor, Kurdish Service (Reassignment Option 2) or Executive Producer, Bangladesh Service (Reassignment Option 5). In the event Complainant chooses Reassignment Option 2, the Agency may choose to reinstate Complainant to his former position of Executive Producer Kurdish Service if Reassignment Option 2 is not mutually agreeable. The Agency shall take prompt steps to effect Complainant's placement in the selected position following Complainant's election of reinstatement or reassignment in accordance with this paragraph. Placement shall occur by not later than 60 calendar days following Complainant's response to the Agency's placement offer.**

## D. <u>Requested Remedy 4: Attorney's Fees and Costs</u>

EEOC regulations require that an agency shall award attorney's fees to "prevailing parties" who are represented by an attorney. *See* 29 C.F.R. § 1614.501(e). Here, Complainant is a "prevailing party" through the entry of an Order Entering Judgment in Complainant's favor. For that reason, and because Complainant is represented by an attorney, I find that Complainant is eligible for an award of fees.

As a general rule, the attorney's fee award is computed by determining the "lodestar" figure, which is the product of the number of hours the attorney reasonably expended on the case, multiplied by a reasonable hourly rate. *Blum v. Stenson*, 465 U.S. 886 (1984); *Hensley v. Eckerhart*, 461 U.S. 424 (1983). As noted by the Commission, "[t]here is a strong presumption that the lodestar represents the reasonable fee." *See* MD-110, Chap. 11, § VI (B); *See also* 29 C.F.R. § 1614.501(e)(2)(ii)(B). It is well-settled that a reasonable hourly rate is to be determined by the "prevailing market rates in the relevant community." *Blum*, 465 U.S. 886. Pursuant to Commission precedent, it is proper to use the current rates in calculating charges for the entire litigation. *See Mareno v. Dep't. of Veterans Affairs*, EEOC Appeal No. 01943104 (Feb. 14, 1996) (the proper customary hourly rate is the reasonable hourly rate in effect at the time of the award and not at the time the Services are provided). MD-110, Chapter 11-14 states that the

"hours spent on unsuccessful claims should be excluded in considering the amount of a reasonable fee only where the unsuccessful claims are distinct in all respects from the successful claims" (citing *Hensley v. Eckerhart,* 461 U.S. 424 (1983)).

On June 18, 2022, Complainant submitted a verified petition for attorneys' fees seeking reimbursement of $141,248.16 in attorneys' fees. Complainant did not seek to recoup litigation expenses. Complainant's attorney provided timekeeping documentation showing a total of 187.83 hours worked by Complainant's designated representative, Ms. Dettling, at a rate of $752/hour, as well as an affidavit attesting to the veracity of these hours and rates. Specifically, Complainant utilized rates consistent with the U.S. Department of Justice's revised matrix known as "the *Fitzpatrick* Matrix," as relevant to Ms. Dettling's years of litigation experience. *See* Fee Petition at Exh. C.  Pursuant to Ms. Dettling's sworn affidavit, Ms. Dettling excluded hours "spent on the unsuccessful issues […] from the billing invoice" *See* Fee Petition at Exh. B, para. 7.

The Agency was provided an opportunity to respond to Complainant's Fee Petition, but failed to respond. In the absence of any argument or objection to the Fee Petition, I find that the Agency has consented to the appropriateness and reasonableness of the hourly rates utilized and hours expended.

Based upon the foregoing, I find that the record supports Complainant's entitlement to reimbursement of attorney fees in the amount of **$141,248.16**. I note that notwithstanding the Agency's lack of response, in fashioning this remedy, I considered that Complainant prevailed on only a portion of his claims. While Complainant excluded entries on unsuccessful issues, to the extent that some of the entries reflect time spent on both successful and unsuccessful claims, I hereby find that Complainant is entitled to reimbursement of the full fees sought.  I base my ruling on the fact that all four claims stemmed from a similar reprisal theory, and thus, are not truly fractionable. Additionally, I find that reduction is not warranted where, as here, Complainant obtained the majority of relief sought in his Complaint through the remaining claims upon which Complainant prevailed, *i.e.,* change in his position and personnel records and compensatory damages, among other remedies awarded. *See e.g., Smith v. Dep't of Veterans Affairs*, EEOC Appeal No. 0120112724 (Oct. 17, 2011)(holding further reduction in fees was not warranted where complainant prevailed on one of the most material claims);  *Heffley v. U.S. Postal Serv.,* EEOC Appeal No. 07A40138 (Mar. 17, 2005)(declining to take an across-the-board reduction where legal theories put forth on successful and unsuccessful claims were closely intertwined).

**Wherefore, within 60 calendar days of issuing a Final Decision in this case, the Agency is ORDERED to reimburse Complainant's attorney fees in the amount of $141,248.16.**

### E.  Additional Relief Warranted: Posting Notice, Training, & Consideration of Discipline of Responsible Management Officials

The Commission has upheld the issuance of remedies, including those associated with training and a posting notice, even when not specifically requested by Complainant. The Commission cannot order the agency to take disciplinary action against a particular official as

part of its remedies; however, it is established Commission policy that disciplinary action against an offending official should be considered by the agency as a corrective remedy once a finding of discrimination has been made. *See Mitchell v. Dep't of Army*, EEOC Appeal No. 07A10065 (Aug. 8, 2002); *Lacanienta v. U.S. Postal Serv.*, EEOC Appeal No. 01911733, (Sept. 18, 1991) *citing* EEOC Policy Statement on Remedies and Relief for Individual Cases of Unlawful Discrimination, 29 C.F.R. Part 1613, Appendix A; 29 C.F.R. 1613.221(c)(3); *Cassida v. Dep't of the Army*, EEOC Request No. 05900794 (Sept. 14, 1990).

Here, I find the remedies of training, the consideration of discipline, and a posting notice, are warranted under the circumstances of this case. As detailed in the enclosed Bench Decision, the Agency was found liable for two acts of unlawful retaliation at the hands of three different management officials, Kelu Chao, Motabar Shirwani, and Fakhria Jawhary, and hearing testimony in this matter supports that an overarching retaliatory animus towards Complainant's EEO activities existed among the relevant managers, thereby supporting the appropriateness of training and consideration of discipline. Further, EEOC Regulations at 29 C.F.R. § 1614.501(a)(1) provide that "[w]hen an agency, or the Commission, in an individual case of discrimination, finds that an applicant or an employee has been discriminated against, the Agency shall provide full relief which shall include … [n]otification to all employees of the agency in the affected facility of their right to be free of unlawful discrimination and assurance that the particular types of discrimination found will not recur."

**Wherefore, within 60 calendar days of issuing a Final Decision in this case, the Agency is ORDERED to (i) post the attached Notice for a period of no less than 90 consecutive days at VOA, 330 Independence Avenue, S.W., Washington, D.C. 20237 and electronically; (ii) provide a minimum of four (4) hours of training to Kelu Chao and Motabar Shirwani, specific to anti-retaliation training for supervisors; and (iii) consider taking disciplinary action against Chao and Shirwani, as appropriate. [3] Copies of the Notice, after being signed by the Agency's duly authorized representative, shall be posted both in hard copy and electronic format by the Agency in conspicuous places, including all places where notices to employees are customarily posted. The Agency shall take reasonable steps to ensure that said Notices are not altered, defaced, or covered by any other material. The Commission does not consider training to be disciplinary action. If the Agency decides to take disciplinary action, it shall identify the action taken. If the Agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to impose discipline.**

It is so **ORDERED**.

For the Commission:

Sarah McKinin, Administrative Judge

---

[3] At the time of this Decision, Fakhria Jawhary, a third responsible management official, is no longer a federal employee.

Copies Via Email and Upload to EEOC Portal:

**For the Complainant**
Complainant's Representative, Rosemary Dettling, rdettling@felsc.com
Complainant, ████████████████████████

**For the Agency**
Agency Representative, Jessie James, Jr., jjames@usagm.gov

## SUMMARY OF RELIEF

Unless a different time period is specified, within sixty (60) calendar days of the date the Agency issues a Final Order, the Agency is ORDERED to:

I       Pay to Complainant $150,000 in non-pecuniary compensatory damages.

II       Expunge from Complainant's Official Personnel File (OPF), (electronic and hard copy, if any), and all other Agency systems of record, all documentation of Complainant's 2018 Minimally Successful Performance Rating and replace the Minimally Successful Rating with a Highly Successful Rating that is compliant with instructions set forth in this Decision and Order.

III      Within fourteen (14) calendar days of the date the Agency issues a Final Order, offer Complainant his choice of placement in 1) his former position of Executive Producer Kurdish Service, 2) Supervisory Managing Editor, Kurdish Service (Reassignment Option 2), or 3) Executive Producer, Bangladesh Service (Reassignment Option 5), and take prompt steps to effect Complainant's decision in accordance with instructions set forth in this Decision and Order.

IV      Pay to Complainant $107,236 in non-pecuniary compensatory damages.

V       Pay to Complainant's attorney $141,248.16 in fees.

VI      Provide 4 hours of training to Kelu Chao and Motabar Shirwani, specific to anti-retaliation training for supervisors.

VII     Consider taking disciplinary action against offending officials  Chao and Shirwani.

VIII    Post the attached notice in a conspicuous physical space and electronically for a period of not less than 90 consecutive days.


It is so **ORDERED**.


For the Commission:                    Sarah McKinin, Administrative Judge

**NOTICE TO EMPLOYEES POSTED BY ORDER OF**
**THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**An Agency of the United States Government**

This Notice is posted pursuant to an order by the United States Equal Employment Opportunity Commission, dated July 17, 2022, which found that a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-17 (2016) (as amended) has occurred at the U.S. Agency for Global Media, Voice of America, Washington, D.C. Office.

Federal law requires that there be no discrimination against any employee or applicant for employment because of the person's RACE, COLOR, RELIGION, SEX (including GENDER IDENTITY, SEXUAL ORIENTATION, and PREGNANCY), NATIONAL ORIGIN, AGE, DISABILITY, GENETIC INFORMATION, or PRIOR EEO ACTIVITY with respect to hiring, firing, promotion, compensation, or other terms, conditions or privileges of employment. The U.S. Agency for Global Media confirms its commitment to comply with these statutory provisions. It supports and will comply with such federal law and will not take action against individuals because they have exercised their rights under the law.

**The U.S. Agency for Global Media, Voice of America, Washington, D.C. Office, was found liable for committing unlawful retaliation against its employee, who participated in protected EEO activity. The EEOC has ORDERED the U.S. Agency for Global Media to post this notice for a period of not less than 90 consecutive days, and to take other remedial actions in favor of the employee, including an order to place the employee in a selected position, expunge adverse personnel records, pay compensatory damages and attorney fees, consider disciplining the offending management officials and conduct training.** The U.S. Agency for Global Media will ensure that officials responsible for personnel decisions and terms and conditions of employment will abide by the requirements of all federal equal employment opportunity laws.

The U.S. Agency for Global Media, Voice of America, will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to, federal equal employment opportunity law.

_____                                  _____
Date                                             Signature of Authorized Official
                                                 Name/Title of Authorized Official [Printed]

14

## **NOTICE TO THE PARTIES**

This is a decision by an Equal Employment Opportunity Commission Administrative Judge issued pursuant to 29 C.F.R. § 1614.109(b), 109(g) or 109(i).  **With the exception detailed below, Complainant may not appeal to the Commission directly from this decision.** EEOC regulations require the Agency to take final action on the complaint by issuing a final order notifying Complainant whether or not the Agency will fully implement this decision within forty (40) calendar days of receipt of the hearing file and this decision.  In April 2020, a memorandum was issued by Carlton Hadden to the Federal Sector EEO Directors and officials containing information and directives regarding the tolling of timeframes during the pandemic. In July 2020, this memorandum was modified to direct Agencies to return to issuing final actions.    See    https://eeoc.gov/update-april-6-2020-memorandum-processing-information. Complainant may appeal to the Commission within thirty (30) calendar days of receipt of the Agency's final order.  Complainant may file an appeal whether the Agency decides to fully implement this decision or not.

The Agency's final order shall also contain notice of Complainant's right to appeal to the Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for such appeal or lawsuit.  If the final order does not fully implement this decision, the Agency must also simultaneously file an appeal to the Commission in accordance with 29 C.F.R. § 1614.403, and append a copy of the appeal to the final order.  A copy of EEOC Form 573 must be attached.  A copy of the final order shall also be provided by the Agency to the Administrative Judge.

If the Agency has not issued its final order within forty (40) calendar days of its receipt of the hearing file and this decision, Complainant may file an appeal to the Commission directly from this decision.  In this event, a copy of the Administrative Judge's decision should be attached to the appeal.  Complainant should furnish a copy of the appeal to the Agency at the same time it is filed with the Commission, and should certify to the Commission the date and method by which such Service was made on the Agency.

You may file an appeal with the Commission's Office of Federal Operations **when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision**.  29 C.F.R. § 1614.110(a).  You will have **thirty (30) days** to file an appeal from the time you receive the agency's final order.  If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. *See* EEO MD-110, 9-3.  In either case, please attach a copy of this decision with your appeal.

**Do not send your appeal to the Administrative Judge**. Your appeal must be filed with the Office of Federal Operations at the address set forth below.  If you do not use the EEOC Public Portal to file your appeal, you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations, and you must certify the date and method by which you sent a copy of your appeal to the agency.

### *HOW TO FILE AN APPEAL*

**RECOMMENDED METHOD** – The EEOC highly recommends that you file your appeal online using the EEOC Public Portal at https://publicportal.eeoc.gov/, and clicking on the "Filing with the EEOC" link.  If you have not already registered in the Public Portal, you will be asked to register by entering your contact information and confirming your email address.  Once you are registered you can request an appeal, upload relevant documents (e.g., a statement or brief in support of your appeal), and manage your personal and representative information.  During the adjudication of your appeal, you can also use the Public Portal to view and download the appellate record.  **If you use the Public Portal to file your appeal, you do not have to send a copy to the agency.**

BY MAIL – You may mail your written appeal to:

        Director, Office of Federal Operations
        Equal Employment Opportunity Commission
        P.O. Box 77960
        Washington, D.C. 20013-8960

BY HAND DELIVERY OR COURIER – You can also hand-deliver or send your appeal by courier Service to:

        Director, Office of Federal Operations
        Equal Employment Opportunity Commission
        131 M St., NE
        Washington, D.C. 20507

BY FAX – Finally, you may send it by facsimile to (202) 827-2349.

If you elect to mail, deliver, or fax your appeal you should use EEOC Form 573, Notice of Appeal/Petition, and should indicate what you are appealing.  Additionally, you must serve the agency with a copy of your appeal, and include a statement certifying the date and method by which Service to the agency was made.

### **COMPLIANCE WITH AN AGENCY FINAL ACTION**

An Agency's final action that has not been the subject of an appeal to the Commission or civil action is binding on the Agency.  See 29 C.F.R. § 1614.504.  If Complainant believes that the Agency has failed to comply with the terms of its final action, Complainant shall notify the Agency's EEO Director, in writing, of the alleged noncompliance within thirty (30) calendar days of when the complainant knew or should have known of the alleged noncompliance.  The Agency shall resolve the matter and respond to the complainant in writing.  If Complainant is not satisfied with the Agency's attempt to resolve the matter, he or she may appeal to the Commission for a determination of whether the Agency has complied with the terms of its final action.  Complainant may file such an appeal within thirty (30) calendar days of receipt of the Agency's determination or, in the event that the Agency fails to respond, at least thirty-five (35)

calendar days after Complainant has served the Agency with the allegations of noncompliance. A copy of the appeal must be served on the Agency, and the Agency may submit a response to the Commission within thirty (30) calendar days of receiving the notice of appeal.

EXHIBIT F



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

, a/k/a
Glenna O.,[1]
Complainant,

v.

Matthew P. Donovan,
Acting Secretary,
Department of the Air Force,
Agency.

Appeal No. 0720180030

Hearing No. 570-2016-00054X

Agency No. 9O0D15001F18

## DECISION

Simultaneously with its August 24, 2018 final order, the Agency filed a timely appeal with the Equal Employment Opportunity Commission (EEOC or Commission) pursuant to 29 C.F.R. § 1614.403(a). The Agency requests that the Commission affirm its rejection of the finding by an Administrative Judge (AJ) with the EEOC of discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq., and Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 et seq.

## BACKGROUND

At the time of events giving rise to this complaint, Complainant worked for the Choctaw Archiving Enterprise of the Choctaw Nation of Oklahoma (Staffing firm 1) serving the Agency as an Outreach Manager (social worker) at the Agency's 48th Medical Group, Mental Health Flight, Family Advocacy Program located on a Royal Air Force base in Lakenheath, United Kingdom.

Her position description reflects she managed the Prevention/Outreach program with the goals of promoting and fostering capacity, resilience, family wellness, deterring predictable maltreatment problems, and decreasing maladaptive behavior to support mission readiness.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

2                                                          0720180030

Tools to do this included social marketing campaigns, behavioral health and family violence education, program interventions with active duty and squadrons to promote protective factors and address maltreatment risk factors, and maintaining current resource information both on and off the base. Report of Investigation (ROI), Ex. F-1.c., at Bates Nos. (lower right) 478 – 479. This was a non-clinical position.

Complainant served Agency populations in Lakenheath and for substantial periods at the Royal Air Force Base in Mildenhall, about five miles from Lakenheath. She grew up in Mildenhall, was educated in Great Britain, and earned a Masters' degree in Social Work in 2005.

On January 13, 2015, Complainant filed an EEO complaint, with amendments accepted at the direction of the AJ during the hearing process, alleging that the Agency harassed and discriminated against her:

1. Based on her sex (female) when, in February and March 2014, her Agency first line supervisor (S1 - female) wrote on the back of a group gift license plate to a departing employee "see you later, B/F Blue Falcon", slang for "buddy fucker", and said to Complainant, "I see you have your hooker heels on" and "who did you have to lie down with to get that printer".

2. Based on reprisal for prior protected EEO activity when she was subjected to harassment from November 3, 2014 through May 15, 2015, as evident by 23 listed examples; and

3. based on her sex and reprisal when she was constructively discharged on February 5, 2016, the date she resigned.

The harassment alleged in claim 2 including the Lakenheath hospital's delay in granting her the privileges she needed to take a higher paying position as a clinical social worker. Complainant had been selected for the position in August 2014 by the Squadron Commander at Mildenhall, with hiring though Potomac Healthcare Solutions, LLC of Woodbridge, Virginia (Staffing firm 2). HT 1, at 28, 31 – 32; HT 5, at 192; ROI, Exhs. B-1, at Bates Nos. 45 – 46 and F-3, at Bates Nos. 1547 – 1548, 1553, 1559 – 1560. The Lakenheath hospital served both the Lakenheath and Mildenhall bases. As a result of the delay in granting her privileges, Complainant was unable to assume the position.

In August 2015, following the Agency's investigation into her complaint, Complainant requested a hearing before an EEOC Administrative Judge (AJ). After a hearing, the AJ found discrimination on all three claims, and awarded various remedies, including instatement, back pay, front pay, and damages. The Agency's final order rejected the AJ's findings of discrimination and all relief ordered, and filed the instant appeal.

In opposition to the appeal, Complainant argues the AJ's decision should be affirmed, with an update in awarded attorney fees.

3                                                                                    0720180030

## ANALYSIS AND FINDINGS

Pursuant to 29 C.F.R. § 1614.405(a), all post-hearing factual findings by an AJ will be upheld if supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 477 (1951) (citation omitted). A finding regarding whether or not discriminatory intent existed is a factual finding. See Pullman-Standard Co. v. Swint, 456 U.S. 273, 293 (1982). An AJ's conclusions of law are subject to a de novo standard of review, whether or not a hearing was held.

An AJ's credibility determination based on the demeanor of a witness or on the tone of voice of a witness will be accepted unless documents or other objective evidence so contradicts the testimony or the testimony so lacks in credibility that a reasonable fact finder would not credit it. See EEOC Management Directive for 29 C.F.R. Part 1614 (EEO-MD-110), at 9-17 (revised Aug. 5, 2015).

Preliminary Matters: Agency's Appeal of AJ's Procedural Rulings

*Joint Employment*

In opposing Complainant's motion on an unrelated matter almost a year prior to the hearing, the Agency argued that Complainant was an independent contractor who was not a common law employee of the Agency with standing to bring a complaint of unlawful employment discrimination in the EEO process. In her decision following the hearing, the AJ without discussion treated Complainant as a common law employee of the Agency.

On appeal, the Agency argues that it had insufficient control over Complainant's employment to be her common law joint employer.

EEOC Regulation 29 C.F.R. § 1614.103(a) provides that complaints of employment discrimination shall be processed in accordance with Part 1614 of the EEOC regulations. EEOC Regulation 29 C.F.R. § 1614.103(c) provides that within the covered departments, agencies and units, Part 1614 applies to all employees and applicants for employment therewith.

In Serita B. v. Department of the Army, EEOC Appeal No. 0120150846 (November 10, 2016), the Commission reaffirmed its long-standing position on "joint employers" and noted it is found in numerous sources. See, e.g., EEOC Compliance Manual Section 2, "Threshold Issues," Section 2-III(B)(1)(a)(iii)(b) (May 12, 2000) (Compliance Manual)[2]; EEOC Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms (Dec. 3, 1997) (Enforcement Guidance), "Coverage Issues," Question 2;

---

[2] The EEOC Compliance Manual and other guidance documents, as well as federal-sector appellate decisions, are available online at www.eeoc.gov.

4                                                                 0720180030

<u>Ma v. Dep't of Health and Human Servs.</u>, EEOC Appeal Nos. 01962389 & 01962390 (May 29, 1998).

The term "joint employer" refers to two or more employers that each exercises sufficient control of an individual to qualify as the worker's employer. <u>Compliance Manual</u>, Section 2-III(B)(1)(a)(iii)(b). To determine whether the Agency has the right to exercise sufficient control, EEOC considers factors derived from common law principles of agency. <u>See Enforcement Guidance</u>, "Coverage Issues," at Question 2. EEOC considers, <u>inter alia</u>, the Agency's right to control when, where, and how the worker performs the job; the right to assign additional projects to the worker; whether the work is performed on Agency premises; whether the Agency provides the tools, material, and equipment to perform the job; the duration of the relationship between the Agency and the worker whether the Agency controls the worker's schedule; and whether the Agency can discharge the worker. <u>EEOC Compliance Manual</u>, Section 2-III(A)(1) (citing <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 323-24 (1992)); <u>EEOC v. Skanska USA Bldg., Inc.</u>, 550 F.App'x 253, 256 (6th Cir. 2013) ("Entities are joint employers if they 'share or co-determine those matters governing essential terms and conditions of employment'") (quoting <u>Carrier Corp. v. NLRB</u>, 768 F.2d 778, 781 (6th Cir. 1985); <u>see also Ma</u>, EEOC Appeal Nos. 01962389 & 01962390.

In determining a worker's status, EEOC looks to what actually occurs in the workplace, even if it contradicts the language in the contract between the staffing firm and the agency. <u>Baker v. Dep't of the Army</u>, EEOC Appeal No. 01A45313 (Mar. 16, 2006) (while contract between staffing firm and agency provided that contract personnel were employees of staffing firm under its administrative supervision and control, agency actually retained supervisory authority over the contract workers).

On the factor of the right to control when, where, and how the worker performs the job and to assign additional projects, complete agency control is not required. Rather, the control may be partial or joint and still point to joint employment. <u>Shorter v. Dep't of Homeland Sec.</u>, EEOC Appeal No. 0120131148 (June 11, 2013) (where both staffing firm and agency made assignments, this pointed to joint employment); <u>Complainant v. Dep't of the Navy</u>, EEOC Appeal No. 0120143162 (May 20, 2015), <u>request for reconsideration denied</u>, EEOC Request No. 0520150430 (Mar. 11, 2016) (where staffing firm wrote and issued complainant's appraisal with input from agency, this pointed toward joint employment). Likewise, where both the agency and staffing firm provided tools, material, and equipment to perform the job, this pointed to joint employment. <u>Elkin v. Dep't of the Army</u>, EEOC Appeal No. 0120122211, 2012 WL 5818075 (Nov. 8, 2012). The EEOC considers an entity's right to control the terms and conditions of employment, whether or not it exercises that right, as relevant to joint employer status. <u>Enforcement Guidance</u>, "Coverage Issues," at Question 2, Example 5 (where an entity reserves the right to direct the means and manner of an individual's work, but does not generally exercise that right, the entity may still be found to be a joint employer).

0720180030

In sum, a federal agency will qualify as a joint employer of an individual if it has the requisite right to control the means and manner of the individual's work, regardless of whether the individual is paid by an outside organization or is on the federal payroll. See id., at Q. 2.

The parties stipulated that Complainant reported to the Agency chain of command at the Family Advocacy Outreach office. She was chosen by local Agency management at Lakenheath after they reviewed her resume and interviewed her, she was hired through Staffing Firm 1, and served as Outreach Manager since November 2008, a long duration. HT 1, at 79, 149 – 150. Staffing Firm 1 management was located in the United States. Agency management had control how Complainant performed her work, e.g., setting what percentage of time Outreach Managers worked outside of the office, how much detail was required on their electronic appointment calendar, gave them assignments and requirements like attending weekly meetings, creating an annual public relations campaign with First Sergeants at both Lakenheath and Mildenhall to create good will since they would be heavily involved in the referral process, doing one-to-one coaching for clients that did not feel comfortable attending classes, having a monthly information booth, creating more partnerships with other Agencies like partnering with the gym to host 5K runs, creating a script for volunteers for the Black Eye Campaign, and deadlines to plan for events. See Outreach Meeting Minutes, dated October 14 and 24, 2014, one led by S1, the other by S2, both attended by four people, including Complainant. ROI, Ex. F-1.m., at Bates Nos. 856 – 857, Ex. F-2.b. at Bates Nos. 1180 – 1181. Complainant worked on Agency premises, the Agency dictated when she was required to report to work and had input on when she could take leave, and required her to take certain training and set deadlines therefore. The Agency also exercised significant control over Complainant's employment when its Lakenheath local management discriminatorily refused to release her privileges for sign off unless she resigned, denying her the promotion for which she was chosen by an Agency Squadron Commander at Mildenhall.

While Staffing Firm 1 also exercised control over Complainant's employment by compensating her, approving her leave, and significantly independently looking into the validity of the Agency complaints about Complainant and declining to remove her against the Agency's wish from serving in its Family Advocacy Program, the Agency had sufficient control over Complainant's employment to be her common law joint employer.

*AJ's Rulings on Witness Testimony*

The Agency argues that during the liability phase of the hearing, the AJ improperly prevented it from impeaching Complainant's Witness 1, one of her coworkers. Witness 1 testified that S1 treated Complainant badly by telling him to stay away from her, that she was on the way out of her job, undercutting her at meetings by talking over and contradicting her, and after meetings turning to other colleagues to mock and smirk at her. Witness 1 previously signed a March 2015 memo indicating that during the same time period S1 had impeccable adherence to ethics and fairness and was a consummate professional. When the Agency attempted to impeach Witness 1 with a line of questioning using the memo, Complainant's attorney objected because the memo was not listed with the Agency's exhibits in its pre-hearing report, as required. The AJ sustained the objection, explaining that the exhibit was an unfair surprise.

6                                                                                    0720180030

We agree with the Agency that the AJ's ruling was an abuse of discretion. While it was proper to reject the memo as an exhibit, the Agency was entitled to use it to ask questions for impeachment purposes. Nevertheless, we find that this error was without consequence. First, the Agency was able to ask Witness 1 an impeaching line of questions using his record January 2015, statement for S1's CDI that he "witnessed no inappropriate comments or actions on anyone's part" during his tenure. HT 1, at 397 – 401. More importantly, while the Agency argues Witness 1 was a key witness, which we find questionable, the AJ in her detailed, single spaced 41 page decision only referred to Witness 1's testimony once - for the general observation that Complainant became withdrawn, guarded, and depressed in string citation that included other witnesses to this, and these observations were supported by Complainant and other witnesses.

The Agency argues that the AJ improperly cut off other lines of cross-examination on Witness 1 during the remedies hearing. On direct examination, in response to the question on what Complainant said about why she was depressed and anxious, Witness 1 testified that Complainant felt targeted in the workplace – insulted, berated, and marginalized, and Complainant related an instance of S2 screaming at her that left her in tears. HT 4, at 15. On cross examination, the Agency asked Witness 1 how Complainant felt about Successor S1 telling her she needed to take leave for an EEO appointment she had the day before. The Agency also asked Witness 1 if he was aware of any heated discussions Complainant had, which the record strongly suggests referred to an Airman who once aggressively screamed at Complainant. In response to subsequent Agency questioning at the hearing, Complainant described the Airman as a very young man with professional and personal difficulties whom she and a coworker were informally supporting. Complainant explained that the Airman came to the office she shared with two others and said he wanted to cut his wrists, so she took him down to the Emergency Room, the Airman was then assigned to litter picking duty around the base, and came to her office and screamed at her because he believed she made things much worse by taking him to the Emergency Room. Complainant testified the Airman apologized after he cooled down and she felt he was going through a lot. Complainant's attorney objected to the first referenced cross examination question to Witness 1 for being outside the scope of direct examination, and because Witness 1 was not the Agency's witness. The AJ sustained the objection. When Agency counsel protested that Witness 1 testified about how Complainant's injuries were related to the Agency's treatment of her, the AJ conceded this was true, but explained his testimony went to broad strokes versus this particular leave policy. The AJ sustained Complainant's objection to the Agency's second cross examination question for being outside the scope of direct examination. HT 4, at 33.

Prior to the remedies hearing, the Agency included in its proposed witness list an expert psychologist with a Ph.D. It proffered that he would use his expertise to opine on the reliability of the testimony and evidence presented by Complainant, her witnesses, and the evidence she presented during the remedies hearing based on his expertise. Prior to the hearing the AJ rejected this witness on the grounds of relevance. On appeal, the Agency reiterates these arguments for why its expert witness was relevant.

7                                                          0720180030

In opposition to the Agency's appeal, Complainant argues that the Agency's proposed expert witness' testimony was not relevant because he had no personal knowledge of the harm suffered by her and could not possibly undermine her testimony or that of her witnesses because he would not be permitted to sit in the hearing and listen to their testimony. The AJ did not abuse her discretion in not approving this witness.

Finally, on appeal, the Agency argues that the AJ prevented it from obtaining evidence on alternative causes of damages, as recounted above. We find that the AJ did not abuse her discretion in sustaining the above objections. Witness 1 was not an Agency witness, and as found by the AJ while he testified in broad strokes about what caused Complainant's injuries, the Agency's above two questions went to specific matters not covered on direct. It appears that the Agency was attempting to do an end run around the AJ's discovery sanction order with these questions.[3]

<u>Agency's Appeal of AJ's Conclusions on the Merits of Complainant's Claims</u>

*Hostile Work Environment*

To establish a claim of harassment a complainant must show that: (1) they belong to a statutorily protected class; (2) they were subjected to harassment in the form of unwelcome verbal or physical conduct involving the protected class; (3) the harassment complained of was based on their statutorily protected class; (4) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. <u>See</u> <u>Henson v. City of Dundee</u>, 682 F.2d 897 (11th Cir. 1982). Further, the incidents must have been "sufficiently severe or pervasive to alter the conditions of [complainant's] employment and create an abusive working environment." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993). The harasser's conduct should be evaluated from the objective viewpoint of a reasonable person in the victim's circumstances. <u>Enforcement Guidance on Harris v. Forklift Systems Inc.</u>, EEOC Notice No. 915.002 at 6 (Mar. 8, 1994).

S1 (female) became Complainant's first line Agency supervisor in November 2013. The AJ found as follows. Around February 2014, S1 wrote slang for "buddy fucker" on a going away gift for an employee. Complainant told S1 this was inappropriate, especially since all office members chipped in to purchase the gift, and S1 reacted by saying the employee would have been fired anyway.

Around the same time, S1 walked into Complainant's office and told her she had her "hooker heels on." Complainant shared her office with Coworker 1 (male), another contract social worker who

---

[3] On appeal, the Agency also questions the AJ's earlier decision to impose the payment of attorney's fees to Complainant for discovery efforts as a sanction. We need not decide this issue because, as the prevailing party in this case, Complainant is entitled to such fees and costs anyway as set forth in 29 C.F.R. § 1614.501(e).

8                                                          0720180030

reported to S1. Complainant was shocked and embarrassed by S1's comment and told S1 it was inappropriate. Coworker 1 was shocked and viewed the comment as directed at Complainant.

Several months later (sometime in February or March 2014), when she learned Complainant obtained a new printer, S1 asked her, in the presence of Coworker 1, "who did you sleep with for that printer" or words to that effect. Coworker 1 shook his head in shock and said to Complainant that, "if I said that, I'd get fired," and testified with S1, "every day, it seemed like it was some hostility, be it subtle, be not, it was always targeted towards [Complainant]."

The AJ concluded that S1 made patently sexual comments on several occasions, Complainant protested the remarks, showing they were unwelcome, and the harassment was severe, particularly the "hooker heels" and printer remarks. The AJ found that it was reasonable for Complainant to be deeply offended by these sexualized comments which denigrated both her person and professionalism, and because this conduct was severe, the AJ need not determine whether it was pervasive. The AJ found that as the leader of the Family Advocacy Program, S1 set the tone there, creating an environment where sexually vulgar commentary could be used to denigrate subordinates, and thus she created a hostile work environment.

The AJ found that from the time Complainant first objected to S1's vulgar sexual remarks, S1 engaged in a campaign of retaliation against her, enlisting Complainant's second and third line supervisors (S2 – female) (S3 – male) and the 48th Medical Group hospital Chief of Medical Staff (Medical Staff Chief - female) at the Lakenheath base. The AJ found that S2 learned Complainant was using the EEO office during a site visit by the Staffing Firm 1 Senior Program Manager (Staffing Firm Manager 1). This occurred on October 30 – 21, 2014. S3 learned then also, and the AJ found S1 learned in early November 2014. HT 2, at 125 – 126.

After the EEO office learned that Complainant had standing as a common law employee, the local EEO Director in December 2014, advised Complainant's Agency fourth line supervisor (S4 – female) of the advantages of conducting a command-directed investigation (CDI). In December 2014, S4 appointed an Investigating Officer to conduct the CDI, who drafted a report on January 7, 2015, that reflected statements were taken from a dozen people, including S1. The AJ found that Agency management's harassment of Complainant intensified in the wake of the CDI. The finalized CDI substantiated that S1 made sexually harassing comments. The AJ found that based on this S1 was moved to a non-supervisory role, effective March 4, 2015. S1 was succeeded by Successor S1 (female). S4 testified she placed S1 in a non-supervisory position to give her an opportunity to better develop her skills.

The AJ found that the Agency subjected Complainant to retaliatory harassment starting in February or March 2014, when S1 and at some point S2 started calling the Staffing Firm Manager 1 complaining about her performance, whereabouts, time sheet entries, and people with whom she had contact. The AJ found that Staffing Firm Manager 1 looked into these concerns, determined they were unsubstantiated and decided to take no action. At some point S3 called Staffing Firm Manager 1 to raise S1 and S2's concerns and brought up having her terminated. HT 2, at 121. However, Staffing Firm Manager 1 was unmoved.

9                                           0720180030

The AJ found that S3 was complicit in S1's retaliatory vendetta against Complainant. The AJ found that S3's lack of respect about the EEO process was evident from his testimony. The AJ found that after S1, S2 and S3's efforts with Staffing Firm 1 to get Complainant fired failed, by November 2014, they elevated their concerns to the Air Force Medical Operations Activity (AFMOA), which has oversight and funding responsibility for all family advocacy programs within the Air Force. Observing that AFMOA took no action, the AJ found that one could conclude that like Staffing Firm Manager 1, AFMOA found no evidence to support terminating Complainant.

The AJ found that S1, Successor S1, and S2 continued to engage in retaliatory harassment aimed to make Complainant's life a "living hell." Specifically, S1 scoured Complainant's Facebook page via Complainant's friends in an attempt to find anything she could use against her. This occurred by May 2015. ROI Ex. F-2.b., Bates No. 1027. The AJ referred to Successor S1 talking behind Complainant's back, Successor S1 and S2 badgering her on her whereabouts as she performed her outreach duties in two military bases and the surrounding community, on April 24, 2015, even though Complainant called in sick Successor S1 badgered her via multiple contacts to contact her, Successor S1 delayed approval of her leave, and on May 15, 2015, Successor S1 unnecessarily required Complainant to complete training before she could take leave the following Monday for her birthday, making her late in picking up her nieces from school. The AJ found that even though Complainant would start her day later in the morning to accommodate her schedule because she often gave presentations in the evening or outside normal work hours to reach target audiences, beginning in May 2015, S2 required her work normal office hours, and if she had an evening event to leave the office at the end of the business day (4:30 PM), go home, and come back to the base for the evening event.

In May 2014, in hopes of becoming a clinical social worker and advance her career, Complainant applied to obtain a Licensed Independent Social Worker (LISW) license. After submitting documentation, including of 3,000 hours of supervised social work practice from October 2011-April 2014, and passing the Ohio Board's clinical exam, Ohio granted Complainant a LISW license in September 2014. The Agency's August 2014 Mildenhall promotion offer was conditioned on her obtaining privileges from the Agency's Lakenheath hospital to practice clinical social work. A prerequisite to this was her US social work license.

In September 2014, S1 learned from the Medical Staff Chief that Complainant was offered the Mildenhall position and applied for privileges. The Medical Staff Chief was Chair of the privileges committee, which was made up of representatives of different health care specialties at the Lakenheath hospital.

The AJ found as follows. On October 2, 2014, S1 sent a letter to the Ohio Board seeking to have Complainant's LISW license revoked by writing that because Complainant did not perform clinical work for the Agency it would be impossible for her to accumulate 3000 supervised, and that while Coworker 1 submitted documentation representing himself as Complainant's clinical supervisor, as a contractor he was prohibited from serving as a supervisor and never did so. ROI, Ex. F-2.b., Bates No. 1225.

0720180030

S1 followed up on October 16, 2014, by emailing the Ohio Board Deputy Director argument that under specified Ohio regulations Complainant obtained the license under false pretenses, that she applied for a counseling/therapeutic job at one of their base clinics, and the hospital was extremely surprised she obtained an independent Ohio license.

On October 16, 2014, the Ohio Deputy Director replied to S1 by questioning her concerns and her interpretation of Ohio's regulations, noting Complainant represented herself as a Family Advocacy Outreach Manager, not a Treatment Manager, that under Ohio regulations Coworker 1's supervision only needed to provide professional mentoring as opposed to clinical supervision, and obtaining an LISW does not require experience diagnosing and treating emotional disorders.

The AJ found that while S1's concerns about Complainant's LISW license may have been reasonable before she received Ohio's explanation in October 2014, she continued to be fixated in retaliatory persistent efforts to get Ohio to rescind the license and worked in concert with S2. The AJ found that Ohio explained its standards to S1 in a way that a reasonable person would have seen Complainant did not misrepresent her experience. But S1 did not stop her efforts to get Complainant's Ohio LISW license revoked, as evidenced by S1 sending a follow up letter to the Ohio Deputy Director. Subsequently, in January 2015, the Ohio Board notified Complainant that there was a complaint against her license, asked her to provide specified information, which she did, and in March 2015, Ohio Board closed the investigation, finding it was unable to substantiate the complaint against her license. The AJ found that nevertheless, a month later S1 wrote a memorandum which she testified may have been sent to the Ohio Board or her supervisors that Complainant misrepresented herself before the Board, and urged that this be considered that this demonstrates she lacked professionalism, had poor ethical practices, and placed patients at significant risk.

As Complainant's first line supervisor and senior social worker at the facility, S1 was involved in the process on Complainant's request for privileges at the Lakenheath hospital. HT 3, at 66. The AJ found that S1 and S2 co-opted the Medical Staff Chief, and even though the privileges committee voted to approve Complainant's privileges and the Ohio Board closed the complaint against her LISW license, the Medical Staff Chief would not release her privileges for final sign off. The AJ found that the Medical Staff Chief also spoke with M1, the Agency official with oversight of the medical program at Mildenhall with whom Complainant would work, advising she did not have the clinical experience to take the job and asking they rethink the hiring. The AJ recounted testimony that when the hiring Squadron Commander at Mildenhall was advised an issue was raised that Complainant was unqualified, he said, "that's not their job, that's my job."

The AJ examined the Medical Staff Chief, asking her to elaborate on her reason for not releasing Complainant's privileges, and later found her explanation that Complainant must resign from her current job to be eligible for privileges was not cogent, was contradicted by other specified evidence, and would be risky for Complainant.

0720180030

The AJ found that roughly nine months after the clinical social worker job at Mildenhall was offered to Complainant, Mildenhall withdrew the offer because they needed someone in the position and it was clear approval of Complainant's privileges was not forthcoming. The withdrawal occurred after the Medical Staff Chief relayed that Complainant needed to resign to get her privileges. HT 1, at 216.

On appeal, the Agency argues that Complainant did not make out a prima facie case of sexual harassment discrimination because S1's alleged sexualized statements were not sufficiently severe or pervasive to create an abusive working environment. It contends that the AJ erred because she did not apply the objective, reasonable person standard to determine whether the alleged statements constituted harassment, i.e., she erroneously found that the referenced three statements were "severe" because Complainant was deeply offended by them which denigrated her person and her professionalism.

As an initial matter, we find that the AJ's factual findings on the incidents of harassment occurring are supported by substantial evidence. In stating the law on harassment, the AJ set forth the reasonable person standard. See AJ decision, at 19. While the AJ wrote that Complainant was deeply offended by the sexualized comments, she found this was reasonable – a reference to the reasonable person standard. The AJ did not error as a matter of law in finding these comments created a hostile work environment.

Regarding retaliatory harassment, the Agency argues that the AJ incorrectly found that the Medical Staff Chief gave no cogent explanation for why Complainant must resign prior to her privileges being released for final sign off so she would be eligible for the Mildenhall job. While we concede, as argued by the Agency, that the Medical Staff Chief provided a regulatory explanation, the AJ's finding that the explanation was unpersuasive is supported by substantial evidence. On appeal, the Agency does not dispute the AJ's other factual findings supporting Complainant's retaliatory harassment claim, nor argue that they do not constitute a hostile work environment. We agree with the AJ's findings that Complainant proved she was subjected to a retaliatory hostile work environment by the Agency, and both its attacks on her Ohio LISW license and its interference which prevented her from taking the job at Mildenhall constituted severe harassment.

*Imputing Liability to Agency*

Before finding a violation of Title VII and Rehabilitation Act, however, there must be some basis to impute liability to the Agency. An employer is always liable for harassment by a supervisor on a prohibited basis that culminates in a tangible employment action. No affirmative defense is available in such cases. See Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, EEOC Notice No. 915.002 (June 18, 1999), Section IV. (available at www.eeoc.gov.). The Agency Lakenheath hospital's refusal to release Complainant's privileges for final sign off unless she resigned constituted, in effect, a denial of those privileges which caused her to lose being promoted, both of which are tangible employment actions. While the AJ did not find these events were tangible, we do. Accordingly, the Agency is liable for these actions.

When harassment by a supervisor creates an unlawful hostile environment but does not result in a tangible employment action, the employer can raise an affirmative defense to liability or damages, which it must prove by a preponderance of the evidence. The defense consists of two necessary elements: (1) the employer exercised reasonable care to prevent and correct promptly any harassment; and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Id. at Section V. The first prong of the affirmative defense usually requires an employer to establish, disseminate, and enforce an anti-harassment policy and complaint procedure and to take other reasonable steps to prevent and correct harassment. The AJ imputed liability to the Agency on Complainant's harassment claims using this analysis.

The AJ found that the Agency did not exercise reasonable care to prevent the sexual and retaliatory harassment. In support, the AJ referenced the following. Complainant testified that she did not recall any poster or other notices of EEO rights in Lakenheath. When asked if she received training for supervisors and EEO training for supervisors, S1 testified she did in 2015, subsequent to the instant EEO case. HT 1, at 151. When asked if she ever reviewed the Agency's harassment policy, S1 replied, "not in its entirety." S4 testified that upon S1's removal from supervision, she did not direct that S1 to participate in any form of EEO training, or take action to ensure S1 did not leave Complainant alone. The AJ found that while the Agency asserted that all new employees in "MDOS" (of which S1 was a part) attend face to face Squadron Newcomers Orientation where discussion is prompted on discrimination/harassment, the Agency provided no training slides nor materials, or documentation of staff taking the training. The AJ found that a 1¼ page excerpt of a February 3, 2007 policy which addressed sexual harassment and retaliation in the record did not show the policy was adequate.

The AJ concluded that the Agency failed to prove it exercised reasonable care to prevent the sexual and retaliatory harassment – S1 testified that she did not receive training on sexual harassment or EEO, the Agency offered no proof to the contrary, and the Agency offered scant evidence of any policy, training, or other measures that could have prevented the harassment by S1 and others.

The AJ found that the Agency failed to take prompt remedial action to remedy the sexual harassment. Specifically, while Complainant reported her concerns about the sexual harassment to the EEO office in March 2014, it did not assist her because it failed to recognize until December 2014, some eight months later, that a contractor could receive EEO counseling to file an EEO complaint under 29 C.F.R. Part 1614.[4] The AJ also found that the record did not show why the EEO office did not recommend a CDI or alert the Command about Complainant's allegations until December 2014, since these options are independent of EEO jurisdiction. The AJ found that had the CDI been conducted in the first weeks after Complainant contacted the EEO office in 2014, this might have helped timely remedy the sexual harassment.

---

[4] Citing Commission precedent that EEO offices are required to give individuals EEO counseling and a notice of right to file a complaint, and then dismiss the complaint with appeal rights if believes the complainant does not have standing, the AJ found this was inexcusable.

13                                    0720180030

The AJ found that since the Agency had constructive knowledge of Complainant's sexual harassment allegations in March 2014, it cannot avoid liability on the grounds that it took prompt, remedial action starting in December 2014.

The AJ found that the Agency did not take steps to correct the retaliatory harassment to which Complainant was subjected, despite Complainant on January 22, 2015, notifying the EEO office and S4 by email that she believed the complaint against her Ohio LISW may have been initiated because of her EEO activity. ROI, Ex. B-1.d.; Bates No. 381 – 383.

On appeal, the Agency disagrees with the AJ's finding that S1 did not receive EEO or sexual harassment training and that it did not offer sufficient evidence of policies, training, or other measures to prevent sexual harassment. It cites to S1's EEO investigatory declaration that all active duty members (S1 was active) are required to attend an EEO briefing once per assignment, and in November 2014, the EEO office provided EEO training to all MDOS in the 48th Fighter Wing. The Agency also cites to S2 and S4's EEO investigative declarations about postings of Agency non-discrimination policies. They refer in part to an updated Agency wide Equal Opportunity and Non-Discrimination Policy Memorandum dated May 14, 2014, that was publicly posted on Medical Group bulletin boards. It instructs that those subjected to unlawful discrimination or harassment must report it promptly to their supervisor, but if a superior is the alleged perpetrator the report must be made to the next level or the local EEO office, and another option was reporting the unlawful discrimination or harassment to a specified Air Force Discrimination Hotline. ROI, Ex. F-2.d., at Bates No. 1420. The Agency argues that after the EEO office notified S4 of Complainant's sexual harassment complaint, she promptly ordered a CDI which resulted in S1 being moved to a non-supervisory position.

We find that the AJ's imputation of liability to the Agency on Complainant's sexual and retaliatory harassment is supported by substantial evidence. Specifically, even if S1 took EEO training, as found by the Agency there was insufficient information about the content thereof to show it was of sufficient quality to be preventative. Further, since the Agency wide EEO policy instructs that reporting discrimination and harassment to a superior, the local EEO office, or a hotline are all options, and Complainant promptly reported the harassment to the local EEO office, the AJ correctly imputed knowledge to Agency management, supporting her finding that the Agency failed to promptly correct the harassment. Also, given that the Agency's posted policy instructs that those subjected to unlawful discrimination or harassment must report it promptly to their supervisor, but if a superior is the alleged perpetrator the report must be made to the next level or the local EEO office, the latter which Complainant promptly did, we find that the second prong of the Agency's affirmative defense to imputation of liability for intangible actions (the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise) fails.

*Constructive Discharge*

The Commission has adopted a three-pronged test for establishing a constructive discharge. Complainant must show that: (1) a reasonable person in her position would have found the working

conditions intolerable; (2) the conduct which constituted prohibited discriminatory treatment created the intolerable working conditions; and (3) Complainant's involuntary resignation resulted from the intolerable working conditions. Taylor v. Air Force and Army Exchange Service, EEOC Request No. 05900630 (July 20, 1990).

The AJ found that Complainant met this test. Specifically, the AJ found as follows. From the time Agency management was aware that Complainant engaged in EEO activity, management officials looked for a way to terminate her employment, including attacking her Ohio LISW license, complaining to Staffing Firm 1, and elevating these concerns to AFMOA. When these efforts failed, they attempted to coerce Complainant to resign as a condition for her obtaining the privileges she needed take the Mildenhall promotion she was offered. This left Complainant to either remain in her job, miss out on the Mildenhall promotion, or see if she could stick it out and endure continued harassment without escape until the perpetrators rotated elsewhere. When she learned that this could be more than a year away, she ultimately resigned. Complainant testified that because of the sustained harassment, her heath suffered, she lost weight, had to take medication to sleep, could not take it anymore, and had to resign. Preponderant evidence shows these intolerable working conditions were calculated successfully to make Complainant resign.

On appeal, the Agency makes no specific argument on the constructive discharge claim. We find the AJ's finding that Complainant was constructively discharged when she resigned on February 5, 2016, is supported by substantial evidence.

Remedies

*Instatement/Reinstatement*

EEOC Regulation 29 C.F.R. § 1614.501(a) requires that when there has been a finding of discrimination against an employee, the Agency shall provide full relief. This includes an unconditional offer of placement in the position the person would have occupied but for the discrimination, or a substantially equivalent position. Id., at .501(a)(3).

The AJ found that the Agency's contention that it was powerless to direct the hire of Complainant by a staffing firm was without merit. She referred to the Staffing Firm Manager 1's testimony that Complainant was chosen in 2008 by local Agency management at Lakenheath after they reviewed her resume and interviewed her. HT 1, at 79. Complainant also testified that this was the case. HT 1, at 149 – 150. The AJ also referred to the testimony by a contract Operational Psychologist, who worked for Staffing Firm 3 serving the 352D Special Operations Group, 321st Special Tactics Squadron at Mildenhall, who was a consultant for the Squadron Commander, that the Commander made the decision to hire Complainant. HT 1, at 28, 30 – 32. We add he explained that the Commander informs the staffing firm who he intends to hire. Id., at 32.

The AJ ordered that the Agency offer to place Complainant to the social worker position at Mildenhall she was offered in August 2014, or a substantially equivalent position, which could include the Lakenheath base, effective October 1, 2014,[5] and give her 15 days to accept or decline the offer. The AJ instructed that failure to accept the offer shall be tantamount to declination, and should Complainant decline the offer, the date on which she declines will be the end date for any back pay due.

On appeal, the Agency makes no specific arguments on instatement/reinstatement. We agree with the tenor of the AJ's order, with a proviso. The AJ's finding that local Agency management, in practice, had the power which it exercised twice before to choose Complainant for hire by a staffing firm is supported by substantial evidence. But nevertheless, a staffing firm could decline the Agency's choice, and we do not have authority to order a staffing firm to hire Complainant. Accordingly, we find that make whole relief includes the Agency identifying a funded slot and if none exists opening one for the position of clinical social worker serving the Agency in Mildenhall that Complainant was denied in 2014, or a substantially equivalent position, choosing Complainant, and then without equivocation asking the appropriate staffing firm(s) verbally and in writing to offer Complainant the position or a substantially equivalent one.

We acknowledge that in Christmon v. Veterans Affairs, EEOC 07A50006 (Mar. 18, 2005), the Commission reversed the part of an AJ's decision that ordered the Agency to reinstate a complainant who was jointly employed by a staffing firm and was terminated due to the agency's discrimination on April 4, 2002, because the staffing firm's contract with the agency expired on August 31, 2002, and the successor staffing firm advised the former joint employees that they needed to apply to be considered for hire with all other eligible candidates. The Commission found that given this, it was too speculative to find that the complainant would have been hired by the successor staffing firm and hence would still be employed but for the discrimination. We distinguish Christmon because the AJ found that the Agency had the power to choose Complainant for hiring by a staffing firm is supported by substantial evidence. Accordingly, with modification as set forth in the order below we affirm the AJ's order regarding instatement.

*Back pay*

The AJ ordered that the Agency pay Complainant back pay with all associated benefits and interest in accordance with 5 C.F.R. § 550.805, for the difference between the compensation she would have received had she been able to accept the position at Mildenhall and the compensation she was paid as Outreach Manager in Lakenheath from October 1, 2014 through February 5, 2016, and thereafter at the compensation rate she would have received for the position at Mildenhall through the time she is instated or declines the offer of instatement. The AJ instructed that "all associated benefits" includes the value of tax-free compensation since while on contract for the Agency Complainant's salary was tax free, but she did not enjoy this in the employment she was able to

---

[5] The AJ found that the administrative process for hiring Complainant at Mildenhall would likely have been completed on October 1, 2014.

16                                                                                    0720180030

obtain after her constructive discharge. The AJ further instructed that associated benefits includes the value during her employment with the Agency through Staffing Firm 1 of health insurance paid by Staffing Firm 1.[6]

The AJ found that the Staffing Firm Manager 1 credibly testified that each of the nine employees working for Staffing Firm 1 serving the Agency was picked up in November 2016, by the successor staffing firm and his belief Complainant would have been picked up as well. HT 4, at 112 – 113. The successor staffing firm underbid Staffing Firm 1. Based on the above, the AJ found that absent Complainant's constructive discharge, she could have been expected to continue in her employment as Outreach Manager in Lakenheath. The AJ found, however, that since the retaliatory harassment resulted in the rescission of the higher paying Mildenhall offer, make whole relief included entitlement to back pay at the higher rate Complainant would have earned at Mildenhall. We agree.

A back pay claimant under Title VII generally has a duty to mitigate damages. Specifically, §706(g) of Title VII, 42 U.S.C. §2000e-5(g)(1) provides that "interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." The burden is on the agency, however, to establish that the employee failed in her duty to mitigate. The Commission has generally held that an agency must satisfy a two-prong test to carry its burden of proof; this test requires the agency to show: 1) that the complainant failed to use reasonable care and diligence in seeking a suitable position, and 2) that there were suitable positions available which the complainant could have discovered and for which he or she was qualified. Where a complainant makes no effort to mitigate damages and does not explain the lack of effort, the agency does not have to meet the second prong. McNeil v. Postal Service, EEOC Petition No. 04990007 (Dec. 9, 1999).

The AJ found that the documentary and testimonial evidence demonstrated that Complainant continually worked or sought work to mitigate her damages following her constructive discharge, but was unable to find comparable employment, and the Agency did not show Complainant failed in her duty to mitigate losses.

On appeal, the Agency argues that Complainant failed in her duty to mitigate her losses. We find that the AJ's decision to the contrary is supported by substantial evidence.

---

[6] The AJ found that while Complainant provided evidence that during her employment with Staffing Firm 1 serving the Agency she was entitled to "full logistical support" including gas coupons, she offered no evidence showing the allotment thereof to which she was entitled, and hence did not award the value thereof as a remedy. The AJ found that while Complainant contended that in connection with this employment, she received substantial discounts on gasoline purchased she purchased on base and a $2,500 educational allowance, she provided insufficient evidence for her losses of purchasing gasoline off base such as receipts nor sufficient proof that she was entitled to a $2,500 annual education benefit.

17                                                    0720180030

*Front pay*

Front pay may be awarded in lieu of reinstatement when: (1) no position is available; (2) a subsequent working relationship between the parties would be antagonistic; or (3) the employer has a record of long-term resistance to anti-discrimination efforts. The fact that front pay is awarded in lieu of reinstatement implies that the complainant is able to work but cannot do so because of circumstances external to the complainant. EEO MD-110, at 11-7.

The AJ found that a future employment relationship would not necessarily be antagonistic, nor had the Agency demonstrated long-term resistance to anti-discrimination obligations. This is supported by substantial evidence.

A complainant who is jointly employed by an agency and staffing firm is eligible for front pay by the agency if the facts show that the joint employee could reasonably have been expected to continue her service on the contract. Gaynell A. v. Navy, EEOC Appeal No. 0720100043 (Apr. 4, 2014) (the complainant who was jointly employed as an electrician by the agency and a staffing firm was terminated on January 18, 2007, due to the agency's discrimination. The AJ ordered the agency to request the staffing firm to make an unconditional job offer to the complainant for the position of electrician, and if the staffing firm refused the agency would be liable for front pay for five years, or until such time that the staffing firm no longer had a contract with the staffing firm, whichever occurred first. The agency implemented the AJ's order that it request the staffing firm offer the complainant employment, but the staffing firm refused. On appeal, the agency argued that since its contract with the staffing firm ended on September 30, 2007, front pay should terminate then. The Commission modified the AJ's order by requiring the "front pay" to run three years. The Commission found that while the contract expired on September 30, 2007, the agency extended its contract with the staffing firm for its electricians for another three years, and the record showed that had the complainant not been terminated, absent discrimination by the agency she would have been employed until September 2010). The AJ cited Gaynell A., and found that Complainant had a reasonable expectation of continued employment by a staffing firm serving the Agency indefinitely.

The AJ ordered that if neither the position at Mildenhall nor a substantially equivalent position is available, that the Agency pay Complainant front-pay equivalent to the compensation she would have received from the time she may be placed in such a position, for a period not to exceed 10 years. The AJ found that an award of ten years in front pay was supported by Complainant's testimony regarding her difficulty finding comparable work outside the Lakenheath or Mildenhall bases, the salaries and the tax-free compensation and exceptional benefits associated with the positions, and her lack of eligibility for many on base jobs as a local national without status as a spouse or current employee. The AJ recounted that in its written closing argument, the Agency argued that if front pay is awarded, it should be granted with the following caveat: Complainant is required to "seek comparable work" and the Agency is to pay her front pay from the date of the AJ's decision until Complainant "finds comparable work or reaches full retirement age." At the time of the AJ's decision in July 2018, Complainant was 35 years old.

18                                          0720180030

On appeal, the Agency argues that Complainant is not entitled to front pay because she has failed in her duty to mitigate damages. It argues that any award ordering front pay should include language on the duty to mitigate. Further, citing Brown-Fleming v. Justice, EEOC Petition No. 0420080016 (Oct. 28, 2010), the Agency argues that 10 years is too long, since front pay is only intended to bridge a time when the EEOC concludes the complainant is reasonably likely find comparable work. The Agency does not dispute the AJ's finding that while employed Complainant had a reasonable expectation of continued employment by a contractor serving the Agency indefinitely. In opposition to the appeal, Complainant argues that the AJ's findings supporting the award of front are supported by the record.

We find that the AJ's award of 10 years of front pay is supported by substantial evidence and is legally correct. We add that Complainant has a duty to mitigate damages, regardless of the language in the AJ's order.

We must make an adjustment to the AJ's back and front pay orders, i.e., make whole relief is based on the compensation Complainant would have received from the applicable staffing firms. Regulation 5 C.F.R. § 550.805 does not apply because Complainant received her pay from a staffing firm.

*Compensatory Damages*

Compensatory damages may be awarded for past pecuniary losses, future pecuniary losses, and non-pecuniary losses that are directly or proximately caused by the agency's discriminatory conduct. Compensatory and Punitive Damages Available Under Section 102 of the Civil Rights Act of 1991 (July 14, 1992) (available at www.eeoc.gov.). Non-pecuniary losses are losses that are not subject to precise quantification including emotional pain and injury to character, professional standing, and reputation. Compensatory damages are awarded to compensate for losses or suffering inflicted due to discrimination. Damages for past pecuniary damages will not normally be sought without documentation such as receipts, records, bills, cancelled checks, or confirmation by other individuals of actual losses and expenses. Id.

The AJ found that Complainant did not prove an entitlement to pecuniary damages.

The AJ found that Complainant proved she sustained $125,000 in non-pecuniary damages. In support, the AJ made the following findings and references. Prior to the progression of her emotional injuries from the harassment, Complainant was cheerful, bubbly, easy to talk to, outgoing, and hopeful about her future. Complainant was humiliated by the sexualized comments made in early 2014. As a result of the subsequent retaliatory harassment, she had feelings of isolation and lost trust of colleagues who may befriend her since they might report things about her to S1. Complainant physically shook when she learned of the Agency's complaint against her Ohio LISW license, and was devastated by the ensuing effective denial of her privileges which resulted in her loss of the getting the Mildenhall job, her "dream job". While the complaint against her LISW license was ultimately denied, it is still on her record which weighs on her.

The AJ wrote and/or referenced the following. Prior to the full effects of the harassment on Complainant, she had a fiancé, and close relationships with friends and her parents. Her parents lived a few doors down and Complainant visited most evenings, but over time because of the emotional harm caused by the harassment withdrew from them and started visiting much less, instead going home to bed absolutely exhausted. Sometimes when Complainant visited her parents after work she showed up sobbing with tears, and felt bad for stressing her parents out. Complainant's fiancé broke off their approximately eight-month engagement around August 2017, complaining Complainant never seemed to want to do anything, just went to bed all the time, and they did not have fun anymore. Complainant lost weight, was anxious, cried, and sought medical assistance for her conditions, including sleeplessness. Complainant shut down her Facebook account to avoid being monitored by colleagues, thereby increasing her isolation. She became withdrawn, untrusting, guarded, and depressed, and her personality changed for the worse. The AJ made these findings based on the testimony of Complainant and her coworkers, the PM, and Complainant's mother.

The AJ found that for Complainant's emotional injuries, an award of $125,000 was consistent with the awards made in similar cases.

On appeal, the Agency argues that any nonpecuniary damages award should be limited to $25,000. It disputes how the AJ weighed the evidence. The Agency makes much of the testimony of Complainant's mother that before October 2015, her daughter was very outgoing, was confident, and enjoyed being around people, but after October 2015 became withdrawn. The Agency argues that the incident with the Airman occurred in October 2015, so this shows this incident caused Complainant significant emotional injury. We observe at that at the hearing in April 2018, when the Agency asked Complainant's mother how Complainant's demeanor was before and after October 2015, it did so without referencing anything connected to this date, like the Airman incident. HT 4, at 60 – 61. Without such context, we are not persuaded that Complainant's mother was referring to the Airman incident or in that moment understood where along the hostile environment timeline October 2015 was.

We find that the AJ's award of $125,000 in nonpecuniary damages is supported by substantial evidence and is consistent with awards made in similar cases. See Brown-Fleming v. Dep't of Justice, EEOC Appeal No. 0120082667 (Oct. 28, 2010) ($150,000 awarded in termination case where complainant suffered from depression, anxiety, stress, insomnia, difficulty concentration, disassociation, crying spells, social isolation, damage to her professional reputation, withdrawal from relationships, and nightmares); Champion v. Postal Service, EEOC Appeal No. 0720090037 (Mar. 10, 2010) ($125,000 awarded in two-year harassment case where complainant suffered from depression, anxiety, sleeplessness, and required psychiatric treatment).

*Attorney Fees and Costs*

The hearing took place at the EEOC's Washington Field Office in Washington, DC, albeit some witnesses attended via video teleconference.

20                                                                                              0720180030

Complainant was represented by an attorney located in Washington, DC, whose hourly rate of $563 was based on the current "Laffey Matrix." The AJ awarded this rate, and cited a Commission case for the proposition that the proper reasonable hourly rate is the rate in effect at the time of the award and not at the time the services are provided. The AJ awarded Complainant $186,207.12 in attorney fees and $11,274.17 in costs, including reimbursement for international telephone calls related to representation, Complainant's travel to the hearing in Washington, D.C., expert analysis and testimony, and a doctor's letter submitted in lieu of live testimony.

On appeal, the Agency does not contest the AJ's calculation of attorney fees and costs. Complainant argues that since the AJ issued her decision on attorney fees, the Laffey Matrix has been updated and her reasonable hourly rate is now $572, and hence her fees should be recalculated. She submits the updated matrix. We agree, and update this fee award to $189,183.28. Complainant's attorney represents she expended an additional 62.76 hours drafting the opposition appellate brief. Based on our review, we find this was reasonable. Accordingly, we award an additional $35,898.72 in attorney fees ($572 X 62.76 hours), for a total fee award of $225,082 ($189,183.28 + $35,898.72).

The Agency's final order is reversed, and the AJ's decision is AFFIRMED, with some modification.

<u>ORDER</u> (D0617)

The Agency is ordered to take the following remedial actions:

1. Within 40 calendar days of the date of this decision, provide Complainant the privileges she was denied to practice with the 48th Medical Group at the Lakenheath base, known as the Lakenheath hospital, which also serves the Mildenhall base in the United Kingdom.

2. Identify a funded slot and if none exists open one for the position of clinical social worker serving the Agency in Mildenhall that Complainant was denied in 2014, or a substantially equivalent position, select her for the position, and then without equivocation ask the appropriate staffing firm(s) verbally, and if necessary in writing, to offer the position or the substantially equivalent one to Complainant. The Agency is ordered to do this within 40 calendar days of the date of this decision. If complying with this time limit is not possible under current contract funding and logistical mechanisms, than the Agency shall complete this action as soon as it is able even if doing so takes an indefinite amount of time working within the parameters of the applicable contract(s), waiting for a renewal option thereto, modifying the contract(s) with the applicable staffing firm(s), or if such contract(s) is about to terminate, waiting for the successor staffing firm(s) to come on board and then taking the above actions with those staffing firm(s).

3. If the staffing firm(s) refuse to hire Complainant to the above position or substantially equivalent position, the Agency must, if Complainant agrees in writing in advance, using the same methodology outlined above, do the same for the position of Outreach Manager

21                                                          0720180030

at Lakenheath, or a substantially equivalent position. Should this result in a job offer to Complainant by a staffing firm, then the requirement to pay front pay would cease.[7]

4.  The Agency shall determine and pay the amount of back pay, with interest, and associated benefits, which includes the value of receiving compensation tax free, no later than ninety (90) calendar days after the date this decision is issued based on the difference between the compensation Complainant would have received had she been able to accept the position serving the Agency at Mildenhall with Staffing Firm 2 and what she received as compensation serving the Agency as Outreach Manager in Lakenheath with Staffing Firm 1 from October 1, 2014 through February 5, 2016, and thereafter at the compensation rate she would have received serving the Agency at Mildenhall with Staffing Firm 2 and successor staffing firms, if any, through the time Complainant is instated or reinstated or declines an offer by a staffing firm made pursuant to this order. In calculating back pay, the Agency shall use 29 C.F.R. § 1614.501 as a general guide, to the extent applicable. Complainant shall cooperate in the Agency's efforts to compute the amount of back pay and benefits due and shall provide all relevant information requested by the Agency. If there is a dispute regarding the exact amount of back pay and/or benefits, the Agency shall issue payment to the Complainant for the undisputed amount within sixty (60) calendar days of the date the Agency determines the amount it believes to be due. The Complainant may petition for enforcement or clarification of the amount in dispute by mailing the petition to the address in the caption of this decision or uploading it via the EEOC Public Portal.

5.  If staffing firm(s) refuse to offer Complainant a position pursuant to this Order, then from the date of the applicable last refusal for a period not to exceed 10 years, the Agency shall pay Complainant monetary front-pay equivalent to the compensation she would have received, including pay increases and the value of benefits, working in the denied Mildenhall position for Staffing Firm 2 and successor staffing firms serving the Agency.

6.  Within 60 calendar days of the date of this decision, the Agency shall pay Complainant $125,000 in non-pecuniary compensatory damages.

7.  Within 60 calendar days of the date of this decision, the Agency shall pay Complainant $225,082 for attorney fees and $11,274.17 in costs.

8.  To the extent they are still employed, contracted with or under the administrative or supervisory control of the Agency, within 90 calendar days of the date of this decision, the Agency shall provide 8 hours of mandatory in person or interactive training to S1, Successor S1, S2, S3, and the Medical Services Chief, and cover the following: how to

---

[7] We understand that the Outreach Manager job is not substantially equivalent to the Mildenhall job, but order this option because Complainant was discriminatorily constructively discharged from the Outreach Manager position in February 2016, and in May 2018, expressed interest in the job by applying with a staffing firm to serve the Agency, but was rejected.

22                                                          0720180030

identify and practical steps to take to prevent sexual and non-sexual harassment, their legal obligations to report and stop harassment, and Workplace Civility and Bystander Intervention training.[8] If S4 is still employed by the Agency in a managerial role, then within 90 calendar days of the date of this decision it shall provide S4 training on her obligations and useful practical steps to prevent and stop harassment in her subordinate chain of command. If the local EEO Director, who served an Complainant's EEO counselor, still is employed by the Agency in an EEO capacity, then the Agency shall provide him a copy of this entire decision.

9.  To the extent the Agency still directly employs as federal employees S1, Successor S1, S2, S2, and the Medical Services Chief, within 60 calendar days from the date of this decision the Agency shall consider discipline against them. The Commission does not consider training to be a disciplinary action. If the Agency decides to take disciplinary action, it shall identify the actions taken. If the Agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to impose discipline. If any of above individuals have left the Agency's employ, the Agency shall furnish documentation of their departure date(s).

The Agency is further directed to submit a report of compliance in digital format as provided in the statement entitled "Implementation of the Commission's Decision." The report shall be submitted via the Federal Sector EEO Portal (FedSEP).  See 29 C.F.R. § 1614.403(g). Further, the report must include supporting documentation of the Agency's calculation of back pay and other benefits due Complainant, including evidence that the corrective action has been implemented.

POSTING ORDER (G0617)

The Agency is ordered to post at its 48th Medical Group, Mental Health Flight, Family Advocacy Program office and Agency Lakenheath hospital at the Royal Air Force Lakenheath base copies of the attached notice. Copies of the notice, after being signed by the Agency's duly authorized representative, shall be posted **both in hard copy and electronic format** by the Agency within 30 calendar days of the date this decision was issued, and shall remain posted for 60 consecutive days, in conspicuous places, including all places where notices to employees are customarily posted. The Agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material.  The original signed notice is to be submitted to the Compliance Officer as directed in the paragraph entitled "Implementation of the Commission's Decision," within 10 calendar days of the expiration of the posting period. The report must be in digital format, and must be submitted via the Federal Sector EEO Portal (FedSEP). See 29 C.F.R. § 1614.403(g).

---

[8] Workplace Civility and Bystander Intervention training are described in EEOC's Report of the Select Task Force on the Study of Harassment in the Workplace (June 2016). See https://www.eeoc.gov/eeoc/task_force/harassment/report.cfm.

23                                                                                          0720180030

IMPLEMENTATION OF THE COMMISSION'S DECISION (K0719)

Under 29 C.F.R. § 1614.405(c) and §1614.502, compliance with the Commission's corrective action is mandatory.  Within seven (7) calendar days of the completion of each ordered corrective action, the Agency shall submit via the Federal Sector EEO Portal (FedSEP) supporting documents in the digital format required by the Commission, referencing the compliance docket number under which compliance was being monitored.  Once all compliance is complete, the Agency shall submit via FedSEP a final compliance report in the digital format required by the Commission.  See 29 C.F.R. § 1614.403(g).  The Agency's final report must contain supporting documentation when previously not uploaded, and the Agency must send a copy of all submissions to the Complainant and his/her representative.

If the Agency does not comply with the Commission's order, the Complainant may petition the Commission for enforcement of the order.  29 C.F.R. § 1614.503(a).  The Complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement.  See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g).  Alternatively, the Complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File a Civil Action."  29 C.F.R. §§ 1614.407 and 1614.408.  A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999).  **If the Complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated**.  See 29 C.F.R. § 1614.409.

Failure by an agency to either file a compliance report or implement any of the orders set forth in this decision, without good cause shown, may result in the referral of this matter to the Office of Special Counsel pursuant to 29 CFR § 1614.503(f) for enforcement by that agency.

STATEMENT OF RIGHTS - ON APPEAL
RECONSIDERATION (M0617)

The Commission may, in its discretion, reconsider the decision in this case if the Complainant or the Agency submits a written request containing arguments or evidence which tend to establish that:

1.     The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.     The appellate decision will have a substantial impact on the policies, practices, or operations of the Agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision.  A party shall have **twenty (20) calendar days** of receipt of another party's timely request for reconsideration in which to submit a brief or statement in opposition.

24                                                                      0720180030

<u>See</u> 29 C.F.R. § 1614.405; <u>Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614</u> (EEO MD-110), at Chap. 9 § VII.B (Aug. 5, 2015). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission. Complainant's request may be submitted via regular mail to P.O. Box 77960, Washington, DC 20013, or by certified mail to 131 M Street, NE, Washington, DC 20507. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. <u>See</u> 29 C.F.R. § 1614.604. The agency's request must be submitted in digital format via the EEOC's Federal Sector EEO Portal (FedSEP). <u>See</u> 29 C.F.R. § 1614.403(g). The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. <u>See</u> 29 C.F.R. § 1614.604(c).

<u>COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION</u> (R0610)

This is a decision requiring the Agency to continue its administrative processing of your complaint. However, if you wish to file a civil action, you have the right to file such action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. In the alternative, you may file a civil action **after one hundred and eighty (180) calendar days** of the date you filed your complaint with the Agency, or filed your appeal with the Commission. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. **Filing a civil action will terminate the administrative processing of your complaint.**

<u>RIGHT TO REQUEST COUNSEL</u> (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests.

25                                                    0720180030

Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

*Carlton M. Hadden*

Carlton M. Hadden, Director
Office of Federal Operations


August 20, 2019
Date

26                                                    0720180030

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed**. I certify that this decision was mailed to the following recipients on the date below:



Rosemary Dettling, Esq.
Federal Employee Legal Services Center
1629 K Street, NW, Suite 300
Washington, DC  20006



U.S. Department of the Air Force
AFLOA/JACL - Labor Law Field Support Center
1500 West Perimeter Road, Suite 1370
Joint Base Andrews, MD 20762

Department of the Air Force
1500 West Perimeter Road, Suite 4350
Joint Base Andrews, MD  20762-7002

August 20, 2019
Date

Compliance and Control Division



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C. 20507**

## NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
An Agency of the United States Government

This Notice is posted pursuant to an order by the United States Equal Employment Opportunity Commission dated _____ which found that a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq. has occurred at the Department of the Air Force's 48th Medical Group, Mental Health Flight, Family Advocacy Program (FAP) and the Lakenheath hospital located on the Lakenheath Royal Air Force base, United Kingdom (this facility).

Federal law requires that there be no discrimination against any employee or applicant for employment because of the person's RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, or DISABILITY with respect to hiring, firing, promotion, compensation, or other terms, conditions or privileges of employment.

FAP was found to have engaged in verbal sexual harassment in 2014, and retaliatory harassment from 2014 - 2016, including being abusive, excessive monitoring, making negative reports about a contractor to their staffing firm in a retaliatory effort to remove the contractor, and attacking the contractor's professional license, and Lakenheath hospital was found to have engaged in severe retaliatory harassment in 2014 and 2015, when it blocked a contractor from receiving privileges and obtaining an offered promotion. This facility was ordered grant the denied privileges, facilitate reinstating the contractor's service to the facility, pay back pay, pay 10 years front pay if the contractor is not reinstated, pay a substantial amount of compensatory damages, provide anti-harassment and Workplace Civility and Bystander Intervention training and consider disciplining specified responsible officials, and pay the contractor's substantial attorney fees and costs bringing this EEO administrative litigation. This facility will ensure that officials responsible for personnel decisions and terms and conditions of employment will abide by the requirements of all federal equal employment opportunity laws and will not retaliate against employees who file EEO complaints.

This facility will comply with federal law and will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to, federal equal employment opportunity law.

Duly Authorized Agency Representative: _____

Date Posted: _____

Posting Expires: _____

29 C.F.R. Part 1614

EXHIBIT G

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
## ATLANTA REGIONAL OFFICE

XXXXXXXXXXXXX

　　　　　　Appellant,

v.

DEPARTMENT OF JUSTICE,

　　　　　　Agency.

DOCKET NUMBER
AT-0752-17-0799-A-1

DATE: August 30, 2024

Rosemary Dettling, Esquire, Washington, D.C., for the appellant.

Leslie A. Saint, Esquire, Washington, D.C., for the agency.

Monica Hansen, Esquire, Washington, D.C., for the agency.

Drew Ambrose, Esquire, Washington, D.C., for the agency.

**BEFORE**
Jeffrey S. Morris
Administrative Judge

## INITIAL DECISION

On May 15, 2024, I issued an initial decision which reversed the agency's action removing the appellant from federal employment. That result was based on the agency's violation of the appellant's due process rights. *See XXXXX v. Department of Justice*, MSPB Docket No. AT-0752-17-0799-B-1, Remanded Appeal File (RAF), Tab 17. My initial decision became the Board's final decision on June 19, 2024 when neither party filed a petition for review. *Id*. On July 7, 2024, the appellant timely filed a motion for attorney fees and costs incurred in connection with the appeal. Attorney Fees File (AFF), Tab 1. The Board has jurisdiction over the motion. *See* 5 C.F.R. § 1201.202(a). For the

following reasons, the appellant's motion for attorney fees and costs is GRANTED in the amount of **$169,307.68**.

## ANALYSIS AND FINDINGS

Background

In the original appeal, I reversed the agency's removal action on the merits. *See* X̶X̶X̶X̶X̶ *v. Department of Justice*, MSPB Docket No. AT-0752-17-0799-I-1, Initial Appeal File (IAF), Tab 32.   Following agency's petition for review, on February 21, 2024, the Board vacated and remanded my initial decision.  *See* X̶X̶X̶X̶X̶*v. Department of Justice*, MSPB Docket No. AT-0752-17-0799-I-1, Petition for Review File (PFRF), Tab 7.  As noted above, upon remand I again reversed the agency's removal action, this time based on the agency's violation of the appellant's due process rights.  *See* X̶X̶X̶X̶X̶ *v. Department of Justice*, MSPB Docket No. AT-0752-17-0799-B-1, RAF, Tab 17.

Also as noted above, on July 7, 2024, the appellant timely filed a motion for attorney fees and costs incurred in connection with the appeals.  AFF, Tab 1. The agency did not respond to the appellant's motion.  The record on attorney fees is now closed.  *Id*., Tab 2.

Burden of proof and applicable law

An appellant bears the burden of proving entitlement to an award of attorney fees under 5 U.S.C. § 7701(g)(1), and must show that: (1) an attorney-client relationship exists pursuant to which counsel rendered legal services on the appellant's behalf in connection with a Board proceeding; (2) the appellant was the prevailing party; (3) an award of attorney fees is warranted in the interest of justice; and (4) the fees requested are reasonable. *See e.g., Holmes v. Office of Personnel Management,* 99 M.S.P.R. 330, ¶ 6 (2005) (citing *Kruger v. Department of Veterans Affairs*, 95 M.S.P.R. 471, ¶ 7 (2004)); *Diehl v. U.S. Postal Service*, 88 M.S.P.R. 104, ¶ 10 (2001).

3

An attorney-client relationship existed and fees were incurred.

The agency has not disputed that an attorney-client relationship existed between the appellant and his counsel, or that the appellant incurred legal fees and costs in prosecuting the appeals. The record contains a retainer agreement and reflects that, at all times relevant to this motion, the appellant was represented by counsel. And, it is undisputed that fees were incurred. Accordingly, I find that the evidence establishes that an attorney-client relationship existed and that fees were incurred in connection with the appeals.

The appellant is the prevailing party in the underlying appeal.

An appellant is considered to be the prevailing party in a case where he has obtained an enforceable order resulting in a material alteration of the legal relationship of the parties. *See Driscoll v. U.S. Postal Service*, 116 M.S.P.R. 662, ¶ 9 (2011); *Baldwin v. Department of Veterans Affairs*, 115 M.S.P.R. 413, ¶ 11 (2010). The agency has not disputed, and I find, that the appellant is the prevailing party in the underlying appeal and he obtained an enforceable order reversing the agency's action removal based on violation of his due process rights.

A fee award is warranted in the interest of justice.

An award of fees is warranted in the interest of justice when, for example, (1) the agency engaged in a prohibited personnel practice; (2) the agency action was clearly without merit or wholly unfounded, or the employee was substantially innocent of the charges; (3) the agency initiated the action in bad faith; (4) the agency committed a gross procedural error; or (5) the agency knew or should have known that it would not prevail on the merits. *Allen v. U.S. Postal Service*, 2 M.S.P.R. 420, 434-35 (1980).

Here, the Board found that the agency violated the appellant's due process rights, a gross procedural error. *See Dunn v. Department of the Army*, 4 M.S.P.R. 407, 409 (1980); *Sowa v. Department of Veterans Affairs*, 96 M.S.P.R. 408, ¶ 14

(2004).  Accordingly, I find that an award of attorney fees is warranted in the interest of justice in this case.

 The fees claimed are reasonable.

 The Board assesses the reasonableness of an attorney fee request by using two objective variables, the attorney's customary billing rate and the number of hours reasonably devoted to the case.  *See Hart v. Department of Transportation*, 115 M.S.P.R. 10, ¶ 14 (2010); *Krape v. Department of Defense*, 97 M.S.P.R. 430, ¶ 6 (2004). This is the "lodestar" which the Board uses in determining the fee award.  *See Driscoll,* 116 M.S.P.R. 662, ¶ 10; *Lizut v. Department of the Navy*, 42 M.S.P.R. 3, 7-8 (1989). The initial calculation should exclude hours for which the prevailing party failed to provide adequate documentation, and should also exclude hours that were not reasonably expended.  *See Driscoll,* 116 M.S.P.R. 662, ¶ 10 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983)).

 In the second phase of the analysis, the lodestar may be adjusted upward or downward based on other considerations, including the crucial factor of the "results obtained."  *See Driscoll,* 116 M.S.P.R. 662, ¶ 10.  In some cases, it may be appropriate to reduce the lodestar to reflect the party's failure to obtain all the relief he requested.  *Id*.  However, a reduction of the lodestar to account for the party's success on only some of his claims for relief is distinct from a finding that hours devoted to unsuccessful claims or issues were not reasonably spent.  *Id*.

 Here, the agency does not dispute either the appellant's attorneys' claimed hourly rates ($690/hour (Dettling); $491/hour (Farr)) or the total number of hours claimed (266.91).  I find that both figures are supported by evidence (AFF, Tab 1), and that the hours claimed are reasonable given the complex and protracted nature of the litigation, *i.e.*, (2018-2024).

 Costs

 The appellant claimed (and presented evidence supporting) costs incurred by her attorneys for lodging and air travel ($494.14), baggage fees ($25.00), ground transportation ($100.37), and copying ($60.18) in the total amount of

$679.69.[1] The agency does not dispute these costs, and I find they are lawful, reasonable, and GRANTED.

 Conclusion

     Based on the above-stated hourly rates and documented hours of work, the appellant's request for attorney fees in the amount of $168,627.99 is GRANTED. Further, for the reasons explained above, his request for costs in the amount of $679.69 is GRANTED. Taken together, I find the appellant has established that he is entitled to an award of attorney fees and costs in the total amount of **$169,307.68**.

## DECISION

The appellant's motion for attorney fees and costs is GRANTED.

## ATTORNEY FEES

I **ORDER** the agency to pay attorney fees and costs in the amount of **$169,307.68** by a check made payable to the appellant's counsel.  Payment must be made no later than 20 calendar days after the date this initial decision becomes final.

*Jeffrey S. Morris*

FOR THE BOARD:         _____
                       Jeffrey S. Morris
                       Administrative Judge

## ENFORCEMENT

If, after the agency has informed you that it has fully complied with this decision, you believe that there has not been full compliance, you may ask the Board to enforce its decision by filing a petition for enforcement with this office, describing specifically the reasons why you believe there is noncompliance.

---

[1] The total amount claimed for these costs in the appellant's motion ($709.58) appears to be a computational error.

Your petition must include the date and results of any communications regarding compliance, and a statement showing that a copy of the petition was either mailed or hand-delivered to the agency.

Any petition for enforcement must be filed no more than 30 days after the date of service of the agency's notice that it has complied with the decision. If you believe that your petition is filed late, you should include a statement and evidence showing good cause for the delay and a request for an extension of time for filing.

### NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

### NOTICE TO APPELLANT

This initial decision will become final on **October 4, 2024**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov/).

### Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative

judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record.  A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first.  If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt.  You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim.  The date of filing by mail is determined by the postmark date.  The date of filing by fax or by electronic filing is the date of submission.  The date of filing by personal delivery is the date on which the Board receives the document.  The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service.  Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party.  *See* 5 C.F.R. § 1201.4(j).  If the petition is filed electronically, the online process itself will serve the petition on other e-filers.  *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.   5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.   Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general.**  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2)  <u>Judicial or EEOC review of cases involving a claim of discrimination</u>**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3)** **Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within **60**

**days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

CERTIFICATE OF SERVICE

     I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

Electronic Service           XXXXXXXXXXX Tyler Jones

                          Served on email address registered with MSPB


<u>Appellant Representative</u>

Electronic Service           Rosemary Dettling

                          Served on email address registered with MSPB


<u>Agency Representative</u>

Electronic Service           Drew Ambrose

                          Served on email address registered with MSPB


<u>Agency Representative</u>

Electronic Service           Monica Hansen

                          Served on email address registered with MSPB


<u>Agency Representative</u>

U.S. Mail                  Leslie Saint

                  935 Pennsylvania Ave., NW

                  Room 10140

                  Washington, District of Columbia 20535

08/30/2024
(Date)

_Angela E Bradanick_

Angela Bradanick

Paralegal Specialist

EXHIBIT H

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD
# DENVER FIELD OFFICE


XXXXXXXXXXXXXXXXX,

               Appellant,

     v.

DEPARTMENT OF VETERANS
   AFFAIRS,

          Agency.

DOCKET NUMBER
DE-1221-20-0280-W-5

DATE: January 31, 2024

    <u>Nathaniel McClure</u>, Wichita, Kansas, for the appellant.
    <u>Rosemary Dettling</u>, Washington, District of Columbia, for the appellant.

    <u>Kathleen M. Hunter</u>, Kansas City, Missouri, for the agency.
    <u>Amber Groghan</u>, Akron, Ohio, for the agency.


**BEFORE**
Stephen C. Mish
Chief Administrative Judge


## INITIAL DECISION

On May 22, 2020, the appellant filed this individual right of action (IRA) appeal under the Whistleblower Protection Act, as amended, alleging the agency had unlawfully failed to take beneficial personnel actions with respect to him, and had taken several adverse personnel actions against him, all in retaliation for his having engaged in activity protected by that act. (Initial Appeal File 1 (IAF1), Tab 1.)[1]

For the reasons set forth below, the appellant's request for corrective action is GRANTED in part and DENIED in part.

---

[1] For various reasons, the appeal was dismissed without prejudice several times, and there have been different administrative judges presiding during earlier phases of the appeal.

**ANALYSIS AND FINDINGS**

<u>Findings of Fact</u>

The preponderant evidence of record establishes the following.[2]   The agency hired the appellant as a Certified Registered Nurse Anesthetist (CRNA) with the agency's Robert J. Dole Medical Center in Wichita, Kansas, on March 12, 2018.  (IAF1, Tab 15, p. 239.)  He was subject to a two-year probationary period in that position.  (*Id.*)   He had previously been employed in a private practice doing work in different facilities.  (HR, Appellant.)  At the times relevant to this appeal, the appellant's immediate supervisor was Dr. Rajeeva Bashyakarla, M.D., his second-level supervisor changed during his tenure and, to the extent there was such person, there is no record of his or her involvement in the events of this case, his third-line supervisor was Chief of Staff, Dr. Robert Cummings, M.D., and the overall director of the Medical Center in Wichita at the relevant time was Rick Ament.  (HR Ament; Cummings; Appellant.)

During the hiring process, the appellant inquired of an agency Human Resources employee about the possibility of receiving student loan relief through an agency program called the Education Debt Reduction Program (EDRP.)  (HR, Cordes, Frueh; Initial Appeal File 5 (IAF5), Tab 48, p.121.)  The appellant did not receive any EDRP benefits from the agency.  (HR Frueh.)

In the course of his employment, the appellant became involved with a working group in Wichita for an agency initiative known as Enhanced Recovery After Surgery (ERAS) for colorectal patients.  The working group interfaced with people from various agency facilities around the country.  The agency recognized the ERAS working group with a "Silver Star" award, noting the initiative "has

---

[2] There are varying burdens of proof applicable in this appeal.  *See Rutila v. Department of Transportation*, 801 F. Appx. 745, 747 (Fed. Cir.  2020).  The appellant bears the burden to establish his prima facie case of whistleblowing retaliation by preponderant evidence, *see id.,* and the majority of findings in this appeal apply that standard.  However, the agency bears a higher evidentiary burden on some points, clear and convincing evidence.  *See id.*  Findings made on that higher standard are specifically noted as such.

resulted in decreased length of stay, a reduction in post-operative complications and opioid use, and increased Veteran satisfaction." (IAF5, Tab 48, p.97.) The award noted, "This innovative best practice has been shared at the local, VISN, and national levels." (*Id.*)

On November 18, 2018, the appellant received an annual performance rating for Fiscal Year 2018 with an overall rating of "High Satisfactory." (IAF5, Tab 63, pp. 4-5.) The appellant's first-line supervisor and Chief of the Anesthesia Department, Dr. Bashyakarla, provided positive commentary with that rating, such as:

> Mr. Xxxxxx joined the department in March 2018 and in this short period has demonstrated that he is well trained and is competent in carrying out the assigned tasks. He has shown diligence when evaluating patients for Anesthetic care, focused while performing history and physical examinations to ensure a safe Anesthesia for the patient. He is clinically proficient in diagnosis, therapeutic ability and consults when indicated and was provided verbal instructions in proper record keeping documentation. . . . Mr. Xxxxxx since joining has shown initiative in incorporating medications, technology for better care of the patients and is enthusiastic in imparting these skills to other members of the department. . . . Xxxx is a dependable, affable individual who maintains good relations with the clinical staff. . . . Mr. Xxxxxx has made a quick transition from practicing in the private world and adapted to practicing as per Federal guidelines. He is a team player and is a member of the ERAS (Early recovery after Surgery) team. He has brought fresh ideas to our practice.

(*Id.*)

A few months after this rating, beginning in or around February 2019, the appellant began requesting that he be given a Special Award for Performance (SAP) based on work he had been performing as a CRNA. (IAF5, Tab 48, pp. 88-94.) Specifically, he requested one based on his work on the ERAS initiative which received the Silver Star award. He also sought a "retention bonus." (*Id.*) One of the physicians he worked with on that initiative suggested he request a SAP based on that work. (HR, Appellant.) The appellant directly requested Dr.

Bashyakarla to provide him one, but Dr. Bashyakarla initially demurred and ultimately declined to do so after consulting with Dr. Cummings.   (HR, Bashyakarla; IAF5, Tab 48, p.91.)  The appellant contacted several people in the agency about such awards and requirements for them, but he was not provided one.  (IAF5, Tab 48, pp. 88-94.)

Approximately one year after his hire as a CRNA, on an unspecified date somewhere in mid-March of 2019, the appellant was involved in an incident with a patient where a procedure was not going according to plan.  Specifically, this patient, who was obese and had a fused spine, was undergoing a colonoscopy and was under anesthesia for that with the appellant administering the anesthesia. (HR, Appellant.)  While under anesthesia, the patient began to cough, which can be problematic.   (*Id.*)   The appellant applied a breathing bag, and while undergoing this procedure, the patient experienced a laryngospasm.   (*Id.*)   A laryngospasm occurs when a patient's vocal cords spasm shut, causing the patient to stop breathing.  In response to this situation, the appellant called for assistance and asked for a glidescope to be brought in.[3]  (IAF5, Tab 23, p.41.)  The appellant believed that a glidescope could be inserted into the patient's airway more easily because it did not require moving the patient's fused neck and would enable him to see into the patient's airway without attempting to lift the patient's neck up and arching it back.   (*Id.*)   He thought such lifting and arching would be further problematic because of this patient's fused spine.  (*Id.*)

Dr. Bashyakarla was alerted to this incident while it was occurring, and he entered the room with the patient and the appellant looking to assist with the situation.  (HR, Bashyakarla.)  The specific actions he took to assist with the patient having the laryngospasm are in some dispute.  What is not disputed is that Dr. Bashyakarla took over.  (HR Bashyakarla; Appellant; IAF5, Tab 48, p. 132.) He unsuccessfully attempted to insert a standard laryngoscope into the patient's

_____

[3] A glidescope can be used for laryngoscopy and is similar to an endoscope but has a structural curvature a standard endoscope does not.  (HR, Appellant.)

throat, not a glidescope, and the appellant tried to warn Dr. Bashyakarla about this patient's fused spine.  (HR Bashyakarla, Appellant.)   Again, the parties dispute who did exactly what at that point, but ultimately the laryngospasm subsided, the patient did start breathing again, and the incident resolved without a catastrophic outcome.  (HR Bashyakarla.)  At the time, the patient was unstable and hypoxic, so this was a serious, life-threatening incident. (*Id.*)

The agency has a Patient Safety department in Wichita and an internal reporting system for sub-optimal medical incidents, and a failure to report such an incident could result in discipline of an employee based on the failure because there is a duty to report them.   (HR Cummings.)  A Joint Patient Safety Report (JPSR) can be used to formally report such incidents.  (*Id.*)  There are also other reporting mechanisms, and reports of near-miss incidents can even be made orally.  (*Id.*; HR Diaz.)  Whether, and if so, how and when, the appellant reported this mid-March 2019 laryngospasm/endoscope incident is in dispute and will be resolved below.  What is not in dispute is that in April 2019, the appellant met with Drs. Cummings and Bashyakarla in Dr. Cummings' office.  (HR Cummings; Appellant; Bashyakarla.)  The topic and content of that meeting is also in dispute and will be resolved below.

There had been several reports of low morale and poor interpersonal relations within the Anesthesia department, including one from the appellant himself.  (HR Cummings.)  On September 12, 2019, Dr. Cummings tasked Dr. Heather Brown, Ph.D., a Registered Nurse and Nurse Executive in Wichita, with conducting a fact-finding investigation into the Anesthesia department.   (HR Brown; IAF5, Tab 48, pp. 13-14.)  He requested that Dr. Brown be the person to do the fact finding.  (IAF5, Tab 48, p.50.)

Dr. Brown received investigative training in 2018 and had some experience with the conduct of such inquires.  (HR, Brown.)  She was officially charged with looking at the department as a whole.  (*Id.*)  She requested a list of the employees in the Anesthesia department, then developed a set of questions in consultation

with Dean and emailed them to all members of that department.  (HR, Dean, Brown.)  The questions were pointed at several topics, and some were tailored to the individual.  They ranged from the more generic, "Are there standard processes for your job?" to more person-specific questions like, "Would you be surprised if I told you people thought you yelled at them?"  (IAF5, Tab 23, pp. 20, 30.)  She then spoke to the members of the Anesthesia department, mostly in person, typing out their responses to her questions, some of which were oral supplements to her emailed questions.  (*Id.*; HR, Brown.)  When she did so, she would then send her typed notes to the relevant interviewee, and she would allow them to provide supplementary information but not to alter what she had typed.  (*Id.*)  Some of the people she questioned were willing to sign her typed questions and answers, but some were not.  (*Id.*)  She then summarized these answers into a report.  (*Id.*; IAF5, Tab 23, pp. 10-17.)

She collected negative commentary about the appellant during her inquiry, like "he has a chip [on his shoulder], it is escalating" and the working environment "has been worse since XXXX got here[,]"  (IAF5, Tab 23, pp. 38, 47.)  Many of the Anesthesia department employees expressed that they disliked working with the appellant because they perceived him to be aggressive and argumentative.  (*Id.*)  Dr. Brown thought that the appellant was a problematic employee, thought his employment should be terminated and wanted to recommend as much in her report, but she consulted the agency's Human Resources department about what should be included in the report and was advised by Supervisory Human Resources Specialist Christina Dean not to include any such recommendation.  (HR Brown.)  She also collected negative commentary about Dr. Bashyakarla's interactions with employees, such as his yelling at subordinates and unwelcome grabbing of staff, to the point where one employee believed Dr. Bashyakarla might strike him during an incident and another was brought to tears by his hectoring.  (IAF5, Tab 23, pp. 35, 45.)  There were also reports that Dr. Bashyakarla engaged in treatment of employees

regarding tasks he assigned to them which may have had a disparate impact on female employees or may have been gender-based disparate treatment of them.

Dr. Brown finalized and submitted her report on October 22, 2019. While acknowledging some negative information about Dr. Bashyakarla in the report, much of the report deflects and minimizes problems in the Anesthesia department attributable to Dr. Bashyakarla. For example, as stated in the report, "The female employees indicated that the male employees are not held accountable to stocking rooms and adequately completing pre-operative chart reviews, so they are more frequently assigned to those tasks." (IAF5, Tab 23, p. 12.) According to Dr. Brown's report, in response, "Dr. Bashya indicated that he makes assignments based on strengths of the employee." (*Id.*) That was sufficient for Dr. Brown to conclude, "Based on staff interviews, and Dr. Bashya's concurrence, it is reasonable to conclude that assignments are not necessarily fair and equitable. However, there was not enough evidence to determine that assignments are made based on gender."[4] (IAF5, Tab 23, p. 15.) Similarly, Dr. Brown wrote, "Staff interviews suggest that Dr. Bashya does yell and may grab staff member arms in a manner to convey importance. There was no evidence that he did either with malice or intent to harm. Dr. Bashya expressed surprise (that appeared genuine) when told of staff perceptions related to his yelling/grabbing. He thanked the

---

[4] Many times, a vague, subjective explanation such as that offered by Dr. Bashyakarla will not pass legal scrutiny. *See, generally, Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011) ("an employer's undisciplined system of subjective decisionmaking can have precisely the same effects as a system pervaded by impermissible intentional discrimination") (cleaned up). It could be that the specific female employees at issue were demonstrably better at the tasks of stocking rooms or charting than the specific male employees at issue, but it is intuitively difficult to see why that would be with such tasks, or why any good/bad dichotomy would split exactly along gender lines. Or, it could be that Dr. Bashyakarla believed the women to be better because of their gender, or the men worse because of theirs, and made work assignments accordingly. "When I give chart review/pre-op workups, I can expect that the female providers get it done. The men are much more slow and don't always get it done." (IAF5, Tab 23, p. 21.) The issue of gender discrimination *vel non* will not be resolved here. Suffice it to say, Dr. Brown's report identifies real problems with Dr. Bashyakarla's workplace conduct which are glossed over or explained away. *See also* Kan. Stat. Ann. § 21-5413(a)(2) (elements of simple battery in Kansas).

fact-finding process for bringing that to his attention and indicated he would make changes to improve on that perception."  (*Id.*)

This is in contrast, however, to a section of the report she dedicated to the appellant, who based on the official charge, would not have been an individual focus of the report.  There, such minimizing is not to be found.  In a section titled "Serious concern[,]" Dr. Brown remarked that the appellant "was particularly vocal during his interview."  (IAF5, Tab 23, p. 16.)  This section of the report is written as if there was unanimity of thought about the appellant by members of the Anesthesia department.  For example, it states:

> Other staff interviewed identify Mr. Roberts as frequently hostile, usually angry, and almost always chaotic. They report that during periods of leave, the department functions smoothly and without constant "angst". They report that staff meetings are intolerable to attend because he comes "looking for a fight." Despite Mr. Roberts report that he is simply trying to generate conversation and solutions, his colleagues perceive him as wanting to debate until you agree with his solution. Dr. Bashya concurred that the constant fighting was one influencing factor to not having staff meetings. The physicians voice some concern that he has limited insight into his own practice, including his limitations and are concerned that he won't recognize when he needs to ask for help, or do so when needed. They report that he has regional block complications that he refuses to accept responsibility for (unable to substantiate or refute this claim as complications were outside the scope of this review).
>
> Based on the interview with Mr. Roberts, and the hostility expressed towards Leadership (specifically Dr. Bashya), it is unlikely that this relationship can be repaired to support a fully functioning, progressive unit. Mr. Roberts attitude and demeanor have a significant negative effect on the unit.

(*Id.*)  Although several of the Anesthesia department employees expressed a negative impression of the appellant, essentially that he was a unpleasant person with a sandpaper personality, so to speak, the statements from employees about the appellant are not uniformly negative.  For example, of the four physicians in the Anesthesia department, one said nothing negative about the appellant specifically.  (IAF5, Tab 23, pp. 33-36.)   Of the other CRNAs, one said he had a

professional relationship with all his colleagues in Anesthesia, (IAF5, Tab 23, pp. 28,) and one described the appellant's unpleasant behavior as action to address failed leadership in the Anesthesia department:

> Some of the issues that have come up have come to a head because we have people who are willing to speak up. I can't see any accountability from Dr. Bashya. Dr. Smalley is basically the second in command. She wears rose colored glasses and defends him. I'm frustrated by it. He does have emotional outbursts,
> A new personality comes in that is angry, loud, disrespectful. He just didn't want to deal with it. But the new guy is upset because Dr. Bashya doesn't want to deal with him. So he just gets more upset because Dr. Bashya isn't listening and Dr. Bashya just doesn't want to interact with him.
> He has treated you poorly in the past and I felt like it was inappropriate and unacceptable. Who am I going to go to? People make excuses and say he isn't a bad guy. Nobody wants to be the one to report it. But ~~Braxton~~ and ~~Ryan~~ don't care. They'll send up flares and keep talking until someone listens and does something about it. If anything good comes out of their attitude, it will be awareness.

(IAF5, Tab 23, p. 50.)

On the same date listed on Brown's report, October 22, 2019, the appellant was called to a meeting in Dr. Cumming's office.  In that meeting the appellant was informed, orally and by memorandum, that he was being sent to work in the Wichita Facilities Management Service for up to three months.  (HR, Appellant, Dean; IAF5, Tab 23, p.7.)  He was to have no contact with Anesthesia department personnel during this time.  (*Id*.)  Whether Dean told the appellant during this meeting that, if he did not use this time to find himself a new job and resign from the agency it would convene an administrative investigation board for the purpose of terminating his employment, is in dispute and will be resolved below.  What is not disputed is that, by January 13, 2020, the agency decided that the appellant should still not return to Anesthesia but would work "in Logistics" for a period of up to sixty days instead.  (IAF5, Tab 21, p. 118; Tab 23, p.5.)   The two detail memoranda did not state why the appellant was being detailed out of the Anesthesia department, why Facilities Management or Logistics were selected as

his new areas of employment, or why he was forbidden to have contact with members of the Anesthesia department.  (*Id.*)

The appellant, however, did not actually report for these temporary reassignments for this whole period and instead took leave for most of it.  (HR, Appellant; IAF, Tab 21, pp. 147-149.)  In the meanwhile, the agency convened a Professional Standards Board (PSB).  It was comprised of the following persons: Valerie McClaran, Chair of the PSB and Chief CRNA at the Kansas City VAMC; Nipi Pappan George, CRNA at the Kansas City VAMC; and Timothy Fundenberger, CRNA at the Kansas City VAMC.  (HR, McClaran; IAF5, Tab 21, p.30.)  McClaran was contacted to be on the PSB by the Kansas City Human Resources Director after being identified by Dean.  (*Id.*; HR Dean.)  She agreed to chair it, then she contacted the other two members, and they also agreed to be on the PSB.  (HR McClaran.)

Upon the PSB being constituted, on or about January 24, 2020, McClaran sent a letter to the appellant notifying him of that fact and what the focus of its inquiry would be.  (IAF5, Tab 21, pp. 178-179.)  That focus was on the appellant and, "Inability to maintain a cordial working environment with interactions with staff" and "Continual disruptive behavior."  (*Id.*)  Following that letter, the appellant arrived at the Kansas City facility with a representative on January 27, 2020, to provide McClaran with a packet of information he wanted the PSB to consider.  (*Id.*; IAF5, Tab 21, pp. 57-101.)  Although the appellant's appearance in Kansas City was entirely unannounced and unexpected, McClaran met with him, accepted the packet and spoke with him for approximately 15-20 minutes.  (HR McClaran.)

McClaran next contacted Dean seeking the information the agency relied on in convening the PSB.  (*Id.*)  Dean sent McClaran a packet of information and she, McClaran, provided copies to the other two PSB members.  (*Id.*; IAF, Tab 21, pp. 178-206.)  The PSB members then discussed who in the Wichita Anesthesia department they wanted to speak with and the questions they would

ask of them.  (*Id*.)   The PSB interviewed the following persons on February 3, 2020: Drs. Bashyakarla and Vicki Smalley; CRNA Stephen Reihnart; CRNA Brandon Bailey; CRNA Tamara Rothenberger; CRNA Erin Goodnight; and the appellant, himself.  (IAF5, Tab 21, pp. 35-55.)   All were by video, save the appellant who came in-person with a representative.  (HR, McClaran.)

The PSB members took notes of their interviews by hand, then sent them to Dean to have them typed out.  (HR, McClaran.)  Upon being apprised that it had completed its interviews, Dean asked McClaran if the PSB would like to render an immediate decision, but McClaran declined.  (*Id.*)   The PSB members had agreed they should not rush their decision as it was a serious matter.  (HR, McClaran, Fundenberger.)   Two days after the interviews, the PSB reached the conclusion that the appellant's employment should be terminated due to disruptive behavior.  (HR, McClaran, Fundenberger.)   McClaran executed a form saying as much which she sent to Dean.  (IAF5, Tab 21, p.28.)   The PSB recommendation was sent to Ament.  (HR, Ament.)   He then terminated the appellant's employment effective February 10, 2020.  (HR, Ament; IAF5, Tab 21, p.24.)

I reserve additional findings for discussion below.

## Applicable Law

Under the Whistleblower Protection Enhancement Act of 2012 (WPEA), the Board has jurisdiction over an IRA appeal if the appellant has exhausted his administrative remedies before OSC and makes nonfrivolous allegations that (1) he made a protected disclosure described under 5 U.S.C. § 2302(b)(8) or engaged in protected activity described under 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D), and (2) the disclosure or protected activity was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a). Once an appellant establishes jurisdiction over his IRA appeal, he is entitled to a hearing on the merits of his claim, which he must prove by preponderant evidence. If the appellant proves that his protected disclosure or activity was a contributing factor in a personnel action taken against him, the agency is given an opportunity to prove, by clear and convincing evidence,

that it would have taken the same personnel action in the absence of the
protected disclosure.

*Salerno v. Department of the Interior*, 123 M.S.P.R. 230, 234 (2016) (internal
citation omitted).

To establish that one has made a protected whistleblowing disclosure, an
appellant must prove "a disinterested observer with knowledge of the essential
facts known to and readily ascertainable by the [appellant] could reasonably
conclude that the [disclosed] actions of the agency evidenced a violation of law,
rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of
authority, or a substantial and specific danger to public health or safety." *Id.* at
235. And to establish a protected disclosure was a contributing factor in a
personnel action, an appellant can prove that agency personnel with knowledge of
the disclosure were, within two years of the disclosure, involved in the taking of
the personnel action. *Wadhwa v. Department of Veterans Affairs*, 110 M.S.P.R.
615, 621 (2009) (discussing the knowledge/timing test set out in 5 U.S.C.
§ 1221(e)). If the knowledge/timing test is proven, because Congress wrote it
into the statute, the conclusion of contributing factor must be drawn even if it is
manifestly against the weight of the evidence. "Once the knowledge/timing test
has been met, an administrative judge must find that the appellant has shown that
his whistleblowing was a contributing factor in the personnel action at issue, even
if after a complete analysis of all of the evidence a reasonable factfinder could
not conclude that the appellant's whistleblowing was a contributing factor in the
personnel action." *Mastrullo v. Department of Labor*, 123 M.S.P.R. 110, 119
(2015). Agency involvement can be either as the actual decisionmaker regarding
the personnel action or by influence on the decisionmaker. *See Aquino
v. Department of Homeland Security*, 121 M.S.P.R. 35, 45 (2014). *See also
Karnes v. Department of Justice*, 2023 MSPB 12, ¶¶ 18-20 (2023) (affirming that
"an employer could be held liable for taking a personnel action when a
supervisor's retaliatory animus was the proximate cause of an adverse

13

employment action, even if the retaliating supervisor did not make the ultimate decision"); *Dorney v. Department of the Army*, 117 M.S.P.R. 480, 485–86 (2012) ("in a corrective action appeal, the party before the Board is the agency, not its individual officials[,]" therefore, "a lack of actual knowledge by a single official is not dispositive. Rather, we must determine whether *the agency* took a wrongful personnel action against the appellant") (emphasis original).

Alternatively, even if an appellant does not prove by preponderant evidence that the knowledge/timing test is met, "the Board must consider other evidence, such as that pertaining to the strength or weakness of the agency's reasons for taking the personnel action, whether the whistleblowing was personally directed at the proposing or deciding official, and whether those individuals had a desire or motive to retaliate against the appellant." *Chambers v. Department of Homeland Security*, 2022 MSPB 8, ¶ 15 (2022).

Once an appellant has proven that a protected disclosure or activity was a contributory factor in a personnel action, the burden of persuasion shifts to the agency, and it must prove by clear and convincing evidence that it would have acted the same in the absence of the appellant's protected activity or disclosure. *See Smith v. General Services Administration*, 930 F.3d 1359, 1365 (Fed. Cir. 2019) ("Where whistleblowing is at issue, however, the proper inquiry is not whether the agency action is justified; it is whether the agency would have acted in the same way absent the whistleblowing"). Clear and convincing evidence is "a high burden of proof for the Government to bear" and is utilized for the protection of "particularly important interests in a limited number of civil cases." *Whitmore v. Department of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012) (internal citation and quotation omitted). The Board has defined it by regulation to mean, "that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established." 5 C.F.R. § 1209.4(e). It is above and beyond the preponderance standard, and in fact, is only "a somewhat lighter burden than that imposed by requiring proof beyond a

reasonable doubt." *Miller v. Department of Justice*, 842 F.3d 1252, 1258 (Fed. Cir. 2016) (internal quotation omitted). To evaluate whether an agency has met this burden, the Federal Circuit Court of Appeals has "approved of the use of three, albeit nonexclusive, factors described in *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999):

> [1] the strength of the agency's evidence in support of its personnel action; [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and [3] any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated."

*Miller*, 842 F.3d at 1257.

<u>The appellant proved he made three protected disclosures.</u>

There were three alleged protected activities identified in the prior jurisdictional ruling. (IAF5, Tab 33, p.4.) The appellant has proven them by preponderant evidence. The first is, "submission of a Duty to Report to Quality Assurance soon after the mid-March 2019 procedure with Dr. Bashyakarla." (*Id.*) I begin by noting that there is no documentary evidence, no printed copy, of this report in the record. However, the appellant credibly testified that, not immediately after but not long after, the March 2019 laryngospasm incident, he entered one about that incident through the agency's internal computer system.[5] The appellant credibly testified, without contradiction by other witnesses, that when one is in the agency's computer system, there is an icon on the homescreen labeled, "Talk to Me," and when one clicks it, it takes you to a page with several links, one of which is "Duty to Report." (HR, Appellant.) Upon clicking that,

---

[5] A whistleblower's motives for making a disclosure, e.g., bitterness or spite upon not receiving an immediate SAP in or around March 2019, are irrelevant to its protection under the WPA. 5 U.S.C. § 2302(f)(1)(C) ("A disclosure shall not be excluded from subsection (b)(8) because—[***] of the employee's or applicant's motive for making the disclosure").

the user is shown a page which has several fields for entry of information.  (*Id.*) There, he entered a description of the incident "from start to finish" and said it was "a close call," and that the whole situation could have been avoided if there had been better communication between him and Dr. Bashyakarla.  (*Id.*) Specifically, I find it more likely than not the appellant wrote that, in entering the room and attempting to assist, Dr. Bashyakarla did not heed his multiple warnings about the patient's fused spine, unsuccessfully attempted to insert a "Miller" headed endoscope rather than a glidescope several times, and that these repeated failed attempts caused bleeding in the patient's throat which could have been avoided had Dr. Bashyakarla listened to him.  (*Id.*)

I find the report was submitted by the appellant as he described, and said the things outlined above, in the absence of the actual report in evidence.  I do so for several reasons.  First, the appellant credibly testified he submitted the report in the manner described.[6]  None of the agency witnesses provided countervailing testimony that there was no "Talk to Me" button displayed in the agency's computer system or that accessing it brought you to another screen which had a Duty to Report link, or anything similar.  In fact, that much was corroborated. The agency employee who testified she administered the agency's DTR system, Diana Diaz, described it similarly.  (HR, Diaz.)

Diaz credibly testified that, when requested by agency counsel, she ran a search of the system covering January 2019 to July of 2020 and did not find a

---

[6] While the agency did well-prove contradictions between the appellant's testimony at the hearing and testimony in a discovery deposition, (HR, Appellant,) those contradictions were not on the point of whether he submitted the DTR at all.  The appellant also effectively impeached agency witnesses on certain points.  (HR, Brown.) Witnesses can be credible on one point of testimony but not credible on another.  *See, e.g., Seas v. U.S. Postal Service*, 73 M.S.P.R. 422, 430 (1997) ("the fact that a witness may give inconsistent testimony on one issue does not mean that her testimony on another issue cannot be credible").  I recognize the agency's theory of the case, that the appellant should be found not credible in regard having submitted the DTR in the first place, and it is not without some force.  (IAF5, Tab 76, pp. 10-13.) There are many possible inferences to be drawn from the agency's impeachment of the appellant.  Given the totality of the evidence in the appeal, however, that is not the inference I draw.

DTR from the appellant when she did. (HR, Diaz.)  However, she also testified she did not assume her role with the agency until June of 2019.  (*Id.*)  That is a few months after the appellant testified he did file a DTR.  While Diaz further testified, "Yes, ma'am," to the question, "So, is it safe to say that once a DTR is in the DTR system it will always be in the DTR system[,]" she did not explain how she knew that to be true, what if any safeguards there are to prevent accidental data loss or corruption, and it contravenes common knowledge that, in general, electronic data is subject to deletion.  (*Id.*)  Thus, while I do not find that Diaz purposefully testified falsely, I do not give this particular bit of testimony significant weight.

I also note an August 2020 agency Inspector General's report about the agency's Wichita facility which found, in 2019, the facility did not always properly document and report serious negative medical incidents as it should have.[7]  (IAF5, Tab 77, p.43.)  The missing report here about the laryngospasm/endoscope patient would be a corresponding negative medical incident at or around the same time also not handled appropriately by agency managers.  Next, there is a February 5, 2020, email from Wichita Human Resources Specialist Sandra Miller to Wichita Harassment Prevention Program Coordinator Neil Simmons.  (IAF, Tab 48, pp. 22-29.)  Simmons had directed Dr. Cummings to initiate an investigation, after coordination with the Human Resources department, into allegations of harassment the appellant made.  (*Id.*)  Simmons' direction post-dated Dr. Brown's investigation, he rejected the suggestion from Dean that Dr. Brown's fact-finding would suffice, and Simmons' email identified specific allegations by the appellant to which he, Simmons, expected specific inquiry and response.  One of the identified allegations was, "Ryan complained about patient safety concerns and his complaint(s) was swept

---

[7] This was during Dr. Cummings' tenure as Chief of Staff responsible for overseeing medical functions in Wichita.  (HR, Cummings.)  Indeed, the appellant's disclosure was made a few months before the Inspector General's unannounced review, which review began shortly after Diaz assumed her position overseeing the DTR system.

under the rug, he claims." (IAF5, Tab 48, p. 26.)  Miller's response about that allegation to Simmons was, "Mxx Roberts had filed a DTR in March of 2019. That DTR is not available to be shared. It was looked into and the findings discussed with Mx Roberts in a meeting with Dr. Cummings and Dr. Bashyakarla." (*Id.*) Again, this statement does not even impliedly question the making of the report but rather does the opposite.  Miller credibly testified that to the best of her recollection she did not see the DTR and probably wouldn't have been allowed to if she asked, but she did not have good recollection of what she specifically did in reviewing the allegations and responding to Simmons because she retired a few years before her testimony and had no materials from that time to review.  (HR, Miller.)

Finally, I find the appellant submitted the report as he described because, as will be discussed below, Dr. Bashyakarla, Dr. Cummings and the appellant had a meeting to discuss the incident in Dr. Cummings' office on or about April 9, 2019.  (HR, Appellant; Bashyakarla.)  How Dr. Cummings knew of the incident to have the meeting about it but for a report is not in evidence, and the occurrence of the meeting Dr. Cummings denied dovetails with Miller's email to Simmons that it did occur and also with the appellant's and Dr. Bashyakarla's testimony that it did.

That brings us to the second alleged disclosure, "the April 9, 2019 follow-up meeting with Dr. Cummings, which further discussed the incident." (IAF5, Tab 33, p.4.)  In his testimony, Dr. Cummings testified that he did have a meeting with the appellant and Dr. Bashyakarla at or around this time, but he denied any recollection that the meeting was to discuss the laryngospasm/endoscope incident. (HR, Cummings.)  Rather, according to Dr. Cummings, the meeting was to discuss and ameliorate interpersonal tensions between the two of them.  (*Id.*)  I do not credit that testimony because the other two participants in this meeting, Dr. Bashyakarla and the appellant, both credibly testified that the meeting actually was to discuss the laryngospasm/endoscope incident.  (HR, Appellant;

18

Bashyakarla.)    *See Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987) (factors for evaluating credibility of testimony).  Thus, I find that the meeting on or about April 9, 2019, focused, at least for some time, on the appellant's disclosure about the laryngospasm/endoscope incident.

I conclude the appellant's disclosure about that incident qualifies for protection under the Whistleblower Protection Act as a disclosure of substantial and specific danger to public health and safety.  The Board has previously held protected on that basis disclosures of singular, one-off instances of avoidable harm to individual medical patients.  *See Parikh v. Department of Veterans Affairs,* 110 M.S.P.R. 295, 303 (2008) (separate disclosures of "an unnecessary and improperly performed medical procedure" and that "a resident's failure to follow instructions caused harm to a patient"), overruled on other grounds, *Hau v. Department of Homeland Security*, 123 M.S.P.R. 620, 626-27 (2016).  I conclude the appellant's belief that he was making a disclosure of that nature is reasonable.  He disclosed an agency-inflicted injury to a patient, minor or major, which could have been avoided.  *See Parikh,* 110 M.S.P.R. at 303. And repeating a prior protected disclosure is still protected upon reiteration.  *Mithen v. Department of Veterans Affairs*, 119 M.S.P.R. 215, 223, n.11 (2013) ("We note that, under the WPEA, a disclosure of information previously disclosed is not excluded from coverage" citing 5 U.S.C. § 2302(f)(1)(B)).

With the third alleged disclosure, "participation in a fact-finding regarding the [laryngospasm/endoscope] incident[,]" (IAF5, Tab 33, p.4,) I find, and it is undisputed, that the appellant did participate in the fact-finding conducted by Dr. Brown.  But, Dr. Brown's investigation was not focused on the mid-March 2019 laryngospasm/endoscope incident.    None of her questions to Anesthesia department employees specifically mentioned it, nor do any appear to obliquely relate to it.[8]  (IAF5, Tab 23, pp. 18-60.)  However, in his response to Dr. Brown's

_____

[8] I note that, of all of Dr. Brown's written questions and answers, the appellant is the only person interviewed who she listed by first name only.

question, "Can you describe your main role and responsibilities[,]" (IAF5, Tab 23, p. 40,) the appellant went on a bit of a diatribe well beyond a direct answer to that question and stated, in part:

> A dtr was filed about this; I got called into dr. bashya's office a couple days after that. Veteran was in endo; had fused neck; I asked for veteran to be put on his back; bring the glidescope; I requested clewer; dr. bashya came rushing in, bloodied up his airway attempting direct laryngoscopy (Dr. Reed, Sam Clewar, Kelsie, endo staff all witnessed this incident). I grabbed an LMA and directed bachya to move out of the way to maintain an airway. All swept under the rug.

(IAF5, Tab 23, p. 41.)

The jurisdictional ruling was specifically, "Finally, participation in a fact-finding regarding the incident. I find this is a non-frivolous allegation of a protected activity under 5 U.S.C. § 2302(b)(9) and a non-frivolous allegation of a protected disclosure under 5 U.S.C. § 2302(b)(8)(B)."  (IAF5, Tab 33, p.4.)  The ruling that participation in the fact finding was protected under Section 2302(b)(9) does not specify which subsection of (b)(9), (A) through (D), is the operative portion.  Under *Cooper v. Department of Veterans Affairs*, 2023 MSPB 24, ¶ 19 & n.9 (2023), I do not resolve the issue because, as in *Cooper*, whether participation in the fact-finding constitutes protected activity under some portion of 2302(b)(9) or not, the statement the appellant made during the fact-finding is protected in and of itself under (b)(8).  *Cooper*, 2023 MSPB 24, ¶ 19 & n.9.  It is a reiteration of the original DTR disclosure, which is protected.  *Mithen*, 119 M.S.P.R. at 223.

<u>The appellant proved he was subject to two affirmative personnel actions by the agency and that it failed to take three others with respect to him.</u>

There are five retaliatory instances alleged by the appellant which were held to be properly before the Board.[9] (IAF5, Tab 33, pp. 4-5.)  There is no real dispute about them in that they are were stipulated.  (IAF5, Tab 56, p.2; Tabs 47-

_____

[9] The several types of personnel actions actionable under the WPEA are listed in 5 U.S.C. § 2302(a)(2)(A).

48.)   To the extent they were disputed, that the appellant was detailed out of the Anesthesia Department on January 13, 2020, 5 U.S.C. § 2302(a)(2)(A)(iv), and that the agency terminated the appellant's employment effective February 10, 2020, 5 U.S.C. § 2302(a)(2)(A)(iii) are amply documented in the record, and I find the agency took those actions.

With personnel actions the appellant contends the agency failed to take, one is the appellant's requested SAP.   5 U.S.C. § 2302(a)(2)(A)(ix).   Dr. Bashyakarla testified that he ultimately decided that he would not put the appellant in for one after consulting with Dr. Cummings about it, and I find he did not.  (HR, Bashyakarla.)  Next, the appellant testified he requested of agency officials that he be entered into an agency Education Debt Repayment Program (EDRP) but was not.  (HR, Appellant.)  And, the agency employee who initially handled his request as part of a Human Resources Compensation Team, Angel Frueh, testified that she determined the appellant wasn't eligible for the program as a recruitment payment based on the documentation of his hiring, and she further testified she corresponded with other agency employees involved with the program who determined the appellant was not eligible for the program as an employment retention incentive.  (HR, Frueh; IAF5, Tab 23, p.62.)  I credit that testimony and conclude not receiving the benefits of the EDRP is a failure to take a personnel action regarding benefits.  5 U.S.C. § 2302(a)(2)(A)(ix).

Finally, the prior jurisdictional ruling identified "the agency's failed to provide the appellant with a relocation/retention bonus" as a personnel action. (IAF5, Tab 33, p.4.)   No witness, to include the appellant, testified about a relocation bonus or other payment based on a change of residence, and if I understood his testimony, he obtained his degrees in Wichita and worked in and around that city from then through the events of this appeal.  (HR, Appellant.) Thus, I find relocation is not actually at issue.  Rather, testimony about employee retention payments was in the context of the EDRP, that one can be eligible for the EDRP under specific circumstances as a retention incentive.  (HR, Freuh;

Appellant.) Thus, I find that only the EDRP is at issue, albeit with two personnel actions, denial of participation in the program by virtue of hire, and denial of participation in the program as a retention incentive.

<u>The appellant proved by preponderant evidence under the knowledge/timing test that his disclosure was a contributing factor in three of the five personnel actions.</u>

As set out above, to carry his evidentiary burden, the appellant must prove it more likely than not that at least one of his disclosures was a contributing factor in the agency's taking or not taking one of the personnel actions. I start with the two he did not prove, denial of participation in the EDRP as a recruitment incentive for hiring, and denial of participation in the EDRP as a retention incentive. For both personnel actions, the persons who decided the appellant was not eligible under the terms of the program were not Wichita-based, and there is no evidence they had actual knowledge of, or were influenced by persons knowledgeable about, the appellant's disclosures in making their determinations. Nor is there other evidence to support that the appellant's whistleblowing was a contributing factor in these two actions in the absence of any knowledge of the disclosure.

With the EDRP as a recruitment tool, the person who determined that the appellant was not eligible was Frueh. (HR, Frueh.) She first began corresponding with the appellant about these issues before he actually began his employment with the agency. (IAF5, Tab 48, p. 121; Tab 47, p.37.) She credibly testified, without contradiction, that if EDRP was available to anyone as a recruitment incentive it had to be listed as an available benefit on the hiring announcement for the position, or if an employee was hired without a posted announcement as is sometimes the case, then it had to be listed on the agency's offer letter to the putative employee. (HR, Frueh.) Frueh examined the appellant's hiring documentation, determined that he was hired without a posted announcement, then checked his commitment letter and saw that the EDRP was

not mentioned there.  (HR, Frueh; IAF5, Tab 23, pp. 67-68.)  She determined that the appellant was not eligible because the EDRP was not mentioned in the letter and informed him as much.[10]  (*Id.*)

The appellant offered no evidence that Frueh was directly aware of his allegations at the time she made this determination, and there is insufficient evidence to find constructive knowledge through contact with someone who was aware.  *See Karnes*, 2023 MSPB 12, ¶¶ 18-20; *Aquino*, 121 M.S.P.R. at 45; *Wadhwa*, 110 M.S.P.R. 621.  Further, the appellant's disclosures were not directed at Frueh and did not otherwise involve any area of responsibility for her. *See Chambers*, 2022 MSPB 8, ¶15; *Dorney*, 117 M.S.P.R. at 486.  And while neither party stepped through any governing manual or policy document with her, there is nothing apparent to undermine Frueh's description of contours of the EDRP.[11]  *See Wilson v. Department of Veterans Affairs*, 2022 MSPB 7, ¶ 56 (2022) (plausible unrebutted testimony can be sufficient to establish facts). Thus, I conclude that the appellant has not proven that his protected disclosures were a contributing factor in the agency denying him the EDRP benefits based on his recruitment and hiring.

With the EDRP as a retention tool, Frueh credibly testified that when the appellant contacted her about EDRP for retention purposes, she ultimately submitted an application packet for him.  (HR, Frueh.)  However, after she did so, she received an email from another agency employee involved with administering the EDRP, a Matthew Rhodes, who declared that the application was insufficient to justify EDRP.  (*Id.*)  Frueh relied on his assessment in saying the appellant was not entitled to retention EDRP.  (*Id.*)  In the email, Rhodes stated:

---

[10]  It is unclear exactly when Frueh reached this determination, and I assume in the appellant's favor that it was after he engaged in protected activity.  It may well have been the other way around.

[11]  It appears an outdated version of the governing agency manual is in the record. (IAF5, Tab 23, pp. 114-156.)  It does not match with the manual or form numbers Rhodes discusses, *infra*.

Angel,

Looking at the EDRP Retention request there are several problems with it...

- VA Handbook 5007 requires us to show a Likelihood of Leaving Federal Employment using one of the below.
  - o The employee is in receipt of a bona fide offer of employment as evidenced by a formal written job offer or affidavit signed by the employee providing the position and salary being offered, the name and location of the organization, and the prospective date of employment; or
  - o Confirmation of the employee's submission of a retirement application or letter of resignation to the local human resources office.
- Pay is competitive my review of the 2018 IHS Nursing Salary Survey shows a range of $117,200 - $199,200 compared to stations LPS with $133,474 - $210,700.
- Per USA Staffing Columbia had an announcement for 0605 but there are no announcements for Wichita.
- Additionally, the VA10017 that was provided has no description of efforts to eventually eliminate the use of a retention.
- Other supporting factors lists time off but would need full leaver package to compare... does time off consider VA's 10 Paid holidays and 13 SL days per year? In total VA Nurses receive 49 work days per year paid or 9.8 weeks. Furthermore, if we are looking at benefits we need to look at them all (Retirement, TSP....) not just cherry pick one or two.

Ultimately the submitted VA10017 does not meet the basic requirements in VA Handbook 5007 to be considered. Please review the attached guidance and if you think the Retention is justified please edit VA10017 and return in LEAF to the CCOE. If you agree that a Retention Incentive is not justified at this time, please Cancel LEAF request.[12]

(IAF5, Tab 23, pp. 62.)

As with the appellant's EDRP request based on his hiring, there is no indication that Rhodes was actually aware of the appellant's disclosures. Unlike with Frueh and the hiring EDRP request, however, there is some evidence of Dr. Bashyakarla's involvement with this request. Specifically, Frueh credibly testified that the application came through Dr. Bashyakarla, and after receiving Rhodes' email she alerted Dr. Bashyakarla to what it said about the appellant's

---

[12] In Rhodes' email there is a table reflecting the salary range numbers he mentions which is not reproduced here.

application not qualifying and she did not hear anything further about EDRP for the appellant after that. (HR, Frueh.) Her actual contact with Dr. Bashyakarla in this regard, however, post-dates Rhodes' rejection, (*id.*,) and that contact could not have been a contributing factor in Rhodes' determination.    And, again, as with Frueh, the appellant's disclosures did not implicate Rhodes personally or any program with which he had proven involvement.  *See Chambers*, 2022 MSPB 8, ¶15; *Dorney*, 117 M.S.P.R. at 486.  Thus, I conclude the appellant has not proven his disclosures were a contributing factor in denial of EDRP participation as a retention incentive.

With the appellant's request for a SAP, as found above despite his denials, Dr. Cummings was aware of the appellant's DTR about the laryngospasm/endoscope incident, as was Dr. Bashyakarla, and according to Bashyakarla's testimony, the two of them consulted about whether to put the appellant forward for a SAP, ultimately deciding not to do so.    (HR, Bashyakarla.)  No formal denial memorandum or anything of that nature is apparent from the record, and none of the witnesses discussed anything of that kind being issued.  Dr. Bashyakarla did not provide a specific date for his and Cummings' determination to not provide the appellant a SAP.    (HR, Bashyakarla.)  Thus, it is not entirely clear exactly when the denial occurred.  I conclude it was at some point after the appellant filed the nid-March 2019 DTR, perhaps as early as April, but no later than July of that year.  I do so based on email exchanges between the appellant and several people.

By email dated March 11, 2019, the appellant directly requested a SAP of Dr. Bashyakarla.  (IAF5, Tab 48, pp. 91-92.) Dr. Bashyakarla responded the following day that he'd discuss it with Dr. Cummings, the Chief of Staff.  (*Id.*) Then, in the same email string, the appellant follows up on June 10, again inquiring about a SAP for himself, and Bashyakarla responds on June 14 that he forwarded the appellant's request to the Chief of Staff for action. (*Id.*)  Next, in

an April 11, 2019, email exchange about SAPs with Juliana Cotton, the appellant states:

> You then talk to your chief, explain to him/her what a SAP is, because they have no idea. Then you essentially put down on paper the words that they been saying to you, ask them to read it and add to it if they feel so inclined, and then submit it. Several weeks, then months pass, and upon inquiring about it again, you are told "No. That would not be fair to the rest of the providers." And, "I don't want to make waves."

(IAF5, Tab 48, p. 94.)

Then in a September 20, 2019 email exchange with Dean about SAPs, the appellant states:

> I do have a question about SAPs though. I was approached and told I should definitely inquire about getting put in for an SAP for my contribution to the ERAS program (that has anesthesia teams from California and North Carolina VAs asking for me to be on the monthly workgroup calls so they can ask me questions, but I am unable to d/t being marooned in the OR by the current anesthesia chief).
>
> After several email exchanges and ignoring my question when I would ask him, I finally approached him when he was standing in a hallway, and asked him why it was taking so long to discuss- his response "No, I will not consider it. It would not be fair to the other CRNAs." I respectfully said, "but it's a 'special award for performance'".  He walked away.
>
> Fast forward three months ... I asked him again last week, and he said it would "never be a consideration."

(IAF5, Tab 48, p. 90.)

 In light of these emails indicating the approximate timing of the denial, I find that the appellant's first and second disclosures were a contributing factor in this action under the knowledge/timing test as Drs. Bashyakarla and Cummings were aware of the appellant's disclosures made less than a year earlier.  *See Wadhwa*, 110 M.S.P.R. at 621.

With the detail out of the Anesthesia Department up to the time of his termination, while Dean provided the memoranda informing the appellant of the move, she credibly testified it was not her determination to make but rather that of Drs. Cummings and Bashyakarla.  (HR, Dean; IAF5, Tab 21, p.201.)  Dr.

Bashyakarla credibly testified that he consulted with Human Resources officials about detailing the appellant, but it was he who decided to detail the appellant out of the Anesthesia Department.  (HR, Bashyakarla.)  The detail occurred less than a year after the appellant's disclosures, and I conclude they (the same basic disclosure repeated three times) were a contributing factor in the detail.  *See Wadhwa*, 110 M.S.P.R. at 621.

Finally, with the agency's termination of the appellant's employment, Director Ament had the final say on that action, (HR, Ament,) but he did not act in a vacuum.  Rather, he consulted with several people about the appellant and what to do with him during a meeting which predates the February 3, 2020, SRB convened in Kansas City.  (IAF5, Tab 48, pp. 63-65.)  The meeting was convened in response to an email the appellant sent to Director Ament on January 17, 2020, which referenced the March 2019 DTR by stating "Mr. Roberts filed a Duty to Report in March of 2019, regarding the actions of Dr. Rajeeva Bashyakarla, where a patient almost died; read the filed DTR· there were many witnesses. This DTR was investigated and the Chief of Staff Dr. Robert Cummings, came to the professional conclusion that Mr. Roberts and Dr. Bashyakarla have personal differences."  (IAF5, Tab 48, p.66.)   The email further stated that the appellant had filed complaints with the Office of Special Counsel and the agency's own Office of Accountability and Whistleblower Protection (OAWP) regarding his treatment by Drs. Cummings and Bashyakarla. (IAF5, Tab 48, p.68). The participants in that meeting included not only Director Ament, as well as Dean, but also Dr. Brown and Dr. Cummings. (*Id*.)   Dean's credible testimony confirmed that she signed a written summary of that meeting as confirmation of its accuracy. (HR, Dean.)  In that summary, the termination of the appellant's employment is discussed among the participants as if the appellant is understood to be a whistleblower and his termination was a foregone conclusion. Specifically, the summary states in pertinent parts:

A meeting was held Friday, January 17, 2020, to discuss an email received by members of the PENTAD from ~~Ryann Roberts~~, with the subject line "Protected Disclosure-Duty to Report." The following employees were in attendance at the meeting: Bonnie Henderson, Tina Dean, Neil Simmons, Heather Brown, Dr. Robert Cummings, Lisa Blackburn and Rick Ament. It was the Director's intent that the meeting would ensure that all affected parties would have the same information and to query the attendees regarding any actions that may not be reflected accurately in the email from ~~Mx. Roberts~~.

[***]

Mr. Ament is aware that ~~Mx. Roberts~~ was trying to schedule an appointment, but because the director is the deciding official on the proposed action recommended by the summary review board, he chose to put off meeting with the employee to maintain the integrity of the process.

[***]

OAWP will not be able to hold an action since ~~Mx. xxxxxxxx~~ is a Title 38 employee.

[***]

The bigger picture reason for the meeting with Dr. Cummings and Christina Dean was to inform ~~Mx. Roberts~~ of the fact-finding results, close the loop on any questions, let him know he would be terminated during his probationary period, and would be detailed to Facilities until that time.

(IAF5, Tab 48, pp. 63-64.)

To the extent the Kansas City-based SRB had not yet conducted any interviews or reached any conclusions about the appellant, let alone offered its actual recommendation, the appellant's termination being discussed as a *fait accompli* which would not be delayed leads me to draw unflattering inferences about the conversation in this meeting. Specifically, one inference drawn is that in this meeting the appellant's March 2019 DTR about the laryngospasm/endoscope incident was discussed among the participants. That includes Director Ament. Even if it could be said he did not have actual knowledge from the appellant's email and this meeting, I infer constructive knowledge through Cummings' participation and discussion with him. *See Miller v. Department of Veterans Affairs*, 92 M.S.P.R. 610, 620 (2002) ("we also agree with the AJ's determination that Norman, as the proposing official and longtime GLAHCS Chief of Staff, likely influenced deciding official Thomas's decisions

by proposing the appellants' removals and by discussing Pandol's congressional testimony with Thomas before Thomas made his decisions on the appellants' discipline").    Accordingly, I conclude under the knowledge/timing test that appellant's mid-March 2019 DTR, reiterated, was a contributing factor in Director Ament's February 7, 2020, decision to terminate the appellant's employment. *See Wadhwa*, 110 M.S.P.R. at 621.

<u>The agency has not proven by clear and convincing evidence that it would have acted the same in the absence of the appellant's disclosures.</u>

Starting with the SAP, Dr. Bashyakarla credibly testified that he and Dr. Cummings agreed that the appellant should not receive a SAP.    (HR, Bashyakarla.)    Dr. Bashyakarla thought it would be unfair to several of the appellant's fellow CRNAs in Wichita as some of them had longer tenure than the appellant but were already being paid less than he was even without providing him a SAP.  (*Id.*)  To his recollection, he had never provided any subordinate with a SAP.    (*Id.*)    However, given the "high burden" the clear and convincing evidence standard imposes, one that is only a "somewhat lighter burden" than the criminal standard of beyond reasonable doubt, I conclude the agency has not met its burden.

Utilizing the three *Carr* factors, the strength of the agency's evidence is the first, *Carr*, 185 F.3d at 1323, and it does not favor the agency.  While there is some credible evidence in the appeal about CRNA salary ranges from Rhodes' email, what is not extant is evidence that more senior CRNAs, collectively, had expressed dissatisfaction that the appellant, specifically, or more newly hired CRNA's, generally, were making more money than more senior CRNAs.  In a statement given during Dr. Brown's fact finding, CRNA Erin Goodnight does express that, "I had a big pay discrepancy when I first got here. I was advised to file an EEO. I was told it went to a pay committee, but there isn't a committee. My colleague (that I trained) will be making more than me in 2 years, though I have more experience (by 7 years)." (IAF5, Tab 23, p. 32.)  But this is the lone

statement to that effect.  Nor is there evidence that any of the more senior CRNAs would have been upset with a one-time SAP for the appellant's recognized and awarded work on the ERAS initiative.  There are some statements where there are mentions of dissatisfaction with pay in the Anesthesia department generally, to include the dissatisfaction of physicians with their pay and responsibilities.  But, that does not support, under the clear and convincing standard, the specific concern Dr. Bashyakarla articulated about upsetting longer-tenured coworkers in awarding the appellant a SAP.

The agency posits in closing arguments that all CRNAs were required to participate on committees as part of their regular job duties, and thus the appellant's work on the ERAS initiative did not constitute something special to warrant providing a SAP.  (IAF5, Tab 76, p. 21.)  What the agency does not address is the circumstances of those other CRNAs' work on those committees and whether they were held out for recognition by the agency as the appellant and other ERAS-involved personnel in Wichita were.

The second *Carr* factor, the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision, *Carr*, 185 F.3d at 1323, also does not favor the agency.  As he testified, Dr. Bashyakarla was the person who decided that the appellant would be detailed out of the Anesthesia department.[13]  The appellant's disclosures were specifically about Dr. Bashyakarla, providing him strong motive to retaliate against the appellant.  *See Karnes*, 2023 MSPB 12, ¶33.  The agency argues that Dr. Bashyakarla consulted with persons from the Human Resources department about whether to detail the appellant and followed their advice in doing so.  (IAF5, Tab

---

[13] Depending on who was asking, Dr. Bashayakarla testified that he consulted with Human Resources, but the decision was his, and he also testified that the decision to detail the appellant was made by Human Resources.  (HR, Bashyakarla.)  Between the two, the statement that he consulted with HR but the decision was his is more credible as that comports with Dean's testimony about what she did and former Human Resources Officer Sydney Kaus' testimony about how such a detail would come about, in general.  (HR, Dean; Kaus.)  *See Hillen*, 35 M.S.P.R. at 458.

76, p. 22.)  To the extent that is true, it was Dr. Bashyakarla's ultimate decision whether to detail the appellant or not, and his consulting with Human Resources personnel does not immunize the agency from the consequences of his choice.

The third *Carr* factor, comparative employees, 185 F.3d 1323, also does not favor the agency.  In the context of this personnel action, what it would have to produce is a person or persons who were not whistleblowers but who also were named in a special recognition award for work on a committee or initiative such as ERAS and who also were not provided a SAP for such work when they specifically sought one.  *See Siler v. Environmental Protection Agency*, 908 F.3d 1291, 1299 (Fed. Cir. 2018).  It did not do so, so this factor cannot favor the agency as a matter of law.  *See id.*  It may be there was no such person to produce within the agency (not just Wichita), but the agency did not prove that, either. *See Miller,* 842 F.3d at 1262 ("The Government introduced no evidence as to what actions it takes against other DOJ employees during OIG investigations despite this factor being directed to the 'agency' rather than to a particular supervisor at a particular Federal Bureau of Prisons facility").

The knowledge/timing test for an employee can be fairly easy to meet, awareness by relevantly involved officials within two years of the personnel action.  Indeed, knowledge/timing does not even need to comport with the overall weight of the evidence.  The standard of proof on clear and convincing evidence for an agency is the opposite; it is a heavy burden, and whatever evidence is adduced must leave "a firm belief as to the allegations sought to be established." 5 C.F.R. § 1209.4(e).  In this context, it is that the agency would have done things just the same even if there was no whistleblowing.  The evidence adduced here did not create such a belief that the appellant would have been denied a SAP of some amount for his ERAS work in the absence of his disclosures.

With respect to detailing the appellant out of the Anesthesia department, here, the agency presented stronger evidence for its action.  Specifically, as revealed by Dr. Brown's fact finding, many Anesthesia department employees

had at least some negative commentary about the appellant, even ones who also offered the appellant some praise, and much of the commentary was strongly negative about the appellant's day-to-day affect and behavior while working within the Anesthesia department. They expressed things like, "Ryan is constantly angry all the time[,]" (IAF5, Tab 23, p.23,) "It has been worse since Ryan got here. There is such venom and hostility.  It is ugly and disrespectful[,]" (*id.* at p.47,) and "Ryan is so angry all of the time and I just don't know that he can get over it. He has a chip on his shoulder and is just waiting for it to get knocked off." (*Id.* at p.51.)  One expressed that when the appellant was away from work for two weeks, "it was really quiet."  (*Id.*)

According to Dean, although detail memoranda does not state why the appellant was detailed, the reason the appellant was detailed out of the Anesthesia department was concerns about his interpersonal interactions with other members of the department.  (HR, Dean.)  Facially, quickly separating an employee who causes anxiety and consternation among a work group from that group makes some sense.  Dean also testified the details were instituted because an SRB was being considered for the appellant.  (*Id.*)

With regard to the appellant's unpleasant interactions with coworkers, the same basic thing can be said of the commentary about Dr. Bashyakarla in response to Dr. Brown's questions, and he was not swiftly whisked away from Anesthesia.   Several employees expressed that he caused anxiety and consternation within the Anesthesia department with ongoing behaviors they felt were inappropriate.  These were statements like, "Something happened between me and my supervisor and I took it as aggressive and demeaning. It's happened several times since I've been here. He did apologize. I moved on, but question the sincerity because it seems to be on-going[,]"  (IAF5, Tab 23, p.31,) "He just keeps asking questions and yelling. I felt small and completely paralyzed because I didn't feel like I could respond because we were in front of a patient behind a curtain and everyone could hear what was going on. Again, I didn't even know

how to address him because I am within my 2 year probationary period.  I have witnessed him do that to other people[,]" (*id.* at p.35,) "That type of behavior led to our first confrontation when he grabbed the back of my arm and attempted to drag me to the pre-op area. I yanked my arm away and told him we could discuss it later. I told him to never grab me like that again[,]" (*id.* at pp. 55-56,) and "I have seen Dr. Bashya pull people by the wrist to get their attention. No grown up wants to be touched and led by the wrist." (*Id.* at p.46.)  Given this documented behavior and its effects, the notion the agency was acting from a pure motivation to protect other employees in the Anesthesia department from a bad actor when it detailed the appellant away is undercut.[14]

The other rationale, that an SRB for the appellant was under consideration, Dean testified that it would have been Dr. Bashyakarla who recommended or requested that an SRB be convened.  (HR, Dean.)  I credit that testimony as it comports with the agency manual addressing SRBs.  (IAF5, Tab 61, p.190.) And, as found above he had a strong motive to retaliate.  There is record evidence that at least two other agency employees who faced an SRB or an investigation of some kind were detailed out of their positions, (IAF5, Tab 47, pp. 17, 22,) and evidence that other employees have been temporarily detailed and/or prohibited from entering their former work areas without notation of an SRB or anything similar.  (*Id.* at pp. 18-21.)  They are signed by, or on behalf of, the Human Resources Officer in Wichita at the time, Sydney Kaus.  However, neither Kaus, nor Dean, nor any other agency employee testified that this was a blanket, non-discretionary policy to detail the subjects of investigations away from their usual employment, and even if it was, to the extent a detail would automatically follow from a request or suggestion by Dr. Bashyakarla, I do not consider this strong

---

[14] The appellant is described as highly abrasive by many of his coworkers, and one Anesthesiologist expressed some concern for her physical safety (without many supporting specifics) but there are no allegations against him of repeated offensive physical contacts or screaming tirades from which employees needed protection.

evidence the agency would have detailed the appellant in the absence of his disclosures.[15]

As to evidence of comparator employees for the third Carr factor, there are those in Kaus' memoranda. What was not established with regard to them is that they were not whistleblowers, which is key to being a proper comparator. *See Miller*, 842 F.3d 1257. Dean did testify that she did not think them whistleblowers. (HR, Dean.) However, that would be a mixed question of law and fact for the Board to determine. Whether or not a set of circumstances meets a given legal definition is a conclusion of law. *See, e.g., Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001). And even if it were a straight factual question, she provided no supporting details about the specifics of those employee's situations. Therefore, on balance, I conclude the agency has not shown by the heavy burden of clear and convincing evidence that it would have detailed the appellant absent his disclosures.

The last personnel action is the termination of the appellant's employment. Director Ament was the ultimate decision maker in that regard. (HR, Ament.) Before addressing the *Carr* factors, I address his testimonial credibility.[16] He was relatively new to the agency at the time of the events of this appeal, having been appointed to that position, his very first with the agency, approximately two years prior to the events of this appeal. (*Id.*) He testified he relied on the SRB recommendation to terminate the appellant as "the most significant"

---

[15] Although perhaps not strictly necessary to a decision in this appeal, regarding whether Dean told the appellant in the October 22, 2019, meeting where the appellant was presented his first detail memorandum that he would be terminated and should use the time period of the detail to seek employment elsewhere, I find she did. (IAF5, Tab 48, pp. 48, 63-64.)

[16] The *Carr* factors are not exclusive considerations in a clear and convincing analysis, and a finding that protected activity was a consideration an agency relied on in taking a personnel action could obviate the need to address one or all of them. *See Smith*, 930 F.3d at 1365 ("Where whistleblowing is at issue, however, the proper inquiry is not whether the agency action is justified; it is whether the agency would have acted in the same way *absent the whistleblowing*") (emphasis added). I do so anyway.

consideration.  (HR, Ament.)  While that bit of testimony was credible, some other portions of his testimony were not.  He further testified that he did not factor that the appellant had filed a DTR into his decision, and that at the time of his decision, while he had engaged in some correspondence with the appellant, he did not know anything about him as an individual beyond the evidence file he was presented to consider.  (*Id.*)  I do not credit that testimony.

It is not credited as it is directly undermined by the January 17, 2020, memorandum documenting the meeting he convened with Drs. Cummings and Brown, Dean and others where the whole point of the meeting was to talk about the appellant, his potential termination and "ensure that all affected parties would have the same information[.]" (IAF5, Tab 48, p.63.)  *See Hillen*, 35 M.S.P.R. at 458.  As found above, I infer the appellant's DTR about the endoscope/laryngospasm incident was discussed in that meeting, and I find Director Ament considered it, even if not as a primary consideration, in deciding to terminate the appellant's employment.[17]  *See Parikh v. Department of Veterans Affairs*, 116 M.S.P.R. 197, 216 (2011) (holding that even if an agency is primarily motivated by legitimate considerations in taking a personnel action, the agency must prove by clear and convincing evidence that the action involved no consideration of protected activity).

Turning to the first *Carr* factor, strength of evidence, much as with detailing the appellant out of the Anesthesia department, there is solid evidentiary support for doing so found in the statements witnesses made to the SRB and in Dr. Brown's fact-finding results presented to the SRB.  They are fundamentally the same.  Several coworkers found him to be nearly perpetually abrasive and angry, and therefore unpleasant to work with, although some did not report they felt that way.  The appellant was in a probationary period, and Federal Government agencies, generally, are supposed to be monitoring employees to

---

[17] It is possible that, relatively new, Director Ament was being steered by others of longer tenure such as Dr. Cummings.  Even if so, that does not aid the agency.

determine their fitness for continued employment during that period. A probationer's ability or inability to get along with coworkers in the long term is an entirely legitimate consideration in that regard.

As to motive to retaliate, the appellant's protected disclosure did not involve Director Ament personally, and while he was the overall facility director in Wichita, the appellant's disclosures were not about hospital operations generally or broad, programmatic issues in Wichita. Rather, they were that Dr. Bashyakarla had inflicted unnecessary injury on a patient which could have been avoided had Dr. Bashyakarla listened to what the appellant was trying to tell him about the patient's fused spine when Dr. Bashyakarla kept unsuccessfully attempting to insert the endoscope. Thus, I find that Director Ament had neither personal nor institutional retaliatory motive to reprise against the appellant. However, several of the people involved in bringing the appellant to his attention in the context of removal did. *See Karnes*, 2023 MSPB 12, ¶¶ 18-20.

Finally, for comparators, the agency identified none who were not proven non-whistleblowers, which it must do for this factor. *See Miller*, 842 F.3d 1257. Thus, it cannot favor the agency, and it has not established a firm belief that the appellant's employment would have been terminated absent his disclosure.

## CONCLUSION

The appellant may have been an unpleasant probationary employee who rubbed many coworkers the wrong way, and the termination of an employee on that basis would not be facially unwarranted. However, he made a disclosure about an incident which is protected by law and which the agency took into account when it denied him an award, detailed him out of his usual department, and when it terminated his employment. It has not met the very high standard to prove otherwise, and the appellant is entitled to corrective action for those actions.

**DECISION**

The appellant's request for corrective action is GRANTED IN PART and DENIED IN PART.

**ORDER**

I **ORDER** the agency to determine the average amount of a Special Award for Performance bestowed at the Robert J. Dole VAMC in 2019 for work similar to the ERAS initiative and to pay the appellant that amount no later than 60 calendar days after the date this initial decision becomes final. I **ORDER** the appellant to cooperate in good faith with the agency's efforts to compute the amount and to provide all necessary information requested by the agency to help it comply.

If there is a dispute about the amount due, I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the undisputed amount no later than 60 calendar days after the date this initial decision becomes final. Appellant may then file a petition for enforcement with this office to resolve the disputed amount.

I **ORDER** the agency to cancel the termination of the appellant's employment and reinstate him to his former position retroactive to February 10, 2020, and to pay appellant by check or through electronic funds transfer for the appropriate amount of back pay, with interest and to adjust benefits with appropriate credits and deductions in accordance with the Office of Personnel Management's regulations no later than 60 calendar days after the date this initial decision becomes final. I **ORDER** the appellant to cooperate in good faith with the agency's efforts to compute the amount of back pay and benefits due and to provide all necessary information requested by the agency to help it comply.

If there is a dispute about the amount of back pay due, I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the undisputed amount no later than 60 calendar days after the date this initial

decision becomes final.  Appellant may then file a petition for enforcement with this office to resolve the disputed amount.

I **ORDER** to remove all references to the appellant's details from his Official Personnel File, if there, and from all agency records, if there.

I **ORDER** the agency to inform appellant in writing of all actions taken to comply with the Board's Order and the date on which it believes it has fully complied.  If not notified, appellant must ask the agency about its efforts to comply before filing a petition for enforcement with this office.

For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached.  I **ORDER** the agency to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

## INTERIM RELIEF

If a petition for review is filed by either party, I **ORDER** the agency to provide interim relief to the appellant in accordance with 5 U.S.C. § 7701(b)(2) (A).  The relief shall be effective as of the date of this decision and will remain in effect until the decision of the Board becomes final.

Any petition for review or cross petition for review filed by the agency must be accompanied by a certification that the agency has complied with the interim relief order, either by providing the required interim relief or by satisfying the requirements of 5 U.S.C. § 7701(b)(2)(A)(ii) and (B).  If the appellant challenges this certification, the Board will issue an order affording the agency the opportunity to submit evidence of its compliance.

If an agency petition or cross petition for review does not include this certification, or if the agency does not provide evidence of compliance in response to the Board's order, the Board may dismiss the agency's petition or cross petition for review on that basis.

*Stephen C. Mish*

FOR THE BOARD:        _____

Stephen C. Mish
Chief Administrative Judge

## ENFORCEMENT

If, after the agency has informed you that it has fully complied with this decision, you believe that there has not been full compliance, you may ask the Board to enforce its decision by filing a petition for enforcement with this office, describing specifically the reasons why you believe there is noncompliance. Your petition must include the date and results of any communications regarding compliance, and a statement showing that a copy of the petition was either mailed or hand-delivered to the agency.

Any petition for enforcement must be filed no more than 30 days after the date of service of the agency's notice that it has complied with the decision. If you believe that your petition is filed late, you should include a statement and evidence showing good cause for the delay and a request for an extension of time for filing.

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

## NOTICE TO APPELLANT

This initial decision will become final on **March 6, 2024**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.  If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first.  You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review.  Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing.  A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and

may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov/).

## Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic

filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## ATTORNEY FEES

If no petition for review is filed, you may ask for the payment of attorney fees (plus costs, expert witness fees, and litigation expenses, where applicable) by filing a motion with this office as soon as possible, but no later than 60 calendar days after the date this initial decision becomes final. Any such motion must be prepared in accordance with the provisions of 5 C.F.R. Part 1201, Subpart H, and applicable case law.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a

statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>.**  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date this decision becomes final</u>.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation

for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

      **(2)  Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

      Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

      http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

      Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after this decision becomes final</u> as explained above.  5 U.S.C. § 7702(b)(1).

      If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission

P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3)   Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of the date this decision becomes final under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular

relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

## NOTICE TO THE APPELLANT
## REGARDING YOUR RIGHT TO REQUEST CONSEQUENTIAL AND/OR COMPENSATORY DAMAGES

You may be entitled to be paid by the agency for your consequential damages, including medical costs incurred, travel expenses, and any other reasonable and foreseeable consequential damages. To be paid, you must meet the requirements set out at 5 U.S.C. §§ 1214(g) or 1221(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202 and 1201.204.

In addition, the Whistleblower Protection Enhancement Act of 2012 authorized the award of compensatory damages including interest, reasonable expert witness fees, and costs, 5 U.S.C. §§ 1214(g)(2), 1221(g)(1)(A)(ii), which you may be entitled to receive.

If you believe you are entitled to these damages, you must file a motion for consequential damages and/or compensatory damages with this office WITHIN 60 CALENDAR DAYS OF THE DATE THIS INITIAL DECISION BECOMES FINAL.

## NOTICE TO THE PARTIES

If this decision becomes final and the Board "determines that there is reason to believe that a current employee may have committed a prohibited personnel practice, the Board shall refer the matter to the Special Counsel to investigate and take appropriate action" under 5 U.S.C. § 1215.  5 U.S.C. § 1221(f)(3).  Please note that while any Special Counsel investigation related to this decision is pending, "no disciplinary action shall be taken against any employee for any alleged prohibited activity under investigation or for any related activity without the approval of the Special Counsel."  5 U.S.C. § 1214(f).

**DEFENSE FINANCE AND ACCOUNTING SERVICE**
**Civilian Pay Operations**

# DFAS BACK PAY CHECKLIST

The following documentation is required by DFAS Civilian Pay to compute and pay back pay pursuant to 5 CFR § 550.805.  Human resources/local payroll offices should use the following checklist to ensure a request for payment of a back pay award is complete.  Missing documentation may substantially delay the processing of a back pay award.  **More information may be found at: https://wss.apan.org/public/DFASPayroll/Back%20Pay%20Process/Forms/AllItems.aspx.**

**NOTE:  Attorneys' fees or other non-wage payments (such as damages) are paid by vendor pay, not DFAS Civilian Pay.**

☐   1) Submit a **"SETTLEMENT INQUIRY - Submission"** Remedy Ticket.  Please identify the specific dates of the back pay period within the ticket comments.

Attach the following documentation to the Remedy Ticket, or provide a statement in the ticket comments as to why the documentation is not applicable:

☐   2) Settlement agreement, administrative determination, arbitrator award, or order.

☐   3) Signed and completed "Employee Statement Relative to Back Pay".

☐   4) All required SF50s (new, corrected, or canceled).  **\*\*\*Do not process online SF50s until notified to do so by DFAS Civilian Pay.\*\*\***

☐   5) Certified timecards/corrected timecards.  **\*\*\*Do not process online timecards until notified to do so by DFAS Civilian Pay.\*\*\***

☐   6) All relevant benefit election forms (e.g. TSP, FEHB, etc.).

☐   7) Outside earnings documentation.  Include record of all amounts earned by the employee in a job undertaken during the back pay period to replace federal employment.  Documentation includes W-2 or 1099 statements, payroll documents/records, etc.  Also, include record of any unemployment earning statements, workers' compensation, CSRS/FERS retirement annuity payments, refunds of CSRS/FERS employee premiums, or severance pay received by the employee upon separation.

**Lump Sum Leave Payment Debts:**  When a separation is later reversed, there is no authority under 5 U.S.C. § 5551 for the reinstated employee to keep the lump sum annual leave payment they may have received.  The payroll office must collect the debt from the back pay award.  The annual leave will be restored to the employee.  Annual leave that exceeds the annual leave ceiling will be restored to a separate leave account pursuant to 5 CFR § 550.805(g).

## NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts.

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

   a. Employee name and social security number.
   b. Detailed explanation of request.
   c. Valid agency accounting.
   d. Authorized signature (Table 63).
   e. If interest is to be included.
   f. Check mailing address.
   g. Indicate if case is prior to conversion.  Computations must be attached.
   h. Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected (if applicable).

Attachments to AD-343

1. Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement (if applicable).
2. Copies of SF-50s (Personnel Actions) or list of salary adjustments/changes and amounts.
3. Outside earnings documentation statement from agency.
4. If employee received retirement annuity or unemployment, provide amount and address to return monies.
5. Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)
6. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.
7. If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases:  (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

   a. Must provide same data as in 2, a-g above.
   b. Prior to conversion computation must be provided.
   c. Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

U.S. Mail
Ryan Proehman
201 S Grand Mere Ct.
Wichita, Kansas 67230

Agency Representative

Electronic Service
Amber Groghan
Served on email address registered with MSPB

Agency Representative

U.S. Mail
Kathleen Hunter
120 Walnut St, Suite 800
Bldg 120
Kansas City, Missouri 64106

Private Attorney

U.S. Mail
Rosemary Dettling
Federal Employee Legal Services Center
1629 K Street, NW - Suite 300
Washington, District of Columbia 20006

Other Appellant Representative

U.S. Mail
Nathaniel McClure
1815 W 55th St S
Wichita, Kansas 67217

01/31/2024
(Date)

*Jeremy Meyers*

Jeremy Meyers
Paralegal Specialist

EXHIBIT I

# Section II: Practice Area Analysis

**Employment and Labor**
By City

**2023 - Real Rates for Associate and Partner**

**Trend Analysis - Mean**

| City | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|------|------|---|----------------|--------|----------------|------|------|------|
| Denver CO | Associate | 17 | $325 | $348 | $394 | $362 | $347 | $313 |
| Greenville SC | Partner | 16 | $386 | $448 | $506 | $454 | $439 | $431 |
| Houston TX | Partner | 14 | $466 | $565 | $708 | $609 | $585 | $568 |
| Kansas City MO | Partner | 11 | $398 | $442 | $543 | $481 | $428 | $421 |
| | Associate | 13 | $238 | $250 | $323 | $279 | $286 | $295 |
| Los Angeles CA | Partner | 102 | $535 | $675 | $981 | $769 | $754 | $710 |
| | Associate | 80 | $385 | $486 | $835 | $589 | $473 | $494 |
| Minneapolis MN | Partner | 20 | $498 | $615 | $704 | $602 | $574 | $562 |
| | Associate | 12 | $299 | $357 | $440 | $387 | $392 | $417 |
| Nashville TN | Partner | 21 | $401 | $477 | $512 | $460 | $452 | $429 |
| New York NY | Partner | 233 | $475 | $660 | $960 | $820 | $713 | $684 |
| | Associate | 202 | $351 | $530 | $735 | $599 | $506 | $495 |
| Philadelphia PA | Partner | 78 | $495 | $630 | $810 | $682 | $689 | $665 |
| | Associate | 89 | $400 | $486 | $540 | $491 | $447 | $428 |
| Pittsburgh PA | Partner | 25 | $528 | $657 | $762 | $694 | $632 | $592 |

wolterskluwer.com

EXHIBIT J

 LEGAL·IO

Search Legal.io    Hire Talent ⌄    Jobs ⌄    Salaries    More ⌄    Sign in    Join

  For Clients

## Law Firm Hourly rates

| Los Angeles | | Employment and Lat |

### What is the hourly rate of lawyers specializing in Employment and Labor in Los Angeles?

The average hourly rate of attorneys working in law firms specializing in Employment and Labor in Los Angeles is $498/hr. This estimate is based on 141 hourly rates reported by community members.

**Want a better rate? Hire with Legal.io.**

| Low | Average | High |
|-----|---------|------|
| **$227**/hr | **$498**/hr | **$769**/hr |
| 10th Percentile | Median: $465/hr | 90th Percentile |

### How does the hourly rate vary in function of experience?

Depending on their level of experience, lawyers in Los Angeles who specialize in Employment and Labor charge from $227 to $769/hr and above.



Hire Talent                                                    Find Work

Hourly rates for Employment And Labor Law in Los Angeles | Legal.io

## Work with Us

Solutions

Get Started

Testimonials

Employer Resources

Submit RFP

Advertise

## Roles

Commercial Counsel

Contract Manager

Corporate Counsel

General Counsel

Intellectual Property Counsel

Labor & Employment Counsel

Legal Operations

Marketing Counsel

Paralegal

Product Counsel

Privacy Counsel

Regulatory & Compliance Counsel

Trust & Safety

And more...

## Industries

Aerospace & Defense

Automotive

Consumer Goods

Energy

Finance

Healthcare

Manufacturing

Professional Services

Real Estate

Retail

Technology

Telecom

Transportation

And more...

Join Legal.io

Job Board

Employers

Post a Job

## Tools & Resources

Salary Insights

AI-Driven RFP Tool

Budget & Savings Calculator

Outside Counsel Billing Guidelines

Careers

Legal Software

Resources

About us        Terms of Service        Privacy Policy

© 2024 All rights reserved. Made by Lawtonica, Inc. /dba Legal.io

EXHIBIT K

**Federal Employee Legal Services Center**
1629 K Street, N.W.
Suite 300
Washington, DC 20006
United States
Phone: 202-390-4741
Fax: 202-379-9772
Email: billing@felsc.com



**Royland G. Damwyk - EEO Complaint**



**Invoice 20495**

| | |
|---|---|
| **Date** | Oct 29, 2024 |
| **Terms** | |
| **Service Thru** | Oct 29, 2024 |

**In Reference To: Non Case-Related (Federal Sector Employment)**

**Case ID: -1**

| Date | By | Services | Hours | Rates | Amount |
|---|---|---|---|---|---|
| 09/29/2017 | Rosemary Dettling | **Legal Work:** Evaluated Ms. Damwyk's third EEO complaint. Spoke to her on phone. Read and responded to her email re filing third EEO complaint; read her June 28, 2016 email request for accommodation ("I am asking for a medical accommodation to an alternate office location and sick leave until a resolution can be accomplished") | 0.00 | $ 0.00/hr | No Charge |
| 09/30/2017 | Rosemary Dettling | **Legal Work:** Sent retainer agreement; confirmed representation for third complaint; responded to client's email re failure to accommodate; read Corser's denial of June 28, 2016 accommodation request, "Memorandum to Roylan Damwyk" | 0.00 | $ 0.00/hr | No Charge |
| 10/02/2017 | Rosemary Dettling | **Legal Work:** Responded to client's email re filing third case of discrimination, re: failure to accomm dating back to June. Explained terms of service; sent retainer agreement | 0.18 | $ 1,000.00/hr | $ 180.00 |
| 10/03/2017 | Rosemary Dettling | **Legal Work:** Emailed EEO Office and advised of representation | 0.07 | $ 1,000.00/hr | $ 70.00 |
| 10/03/2017 | Rosemary Dettling | **Legal Work:** Read email from Phelps re processing of informal complaint | 0.06 | $ 1,000.00/hr | $ 60.00 |

| 10/03/2017 | Rosemary Dettling | **Legal Work:** Read and responded to client email re EEO process; read client email to Vanneca Phelps (EEO Director) explaining her issues ("I need to file an additional complaint for failure to accommodation a request for medical accommodation. I requested a medical accommodation in June 2016 and provided valid medical documentation and received no medical accommodation. I contacted the labor relations office again in March of 2017 requesting medical accommodation and have not received a resolution to my request") | 0.05 | $ 1,000.00/hr | $ 50.00 |
|---|---|---|---|---|---|
| 10/04/2017 | Rosemary Dettling | **Legal Work:** Read email from Phelps and discussed with client | 0.22 | $ 1,000.00/hr | $ 220.00 |
| 10/07/2017 | Rosemary Dettling | **Legal Work:** Read email from Phelps and discussed with client re accepted issues; discussed fact that Phelps seem leaning toward not accepting Client's issue | 0.11 | $ 1,000.00/hr | $ 110.00 |
| 10/10/2017 | Rosemary Dettling | **Legal Work:** Left message with EEO office; emailed EEO Office asking them to stop contacting client directly; client called to say that her EEO Specialist was Kenneth Richmond | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 10/10/2017 | Rosemary Dettling | **Legal Work:** Read and responded to client's October 9 email to EEO Office ("Here are the supporting documents for my EEO complaint for the agencies [sic] Failure to Accommodation a request for a Medical Accommodation. I believe this information will show how I have been diligent and patient in trying to get some resolution to this request since June of 2016. I believe the information I have provide is accurate and if there are any discrepancies, they are not intentional. I believe my management could make some simple and easy adjustments to provide an alternate office where I could continue to do my job and still be protected from a hostile work environment") | 0.20 | $ 1,000.00/hr | $ 200.00 |
| 10/11/2017 | Rosemary Dettling | **Legal Work:** Read and responded to client email re EEO Office's continued attempts to speak to her outside my presence | 0.06 | $ 1,000.00/hr | $ 60.00 |
| 10/28/2017 | Rosemary Dettling | **Legal Work:** Read and responded to client email re EEO Counselor Kenneth Richmond. He was supposed to contact me for EEO counseling but he only contacted client. | 0.09 | $ 1,000.00/hr | $ 90.00 |
| 10/28/2017 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re Phelphs' email re her understanding of accepted issues | 0.03 | $ 1,000.00/hr | $ 30.00 |
| 10/31/2017 | Rosemary Dettling | **Legal Work:** Reminded EEO office not to contact client directly | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/07/2017 | Rosemary Dettling | **Legal Work:** Email to EEO Office re clarifying issues ("My client initiated an EEO complaint on October 3, 2017. See attached email. She sent the below email to the EEO office on October 10, following up on her EEO complaint...") | 0.08 | $ 1,000.00/hr | $ 80.00 |

| 11/07/2017 | Rosemary Dettling | **Legal Work:** Read email from Phelps | 0.05 | $ 1,000.00/hr | $ 50.00 |
|---|---|---|---|---|---|
| 11/07/2017 | Rosemary Dettling | **Legal Work:** Email to Meta re issues and asking him not to contact client directly without my knowledge | 0.08 | $ 1,000.00/hr | $ 80.00 |
| 11/07/2017 | Rosemary Dettling | **Legal Work:** Emailed EEO Office re correct issues ("The issue Roylan Damwyk seeks counseling on is:<br><br>Whether Plaintiff was discriminated against based on her disability (acute stress disorder, high blood pressure) when, from June 26, 2016 until November 6, 2017, [Defendants] failed to provide reasonable accommodation and failed to engage in the interactive process.<br><br>As relief, she seeks accommodation, back pay, benefits, compensatory damages, and attorney fees. Although [Defendants] finally accommodated her on November 6, 2017, the other relief has not been provided. She was on leave without pay during this time, while waiting for [Defendants] to accommodate her. | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 11/07/2017 | Rosemary Dettling | **Legal Work:** Read email from Meta re documents - with subject line "EEO Complaint for failure to accommodate a request for medical accommodation." | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/07/2017 | Rosemary Dettling | **Legal Work:** Read and responded to client email re EEO process and agency's habit of calling her into EEO office | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 11/08/2017 | Rosemary Dettling | **Legal Work:** Email to Phelps telling her that attachment she sent did not open (no response) | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/08/2017 | Rosemary Dettling | **Legal Work:** Responded to email form client. She is upset that Phelps made her sign the final interview notice today without my knowledge. Responded to client re settlement demand | 0.17 | $ 1,000.00/hr | $ 170.00 |
| 11/08/2017 | Rosemary Dettling | **Legal Work:** Response email to Meta re need to correct issues | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/09/2017 | Rosemary Dettling | **Legal Work:** Email to Phelps re need to correct issues | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/09/2017 | Rosemary Dettling | **Legal Work:** Responded to client's email re relief and settlement of third complaint | 0.17 | $ 1,000.00/hr | $ 170.00 |
| 11/10/2017 | Rosemary Dettling | **Legal Work:** Responded to client's email re accommodation offer | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 11/14/2017 | Rosemary Dettling | **Legal Work:** Responded to client email re medical documents that supported her 2016 request for accommodation | 0.14 | $ 1,000.00/hr | $ 140.00 |
| 11/16/2017 | Rosemary Dettling | **Legal Work:** Responded to client email re settlement, called agency EEO Office to discuss settlement; made good faith attempt; discussed global settlement | 0.17 | $ 1,000.00/hr | $ 170.00 |

| 11/20/2017 | Rosemary Dettling | **Legal Work:** Responded to multiple client email re formal complaint, obtained exhibits in support of complaint | 0.35 | $ 1,000.00/hr | $ 350.00 |
|---|---|---|---|---|---|
| 11/21/2017 | Rosemary Dettling | **Legal Work:** Drafted attachment to EEO complaint listing issues and relief | 0.60 | $ 1,000.00/hr | $ 600.00 |
| 11/22/2017 | Rosemary Dettling | **Legal Work:** Sent formal complaint to EEO Office | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/22/2017 | Rosemary Dettling | **Legal Work:** Reviewed additional client documents that support third complaint; revised request for relief | 0.78 | $ 1,000.00/hr | $ 780.00 |
| 11/22/2017 | Rosemary Dettling | **Legal Work:** Email to client confirming issues and relief in complaint and EEO process under 29 CFR 1614 | 0.13 | $ 1,000.00/hr | $ 130.00 |
| 11/23/2017 | Rosemary Dettling | **Legal Work:** Phone call with client, client said EEO Office made her sign a complaint form outside the presence of her attorney, client was not given a copy; called EEO office and again asked them not to contact client outside my presence. Everything needs to go through me. | 0.65 | $ 1,000.00/hr | $ 650.00 |
| 11/23/2017 | Rosemary Dettling | **Legal Work:** Phone call with client: client said that Phelps directed her to come to the EEO office and then directed her to sign a complaint form. I explained that she should not speak to Phelps about her EEO cases and should instead tell her to contact me. | 0.45 | $ 1,000.00/hr | $ 450.00 |
| 11/23/2017 | Rosemary Dettling | **Legal Work:** Reminded EEO office to please not contact client directly, asked eeo office to stop calling client | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 11/24/2017 | Rosemary Dettling | **Legal Work:** Responded to client's email re accommodation offer and impact it has on third case; discussed outstanding financial damages | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/25/2017 | Rosemary Dettling | **Legal Work:** Responded to client's email re 29 CFR 1614 and filing third complaint of discrimination | 0.17 | $ 1,000.00/hr | $ 170.00 |
| 11/26/2017 | Rosemary Dettling | **Legal Work:** Reviewed client documents that support third complaint (leave records, accommodation requests). | 3.07 | $ 1,000.00/hr | $ 3,070.00 |
| 11/27/2017 | Rosemary Dettling | **Legal Work:** Read email from Phelps re accepted issues and refusal to honor issues brought to her office | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/27/2017 | Rosemary Dettling | **Legal Work:** Responded to client email re Phelps Nov 27 email confirming receipt of the complaint I filed | 0.06 | $ 1,000.00/hr | $ 60.00 |
| 11/27/2017 | Rosemary Dettling | **Legal Work:** Responded to client email re Acknowledgment Letter and medical treatment by Dr. Charles Smith; confirmed with client that all letters from Knox, Smith, Schlosser were being provided to Corser | 0.16 | $ 1,000.00/hr | $ 160.00 |
| 11/27/2017 | Rosemary Dettling | **Legal Work:** Responded to client email re medical treatment by Knox and Schlosser | 0.10 | $ 1,000.00/hr | $ 100.00 |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 11/27/2017 | Rosemary Dettling | **Legal Work:** Re-sent formal complaint to EEO Office with my email dated November 22 showing that I filed it on time | 0.14 | $ 1,000.00/hr | $ 140.00 |
| 11/28/2017 | Rosemary Dettling | **Legal Work:** Responded to client email re formal complaint and Ms. Phelps emails sent directly to her without copying counsel | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 12/04/2017 | Rosemary Dettling | **Legal Work:** Responded to client's email re consolidation of all three complaints | 0.35 | $ 1,000.00/hr | $ 350.00 |
| 12/07/2017 | Rosemary Dettling | **Legal Work:** Discussion with client re EEO process, burden of proof, management officials, agency's accommodation policy, damages, and agency's obligation to contact me once notified of my representation | 1.50 | $ 1,000.00/hr | $ 1,500.00 |
| 12/13/2017 | Rosemary Dettling | **Legal Work:** Read and responded to client email re formal EEO process and deadlines | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 12/18/2017 | Rosemary Dettling | **Legal Work:** Called Ms. Phelps and asked her not to email my client without copying me. Stated that all correspondence, including the EEO Counselor's Report, should be sent to me | 0.16 | $ 1,000.00/hr | $ 160.00 |
| 12/18/2017 | Rosemary Dettling | **Legal Work:** Discussed EEO Counselor's Report with client; I told client that EEO Counselor Kenneth Richmond never contacted me during EEO Counseling time period even though I was representing her. Asked her to direct any inquiries from EEO office to me | 0.75 | $ 1,000.00/hr | $ 750.00 |
| 12/19/2017 | Rosemary Dettling | **Legal Work:** Read and responded to client email re EEO process | 0.18 | $ 1,000.00/hr | $ 180.00 |
| 12/19/2017 | Rosemary Dettling | **Legal Work:** Read and responded to email from client: client informed me that on December 17, 2017 Phelps from EEO. Office emailed her the "Counselor's Report." Ms. Phelps again did not copy me. Instructed client to not respond to Phelps' emails and thanked her for forwarding it to me | 0.14 | $ 1,000.00/hr | $ 140.00 |
| 12/26/2017 | Rosemary Dettling | **Legal Work:** Researched whether EEOC recognizes "delay" as failure to accommodate issue | 0.78 | $ 1,000.00/hr | $ 780.00 |
| 12/29/2017 | Rosemary Dettling | **Legal Work:** Reviewed client documents that support accommodation requests (1.0) and researched EEOC cases to see if there was precedent regarding contacting complainant directly outside presence of counsel (1.15) | 2.15 | $ 1,000.00/hr | $ 2,150.00 |
| 01/03/2018 | Rosemary Dettling | **Legal Work:** Phone call with client regarding agency's refusal to accept correct issues; calmed client and told her EEO Office had always contacted me in the past; not sure why this complaint is different; read her medical files as of October 2017 | 0.43 | $ 1,000.00/hr | $ 430.00 |
| 01/04/2018 | Rosemary Dettling | **Legal Work:** Discussed Acceptance Letter with client. She forded it to me on Januay 4th. The client informed me that she received the acceptance letter in the mail. I did not receive a copy. I tried to calm the client: She is very upset that the EEO Office is contacting her but not me. | 0.78 | $ 1,000.00/hr | $ 780.00 |

| 01/05/2018 | Rosemary Dettling | **Legal Work:** Sent formal letter to agency objecting to accepted issues. Informed Phelps and EEO Office that client did not raise the "accepted" issues, and instead raised issues in her Octo 3rd email to EEO Office. ("...As you recall, Ms. Damwyk sought EEO counseling and filed an EEO complaint alleging the following issue: Whether Plaintiff was discriminated against based on her disability (acute stress disorder, high blood pressure) when, from June 26, 2016 until November 6, 2017, Defendants failed to provide reasonable accommodation and failed to engage in the interactive process. She did not raise the issues listed in the acceptance letter... Please correct the accepted issues"); discussed with client before sending letter | 1.07 | $ 1,000.00/hr | $ 1,070.00 |
|---|---|---|---|---|---|
| 01/08/2018 | Rosemary Dettling | **Legal Work:** Responded to multiple client emails re medical treatment by Janis Knox and Carl Schlosser, and settlement. Discussed need for them to testify as damages witnesses and treating medical care providers. | 0.55 | $ 1,000.00/hr | $ 550.00 |
| 01/10/2018 | Rosemary Dettling | **Legal Work:** Responded to multiple client emails re Dr. Schlosser's availability to give a statement to investigator | 0.33 | $ 1,000.00/hr | $ 330.00 |
| 01/12/2018 | Rosemary Dettling | **Legal Work:** Discussed settlement with agency per judge's instructions. They have no interest in settling. | 0.14 | $ 1,000.00/hr | $ 140.00 |
| 01/18/2018 | Rosemary Dettling | **Legal Work:** Phone call with client regarding agency's refusal to accept correct issues; discussed options | 0.67 | $ 1,000.00/hr | $ 670.00 |
| 01/20/2018 | Rosemary Dettling | **Legal Work:** Phone call with client regarding agency's refusal to accept correct issues; left message with EEO Office to confirm receipt of letter | 0.38 | $ 1,000.00/hr | $ 380.00 |
| 01/23/2018 | Rosemary Dettling | **Legal Work:** Phone call with client regarding agency's refusal to send me counselor report | 0.19 | $ 1,000.00/hr | $ 190.00 |
| 01/26/2018 | Rosemary Dettling | **Legal Work:** Responded to multiple client emails reminded her to tell EEO that she cannot talk to them | 0.19 | $ 1,000.00/hr | $ 190.00 |
| 01/26/2018 | Rosemary Dettling | **Legal Work:** Read email from EEO Office (Phelps) to client, without me being copied; emailed client and told her not to answer emails from EEO. | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 03/23/2018 | Rosemary Dettling | **Legal Work:** Discussed witnesses with client; obtained contact information; drafted witness list to provide to investigator | 2.24 | $ 1,000.00/hr | $ 2,240.00 |
| 04/02/2018 | Rosemary Dettling | **Legal Work:** Responded to multiple client emails; client told me that Phelps made her sign the notice of rights and responsibilities form outside my presence. I was not notified that the form was issued. Reminded client to tell EEO that she cannot talk to them without me present | 0.16 | $ 1,000.00/hr | $ 160.00 |
| 04/02/2018 | Rosemary Dettling | **Legal Work:** Email to Phelps forwarding her my November 27, 2017 with formal complaint attached. | 0.18 | $ 1,000.00/hr | $ 180.00 |

| 04/05/2018 | Rosemary Dettling | **Legal Work:** Read email from new agency representative re third case; reviewed more documents from client related to her interactions (emails, phone calls, and in-person meetings) with Corser, Chiavacci, Lawrence, Miller, Condrell, Quichocho during period June 2016 to November 2017 | 3.05 | $ 1,000.00/hr | $ 3,050.00 |
| --- | --- | --- | --- | --- | --- |
| 04/13/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re EEO process (FAD v. hearing) | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 05/02/2018 | Rosemary Dettling | **Legal Work:** Read email from client and attached letter from Phelps that she sent to client only; responded to client and again reminded her not to talk to Phelps | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 05/03/2018 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re Phelphs' email | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 05/08/2018 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re hearing request | 0.06 | $ 1,000.00/hr | $ 60.00 |
| 05/08/2018 | Rosemary Dettling | **Legal Work:** Filed hearing request | 0.50 | $ 1,000.00/hr | $ 500.00 |
| 05/09/2018 | Rosemary Dettling | **Legal Work:** Read and responded to email from EEO investigator | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 05/09/2018 | Rosemary Dettling | **Legal Work:** Read and responded to questions from Kalvin Laribo - EEO investigator - re investigation | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 05/10/2018 | Rosemary Dettling | **Legal Work:** Read and responded to numerous emails from client re witnesses we want interviewed during investigation | 0.29 | $ 1,000.00/hr | $ 290.00 |
| 05/14/2018 | Rosemary Dettling | **Legal Work:** Read and responded to questions from Kalvin Laribo - EEO investigator - re investigation | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 05/15/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re damages and appropriate request for relief; sent agency request for relief | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 05/16/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re witness list | 0.14 | $ 1,000.00/hr | $ 140.00 |
| 05/21/2018 | Rosemary Dettling | **Legal Work:** Read and responded to questions from Kalvin Laribo - EEO investigator - re investigation | 0.04 | $ 1,000.00/hr | $ 40.00 |
| 05/22/2018 | Rosemary Dettling | **Legal Work:** Read email from Phelps and discussed with client | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 05/23/2018 | Rosemary Dettling | **Legal Work:** Helped client prepare for investigation; discussedd burden of proof, need for her to remind agency of the issue she brought to EEO office's attention; discussed burden of proof for compensatory damages | 1.00 | $ 1,000.00/hr | $ 1,000.00 |
| 05/25/2018 | Rosemary Dettling | **Legal Work:** Responded to client email re declaration and what needs to be included | 0.07 | $ 1,000.00/hr | $ 70.00 |
| 05/30/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re incorrect issues | 0.14 | $ 1,000.00/hr | $ 140.00 |
| 05/30/2018 | Rosemary Dettling | **Legal Work:** Read and responded to questions from Kalvin Laribo - EEO investigator - re investigation | 0.10 | $ 1,000.00/hr | $ 100.00 |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 05/31/2018 | Rosemary Dettling | **Legal Work:** Read scheduling letter from EEO Office; discussed with client; called investigator and asked him to interview client's witnesses (Dederding, Nocis, Torres, Knox, Schlosser, Maloy) | 0.60 | $ 1,000.00/hr | $ 600.00 |
| 06/01/2018 | Rosemary Dettling | **Legal Work:** Discussed investigator's questions with client and helped her finalize her declaration; read client's medical documents from client and letters sent to the agency | 3.23 | $ 1,000.00/hr | $ 3,230.00 |
| 06/01/2018 | Rosemary Dettling | **Legal Work:** Phone call with client regarding agency's refusal to accept correct issues, and declaration responses | 0.55 | $ 1,000.00/hr | $ 550.00 |
| 06/01/2018 | Rosemary Dettling | **Legal Work:** Read and responded to questions from Kalvin Laribo - EEO investigator - re investigation | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 06/01/2018 | Rosemary Dettling | **Legal Work:** Read email from Phelps and discussed with client; explained to client the process of objecting and stated I will continue to object, but don't have power to change it | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 06/03/2018 | Rosemary Dettling | **Legal Work:** Email response to client re investigator's questions regarding damages | 0.14 | $ 1,000.00/hr | $ 140.00 |
| 06/04/2018 | Rosemary Dettling | **Legal Work:** Discussed scheduling notice with client re investigation of claims she never raised | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 06/04/2018 | Rosemary Dettling | **Legal Work:** Read and responded to email from Hughes re amending complaint; stated to agency that we were not asking for an amendment, we were asking that original claim be reinstated; explained to client that if I filed a Motion to Amend the agency and EEOC would dismissed it as untimely EEO contaact | 0.39 | $ 1,000.00/hr | $ 390.00 |
| 06/04/2018 | Rosemary Dettling | **Legal Work:** Read and responded to emails from agency rep Hughes | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 06/05/2018 | Rosemary Dettling | **Legal Work:** Email to Hughes reagarding wrong issues | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 06/05/2018 | Rosemary Dettling | **Legal Work:** I emailed the EEO Office and then called the EEO Office. I told them that the agency was investigating the wrong issues. They will not investigate the issue that was brought to EEO's attention on October 3, 2017, concerning the failure to accommodate from June 2016 to November 2017. (NOTE: Tried to explain that the only proof the agency has that the client raised the three "accepted" issues is the agency's own "Acceptance Letter," which is not proof that the client ever wanted to be counseled on those issues. The agency keeps referring to a complaint that the client ostensibly signed outside my presence in November 2017, but that document does not contain the three issues the agency accepted. The only documents EEO Office received from our office contain the correct issue - failure to accom dating back to June 2016). Researched EEO regs - 29 CFR 1614 - right to representation and tried to find cases where the EEO office refused to respect the complainants' right to representative of her choice). | 0.76 | $ 1,000.00/hr | $ 760.00 |

| 06/05/2018 | Rosemary Dettling | **Legal Work:** Read and responded to questions from Kalvin Laribo - EEO investigator - re investigation | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 06/06/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re incorrect issues | 0.11 | $ 1,000.00/hr | $ 110.00 |
| 06/07/2018 | Rosemary Dettling | **Legal Work:** Read and responded to emails from agency rep Hughes; read the agency's "Administrative File" that posted on the EEOC's Public Portal. (Phelps uploaded all of the documents she forced client to sign outside my presence, but none of my emails to the EEO Office were included in the file). | 0.68 | $ 1,000.00/hr | $ 680.00 |
| 06/08/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re incorrect issue and delay | 0.03 | $ 1,000.00/hr | $ 30.00 |
| 06/11/2018 | Rosemary Dettling | **Legal Work:** Read and responded to emails from agency rep Hughes re agency refusal to change issues back to original issue client sought counseling on | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 06/11/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re incorrect issues | 0.02 | $ 1,000.00/hr | $ 20.00 |
| 06/12/2018 | Rosemary Dettling | **Legal Work:** Read and responded to questions from Kalvin Laribo - EEO investigator - re investigation | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 06/15/2018 | Rosemary Dettling | **Legal Work:** Reviewed client's rebuttal statement re Corser | 0.39 | $ 1,000.00/hr | $ 390.00 |
| 06/18/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re how to rebut Corser's statements | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 06/30/2018 | Rosemary Dettling | **Legal Work:** Read ROI; discussed with client | 2.56 | $ 1,000.00/hr | $ 2,560.00 |
| 07/04/2018 | Rosemary Dettling | **Legal Work:** Discussed Ack Order with client; discussed EEO procedures and timeframes | 0.75 | $ 1,000.00/hr | $ 750.00 |
| 07/05/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re ROI inaccuracies | 0.11 | $ 1,000.00/hr | $ 110.00 |
| 07/06/2018 | Rosemary Dettling | **Legal Work:** Filed Notice of Representation with EEOC | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 07/06/2018 | Rosemary Dettling | **Legal Work:** Read and responded to emails from agency rep Hughes | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 07/12/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re process to seek sanctions | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 07/12/2018 | Rosemary Dettling | **Legal Work:** Researched issues on sanctions for failure to properly investigate issues raised and sanctions available, particularly default Judgment, outlined motion | 2.56 | $ 1,000.00/hr | $ 2,560.00 |
| 07/16/2018 | Rosemary Dettling | **Legal Work:** Drafted and filed Motion for Sanctions, seeking sanctions for not investigating proper issue | 2.01 | $ 1,000.00/hr | $ 2,010.00 |
| 07/17/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re incorrect issues and medical documents | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 07/18/2018 | Rosemary Dettling | **Legal Work:** Filed Second Notice of Representation | 0.25 | $ 1,000.00/hr | $ 250.00 |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 07/18/2018 | Rosemary Dettling | **Legal Work:** Drafted discovery questions; reviewed documents to see what was missing | 4.90 | $ 1,000.00/hr | $ 4,900.00 |
| 07/19/2018 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re discovery responses | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 07/19/2018 | Rosemary Dettling | **Legal Work:** Finalized discovery requests | 1.10 | $ 1,000.00/hr | $ 1,100.00 |
| 07/19/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re documents needed in discovery | 0.06 | $ 1,000.00/hr | $ 60.00 |
| 07/20/2018 | Rosemary Dettling | **Legal Work:** Finalize Motion for Sanctions | 1.56 | $ 1,000.00/hr | $ 1,560.00 |
| 07/21/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re incorrect issues and medical documents | 0.17 | $ 1,000.00/hr | $ 170.00 |
| 07/24/2018 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re discovery responses | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 07/26/2018 | Rosemary Dettling | **Legal Work:** Reviewed and compiled documents for discovery responses and started separating them per DPR number. Read client's calculations of lost leave and TSP. Asked if they were offset by Workerrs' Compensation (she said WC was not granted bc agency objected to it). Telephoned client and asked her about leave donor program process | 3.78 | $ 1,000.00/hr | $ 3,780.00 |
| 07/27/2018 | Rosemary Dettling | **Legal Work:** Discussed agency's discovery requests with client | 0.45 | $ 1,000.00/hr | $ 450.00 |
| 07/27/2018 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re agency's discovery requests, explained need to answer truthfully, stick with issue she raised in October 2017 | 0.19 | $ 1,000.00/hr | $ 190.00 |
| 07/27/2018 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re discovery responses; she has questions about how to respond to damages | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 07/29/2018 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re discovery responses; read AJ's Order denying sanctions; discussed with client | 0.40 | $ 1,000.00/hr | $ 400.00 |
| 07/30/2018 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re discovery responses | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 07/31/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re how to respond to discovery requests | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 08/02/2018 | Rosemary Dettling | **Legal Work:** Contacted agency attorney to discuss potential settlement per judge's continuing instruction to make good faith attemtps. Agency not interested. | 0.16 | $ 1,000.00/hr | $ 160.00 |
| 08/02/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re discovery requests | 0.11 | $ 1,000.00/hr | $ 110.00 |
| 08/05/2018 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re attempts to correct issues | 0.18 | $ 1,000.00/hr | $ 180.00 |
| 08/07/2018 | Rosemary Dettling | **Legal Work:** Served deposition notice: Robert Corser, Lt Col Jason Turner, Nancy Lawrence, Lt Col Begg, Alexander Stewart, and Arlene Quichocho | 0.76 | $ 1,000.00/hr | $ 760.00 |

| 08/08/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re depositions | 0.18 | $ 1,000.00/hr | $ 180.00 |
|---|---|---|---|---|---|
| 08/10/2018 | Rosemary Dettling | **Legal Work:** Read section portion of ROI that concerns Mr. Corser's involvement in accommodation process. analyzed ROI to see who needed to be deposed | 0.45 | $ 1,000.00/hr | $ 450.00 |
| 08/15/2018 | Rosemary Dettling | **Legal Work:** Read agency's motion for stay | 0.50 | $ 1,000.00/hr | $ 500.00 |
| 08/16/2018 | Rosemary Dettling | **Legal Work:** Finalized discovery responses; separated documents (2000+ pages) into separate categories according to the document production request number | 6.10 | $ 1,000.00/hr | $ 6,100.00 |
| 08/22/2018 | Rosemary Dettling | **Legal Work:** Sent discovery responses to agency | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 08/22/2018 | Rosemary Dettling | **Legal Work:** Drafted response to agency's request for stay | 1.00 | $ 1,000.00/hr | $ 1,000.00 |
| 08/24/2018 | Rosemary Dettling | **Legal Work:** Read the agency's discovery responses and noted nonresponsive answers. I spoke to the agency on the phone about the deficiencies, but the agency attorney indicated the answers would not be changed. Wrote a letter to agency memorializing the conversation and pointing out the deficiencies. Sent letter to the agency. | 2.97 | $ 1,000.00/hr | $ 2,970.00 |
| 08/25/2018 | Rosemary Dettling | **Legal Work:** Worked on Corser's deposition questions | 1.09 | $ 1,000.00/hr | $ 1,090.00 |
| 08/28/2018 | Rosemary Dettling | **Legal Work:** Drafted motion to compel and provided it to the agency before filing it. The agency responded and said they would provide the documents requested. Agency requested that I hold off on filing motion. Spoke to Kristen Farr about case. | 5.68 | $ 1,000.00/hr | $ 5,680.00 |
| 08/29/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re agency's request to stay proocedings | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 09/04/2018 | Rosemary Dettling | **Legal Work:** I contacted the agency again with Kristen Farr, noting a few more deficiencies in the supplemental response. Received documents from agency that supplemented original submission. Reviewed them with KF. Agreed with agency to set up a conference call with judge to discuss agency's motion to stay. | 2.75 | $ 1,000.00/hr | $ 2,750.00 |
| 09/04/2018 | Rosemary Dettling | **Legal Work:** Read email from agency" indicated that it would not produce Nancy Lawrence for a deposition; emailed agency rep and stated that we would then object to her testifying at a hearing | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 09/06/2018 | Rosemary Dettling | **Legal Work:** Responded to multiple emails to/from agency rep scheduling depositions | 0.50 | $ 1,000.00/hr | $ 500.00 |
| 09/20/2018 | Rosemary Dettling | **Legal Work:** Responded to client's email re scheduling of depositions and location | 0.12 | $ 1,000.00/hr | $ 120.00 |
| 09/21/2018 | Rosemary Dettling | **Legal Work:** Reviewed documents submitted by agency in discovery | 2.79 | $ 1,000.00/hr | $ 2,790.00 |

| | | | | | |
|---|---|---|---|---|---|
| 09/21/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re deposition process | 0.18 | $ 1,000.00/hr | $ 180.00 |
| 09/23/2018 | Rosemary Dettling | **Legal Work:** Agreed to joint motion for enlargement of time to complete discovery, proposed by agency | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 09/29/2018 | Rosemary Dettling | **Legal Work:** Discussed client's discovery responses and agency's responses | 0.55 | $ 1,000.00/hr | $ 550.00 |
| 09/30/2018 | Rosemary Dettling | **Legal Work:** Reviewed client's OPF, awards, step increases, promotions | 1.80 | $ 1,000.00/hr | $ 1,800.00 |
| 10/04/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re depositions of witnesses | 0.13 | $ 1,000.00/hr | $ 130.00 |
| 10/05/2018 | Rosemary Dettling | **Legal Work:** Finalized Robert Corser's deposition questions and exhibit list for his deposition. Drafted questions for Lt Col Jason Turner, Nancy Lawrence, Lt Col Begg, Alexander Stewart, and Arlene Quichocho | 3.89 | $ 1,000.00/hr | $ 3,890.00 |
| 10/05/2018 | Rosemary Dettling | **Legal Work:** Served amended deposition notices | 0.55 | $ 1,000.00/hr | $ 550.00 |
| 10/05/2018 | Rosemary Dettling | **Legal Work:** Read and responded to six emails from court reporter (Jessica Stewart) re scheduling depositions | 0.00 | $ 1,000.00/hr | No Charge |
| 10/05/2018 | Rosemary Dettling | **Legal Work:** Read and responded to six emails from court reporter (Jessica Stewart) re scheduling depositions | 0.00 | $ 1,000.00/hr | No Charge |
| 10/05/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re depositions; discussed which witnesses to depose | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 10/06/2018 | Rosemary Dettling | **Legal Work:** Letter to Agency re deposition testimony and need for post December 2016 accommodation policy | 0.45 | $ 1,000.00/hr | $ 450.00 |
| 10/06/2018 | Rosemary Dettling | **Legal Work:** Reviewed agency accommodation policy and discussed with client. Finalized deposition questions for Nancy Lawrence (in case she shows up), Lt Col Begg, Alexander Stewart, and Arlene Quichocho, compiled depo exhibits for each deposition | 4.86 | $ 1,000.00/hr | $ 4,860.00 |
| 10/08/2018 | Rosemary Dettling | **Legal Work:** Prepared for depositions of agency officials | 3.03 | $ 1,000.00/hr | $ 3,030.00 |
| 10/08/2018 | Rosemary Dettling | **Legal Work:** Read and responded to six emails from court reporter (Monsi Zepeda) re deposition schedule | 0.00 | $ 1,000.00/hr | No Charge |
| 10/09/2018 | Rosemary Dettling | **Legal Work:** Compiled additional documents and sent to agency as supplemental discovery responses | 4.98 | $ 1,000.00/hr | $ 4,980.00 |
| 10/10/2018 | Rosemary Dettling | **Legal Work:** Travel to LA for depositions; door to door (10.20 hrs); obtained rental car for depositions in Santa Barbara; drove to Santa Barbara (2.4); discussed depositions with client (1.9) | 14.50 | $ 1,000.00/hr | $ 14,500.00 |
| 10/10/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re depositions | 0.05 | $ 1,000.00/hr | $ 50.00 |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 10/11/2018 | Rosemary Dettling | **Legal Work:** Discussed deposition questions with client; conducted depositions; met with client afterwards; prepared for second day of depositions | 4.66 | $ 1,000.00/hr | $ 4,660.00 |
| 10/11/2018 | Rosemary Dettling | **Legal Work:** Read and responded to six emails from court reporter (Annie Munoz) re scheduling depositions | 0.00 | $ 1,000.00/hr | No Charge |
| 10/12/2018 | Rosemary Dettling | **Legal Work:** Discussed deposition questions with client; conducted depositions; discussed settlement with agency rep; met with client afterward; drove back to LA (3.30 - traffic heavy) | 7.87 | $ 1,000.00/hr | $ 7,870.00 |
| 10/13/2018 | Rosemary Dettling | **Legal Work:** Travel back to DC from depositions; door to door; returned rental car | 10.50 | $ 1,000.00/hr | $ 10,500.00 |
| 10/17/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re agency's accommodation policy | 0.11 | $ 1,000.00/hr | $ 110.00 |
| 10/18/2018 | Rosemary Dettling | **Legal Work:** Responded to multiple client emails re AJ's decision to deny motion for sanctions | 0.07 | $ 1,000.00/hr | $ 70.00 |
| 10/19/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re depositions | 0.06 | $ 1,000.00/hr | $ 60.00 |
| 10/21/2018 | Rosemary Dettling | **Legal Work:** Researched: failure to accommodate EEOC cases and circuit cases; failure to engage in interactive process; delay in accommodating employee; ignoring request; forcing employee on leave; failure to abide by accommodation policy | 2.75 | $ 1,000.00/hr | $ 2,750.00 |
| 10/22/2018 | Rosemary Dettling | **Legal Work:** Read and responded to six emails from court reporter (Monsi Zepeda) re depositions | 0.00 | $ 1,000.00/hr | No Charge |
| 10/25/2018 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re Judge's Order | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/06/2018 | Rosemary Dettling | **Legal Work:** Read and responded to other emails from court reporter (Monsi Zepeda) re depositions | 0.00 | $ 1,000.00/hr | No Charge |
| 11/09/2018 | Rosemary Dettling | **Legal Work:** Drafted Motion to Stay | 2.61 | $ 1,000.00/hr | $ 2,610.00 |
| 11/09/2018 | Rosemary Dettling | **Legal Work:** Phone call with client regarding motion for stay | 0.87 | $ 1,000.00/hr | $ 870.00 |
| 11/09/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re deposition transcripts | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 11/09/2018 | Rosemary Dettling | **Legal Work:** Drafted Motion to Stay Proceedings; attempted to steer EEOC toward issue complainant raised in October 2017 | 2.61 | $ 1,000.00/hr | $ 2,610.00 |
| 11/10/2018 | Rosemary Dettling | **Legal Work:** Drafted Motion to Stay Proceedings | 2.15 | $ 1,000.00/hr | $ 2,150.00 |
| 11/12/2018 | Rosemary Dettling | **Legal Work:** Finalized Motion to Stay Proceedings | 1.99 | $ 1,000.00/hr | $ 1,990.00 |
| 11/12/2018 | Rosemary Dettling | **Legal Work:** Finalized Motion to Stay Proceeding | 2.43 | $ 1,000.00/hr | $ 2,430.00 |
| 11/12/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re deposition transcripts | 0.00 | $ 1,000.00/hr | No Charge |
| 11/12/2018 | Rosemary Dettling | **Legal Work:** Filed Motion to Stay Summary Judgment (with 32 attachments) | 5.89 | $ 1,000.00/hr | $ 5,890.00 |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 11/12/2018 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re opposition to MSJ | 0.11 | $ 1,000.00/hr | $ 110.00 |
| 11/13/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re MSJ burden of prrof | 0.08 | $ 1,000.00/hr | $ 80.00 |
| 11/13/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re deposition transcripts | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 11/14/2018 | Rosemary Dettling | **Legal Work:** Researched issues on delay in accommodation in federal court - whether it was actionable | 1.40 | $ 1,000.00/hr | $ 1,400.00 |
| 11/15/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re deposition transcripts | 0.07 | $ 1,000.00/hr | $ 70.00 |
| 11/15/2018 | Rosemary Dettling | **Legal Work:** Reviewed agency's discovery responses before MSJ; discussed with client | 1.05 | $ 1,000.00/hr | $ 1,050.00 |
| 11/15/2018 | Rosemary Dettling | **Legal Work:** Reviewed deposition transcripts for accuracy | 1.75 | $ 1,000.00/hr | $ 1,750.00 |
| 11/23/2018 | Rosemary Dettling | **Legal Work:** Drafted opposition to MSJ | 2.76 | $ 1,000.00/hr | $ 2,760.00 |
| 11/23/2018 | Rosemary Dettling | **Legal Work:** Email to Judge Gross re status | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/24/2018 | Rosemary Dettling | **Legal Work:** Phone call with client regarding MSJ response | 1.04 | $ 1,000.00/hr | $ 1,040.00 |
| 11/24/2018 | Rosemary Dettling | **Legal Work:** Drafted response to agency's motion for summary judgment | 1.05 | $ 1,000.00/hr | $ 1,050.00 |
| 11/25/2018 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re opposition to MSJ | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 11/26/2018 | Rosemary Dettling | **Legal Work:** Drafted response to agency's motion for summary judgment | 1.55 | $ 1,000.00/hr | $ 1,550.00 |
| 11/26/2018 | Rosemary Dettling | **Legal Work:** Drafted response to agency's motion for summary judgment | 2.69 | $ 1,000.00/hr | $ 2,690.00 |
| 11/26/2018 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re opposition to MSJ | 0.28 | $ 1,000.00/hr | $ 280.00 |
| 11/27/2018 | Rosemary Dettling | **Legal Work:** Phone call with client regarding MSJ response | 1.55 | $ 1,000.00/hr | $ 1,550.00 |
| 11/27/2018 | Rosemary Dettling | **Legal Work:** Finalized opposition to MSJ | 3.78 | $ 1,000.00/hr | $ 3,780.00 |
| 11/28/2018 | Rosemary Dettling | **Legal Work:** Read and responded to client email re Stay of Proceeding | 0.12 | $ 1,000.00/hr | $ 120.00 |
| 11/28/2018 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re opposition to MSJ | 0.16 | $ 1,000.00/hr | $ 160.00 |
| 02/12/2019 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re settlement; read AJ's INITIAL ORDER CONTINUING THE COMPLAINANT'S MOTION FOR SANCTIONS AND THE AGENCY MOTION FOR SUMMARY JUDGMENT PENDING THE PARTIES' COMPLIANCE WITH THIS ORDER | 0.35 | $ 1,000.00/hr | $ 350.00 |
| 02/19/2019 | Rosemary Dettling | **Legal Work:** Received email from agency re settlement; discussed with client | 0.20 | $ 1,000.00/hr | $ 200.00 |

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 02/21/2019 | Rosemary Dettling | **Legal Work:** Sent settlement demand to agency; discussed with client prior to sending it | 0.20 | $ 1,000.00/hr | $ 200.00 |
| 02/22/2019 | Rosemary Dettling | **Legal Work:** Received agency's email re requesting extenson; Discussed agency's proposed motion for extension with KR; agency indicated that Phelps was unavailable to answer Judge's questions; opposed motion | 0.24 | $ 1,000.00/hr | $ 240.00 |
| 02/23/2019 | Rosemary Dettling | **Legal Work:** Read agency's motion for extenson | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 02/25/2019 | Rosemary Dettling | **Legal Work:** Read email from Judge Mulligan; discussed with client; judge mulligan is not happy that we did not address accepted issues in response motion, explained that client could not respond to issues she never raised | 0.06 | $ 1,000.00/hr | $ 60.00 |
| 02/25/2019 | Rosemary Dettling | **Legal Work:** Email response to client re agency's motion for extension | 0.11 | $ 1,000.00/hr | $ 110.00 |
| 02/27/2019 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re settlement | 0.09 | $ 1,000.00/hr | $ 90.00 |
| 03/06/2019 | Rosemary Dettling | **Legal Work:** Read agency's response to EEOC's initial order.; drafted response | 2.75 | $ 1,000.00/hr | $ 2,750.00 |
| 03/08/2019 | Rosemary Dettling | **Legal Work:** Drafted and filed REPLY TO AGENCY'S RESPONSE TO INITIAL ORDER | 2.12 | $ 1,000.00/hr | $ 2,120.00 |
| 03/09/2019 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re Judge's Order | 0.07 | $ 1,000.00/hr | $ 70.00 |
| 03/19/2019 | Rosemary Dettling | **Legal Work:** Drafted and filed Reply to Agency's Response to AJ's Initial Order. Note: again arguing that the accepted issues were incorrect. Spoke to client before filing it | 1.33 | $ 1,000.00/hr | $ 1,330.00 |
| 04/30/2019 | Rosemary Dettling | **Legal Work:** Sent email to agency with settlement offer; discussed settlement with agency | 1.08 | $ 1,000.00/hr | $ 1,080.00 |
| 06/25/2019 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re Judge's Order | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 07/02/2019 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re settlement efforts | 0.16 | $ 1,000.00/hr | $ 160.00 |
| 07/07/2019 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re sanctions for not investigating the correct issues | 0.14 | $ 1,000.00/hr | $ 140.00 |
| 07/08/2019 | Rosemary Dettling | **Legal Work:** Discussed settlement options with agency and emailed client that agency was not interested in settling | 0.33 | $ 1,000.00/hr | $ 330.00 |
| 07/26/2019 | Rosemary Dettling | **Legal Work:** Emailed EEOC re status of motion filed a year ago | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 07/27/2019 | Rosemary Dettling | **Legal Work:** Email to judge re status of motions | 0.11 | $ 1,000.00/hr | $ 110.00 |
| 07/29/2019 | Rosemary Dettling | **Legal Work:** Read AJ's denial of motion for sanctions and scheduling email, read email from Judge Mulligan; discussed with client | 0.85 | $ 1,000.00/hr | $ 850.00 |
| 07/30/2019 | Rosemary Dettling | **Legal Work:** Read emails from Judge Mulligan; discussed with client | 0.40 | $ 1,000.00/hr | $ 400.00 |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 07/30/2019 | Rosemary Dettling | **Legal Work:** Filed second response to MSJ, as ordered by AJ (AJ rebuked complainant for not responding to the "accepted" issues in her earlier response to the agency's MSJ, but complainant explained that she could not argue the merits of claims she did not raise with the EEO office | 2.25 | $ 1,000.00/hr | $ 2,250.00 |
| 08/10/2019 | Rosemary Dettling | **Legal Work:** Read and responded to multiple emails from client re attempts to correct issues | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 08/15/2019 | Rosemary Dettling | **Legal Work:** Read and responded to numerous emails from client re outstanding motions, judge's ruling, time limits under EEOC regs | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 10/15/2019 | Rosemary Dettling | **Legal Work:** Read email from Judge Mulligan; discussed with client | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 10/16/2019 | Rosemary Dettling | **Legal Work:** Read AJ's Order re initial order; discussed with client | 0.50 | $ 1,000.00/hr | $ 500.00 |
| 10/17/2019 | Rosemary Dettling | **Legal Work:** Read final agency decision; discussed with client | 0.80 | $ 1,000.00/hr | $ 800.00 |
| 10/25/2019 | Rosemary Dettling | **Legal Work:** Drated Response to AJ's October 15th Order | 4.73 | $ 1,000.00/hr | $ 4,730.00 |
| 10/26/2019 | Rosemary Dettling | **Legal Work:** Continued drafting Response to AJ's October 15th Order | 3.55 | $ 1,000.00/hr | $ 3,550.00 |
| 10/31/2019 | Rosemary Dettling | **Legal Work:** Filed Response to AJ's October 15th Order | 1.89 | $ 1,000.00/hr | $ 1,890.00 |
| 11/01/2019 | Rosemary Dettling | **Legal Work:** Read email from Judge Mulligan | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/15/2019 | Rosemary Dettling | **Legal Work:** Read EEOC's updated filing requirements | 0.33 | $ 1,000.00/hr | $ 330.00 |
| 11/22/2019 | Rosemary Dettling | **Legal Work:** Email to Judge Gross re status | 0.03 | $ 1,000.00/hr | $ 30.00 |
| 02/06/2020 | Rosemary Dettling | **Legal Work:** Read AJ's Order of dimissal; discussed with client | 1.37 | $ 1,000.00/hr | $ 1,370.00 |
| 02/17/2020 | Rosemary Dettling | **Legal Work:** Read and responded to emails from client re order of dismissal and her options | 0.17 | $ 1,000.00/hr | $ 170.00 |
| 04/18/2020 | Rosemary Dettling | **Legal Work:** Read and responded to emails from client re OFO timeframe | 0.03 | $ 1,000.00/hr | $ 30.00 |
| 04/22/2020 | Rosemary Dettling | **Legal Work:** Read and responded to email ███████ ███████ ███████ | 0.00 | $ 1,000.00/hr | No Charge |
| 10/01/2020 | Rosemary Dettling | **Legal Work:** Filed Appeal form | 0.20 | $ 1,000.00/hr | $ 200.00 |
| 10/01/2020 | Rosemary Dettling | **Legal Work:** Read final agency decision and discussed with client | 0.19 | $ 1,000.00/hr | $ 190.00 |
| 10/09/2020 | Rosemary Dettling | **Legal Work:** Responded to multiple client emails re appeal brief | 0.11 | $ 1,000.00/hr | $ 110.00 |
| 10/15/2020 | Rosemary Dettling | **Legal Work:** Responded to multiple client emails re appeal process under 29 CFR 1614 | 0.17 | $ 1,000.00/hr | $ 170.00 |
| 10/27/2020 | Rosemary Dettling | **Legal Work:** Emailed OFO re extension request | 0.10 | $ 1,000.00/hr | $ 100.00 |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 11/01/2020 | Rosemary Dettling | **Legal Work:** Drafted appeal brief | 2.11 | $ 1,000.00/hr | $ 2,110.00 |
| 11/02/2020 | Rosemary Dettling | **Legal Work:** Drafted appeal brief | 3.14 | $ 1,000.00/hr | $ 3,140.00 |
| 11/03/2020 | Rosemary Dettling | **Legal Work:** Filed second extension request | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 11/03/2020 | Rosemary Dettling | **Legal Work:** Drafted appeal brief | 3.20 | $ 1,000.00/hr | $ 3,200.00 |
| 11/04/2020 | Rosemary Dettling | **Legal Work:** Drafted appeal brief | 1.74 | $ 1,000.00/hr | $ 1,740.00 |
| 11/05/2020 | Rosemary Dettling | **Legal Work:** Finalized and filed appeal brief (141 pages) | 5.27 | $ 1,000.00/hr | $ 5,270.00 |
| 01/05/2021 | Rosemary Dettling | **Legal Work:** Read agency's response to OFO appeal brief and discussed with client.Went into depth options to file in federal court, timeframes, process, formality, jury trial v bench trial, damages | 2.76 | $ 1,000.00/hr | $ 2,760.00 |
| 04/21/2021 | Rosemary Dettling | **Legal Work:** Read and responded to emails from client re OFO delay | 0.14 | $ 1,000.00/hr | $ 140.00 |
| 05/13/2021 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re timeframe for OFO response | 0.06 | $ 1,000.00/hr | $ 60.00 |
| 08/26/2021 | Rosemary Dettling | **Legal Work:** Read and responded to emails from client re when she can expect OFO decision | 0.35 | $ 1,000.00/hr | $ 350.00 |
| 11/24/2021 | Rosemary Dettling | **Legal Work:** Read and responded to email from client re OFO timeframe | 0.21 | $ 1,000.00/hr | $ 210.00 |
| 04/01/2022 | Rosemary Dettling | **Legal Work:** Read OFO appeal decision; discussed with client; discussed options of filing a motion for reconsideration with the OFO or filing in federal court; explained that I was not licensed in CA or CDC federal court and could not represent her in CA; discussed chances of settling case | 1.10 | $ 1,000.00/hr | $ 1,100.00 |
| 04/05/2022 | Rosemary Dettling | **Legal Work:** Spoke to client again about her options of filing in federal court; provided names of law firms in LA for her to contact, and public interest/pro bono entities. | 0.27 | $ 1,000.00/hr | $ 270.00 |
| 06/02/2022 | Rosemary Dettling | **Legal Work:** Email response to client re OFO decision | 0.00 | $ 1,000.00/hr | No Charge |

| | |
|---|---|
| **Total Hours** | 232.03 hrs |
| **Total Federal Sector Employment** | $ 232,030.00 |
| **Total Invoice Amount** | $ 232,030.00 |
| **Previous Balance** | $ 0.00 |
| **Balance (Amount Due)** | $ 232,030.00 |

**Notes:**

████████████████████████████
████████████████████████████████



EXHIBIT L

**Federal Employee Legal Services Center**
1629 K Street, N.W.
Suite 300
Washington, DC 20006
United States
Phone: 202-390-4741
Fax: 202-379-9772
Email: billing@felsc.com



**Royland G. Damwyk - Federal**
500 Countrywood Court
Lompoc, CA 93436
United States
Phone: (805) 588-0576
Email: Roylan.cali@gmail.com

PRE-BILL

# Invoice 20496

| Date | Mar 06, 2025 |
|---|---|
| Terms | N/A |
| Service Thru | Mar 06, 2025 |

**In Reference To: Non Case-Related (Federal Sector Employment)**

**Case ID: -1**

| Date | By | Services | Hours | Rates | Amount |
|---|---|---|---|---|---|
| 04/18/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey re upcoming schedule | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 04/20/2023 | Rosemary Dettling | **Legal Work:** Read case history DKt. 1-42 | 1.65 | $ 1,000.00/hr | $ 1,650.00 |
| 05/12/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey re scheduling and meet and confer | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 05/16/2023 | Rosemary Dettling | **Legal Work:** Attended meet and confer; emailed Def. about meet and confer before, discussed with afterward | 1.00 | $ 1,000.00/hr | $ 1,000.00 |
| 05/26/2023 | Rosemary Dettling | **Legal Work:** Read Def. Motion to Dismiss; Outlined response motion; read ROI and discovery from the first case, plus material obtained from the client; drafted outline response to Defendant's Motion to Dismiss | 5.55 | $ 1,000.00/hr | $ 5,550.00 |
| 05/26/2023 | Rosemary Dettling | **Legal Work:** Reviewed Defendant's exhibits attached to MTD; searched for counter exhibits - medical and accommodation requests; reviewed emails from EEO office | 1.21 | $ 1,000.00/hr | $ 1,210.00 |
| 05/27/2023 | Rosemary Dettling | **Legal Work:** Drafted response to Defendant's Motion to Dismiss; Reviewed pleadings from administrative case (1.43 hours, no charge for that) | 1.03 | $ 1,000.00/hr | $ 1,030.00 |
| 05/27/2023 | Rosemary Dettling | **Legal Work:** Researched how/when a motion to dismiss is converted into a motion for summary judgment; researched exhaustion argument, Ninth Cir. precedent re motion to dismiss | 1.86 | $ 1,000.00/hr | $ 1,860.00 |

| Date | Attorney | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 05/30/2023 | Rosemary Dettling | **Legal Work:** Drafted response to Defendant's Motion to Dismiss; researched timeliness argument in NInth Cir. (2.3 hrs); drafted motion for leave to file out of time | 6.86 | $ 1,000.00/hr | $ 6,860.00 |
| 05/30/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey; re scheduling order and joint report; emailed Def re MTD | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 06/01/2023 | Rosemary Dettling | **Legal Work:** Drafted response to Defendant's Motion to Dismiss; researched failure to state a claim Ninth Cir.; reviewed documents for possible exhibits | 1.99 | $ 1,000.00/hr | $ 1,990.00 |
| 06/01/2023 | Rosemary Dettling | **Legal Work:** Phone call with client re facts re MTD | 1.26 | $ 1,000.00/hr | $ 1,260.00 |
| 06/03/2023 | Rosemary Dettling | **Legal Work:** Drafted response to Defendant's Motion to Dismiss; reviewed Def.'s declarations and exhibits; researched Ninth Cir. and Cen. Dis. precedent re dismissal under Rehab Act; read Local Rules (no charge) and Judge's Orders (no charge) | 3.96 | $ 1,000.00/hr | $ 3,960.00 |
| 06/04/2023 | Rosemary Dettling | **Legal Work:** Drafted response to Defendant's Motion to Dismiss; reviewed and edited final version; discussed with client, email to Def. re Judge's orders | 1.03 | $ 1,000.00/hr | $ 1,030.00 |
| 06/05/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey re untimely filing; phone call with Def. re untimely filing | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 06/14/2023 | Rosemary Dettling | **Legal Work:** Read reply to Opposition to MTD | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 06/23/2023 | Rosemary Dettling | **Legal Work:** Read Reassignment Order; discussed with client | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 07/05/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey re status report, minor edits | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 07/07/2023 | Rosemary Dettling | **Legal Work:** Drafted Initial Disclosures; read scheduling order | 1.05 | $ 1,000.00/hr | $ 1,050.00 |
| 07/10/2023 | Rosemary Dettling | **Legal Work:** Responded to an email from J. Blakey re discovery plan and schedule; sent initial disclosures to def. | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 07/26/2023 | Rosemary Dettling | **Legal Work:** Travel to LA for Conference with Judge Hernán D. Vera (Oral Argument re Motion to Dismiss) (prepped for oral argument on plane (6.10) | 9.35 | $ 1,000.00/hr | $ 9,350.00 |
| 07/26/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey; asked Def. if it objected to us filing an amended complaint out of time to address the harassment issue; Def. objected | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 07/27/2023 | Rosemary Dettling | **Legal Work:** Oral argument before Judge Vera; met with client before and after to discuss process re oral argument, MTD and next steps | 0.55 | $ 1,000.00/hr | $ 550.00 |
| 07/29/2023 | Rosemary Dettling | **Legal Work:** Travel home after Conference with Judge Hernán D. Vera in Courtroom 5B (Motion to Dismiss) | 8.87 | $ 1,000.00/hr | $ 8,870.00 |
| 08/09/2023 | Rosemary Dettling | **Legal Work:** Called Client to discuss next steps in litigation process | 0.15 | $ 1,000.00/hr | $ 150.00 |

| | | | | | |
|---|---|---|---|---|---|
| 08/14/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey re amended Complaint; told Def. we would not be filing an amended complaint for harassment | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 08/16/2023 | Rosemary Dettling | **Legal Work:** Read Def. Initial Disclosures | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 08/16/2023 | Rosemary Dettling | **Legal Work:** Read and signed off on Joint Rule 26(f) report | 0.20 | $ 1,000.00/hr | $ 200.00 |
| 08/21/2023 | Rosemary Dettling | **Legal Work:** Served amended disclosures to Def.; read answer to complaint | 0.33 | $ 1,000.00/hr | $ 330.00 |
| 09/28/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey regarding mutually agreeable discovery plan | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 10/05/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey; met and conferred re trial schedule, agreed to schedule | 0.78 | $ 1,000.00/hr | $ 780.00 |
| 10/06/2023 | Rosemary Dettling | **Legal Work:** Emailed J. Blakey re discovery plan | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 10/10/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey re discovery plan and status report; agreed on final dates; read final version | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 10/20/2023 | Rosemary Dettling | **Legal Work:** Drafted discovery requests to obtain more information about management's response to RA requests | 4.98 | $ 1,000.00/hr | $ 4,980.00 |
| 10/20/2023 | Rosemary Dettling | **Legal Work:** Read docket, notice of deficiencies; Drafted discovery requests; discussed with client | 2.10 | $ 1,000.00/hr | $ 2,100.00 |
| 10/25/2023 | Rosemary Dettling | **Legal Work:** Travel to LA for Conference with Judge Hernán D. Vera (Scheduling Conference); reviewed file (2.47) met with client | 9.98 | $ 1,000.00/hr | $ 9,980.00 |
| 10/25/2023 | Rosemary Dettling | **Legal Work:** Read Defendant's discovery requests; discussed with client | 1.05 | $ 1,000.00/hr | $ 1,050.00 |
| 10/26/2023 | Rosemary Dettling | **Legal Work:** Travel home after Conference with Judge Hernán D. Vera in Courtroom 5B (Scheduling Conference) | 9.25 | $ 1,000.00/hr | $ 9,250.00 |
| 10/26/2023 | Rosemary Dettling | **Legal Work:** Oral argument before Judge Vera (Status Conference); met with client before and after to discuss process re oral argument, MTD and next steps | 0.50 | $ 1,000.00/hr | $ 500.00 |
| 10/27/2023 | Rosemary Dettling | **Legal Work:** Compiled responsive documents to Def. discovery requests; read Order | 3.91 | $ 1,000.00/hr | $ 3,910.00 |
| 11/13/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey re proposed mediators | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 11/15/2023 | Rosemary Dettling | **Legal Work:** Responded to email from J. Blakey re Def. request for an extension; discussed mediation dates | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 12/15/2023 | Rosemary Dettling | **Legal Work:** Responded to emails from J. Blakey re stipulation | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 12/18/2023 | Rosemary Dettling | **Legal Work:** Responded to emails from J. Blakey; looked up mediator (no charge) | 0.05 | $ 1,000.00/hr | $ 50.00 |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 01/25/2024 | Rosemary Dettling | **Legal Work:** Drafted detailed objection to Defendant's discovery responses. | 2.06 | $ 1,000.00/hr | $ 2,060.00 |
| 02/06/2024 | Rosemary Dettling | **Legal Work:** Received and reviewed Defendant's discovery responses; Defendant objected to every question and gave multiple reasons for objecting to each question; Defendant also refused to provide documents in response to Plaitniff's questions; discussed with client | 1.10 | $ 1,000.00/hr | $ 1,100.00 |
| 02/12/2024 | Rosemary Dettling | **Legal Work:** Finalized 12-page letter to Defendant detailing why Def.'s discovery responses were nonresponsive; rad local rules regarding process for filing a motion to compel with magistrate judge (.20 min). (Required to make good faith attempt to get oppos. counsel to respond). | 5.48 | $ 1,000.00/hr | $ 5,480.00 |
| 02/21/2024 | Rosemary Dettling | **Legal Work:** Finalized second letter to agency (32 pages) stating each reasons their discovery responses were insufficient. (Def. only supplied 3 ROI's from EEO cases, which were already in client's possession). (time spent on 2/20 (5.3 hours) 2/19 (4.6 hours), and other days not billed | 8.50 | $ 1,000.00/hr | $ 8,500.00 |
| 03/08/2024 | Rosemary Dettling | **Legal Work:** Reviewed Defendant's supplemental discovery responses; discussed with client | 3.09 | $ 1,000.00/hr | $ 3,090.00 |
| 04/19/2024 | Rosemary Dettling | **Legal Work:** Phone calls and emails to client re her deposition, schedule for 4/24 | 2.09 | $ 1,000.00/hr | $ 2,090.00 |
| 04/23/2024 | Rosemary Dettling | **Legal Work:** Phone calls and several emails to client re her deposition, schedule for 4/24; discussed depo instructions | 2.06 | $ 1,000.00/hr | $ 2,060.00 |
| 04/24/2024 | Rosemary Dettling | **Legal Work:** Sat for depo with Roylan Damwyk; prepped client before | 7.56 | $ 1,000.00/hr | $ 7,560.00 |
| 05/28/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to num. email from J. Blakey; read stipulation to continue | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 07/01/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motion for Summary Judgment - read Def.'s motion; checked citations to proposed undisputed facts; discussed with client; prepared first part of outline; checked cases cited by Def. | 5.98 | $ 1,000.00/hr | $ 5,980.00 |
| 07/03/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motion for Summary Judgment - responded to Def. Proposed facts 1-130) and checked record for correct citations | 4.87 | $ 1,000.00/hr | $ 4,870.00 |
| 07/04/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motion for Summary Judgment - worked on response to conclusions of facts and law | 1.75 | $ 1,000.00/hr | $ 1,750.00 |
| 07/05/2024 | Rosemary Dettling | **Legal Work:** Phone call with client re Def.'s 130 undisputed fact | 0.76 | $ 1,000.00/hr | $ 760.00 |
| 07/05/2024 | Rosemary Dettling | **Legal Work:** Drafted response to Defendant's Motion for Summary Judgment - drafted our own facts; cross-checked with exhibits and citations (def. did not send us a word-searchable draft | 4.22 | $ 1,000.00/hr | $ 4,220.00 |
| 07/06/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motion for Summary Judgment and other | 4.00 | $ 1,000.00/hr | $ 4,000.00 |

| 07/07/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motion for Summary Judgment - discussed proposed undisputed facts with client and finalized them | 5.75 | $ 1,000.00/hr | $ 5,750.00 |
| 07/08/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motion for Summary Judgment | 4.08 | $ 1,000.00/hr | $ 4,080.00 |
| 07/09/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motion for Summary Judgment | 0.90 | $ 1,000.00/hr | $ 900.00 |
| 07/10/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motion for Summary Judgment; served final version on def | 2.98 | $ 1,000.00/hr | $ 2,980.00 |
| 08/27/2024 | Rosemary Dettling | **Legal Work:** Travel to LA for Conference with Judge Hernán D. Vera in Courtroom 5B (Oral Argument re MSJ) (prepped for oral argument on plane (5.40) | 9.75 | $ 1,000.00/hr | $ 9,750.00 |
| 08/28/2024 | Rosemary Dettling | **Legal Work:** Travel home after Conference with Judge Hernán D. Vera in Courtroom 5B (Motion for Summary Judgment) | 9.54 | $ 1,000.00/hr | $ 9,540.00 |
| 08/28/2024 | Rosemary Dettling | **Legal Work:** Oral argument on Motion for Summary Judgment; discussion with client after conference about next step in litigation | 0.67 | $ 1,000.00/hr | $ 670.00 |
| 08/30/2024 | Rosemary Dettling | **Legal Work:** Read Order on Motion for MSJ; discussed with client | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 09/05/2024 | Rosemary Dettling | **Legal Work:** Drafted and emailed settlement statement to Sanford Jossen | 2.76 | $ 1,000.00/hr | $ 2,760.00 |
| 09/08/2024 | Rosemary Dettling | **Legal Work:** Drafted Memorandum of Contentions of Facts and Law; spoke to Plaintiff about the availability of her witnesses | 3.35 | $ 1,000.00/hr | $ 3,350.00 |
| 09/09/2024 | Rosemary Dettling | **Legal Work:** Drafted Verdict Form (2.98) and Voire Dire questions (2.06); | 5.04 | $ 1,000.00/hr | $ 5,040.00 |
| 09/09/2024 | Rosemary Dettling | **Legal Work:** Drafted Memorandum of Contentions of Fact and Law | 2.54 | $ 1,000.00/hr | $ 2,540.00 |
| 09/10/2024 | Rosemary Dettling | **Legal Work:** Drafted Memorandum of Contentions of Fact and Law | 2.87 | $ 1,000.00/hr | $ 2,870.00 |
| 09/11/2024 | Rosemary Dettling | **Legal Work:** Settlement conference with Sanford Jossen; discussed settlement with client before and after; phone call with Mr. Jossen | 3.33 | $ 1,000.00/hr | $ 3,330.00 |
| 09/12/2024 | Rosemary Dettling | **Legal Work:** Drafted Memorandum of Contentions of Fact and Law | 5.20 | $ 1,000.00/hr | $ 5,200.00 |
| 09/12/2024 | Rosemary Dettling | **Legal Work:** Drafted Witness List and our portion of the [Proposed] Final Pre-trial Order | 2.25 | $ 1,000.00/hr | $ 2,250.00 |
| 09/12/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to num. email from J. Blakey | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 09/13/2024 | Rosemary Dettling | **Legal Work:** Drafted Memorandum of Facts and Conclusions and statement of our case for pre-trial order | 1.14 | $ 1,000.00/hr | $ 1,140.00 |
| 09/13/2024 | Rosemary Dettling | **Legal Work:** Drafted Exhibit List | 1.08 | $ 1,000.00/hr | $ 1,080.00 |
| 09/13/2024 | Rosemary Dettling | **Legal Work:** Called client re availability at trial of Ms. Knox and Dr. Smith | 0.08 | $ 1,000.00/hr | $ 80.00 |

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 09/14/2024 | Rosemary Dettling | **Legal Work:** Drafted Exhibit List and compiled documents | 4.32 | $ 1,000.00/hr | $ 4,320.00 |
| 09/17/2024 | Rosemary Dettling | **Legal Work:** Drafted Witness List | 2.09 | $ 1,000.00/hr | $ 2,090.00 |
| 09/17/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to num. email from J. Blakey re pretrial Order | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 09/18/2024 | Rosemary Dettling | **Legal Work:** Drafted Exhibit List | 3.46 | $ 1,000.00/hr | $ 3,460.00 |
| 09/20/2024 | Rosemary Dettling | **Legal Work:** Drafted Exhibit List and compiled exhibtis; sent jury instructions to def | 6.54 | $ 1,000.00/hr | $ 6,540.00 |
| 09/20/2024 | Rosemary Dettling | **Legal Work:** Drafted Jury Instructions; sent exhibit list to Def.; read Def. objections to our exhibits; objected to Def. exhibits | 1.54 | $ 1,000.00/hr | $ 1,540.00 |
| 09/23/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to num. email from J. Blakey re joint exhibit list | 0.30 | $ 1,000.00/hr | $ 300.00 |
| 09/24/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to nine emails from J. Blakey re pretrial ; read def initial disclosures; voire dire sent to def; special verdict form sent to Def | 0.15 | $ 1,000.00/hr | $ 150.00 |
| 09/25/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motions in Limine 1 | 2.28 | $ 1,000.00/hr | $ 2,280.00 |
| 09/26/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motions in Limine 1; looked up citations in Def.'s Motion | 3.76 | $ 1,000.00/hr | $ 3,760.00 |
| 09/27/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motions in Limine 1 | 1.16 | $ 1,000.00/hr | $ 1,160.00 |
| 09/27/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motions in Limine 2; looked up cases cited by Def in motion | 4.83 | $ 1,000.00/hr | $ 4,830.00 |
| 09/28/2024 | Rosemary Dettling | **Legal Work:** Drafted Opposition to Defendant's Motions in Limine 2 | 3.51 | $ 1,000.00/hr | $ 3,510.00 |
| 09/30/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re pretrial docs | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 10/02/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re pretrial docs; asked for Def's exhibits but did not receive them. sent our exhibits to Def. | 0.45 | $ 1,000.00/hr | $ 450.00 |
| 10/03/2024 | Rosemary Dettling | **Legal Work:** Meet and Confer with Def; discussed with client afterward | 0.48 | $ 1,000.00/hr | $ 480.00 |
| 10/04/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re pretrial docs; sent objections to their verdict form; sent another copy of our exhbits | 0.20 | $ 1,000.00/hr | $ 200.00 |
| 10/06/2024 | Rosemary Dettling | **Legal Work:** Sent redline version of obj to their statement of the case | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 10/06/2024 | Rosemary Dettling | **Legal Work:** Drafted Response to Def. Motion for Reconsideration | 3.97 | $ 1,000.00/hr | $ 3,970.00 |
| 10/07/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re statement of the case; objected to Def. changes to our statement of the case; final edits to pretrial order | 0.26 | $ 1,000.00/hr | $ 260.00 |

| 10/07/2024 | Rosemary Dettling | **Legal Work:** Drafted Response to Def. Motion for Reconsideration; sent exhibits to Def. still have not received their exhibits | 2.33 | $ 1,000.00/hr | $ 2,330.00 |
|---|---|---|---|---|---|
| 10/08/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re exhibits. Def. proposed sending each of the 50 exhibits one at a time in emails. I declined that option. Sent our final version of proposed final pretrial order | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 10/09/2024 | Rosemary Dettling | **Legal Work:** Drafted PLAINTIFF'S RESPONSE TO DEFENDANT'S AMENDED MEMORANDUM OF CONTENTIONS OF FACTS AND LAW | 4.10 | $ 1,000.00/hr | $ 4,100.00 |
| 10/09/2024 | Rosemary Dettling | **Legal Work:** Drafted Trial Questions for Roylan Damwyk; read Def.'s filed joint exhibit list - still have not received their exhibits | 1.63 | $ 1,000.00/hr | $ 1,630.00 |
| 10/09/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re pretrial docs | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 10/10/2024 | Rosemary Dettling | **Legal Work:** Drafted Trial Questions for Neil Damwyk | 0.91 | $ 1,000.00/hr | $ 910.00 |
| 10/11/2024 | Rosemary Dettling | **Legal Work:** Drafted Trial Questions for joint witness Robert Corser; reviewed Def. Motion for Summary Judgment to see what they admitted about Corser; read Corser depo and affidavit; read declarations attached to summary judgment | 5.76 | $ 1,000.00/hr | $ 5,760.00 |
| 10/11/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re pretrial docs | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 10/15/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re exhibits; Def. sent its 50 emails to me, but sent them in separate emails as separate pdf. read them all | 2.76 | $ 1,000.00/hr | $ 2,760.00 |
| 10/17/2024 | Rosemary Dettling | **Legal Work:** Phone call with client re Mil 1 and 2 | 0.55 | $ 1,000.00/hr | $ 550.00 |
| 10/17/2024 | Rosemary Dettling | **Legal Work:** Drafted Trial Questions for Richard Nocis; sent amended witness list to Def bc they objected to the first version; reviewed exhibits to determine which ones were joint | 1.11 | $ 1,000.00/hr | $ 1,110.00 |
| 10/17/2024 | Rosemary Dettling | **Legal Work:** Asked Def. if the agency was going to make the federal employees available for trial | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 10/18/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re amended exhibit list; meet and confer; called client afterwards | 0.40 | $ 1,000.00/hr | $ 400.00 |
| 10/19/2024 | Rosemary Dettling | **Legal Work:** Drafted Trial Questions for joint witness Thomas Chiavacci; reviewed Def. exhibits to see which applied to Chiavacci | 2.75 | $ 1,000.00/hr | $ 2,750.00 |
| 10/20/2024 | Rosemary Dettling | **Legal Work:** Travel to LA for Conference with Judge Hernán D. Vera in Courtroom 5B (MIL 1 and 2); prepped for oral argument, worked on case prep for trial - read depo transcripts, declarations of Def. witnesses (6.10 hours on plane) | 10.05 | $ 1,000.00/hr | $ 10,050.00 |
| 10/21/2024 | Rosemary Dettling | **Legal Work:** Conference with Judge Hernán D. Vera in Courtroom 5B re Motions in Limine; Pre-trial | 0.50 | $ 1,000.00/hr | $ 500.00 |

| Date | Name | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 10/22/2024 | Rosemary Dettling | **Legal Work:** Travel home after Conference with Judge Hernán D. Vera in Courtroom 5B (Motions in Limine) | 8.99 | $ 1,000.00/hr | $ 8,990.00 |
| 10/23/2024 | Rosemary Dettling | **Legal Work:** Read/Responded to email from J. Blakey re amended exhibit lsit | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 10/24/2024 | Rosemary Dettling | **Legal Work:** Revised exhibit list pr def renumbering; read Def.'s reply to Opp. to Mot. | 0.35 | $ 1,000.00/hr | $ 350.00 |
| 10/25/2024 | Rosemary Dettling | **Legal Work:** Phone call with client re settlement demand; more emails from Def. regarding additional things they want to change in exhibit list; asked Def. if they are filing it today. said I am flexible; more email from Def. regarding exhibit list | 1.11 | $ 1,000.00/hr | $ 1,110.00 |
| 10/26/2024 | Rosemary Dettling | **Legal Work:** Discussed settlement with client in preparation for settlement conference; implored her to seriously consider settlement; discussed cap on comp damages; risks of litigation | 1.87 | $ 1,000.00/hr | $ 1,870.00 |
| 10/26/2024 | Rosemary Dettling | **Legal Work:** Drafted settlement conference statement for Magistrate Judge Karen L. Stevenson | 3.75 | $ 1,000.00/hr | $ 3,750.00 |
| 10/27/2024 | Rosemary Dettling | **Legal Work:** Sent final exhibit list with redlines to Def | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 10/28/2024 | Rosemary Dettling | **Legal Work:** Read final version of joint exhibit list; sent settlement demand to client for approval | 0.20 | $ 1,000.00/hr | $ 200.00 |
| 10/29/2024 | Rosemary Dettling | **Legal Work:** Exchanged settlement statements with Def. | 0.07 | $ 1,000.00/hr | $ 70.00 |
| 10/31/2024 | Rosemary Dettling | **Legal Work:** Asked Ava to prepare a demonstrative for opening argument; sent information to her (.15) | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 11/01/2024 | Rosemary Dettling | **Legal Work:** Settlement Conference with Magistrate Judge Karen L. Stevenson; preparation with client before; discussed with client afterward; emailed Def and asked about status of federal witnesses; they told me they were told they could not testify unless subpoenaed by Court. | 4.65 | $ 1,000.00/hr | $ 4,650.00 |
| 11/01/2024 | Rosemary Dettling | **Legal Work:** Discussed testimony with witnesses Richard Nocis, Betsy Torres, Janis Knox, Hank Dedering, Neil Damwyk, Martin Damwyk, Carl Schlosser | 1.94 | $ 1,000.00/hr | $ 1,940.00 |
| 11/02/2024 | Rosemary Dettling | **Legal Work:** Drafted Trial Questions for Dr. Carl Schlosser and Ms. KNoex based on their letters medical records in file; reviewed Ava's demonstrative (.10) | 2.89 | $ 1,000.00/hr | $ 2,890.00 |
| 11/04/2024 | Rosemary Dettling | **Legal Work:** Prepared for Trial; prepared opening; practiced opening with other attorneys; decided which exhibits would be used for which clients; Def asked me to redo my exhibit list (.05) | 3.87 | $ 1,000.00/hr | $ 3,870.00 |
| 11/05/2024 | Rosemary Dettling | **Legal Work:** Drafted Trial Questions for Pl. witness Betsy Torres | 1.07 | $ 1,000.00/hr | $ 1,070.00 |
| 11/06/2024 | Rosemary Dettling | **Legal Work:** Drafted potential trial questions for Jason Turner based on defendant's submissions; reviewed def's demonstrative; reviewed second draft of demonstrative (.20) w ava | 1.40 | $ 1,000.00/hr | $ 1,400.00 |

| 11/06/2024 | Rosemary Dettling | **Legal Work:** Sent demonstrative to Def.; Def. had objections; asked Ava to revise and take out "law" portion of the demonstrative | 0.15 | $ 1,000.00/hr | $ 150.00 |
|---|---|---|---|---|---|
| 11/07/2024 | Rosemary Dettling | **Legal Work:** Travel to LA for trial; discussed settlement with the client; prepped for trial on the plane by reviewing exhibits, questions, the proposed pre-trial order, and voire dire questions (6 hours); reviewed Def. ex parte request to Court; discussed it with the client | 9.85 | $ 1,000.00/hr | $ 9,850.00 |
| 11/07/2024 | Rosemary Dettling | **Legal Work:** Discussed testimony with witnesses Martin Damwyk, Carl Schlosser; looked at revised demonstrative (.10) | 1.64 | $ 1,000.00/hr | $ 1,640.00 |
| 11/08/2024 | Rosemary Dettling | **Legal Work:** Discussed testimony with witnesses Richard Nocis, Carl Schlosser, and Janis Knox; discussed questions that will be asked; judge's expectations, court-room decorum, medical documents and treatment, and potential cross-examination questions; met tech department at the courthouse at 8 am; discussed Def's ex parte request for Mr. Corser to testify remotely; informed Def that we had no objection to remote testimony | 4.33 | $ 1,000.00/hr | $ 4,330.00 |
| 11/09/2024 | Rosemary Dettling | **Legal Work:** Prepared for Trial; went over trial questions with each of Damwyk's witnesses; reviewed powerpoint; recommended deleting some more things on PowerPoint; read Corser and Quichocho deposition testimony; prepared opening argument | 7.55 | $ 1,000.00/hr | $ 7,550.00 |
| 11/10/2024 | Rosemary Dettling | **Legal Work:** Prepared for Trial; met with the client to discuss direct and cross-examination; spoke to her husband and son about their testimony; spoke with Richard Nocis on the phone; left a message with Schlosser; spoke to Pay Mallow about his testimony and need to stay on course; reviewed all exhibits; Court's orders (no charge); read voire dire questions and narrowed them to most relevant questions; read article on jury selection | 9.83 | $ 1,000.00/hr | $ 9,830.00 |
| 11/11/2024 | Rosemary Dettling | **Legal Work:** Met with client and witnesses Janis Knox, Neil Damwyk, Martin Damwyk, Hank Dederding (deducted), Betsy Torres, Pat Malloy; discussed questions, court-room decorum, and potential cross-examination; read verdict form and Defendant's propose voire dire questions; reviewed Defendant's reasonable accommodation policy; Read Def's updated demonstrative | 7.68 | $ 1,000.00/hr | $ 7,680.00 |
| 11/12/2024 | Rosemary Dettling | **Legal Work:** Attended trial - Day 1; prepared for next day with witnesses Schlosser, Nocis, Neil Damwyk, and Roylan Damwyk (2.26) | 9.50 | $ 1,000.00/hr | $ 9,500.00 |
| 11/12/2024 | Rosemary Dettling | **Legal Work:** Reviewed revised demonstrative before trial. The only changes were deletions Def. requested; reviewed voire dire and opening statements | 0.76 | $ 1,000.00/hr | $ 760.00 |

| Date | Attorney | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 11/13/2024 | Rosemary Dettling | **Legal Work:** Attended Trial - Day 2; prepared for next day's cross-examination by reviewing Def.'s exhibits (1.89) | 8.00 | $ 1,000.00/hr | $ 8,000.00 |
| 11/14/2024 | Rosemary Dettling | **Legal Work:** Reviewed Questions for joint witness Arlene Quichocho; drafted outline of closing argument read rehabilitation policy for Quichocho's testimony | 4.74 | $ 1,000.00/hr | $ 4,740.00 |
| 11/14/2024 | Rosemary Dettling | **Legal Work:** Attended Trial - Day 3 | 6.90 | $ 1,000.00/hr | $ 6,900.00 |
| 11/15/2024 | Rosemary Dettling | **Legal Work:** Attended Trial - Day 4; discussed case with client before trial day | 8.50 | $ 1,000.00/hr | $ 8,500.00 |
| 11/16/2024 | Rosemary Dettling | **Legal Work:** Travel home after Trial | 8.75 | $ 1,000.00/hr | $ 8,750.00 |
| 11/18/2024 | Rosemary Dettling | **Legal Work:** Email to/from Paula Pearlman re market rates in Los Angeles | 0.00 | $ 0.00/hr | No Charge |
| 11/22/2024 | Rosemary Dettling | **Legal Work:** Multiple email to/from Paula Pearlman re market rates in Los Angeles and what other attorneys think | 0.00 | $ 0.00/hr | No Charge |
| 11/24/2024 | Rosemary Dettling | **Legal Work:** Multiple email to/from Paula Pearlman re market rates in Los Angeles | 0.00 | $ 0.00/hr | No Charge |
| 11/25/2024 | Rosemary Dettling | **Legal Work:** Multiple email to/from Paula Pearlman re market rates in Los Angeles | 0.00 | $ 0.00/hr | No Charge |
| 12/18/2024 | Rosemary Dettling | **Legal Work:** Multiple to LA attorneys re rates; spoke to Paula Pearlman on phone | 0.00 | $ 0.00/hr | No Charge |
| 01/02/2025 | Rosemary Dettling | **Legal Work:** Researched Ninth Circuit cases re retaliation under Rehab Act, mootness based on prior award of backpay on one count; pattern of retaliation; reviewed Supreme Court and Ninth Circuit cases, and other circuits, plus district court cases. Researched Congressional intent for damages under the Rehab Act v. Title VII and the ADA. | 1.40 | $ 1,000.00/hr | $ 1,400.00 |
| 01/02/2025 | Rosemary Dettling | **Legal Work:** Researched Ninth Circuit cases re retaliation under Rehabilitation Act: retaliation for delay in accommodation, adverse action, pattern of retaliation, prima. facie case, challenges to prima facie case, burden of proof | 1.87 | $ 1,000.00/hr | $ 1,870.00 |
| 01/03/2025 | Rosemary Dettling | **Legal Work:** Drafted Bill for Cost (worked 7.5 hours but billed 4.50) | 4.50 | $ 1,000.00/hr | $ 4,500.00 |
| 01/03/2025 | Rosemary Dettling | **Legal Work:** Drafted Post-trial Brief on Count IV (Retaliation) | 3.78 | $ 1,000.00/hr | $ 3,780.00 |
| 01/03/2025 | Rosemary Dettling | **Legal Work:** Phone call with client re retaliation brief and bill for costs | 0.88 | $ 1,000.00/hr | $ 880.00 |
| 01/05/2025 | Rosemary Dettling | **Legal Work:** Drafted Post-trial Brief on Count IV (Retaliation); reviewed De.'s witnesses' testimony | 4.32 | $ 1,000.00/hr | $ 4,320.00 |
| 01/06/2025 | Rosemary Dettling | **Legal Work:** Reviewed transcripts for retal brief; discussed with client | 0.49 | $ 1,000.00/hr | $ 490.00 |
| 01/06/2025 | Rosemary Dettling | **Legal Work:** Drafted Post-trial Brief on Count IV (Retaliation) | 6.00 | $ 1,000.00/hr | $ 6,000.00 |

| 01/07/2025 | Rosemary Dettling | **Legal Work:** Researched Supreme Court, Ninth Circuit, District Court cases re nominal damages | 1.40 | $ 1,000.00/hr | $ 1,400.00 |
| 01/08/2025 | Rosemary Dettling | **Legal Work:** Emailed Draft of Post-trial Brief on Count IV (Retaliation) to Roylan Damwyk, phone call with client to discuss brief | 0.10 | $ 1,000.00/hr | $ 100.00 |
| 01/08/2025 | Rosemary Dettling | **Legal Work:** Drafted Post-trial Brief on Count IV (Retaliation) | 2.98 | $ 1,000.00/hr | $ 2,980.00 |
| 01/09/2025 | Rosemary Dettling | **Legal Work:** Drafted Post-trial Brief on retaliation claim | 3.00 | $ 1,000.00/hr | $ 3,000.00 |
| 01/10/2025 | Rosemary Dettling | **Legal Work:** Finalized Post-trial Brief on Count IV (Retaliation) | 0.95 | $ 1,000.00/hr | $ 950.00 |
| 01/11/2025 | Rosemary Dettling | **Legal Work:** Read Defendant's Post-trial Brief; discussed w client and Sara Bloom | 0.40 | $ 1,000.00/hr | $ 400.00 |
| 01/13/2025 | Rosemary Dettling | **Legal Work:** Read Notice of Deficiencies | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 01/14/2025 | Rosemary Dettling | **Legal Work:** Researched cases cited in Defendant's Post-trial Brief re honest belief defense, fair notice, affirm defense case history, new cases, etc., including: Villiarmo v. Aloha Island Air., 281 F.3d 1054, 1063 (9th Cir. 2002) Pagonakis v. Express LLC, 315 F. App'x 425, 431 (3d Cir. 2009); Grantz v. State Farm Mut. Auto. Ins. Co., 2009 WL 2870158, at *6-7 (C.D. Cal. Sept. 2, 2009), affirmed, 429 F. App'x 692 (9th Cir. 2011), | 2.50 | $ 1,000.00/hr | $ 2,500.00 |
| 01/15/2025 | Rosemary Dettling | **Legal Work:** Read Judge's Decision on Notice of Deficiencies | 0.05 | $ 1,000.00/hr | $ 50.00 |
| 02/05/2025 | Rosemary Dettling | **Legal Work:** Multiple emails to/from Paula Pearlman re her declaration for attorney fees re market rates in Los Angeles | 0.00 | $ 0.00/hr | No Charge |
| 02/08/2025 | Rosemary Dettling | **Legal Work:** Drafted Motion for Reconsideration | 6.72 | $ 1,000.00/hr | $ 6,720.00 |
| 02/09/2025 | Rosemary Dettling | **Legal Work:** Drafted Attorney Fee Petition | 5.32 | $ 1,000.00/hr | $ 5,320.00 |
| 02/10/2025 | Rosemary Dettling | **Legal Work:** Drafted Attorney Fee Petition | 4.75 | $ 1,000.00/hr | $ 4,750.00 |
| 02/10/2025 | Rosemary Dettling | **Legal Work:** Researched Central District rulings on attorney fees | 1.50 | $ 1,000.00/hr | $ 1,500.00 |
| 02/11/2025 | Rosemary Dettling | **Legal Work:** "Meet and confer" conference with Def, counsel and Sara Bloom | 0.78 | $ 1,000.00/hr | $ 780.00 |
| 02/12/2025 | Rosemary Dettling | **Legal Work:** Drafted Attorney Fee Petition; read Court's rulings on attorney fees (no charge); drafted declaration; discussed client's declaration with her | 4.37 | $ 1,000.00/hr | $ 4,370.00 |
| 02/12/2025 | Rosemary Dettling | **Legal Work:** Email to/from Paula Pearlman re declaration for attorney fee brief | 0.00 | $ 0.00/hr | No Charge |
| 02/13/2025 | Rosemary Dettling | **Legal Work:** Drafted Attorney Fee Petition, decided which decisions should be attached. | 2.32 | $ 1,000.00/hr | $ 2,320.00 |

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 02/13/2025 | Rosemary Dettling | **Legal Work:** Researched issues related to Motion for Reconsideration; checked the history of Villiarmo and found cases supporting the argument that affirmative defenses had to be listed in pre-trial conference; checked Supreme Court precedent; researched whether motion should be filed as FRCP 59 or 60 | 3.94 | $ 1,000.00/hr | $ 3,940.00 |
| 02/13/2025 | Rosemary Dettling | **Legal Work:** Multiple emails to/from Paula Pearlman re market rates in Los Angeles | 0.00 | $ 0.00/hr | No Charge |
| 02/14/2025 | Rosemary Dettling | **Legal Work:** Drafted Attorney Fee Petition (2.22 hours); the rest of time researched on Westlaw whether affirmative defense have to be raised for each claim or whether they can be transferred to other claims; looked into FRCP 8 and cross-checked with LR; researched issue re good faith in accommodation claim and whether it can be transferred to retaliation claim with different burden of proof; researched whether judge can assess the parties credibility without defense of good faith or honest belief; researched ninth Cir. precedent re defendant's obligation to provide tangible evidence (financial burden) of undue hardship | 5.99 | $ 1,000.00/hr | $ 5,990.00 |
| 02/14/2025 | Rosemary Dettling | **Legal Work:** Emails to/from Paula Pearlman re declaration for attorney fee brief | 0.00 | $ 0.00/hr | No Charge |
| 02/15/2025 | Rosemary Dettling | **Legal Work:** Drafted Attorney Fee Petition; focussed on which exhibits were necessary; drafted breakdown of travel expenses (no charge) | 1.63 | $ 1,000.00/hr | $ 1,630.00 |
| 02/17/2025 | Rosemary Dettling | **Legal Work:** Emails to/from Paula re declaration for attorney fee brief | 0.00 | $ 0.00/hr | No Charge |
| 02/19/2025 | Rosemary Dettling | **Legal Work:** Drafted Motion for Reconsideration, researched Ninth Order "fair notice" requirement v "heightened scrutiny"; searched for cases in ninth cir re defenses in complaint v defenses in pre-trial order; researched different btw honest belief and good faith; read FRCP 50, 60, 8, and 19; read declarations for atty fee petition | 3.81 | $ 1,000.00/hr | $ 3,810.00 |
| 03/06/2025 | Rosemary Dettling | **Legal Work:** Finalized Attorney Fee Petition | 2.07 | $ 1,000.00/hr | $ 2,070.00 |
| 03/06/2025 | Rosemary Dettling | **Legal Work:** Finalized Motion for Reconsideration | 3.93 | $ 1,000.00/hr | $ 3,930.00 |

| | |
|---|---|
| **Total Hours** | 473.72 hrs |
| **Total Federal Sector Employment** | $ 473,720.00 |
| **Total Invoice Amount** | $ 473,720.00 |
| **Previous Balance** | **$ 0.00** |
| **Balance (Amount Due)** | **$ 473,720.00** |

**Notes:**

YOUR PAYMENT IS DUE WITHIN TEN DAYS OF RECEIPT
For your convenience, FELSC accepts payments through www.PayPal.com.
On the PayPal site, please type in our account locator: billing@felsc.com.

You can also wire or transfer money directly into our account at:
Wells Fargo Bank, 5701 Connecticut Ave., NW, Washington, DC.
Account name: Federal Employee Legal Services Center,
Account Number: 2000024541349
Routing Numbers: 054001220 (electronic payment), 121000248 (wire transfer)

You can submit checks to:

FELSC Billing Department
1629 K Street, NW, Suite 300
Washington, DC 20006

All billing questions should be directed to Barbi at billing@felsc.com

EXHIBIT M

## Exhibit M:
## Travel costs ($12,871.46) and copies/exhibits ($469.60):


**TRAVEL EXPENSES**

November 7-16, 2024:
**(Jury Trial/Bench Trial,**
**November 12-15, 2024)**

| | |
|---|---|
| Transportation to Airport: | $126.67 (RD) |
| Airfare to LAX: | $468.48 (RD) |
| Car rental: | $551.93  (RD) |
| Parking $60.50 x 4 nights: | $242.00 (RD) |
| Hotel: | |
| 11/7/2024 to 11/10/2024: | $1049.91 (RD) |
| 11/10/2024: | $345.98 (SB) |
| 11/10/2024: | $342.98 (RD) |
| 11/11-16/2024: | $1388.55 (RD) |
| 11/11-16/2024: | $1388.55 (SB) |
| Uber to downtown LA: | $56.70 (RD, SB) |
| Airfare to JFK: | $428.48 (RD) |
| Airfare to LAS: | $140.48 (SB) |
| Transportation from Airport: | $98.88 (RD) |
| **Total:** | **$6,629.59** |

October 20-22, 2024:
**(Motions in Limine Oral Argument,**
**Pre-trial Conference October 21, 2024):**

| | |
|---|---|
| Transportation to Airport: | $140.55 (RD) |
| Airfare: | $716.58 (RD) |
| Hotel:  10/20/2024 | |
| 10/21/2024 | $554.44  (RD) |
| Transportation from Airport: | $98.88 (RD) |
| **Total:** | **$1,510.45** |

Travel August 27-28, 2024:
**(Motion for Summary Judgment,**
**Oral Argument, August 28, 2024))**

| | |
|---|---|
| Transportation to Airport: | $146.30 (RD) |

| | |
|---|---|
| Airfare: | $811.95 (RD) |
| Hotel:  08/27/2024 | $227.97 (RD) |
| Transportation from Airport: | $90.55 (RD) |
| **Total:** | **$1,276.77** |

Travel October 25-26, 2023:
**(Scheduling Conference, October 26, 2023)**

| | |
|---|---|
| Transportation to airport | $119.86 (RD) |
| Airfare: | $353.80 (RD) |
| Hotel:  10/25/2023 | $269.37 (RD) |
| Transportation from airport: | $98.88 (RD) |
| **Total:** | **$841.91** |

Travel July 26-29, 2023:
**(Motion to Dismiss, Oral Argument, July 27, 2023)**

| | |
|---|---|
| Airfare: | $487.80 (RD) |
| Hotel:  07/26/2023 | $302.28 (RD) |
| Uber from LAX to hotel: | $45.26 (RD) |
| Transportation from Airport: | $98.75 (RD) |
| **Total:** | **$934.09** |

Travel October 10-13, 2018:
**(Depositions, October 11-12, 2018)**

| | |
|---|---|
| Airfare: 10/10/2018 | 513.75 (RD) |
| Rental Car: | $124.77 (RD) |
| Hotel:  10/10/2018 | $320.49 (RD) |
|         10/11-12/2018 | $627.94 (RD) |
| Transportation from IAD: | $76.42 plus 15.28 (RD) |
| **Total:** | **$1,678.65** |

**COPIES/EXHIBITS FOR COUNSEL ($469.60):**

$55.47 Fed-ex 11/08/2024 (Fed-ex transferred exhibits to USB Drive for submission of electronic copies of exhibits to Court

$299.07 Staples 11/10/2024 (copies of Defendant's exhibits for counsel)

2

$115.06 Staples 11/10/2024 (copies of Plaintiff's exhibits for counsel)

November 7, 2024
Here's your receipt for your ride,
Rosemary



# Total                    $126.67

> **Learn more** about the government-mandated pricing rules, taxes, and fees that make trips in NYC more expensive.

| | |
|---|---|
| Trip fare | $100.51 |
| **Subtotal** | **$100.51** |
| JFK Airport Surcharge | $2.50 |
| New York State Benefits Surcharge ❓ | $1.24 |
| RFK Bridge Manhattan to Queens/Bronx ❓ | $6.94 |
| NY Congestion Fee ❓ | $2.75 |
| Sales Tax ❓ | $9.87 |

4

11/18/24, 12:42 PM

NY State Black Car Fund ❓                                    $2.86

## Payments

 **PayPal -** ███████████████        $126.67
11/7/24 1:17 PM

Affiliated with UBER USA, LLC (B03404)

To submit a complaint to the NYC TLC, please call 311.

Receipts : Delta Air Lines

11/3/24, 10:02 PM

 **▲ DELTA**

**Date of Purchase: Nov 03, 2024**

# New York-Kennedy, NY ► Los Angeles, CA

**Passenger Information**

**ROSEMARY DETTLING**

Confirmation Number: G7OGKD
Ticket Number: 0062280884457

**FLIGHT**

| Date and Flight | Status | Class | Seat/Cabin |
|---|---|---|---|
| JFK ► LAX \| Thu 07Nov2024 \| DL 747 \| | OPEN | Q | 51G |

**NEW TICKET DETAILED CHARGES**

**Air Transportation Charges**

| | |
|---|---|
| Base Fare: | $421.75 USD |

**Taxes, Fees and Charges**

| | |
|---|---|
| United States - September 11th Security Fee(Passenger Civil Aviation Security Service Fee) (AY) | $5.60 USD |
| United States - Transportation Tax (US) | $31.63 USD |
| United States - Passenger Facility Charge (XF) | $4.50 USD |
| United States - Flight Segment Tax (ZP) | $5.00 USD |
| **Total Price:** | **$468.48 USD** |
| | $378.47 USD |
| | $90.01 USD |

**KEY OF TERMS**

| | |
|---|---|
| # - Arrival date different than departure date | F - Food available for purchase |
| ** - Check-in required | L - Lunch |
| *** - Multiple meals | LV - Departs |
| *S$ - Multiple seats | M - Movie |
| AR - Arrives | R - Refreshments, complimentary |
| B - Breakfast | S - Snack |
| C - Bagels / Beverages | T - Cold meal |
| D - Dinner | V - Snacks for sale |

Check your flight information online at delta.com or call the Delta Flightline at 800.325.1999.
Baggage and check-in requirements vary by airport and airline, so please check with the operating carrier on your ticket.
Please review Delta's check-in requirements and baggage guidelines for details.
You must be checked in and at the gate at least 15 minutes before your scheduled departure time for travel inside the United States.
You must be checked in and at the gate at least 45 minutes before your scheduled departure time for international travel.
For tips on flying safely with laptops, cell phones, and other battery-powered devices, please visit http://SafeTravel.dot.gov
Do you have comments about service? Please email us to share them.

NON-REFUNDABLE / CHANGE FEE
When using certain vouchers to purchase tickets, remaining credits may not be refunded. Additional charges and/or credits may apply and are displayed in the sections below.

Receipts : Delta Air Lines

11/3/24, 10:02 PM

This ticket is non-refundable unless issued as a fully refundable fare. Any change to your itinerary may require payment of a change fee and increased fare. If you do not show up for any flight in your itinerary without notifying Delta or canceling/changing your flight prior to departure, Delta may cancel the reservation for all remaining flights in the itinerary, and the ticket will have no remaining value.

All Preferred, Delta Comfort+™, First Class, Delta Premium Select, and Delta One seat purchases are non-refundable.

**TERMS & CONDITIONS**

Air transportation on Delta and the Delta Connection® carriers is subject to Delta's conditions of carriage. They include terms governing for example:
   **Limits on our liability** for personal injury or death of passengers, and for loss, damage of delay of goods and baggage.
   **Claim restrictions** including time periods within which you must file a claim or bring action against us.
   Our right to **change terms** of the contract.
   **Check-in requirements** and other rules established when we may refuse carriage.
   Our rights and limits of our liability for **delay of failure to perform service**, including schedule change, substitution of alternative air carriers or aircraft, and rerouting.
   Our policy **on overbooking flights**, and your rights if we deny you boarding due to an oversold flight.

These terms are incorporated by reference into our contract with you. You may view these conditions of carriage on delta.com, or by requesting a copy from Delta.

You have received this email because you elected to receive your Electronic Ticket receipt sent to you via email. If you would like to take advantage of other Delta email programs featuring special fare, promotions, information and flight updates, please visit **delta.com/emailprograms or flight notifications.**

**COPYRIGHT INFORMATION**

This email message and its contents are copyrighted and are proprietary products of Delta Air Lines, Inc. Delta Blvd. P.O. Box 20706 Atlanta, GA 30320-6001. Any unauthorized use, reproduction, or transfer of this message or its contents, in any medium, is strictly prohibited.

© 2020 Delta Air Lines, Inc. All rights reserved.

Search for a topic...  Q

Popular Topics       Help Center    Delta Discover Map    eCredits



**Rental Agreement Summary**

RA #: 569243724
Rent'r: ROSEMARY DETTLING

### 📅 Dates & Times

### 📍 Location

**Pickup**
Nov 7, 2024
6:13 PM

9020 AVIATION BLVD
INGLEWOOD, CA 90301
8036292047

**Return**
Nov 11, 2024
10:33 AM

9020 AVIATION BLVD
INGLEWOOD, CA 90301
8336292047

### 🚗 Vehicle

Make/Model: HYUN/KONA
Color: ORANGE
Car Class Driven: CFAR
Car Class Charged: CFAR
Miles In: 21265          Miles Out: 21182
Mileage: 83
Fuel In: 3/4              Fuel Out: Full
License: CWW6271          State/Province: AZ
Unit #: 7W6HVW           Vehicle #: RU066280

### 💲 Charges                 Price/Unit      Total

**Renter Charges**

| | | |
|---|---|---|
| TIME & DISTANCE | 4 @ $74.00 / DAY | $296.00 |
| 11/07/2024 - 11/11/2024 | | |
| NO CHARGE DISTANCE | 0 @ $0.00 / MILE | $0.00 |
| 11/07/2024 - 11/11/2024 | | |
| CDW null | 4 @ $24.99 / DAY | $99.96 |
| REFUELING CHARGE | 3 @ $7.26 / GALLON | $21.77 |
| AIRPORT CONCESSION FEE 11.11 PCT | 11.1100% | $47.01 |
| CUSTOMER FACILITY CHARGE 9.00/DAY | 4 @ $9.00 / DAY | $36.00 |
| TOURISM COMMISSION REC 3.50 PCT | 3.5000% | $10.36 |
| VEHICLE LICENSE RECOVERY FEE | 4 @ $1.36 / DAY | $5.44 |
| SALES TAX | 10.0000% | $34.30 |
| MOTOR VEH FUEL SALES TAX | 5.0000% | $1.09 |

**Total Charges:    $551.93**

Charge To: MMMMMMMMMM3302MMM
                              APN:
          AID: A0000000025010801
          Verified: Signature
              Entry: Manual
                    TSI:

**Amount Due:      $0.00**

Subject to Audit
Your loyalty number is 7KGWM7I
For Reservations: 1 800 RENT-A-CAR



**Hilton**

SANTA MONICA

HILTON SANTA MONICA
1707 Fourth Street | Santa Monica, CA | 90401
T: (310) 395-3332 | F: (310) 452-7399
W: santamonica.hilton.com

NAME AND ADDRESS:

Dettling, Rosemary

-- 0
UNITED STATES OF AMERICA

| | |
|---|---|
| Room: | 205/K1 |
| Arrival Date: | 11/7/2024  7:13:00 PM |
| Departure Date: | 11/10/2024 1:07:00 PM |
| Adult/Child: | 1/0 |
| Room Rate: | |
| Rate Plan: | OGDMEX |
| HH # | |
| AL: | |
| Car: | |

Confirmation Number: 3163319362

11/11/2024

| DATE | REFERENCE | | | DESCRIPTION | | AMOUNT |
|---|---|---|---|---|---|---|
| 11/7/2024 | *SUITE SERVICE | LINTR | 1177944 | $28.51 | | |
| ✓ 11/7/2024 | OVERNIGHT VALET PARKING | ANDREMART IN1244 | 1177998 | $55.00 | | |
| ✓ 11/7/2024 | PARKING TAX | ANDREMART IN1244 | 1177998 | $5.50 | | |
| 11/8/2024 | soda | JODA | 1178431 | $5.00 | | |
| 11/8/2024 | *MONICA'S CAFE | LINTR | 1178432 | $4.82 | | |
| 11/8/2024 | sparkling water | JODA | 1178694 | $5.00 | | |
| ✓ 11/8/2024 | OVERNIGHT VALET PARKING | ANDREMART IN1244 | 1178927 | $55.00 | | |
| ✓ 11/8/2024 | PARKING TAX | ANDREMART IN1244 | 1178927 | $5.50 | | |
| 11/9/2024 | *MONICA'S CAFE | LINTR | 1179542 | $11.77 | | |
| 11/9/2024 | candy cookies and paradigm water | JOSH | 1179795 | $15.00 | | |
| ✓ 11/9/2024 | OVERNIGHT VALET PARKING | ANDREMART IN1244 | 1179952 | $55.00 | | |
| ✓ 11/9/2024 | PARKING TAX | ANDREMART IN1244 | 1179952 | $5.50 | | |
| 11/10/2024 | *MONICA'S CAFE | LINTR | 1180621 | $5.14 | | |
| 11/10/2024 | VS *3884 **BALANCE** | JODA | 1180703 | | ($256.74) | $0.00 |

**Hilton**

WALDORF ASTORIA

L X R

CONRAD

canopy

Signia Hilton

**Hilton**

CURIO COLLECTION

DoubleTree

TAPESTRY COLLECTION

EMBASSY SUITES

TEMPO

MOTTO

Hilton Garden Inn

Hampton

tru

HOMEWOOD SUITES

HOME 2 SUITES

Hilton Grand Vacations

Hilton HONORS

| ACCOUNT NO. | | DATE OF CHARGE | FOLIO NO./CHECK NO. |
|---|---|---|---|
| VS *3884 | | 11/10/2024 | 211786 B |

| CARD MEMBER NAME | | | |
|---|---|---|---|
| Dettling, Rosemary | | AUTHORIZATION | INITIAL |
| | | 084292 | |
| ESTABLISHMENT NO. & LOCATION | ESTABLISHMENT AGREES TO TRANSMIT TO CARD HOLDER FOR PAYMENT | PURCHASES & SERVICES | |

| | |
|---|---|
| | TAXES |
| | TIPS & MISC. |

| CARD MEMBER'S SIGNATURE | TOTAL AMOUNT |
|---|---|
| | -256.74 |

MERCHANDISE AND/OR SERVICES PURCHASED ON THIS CARD SHALL NOT BE RESOLD OR RETURNED FOR A CASH REFUND.

PAYMENT DUE UPON RECEIPT

9

# Hilton
**SANTA MONICA**

HILTON SANTA MONICA
1707 Fourth Street | Santa Monica, CA | 90401
T: (310) 395-3332 | F: (310) 452-7399
W: santamonica.hilton.com

NAME AND ADDRESS:
Dettling, Rosemary

-- 0
UNITED STATES OF AMERICA

| | |
|---|---|
| Room: | 433/D2RRU1 |
| Arrival Date: | 11/10/2024  11:31:00 AM |
| Departure Date: | 11/11/2024 |
| Adult/Child: | 1/0 |
| Room Rate: | |
| Rate Plan: | AC |
| HH # | |
| AL: | |
| Car: | |

Confirmation Number: 3167105127

11/11/2024

| DATE | REFERENCE | | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| ✓ 11/10/2024 | OVERNIGHT VALET PARKING | PTREJO6 | 1180908 | $55.00 |
| ✓ 11/10/2024 | PARKING TAX | PTREJO6 | 1180908 | $5.50 |
| 11/11/2024 | *MONICA'S RESTAURANT | LINTR | 1181547 | $39.27 |
| 11/11/2024 | *SUITE SERVICE [XFR FR RM523 Bloom, Sara:RCPT B] [XFR FR RM Bloom Sara 523 RCPT B - 11/10/2024] **BALANCE** | CGALLEGOS 11 | 1181552 | $47.05 |

$146.82











| | | |
|---|---|---|
| ACCOUNT NO. | DATE OF CHARGE | FOLIO NO./CHECK NO. |
| | | 212492 B |
| CARD MEMBER NAME | AUTHORIZATION | INITIAL |
| ESTABLISHMENT NO. & LOCATION    ESTABLISHMENT AGREES TO TRANSMIT TO CARD HOLDER FOR PAYMENT | PURCHASES & SERVICES | |
| | TAXES | |
| | TIPS & MISC. | |
| CARD MEMBER'S SIGNATURE | TOTAL AMOUNT | |
| MERCHANDISE AND/OR SERVICES PURCHASED ON THIS CARD SHALL NOT BE RESOLD OR RETURNED FOR A CASH REFUND. | PAYMENT DUE UPON RECEIPT | |

10



**Hilton**
SANTA MONICA

HILTON SANTA MONICA
1707 Fourth Street | Santa Monica, CA | 90401
T: (310) 395-3332 | F: (310) 452-7399
W: santamonica.hilton.com

NAME AND ADDRESS:

Dettling, Rosemary

-- 0
UNITED STATES OF AMERICA

| | |
|---|---|
| Room: | 433/D2RRU1 |
| Arrival Date: | 11/10/2024  11:31:00 AM |
| Departure Date: | 11/11/2024 |
| Adult/Child: | 1/0 |
| Room Rate: | |
| Rate Plan: | AC |
| HH # | |
| AL: | |
| Car: | |

Confirmation Number: 3167105127

11/11/2024

| DATE | REFERENCE | | | DESCRIPTION | AMOUNT |
|---|---|---|---|---|---|
| 11/10/2024 | OVERNIGHT VALET PARKING | PTREJO6 | 1180908 | $55.00 | |
| 11/10/2024 | PARKING TAX | PTREJO6 | 1180908 | $5.50 | |
| 11/11/2024 | *MONICA'S RESTAURANT **BALANCE** | LINTR | 1181547 | $39.27 | |

| | |
|---|---|
| ACCOUNT NO. | DATE OF CHARGE | FOLIO NO./CHECK NO. 212492 B |
| CARD MEMBER NAME | AUTHORIZATION    INITIAL |
| ESTABLISHMENT NO. & LOCATION    ESTABLISHMENT AGREES TO TRANSMIT TO CARD HOLDER FOR PAYMENT | PURCHASES & SERVICES |
| | TAXES |
| | TIPS & MISC. |
| CARD MEMBER'S SIGNATURE | TOTAL AMOUNT |
| MERCHANDISE AND/OR SERVICES PURCHASED ON THIS CARD SHALL NOT BE RESOLD OR RETURNED FOR A CASH REFUND. | PAYMENT DUE UPON RECEIPT |

**Hilton**

WA
WALDORF ASTORIA

L X R

CONRAD

canopy

Signia
Hilton

$99.77  **Hilton**

CURIO
COLLECTION


DOUBLETREE

TAPESTRY
COLLECTION

E
EMBASSY
SUITES

TEMPO

MOTTO

**Hilton**
Garden Inn

Hampton

tru

HOMEWOOD
SUITES


HOME2
SUITES

**Hilton**
Grand Vacations

**Hilton**
HONORS

11

## Room details
## Room, 1 King Bed, Pool View

Reserved for

rosemary dettling, 2 adults

Included amenities

1 Free beverage per person for 2 (once per stay)

Requests

1 King Bed

Non-Smoking

All special requests (such as in-room amenities, bed type, and smoking preference) are shared with the property, but requests are not guaranteed and may incur additional charges. We recommend you confirm them directly with the property before travel.

## Payment details

| | |
|---|---:|
| Room price | |
| Thu, Jul 27 | $481.50 |
| Fri, Jul 28 | $499.50 |
| Taxes & Fees | $162.06 |
| Resort fee<br>Payable at property | $92.16 |
| Other | |
| Rewards used | -$43.50 |

| | |
|---|---:|
| **Total** | **$1,191.72** |
| Paid | $1,099.56 |
| Pay at property | $92.16 |

Private sale: save 10%

Prices shown after $109.00 savings

## Expedia support

Contact Expedia if you need help managing this itinerary.

12

**⌅ Expedia**

# Receipt

Expedia itinerary: 72961775821686

Purchase date: Nov 10, 2024

## Booking details

Hilton Santa Monica Hotel & Suites

1707 4th St, Santa Monica, CA, 90401 United States of America

Check-in: Nov 10, 2024

Check-out: Nov 11, 2024

1 room x 1 night

Suite, 1 Bedroom (1 King Bed)

Booked for: Sara Bloom

## Payment details

Room price

| | |
|---|---|
| Sun, Nov 10 | $298.30 |
| Taxes & Fees | $49.11 |
| Other | |
| OneKeyCash applied | -$1.43 |

| | |
|---|---|
| Total | **$345.98** |
| | Paid |
| | XXXXXXXXXXXXXXXXXXXX |

13

**Expedia**

# Receipt

Expedia itinerary: 72958257376853

Purchase date: Nov 5, 2024

## Booking details

Hilton Santa Monica Hotel & Suites

1707 4th St, Santa Monica, CA, 90401 United States of America

Check-in: Nov 10, 2024

Check-out: Nov 11, 2024

1 room x 1 night

Suite, 1 Bedroom (2 Double Beds)

Booked for: rosemary dettling

## Payment details

| | |
|---|---|
| Room price | |
| Sun, Nov 10 | $281.06 |
| Taxes & Fees | $47.02 |
| Other | |
| Hotel Booking Protection | $14.76 |

| | |
|---|---|
| Total | **$342.84** |
| | Paid |
| | XXXXXXXXXXXXXXXXXX |

14

# OMNI LOS ANGELES

TRIAL Federal Employee Legal Services
United States

**INFORMATION**
**INVOICE**

| | |
|---|---|
| Room No. | : 9125 |
| Arrival | : 11/10/24 |
| Departure | : 11/20/24 |
| Conf. No. | : 14115316 |

| | |
|---|---|
| Membership No | : |
| A/R Number | : |
| Company Name | : Trial Teams 2024 Omni Los Angeles Hotel |

| | |
|---|---|
| Custom Ref. | : |
| Page No. | : 5 of 8 |

| Date | Description | Charges | Payment |
|---|---|---|---|
| 11/16/24 | 2% City Tourism Assessment Tax | 4.98 | |
| 11/16/24 | .195% State Tourism Assessment Tax | 0.49 | |
| | Sub Total | 289.33 | 0.00 |
| | Guest Total | 2,025.31 | 0.00 |
| | Dettling, Rosemary  Room # 1325 | | |
| 11/11/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/11/24 | 14% Occupancy Tax | 33.46 | |
| 11/11/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/11/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| 11/12/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/12/24 | 14% Occupancy Tax | 33.46 | |
| 11/12/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/12/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| 11/13/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/13/24 | 14% Occupancy Tax | 33.46 | |
| 11/13/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/13/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| 11/14/24 | Room Charge - No Dest Charge | 239.00 | |

Omni Los Angeles Hotel at California Plaza | 251 South Olive Street | Los Angeles, CA 90012
Telephone: (213) 617-3300

# OMNI LOS ANGELES

TRIAL Federal Employee Legal Services
United States

| | |
|---|---|
| Room No. | : 9125 |
| Arrival | : 11/10/24 |
| Departure | : 11/20/24 |

**INFORMATION**
INVOICE

Conf. No. : 14115316

| | | | |
|---|---|---|---|
| Membership No | : | | |
| A/R Number | : | Custom Ref. | : |
| Company Name | : Trial Teams 2024 Omni Los Angeles Hotel | Page No. | : 6 of 8 |

| Date | Description | Charges | Payment |
|---|---|---|---|
| 11/14/24 | 14% Occupancy Tax | 33.46 | |
| 11/14/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/14/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| 11/15/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/15/24 | 14% Occupancy Tax | 33.46 | |
| 11/15/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/15/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| 11/16/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/16/24 | 14% Occupancy Tax | 33.46 | |
| 11/16/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/16/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| | Guest Total | 1,666.26 | 0.00 |

$1666.26 ($277.71 x 6 nights)
- 277.71 (Nov 16)
_____
$ 1388.55

16

# OMNI LOS ANGELES

TRIAL Federal Employee Legal Services
United States

| | |
|---|---|
| Room No. | : 9125 |
| Arrival | : 11/10/24 |
| Departure | : 11/20/24 |

**INFORMATION**
INVOICE

Conf. No.     : 14115316

| | |
|---|---|
| Membership No | : |
| A/R Number | : |
| Company Name | : Trial Teams 2024 Omni Los Angeles Hotel |

| | |
|---|---|
| Custom Ref. | : |
| Page No. | : 1 of 8 |

| Date | Description | Charges | Payment |
|---|---|---|---|
| | Bloom, Sara  Room # 1427 | | |
| 11/11/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/11/24 | 14% Occupancy Tax | 33.46 | |
| 11/11/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/11/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| 11/12/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/12/24 | 14% Occupancy Tax | 33.46 | |
| 11/12/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/12/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| 11/13/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/13/24 | 14% Occupancy Tax | 33.46 | |
| 11/13/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/13/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| 11/14/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/14/24 | 14% Occupancy Tax | 33.46 | |
| 11/14/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/14/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |

Omni Los Angeles Hotel at California Plaza | 251 South Olive Street | Los Angeles, CA 90012
Telephone: (213) 617-3300

# OMNI LOS ANGELES

TRIAL Federal Employee Legal Services
United States

Room No.    : 9125
Arrival     : 11/10/24
Departure   : 11/20/24

INFORMATION
INVOICE

Conf. No.   : 14115316

Membership No    :
A/R Number       :
Company Name     : Trial Teams 2024 Omni Los Angeles Hotel

Custom Ref.      :
Page No.         : 2 of 8

| Date | Description | Charges | Payment |
|------|-------------|---------|---------|
| 11/15/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/15/24 | 14% Occupancy Tax | 33.46 | |
| 11/15/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/15/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| 11/16/24 | Room Charge - No Dest Charge | 239.00 | |
| 11/16/24 | 14% Occupancy Tax | 33.46 | |
| 11/16/24 | 2% City Tourism Assessment Tax | 4.78 | |
| 11/16/24 | .195% State Tourism Assessment Tax | 0.47 | |
| | Sub Total | 277.71 | 0.00 |
| | Guest Total | 1,666.26 | 0.00 |

$ 1666.26
- 277.71
$1388.55

18

11/18/24, 12:40 PM

November 11, 2024
Thanks for tipping, Rosemary



# Total                                   $56.70

| | |
|---|---|
| Trip fare | $27.68 |
| **Subtotal** | **$27.68** |
| Booking Fee ❓ | $18.39 |
| Wait Time ❓ | $0.35 |
| Access for All Fee ❓ | $0.10 |
| CA Driver Benefits ❓ | $0.79 |
| Tip | $9.39 |

**Payments**

PayPal - ~~rosemary@false.com~~          $47.31
11/11/24 11:14 AM

19

11/18/24, 12:40 PM

**PayPal -** ~~uttling@f~~
11/11/24 11:26 AM                                                    $9.39

20

## Passenger Info

Name: ROSEMARY DETTLING



Gold

| FLIGHT | SEAT |
|--------|------|
| DELTA 939 | **Select Seat** |

Visit **delta.com** or download the **Fly Delta app** to view, select or change your seat. If you purchased a Delta Comfort+$^{TM}$ seat or a Trip Extra, please visit **My Trips** to access a receipt of your purchase.

| Sat, 16NOV | DEPART | ARRIVE |
|------------|--------|--------|
| DELTA 939 Main Cabin (Q) | LOS ANGELES, CA 12:00N | NYC-KENNEDY 8:28pm |

### MANAGE MY TRIP

## Flight Receipt

Ticket #: **0062283696764**
Place of Issue:
Issue Date: 15NOV24
Expiration Date: 15NOV25

7/24/25, 10:43 PM

| METHOD OF PAYMENT | |
| --- | --- |
| ███████████ | **$428.48 USD** |

| CHARGES | |
| --- | --- |
| **Air Transportation Charges** | |
| Base Fare | $384.54 USD |
| **Taxes, Fees and Charges** | |
| United States - September 11th Security Fee(Passenger Civil Aviation Security Service Fee) (AY) | $5.60 USD |
| United States - Transportation Tax (US) | $28.84 USD |
| United States - Passenger Facility Charge (XF) | $4.50 USD |
| United States - Flight Segment Tax (ZP) | $5.00 USD |
| **TICKET AMOUNT** | **$428.48 USD** |



**Date of Purchase: Nov 15, 2024**

# Los Angeles, CA ► New York-Kennedy, NY

**Passenger Information**

**ROSEMARY DETTLING**

Confirmation Number: **HOEIXD**
Ticket Number: **0062283696764**

## FLIGHT

| Date and Flight | Status | Class | Seat/Cabin |
|---|---|---|---|
| **LAX ► JFK | Sat 16Nov2024 | DL 939 |** | FLWN | Q | |

### DETAILED CHARGES

**Air Transportation Charges**

| | |
|---|---|
| Base Fare: | $384.54 USD |

**Taxes, Fees and Charges**

| | |
|---|---|
| United States - September 11th Security Fee(Passenger Civil Aviation Security Service Fee) (AY) | $5.60 USD |
| United States - Transportation Tax (US) | $28.84 USD |
| United States - Passenger Facility Charge (XF) | $4.50 USD |
| United States - Flight Segment Tax (ZP) | $5.00 USD |
| **Total Price:** | **$428.48 USD** |

Paid with American Express ending 8001               $428.48 USD

### KEY OF TERMS

| | |
|---|---|
| # - Arrival date different than departure date | F - Food available for purchase |
| ** - Check-in required | L - Lunch |
| ***- Multiple meals | LV - Departs |
| *$$ - Multiple seats | M - Movie |
| AR - Arrives | R - Refreshments, complimentary |
| B - Breakfast | S - Snack |
| C - Bagels / Beverages | T - Cold meal |
| D - Dinner | V - Snacks for sale |

Check your flight information online at delta.com or call the Delta Flightline at 800.325.1999.
Baggage and check-in requirements vary by airport and airline, so please check with the operating carrier on your ticket.
Please review Delta's check-in requirements and baggage guidelines for details.
You must be checked in and at the gate at least 15 minutes before your scheduled departure time for travel inside the United States.
You must be checked in and at the gate at least 45 minutes before your scheduled departure time for international travel.
For tips on flying safely with laptops, cell phones, and other battery-powered devices, please visit http://SafeTravel.dot.gov
Do you have comments about service? Please email us to share them.

NON-REFUNDABLE / CHANGE FEE
When using certain vouchers to purchase tickets, remaining credits may not be refunded. Additional charges and/or credits may apply and are displayed in the sections below.

This ticket is non-refundable unless issued as a fully refundable fare. Any change to your itinerary may require payment of a change fee and increased fare. If you do not show up for any flight in your itinerary without notifying Delta or canceling/changing your flight prior to departure,

23

**Expedia**

# Receipt

Expedia itinerary: 72965343893221

Purchase date: Nov 16, 2024

## Booking details

**One way flight**

Los Angeles (LAX) to Las Vegas (LAS)

United 2449

Economy / Coach (N)

Depart: Nov 16, 2024

Arrive: Nov 16, 2024

Traveler 1: Adult

SARA BLOOM

Ticket Number: 0162436665268

## Payment details

Flight price

| | |
|---|---|
| Traveler 1: Adult | $116.63 |
| Taxes and fees | $23.85 |

| | |
|---|---|
| **Total** | **$140.48** |
| Paid | $140.48 |
| | XXXXXXXXXXXXXXXX XXXX |

24

12/3/24, 8:52 PM

Outlook

**eTicket Itinerary and Receipt for Confirmation GWPB6T**

**From** United Airlines <Receipts@united.com>
**Date** Fri 11/15/2024 8:59 PM
**To**



Fri, Nov 15, 2024

# Thank you for choosing United.

A receipt of your purchase is shown below. Please retain this email receipt for your records.

**Get ready for your trip:** Visit the Travel-Ready Center, your one-stop digital assistant, to find out about important travel requirements specific to your trip.

Confirmation Number:

# GWPB6T

| Flight 1 of 1 UA2449 | Class: United Economy (N) |
|---|---|
| Sat, Nov 16, 2024 | Sat, Nov 16, 2024 |
| **01:08 PM** | **02:22 PM** |
| Los Angeles, CA, US (LAX) | Las Vegas, NV, US (LAS) |

**Traveler Details**

BLOOM/SARA
eTicket number: **0162436665268**

Seats: **LAX-LAS -----**

**Purchase Summary**

| | |
|---|---|
| Method of payment: | American Express ending in XX800X |
| Date of purchase: | **Sat, Nov 16, 2024** |
| Airfare: | **116.63** |

25

| | |
|---|---|
| U.S. Transportation Tax: | **8.75** |
| U.S. Flight Segment Tax: | **5.00** |
| Passenger Civil Aviation Security Service Fee: | **5.60** |
| U.S. Passenger Facility Charge: | **4.50** |
| Total Per Passenger: | **140.48 USD** |

| | |
|---|---|
| **Total:** | **140.48 USD** |

## Fare Rules

Additional charges may apply for changes in addition to any fare rules listed.
NRF-BE/NOCHGDAFTDPT;CC/NDCRC

## Baggage allowance and charges for this itinerary

| Origin and destination for checked baggage | 1st bag charge | 2nd bag charge | 1st bag weight and dimensions | 2nd bag weight and dimensions |
|---|---|---|---|---|
| Sat, Nov 16, 2024<br>Los Angeles, CA, US (LAX)<br>to Las Vegas, NV, US (LAS) | 40.00 USD | 50.00 USD | 50lbs(23kg) - 62in(157cm) | 50lbs(23kg) - 62in(157cm) |

## Important Information about MileagePlus Earning

• Accruals vary based on the terms and conditions of the traveler's frequent flyer program, frequent flyer status, and the selected itinerary. United MileagePlus® mileage accrual is subject to the rules of the MileagePlus program. Once travel has started, accruals will no longer display. You can always view your MileagePlus account for posted accrual.

• You can earn up to 75,000 award miles per ticket. The 75,000 award miles cap may be applied to your posted flight activity in an order different than shown. Accrual is only displayed for MileagePlus members who choose to accrue to their MileagePlus account.

## eTicket Reminders

• **Check-in Requirement** - Bags must be checked and boarding passes obtained at least 45 minutes prior to scheduled departure. Baggage will not be accepted and advance seat assignments may be cancelled if this condition is not met.

**EXCEPTION**: When departing from Anchorage, Atlanta, Austin, Baltimore, Chicago, Cincinnati, Cleveland, Dallas/Ft. Worth, Denver, Detroit, Fort Lauderdale, Greenville-Spartanburg, Guam, Honolulu, Houston, Indianapolis, Jacksonville, Kona, Las Vegas, Los Angeles, Maui, Miami, New York (LGA), Newark, Orange County (SNA), Orlando, Philadelphia, Phoenix, Pittsburgh, Raleigh/Durham, Reno, San Diego, San Francisco, San Juan, PR (60 minutes), Savannah, Seattle, St. Louis, St. Thomas, U.S. Virgin Islands (60 minutes), Tampa, Washington, DC (both IAD and DCA), the check in requirement time for Passengers and Bags is 45 minutes except where noted.

• **Boarding Requirement** - Passengers must be prepared to board at the departure gate with their boarding pass at least 15 minutes prior to scheduled departure.

• Failure to meet the **Boarding Requirements** may result in cancellation of reservations, denied boarding, removal of checked baggage from the aircraft and loss of eligibility for denied boarding compensation.

• Bring your boarding pass or this eTicket Receipt along with photo identification to the airport.

• The FAA now restricts carry-on baggage to one bag plus one personal item (purse, briefcase, laptop computer, etc.) per passenger. The fare rules for your ticket may restrict your carry-on baggage allowance even further.

• For up to the minute flight information, sign-up for our Flight Status Updates or call 1-800-824-6200; in Spanish 1-800-426-5561.

```
******DRIVER COPY******
Merchant ID:           391
ENTRY METHOD:
CHIP CONTACTLESS
AID:    A000000025010801
APPL. NAME:
mmmmmmmm
ATC:                 mmmm
TID:            ******617
Mode:              Issuer

DRIVER            5215942
CAB                 9M30
PASSENGERS             1
DATE            11/16/24
START           20:20:47
END             21:12:01
TRIP                 167
JFK MANHATTAN 2
DISTANCE        26.85 mi
FARE R2           $70.00
RFK Bridge         $6.94
SUB TOTAL         $76.94
TIP               $16.19
STATE SURCHARGE    $0.50
IMP. SURCHARGE     $1.00
CGN SRCH.          $2.50
AIRPORT FEE:       $1.75
TOTAL             $98.08
AUTH              852978
NO SIGNATURE REQUIRED
*********************
```

PANYNJ
START (31)

October 20, 2024
Thanks for tipping, Rosemary



# Total    $140.55

Learn more about the government-mandated pricing rules, taxes, and fees that make trips in NYC more expensive.

Trip fare                                                         $81.85

**Subtotal**                                                     **$81.85**

Lincoln Tunnel Toll ❓                                            $20.00

New Jersey Lincoln Tunnel Secaucus 16E to Newark Airport 14 ❓    $3.18

Out of Town Surcharge                                             $5.00

EWR Airport Surcharge                                             $2.50

Newark City Surcharge                                             $1.00

11/18/24, 12:43 PM

| | |
|---|---|
| New York State Benefits Surcharge ❓ | $1.09 |
| Tip | $23.42 |
| NY State Black Car Fund ❓ | $2.51 |

## Payments



| | |
|---|---|
| **PayPal -** ████████████ 10/20/24 2:11 PM | $117.13 |
| **PayPal -** ███████████ 10/20/24 2:19 PM | $23.42 |

Affiliated with UBER USA, LLC (B03404)

To submit a complaint to the NYC TLC, please call 311.

29

**↗ Expedia**

# Receipt

Expedia itinerary: ~~██████████~~
Purchase date: Oct 15, 2024

## Booking details

### Flights

Newark (EWR) to Los Angeles (LAX)
United 2294
Economy / Coach (N)
Depart: Oct 20, 2024
Arrive: Oct 20, 2024
Los Angeles (LAX) to New York (JFK)
JetBlue Airways 624
Economy / Coach (W)
Depart: Oct 22, 2024
Arrive: Oct 22, 2024

Traveler 1: Adult
ROSEMARY DETTLING
Ticket Number: 0162428620208

## Payment details

| | |
|---|---:|
| Flight 1 price: EWR to LAX | |
| Traveler 1: Adult | $342.68 |
| Taxes and fees | $40.80 |
| Flight 2 price: LAX to JFK | |
| Traveler 1: Adult | $295.81 |
| Taxes and fees | $37.29 |

| | |
|---|---:|
| **Total** | **$716.58** |
| Paid | $716.58 |
| | ~~(American Express 8003)~~ |
| | XXXXXXXXXXXXX5XXXXXX |

30

# OMNI LOS ANGELES

*Rosemay*

Ms Roylan Damwyk

| | |
|---|---|
| Room No. | : 0810 |
| Arrival | : 10/20/24 |
| Departure | : 10/22/24 |
| Conf. No. | : 13971558 |

| | |
|---|---|
| Membership No | : SG11293778 |
| A/R Number | : |
| Company Name | : |

| | |
|---|---|
| Custom Ref. | : |
| Page No. | : 1 of 2 |

| Date | Description | Charges | Payment |
|---|---|---|---|
| 10/20/24 | Room Charge | 173.13 | |
| 10/20/24 | 14% Occupancy Tax | 24.24 | |
| 10/20/24 | 2% City Tourism Assessment Tax | 3.46 | |
| 10/20/24 | .195% State Tourism Assessment Tax | 0.34 | |
| 10/20/24 | $35 Destination Charge | 35.00 | |
| 10/20/24 | 14% Dest Charge Occupancy Tax | 4.90 | |
| 10/20/24 | 2% Dest Charge City Tourism Assessment Tax | 0.70 | |
| 10/20/24 | .195% Dest Charge State Tourism Assessment Tax | 0.07 | |
| 10/21/24 | Room Charge | 234.03 | |
| 10/21/24 | 14% Occupancy Tax | 32.76 | |
| 10/21/24 | 2% City Tourism Assessment Tax | 4.68 | |
| 10/21/24 | .195% State Tourism Assessment Tax | 0.46 | |
| 10/21/24 | $35 Destination Charge | 35.00 | |
| 10/21/24 | 14% Dest Charge Occupancy Tax | 4.90 | |
| 10/21/24 | 2% Dest Charge City Tourism Assessment Tax | 0.70 | |
| 10/21/24 | .195% Dest Charge State Tourism Assessment Tax | 0.07 | |

| | Total | 554.44 | 0.00 |
|---|---|---|---|
| | **Balance** | | **554.44** |

### Thank you for staying at Omni Hotels & Resorts

Omni Los Angeles Hotel at California Plaza | 251 South Olive Street | Los Angeles, CA 90012
Telephone: (213) 617-3300

31

# OMNI LOS ANGELES

Ms Roylan Damwyk

Membership No    : SG11293778
A/R Number       :
Company Name     :

| | |
|---|---|
| Room No. | : 0810 |
| Arrival | : 10/20/24 |
| Departure | : 10/22/24 |
| Conf. No. | : 13971558 |

Custom Ref.    :
Page No.       : 2 of 2

```
ATC:        mmmmmm  *****
APPL. NAME: mmmmmmmmmIT
ATC:        mmmmmmmmm
TID:        *****131
Mode:       Issuer

DRIVER           6079428
CAB              4L47
PASSENGERS       1
DATE             10/23/24
START            23:46:20
END              00:18:14
TRIP             2465
JFK MANHATTAN 2
DISTANCE         20.5* mi
FARE K2          $70.00
RFK Bridge       $6.94
SUB TOTAL        $76.94
TIP              $16.19
STATE SURCHARGE  $0.50
IMP. SURCHARGE   $1.00
CGN SRCH.        $2.50
AIRPORT FEE:     $1.75
TOTAL            $98.88
AMEX             7144
AUTH             864402
  NO SIGNATURE REQUIRED
*************************
  Contact TLC Dial 3-1-1
```

33

August 28, 2024
Thanks for tipping, Rosemary



# Total                                              $146.30

> <u>Learn more</u> about the government-mandated pricing rules, taxes, and fees that make trips in NYC more expensive.

| Trip fare | $95.92 |
|---|---|

| **Subtotal** | **$95.92** |
|---|---|
| RFK Bridge Manhattan to Queens/Bronx ? | $6.94 |
| JFK Airport Surcharge | $2.50 |
| NY Congestion Fee ? | $2.75 |
| New York State Benefits Surcharge ? | $1.57 |
| Tip | $24.38 |

11/18/24, 12:45 PM

NY State Black Car Fund ❓                                    $2.75

Sales Tax ❓                                                  $9.49

## Payments



**PayPal –** ▓▓▓▓▓▓▓▓▓                                      $121.92
8/28/24 11:51 AM

**PayPal –** ▓▓▓▓▓▓▓▓▓                                       $24.38
8/28/24 12:07 PM

Affiliated with UBER USA, LLC (B03404)

To submit a complaint to the NYC TLC, please call 311.

about:srcdoc                                               Page 2 of 2

35



**Date of Purchase: Aug 07, 2024**

# Flight Receipt for New York-Kennedy, NY to Los Angeles, CA

## PASSENGER INFORMATION

ROSEMARY DETTLING

Confirmation Number: G3LYDS
Ticket Number: 0062258662744

## FLIGHT INFORMATION

| Date and Flight | Status | Class | Seat/Cabin |
|---|---|---|---|
| JFK>LAX<br>Wed 28Aug2024 DL 747 | OPEN | U | |
| LAX>JFK<br>Thu 29Aug2024 DL 972 | OPEN | K | |

## DETAILED CHARGES

**Air Transportation Charges**
Base Fare:                                                        $727.21   USD

**Taxes, Fees & Charges:**
United States - September 11th Security Fee(Passenger
Civil Aviation Security Service Fee) (AY)                         $11.20   USD
United States - Transportation Tax (US)                          $54.54   USD
United States - Passenger Facility Charge (XF)                    $9.00   USD
United States - Flight Segment Tax (ZP)                          $10.00   USD

| **Total Price:** | **$811.95   USD** |
|---|---|

Paid with American Express xXXXXXXXXXXX8001x

## KEY OF TERMS

| | |
|---|---|
| # - Arrival date different than departure date | F - Food available for purchase |
| ** - Check-in required | L - Lunch |
| ***- Multiple meals | LV - Departs |
| *S$ - Multiple seats | M - Movie |
| AR - Arrives | R - Refreshments, complimentary |
| B - Breakfast | S - Snack |
| C - Bagels / Beverages | T - Cold meal |
| D - Dinner | V - Snacks for sale |

36

# OMNI LOS ANGELES

Rosemary Dettling
United States

INFORMATION
INVOICE

| | |
|---|---|
| Room No. | : 1131 |
| Arrival | : 08/28/24 |
| Departure | : 08/29/24 |
| Conf. No. | : 13447246 |

| | | | |
|---|---|---|---|
| Membership No | : | | |
| A/R Number | : | Custom Ref. | : 291067993 |
| Company Name | : Expedia Hotel Collect | Page No. | : 1 of 1 |

| Date | Description | Charges | Payment |
|---|---|---|---|
| 08/28/24 | Room Charge | 161.20 | |
| 08/28/24 | 14% Occupancy Tax | 22.57 | |
| 08/28/24 | 2% City Tourism Assessment Tax | 3.22 | |
| 08/28/24 | .195% State Tourism Assessment Tax | 0.31 | |
| 08/28/24 | $35 Destination Charge | 35.00 | |
| 08/28/24 | 14% Dest Charge Occupancy Tax | 4.90 | |
| 08/28/24 | 2% Dest Charge City Tourism Assessment Tax | 0.70 | |
| 08/28/24 | .195% Dest Charge State Tourism Assessment Tax | 0.07 | |
| 08/29/24 | ▬▬▬▬▬▬ | | 227.97 |

| | Total | 227.97 | 227.97 |
|---|---|---|---|
| | Balance | | 0.00 |

**Thank you for staying at Omni Hotels & Resorts**

Omni Los Angeles Hotel at California Plaza | 251 South Olive Street | Los Angeles, CA 90012
Telephone: (213) 617-3300

37

```
Merchant: Curb Mobility.
Contact #: 1(800) 488 87
email: cs@gocurb.com
Address: 11-11 34 Ave, L


    *CREDIT CARD SALE

    *DRIVER COPY
Merchant ID:              760
ENTRY METHOD:
CHIP CONTACTLESS
A D.    A0000000moommaaam
APPL. NAME:
AMERICAN EXPRESS
ATC:
                         0147
TID:                 ******504
Mode:                   issuer

DRIVER                  C063287
CAB                        6072
PASSENGERS                    1
DATE                   8/30/24
START                  01:31:41
END                    02:18:11
TRIP                       9168
JFK MANHATTAN 2
DISTANCE               18.75 mi
FARE R2                  $70.00
SUB TOTAL                $70.00
TIP                      $14.80
STATE SURCHARGE           $0.50
IMP. SURCHARGE            $1.00
CGN SRCH.                 $2.50
AIRPORT FEE:              $1.75
TOTAL                    $90.55
AMEX                       8001
AUTH                     815682
NO SIGNATURE REQUIRED
*

          PANYNJ
START (31):
Airport:           JFK_Term4
END (103):
Destination:
CentralParkWest

Contact TLC Dial 3-1-1
```

11/18/24, 12:49 PM

October 25, 2023
Thanks for tipping, Rosemary



# Total $119.86

Learn more about the government-mandated pricing rules, taxes, and fees that make trips in NYC more expensive.

| | |
|---|---|
| Trip fare | $77.59 |
| **Subtotal** | **$77.59** |
| RFK Bridge Bronx to Queens/Manhattan ⍰ | $6.94 |
| JFK Airport Surcharge | $2.50 |
| NY Congestion Fee ⍰ | $2.75 |
| Tips | $19.97 |
| NY State Black Car Fund ⍰ | $2.39 |

11/18/24, 12:49 PM

Sales Tax ❓                                              $7.72

## Payments



**PayPal -** ▬▬▬▬▬▬▬                                     $99.89
10/25/23 12:20 PM

**PayPal -** ◀▬▬▬▬▬                                      $19.97
10/25/23 12:22 PM

**A temporary hold of $99.89 was placed on your payment method PayPal - rdettling@felsc.com. This is not a charge and will be removed. It should disappear from your bank statement shortly.** Learn More

Affiliated with UBER USA, LLC (B03404)

To submit a complaint to the NYC TLC, please call 311.

Receipts : Delta Air Lines

10/20/23, 6:09 PM



**Date of Purchase: Sep 19, 2023**

# New York-Kennedy, NY ▶ Los Angeles, CA

**Passenger Information**

**ROSEMARY DETTLING**

Confirmation Number: **F7CSYM**
Ticket Number: **0062175201847**

**FLIGHT**

| Date and Flight | Status | Class | Seat/Cabin |
|---|---|---|---|
| JFK ▶ LAX | Wed 25Oct2023 | DL 773 | | OPEN | E | |
| LAX ▶ JFK | Thu 26Oct2023 | DL 436 | | OPEN | E | |

**DETAILED CHARGES**

**Air Transportation Charges**

| | |
|---|---|
| Base Fare: | $301.39 USD |

**Taxes, Fees and Charges**

| | |
|---|---|
| United States - September 11th Security Fee(Passenger Civil Aviation Security Service Fee) (AY) | $11.20 USD |
| United States - Transportation Tax (US) | $22.61 USD |
| United States - Passenger Facility Charge (XF) | $9.00 USD |
| United States - Flight Segment Tax (ZP) | $9.60 USD |
| **Total Price:** | **$353.80 USD** |
| | $353.80 USD |

**KEY OF TERMS**

| | |
|---|---|
| # - Arrival date different than departure date | F - Food available for purchase |
| ** - Check-in required | L - Lunch |
| *** - Multiple meals | LV - Departs |
| *S$ - Multiple seats | M - Movie |
| AR - Arrives | R - Refreshments, complimentary |
| B - Breakfast | S - Snack |
| C - Bagels / Beverages | T - Cold meal |
| D - Dinner | V - Snacks for sale |

Check your flight information online at delta.com or call the Delta Flightline at 800.325.1999.
Baggage allowance and check-in requirements vary by airport and airline, so please check with the operating carrier on your ticket.
Please review Delta's check-in requirements and baggage guidelines for details.
You must be checked in and at the gate at least 15 minutes before your scheduled departure time for travel inside the United States.
You must be checked in and at the gate at least 45 minutes before your scheduled departure time for international travel.
For tips on flying safely with laptops, cell phones, and other battery-powered devices, please visit http://SafeTravel.dot.gov
Do you have comments about service? Please email us to share them.

NON-REFUNDABLE / CHANGE FEE
When using certain vouchers to purchase tickets, remaining credits may not be refunded. Additional charges and/or credits may apply and are displayed in the sections below.

https://www.delta.com/mydelta/receiptDetailsPage

Page 1 of 3

10/25

Rosemary



# Hilton
**LOS ANGELES AIRPORT**

**HILTON LOS ANGELES AIRPORT**
5711 West Century Blvd. | Los Angeles, CA | 90045
T: 310 410 4000 | F: 310 410 6177
W: losangelesairport.hilton.com

DAMWYK, ROYLAN



| | |
|---|---|
| **Room:** | 1553/K1SO |
| **Arrival Date:** | 10/25/2023 2:13.00 PM |
| **Departure Date:** | 10/26/2023 |
| **Adult/Child:** | 1/0 |
| **Room Rate:** | 232.00 |
| **Rate Plan:** | LV0 |
| **HH #** | |
| **AL:** | |
| **Car:** | |

**Hilton**

Confirmation Number: 3440284227

10/26/2023

| DATE | DESCRIPTION | ID | REF. NO | CHARGES | CREDITS | BALANCE |
|---|---|---|---|---|---|---|
| 10/25/2023 | GUEST ROOM | YTHIRUN | 23150522 | $232.00 | | |
| 10/25/2023 | ROOM OCCUPANCY TAX - RM | YTHIRUN | 23150522 | $32.48 | | |
| 10/25/2023 | CA TOURISM ASSESSMENT | YTHIRUN | 23150522 | $0.25 | | |
| 10/25/2023 | LA TOURISM ASSESSMENT FEE | YTHIRUN | 23150522 | $4.64 | | |
| 10/26/2023 | VS *3474 **BALANCE** | BMACHU | 23151886 | | ($269.37) | $0.00 |











| ACCOUNT NO. | | DATE OF CHARGE | FOLIO NO./CHECK NO. 6054908 A |
|---|---|---|---|
| CARD MEMBER NAME | | AUTHORIZATION | INITIAL |
| ESTABLISHMENT NO. & LOCATION | ESTABLISHMENT AGREES TO TRANSMIT TO CARD HOLDER FOR PAYMENT | PURCHASES & SERVICES | |
| Thank you for choosing Hilton. You'll get more when you book directly with us–more destinations, more points, and more value. Book your next stay at hilton.com. | | TAXES | |
| | | TIPS & MISC. | |
| CARD MEMBER'S SIGNATURE | | TOTAL AMOUNT | -269.37 |
| | | PAYMENT DUE UPON RECEIPT | |

MERCHANDISE AND/OR SERVICES PURCHASED ON THIS CARD SHALL NOT BE RESOLD OR RETURNED FOR A CASH REFUND.
FACILITY OR RENTAL CHARGES ARE USED TO COVER THE COST OF EQUIPMENT, HEAT, LIGHT, POWER, AND OTHER
EXPENSES. THIS "FACILITY OR RENTAL CHARGE" IS NOT A TIP OR GRATUITY FOR SERVICES PROVIDED BY EMPLOYEES,
AND NO PART OF THE "FACILITY CHARGE" IS DISTRIBUTED TO EMPLOYEES.

42

11/2/23, 10:59 AM





ROSEMARY DETTLING

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| Oct 27 | **VTS INDEPENDENT DRIVERS** 11-11 34TH AVENUE ASTORIA NY 11106 (718) 752-1656 https://gocurb.com/about/contact/ | **FIRST CITYCAB CORP. QUEENS NY** <br> as FIRST CITYCAB CORP. QUEENS NY <br><br> CARD ROSEMARY DETTLING <br> XXXXXXXXXXXXXXX <br> 1X on Other purchases      99 <br><br> ADDITIONAL INFORMATION <br> 00645476604 TAXICAB & LIMOUSINE | $98.88 |

about:srcdoc

Page 1 of 1

43



**Date of Purchase: Jul 12, 2023**

# Flight Receipt for New York-Kennedy, NY to Los Angeles, CA

## PASSENGER INFORMATION

ROSEMARY DETTLING


Confirmation Number: F9AFCQ
Ticket Number: 0062127487019

## FLIGHT INFORMATION

| Date and Flight | Status | Class | Seat/Cabin |
|---|---|---|---|
| JFK>LAX<br>Wed 26Jul2023 DL 563 | FLWN | U | |
| LAX>JFK<br>Sat 29Jul2023 DL 670 | FLWN | U | |

## DETAILED CHARGES



**Air Transportation Charges**
Base Fare:                                                                $426.04   USD

**Taxes, Fees & Charges:**
United States - September 11th Security Fee(Passenger
Civil Aviation Security Service Fee) (AY)                    $11.20   USD
United States - Transportation Tax (US)                   $31.96   USD
United States - Passenger Facility Charge (XF)        $9.00   USD
United States - Flight Segment Tax (ZP)                    $9.60   USD

| **Total Price:** | **$487.80   USD** |
|---|---|

Paid with XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

## KEY OF TERMS

# - Arrival date different than departure date
** - Check-in required
***- Multiple meals
*S$ - Multiple seats
AR - Arrives
B - Breakfast
C - Bagels / Beverages
D - Dinner

F - Food available for purchase
L - Lunch
LV - Departs
M - Movie
R - Refreshments, *complimentary*
S - Snack
T - Cold meal
V - Snacks for sale

44



# OMNI LOS ANGELES

Roylan Damwyk

| | |
|---|---|
| Room No. | : 0824 |
| Arrival | : 07/26/23 |
| Departure | : 07/27/23 |
| Conf. No | : 10360293 |

| | |
|---|---|
| Membership No | : |
| A/R Number | : |
| Company Name | : |

| | |
|---|---|
| Custom Ref. | : |
| Page No. | : 1 of 1 |

| Date | Description | Charges | Payment |
|---|---|---|---|
| 07/26/23 | Room Charge | 220.15 | |
| 07/26/23 | 14% Occupancy Tax | 30.82 | |
| 07/26/23 | 2% City Tourism Assessment Tax | 4.40 | |
| 07/26/23 | .195% State Tourism Assessment Tax | 0.43 | |
| 07/26/23 | Destination Charge | 40.00 | |
| 07/26/23 | 14% Dest Charge Occupancy Tax | 5.60 | |
| 07/26/23 | 2% Dest Charge City Tourism Assessment Tax | 0.80 | |
| 07/26/23 | .195% Dest Charge State Tourism Assessment Tax | 0.08 | |
| 07/27/23 | American Express XXXXXXXXXXXX1003 | | 302.28 |

| | Total | 302.28 | 302.28 |
|---|---|---|---|
| | Balance | | 0.00 |

**Thank you for staying at Omni Hotels & Resorts**

July 29, 2023
Here's your updated ride receipt



# Total                     $45.26

> As a result of expenses associated with California's commercial auto insurance requirements, the Booking Fee has increased.

Trip fare                                    $24.52

**Subtotal**                                 **$24.52**

Booking Fee  ?                               $8.31

Access for All Fee  ?                        $0.10

CA Driver Benefits  ?                        $0.79

LAX Airport Surcharge                        $4.00

Tips                                         $7.54

about:srcdoc

## Payments



| | | |
|---|---|---|
| **PayPal -** ▬▬▬▬▬▬▬▬ | | $37.72 |
| 7/29/23 11:15 AM | | |
| **PayPal -** ▬▬▬▬▬▬▬ | | $7.54 |
| 7/29/23 11:21 AM | | |

**A temporary hold of $37.72 was placed on your payment method PayPal - rdettling@felsc.com. This is not a charge and will be removed. It should disappear from your bank statement shortly.** <u>Learn More</u>

7/31 Purchase Authorized On 07/29 Lax Airp Homeboy C Los
Angeles CA S303210731127350 Card 4734
18.06

7/31 Purchase Authorized On 07/29 Nyc Taxi 1246 1246 Long Island
C NY S303211170422806 Card 4734
98.75

07/31/23          PURCHASE AUTHORIZED ON 07/29 NYC TAXI 1246 1246 LONG ISLAND C
Collapse          NY S303211170422806 CARD 4734
Row100

Begin region

## Details

Merchant Name:

**NYC TAXI 1246**

Merchant Address:

**LONG ISLAND C, NY, 11106**

Transaction Method:

**Card Inserted**

Category:

**Taxi**

Dispute this transactionManage disputes

48

9/8/24, 7:58 PM

| | Total | : |
| | Subtotal | : |
| | Taxes & Fees | |

## Washington (DCA) → Los Angeles (LAX)
Oct 10, 2018 - Oct 13, 2018 , 1 ticket

**TICKETING IN PROGRESS**
Alaska Airlines        RRESLI

**Ticketing in progress. The airline will confirm most tickets within 5 minutes, but some ticket types take up to 24 hours. You do not need to call us to reconfirm your booking. Check back to ensure your ticket has been issued.**

### Additional Flight Services

- **The airline may charge** additional fees f checked baggage or other optional se

**Traveler Information**

| Rosemary Dettling | No frequent flyer details provided | Ticketing in progress |

\* Seat assignments, special meals, frequent flyer point awards and special assistance requests should be confirmed directly with the airline.

**Oct 10, 2018 - Departure Nonstop**

Special Fare

| | Washington | Los Angeles | 5 h 45 m |
| | | | 2,295 mi |
| Alaska | DCA 9:10am | LAX 11:55am | |
| | Terminal B | Terminal 6 | |
| | Alaska Airlines 1005 | | |
| | Economy / Coach (K) | Confirm seats with the airline\* | | |

**Oct 12, 2018 - Return Nonstop**

Special Fare

| | Los Angeles | Washington | 4 h 54 m |
| | | | 2,295 mi |
| Alaska | LAX 10:50pm | IAD 6:44am +1 day | |
| | Terminal 6 | (Arrives on Oct 13, 2018) | |
| | Alaska Airlines 1114 | | |
| | Economy / Coach (R) | Confirm seats with the airline\* | | |

**Airline Rules & Regulations**

- **Fares are not guaranteed until ticketed.**
- **We understand that sometimes plans change. We do not charge a cancel or change fee. When the airline charges such fees in accordance with its own policies, the cost will be passed on to you.**
- **Tickets are nonrefundable, nontransferable and name changes are not allowed.**
- **Please read important information regarding** airline liability limitations .

## Thrifty
Oct 10, 2018 - Oct 12, 2018, Standard 2 or 4-Door Car

**Confirmed**
Confirmation # H8102837641

**Your reservation is booked and confirmed. No need to call us to reconfirm this reservation.**

### Additional Car Services

49

**DETTLING/Rosemary**

**DCA ✈ LAX**
Departing 10 Oct 2018

| Flight | | Gate | Boards | Departs | Group | Seat |
|--------|--|------|--------|---------|-------|------|
| 1005 | DCA ✈ Los Angeles | -- | **8:30 am** | 9:10 am | **D** | **9A** |



Confirmation RRESLI

50

**THRIFTY CAR RENTAL**
Phone:     800-334-1705
Web:       www.thrifty.com

**Thrifty**

CHARGE DETAIL

| | |
|---|---|
| Rental Agreement No: | 122866800 |
| Date: | 10/13/2018 |
| Document: | 968002886324 |

Renter:          ROSEMARY DETTLING
Account No.:

Direct All Inquiries To:
   THRIFTY CAR RENTAL
   PO BOX 35250
   TULSA, OK 74153-1167

   TAX Id:      73-1389882

### ROSEMARY DETTLING

## RENTAL REFERENCE
Rental Agreement No: 122866800
Reservation ID:     H8102837641
I.T. No.:           1001362
Voucher:            01NY7FN
Special Bill Info:  XXX AIG

## RENTAL DETAILS
Rate Plan:      IN: D3TAV   OUT: D3TAV
Rented On:      10/10/2018 12:44  LOC# 071018
                LOS ANGELES AP, CA
Returned On:    10/12/2018 20:19  LOC# 071018
                LOS ANGELES AP, CA
Car Description:   SIR SOUL 5D 1A163BV
Veh. No.:          1996859
CAR CLASS Charged: D        MILEAGE  In: 21,611
           Rented: C                 Out: 21,354
         Reserved: D                 Driven:   257

## MISCELLANEOUS INFORMATION
CC AUTH:  563880  DATE: 2018/10/10  AMT:  350.00

## RENTAL CHARGES
| | | |
|---|---|---:|
| LIABILITY INS. SUPPLEMENT | | 52.74 |
| FUEL PURCHASE OPTION | | 52.67 |
| CONCESSION FEE RECOVERY | | 14.37 |
| SATELLITE RADIO | | 23.97 |
| CUSTOMER RELATIONS EXPENSE | | -25.00 |
| REFUEL SALES TAX | 4.50% | 2.37 |
| TAX | 9.50% | 3.65 |
| | | |
| TOTAL CHARGES | | 124.77 USD |

**E-RETURN RECEIPT**

**THANK YOU FOR RENTING FROM THRIFTY**

---

**ALL CHARGES HAVE BEEN BILLED TO YOUR ACCOUNT.**

| | |
|---|---|
| Rental Agreement No: | 122866800 |
| Date: | 10/13/2018 |
| Document: | 968002886324 |

Direct All Inquiries To:
THRIFTY CAR RENTAL
PO BOX 35250
TULSA, OK 74153-1167
UNITED STATES

Renter:          ROSEMARY DETTLING
Account No.:

Phone:     800-334-1705
Web:       www.thrifty.com

| | |
|---|---:|
| TOTAL CHARGES | 124.77 USD |

GD-RECP         0096 GC

9/8/24, 7:58 PM

| Pick up | Drop off |
| --- | --- |
| 11:00am | 10:00pm |
| Oct 10, 2018 | Oct 12, 2018 |
| **Los Angeles (LAX)** | **Los Angeles (LAX)** |
| Open 12:01am - 1:30am, 4:00am - Midnight | Open 12:01am - 1:30am, 4:00am - Midnight |

Mileage rules:Unlimited mileage

Fuel info: Full to Full

The car is supplied with a full tank
It should be returned full or refuelir
charges will be applied at drop-off.
our Fuel Policy .

The following fees may be charged
time of rental for additional service

Extra hour: $6.66



Standard 2 or 4-Door Car
Nissan Sentra or similar
Includes air conditioning, automatic transmission

**Reserved for**    **ROSEMARY DETTLING**

## When you arrive

After hours arrivals/returns: airports - open 24 hrs except for inclement weather, reservations are accepted any time and vehicles may be returned at any time 24hrs a day. . Holding reserved vehicles: reservations will be honored for 2 hours after the original scheduled pick up time (6 hrs for corporate locations).

Rental counter in terminal. Customer shuttled to cars. Shuttle pick up is on the lower/arrival level islands in front of each terminal under the purple sign which reads "rental car shuttle". Courtesy phone located in baggage claim area. When exiting the airport, follow the signs to "ground transportation" and stand under the purple sign marked "car rental companies" to await shuttle pick up. Customers can board the Dollar or Thrifty shuttle bus. . We are in the process of building a world-class airport for los angeles. Due to construction in the central terminal area, allow extra time for hotel, parking and other shuttles to arrive. Thank you for your support as we improve your lax experience.

For specific rental questions, contact the car agency at 800 847 4389 (reservation), +1 877 283 0898 (direct)

**Rules and restrictions**

- The following rules and restrictions are provided by the car rental company.
- The driver must present a valid driver's license and credit card in their name upon pick-up. The credit card is required as a deposit when renting any vehicle. The deposit amount is held by the car rental company. Please ensure sufficient funds are available on the card.
- International rentals may have different driver license requirements. An international driving license is required if the drivers' license is non-roman alphabet.
- Additional charges or restrictions may apply for drivers under 25 or over 70.
- Charges for refueling, additional drivers, etc. are not included in the total price.
- Special equipment, such as child seats and GPS, can be purchased upon pick-up (if available).
- Geographical restrictions may apply, even for rental contracts that feature unlimited mileage. Some car rental companies do not allow you to take their vehicles across certain domestic or international borders, or may apply an additional charge to do so.
- Your rental may have mandatory, local insurance requirements that result in additional charges at the time of rental.
- Cancellations can be made free of charge up to and including the day prior to your pickup date, and your card will be refunded in full.
- No refunds will be offered on unused rental days.

52

9/8/24, 8:07 PM

**Expedia travel confirmation - Oct 10 - (Itinerary # 7384820366762)**

Expedia.com <Expedia@expediamail.com>
Mon 10/8/2018 5:20 PM
To:rdettling1@hotmail.com <rdettling1@hotmail.com>

# Expedia

# Thanks!

Your reservation is confirmed. No need to call to reconfirm.

## The Ritz-Carlton Bacara, Santa Barbara, Goleta

Oct 10, 2018 - Oct 11, 2018

See live updates to your itinerary, anywhere and anytime.

| **See your itinerary** | **Download to your Phone** |

## Hotel overview



**The Ritz-Carlton Bacara, Santa Barbara**

8301 Hollister Avenue, Goleta, CA, 93117 United States of America

View hotel          Map and directions
Message hotel

**Reservation dates**
Oct 10, 2018 - Oct 11, 2018

53

9/8/24, 8:07 PM

Room price: $339.87
1 night: $299.00
Taxes & fees: $40.87

Hotel Fees (Paid at hotel)  $35.00

Subtotal: $339.87
2,713 Expedia Rewards points used: -$19.38
**Estimated Total: $320.49**
**$339.87** collected by Expedia. Additional fees will be collected by the hotel

Unless specified otherwise, rates are quoted in US dollars.

## Additional hotel fees

The below fees and deposits only apply if they are not included in your selected room rate.

You'll be asked to pay the following charges at the property:
* Resort fee: USD 35.00 per accommodation, per night

The resort fee includes:
* Pool access
* Spa access
* Fitness center access
* Business center/computer access
* Newspaper
* Faxes
* In-room coffee
* In-room bottled water
* Additional inclusions

We have included all charges provided to us by the property. However, charges can vary, for example, based on length of stay or the room you book.

The price shown above DOES NOT include any applicable hotel service fees, charges for optional incidentals (such as minibar snacks or telephone calls), or regulatory surcharges. The hotel will assess these fees, charges, and surcharges upon check-out.

## Rules and restrictions

### Cancellations and changes

We understand that sometimes plans fall through. We do not charge a cancel or change fee. When the property charges such fees in accordance with its own policies, the cost will be passed on to you. The Ritz-Carlton Bacara, Santa Barbara charges the following cancellation and change fees.

54

| Date | Description | Location | State | Amount |
|---|---|---|---|---|
| 10/05/18 | EXPEDIA 7384273542130 TRAVEL | EXPEDIA.COM | WA | |
| 10/05/18 | | 206-301-5900 | | $513.75 |
| 10/12/18 | THE RITZ CARLTON SANTA BARBARA Arrival Date 10/11/18 00000000 Departure Date 10/12/18 | GOLETA | CA | |
| 10/12/18 | THRIFTY CAR RENTAL | | | $627.94 |
| | Rental: Location LOS ANGELES CA Return: LOS ANGELES CA Agreement Number: 122866800 Renter Name: DETTLING /ROSEMARY | 877-283-0898 Date 18/10/10 18/10/12 | CA | $124.77 |
| 10/12/18 | 800-983-4637 | WOODLAND HILLS | CA | |
| 10/13/18 | DROPBOX*PRPR88W2ZL97 DROPBOX*PRPR88W 4159867057 | SAN FRANCISCO | CA | $17.22 |
| 10/13/18 | UBER TRIP 3YO76 HELP.UBER.COM | HELP.UBER.COM | CA | $99.00 |
| 10/13/18 | UBER TRIP 3YO76 HELP.UBER.COM | HELP.UBER.COM | CA | $76.42 |
| | | | | $15.28 |

55

**FedEx Office** 

350 S C 2nd Ave Ste D1
Los Angeles, CA 90071-3460
213.620.8815

November 8, 2024 10:26 AM
Receipt #: EMTKR0104090

2862
Auto Scan-To-PDF          60 @          $0.7597 T
Reg. Price $1.0900

5238
FS Surcharge              1 @           $2.5000 T

4232
Mailr Kraft 6x9 1ct       1 @           $1.2900 T

1081
Mailr Poly Media 1ct      1 @           $1.2900 T

Retail Subtotal                         $50.66
Tax                                     $4.81
Total                                   $55.47

***************PURCHASE***************
APPROVED

Total:                                  $55.47

Card Type: Contactless
Card Entry: Contactless
Acct #:
Approval Code: 808452

---

**Staples**

2052 Bundy Drive
West Los Angeles, CA 90025
310-826-0442

Sale

REWARDS NUMBER 3481792101

*************RETAIL RETURN RECEIPT*****
************* Not Valid For Refund ***********

| Qty | Item | Price | Amount |
| --- | --- | --- | --- |
| 1 | STAPLES WH 8X8TAB | 15.99 | 271.63 |
|  | 7181030025/ |  |  |
|  | REUSABLE TOTE GRYS |  |  |
|  | 85619067095 |  |  |
| 1 |  | 1.29 | 1.29 |

Subtotal                        273.12
CALIFORNIA 9.5%                  25.95

Total                           299.07

AMF CREDIT
Card No. :
Contactless
Auth No. :
Mode : Issuer
AID. : A0000
IVR. : 00000000
IAU : 0000000
ISI. : E800
ARC : 3030

Verified By PIN

Easy Rewards Point Summary
Points Redeemed Today               0
Points Remaining                    195
Dollars Remaining                   $0.00

---

**Staples**

1501 Lincoln Blvd.
Venice, CA 90291
310-577-9740

Sale                        Register: 5
                            Date: 11/08/24
                            Time: 12:35 PM
                            Cashier:

| Qty | Item | Price | Amount |
| --- | --- | --- | --- |
| 1 | ESSAY/HOMEMINI GHS |  |  |
| 1 | EXPRS SS GUARANTEE | 24.74 | 24.74 N |

Subtotal
CALIFORNIA 9.5%

Total                           15.06

AMF
Chip Read
Auth No. : 837-41
Mode : Issuer
AID. :
IVR. :
ISI. :
ARC : 3030

Staples,
the working and learning store.
Receive every tool to take on tomorrow,
including products, services...

# EXHIBIT N

**Federal Employee Legal Services Center**
1629 K Street, N.W.
Suite 300
Washington, DC 20006
United States
Phone: 202-390-4741
Fax: 202-379-9772
Email: billing@felsc.com



**Roylan G. Damyk**
United States

# Invoice 20490

| Date | Nov 20, 2024 |
|---|---|
| **Terms** | |
| **Service Thru** | Nov 20, 2024 |

**In Reference To: Non Case-Related (Expenses)**

**Case ID: -1**

| Date | By | Expenses | Amount |
|---|---|---|---|
| 11/20/2024 | Rosemary Dettling | **Miscellaneous:** Powerpoint Presentation 11/02/2024 Amended Powerpoint 11/06/2024 Second Amended Powerpoint: 11/07/2024 Opening Argument - Jury Trial 11/12/2024 Flat Rate: $500 Ava Luciana Dettling-Marefat | $ 500.00 |

| | |
|---|---|
| **Total Expenses** | $ 500.00 |
| **Total Invoice Amount** | $ 500.00 |
| **Previous Balance** | **$ 0.00** |
| **Balance (Amount Due)** | **$ 500.00** |

**Notes:**

Powerpoint Presentation for Jury Trial

**Receipts:**

**Date:** 11/20/2024 12:00:00 AM

**Expense Type:** Miscellaneous

**Description:** Powerpoint Presentation 11/02/2024 Amended Powerpoint 11/06/2024 Second Amended Powerpoint: 11/07/2024 Opening Argument - Jury Trial 11/12/2024 Flat Rate: $500 Ava Luciana Dettling-Marefat

# Roylan G. Damwyk
## v.
# Frank Kendall, III,
### Secretary of the United States Air Force.

Case #: 22:2-cv-04424-HDV-SK



## Introduction

- Roylan G. Damwyk, Plaintiff
- Frank Kendall, III, Secretary of the Air Force, Defendant
- Sara Bloom, Esq. and Rosemary Dettling, Esq. for Plaintiff

add this instead:
Civil Rights Case:

Equal Rights and Opportunities
Equal Treatment
Protection
Federal Agency
Model Citizen

delete this....
~~Rehabilitation Act of 1973~~

~~1. Ensures that people with disabilities have the same rights and opportunities as everyone else.~~
~~2. Ensures that disabled employees are treated equally.~~
~~3. Employer cannot ignore the needs of vulnerable groups of people, like disabled people.~~

Roylan Damwyk:

Range Scheduler
Disabled
Requested Accommodation
over 17 month period



# Claims at Issue



## Failure to Accommodate



## Retaliation



# The Law

Delete this entire page:

1. Reasonable accommodation request.

2. For each request, employer must respond promptly.

3. Employer must "engage in the interactive process" (must discuss accommodation options with the employee).

4. If employer cannot provide the accommodation requested, the employer must discuss other accommodation options to come up with a mutually agreeable solution.



Move this page to second to last, right before counter arguments

# Agency's Reasonable Accommodation Policy

According to the Agency's reasonable ccommodation policy, Plaintiff's supervisors were supposed to:

1. Respond in writing to each reasonable accommodation request, within 20 days.

2. Tell employee why agency is granting or denying the accommodation request.

3. Provide reasons for the delay within 20 day period and state when a decision will be made.

4. Engage in the interactive process.

5. Refer employee to the EEO office if the employee cannot be accommodated.





# Burden of Proof – Failure to Accommodate

Failure to Accommodation: The Evidence Will Show

**1.**

Plaintiff had disabilities when she requested accommodation

**2.**

She requested accommodation on numerous occasions

**3.**

Agency was aware of her disabilities and need for accommodation

**4.**

Accommodation requests were reasonable

**5.**

Plaintiff could perform the essential functions of her job, or a job she desired, with accommodation



# Burden of Proof – Retaliation

Retaliation Claim: The Evidence Will Show

## 1.

Plaintiff engaged in protected activity under the Rehabilitation Act when she requested reasonable accommodation from the Agency and complained that she was not receiving accommodation

## 2.

The Agency took adverse action against her, keeping her out of work for 17 months

## 3.

There is a causal connection between her protected activity and the adverse action



# Plaintiff's Witnesses    put spaces between witnesses

- Janis Knox – Therapist
- Dr. Carl Schlosser – Long-term Doctor
- Richard Nocis – Former Supervisor
- Betsy Torres – Work Colleague and Union Representative
- Hank Dederding – Fellow Range Scheduler
- Patrick Maloy – Union Representative
- Martin Damwyk – Husband
- Neil Damwyk – Son

Agency's Witness:    (put this on the next page)

- Robert Corser – First-line Supervisor
- Thomas Chiavacci – Second-line Supervisor    Jason Turner, Third-line Supervisor
- Arlene Quichocho – Labor Relations Specialist

Jolene Cantrell - Labor Relations Specialist



# A Brief History…

**June 28, 2016:** Plaintiff requests alternative work location as reasonable accommodation and leave until decision is made

**July 15, 2016:** Plaintiff meets with third-line supervisor and again requests accommodation

**July 22, 2016:** Ms. Knox suggests a change of work location as an accommodation

**Aug 11, 2016:** Plaintiff meets with Nancy Lawrence and again asks for AWL as an accommodation

**Sept 16, 2016:** Ms. Knox advises that Plaintiff cannot return to the hostile work environment

**Oct 18, 2016:** Ms. Knox informs Agency that Plaintiff cannot return to a hostile work environment where no accommodations have been provided

**Oct 22, 2016:** Plaintiff has a psychological evaluation with Dr. Charles E. Smith. He asserts that Plaintiff needs to be removed from hostile work environment

**Oct 24, 2016:** Plaintiff emails Smith's evaluation to Corser and repeats request for accommodation



# A Brief History…

**Jan 10, 2017:** Letter from Knox to Corser reminding him that Plaintiff awaits response

**March 2017:** Plaintiff asks for reassignment as a form of accommodation

**March 29, 2017:** Plaintiff meets with Jolene Cantrell about reassignment as an accommodation

**April 7, 2017:** Plaintiff meets with Arlene Quichocho to discuss retirement if Agency would not accommodate her

**April 17, 2017:** Plaintiff calls Quichocho and asserts that she wants accommodation, not retirement

**April 27, 2017:** Letter from Knox to Corser stating that Plaintiff remains frustrated by lack of response

**May 24, 2017:** Plaintiff emails Corser and asks about status of accommodation request

**May 26, 2017:** Plaintiff emails Quichocho about accommodation request

# A Brief History…



**May 31, 2017:**
Plaintiff requests accommodation

**June 8, 2017:**
Plaintiff emails Corser again asking about status of accommodation request

**June 20, 2017:**
Plaintiff requests accommodation

**June 23, 2017:**
Plaintiff requests reassignment as accommodation

**July 11, 2017:**
Plaintiff alerts Quichocho that she is going to file a complaint should the Agency not respond to her request for accommodation

**Aug 14, 2017:**
Plaintiff sends in a new accommodation request per direction of Agency

**Sept 5, 2017:**
Corser officially denies Plaintiff's June 2016 request for accommodation

**Oct 3, 2017:**
Plaintiff files a discrimination complaint based on failure to accommodate

**Nov 7, 2017:**
Agency reassigns Plaintiff to a new position as an accommodation



# Counter Arguments

**1.**

Plaintiff could not perform her essential duties at an alternative work location

**2.**

Agency granted leave as a permanent form of accommodation

**3.**

Plaintiff did not engage in the interactive process

4. Undue Hardship



## Harm suffered

**Financial**                          **Emotional**

EXHIBIT O

| Billing professional | Title | Rate | Hours | TOTAL |
|---|---|---|---|---|
| Rosemary Dettling | Sr. Counsel | $1000 | 706.48 | $705,750 |
| Sara L. Bloom | Co-counsel | $700 | 88.27 | $61,789 |
|  |  |  |  | $767,539.00 |

Rosemary Dettling/Federal Proceeding: $473,318.29

| Attorney | Title | Task | Rate | Hours | TOTAL |
|---|---|---|---|---|---|
| Rosemary Dettling | Sr. Counsel | Motion to Dismiss | $1000 | 23.75 | $23,750 |
| Rosemary Dettling | Sr. Counsel | MSJ | $1000 | 35.29 | $.35,290 |
| Rosemary Dettling | Sr. Counsel | Motions in Limine 1 | $1000 | 7.2 | $7,200 |
| Rosemary Dettling | Sr. Counsel | Motions in Limine 2 | $1000 | 8.34 | $8,340 |
| Rosemary Dettling | Sr. Counsel | Res. Def. Mot. Recon. | $1000 | 6.3 | $6,300 |
| Rosemary Dettling | Sr. Counsel | Discovery | $1000 | 43.98 | $43,980 |
| Rosemary Dettling | Sr. Counsel | Settlement | $1000 | 16.89 | $16,890 |
| Rosemary Dettling | Sr. Counsel | Trial Preparation | $1000 | 111.82 | $111,820 |
| Rosemary Dettling | Sr. Counsel | Trial | $1000 | 40.39 | $40,390 |
| Rosemary Dettling | Sr. Counsel | Case Management | $1000 | 19.18 | $19,180 |
| Rosemary Dettling | Sr. Counsel | Post-trial Brief | $1000 | 20.57 | $20,570 |
| Rosemary Dettling | Sr. Counsel | Pl. Mot. For Recon. | $1000 | 18.4 | $18,400 |
| Rosemary Dettling | Sr. Counsel | Travel | $1000 | 94.38 | $94,380 |
| Rosemary Dettling | Sr. Counsel | Attorney's Fees | $1000 | 27.18 | $27,180 |
|  |  |  |  | 473.72 | $473,720 |

Sara L. Bloom/Federal Proceeding: $61,789

| Attorney | Title | Task | Rate | Hours | TOTAL |
|---|---|---|---|---|---|
| Sara L. Bloom | Co-counsel | Settlement | $700 | 0 | $0 |
| Sara L. Bloom | Co-counsel | Trial Preparation | $700 | 43.02 | $30,114 |
| Sara L. Bloom | Co-counsel | Trial | $700 | 37.75 | $26,425 |
| Sara L. Bloom | Co-counsel | Case Management | $700 | .76 | $532 |
| Sara L. Bloom | Co-counsel | Post-trial Brief | $700 | 2.17 | $1,519 |
| Sara L. Bloom | Co-counsel | Pl. Mot. For Recon. | $700 | .57 | $399 |
| Sara L. Bloom | Co-counsel | Attorney's Fees | $700 | 4.00 | $2,800 |
|  |  |  |  | 88.27 | $61,789 |

1

Rosemary Dettling/Administrative Case: $232,030

| Attorney | Title | Task | Rate | Hours | TOTAL |
|---|---|---|---|---|---|
| Rosemary Dettling | Sr. Counsel | Building a Case | $1000 | 29.28 | $29,280 |
| Rosemary Dettling | Sr. Counsel | EEO Investigation | $1000 | 11.06 | $11,060 |
| Rosemary Dettling | Sr. Counsel | Discovery | $1000 | 65.64 | $65,640 |
| Rosemary Dettling | Sr. Counsel | Motions Practice | $1000 | 54.48 | $54,480 |
| Rosemary Dettling | Sr. Counsel | Settlement | $1000 | 10.37 | $10,370 |
| Rosemary Dettling | Sr. Counsel | EEOC?OFO Appeal | $1000 | 20.22 | $20,220 |
| Rosemary Dettling | Sr. Counsel | Miscellaneous | $1000 | 15.40 | $15,400 |
| Rosemary Dettling | Sr. Counsel | Travel | $1000 | 26.40 | $26,400 |
| | | | | 232.03 | $232,030 |

Rosemary Dettling, Esq.
Pro Hac Vice
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 390-4741
Email: rdettling@felsc.com

Sara L. Bloom, Esq.
Admitted Pro Hac Vice
Law Office of Sara Bloom
1120 Huffman Rd Ste 24-785
Anchorage, AK 99515
Telephone: (907) 519-3613
Email: sara@907lawyer.com

Counsel for Plaintiff Roylan G. Damwyk

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROYLAN G. DAMWYK,<br><br>Plaintiff,<br><br>v.<br><br>FRANK KENDALL, III., ET AL.,<br><br>Defendants | Case No.: 2:22-cv-04424-GW-SK<br><br>**DECLARATION OF SARA L. BLOOM, PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**<br><br>**Hearing Date: April 10, 2025**<br>**Hearing Time: 10 a.m.**<br>**Ctrm: 5B**<br><br>**Honorable Hernán D. Vera**<br>**United States District Judge** |

1

## DECLARATION OF SARA BLOOM IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS

I, Sara L. Bloom, declare as follows:

1. I am an attorney admitted pro hac vice in the Damwyk v. Kendall, III case. I have represented Plaintiff Roylan G. Damwyk since October 2024 to second chair this case with Rosemary Dettling.

2. I make this Declaration in support of the Plaintiff's Motion for Attorney's Fees as the Plaintiff was the prevailing party in Plaintiff's failure to accommodate case under the Rehabilitation Act of 1973. I have attached my bill using my Practice Panther software and an Excel spreadsheet. *See* Ex. A(1)-(2), pp. 10-19.

3. I have personal knowledge of the facts set forth herein and, if called as a sworn witness, could and would testify competently. I have served as co-counsel in Ms. Damwyk's representation since October 17, 2024.

4. I am an attorney actively licensed to practice law in state and federal courts in Alaska, Maryland, and the District of Columbia, and before the U.S Court of Appeals for the District of Columbia Circuit, the Court of Appeals for the Ninth Circuit, and the United States Supreme Court.

5. Rosemary Dettling and I spoke with the Defendant's counsel about this motion before filing it. The parties could not resolve the issue, though the Defendant said it would revisit the issue once the petition was filed.

### Plaintiff's Counsel's Background and Experience

6. I graduated from the University of Kansas School of Law with a  J.D. in 1992 and have 32 years of legal experience.

2

7.  I started my career in 1992 as a trial attorney for State Farm, trying bench and jury trials in Maryland.  From 1995-1998, I worked for a small firm in Maryland, representing plaintiffs, defendants, and the indigent.  I handled and litigated various cases, including employment, felony criminal cases, and Sec. 1983 cases in state and federal courts.

8.  In 1998, I started a thirteen-year career as a trial defense attorney for the Washington Metropolitan Area Transit Authority handling tort and employment cases from 1998-2011.  *See* Ex. B, pp. 20-32.  I solely tried over 150 jury trials in state and federal courts in D.C. and Maryland.  *Id.*  I argued an appeal before the D.C. Circuit in a national-origin discrimination case.  *See Luis Salazar v. WMATA*, 401 F.3d 504, 365 U.S. App. D.C. 222, 2005 U.S. App. LEXIS 4605. *Id.*  I also arbitrated hundreds of cases, several of them in labor arbitrations, and negotiated collective bargaining agreements on behalf of management.  *Id.*

9.  From 2011-2014, I worked as an Assistant Attorney General, Legislative Counsel, and General Counsel for the Palau National Bank on behalf of the Republic of Palau.  I represented a small island nation in litigation, handling constitutional claims and employment matters.

10. In 2014, I returned to D.C. and started working for the Federal Employee Legal Services Center (FELSC).  While working for FELSC, I handled federal employment sector cases before the EEOC and MSPB.

11. In 2015, I moved to Alaska.  From 2015 until 2017, I worked for the Alaska State Commission for Human Rights, handling and litigating discrimination and retaliation cases, many of which were co-filed with the EEOC.

12. I started my own practice in 2017.  In my private practice, I mainly handle employment cases, including representing federal employees before the EEOC and MSPB and in litigation.  Some federal sector cases I have handled include *Scoggins v. Department of the Army*, a whistleblowing case; in Scoggins, the Appellant was the prevailing party and obtained attorney's fees at my current *Laffey* rate of $520/hr; *K.H. s v. DOT*, FAA SF-0752-22-0425-C-2, a failure to reasonably accommodate case, I obtained fees at my retainer rate; *M.D. v. DOT*, FAA, 2020-288 75-FAA-06, an ADA disability discrimination and retaliation case, resolved in a lump sum settlement in mediation where I took a percentage of fees; and *S.C. v. Department of the Air Force*; SF-0752-20-0652-I-1, an MSPB wrongful termination case settled in a lump sum settlement in mediation where I took a percentage of fees. Id.  In my most recent MSPB case (K.H.), after hearing, the judge found that the FAA failed to reasonably accommodate my client, and the MSPB Board affirmed the decision on appeal.  I also prevailed in all four addendum proceedings that were appealed to the MSPB Board. *See* Ex. C, pp. 33-100.  The judge awarded full back pay, compensatory damages, and attorney's fees at the attorney-fee rate indicated in my retainer agreement.

13. In my private practice, I filed employment and discrimination lawsuits against big corporations such as British Petroleum, Alaska Airlines, Quest Diagnostics, Home Depot, and local and state governments.  I represented hundreds of employees whose employers have harmed them.  *See* Ex. B.  I have also handled civil tort litigation, including in

4

October of this year, I tried a Sec. 1983 and 8th Amendment violation case before a jury in the U.S. District Court for the District of Alaska and represented a nurse as a Defendant against an inmate alleging battery in the same court.

14. I have taken many cases to state and federal court on a contingency basis and have received substantial settlements.  For example, I filed suit in federal court against the State of Alaska in a discrimination and retaliation case for $500k (*T.P. v. State of Alaska*) and received 33% of the settlement; I settled a gender discrimination case against a mine for $150k and received 33%; and within the last month settled a case against a dentistry practice for whistleblowing for $90k and received 33%.Based on my ability and experience, I could command market hourly rates for attorneys in complex litigation on a regular basis if I did not choose to devote my time to representing indigent, low-income, and middle-class victims of discrimination.

### Role in Litigation

15. Based on my ability and experience, I could regularly command market hourly rates for attorneys in complex litigation if I did not choose to devote my time to representing indigent, low-income, and middle-class victims of discrimination.

16. I am co-counsel in this matter and was brought into this case once it was apparent that this case was going to trial.

17. I started my representation pro hac vice officially on October 18, 2024.

5

18. I familiarized with the facts and reviewed pleadings and motions to become familiar with the case.  I also would review filings after my appearance sent to me by ecfmail.  I spent a considerable amount of time the week before trial reviewing pleadings, motions, and trial documents including motions in limine, witness lists, jury instructions, voir dire, verdict sheets, exhibits, medical records, deposition transcripts, case law, and meeting with witnesses with co-counsel and discussing strategy and the case. I spent approximately 43.10 hours prior to and preparing for trial.

19. I attended trial for all four days, 32.5 hours (8.5 hours on Tuesday, Wednesday, and Friday and 7 hours on Thursday the week of November 12, 2024).

20. During the trial, I spent an additional 5.25 hours preparing for the next day.

21. I spent 3.92 hours on post-trial matters, including 1 hour on the motion for reconsideration and its discussion.

22. I spent 3.5 hours on this Declaration, my additions to Plaintiff's Motion for Attorney's fees, and my exhibits attached to it.

23. My hours added up to 88.27 hours.

**Customary Fees and Submission of Accurate Records**

24. I have been barred in Maryland since 1992 and Washington, D.C. since 1998.  My current Fitzpatrick rate is $858 per hour.  *See* Ex. D, pp. 101-105.  The Fitzpatrick rates are higher than the DOJ's prior *Laffey* Matrix but lower than the LSI Laffey Matrix used by many employment/labor attorneys.

6

25. Under the LSI Laffey Matrix, I could request $1,057 an hour.  *See* Ex. E, pp. 106-7.  I have received the *Laffey* rate in *Scoggins v. Dept. of the Army*, 2016 MSPB 32 (September 19th, 2016), a whistleblower case before the MSPB. *See* Ex. F, pp. 108-140.

### Prevailing Market Rates in Los Angeles

26.  I request $700 an hour for work performed in this case. My hourly rate is commensurate with my 32 years of legal experience in employment law in what appears to be the prevailing market rate in Los Angeles. The prevailing market rate in Alaska where I primarily practice is slightly lower than Los Angeles.

27.  My requested hourly rate for handling federal sector employment cases in Federal Court appears to be commensurate with the 2023 Real Rate Report and the rates and awards issued to employment attorneys practicing in federal courts and Los Angeles.

28.  My requested rate is comparable to the rates charged by Los Angeles employment and trial attorneys with comparable experience. *See* Decl. Dettling, Ex. 4, Decl. Pearlson, Ex. 3 In Support of Plaintiff's Motion for Attorney's Fees and Costs.

### Authentication of Billing

29.  My billing records are attached to this declaration.  Ex.  A(1)-(2), pp. 10-19.  I regularly use Practice Panther to generate billing reports.  The billing records in this matter are the business records of the Law Office of Sara Bloom, and they are prepared contemporaneously and are kept in the regular course of my office's billing.

7

30. The billing records were prepared using Practice Panther, a software program that tracks time and expense entries. I use Practice Panther to generate billing reports that indicate the date on which the task was performed, a description of each task performed, and the amount of time spent on each task. I bill by the minute. All time entries are entered on the day the work is completed. I have also put my billing, which is reflected in Practice Panther, on an Excel spreadsheet.

31. The billing records include detailed descriptions of the work I performed on this matter and the time spent on each task.

32. I have examined the services and hours spent on this matter as reflected in the attached invoices to ensure that they comport with contemporaneous records, documents, and correspondence in my litigation file. I reviewed each entry to determine if it was duplicative.

**Lodestar**

33. Multiplying the hours reasonably spent by the reasonable hourly rate for each attorney, the Court should calculate the lodestar as follows: $700 at 88.27 hours for a total of $61,789.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed On: March 6, 2025.

*/s/ Sara Bloom*
Sara Bloom, Esq.
Alaska Bar #1509071
D.C. Bar #459926

8

## **CERTIFICATE OF SERVICE**

I certify that on March 6, 2025, the Declaration of Sara Bloom, Esq. with attached Exhibits A1-F were served on the Court and the following parties by electronic filing through the Court's ECF System:

Jonathan Blakey, Esq.
Matthew Smock, Esq.
Attorneys for Defendant
Frank Kendall, III, in his official capacity as the Secretary of the U.S. Air Force

*/s/ Sara Bloom*
Sara Bloom, Esq.

9

# EXHIBIT A(1)

Bloom Decl. and Exhs 010

# Law Office of Sara L. Bloom, P.C., A Boutique Law Practice

## Law Office of Sara Bloom

1120 Huffman Road Suite 24 785
Anchorage, AK 99515
US
Sara@907lawyer.com
907lawyer.com
O: (907) 519-3613

### INVOICE

| | |
|---|---|
| Number | 4390 |
| Issue Date | 3/4/2025 |
| Due Date | 4/3/2025 |

### Bill To:

Roylan Damwyk

Time Entries

| Time Entries | Billed By | Rate | Hours | Sub |
|---|---|---|---|---|
| **Plan and prepare for**<br>9/28/2024<br>Prepare and file Pro Hac Vice form and get local counsel sponsorship and file. | Sara Bloom | $700.00 | 0.00 | $0.00 |
| **Review documents sent by opposing counsel**<br>10/17/2024<br>My appearance was entered pro hac vice. Started to familiarize with the facts of the case and reviewed Complaint, Motions for SJ, Defendant's filed memorandum of fact and law and voir dire filed with the court, Defendant's Motion in Limine. | Sara Bloom | $700.00 | 2.25 | $1,575.00 |
| **Review Documents or Pleadings**<br>10/21/2024<br>Review Defendant's Statement of Issues for final Pretrial conference | Sara Bloom | $700.00 | 0.30 | $210.00 |

| Time Entries | | Rate | Hours | Sub |
|---|---|---|---|---|
| Review order from judge<br>10/21/2024<br>Review minutes and minute order from judge | Sara Bloom | $700.00 | 0.08 | $56.00 |
| Review Documents or Pleadings<br>10/24/2024<br>Review Defendant's Reply re: MSJ | Sara Bloom | $700.00 | 0.25 | $175.00 |
| Review order from judge<br>10/25/2024<br>Review Order and minutes of pretrial conference | Sara Bloom | $700.00 | 0.08 | $56.00 |
| Review documents sent by opposing counsel<br>10/28/2024<br>Review Defendant's Amended exhibit list | Sara Bloom | $700.00 | 0.17 | $119.00 |
| Review Documents or Pleadings<br>10/30/2024<br>Review Defendant's witness list | Sara Bloom | $700.00 | 0.17 | $119.00 |
| Review documents sent by opposing counsel<br>10/31/2024<br>review Statement of Issues filed by opposing counsel | Sara Bloom | $700.00 | 0.25 | $175.00 |
| Review order from judge<br>11/4/2024 | Sara Bloom | $700.00 | 0.02 | $14.00 |
| Review documents sent by opposing counsel<br>11/7/2024<br>Review Defendant's Motion to Continue | Sara Bloom | $700.00 | 0.05 | $35.00 |
| Plan and prepare for<br>11/7/2024<br>Reviewed file, testimony and exhibits and started preparing for trial | Sara Bloom | $700.00 | 4.87 | $3,409.00 |
| Review documents sent by opposing counsel<br>11/8/2024<br>Prepared for Trial reviewed testimony and exhibits and strategy for trial reviewed joint amended witness list and medical records | Sara Bloom | $700.00 | 8.25 | $5,775.00 |
| Plan and prepare for<br>11/9/2024<br>Review Plaintiff's exhibits and deposition transcripts, jury instructions and verdict sheet and prepare testimony for trial | Sara Bloom | $700.00 | 8.35 | $5,845.00 |
| Plan and prepare for<br>11/10/2024<br>Prepared for trial with Rosemary -met with client to discuss her testimony and prepare her for trial; spoke to husband and son about their testimony and prepare them for trial; spoke with Richard Nocis, reviewed all exhibits; court orders; voir dire questions and prepared questioning of witnesses and cross. | Sara Bloom | $700.00 | 9.83 | $6,881.00 |

| Time Entries | | Rate | Hours | Sub |
|---|---|---|---|---|
| **Plan and prepare for**<br>11/11/2024<br>Prepare for trial with Rosemary-and meet with witnesses Janis Knox, Neil Damwyk, Martin Damwyk, Hank Dederding (deducted); Betsy Torres, Pat Malloy and discussed their testimony and prepared them for trial. Reviewed verdict form, and Defendant's proposed voir dire questions; reviewed Defendant's reasonable accommodations policies | Sara Bloom | $700.00 | 7.68 | $5,376.00 |
| **Appear for/attend**<br>11/12/2024<br>For trial | Sara Bloom | $700.00 | 8.50 | $5,950.00 |
| **Plan and prepare for**<br>11/12/2024<br>for trial- meet with witnesses and discuss strategy | Sara Bloom | $700.00 | 2.00 | $1,400.00 |
| **Appear for/attend**<br>11/13/2024<br>for trial | Sara Bloom | $700.00 | 8.50 | $5,950.00 |
| **Plan and prepare for**<br>11/13/2024<br>prepare for trial- meet with witnesses and plan and prepare for trial | Sara Bloom | $700.00 | 3.25 | $2,275.00 |
| **Appear for/attend**<br>11/14/2024<br>Appear for Jury Trial | Sara Bloom | $700.00 | 7.00 | $4,900.00 |
| **Appear for/attend**<br>11/15/2024<br>Attend Jury Trial | Sara Bloom | $700.00 | 8.50 | $5,950.00 |
| **Draft/revise**<br>1/9/2025<br>Review and edit draft closing argument on retaliation claim | Sara Bloom | $700.00 | 1.25 | $875.00 |
| **Review order from judge**<br>2/5/2025<br>review judge's order on retaliation | Sara Bloom | $700.00 | 0.42 | $294.00 |
| **Communicate with co-counsel**<br>2/5/2025<br>Discuss order | Sara Bloom | $700.00 | 0.50 | $350.00 |
| **Appear for/attend**<br>2/11/2025<br>Meet and Confer on Mot. for Attorney's fees and Mot. for Recon. | Sara Bloom | $700.00 | 0.77 | $539.00 |
| **Communicate with co-counsel**<br>2/11/2025<br>Discuss motion for attorney's fees | Sara Bloom | $700.00 | 0.28 | $196.00 |

| Time Entries | | Rate | Hours | Sub |
|---|---|---|---|---|
| Communicate with co-counsel<br>2/11/2025<br>Discuss Motion for Reconsideration, cat's paw theory, and arguments | Sara Bloom | $700.00 | 0.15 | $105.00 |
| Draft/revise<br>2/11/2025<br>Review Motion for reconsideration | Sara Bloom | $700.00 | 0.42 | $294.00 |
| Review email(s) and/or documents<br>2/11/2025<br>To opposing counsel | Sara Bloom | $700.00 | 0.08 | $56.00 |
| Email opposing counsel<br>2/17/2025<br>Regarding Bill of Costs | Sara Bloom | $700.00 | 0.05 | $35.00 |
| Draft/revise<br>2/18/2025<br>Draft Declaration for Attorney's Fees and prepare exhibits, update trial and litigation list | Sara Bloom | $700.00 | 4.00 | $2,800.00 |
| | | **Time Entries Total** | **88.27** | **$61,789.00** |

| | |
|---|---|
| Total (USD) | $61,789.00 |
| Paid | $0.00 |
| Balance | $61,789.00 |

## Account Summary

Trust Account Balance

$0.00 USD

Non-Trust Retainer Balance

$0.00 USD

# EXHIBIT A(2)

Bloom Decl. and Exhs 018

Law Office of Sara Bloom

## LAW OFFICE OF SARA BLOOM

1120 Huffman Road Ste 24-785
907-519-3613
sara@907lawyer.com

**Roylan Damwyk Case Billable hours for 9/25/2024 - 2/19/2025**

| Dates of Entries | | Task | Attorney Sara Bloom | Hours | Hourly Rate | Charges |
|---|---|---|---|---|---|---|
| 10/17/24 | | Review Review case/pro hac vice approved; Review opposing | | 2.25 | $700.00 | $1,575.00 |
| 10/21/24 | | Review minutes and Order and Def statement of issues for final pret | | 0.38 | $700.00 | $266.00 |
| 10/24/24 | | Review Defendant's Reply re MSJ | | 0.25 | $700.00 | $175.00 |
| 10/25/24 | | Review Order and Minutes of Pretrial Conf | | 0.08 | $700.00 | $56.00 |
| 10/28/24 | | Review Def amended exhibit list | | 0.17 | $700.00 | $119.00 |
| 10/30/24 | | Reviewed witness lists | | 0.17 | $700.00 | $119.00 |
| 10/31/24 | | Review documents sent by opposing counsel | | 0.25 | $700.00 | $175.00 |
| 11/4/24 | | Review Order from Judge | | 0.02 | $700.00 | $14.00 |
| 11/7/24 | | Review documents sent by opposing counsel | | 0.05 | $700.00 | $35.00 |
| 11/7/24 | | Plan and prepare for trial review file and documents | | 4.87 | $700.00 | $3,409.00 |
| 11/8/24 | | Prepare for trial, review documents sent by opposing counsel/revie | | 8.25 | $700.00 | $5,775.00 |
| 11/9/24 | | Prepare for trial review exhibits, jury instructions and verdict sheet | | 8.35 | $700.00 | $5,845.00 |
| 11/10/24 | | Plan and prepare for trial with Rosemary met with Plaintiff and witn | | 9.83 | $700.00 | $6,881.00 |
| 11/11/24 | | Prepare for trial and speak with witnesses | | 7.68 | $700.00 | $5,376.00 |
| 11/12/24 | | Appear and attend jury trial and prepare for trial | | 10.50 | $700.00 | $7,350.00 |
| 11/13/24 | | Appear and attend jury trial | | 8.50 | $700.00 | $5,950.00 |
| 11/14/24 | | Appear and attend jury trial and prepare for trial | | 10.25 | $700.00 | $7,175.00 |
| 11/15/24 | | Appear and attend jury trial | | 8.50 | $700.00 | $5,950.00 |
| 1/9/25 | | Read and Edit Post trial motion | | 1.25 | $700.00 | $875.00 |
| 2/5/25 | | Review judge's order/communication w/ co counsel | | 0.92 | $700.00 | $644.00 |
| 2/11/25 | | Meet and Confer/communicate with co-counsel/review motion for r | | 1.70 | $700.00 | $1,190.00 |
| 2/17/25 | | Email Opposing counsel | | 0.05 | $700.00 | $35.00 |
| 2/18/25 | | Draft Declaration for Attorney's fees Motion | | 4.00 | $700.00 | $2,800.00 |
| | | | HOURS TOTAL | 88.27 | BILLABLE TOTAL | $61,789.00 |



Free use content provided by ClickTime

For more time tracking resources, features and information, visit www.clicktime.com

# EXHIBIT B

Bloom Decl. and Exhs 020

**Litigation cases (this is not a complete list and not including family law litigation)**

**Federal EEO and MSPB**

Won MSPB mixed case- hearing and appeal in Reasonable Accommodation case- *K.H v. FAA* in Alaska SF-0752-22-0425-A-1, C-1, C-2, P-1-received attorney fees as stated in retainer agreement; also won all four addendum proceeding affirmed by the MSPB board.

*M.D v. FAA* MSPB Disability Discrimination/Wrongful Termination 2020-28875-FAA-06 -settled

*S.C v. Department of the Air Force*- MSPB- Wrongful Termination SF-0752-20-0652-I-1- settled

*Scoggins v. Department of the Army,* 2016 MSPB 32 prevailed at hearing and received attorney fees at the *Laffey* Rate.

**Alaska Federal Court Cases**

*Lyons v. Betts*- 3:22-cv-000731 – U.S. Dist. Ct. Dist. Of Alaska- Violations of the 8th, 13th, and 14th amendment- week long jury trial Oct. 2024- represented Plaintiff- defense verdict.

*Stromburg v. North Slope Borough School District* 3AN-cv-08646CI- settled.

*Orlino v. State of Alaska and Melvin Diaz* -3:22-cv-00197-JMK Represented Defendant/Counter and Cross-Plaintiff - Assault and Battery/ settled before trial

*Sansinbandit v. Alaska Airlines*- U.S. Dist. Ct Dist. Of Alaska- 3:18-cv-00267-JWS represented Plaintiff- race discrimination- survived MSJ motion

*West v. Alaska Airlines*- U.S. Dist. Ct Dist. Of Alaska- 3:18-cv-00102 SLG Represented Plaintiff- Disability Discrimination/wrongful termination/FMLA violations-survived motion to dismiss did not survive MSJ

*Prins v. State of Alaska*- U.S. Dist. Ct Dist of Alaska- 3:19-cv-00296-JWS sexual harassment- settled for $500k in mediation after discovery.

*Pate v. Home Depot*- 3:23-cv-00114 SLG- disability discrimination and retaliation- settled-confidential.

*Mason v. British Petroleum, et al.* Case No. 3:19-cv-00250-JWS- Severe brain injury/tortious interference- settled before trial- confidential.

Bloom Decl. and Exhs 021

*Thacker v. Quest Diagnostics*, Case No. 3:20-cv-00283-JMK 2021 U.S. Dist. LEXIS 253448, 2021 WL 6845541-wrongful termination/whistleblowing

*Tyler v. State of Alaska, et al.* Case No. 3:19 CV 00039 JWS – discrimination and retaliation

*Lutman v. Denali Foods, Inc.* Case No. 3:22-cv-00001-JWS- Discrimination and retaliation

## **Alaska State Court Cases**

*Peperone v. Sunshine Community Health, et al*. 3AN-24-07837 CI- breach of contract and whistleblowing-case settled.

*Scritchfield v. City of Homer-* Case No. 3AN-23-04852 CI- Appeal- wrongful termination/violations of due process- Plaintiff prevailed.

*Nelson v. Kodiak Island Borough* 3AN-22-47022CI- gender discrimination/non-selection of a fire chief position- settled before trial-confidential.

*Antonelli v. State of Alaska* 3AN-23-05749-gender discrimination/hostile work environment/wrongful termination-settled before trial-$100k.

*Fain v. Alaska Gateway School District, et al.* Case No. 4TO-23-06791CI- defamation and gender discrimination-settled before trial.

*O'Hara v. Anchorage Equal Rights Commission*, *Case No.* 3AN-22-05430 CI – appeal of non-substantial evidence finding in a sexual harassment case- settled before decision.

*Angasan v. Port Graham Corporation, et al*. 3AN-18-cv-07854CI– gender discrimination/wrongful termination settled before trial-confidential.

*Madsen, et al. v. North Slope Borough-*2BA-18-00252- wrongful termination/toxic tort-settled

*Gilman v. Atmautluak Limited-* 4BE-24-00075CI- wrongful termination-settled

*Hadley and Shelley v. SMG, Inc., et al*. -3AN-18-04791 CI – tort case-settled

*Ebberson v. City of Seward*, 3SW-18-00074 CI-wrongful termination-settled

## **Employment Arbitrations**

Bloom Decl. and Exhs 022

*Scritchfield v. City of Homer*- several days binding arbitration- wrongful termination- Claimant prevailed.

*Cunningham v. City of Homer*- gender discrimination/wrongful termination- week long binding arbitration.

*Klingert v. Alaska Commercial Fishing and Agricultural Bank* -breach of contract/wrongful termination- on-going

*Thon v. Bedrock Petroleum Consultants* -breach of contract/wrongful termination-on-going

**Maryland Federal Cases- have handled several but do not have a list**

**Maryland State Cases**

*See attached print-out from website.*

**District of Columbia Federal Cases (published- do not have a list of cases with unpublished decisions)**

*Luis Salazar v. WMATA*-  401 F.3d 504, 365 U.S. App. D.C. 222, 2005 U.S. App. LEXIS 4605, 95 Fair Empl. Prac. Cas. (BNA) 681-Represented Defendant- National Origin discrimination/non-selection- prevailed on a SJM and argued before the D.C. Circuit.

*Heade v. Wash. Metro. Area Transit Auth.*, 2010 U.S. Dist. LEXIS 23270, 2010 WL 938462

*Harry Anthony v. WMATA,* 2005 U.S. Dist. LEXIS 41560

*Walter Wilson v. WMATA*, 436 F. Supp. 2d 1, 2006 U.S. Dist. LEXIS 41999

**District of Columbia Cases**

Representing WMATA
600 FIFTH STREET NW
Washington, DC 20001
Cases (53)

Cases

Bloom Decl. and Exhs 023

| Case Number | Style / Defendant |
|---|---|
| 2007-CA-003594-B | WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY Vs. SMITH |
| 2007-CA-001137-B | WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY Vs. SMITH |
| 2006-CA-008051-B | JENKINS, MICHAEL et al Vs. SUTTON, JACQUELINE LASHAWN et al |
| 2006-CA-004626-B | WILLIAMSON, WANDA Vs. BROWN, SEAN et al |
| 2006-CA-003233-B | THOMAS, JACQUELYN E Vs. WASHINGTON METROPOLITAN AREA TRA |
| 2006-CA-002640-B | ELOCH, CLAYTON E Vs. WASHINGTON METROPOLITAN AREA TRANSI |
| 2006-CA-001502-B | ANTHONY, RAYMOND Vs. WASHINGTON METROPOLITAN AREA TRAN |
| 2006-CA-001001-B | OBIAKO, CHRIS Vs. WASHING METROPOLITAN AREA TRANSIT AUTHO |
| 2006-CA-000556-B | SMITH, HATTIE M Vs. WASHINGTON METROPOLITAN AREA TRANSIT |
| 2005-CA-007699-B | ELLIS, ASHTON et al Vs. RALHGN, MILTON MARK et al |
| 2005-CA-006744-B | COOKE, ORA Vs. WASHINGTON METROPOLITAN AREA TRANSIT AUTH |
| 2005-CA-005555-B | SCHUMAN, BEATRICE Vs. WASHINGTON METROPOLITAN AREA TRAN |
| 2005-CA-000938-B | MABRY, CHARLIE et al Vs. WHITE, DENA M. et al |
| 2005-CA-000170-B | KING, JESSIE S Vs. HEATLEY, MICHAELBRYANT et al |
| 2004-CA-008823-B | MURPHY, PATRICIA Vs. WMATA et al |
| 2004-CA-007012-B | CRAWFORD, CARLOS Vs. WMATA et al |

Bloom Decl. and Exhs 024

2004-CA-007986-B    SOLOMON, ADANECH A Vs. WMATA et al

2004-CA-006385-B    SARAVIA, REINA et al Vs. WMATA

2004-CA-006076-B    LEWIS, SHIRLEY Vs. WMATA

2004-CA-004284-B    SANDERS, DENISE et al Vs. CHAMBERS, VECTRESE et al

2004-CA-003155-B    LYONS, HILLIARD et al Vs. WMATA

2004-CA-002581-B    MARTIN, AUBRY Vs. WASHINGTION METROPOLITAN AREA TRANSIT A

2004-CA-001865-B    WATTS, KIMBERLY A. Vs. ROSS, EUGENE A. et al

2003-CA-002169-B    PHILLIPS, SHIRLMEIKA Vs. CTI DC INC et al

2003-CA-001847-B    NESTER, BEATRICE Vs. WMATA

2003-CA-000975-B    HOLSENDORFF, JUANITA Vs. WMATA

2002-CA-008671-B    BROWN, JIMMY B. Vs. WMATA

2002-CA-008296-B    GASKINS, WILLIAM Vs. WMATA et al

2002-CA-007940-B    RIDLEY, ELEANOR JONES- Vs. SMA TRANS SVC INC et al

2002-CA-007223-B    HARRIS, MARION Vs. WMATA et al

2002-CA-007146-B    LOVE, JOSEPH Vs. WMATA

2002-CA-002502-B    HURD, LINDA W Vs. WMATA et al

2002-CA-001990-B    TAYLOR, MANUEL H et al Vs. WMATA et al

2002-CA-001711-B    MELANCON, GARY Vs. ZELNICK, ROBERT N.

2002-CA-001432-B    HARRIS, REGINALD Vs. WASH METRO AREA TRANS AUTH

2002-CA-000932-B    MCLEAN, SHEILA Vs. WMATA

2001-CA-008445-B    MYERS, FRANCES R. Vs. WMATA % CHERLY BURKE et al

2001-CA-006215-B    WILLIAMS, IRVIN D. Vs. WMTA et al

2001-CA-006217-B    BILLINGS, SARA Vs. WMATA et al

2001-CA-004125-B    BAYLOR, PATRICIA et al Vs. WMATA

2001-CA-003262-B    HICKS, DEBORAH Vs. WMATA

2001-CA-000774-B    MILLINE, VERNON Vs. WMATA

2000-CA-007326-B    PERKINS, LARRY C Vs. WMATA

2000-SCB-015549    ISAAC, ARAIA VS. WMATA

2000-CA-007062-B    WYNNE, WILLIAM Vs. WMATA

2000-SCB-015165    REDMAN, DEBORAH A VS. WASHINGTON METROPOLITAN AREA TRAI

2000-CA-008213-B    ROUSE, RAYMOND Vs. WASH MET AREA TRANSIT AUTHORITY

2000-CA-002094-B    MARSHALL, GEORGE WASHINGTON Vs. WASH. METRO. AREA TRANSI

2000-CA-000756-B      COOPER, ANGELA Vs. WMATA et al

1999-CA-007805-B      SHORT, ROSIE et al Vs. WMATA

1999-CA-005789-B      LINDSAY, CHRISTINE Vs. WMATA

1999-CA-005310-B      RAWLINSON, FLOYD Vs. WASHINGTON METROPOLITAN AREA TRANS

1999-CA-004990-B      MARTIN, DENISE Vs. WMATA

casesearch-results (1)

| 10100534941994 | Bloom, Sara L Esq | | Attorney | Civil District Court | Tort | Closed | 12/07/1994 | STATE FARM MUTUAL AUTO INSURANCE CO  vs  CHANDLER, RONALD et al |
|---|---|---|---|---|---|---|---|---|
| 50200077681996 | Bloom, Sara L Esq | | Attorney | Upper Marlboro District Court | Contract | Closed | 03/14/1996 | GAEGLER, CHRISTOPHER vs  ALL SEASONS SERVICE INC VA CORP et al |
| 90100036241994 | Bloom, Sara L Esq | | Attorney | Bel-Air District Court | Contract | Closed | 09/12/1994 | BUCKHEIT, BRIAN E vs  PRICE, MICHELLE LYNN et al |
| 7.5782E+05 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Criminal | Closed | 05/06/1994 | |
| 10100025851994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 01/28/1994 | MILLER, LAUREN vs GELFAND, MARK |
| 10100035401993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 02/01/1993 | ROBINSON, MARY vs  VICKERS, MICHELLE D et al |
| 10100040131994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 02/07/1994 | WILLIAMS, OLIVER JR vs  JACKSON, DONNA S et al |
| 10100068651993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 02/25/1993 | LEVENE, PAUL R vs GASBARRO, RONALD |
| 10100073991993 | Bloom, Sara L | | Attorney | Civil District Court | Contract | Closed | 03/04/1993 | MCMILLAN, BARBARA J vs NOEL, DANIEL |
| 10100076731994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 03/03/1994 | BONDS, RACHELLE M vs KIM, YANG CHIN |
| 10100084441994 | Bloom, Sara L | | Attorney | Civil Court | Tort | Closed | 03/04/1994 | WESLEY, OVEN JAMES vs STEWART, MARY C |
| 10100085871995 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 02/23/1995 | HARROD, CHARLENE vs  BROWN, TYESHA et al |
| 10100086991994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 03/09/1994 | BROWN, BEATRICE vs  GARNETT, CHARLES et al |
| 10100094341995 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 03/01/1995 | BOCAGE, TOLESEO vs  FREEMAN, ESTHER et al |
| 10100094461997 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 03/06/1997 | MCNEILL, CHARLES L vs JAGHUBER, REGIS LEE |
| 10100105651994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 03/17/1994 | LEWIS, TARWAN vs  LEE, JEFFREY et al |
| 10100112021994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 03/21/1994 | DUNKLEY, JANET vs  GREESEON, PATRICIA et al |
| 10100125601993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 04/02/1993 | JOHNSON, JOANNA vs BRUNSON, JAMES SR |
| 10100125901993 | Bloom, Sara L | | Attorney | Civil District Court | Contract | Closed | 04/02/1994 | CLARK, YVONNE vs  BOYD, VENITA et al |
| 10100126601994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 03/25/1994 | XISONG, LIN vs FERGUSON, STANFORD LEON |
| 10100131671994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 03/29/1994 | JACOBS, RANDOLPH vs SAUNDERS, LANDONE |
| 10100150061994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 04/08/1994 | DAVIS, JEFFREY G vs  TUBB, RICHARD BROWN et al |
| 10100153761994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 04/12/1994 | DOMINO CAB LTD vs  MEADOR, WILLIAM B et al |
| 10100155801996 | Bloom, Sara L | | Plaintiff | Civil District Court | Contract | Closed | 05/01/1996 | BLOOM, SARA L vs MORRIS, GREG |
| 10100162981994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 04/19/1994 | LASHLEY, DEWAYNE A vs  WEAVER, PATRICIA ANN et al |
| 10100213471996 | Bloom, Sara L | | Attorney | Civil District Court | Contract | Closed | 06/11/1996 | WILLIAMS, JEROME vs OGUNSUA, DAVID et al |
| 10100219021995 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 05/15/1995 | UNIVERSAL UNDERWRITERS INSURANCE CO vs BRAYBOY, FRED |
| 10100224901994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 05/27/1994 | GRAFF, HERBERT E vs RAMIG, KENNETH JOSEPH |
| 10100225001994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 05/27/1994 | HOOD, BETH & KENNETH vs FORWARD, FRANK J |
| 10100226011995 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 05/18/1995 | ALLEN, KEITH vs FRANCO, JOSEPH |
| 10100227251995 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 05/22/1995 | EATON, SOL vs  WILSON, BRADLEY et al |
| 10100232911995 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 05/24/1995 | TURNER, CAROLYN J vs MARSHALL, DAVID ROBERT SR |
| 10100247011994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 06/09/1994 | JOHNSON, BESSIE vs  JAIN, DEEPAK et al |
| 10100247891995 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 06/06/1995 | LARRY, AARON V vs HAUS, JOSEPH |
| 10100250311993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 06/25/1993 | RODRIGUEZ, PEDRO vs RACZKOWSKI, SYLVIA ANN |
| 10100259711994 | Bloom, Sara L | | Attorney | Civil District Court | Contract | Closed | 03/08/1994 | TAUBER, CARL vs JOHNSON, KAREN D |
| 10100262081993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 07/08/1993 | WILSON, ERNEST vs  PULLIAM, DARIEL et al |
| 10100263201995 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 06/13/1995 | GARRISON, ERIC vs  MADDOX, RAYMOND et al |
| 10100265261993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 07/09/1993 | AMES, BRIAN vs ALFORD, WILLIE JR |
| 10100265331994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 06/22/1994 | BROWN, SHIRELLE vs  EVANS, CHARLES R et al |
| 10100265951993 | Bloom, Sara L | | Attorney | Civil District Court | Contract | Closed | 07/13/1993 | KITCHEN, RENEE vs CLASH, VALERIE |
| 10100282921996 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 07/31/1996 | JENKINS, OTIS vs  ONGUNGUA, DAVID et al |
| 10100283871995 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 06/22/1995 | STERN, KEVA vs  MASS TRANSIT ADMINISTRATION et al |
| 10100308501993 | Bloom, Sara L | | Attorney | Civil District Court | Contract | Closed | 08/09/1993 | HOLLY, WILL vs SLADE, JEFFERSON D JR |
| 10100335451994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 08/17/1994 | ANDREWS, KERVIA vs  KING, JUANITA et al |
| 10100343551994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 08/17/1994 | HAMLIN, NAKIA vs  BROWN, ELOYD et al |
| 10100361241994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 08/23/1994 | MCKNIGHT, MATTHEW vs  GREEN, WANDA et al |
| 10100361251994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 08/23/1994 | RUFFIN, ROBERTA vs  GREEN, WANDA et al |
| 10100363701994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 08/25/1994 | HULL, KISHA vs  JENIFER, HOWARD III et al |
| 10100379421994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 09/07/1994 | COOPER, LISA J & GARY vs  KORNEGAY, ALICHIA N et al |
| 10100407371993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 10/05/1993 | EVANS, TAWANDA vs  WILSON, MARION et al |
| 10100410031993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 10/05/1993 | SHAALON, FOUAD vs  LITTLE, THOMAS JR et al |
| 10100413871993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 10/07/1993 | ADKINS, DARYL vs WILT, MICHAEL |
| 10100436711994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 10/13/1994 | JONES, RONNIE vs  TALIAFERRO, WILLIAM et al |
| 10100442031994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 10/11/1994 | HAYES, JAMES vs JONES, GLEN |
| 10100443571992 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 11/25/1992 | JOHNSON, MILTON vs  BOYD, CYNTHIA et al |
| 10100448151993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 10/25/1993 | WALLMAN, MARY ELIZABETH vs  JOHNSON, JOSEPH C et al |
| 10100451111994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 10/18/1994 | BRISCOE, MICHAEL A & JANET Y vs  BUTLER, SANDRA et al |
| 10100461051992 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 12/11/1992 | WARREN, EDMUND vs EDWARDS, DAVE |
| 10100484501993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 11/15/1993 | UDDEME, JOACHIM vs  RUDDLESDEN, MORRIS E et al |
| 10100503531993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 11/24/1993 | GREEN, NORMAN vs KIM, JIN SUK |
| 10100510011994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 11/18/1994 | ZIA, BOSCO CHAW-YI vs  RICKERT, MARTHA et al |
| 10100516271993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 12/03/1993 | STOWE, KAREN vs  BROWN, LARRY W SR et al |
| 10100532111994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 12/02/1994 | CLAYTON, ELLEN vs  WEGFALL, PHYLLIS et al |

Bloom Decl. and Exhs 028

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10100535681993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 12/21/1993 | MCDOWELL, ANTAR vs CURRY, EDWIN HIRAM |
| 10100541101994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 12/12/1994 | ABDUL-RAHEEM, ZAKIYYAH vs WITHERSPOON, PAULINE |
| 10100545031993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 12/28/1993 | DAVIS, GARY SR vs THOMAS, NEVIA |
| 10100545041993 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 12/28/1993 | LEWIS, JAMES vs THOMAS, NEVIA |
| 10100558761994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 12/21/1994 | WASHINGTON, RICHARD vs  BETHEA, DEXTER et al |
| 10100569441994 | Bloom, Sara L | | Attorney | Civil District Court | Tort | Closed | 12/30/1994 | FLOYD, DANNY PERSONAL REPRESENTATIVE vs  CORNISH, CLIFTON et al |
| 10100569611994 | Bloom, Sara L | | Attorney | Civil District Court | Contract | Closed | 12/30/1994 | POWELL, MARSHANN vs STATE FARM MUTUAL AUTO INS CO |
| 50200006411999 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 01/07/1999 | AMOS, RICKY M vs  OMAR, HAJIA MOHAMMED et al |
| 50200043232002 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 02/04/2002 | MOHAN, MAVIS vs WASHINGTON METRO AREA TRANSIT AUTHORITY |
| 50200047222003 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 02/19/2003 | REED, DONNA vs WASHINGTON METROPOLITAN AREA TRANSIT AUT |
| 50200071332003 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 03/12/2003 | HUDSON, LAKEISHA vs  WASHINGTON METROPOLITAN AREA TRANSIT AUT et al |
| 50200094362003 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 04/09/2003 | ADAMS, LISA vs WASH METROPOLITAN TRANSIT AUTHORITY |
| 50200094392001 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 03/27/2001 | REED, DOUGLAS A vs  HUNTER, HALBERT JAMES SR et al |
| 50200095092004 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 03/16/2004 | NWAKA-ORAEGBU, LILY vs WASH METROPOLITAN AREA TRANSIT AUTHORITY |
| 50200101052000 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 03/23/2000 | MILLER, DENISE L vs  BATTLE, DURAL S et al |
| 50200102741999 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 04/09/1999 | PITTS, RICHARD vs WASH METROPOLITAN AREA TRANSIT AUTHORITY |
| 50200105971999 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 03/23/1999 | BOWMAN, CHASTITY vs  WASHINGTON METRO AREA TRANSIT AUT et al |
| 50200110482004 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 03/29/2004 | JOHNSON, ELAINE A vs  CATO, ANGELA S et al |
| 50200121921996 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 04/16/1996 | S&S LIMOUSINES SERVICES INC vs  BRITISH LIMOUSINE SERVICE INC et al |
| 50200158201998 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 09/21/1998 | NOLAN, LAVINIA vs  LUCUS, ALFONSO et al |
| 50200177752000 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 06/05/2000 | ROBINSON, TERRA vs  FULTZ, ANDRE et al |
| 50200177862004 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 05/14/2004 | EATMAN, RONNISE vs  DUNN, JOHN T et al |
| 50200177872004 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 05/14/2004 | MCBRIDE, ASHLEY vs  DUNN, JOHN T et al |
| 50200177882004 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 05/14/2004 | OLIVER, RHOME vs  DUNN, JOHN T et al |
| 50200186812000 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 06/13/2000 | BEVERLY, RODNEY vs WASHINGTON METRO AREA TRANSIT AUTHORITY |
| 50200187642004 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 05/26/2004 | OLIVER, CHINA vs  DUNN, JOHN T et al |
| 50200187652004 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 05/26/2004 | OLIVER, INDIA vs  DUNN, JOHN T et al |
| 50200201812005 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 06/29/2005 | KEARNEY, PATTI vs  KING, JESSIE JR et al |
| 50200202122002 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 06/18/2002 | PHILLIPS, SARAH YOUNG vs WASHINGTON METROPOLITAN AREA TRANSIT AU |
| 50200206351997 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 06/16/1997 | KENNARD, DORIS M vs REALTY MANAGEMENT SERVICE, INC. |
| 50200208652005 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 07/08/2005 | DOUGLAS, KEITH vs  KING, JESSIE JR et al |
| 50200208951998 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 06/22/1998 | ANN REEVES, PSY D vs WASHINGTON AREA METRO TRANSITY AUTH |
| 50200231802001 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 07/25/2001 | MOHAN, VELMA vs  BYNUM, VAN et al |
| 50200236912005 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 08/15/2005 | MARSHALL, SHARKIYLA vs  RIVERS, HARRY et al |
| 50200242552005 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 09/27/2005 | KAMARA, IBRAHIM KAJUE vs  LEE, KENNETH JEROME SR et al |
| 50200242562005 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Open | 09/27/2005 | SESAY, MEMUNATU vs  LEE, KENNETH JEROME SR et al |
| 50200246352002 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 07/26/2002 | SPRIGGS, COLLEEN vs WASHINGTON METRO AREA TRANS AUTHORITY |
| 50200261192001 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 08/16/2001 | GORDON, TROY vs  BARIAL, KELSIE ELIZABETH et al |
| 50200265802005 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 08/25/2005 | DAVIS, MICHELLE vs  WASHINGTON METROPOLITAN AREA TRANSIT AUT et al |
| 50200273932004 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 08/02/2004 | PILGRIM, CHUNITA vs  POWELL, JESSE JR. et al |
| 50200279642001 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 08/31/2001 | WASHINGTON, HAKKATANA vs WASHINGTON METROPOLITAN AREA TRANSIT AUTHORI |
| 50200292811998 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 08/24/1998 | SWEAT, JEZREEL vs  CORMAN, MARIA PRAY et al |
| 50200295741999 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 09/27/1999 | NORTH, WENDY vs WASHINGTON METRO TRANSIT AUTHORITY |
| 50200299202001 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 09/20/2001 | GEBREHIWET, AZMERA vs WASH METRO AREA TRANSIT AUTH |
| 50200312191999 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 10/20/1999 | CARTER, ROBERT M III vs  RILEY, DARYL A et al |
| 50200320702001 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 10/11/2001 | BOZE, GEORGE R vs  WASH METRO AREA TRANSIT AUTH et al |
| 50200347191999 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 11/18/1999 | ARMSTRONG, JOSEPH F vs  SHUFORD, ISABEL et al |
| 50200362261999 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 11/30/1999 | WILLIAMS, LISA vs  WASHINGTON METRO TRANSIT AUTH et al |
| 50200362951995 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 11/29/1995 | TREETOP CONDOMINIUM vs GOLSON, SHARRON |
| 50200368502006 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 12/29/2006 | BELL, CHARLES vs  WMATA et al |
| 50200380771999 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 12/23/1999 | FARMER, JENISE vs  FULLER, MAURICE CLIFTON et al |
| 50200385932006 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Tort | Closed | 12/29/2006 | PARKS, MARY vs  WMATA, TIA et al |
| 50200405872002 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Contract | Closed | 12/12/2002 | WARD, TRACY vs WMATA |
| 60100042761999 | Bloom, Sara L | | Attorney | Rockville District Court | Contract | Closed | 02/22/1999 | SMALL, VIOLET P vs WASHINGTON METROPOLITAN AREA TRASIT AUTH |
| 80100105311994 | Bloom, Sara L | | Attorney | Catonsville District Court | Contract | Closed | 05/02/1994 | MOORE, JOHN W vs  RICE, DARRYL E et al |
| 80100180401994 | Bloom, Sara L | | Attorney | Catonsville District Court | Tort | Closed | 07/13/1994 | ALEXANDER, BRIAN EDWARD vs  SMITH, ERIC DWAIN et al |
| 80100257481993 | Bloom, Sara L | | Attorney | Catonsville District Court | Contract | Closed | 10/07/1993 | LEN POPA CO INC vs  OCKENFELS, WILBERT H et al |
| 80100273231993 | Bloom, Sara L | | Attorney | Catonsville District Court | Contract | Closed | 10/28/1993 | LALANI, MANSURO vs FILBERT, MARY |
| 80200006801994 | Bloom, Sara L | | Attorney | Catonsville District Court | Tort | Closed | 01/11/1994 | HARRIS, KAREN LOUISE vs RAYMOND, PAUL DANA |
| 80200005701994 | Bloom, Sara L | | Attorney | Catonsville District Court | Contract | Closed | 03/08/1994 | TAUBER, CARL A vs JOHNSON, KAREN D |
| 80200006341994 | Bloom, Sara L | | Attorney | Catonsville District Court | Contract | Closed | 03/11/1994 | FABER, KIMBERLY vs MORSE, BARBARA A |
| 80200196241993 | Bloom, Sara L | | Attorney | Catonsville District Court | Contract | Closed | 09/03/1993 | CONWAY, LEO C vs  FARMER, HERBERT et al |
| 80200282541993 | Bloom, Sara L | | Attorney | Catonsville District Court | Tort | Closed | 11/02/1993 | FINNEY, VALERIE A vs COOPER, JAMES H |
| 80300014491994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 01/21/1994 | BRIEGER, LAWRENCE R vs CUMBERLAND, BERNARD W |
| 80300027111995 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 01/31/1995 | SCHERR, HENRY vs  ARIGO, FRANCIS et al |

2

| Case | Name | Role | Court | Type | Status | Date | Description |
|---|---|---|---|---|---|---|---|
| 80300073181993 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 04/02/1993 | BRINN, JOHN R vs STATE FARM MUTUAL AUTOMOBILE INSURANCE |
| 80300220471993 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 08/31/1993 | JONES, KELVIN H vs  HOLLINGSHEAD, JASON et al |
| 80300228651994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 09/07/1994 | DIR.-OFFICE OF FINANCE, BALTO CO, MD & vs  BURKE, MARY FRANCES et al |
| 80300241351993 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Contract | Closed | 09/23/1993 | ROSE, EDWARD M JR vs FARLEY, BOBBY WESLEY |
| 80300262191994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Contract | Closed | 10/07/1994 | PAGE, STEPHEN L vs STATE FARM MUTUAL AUTO INSURANCE CO |
| 80300311851994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 12/02/1994 | SHARPE, DONTA vs TRANLI, BRICHTHAY |
| 80400016891994 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 01/28/1994 | SCHECKELLS, PATRICK vs FRITZ, STACY L |
| 80400046091995 | Bloom, Sara L | | Attorney | Towson District Court | Contract | Closed | 02/16/1995 | MASON, WILLIAM vs OLSEN, LOUIS |
| 80400055311994 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 03/04/1994 | FERGUSON, GREGORY vs REICHLYN, FREDY |
| 80400061541994 | Bloom, Sara L | | Attorney | Towson District Court | Contract | Closed | 03/09/1994 | DUGGINS, HAZEL R vs WEBB, JANET M |
| 80400065711995 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 03/14/1995 | WOOD, MARJORIE vs STATE FARM INSURANCE COMPANIES |
| 80400084831995 | Bloom, Sara L | | Attorney | Towson District Court | Contract | Closed | 03/30/1995 | MEZICK, NANCY E vs HUGHES, RICHARD ALLEN |
| 80400092311994 | Bloom, Sara L | | Attorney | Towson District Court | Contract | Closed | 04/18/1994 | CORD, COLLEEN vs  KIM, JULIE et al |
| 80401118881997 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 04/24/1997 | HORNE, OPHELIA vs WIGGLESWORTH, SHELLY |
| 80401143211995 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 06/13/1995 | LENTZ, LAWRENCE  vs  MORELY, JAMES JOSEPH et al |
| 80400144251993 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 06/11/1993 | ENMEIER, JOSEPH F vs COPENSPIRE, KIM |
| 80400150131994 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 06/23/1994 | ZEMLAK, IRA LEE vs HIGH POINT ELECTRIC INC |
| 80400152621994 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 06/13/1994 | BALKAN, GRACE vs  LARRABEE, IENTHA et al |
| 80400153241994 | Bloom, Sara L | | Attorney | Towson District Court | Contract | Closed | 06/09/1994 | DAVID P GOULD ASSOCIATES INC vs  GOODYEAR, SUZANNE et al |
| 80400159011995 | Bloom, Sara L | | Attorney | Towson District Court | Contract | Closed | 06/23/1995 | CHIODI, LINDSAY vs MCMILLIAN, JESSE THOMAS |
| 80400241331994 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 09/16/1994 | NIEMEYER, SUSAN K vs WINOWITCH, BONNIE |
| 80400297651994 | Bloom, Sara L | | Attorney | Towson District Court | Tort | Closed | 11/17/1994 | LACKEY, EDWARD JOSEPH vs BEAM, JEFFREY |
| 80500016961994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 01/31/1994 | WILLIAMS, VIOLA vs  DOLLINGER, ELLEN MARIA et al |
| 80500089191993 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 04/13/1993 | JONES, ROY M vs  MEADOWS, GLEN E et al |
| 80500097211993 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 04/26/1993 | HANDS, MICHAEL E vs HUTH, JO ANNE |
| 80500132911993 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Contract | Closed | 06/03/1993 | STILLMOCK, PATRICK vs ORBINO, PERRY |
| 80500166261994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | | Closed | 06/24/1994 | EVANS, IDAMAY ANN vs HORNER, SHARON ANN |
| 80500167771994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 06/27/1994 | SCOTT, ANTONIO vs  WALTER, WALTER T et al |
| 80500213551994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 08/12/1994 | RUOCCO, JAMES R vs BOONE, ANGELA |
| 80500222491994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 08/26/1994 | MARCHAND, BRETT CHRISTOPHER vs  KNIGHTON, CHRISTINE et al |
| 80500291411994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 11/10/1994 | ALLEN, DORIS ELRITA vs KELLY, THOMAS WAYNE |
| 80500298061994 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Tort | Closed | 11/18/1994 | MICKLES, CRAIG vs  DAVIS, CHARLES et al |
| 80500302081993 | Bloom, Sara L | | Attorney | Baltimore County District Cour | Contract | Closed | 11/23/1993 | RAMSEY, CHADDIE JOE  vs  WEBSTER, BRIAN CHRISTOPHER et al |
| 90100000171994 | Bloom, Sara L | | Attorney | Bel-Air District Court | Contract | Closed | 01/03/1994 | COONEY, JOHN (MINOR) vs LANE, BRIDGET |
| 90100005351993 | Bloom, Sara L | | Attorney | Bel-Air District Court | Tort | Closed | 02/09/1993 | KANARAS, VASILLOS GEORGE vs SCHAFER, LINDA SOLOMON |
| 90100015501994 | Bloom, Sara L | | Attorney | Bel-Air District Court | Tort | Closed | 12/13/1994 | KIP, HUI LING vs PEDONE, NICHOLAS PAUL |
| 0E+00 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Criminal | - Closed | 12/17/1996 | |
| 24C91281008 | Bloom, Sara L | | Other | Baltimore City Circuit Court | Tort - Mot | Closed | 10/08/1991 | BENNETT VS RHODES CL138313 |
| 24C94018022 | Bloom, Sara L | | Other | Baltimore City Circuit Court | Tort - Mot | Closed | 01/18/1994 | LIVSHITS  VS.  CULBRETH   CL175059 |
| 24C94056015 | Bloom, Sara L | | Other | Baltimore City Circuit Court | Tort - Oth | Closed | 02/25/1994 | EUBANKS  VS.  DAVIS,ETAL  CL176577 |
| 3E00040624 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Criminal | - Closed | 02/20/1996 | |
| 5E00038862 | Bloom, Sara L | | Attorney | Hyattsville District Court | Criminal | - Closed | 01/25/1996 | |
| 6E00006131 | Bloom, Sara L | | Attorney | Upper Marlboro District Court | Criminal | - Closed | 10/13/1994 | |
| 6E00086757 | Bloom, Sara L | | Attorney | Hyattsville District Court | Criminal | | 01/07/1998 | |
| 03C94005707 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Tort - Mot | Closed | 06/20/1994 | Baldwin vs Crampton, et al |
| 03C94007631 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Tort - Mot | Closed | 08/17/1994 | Senora A. Davis Vs. Ubaldo S. Huaromo |
| 03C95000582 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Tort - Mot | Closed | 01/19/1995 | Dickens, et al  vs Woodruff |
| 03C95002212 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | DN | Closed | 03/14/1995 | Dugging V Webb |
| 03C95003722 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Tort - Mot | Closed | 05/01/1995 | Mason vs Olsen |
| 03C95004213 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Tort - Mot | Closed | 05/16/1995 | Mezick vs Hughs |
| 03C95006120 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Tort - Mot | Closed | 07/11/1995 | Wood vs  State Farm Insurance Companies |
| 03C95006551 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Other Civi | Closed | 07/12/1995 | Nguyen Vs Coleman |
| 03C95007114 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | DN | Closed | 08/08/1995 | Niemeyer vs Winowitch |
| 03C95007886 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Other Civi | Closed | 08/30/1995 | Lentz vs Morely, et al |
| 03C95007902 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Other Civi | Closed | 08/30/1995 | Chiodi vs McMillian |
| 03C95009786 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Other Civi | Closed | 10/20/1995 | Floyd vs Betta |
| 03C96003663 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | DN | Closed | 04/15/1996 | Shkolnik, et al vs State Farm Mutual Automobile Insurance Company |
| 03C96008087 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Tort - Mot | Closed | 08/09/1996 | Parson vs McManus |
| 03C97001733 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Tort - Mot | Closed | 02/20/1997 | Zamaria, et al vs Mclain, et al |
| 03C97007034 | Bloom, Sara Lynne | | Attorney | Baltimore County Circuit Court | Tort - Mot | Closed | 07/16/1997 | Horne vs Wigglesworth |
| 60100024022006 | Bloom, Sara Lynne | | Attorney | Rockville District Court | Tort | | 01/06/2006 | PROMSUMPHAN, SATTHER vs WASHINGTON METRO AREA TRANSIT AUTHORI |
| 60100030082006 | Bloom, Sara Lynne | | Attorney | Rockville District Court | Tort | | 01/19/2006 | KARGBO, ALINAMY vs WASHINGTON METROPOLITAN AREA |
| 60100059682003 | Bloom, Sara Lynne | | Attorney | Rockville District Court | Tort | | 03/17/2003 | ALTAMIRI, ROMANET vs BILLINGER, DANIEL DARRELL et al |
| 60100153172000 | Bloom, Sara Lynne | | Attorney | Rockville District Court | Tort | | 06/23/2000 | DAWODU, ADESOLA vs WASHINGTON METROPOLITANAREA TRANSIT |
| 60100253972001 | Bloom, Sara Lynne | | Attorney | Rockville District Court | Tort | Closed | 10/26/2001 | RASHID, FATMATU vs  WASHINGTON METRO. AREA TRANSITAUTHORIT et al |

3

Bloom Decl. and Exhs 030

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 60200029552004 | Bloom, Sara Lynne | | Attorney | Silver Spring District Court 02 | Tort | Closed | 03/23/2004 | PENN, ROCHELLE vs  WASHINGTO METROPOLITAN AREA TRASIT AUTHO et al |
| 60200051382002 | Bloom, Sara Lynne | | Attorney | Silver Spring District Court 02 | Tort | Closed | 03/08/2002 | FONZIN, PHILIPPE vs  PAYNE, HUGHEY JR et al |
| 60200093582001 | Bloom, Sara Lynne | | Attorney | Silver Spring District Court 02 | Tort | Closed | 08/22/2001 | MILLER, WENDOLYN vs  BRINSON, KENNETH RANDOLPH et al |
| 60200107742000 | Bloom, Sara Lynne | | Attorney | Silver Spring District Court 02 | Tort | Closed | 05/19/2000 | KAMARA, LUCIA  vs  WASH. METRO. AREA TRANS. AUTHORITY et al |
| 60200114332002 | Bloom, Sara Lynne | | Attorney | Silver Spring District Court 02 | Tort | Closed | 05/21/2002 | MURPHY, RENAUL vs  AVERY, FRED et al |
| 60200157521999 | Bloom, Sara Lynne | | Attorney | Silver Spring District Court 02 | Tort | Closed | 07/23/1999 | HINDS, BARBARA A vs  MANSARAY, SULAIMAN et al |
| 60200213292002 | Bloom, Sara Lynne | | Attorney | Silver Spring District Court 02 | Tort | Closed | 10/02/2002 | HARRIGAN, BERTHEA A vs  WASHINGTON METRO AREA et al |
| 60200276531999 | Bloom, Sara Lynne | | Attorney | Silver Spring District Court 02 | Tort | Closed | 11/23/1999 | ROBINSON, STEFFANIE vs WASHINGTON METROPOLITAN AREA TRANSIT AUT |
| 60200296401998 | Bloom, Sara Lynne | | Attorney | Silver Spring District Court 02 | Contract | Closed | 11/30/1998 | GREENWOOD TRUST CO. vs  BOWERS, MARY et al |
| 70200019251995 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Contract | Closed | 02/10/1995 | SULLIVAN, CATHERINE D vs WEEKS, BRUCE |
| 70200023941995 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Contract | Closed | 03/10/1995 | LASCO, JEFFREY vs BOARD OF DIR LAKE LOUISE HORIZONTAL PROP |
| 70200026681995 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Contract | Closed | 03/02/1995 | STATE FARM MUTUAL AUTO INSURANCE COMPANY vs BANAGAN, JOSEPH |
| 70200053751994 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Tort | Closed | 05/26/1994 | FRANKLIN, STEPHANIE S vs  HESS, GREGORY MATTHEW et al |
| 70200054921993 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Tort | Closed | 05/06/1993 | MARYLAND AUTO BUYERS INC vs LEIMAN, KATHERINE M |
| 70200067711995 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Tort | Closed | 07/11/1995 | MCKENXIE, PRISCILLA vs WILKERSON, ANNA MARIE |
| 70200096741994 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Contract | Closed | 08/01/1994 | GRANT, ROBERT S vs  KAROPCHINSKY, HARRY RYAN et al |
| 70200118621994 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Contract | Closed | 10/06/1994 | PUMPHREY, LARRY vs HOEHN, TERENCE |
| 70200123071993 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Contract | Closed | 09/28/1993 | DEALERS OUTLET vs FLYNN, LESTER |
| 70200152211993 | Bloom, Sara Lynne | | Attorney | Glen Burnie District Court | Tort | Closed | 12/15/1993 | LEE, SUNG SOO vs DOYLE, BRIAN DAVID |
| 80100251471993 | Bloom, Sara Lynne | | Attorney | Catonsville District Court | Tort | Closed | 10/04/1993 | DOWNS, PATRICIA ANN STYLC vs  LUCKE, FLORENCE ETHEL et al |
| 80200003871995 | Bloom, Sara Lynne | | Attorney | Catonsville District Court | Tort | Closed | 01/27/1995 | KOCZAN, NANCY LOUISE vs BOOS, BRIAN K |
| 80300198551994 | Bloom, Sara Lynne | | Attorney | Baltimore County District Cour | Contract | Closed | 07/29/1994 | STATE FARM MUTUAL AUTOMOBILE vs  BROWN, JOYCE A et al |
| 80300236211994 | Bloom, Sara Lynne | | Attorney | Baltimore County District Cour | Contract | Closed | 09/08/1994 | BARRETT, SHEILA vs D'ACHINO, DOROTHY |
| 80300283771994 | Bloom, Sara Lynne | | Attorney | Baltimore County District Cour | Contract | Closed | 12/06/1994 | CONWAY, JOHN HENRY SR vs  DIETRICH, WILIAM et al |
| 80400125331996 | Bloom, Sara Lynne | | Attorney | Towson District Court | Tort | Closed | 12/07/1994 | STATE FARM MUTUAL AUTO INSURANCE CO vs HARRISON, WILLIAM |
| 80400130501995 | Bloom, Sara Lynne | | Attorney | Towson District Court | Tort | Closed | 05/18/1995 | ANDERSON, DEVIN vs  MILLER, GLEN ANDREW et al |
| 80400134721995 | Bloom, Sara Lynne | | Attorney | Towson District Court | Contract | Open | 05/26/1995 | SCHERR, HENRY vs  ARIGO, FRANCIS et al |
| 80500219331994 | Bloom, Sara Lynne | | Attorney | Baltimore County District Cour | Tort | Closed | 08/19/1994 | PEARSON, CHARLES vs SCHAEFER, HERBERT C |
| 80500290421993 | Bloom, Sara Lynne | | Attorney | Baltimore County District Cour | Contract | Closed | 11/08/1993 | SCHAFER, WAYNE R vs  DOLLINGER, ELLEN M et al |
| 08C06001455 | Bloom, Sara Lynne | | Attorney | Charles County Circuit Court | | Closed | 08/04/2006 | Darlene Scott vs Lauren M Pittman, et al |
| 08C96001617 | Bloom, Sara Lynne | | Attorney | Charles County Circuit Court | Child Sup | Closed | 08/06/1996 | Shephen vs Stephen |
| 13C96031763 | Bloom, Sara Lynne | | Attorney | Howard County Circuit Court | | Closed | 08/05/1996 | Biniak vs Wisby, et al |
| 13C96032762 | Bloom, Sara Lynne | | Attorney | Howard County Circuit Court | Tort - Mot | Closed | 11/14/1996 | Punchasutthi, et al vs Strauss |
| 155349V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort - Prer | Closed | 07/26/1996 | CESAR INFANTE vs  PAUL MAISEL, et al. |
| 156465V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort | Closed | 08/16/1996 | ANASTASIA GIRARD vs  CLARENCE KEISER, Jr , et al. |
| 181263V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort - Neg | Closed | 01/13/1998 | MARINA GUEVARA vs. WASHINGTON METROPOLITAN AREA TRANSIT AUTHORI |
| 203926V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort - Neg | Closed | 10/12/1999 | MYRA PARKER vs.  WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY |
| 205699V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort - Mot | Closed | 11/24/1999 | WALTER PATTON, Jr  vs. WASHINGTON METROPOLITAN TRANSIT AUTHORITY |
| 238750V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort - Neg | Closed | 12/09/2002 | BERTHEA HARRIGAN vs. WASHINGTON METRO AREA TRANSIT AUTHORITY, et |
| 252635V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort - Mot | Closed | 06/15/2004 | STEVE AGOUSSI, et al. vs. WASHINGTON METROPOLITAN AREA TRANSIT AUTH |
| 260031V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort | Closed | 03/23/2005 | MARIA ESPINOZA vs. WASHINGTON METROPOLITAN AREA TRANSIT AUTHORI |
| 271684V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort - Neg | Closed | 05/19/2006 | ALIMAMY KARGBO vs. WASHINGTON METROPOLITAN AREA TRANSIT AUTHOR |
| 394467V | Bloom, Sara Lynne | | Attorney | Montgomery County Circuit Co | Tort - Neg | Closed | 08/20/2014 | DONALD H BOSIC, et al. vs. JILL ULVESTAD |
| 165674V | | | | | | | | |
| 69302V | | | | | | | | |
| 69304V | | | | | | | | |
| 69306V | | | | | | | | |
| 69308V | | | | | | | | |
| 80400289391994 | Bloom, Sara O Esq | | Attorney | Towson District Court | Contract | Closed | 11/09/1994 | STATE FARM MUTUAL AUTOMOBILE INS., CO. vs WILLIAMS, CARL O |
| 10100137261994 | Bloom, Sara | | Attorney | Civil District Court | Tort | Closed | 03/31/1994 | WASHINGTON, DARLENE vs MOHAMMED, MEHR I |
| 10100455971994 | Bloom, Sara | | Attorney | Civil District Court | Tort | Closed | 10/21/1994 | SNYDER, BARRY vs BRIGGS, ETTA JUANITA L |
| 50200071332003 | Bloom, Sara | | Attorney | Upper Marlboro District Court | Tort | Closed | 03/12/2003 | HUDSON, LAKEISHA vs  WASHINGTON METROPOLITAN AREA TRANSIT AUT et |
| 50200177882004 | Bloom, Sara | | Attorney | Upper Marlboro District Court | Tort | Closed | 05/14/2004 | OLIVER, RHOME vs  DUNN, JOHN T et al |
| 50200201812005 | Bloom, Sara | | Attorney | Upper Marlboro District Court | Tort | Closed | 06/29/2005 | KEARNEY, PATTI vs  KING, JESSIE JR et al |
| 50200235401996 | Bloom, Sara | | Attorney | Upper Marlboro District Court | Contract | Closed | 07/19/1996 | SUNCHASE AMERICAN LTD vs RAMEY, DENISE |
| 50200236911995 | Bloom, Sara | | Attorney | Upper Marlboro District Court | Tort | Closed | 08/15/2005 | MARSHALL, SHARKIYLA vs  RIVERS, HARRY et al |
| 50200285642006 | Bloom, Sara | | Attorney | Upper Marlboro District Court | Tort | Closed | 09/22/2006 | ANTHONY, EVERETTE vs WMATA |
| 60200166592012 | Bloom, Sara | | Defendant | Silver Spring District Court 02 | Tort | Closed | 08/16/2012 | LANGUAGE EXPERIENCE, LLC vs BLOOM, SARA |
| 80100109441993 | Bloom, Sara | | Attorney | Catonsville District Court | Tort | Closed | 01/18/1993 | HANSON, YVONNE vs  DUKE, BOBBIE LOUISE et al |
| 80100105311994 | Bloom, Sara | | Attorney | Catonsville District Court | Contract | Closed | 05/02/1994 | MOORE, JOHN W vs  RICE, DARRYL E et al |
| 80100143411993 | Bloom, Sara | | Attorney | Catonsville District Court | Tort | Closed | 06/21/1993 | NDEM, ENDY ORKORIE vs  LUCKETT, JIMMY EARL et al |
| 80100191561992 | Bloom, Sara | | Attorney | Catonsville District Court | Tort | Closed | 08/10/1992 | VINCENT, ANTHONY vs STANSBURY, ROBERT |
| 80100245141993 | Bloom, Sara | | Attorney | Catonsville District Court | Contract | Closed | 09/27/1993 | TUCKER, NIGEL vs PORTER, BARBARA |
| 80100257481993 | Bloom, Sara | | Attorney | Catonsville District Court | Contract | Closed | 10/07/1993 | LEN POPA CO INC vs  OCKENFELS, WILBERT H et al |
| 80100331991993 | Bloom, Sara | | Attorney | Catonsville District Court | Contract | Closed | 12/30/1993 | NEWELL, RICHARD J vs  FISHER, TERRELL et al |

4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 80200089001994 | Bloom, Sara | | Attorney | Catonsville District Court | Tort | Closed | 04/01/1994 DAVIS, SENORA A vs HUAROMO, UBALDO S |
| 80400032521995 | Bloom, Sara | | Attorney | Towson District Court | Contract | Closed | 03/13/1995 CATONS PLUMBING HEATING AIR CONDITIONING vs COVER, LOIS M |
| 80400073741995 | Bloom, Sara | | Attorney | Towson District Court | Contract | Closed | 03/23/1995 JOHNS HOPKINS BAYVIEW MEDICAL CTR, INC vs ROBINSON, PROVINA D |
| 80400206751992 | Bloom, Sara | | Attorney | Towson District Court | Tort | Closed | 08/28/1992 EVANS, L ROBERT vs SMALL, SUE ELLEN |
| 100100034501994 | Bloom, Sara | | Attorney | Howard County District Court | Contract | Closed | 09/15/1994 ASHBY, ANGELA vs WARTEL, CHARLES WARFIELD et al |

5

# EXHIBIT C

Bloom Decl. and Exhs 033

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

███████████████

Appellant,

v.

DEPARTMENT OF
TRANSPORTATION,

Agency.

DOCKET NUMBER
SF-0752-22-0425-I-1

DATE: January 22, 2024

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

<u>Sara L. Bloom</u>, Esquire, Anchorage, Alaska, for the appellant.

████████████████ Esquire, Anchorage, Alaska, for the agency.

### BEFORE

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

### FINAL ORDER

The agency has filed a petition for review and the appellant has filed a cross petition for review of the initial decision, which reversed the agency's removal action. Generally, we grant petitions such as these only in the following circumstances: the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

Bloom Decl. and Exhs 034

or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, we conclude that neither party has established any basis under section 1201.115 for granting the petition or cross petition for review. Therefore, we DENY the petition for review, and cross petition for review and AFFIRM the initial decision, which is now the Board's final decision. 5 C.F.R. § 1201.113(b).

## BACKGROUND

The appellant was employed as an FV-0802-H Engineering Technician (802 ET) for the Federal Aviation Administration's Engineering Services group at the Infrastructure Construction and Installation Center in Anchorage, Alaska. Initial Appeal File (IAF), Tab 1 at 8-9. From 2011 until 2018, the appellant mostly performed Contracting Officer Representative (COR) duties, which is project coordinator work that involves monitoring Federal contractors performing installation and construction at various worksites. IAF, Tab 10 at 75; Hearing Transcript, Day 2 (HT-2) at 120, 125 (testimony of the appellant). In 2018, however, the agency was attempting to replace a navigational aid on Adak Island and the appellant's second-level supervisor, S.H., wanted to send the appellant and other members of his small work unit to help with construction work that would have involved repetitive heavy lifting and hand-mixing concrete. IAF, Tab 9 at 64-65; HT-2 at 80-81 (testimony of W.G.). The appellant indicated that he could not do this sort of work due to his age and the fact that the Department of Veterans Affairs has rated him as 60% disabled, and subsequently submitted a reasonable accommodation request in October 2018 to his then-supervisor, W.G.,

requesting that the agency accommodate his service-related disabilities by not assigning him installation, construction, and manual labor tasks involving prolonged sitting, standing, twisting, bending, lifting above the shoulder line, lifting greater than 30 pounds, or lifting awkward or bulky items. IAF, Tab 10 at 11, 16, 21-22; HT-2 at 127-28 (testimony of the appellant). As part of his request, the appellant explained that he believed that all duties outside of COR work were marginal functions of his position and that he was only limited to not performing "the more physically demanding, labor-intensive tasks." IAF, Tab 10 at 22.

W.G. subsequently initiated the interactive process, asked the appellant to submit medical information, and convened an advisory Reasonable Accommodation Team (ReAct). *Id.* at 11-12, 294; Hearing Transcript, Day 1 (HT-1) at 35 (testimony of S.H.). The appellant submitted letters from two medical providers from November 2018 stating that his medical conditions include a right knee meniscus tear, bilateral rotator cuff tears, elbow tears, and a traumatic injury to his neck and upper back, but that he could still perform COR duties. IAF, Tab 10 at 15, 18-19. In March 2019, W.G. notified the appellant that he was still evaluating the appellant's request but was concerned that limiting the appellant to COR duties would leave essential functions, such as installation and construction duties, undone. *Id.* at 24. W.G. temporarily assigned the appellant to various light duty projects primarily at the "Complex," a warehouse facility that Engineering Services uses to store items and build out projects. *Id.* In September 2019, the appellant submitted a note from his medical provider, Dr. B.G., ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████. *Id.* at 27. The appellant's then first-level supervisor, F.C., was confused as to whether the appellant was being returned to full duty and if he needed to continue the interactive process and, in January 2020, the appellant submitted a letter from Dr. B.G. ████████ ██████various

████████████████████████████████████████████████████

██████████████████████████████████████████ ██. at 28-33, 44.

On April 6, 2020, after suggestion by the ReAct team, the appellant's then-acting manager, M.R., compiled a list of physical duties that he stated were essential functions of the 802 ET position and, in order to better evaluate what duties the appellant could perform, asked the appellant to have his doctor identify the tasks that he could successfully perform given his current physical limitations. *Id.* at 47-54. The list broke the physical duties of the appellant's position into 15 categories with almost 80 subtasks. *Id.* at 48-52. ██ ██



██████████████ *Id.* at 45. On April 17, 2022, M.R. responded, stating ███████████████████████████████████████████

██████████████████ *Id.* at 60. The appellant did not directly respond to this question. *Id.* at 62, 66-68; HT-1 at 214 (testimony of M.R.).

In June 2020, M.R. notified the appellant that he had determined that the appellant could not be reasonably accommodated in his current position involving primarily installation and construction duties and that he would next consider job reassignment. IAF, Tab 10 at 61-65. On August 25, 2020, the agency offered the appellant an FG-0343-11 Step 10 position as a Management and Program Analyst

in Fort Worth, Texas, which he declined. IAF, Tab 42 at 40-42. On September 2, 2020, M.R. issued the appellant a notice of proposed removal for "inability to perform the essential functions of your position because of your medical condition." IAF, Tab 10 at 5-10. While the appellant's reply was under consideration, the agency approached him about a Logistics Management Specialist position in Anchorage that would have allowed him to continue working in the capacity he had been working in the Complex, but the appellant declined to update his resume for the position and human resources did not qualify him based on his current resume. HT-1 at 41-43 (testimony of S.H.). On November 18, 2020, the agency issued a decision letter sustaining the charge and removing the appellant effective December 22, 2020. IAF, Tab 6 at 14-18. The appellant retired effective December 22, 2020.[2]  IAF, Tab 9 at 128-29.

The appellant subsequently filed a complaint of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging constructive discharge, and in June 2022, the EEOC directed him to file a complaint with the Board. IAF, Tab 7 at 8, 12. The appellant thereafter filed the instant Board appeal. IAF, Tab 1. The administrative judge found that the Board had jurisdiction over the agency's removal decision under 5 U.S.C. § 7701(j) and that the appellant's appeal was timely.[3] IAF, Tab 11. After holding the requested hearing, the administrative judge issued an initial decision reversing the agency's removal action and ordering the agency to retroactively restore the appellant effective December 22, 2020.[4]  IAF, Tab 60, Initial Decision (ID) at 47. The

---

[2] The agency purposely set the effective date so that the appellant could retire prior to the removal, but if he did not retire, the removal would go into effect. HT-1 at 219-21 (testimony of M.R.).

[3] Under 5 U.S.C. § 7701(j), an appellant who retires after receiving the agency's decision to remove him, but on or before the scheduled effective date of his removal, may still appeal his removal to the Board. *Mays v. Department of Transportation*, 27 F.3d 1577, 1578-81 (Fed. Cir. 1994).

[4] The appellant indicated at the hearing, and on petition for review, that although he retired, his circumstances changed, and he would like to return to work for the FAA. HT-2 at 186-87 (testimony of the appellant); Petition for Review (PFR) File, Tab 3

Bloom Decl. and Exhs 038

administrative judge first concluded that the agency did not prove its charge. ID at 15-40. In this regard, the administrative judge found that the agency's April 6, 2020 list of duties overstated and did not establish the precise essential functions of the 802 ET position. ID at 16-29. He determined that the essential functions of the 802 ET position involve being able to perform a "critical mass" of the tasks identified in the April 6, 2020 list, including enough tasks in the installation and construction categories, as well as some COR work and some work in the Complex. ID at 16-29. The administrative judge concluded that the appellant is medically able to perform COR and Complex work, and that he is also able to perform some installation and construction work with accommodations, and thus that the agency did not establish the charge. ID at 29-40. The administrative judge also found that the appellant proved his affirmative defense of disability discrimination based on a denial of a reasonable accommodation. ID at 40-41. However, the administrative judge concluded that the appellant did not establish his claim of retaliation for making a reasonable accommodation request or his claim of disparate treatment disability discrimination, as he did not establish that his disability was a motivating factor in the removal decision. ID at 42-47.

The agency has filed a petition for review, arguing that the administrative judge erred in finding that it did not prove the charge and that the appellant established his affirmative defense of disability discrimination based on a denial of a reasonable accommodation. Petition for Review (PFR) File, Tab 1. The appellant filed a response and a cross petition for review in which he largely disputes the administrative judge's finding that he did not establish retaliation for making a reasonable accommodation request. PFR File, Tab 3. The agency filed a reply and a response to the appellant's cross petition for review. PFR File, Tab 5.

---

at 15-16.

## DISCUSSION OF ARGUMENTS ON REVIEW

<u>We agree with the administrative judge that the agency did not prove the charge.</u>

Where, as here, the appellant does not occupy a position with medical standards or physical requirements or subject to medical evaluation programs, in order to establish a charge of medical inability to perform, the agency must prove a nexus between the employee's medical condition and observed deficiencies in his performance or conduct, or a high probability, given the nature of the work involved, that his condition may result in injury to himself or others. *Fox v. Department of the Army*, 120 M.S.P.R. 529, ¶ 25 (2014); *see Haas v. Department of Homeland Security*, 2022 MSPB 36, ¶¶ 10-15 (recognizing this standard and comparing it with the differing standard that applies in the context of an employee's removal from a position with medical standards based solely on their medical history). The Board has otherwise described this standard as requiring that the agency establish that the appellant's medical condition prevents him from being able to safely and efficiently perform the core duties of his position. *Haas*, 2022 MSPB 36, ¶¶ 15, 20. In determining whether an agency has met this burden, the Board will consider whether a reasonable accommodation, short of reassignment, exists that would enable the appellant to safely and efficiently perform his core duties. *Id.*, ¶ 25.

The Board has indicated that the core duties of a position are synonymous with the essential functions of a position under the Americans with Disabilities Act (ADA), as amended by the Americans With Disabilities Act Amendments Act of 2008 (ADAAA), i.e., the fundamental job duties of the position, not including marginal functions. *Id.*, ¶ 21 (citing *Clemens v. Department of the Army*, 120 M.S.P.R. 616, ¶ 6 (2014); 29 C.F.R. § 1630.2(n)(1)). Evidence of whether a particular function is essential includes, among other things, the employer's judgment as to which functions are essential, written position descriptions, the amount of time spent performing the function, the consequences of not requiring

Bloom Decl. and Exhs 040

8

the incumbent to perform the function, and the work experience of past and current incumbents in the job. 29 C.F.R. § 1630.2(n)(3).

Below, the appellant maintained that the essential functions of the 802 ET position were limited to COR work, while the agency maintained that the essential functions of the position were the various tasks on its April 6, 2020 list, including significant installation and construction work. *See* IAF, Tab 21 at 4; HT-2 at 208 (agency closing statement). In the initial decision, the administrative judge found that the position was not limited to COR work. ID at 22. He discussed several written position descriptions and found that each indicated that, at the least, the 802 ET position could involve some installation and construction work. ID at 18-23. He also credited the testimony of multiple past and present incumbents of the position who explained that while the duties of an 802 ET from 2011 to 2018 mostly involved COR/project manager work, the agency prefers to have its ETs perform work in-house and that installation and construction work was a central part of the job before 2011 and after 2018. ID at 21-22.

However, while the administrative judge found that the appellant understated the essential functions of the 802 ET position, he also found that the agency's April 6, 2020 list overstated the essential functions. ID at 25. As noted above, the agency's list broke down what it alleged are the essential functions of the position into 15 general essential functions, including: (1) rack and equipment installation; (2) cable pulling; (3) conduit installation; (4) electrical energized work; (5) grounding and bonding; (6) loading and unloading aircraft; (7) ladders and elevated platforms; (8) general mechanical/carpentry work; (9) electrical grounding work; (10) general housekeeping and maintenance work; (11) general physical COR work; (12) ES Complex; (13) overhead heater installation; (14) site demolition; and (15) install of SWS system. IAF, Tab 10 at 48-52. It further broke down these general functions into approximately 80 subtasks, including, for example, "hammer drilling 15 lbs., bent over less than 5 min at a time, but repetitive throughout the day," "installing and terminating

wires and or cables," "lifting 50 lb coolers repetitively," "standing on ladders to install electrical components and conduits minutes to hours," and "rebuilding walls and stairs." *Id.* The agency compiled the list by surveying tasks completed by ETs across different groups in Alaska over the past 2 years and then labeling every task an essential function. ID at 27; HT-1 at 210-212, 246 (testimony of M.R.).

Although this list is exhaustive, the administrative judge found that it does not accurately describe the essential functions of the appellant's 802 ET position because it does not focus on the work of the appellant's specific 802 ET unit, it does not distinguish between essential and marginal functions, and because the written position descriptions for the 802 ET position do not support essential functions as extensive and detailed as these. ID at 26-27. Further, the administrative judge explained that M.R. testified that he could accommodate an individual who could only perform part of the list, and the current manager of the appellant's old work unit, R.N., testified that an ET must be able to do some of these tasks, but not all, that projects vary, and he tries to utilize the skills of his employees accordingly. ID at 27; HT-1 at 244-45 (testimony of M.R.); HT-2 at 31-32 (testimony of R.N.). The administrative judge thus concluded, based on this testimony and his review of the evidence relating to the other factors set forth at 29 C.F.R. § 1630.2(n)(3), that the essential functions of the position include being able to perform a "critical mass" of the tasks identified in the April 6, 2020 list, including some tasks in the installation and construction categories, such that the 802 ET position is not fundamentally altered by putting the employee on permanent light duty or by limiting the individual to so few installation and construction tasks that he is unable to contribute to the core of the work unit. ID at 25-29. The administrative judge indicated that the essential functions involve some COR work, some work at the Complex, and some installation and construction work. *See* ID at 33-40.

We discern no reason to disturb the administrative judge's thoroughly analyzed and reasoned finding. *See Crosby v. U.S. Postal Service*, 74 M.S.P.R. 98, 106 (1997) (finding no reason to disturb the administrative judge's findings when she considered the evidence as a whole, drew appropriate inferences, and made reasoned conclusions on issues of credibility). On review, the agency argues that the administrative judge improperly placed an "inordinate burden" on it to establish the precise essential functions of the position and that "the only reasonable conclusion is that the essential functions of the 802 ET position . . . are installation and construction duties in general." PFR File, Tab 1 at 20 (citing *Clemens*, 120 M.S.P.R. 616, ¶ 8 (defining the essential function of the position as "significant verbal communication" instead of the underlying tasks identified in the position description)). However, we do not find the administrative judge's conclusion that an 802 ET must be able to perform some installation and construction tasks identified in the April 6, 2020 list necessarily inconsistent with the contention that an 802 ET must be able to perform installation and construction duties in general. The administrative judge correctly recognized that an employee must be able to perform enough installation and construction tasks to contribute to the work unit. ID at 29.

The agency also argues throughout its petition that the administrative judge crafted a "modified" 802 ET position by finding that the essential functions of the position include some COR work, some work at the Complex, and some installation and construction work. *See* PFR File, Tab 1 at 13, 26. The agency emphasizes that the record shows that the 802 ET position involves mostly installation and construction duties, and that COR work and work at the Complex are now performed by employees in a different job series. *Id.* at 26. Although we appreciate the agency's point, the agency also continually maintained throughout this case that the essential functions of the 802 ET position are the tasks identified in its April 6, 2020 list, which include "[g]eneral physical COR work"

and work at the "ES Complex."[5]  IAF, Tab 10 at 48, 50-51.  The agency based its charge on the appellant's inability to perform these functions of his position. IAF, Tab 6 at 14-16.  As previously stated, the administrative judge repeatedly acknowledged that the 802 ET position primarily involves installation and construction duties.  *See* ID at 22-23, 28.  The administrative judge also found that incumbents periodically work in the Complex and may do COR work.  ID at 28; *see also* HT-1 at 44 (testimony of S.H.).  Thus, the agency's argument provides no reason for disturbing the initial decision.  Moreover, we agree with the administrative judge's conclusion and above characterization that the essential functions, or core duties, of the 802 ET position on the record before us include being able to perform a "critical mass" of the tasks identified in the April 6, 2020 list. *See Clemens*, 120 M.S.P.R. 616, ¶ 6.

The administrative judge also subsequently determined that the appellant was medically able to perform work in the Complex, COR work, and some installation and construction work, both with and without accommodations, thus leading to the conclusion that the agency did not establish that the appellant's medical condition prevented him from being able to safely and efficiently perform the core duties of his position. ID at 29-40. The administrative judge reviewed the various medical evidence noted above, including a January 2020

---

[5] On review, the agency states that the April 6, 2020 list was "perhaps inarticulately worded by referring to the duties as 'essential functions,'" when the purpose of the list was to help the appellant "develop an accommodation request that could be found reasonable and effective." PFR File, Tab 1 at 19. But the agency's statement is inconsistent with its position throughout the entirety of this case and, most importantly, its removal letter, which specifically referred to the tasks listed in the April 6, 2020 letter as essential functions. *See* IAF, Tab 6 at 14-16. Further, the agency states that the list was developed to fully understand how the appellant's restrictions affected his ability to perform all of the essential functions of his position and that if he "could perform enough of the subtasks, for example, he could be deemed able to perform that job category despite not being able to complete them all, and thus could be deemed capable of performing installation and construction in general." PFR File, Tab 1 at 19. This reasoning is consistent with the administrative judge's analysis and conclusion that the essential functions of the position include being able to perform a "critical mass" of the tasks identified in the April 6, 2020 list.

Bloom Decl. and Exhs 044

letter from Dr. B.G. setting forth the appellant's most recent particular restrictions that stated that ███████████████████████████████████████████

███████████████████████████████████████████████████████████

██████ ██████ ██████ ██████ ██████ ██ ██████ ██ ████

██████████████████.'' IAF, Tab 10 at 44. With respect to the appellant's ability to perform installation and construction work, the administrative judge found that the appellant's restrictions ruled out some work, but that the agency did not establish that all installation and construction work has physical requirements that are beyond the appellant's limitations, because it did not establish whether any particular subtasks on the April 6, 2020 list are, in and of themselves, essential. ID at 36-37. Based on Dr. B.G.'s annotations of the April 6, 2020 list of alleged essential functions, which also constitutes medical evidence, the administrative judge found that although there were five categories where the appellant likely could not perform the subtasks in question (conduit installation, loading and unloading aircraft, overhead heater installation, site demolition, and installation of SWS system), he could perform each of the subtasks with accommodations in four categories (cable pulling, electrical energized work, grounding and bonding, and general housekeeping and maintenance work) and most of the subtasks in the four remaining construction-based categories (rack and equipment installation, ladders and elevated platforms, general mechanical/carpentry work, and electrical grounding work). ID at 37; *see also* IAF, Tab 10 at 48-52. The administrative judge found that the appellant could perform the above tasks with reasonable accommodations including taking breaks as needed, using assistance devices, and job modification, since ETs work in crews with varying assignments, which he found consistent with testimony from M.R. and R.N. about how work is done. ID at 38; *see also* IAF, Tab 10 at 45.

On review, the agency argues that the administrative judge improperly considered the medical evidence in this case. PFR File, Tab 1 at 14-17.

13

Specifically, the agency claims that the administrative judge wrongly gave "little weight" to medical opinions that recommended that the appellant "avoid installation and construction tasks" and relied on medical documentation that the appellant submitted to support his request to perform solely COR duties when installation and construction work is far more strenuous. *Id.* at 14-15. We disagree. In reaching his conclusion, the administrative judge properly weighed the medical evidence. ID at 29-38; *see Brown v. Department of the Interior*, 121 M.S.P.R. 205, ¶ 11 (2014) (recognizing that, in assessing the probative weight of medical opinions, the Board considers whether the opinion was based on a medical examination and provided a reasoned explanation for its findings as distinct from mere conclusory assertions, the qualifications of the expert rendering the opinion, and the extent and duration of the expert's familiarity with the treatment of the appellant), *overruled on other grounds by Haas*, 2022 MSPB 36.

Although the administrative judge gave little weight to medical opinions that simply stated that the appellant should avoid installation and construction work, he properly reasoned that some of these opinions lack appropriate specificity and, because installation and construction work varies, whether the appellant can perform it depends on the particular requirements. ID at 31. Neither of the opinions that the agency points to indicate an understanding of what installation and construction work actually entails. *See* PFR File, Tab 1 at 15; IAF, Tab 10 at 37, 44; *Brown*, 121 M.S.P.R. 205, ¶ 11. Further, although the administrative judge discussed medical documentation that stated that the appellant could continue to work as a COR, which we acknowledge is less physically strenuous than installation and construction duties, the administrative judge correctly went on to analyze whether the particular restrictions within those documents prevented the appellant from performing installation and construction duties. *See* ID at 31-32, 36-38. We understand the agency's concern that it cannot "simply ignore" medical recommendations that put it on notice of the

appellant's physical limitations; however, the agency's arguments on the whole also largely ignore the fact that Dr. B.G.'s response to its April 6, 2020 list explicitly indicates that the appellant *can* perform some installation and construction work. PFR File, Tab 1 at 15.

The agency also disputes the fact that the administrative judge credited the appellant's estimation of his physical condition and testimony that he is not as "limited" as it may appear, instead claiming that the appellant appears to be downplaying the severity of his condition. PFR File, Tab 1 at 16. However, the Board has regularly held that it will not disturb an administrative judge's findings when he considered the evidence as a whole, drew appropriate inferences, and made reasoned conclusions on issues of credibility. *See Broughton v. Department of Health and Human Services*, 33 M.S.P.R. 357, 359 (1987). Further, the administrative judge made credibility determinations based on his observation of each witness's demeanor at the hearing, and we decline to disturb those findings on review. *See* ID at 14 (citing *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987) (identifying the factors that an administrative judge must consider in making credibility determinations)); *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002) (concluding that the Board generally must give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing and may overturn such determinations only when it has "sufficiently sound" reasons for doing so).

Throughout its petition for review, the agency also argues that the appellant did not identify specific reasonable and effective accommodations that would enable him to perform installation and construction duties. *See* PFR File, Tab 1 at 22-23. In the initial decision, the administrative judge discussed that Dr. B.G. suggested in his response to the agency's April 6, 2020 list that, for those tasks the appellant needed an accommodation, the appellant could take frequent rests, use assistive devices, and use the assistance of other people on the jobsite. ID at

37; IAF, Tab 10 at 45.   Although the agency claims that "assistive devices" is vague, the appellant did in fact testify at the hearing that this could include a dolly, a forklift, or a puller of some sort.   HT-2 at 155 (testimony of the appellant).  The administrative judge also found that job modification is a viable accommodation because ETs work in crews with varying assignments.   ID at 38. We note that the Board has held that an agency is not required to modify or eliminate duties that are an essential function of the position.   *Johnson v. U.S. Postal Service*, 120 M.S.P.R. 87, ¶ 10 (2013).   Here, however, as the administrative judge found, R.N. testified that projects vary, that he tries to utilize the skills of his employees accordingly, and that if an employee cannot do a particular type of task, the agency can and does assign it to others.   ID at 27; HT-2 at 31-32 (testimony of R.N.).   The agency has not persuaded us to disturb this conclusion.   Moreover, the agency has not established that the administrative judge erred in concluding that it did not meet its burden in proving its charge.

<u>We agree with the administrative judge's conclusions as to the appellant's affirmative defenses.</u>

Below, the appellant presented a disability discrimination claim based on the theory of a failure to accommodate.   IAF, Tab 21 at 6, Tab 43 at 2-3.   The Board adjudicates claims of disability discrimination raised in connection with an otherwise appealable action under the substantive standards of section 501 of the Rehabilitation Act, which has incorporated the standards of the ADA as amended by the ADAAA.   *Haas*, 2022 MSPB 36, ¶ 28.  Under the relevant provisions, it is illegal for an employer to "discriminate against a qualified individual on the basis of disability."   *Id.*; 42 U.S.C. § 12112(a).   To prove disability discrimination based on a failure to accommodate, an employee must show that (1) he is an individual with a disability, as defined by 29 C.F.R. § 1630.2(g); (2) he is a qualified individual with a disability as defined by 29 C.F.R. § 1630.2(m); and (3) the agency failed to provide a reasonable accommodation.   *Miller v. Department of the Army*, 121 M.S.P.R. 189, ¶ 13 (2014).   A qualified individual

with a disability is one who can "perform the essential functions of the . . . position that such individual holds or desires" with or without accommodation. *Haas*, 2022 MSPB 36, ¶ 28; 42 U.S.C. § 12111(8); *see* 29 C.F.R. § 1630.2(m). An agency is required to provide reasonable accommodation to an otherwise qualified individual with a disability, unless the agency can show that doing so would cause an undue hardship on its business operations.  42 U.S.C. § 12112(b)(5); *Haas*, 2022 MSPB 36, ¶ 28; *Clemens*, 120 M.S.P.R. 616, ¶ 10.  Once an employee informs the agency that he requires an accommodation, the agency must engage in an interactive process to determine an appropriate accommodation. *Kirkland v. Department of Homeland Security*, 119 M.S.P.R. 74, ¶ 18 (2013). "The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability."  29 C.F.R. part 1630, appendix, § 1630.9.

In the initial decision, the administrative judge concluded that the appellant proved his claim of disability discrimination based on a denial of a reasonable accommodation because the administrative judge found that the appellant is able to perform the essential functions of the 802 ET position as established in this appeal, and thus that he is a qualified individual with a disability, because the agency did not provide the appellant with an accommodation as it erroneously determined he could not perform the essential functions of the position, and because the agency did not show that the accommodations in question would create an undue hardship.  ID at 41.  On review, the agency does not dispute that the appellant is an individual with a disability but argues that the administrative judge erred in finding that the appellant is a qualified individual with a disability, or that he can perform the essential functions of the 802 ET position with or without accommodations.  PFR File, Tab 1 at 17-21.  However, as discussed above, we agree with the administrative judge's analysis as to the essential functions of the 802 ET position and that the appellant can perform many of those functions both with and without accommodations.

The agency also argues that the administrative judge disregarded the fact that the appellant did not properly engage in the interactive process in this case. PFR File, Tab 1 at 21-24. Courts have generally required both parties to engage in the interactive process in good faith. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000); *Collins v. U.S. Postal Service*, 100 M.S.P.R. 332, ¶ 11 (2005). Here, we do not agree that the appellant failed to engage in the interactive process in good faith. The appellant promptly provided the agency with additional medical information on the nature of his disability on multiple occasions and he indicated his belief as to the essential functions of his position, although maybe misguided, and his interest in finding a reasonable accommodation. To this end, he told W.G. that he could do installation and construction work with an accommodation. IAF, Tab 10 at 21-22. Further, the appellant's physician, Dr. B.G., immediately responded to the agency's April 6, 2020 request to better understand the appellant's physical limitations, reviewing more than 80 alleged essential functions to determine whether each individual task was something that the appellant could perform. *Id.* at 45-52.

Although the agency contends that the appellant did not offer any indication as to what accommodations he might need to perform the specific duties in the April 6, 2020 list, including installation and construction duties, Dr. B.G. specifically stated  We do not find these suggested accommodations unreasonable. We do agree with the agency that the appellant made matters more difficult in this case by not directly responding to M.R.'s conclusion that, based on Dr. B.G.'s annotations, it was "clear" that the appellant was unable to perform the essential functions as detailed in the April 6, 2020 list and thus that M.R.

18

would start the reassignment process.  *See* PFR File, Tab 1 at 21-22; IAF, Tab 10 at 60. However, M.R.'s response ignored the fact that Dr. B.G. indicated that the appellant *could* perform many of the alleged essential functions and that he provided proposed reasonable accommodations.    Continuing the interactive process would have been the opportunity to explore the proposed reasonable accommodations further.  The agency claims on review that the purpose of the April 6, 2020 list was to identify the types of things the appellant could do and to find an accommodation, and that is exactly what the appellant's response from Dr. B.G. does.  *See* PFR File, Tab 1 at 19.  Consequently, the agency's arguments have not persuaded us that the administrative judge erred in finding that the appellant proved his claim of disability discrimination based on failure to provide a reasonable accommodation.

Below, the appellant also alleged that the agency retaliated against him for requesting a reasonable accommodation and that it engaged in disparate treatment disability discrimination.  IAF, Tab 43 at 2-3; ID at 40.  With regard to the first claim, the appellant argued that his second-level supervisor, S.H., and his first-level supervisors, F.C. and then M.R., made his job difficult and wanted to get rid of him after he refused to go to Adak Island and after he asked for accommodation.  ID at 42-45.  The administrative judge found that the appellant failed to prove this claim because all three witnesses testified that neither S.H. nor F.C. were involved in the decision making regarding the appellant's removal, the appellant did not establish that S.H. influenced M.R. at all in issuing the decision, and there was no direct evidence, comparator evidence, or any other indications in the record that M.R. expressed hostility towards the appellant's reasonable accommodation request.    ID at 43-45.  The administrative judge explained that although M.R.'s April 6, 2020 list was "over-inclusive" and "made it almost certain that the appellant could not perform what the agency deemed the essential functions," he found M.R.'s approach genuinely erroneous and not an effort to retaliate against the appellant for requesting a reasonable

accommodation. ID at 45. In his cross petition for review, the appellant largely reargues his version of the facts leading to the removal decision, disputes the testimony of several witnesses and the administrative judge's credibility determinations, and reargues that S.H. was involved in his removal. PFR File, Tab 3 at 19-27. However, merely rearguing factual issues raised and properly resolved by the administrative judge below does not establish a basis for review. *Broughton*, 33 M.S.P.R. at 359 (1987); *see also Haebe*, 288 F.3d at 1301.

In his cross petition, the appellant also briefly discusses his claim of disparate treatment disability discrimination. PFR File, Tab 3 at 27. He asserts that "[o]thers not in his protected class" were assigned duties that did not involve intensive labor; specifically, J.W. and M.L. *Id.* However, the administrative judge discussed J.W. and found that although J.W. spent some time developing software for the agency, he is now doing installation and construction work and is thus not a good comparator and does not support the appellant's claim. ID at 46. With regard to the appellant's claim as to M.L., we decline to consider this argument that the appellant submits for the first time on review because he has not shown that it is based on new and material evidence not previously available despite his due diligence. *See Banks v. Department of the Air Force*, 4 M.S.P.R. 268, 271 (1980).

The agency's remaining arguments provide no basis for disturbing the initial decision.

On review, the agency also contends that even if the Board disagrees with its above arguments, the Board should reverse the initial decision and reopen the proceedings. PFR File, Tab 1 at 24-27. In this regard, the agency first argues that the administrative judge erred in finding that the appellant is medically capable of performing the essential functions of the 802 ET position without allowing testimony from its Regional Flight Surgeon, Dr. M.D. *Id.* at 25. The agency explains that it did not call Dr. M.D. as an expert witness as to its determination that the appellant was medically unable to perform the essential

20

functions of his position because the appellant stated throughout this case that he was only challenging the agency's determination that the essential functions of the 802 ET position include more than COR duties and not its determination that he was medically unable to perform the tasks it identified as essential functions, including installation and construction duties. *Id.* at 11, 13, 24-25; *see also* IAF, Tabs 19, 20. The agency alleges that the only discussion of accommodations that would allow the appellant to perform installation and construction duties resulted from the administrative judge's own questioning. *Id.* at 13, 25. We find the agency's assertions unavailing. Although the appellant apparently indicated that he did not plan to challenge the agency's determination that he was medically unable to perform the functions it identified in its April 6, 2020 list, it was the agency's burden to prove its charge and whether the appellant's medical condition prevents him from being able to safely and efficiently perform the core duties of his position. *See Haas*, 2022 MSPB 36, ¶¶ 15, 20. Additionally, while the agency seems to take issue with the administrative judge's questioning of the witnesses, the Board's regulations provide an administrative judge with wide discretion to regulate the course of a hearing. 5 C.F.R. § 1201.41(b)(6). Furthermore, as discussed above, the appellant addressed the issue of what accommodations would allow him to perform installation and construction work during the interactive process.

Similarly, the agency also contends that the administrative judge erred in finding that the "modified" installation and construction position constitutes a full-time position and effective accommodation without the testimony of the 802 ET manager, R.N. PFR File, Tab 1 at 26. The agency asserts that because the appellant "did not raise as a potential accommodation the modified position the AJ ultimately crafted," it did not elicit testimony from R.N. as to whether a position that consisted of COR work, Complex work, and some installation and construction tasks could "even constitute a full-time position" or whether this would warrant sending the appellant to construction projects. *Id.* However, as

explained above, we disagree with the agency's characterization of the initial decision as creating a "modified" position. The agency's April 6, 2020 list, which it argued constitutes the essential functions of the 802 ET position and on which it based its charge, includes installation and construction work, COR work, and work at the Complex. Despite this, the administrative judge properly recognized that the position involves mostly installation and construction work. Whether an individual can perform COR and Complex work is *part of* the analysis as to whether they can perform the essential functions of the 802 ET position. The agency also claims that the initial decision "effectively requires" it to reinstate the appellant to a "newly-crafted position not currently performed by any other 802 ET" and, as a practical matter, means that the agency would likely have to reinstate him to a permanent position at the Complex, which he previously rejected. PFR File, Tab 1 at 26. But again, the agency's argument ignores the fact that the administrative judge recognized that 802 ETs mostly perform installation and construction work and that the administrative judge found that the appellant can perform some of this work with accommodations. The initial decision does not require the agency to effectively reinstate the appellant to the Complex. Therefore, the agency's assertions are unpersuasive.

Accordingly, we affirm the initial decision.

## ORDER

We ORDER the agency to CANCEL the removal and to retroactively restore the appellant effective December 22, 2020. *See Kerr v. National Endowment for the Arts*, 726 F.2d 730 (Fed. Cir. 1984). The agency must complete this action no later than 20 days after the date of this decision.

We also ORDER the agency to pay the appellant the correct amount of back pay, interest on back pay, and other benefits under the Office of Personnel Management's regulations, no later than 60 calendar days after the date of this decision. We ORDER the appellant to cooperate in good faith in the agency's

efforts to calculate the amount of back pay, interest, and benefits due, and to provide all necessary information the agency requests to help it carry out the Board's Order. If there is a dispute about the amount of back pay, interest due, and/or other benefits, we ORDER the agency to pay the appellant the undisputed amount no later than 60 calendar days after the date of this decision.

We further ORDER the agency to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order and of the actions it has taken to carry out the Board's Order. The appellant, if not notified, should ask the agency about its progress. *See* 5 C.F.R. § 1201.181(b).

No later than 30 days after the agency tells the appellant that it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the office that issued the initial decision on this appeal if the appellant believes that the agency did not fully carry out the Board's Order. The petition should contain specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communications with the agency. 5 C.F.R. § 1201.182(a).

For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached. The agency is ORDERED to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

### NOTICE TO THE APPELLANT REGARDING YOUR RIGHT TO REQUEST ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs. To be paid, you must meet the requirements set forth at Title 5 of

the United States Code (5 U.S.C.), sections 7701(g), 1221(g), or 1214(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202, and 1201.203. If you believe you meet these requirements, you must file a motion for attorney fees and costs WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your motion for attorney fees and costs with the office that issued the initial decision on your appeal.

## NOTICE TO THE APPELLANT REGARDING YOUR RIGHT TO REQUEST COMPENSATORY DAMAGES

You may be entitled to be paid by the agency for your compensatory damages, including pecuniary losses, future pecuniary losses, and nonpecuniary losses, such as emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. To be paid, you must meet the requirements set out at 42 U.S.C. § 1981a. The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202, and 1201.204. If you believe you meet these requirements, you must file a motion for compensatory damages WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your motion with the office that issued the initial decision on your appeal.

## NOTICE OF APPEAL RIGHTS[6]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their

---

[6] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

Bloom Decl. and Exhs 056

jurisdiction.  If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

(1) **Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date of issuance of this decision.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The

Bloom Decl. and Exhs 057

Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

(2) **Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision.  If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision.  5 U.S.C. § 7702(b)(1).  If you have a representative in this case, and your representative receives this decision before you do, then you must file

with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) <u>Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012</u>**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[7]  The court of appeals must <u>receive</u> your petition for

---

[7] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

27

review within **60 days** of the <u>date of issuance</u> of this decision.    5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.   20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

> http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

*Jennifer Everling*

FOR THE BOARD:    _____

Jennifer Everling
Acting Clerk of the Board

Washington, D.C.

Bloom Decl. and Exhs 060



**DEFENSE FINANCE AND ACCOUNTING SERVICE**
**Civilian Pay Operations**

# DFAS BACK PAY CHECKLIST

The following documentation is required by DFAS Civilian Pay to compute and pay back pay pursuant to 5 CFR § 550.805.  Human resources/local payroll offices should use the following checklist to ensure a request for payment of back pay is complete.  Missing documentation may substantially delay the processing of a back pay award.  **More information may be found at: https://wss.apan.org/public/DFASPayroll/Back%20Pay%20Process/Forms/AllItems.aspx.**

**NOTE: Attorneys' fees or other non-wage payments (such as damages) are paid by vendor pay, not DFAS Civilian Pay.**

☐  1) Submit a **"SETTLEMENT INQUIRY - Submission"** Remedy Ticket.  Please identify the specific dates of the back pay period within the ticket comments.

Attach the following documentation to the Remedy Ticket, or provide a statement in the ticket comments as to why the documentation is not applicable:

☐  2) Settlement agreement, administrative determination, arbitrator award, or order.

☐  3) Signed and completed "Employee Statement Relative to Back Pay".

☐  4) All required SF50s (new, corrected, or canceled).  **\*\*\*Do not process online SF50s until notified to do so by DFAS Civilian Pay.\*\*\***

☐  5) Certified timecards/corrected timecards.  **\*\*\*Do not process online timecards until notified to do so by DFAS Civilian Pay.\*\*\***

☐  6) All relevant benefit election forms (e.g. TSP, FEHB, etc.).

☐  7) Outside earnings documentation.  Include record of all amounts earned by the employee in a job undertaken during the back pay period to replace federal employment.  Documentation includes W-2 or 1099 statements, payroll documents/records, etc.  Also, include record of any unemployment earning statements, workers' compensation, CSRS/FERS retirement annuity payments, refunds of CSRS/FERS employee premiums, or severance pay received by the employee upon separation.

**Lump Sum Leave Payment Debts:**  When a separation is later reversed, there is no authority under 5 U.S.C. § 5551 for the reinstated employee to keep the lump sum annual leave payment they may have received.  The payroll office must collect the debt from the back pay award.  The annual leave will be restored to the employee.  Annual leave that exceeds the annual leave ceiling will be restored to a separate leave account pursuant to 5 CFR § 550.805(g).



## NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts.

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

   a. Employee name and social security number.
   b. Detailed explanation of request.
   c. Valid agency accounting.
   d. Authorized signature (Table 63).
   e. If interest is to be included.
   f. Check mailing address.
   g. Indicate if case is prior to conversion.  Computations must be attached.
   h. Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected (if applicable).

   Attachments to AD-343

1. Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement (if applicable).
2. Copies of SF-50s (Personnel Actions) or list of salary adjustments/changes and amounts.
3. Outside earnings documentation statement from agency.
4. If employee received retirement annuity or unemployment, provide amount and address to return monies.
5. Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)
6. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.
7. If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

   NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

   The following information must be included on AD-343 for Settlement Cases:  (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

   a. Must provide same data as in 2, a-g above.
   b. Prior to conversion computation must be provided.
   c. Lump Sum amount of Settlement, and if taxable or non-taxable.

   If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail      ██████████

                  ██████████

                  ████████████

<u>Agency Representative</u>

Electronic Service    Maria Teresa Davenport

Served on email address registered with MSPB

<u>Agency Representative</u>

Electronic Service    Rebecca Snowdall

Served on email address registered with MSPB

<u>Private Attorney</u>

Electronic Service    Sara Bloom

Served on email address registered with MSPB

| 01/22/2024 | Dinh Chung |
|---|---|
| (Date) | Dinh Chung |
| | Case Management Specialist |

Bloom Decl. and Exhs 063

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD

<table>
<tr><td>█████████████<br>Appellant,</td><td>DOCKET NUMBER<br>SF-0752-22-0425-C-1</td></tr>
<tr><td>v.</td><td></td></tr>
<tr><td>DEPARTMENT OF<br>TRANSPORTATION,<br>Agency.</td><td>DATE:  February 20, 2025</td></tr>
</table>

## THIS ORDER IS NONPRECEDENTIAL[1]

Sara L. Bloom, Esquire, Anchorage, Alaska, for the appellant.

██████████████, Esquire, Anchorage, Alaska, for the agency.

████████████, Miramar, Florida, for the agency.

### BEFORE

Cathy A. Harris, Chairman
Henry J. Kerner, Vice Chairman
Raymond A. Limon, Member

### ORDER

The agency has filed a petition for review of the compliance initial decision, which granted the appellant's petition for enforcement and found the agency in noncompliance with the Board's final order reversing the appellant's

---

[1]  A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  See 5 C.F.R. § 1201.117(c).

removal.  For the reasons set forth below, we DENY the agency's petition for review and AFFIRM the compliance initial decision's finding that the agency is in noncompliance with the Board's final order concerning the appellant's reinstatement.

## BACKGROUND

The agency issued a decision removing the appellant from his position as a FV-0802-H Engineering Technician (802 ET) based on the charge of inability to perform the essential functions of his position because of a medical condition. *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-I-1, Initial Appeal File (IAF), Tab 6 at 14-18.  The appellant retired in lieu of removal on December 22, 2020.  IAF, Tab 9 at 128-29.

On appeal, the appellant challenged the merits of the charge and raised allegations of disparate treatment disability discrimination, retaliation for making a reasonable accommodation request, and discrimination based on a denial of a reasonable accommodation.  IAF, Tabs 1, 14, 43.  The administrative judge properly found that the Board had jurisdiction over the removal action.[2]  IAF, Tab 11.  He then issued an initial decision reversing the appellant's removal and ordering the agency to restore the appellant effective December 22, 2020.  IAF, Tab 60, Initial Decision (ID) at 47.  Specifically, the administrative judge found that the agency did not prove its charge, ID at 15-40, that the appellant proved his affirmative defense of disability discrimination based on a denial of a reasonable accommodation, ID at 40-41, and that the appellant did not establish his claim of disparate treatment disability discrimination or his claim of retaliation for making a reasonable accommodation request, ID at 42-47.  Following the agency's petition for review, the Board issued a January 22, 2024 Final Order affirming the

---

[2] When an employee decides to retire because his employing agency has issued a decision to remove him and the employee retires on the date the removal was to become effective, the employee does not lose the right to file a Board appeal contesting the removal.  *Scalese v. Department of the Air Force*, 68 M.S.P.R. 247, 249 (1995).

initial decision and again ordering the agency to reverse the appellant's removal and restore him effective December 22, 2020, within 20 days of the Board's decision. *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-I-1, Final Order (Jan. 22, 2024); *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-I-1, Petition for Review File, Tab 6, Final Order at 21. In the Final Order, the Board ordered the agency to pay the appellant the correct amount of back pay, interest on back pay, and other required benefits. *Id.*

On February 15, 2024, the appellant filed a petition for enforcement regarding the reinstatement portion of the Board's January 22, 2024 Final Order. *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-C-1, Compliance File (CF), Tab 1. He claimed that the agency had not reinstated him to his prior position by the deadline in the Final Order even though he was ready, willing, and able to return to work.[3] *Id.* While the appeal was pending before the administrative judge, the agency submitted documentation contending that it had returned the appellant to duty on April 8, 2024, and that it was in compliance with the Board's reinstatement order. CF, Tab 11. The agency explained that it had exercised its "right to assign work" and decided that the appellant should be returned full-time to the Complex, but still as an 802 ET.[4] *Id.*

---

[3] This petition for enforcement is one of four addendum proceedings in this appeal: *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-A-1, concerns the appellant's request for attorney's fees; *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-P-1, concerns the appellant's request for compensatory damages; and *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-C-2, is a petition for enforcement concerning the backpay component of the Final Order.

[4] In the Board's January 22, 2024 Final Order, we determined that the essential functions of the 802 ET position include some Contracting Officer Representative (COR) duties, which is project coordinator work that involves monitoring Federal contractors performing installation and construction at various worksites; some work at the "Complex," a warehouse facility that Engineering Services uses to store items and build out projects; and some installation and construction work. Final Order at 7-11. We agreed with the administrative judge that the appellant showed he could perform

at 7; CF, Tab 12.  The appellant's new supervisor, R.N., who testified at the hearing in the removal appeal, determined that the appellant was incapable of performing enough installation and construction work to contribute to the unit and that the agency would not be assigning him such duties.  CF, Tab 11 at 50-52, Tab 12 at 6-9.  The appellant, however, argued that the agency was still not in compliance with the reinstatement order because its delay was inexcusable and because it had improperly assigned him full-time to the Complex without engaging in an interactive process with him to determine the installation and construction duties he could perform both with and without accommodation.  CF, Tab 13.

The administrative judge subsequently issued a compliance initial decision finding the agency in noncompliance with the Board's Final Order.  CF, Tab 14, Compliance Initial Decision (CID) at 1.  The administrative judge recognized that the agency returned the appellant to work as an 802 ET, but he concluded that the agency did not properly reinstate the appellant to a position encompassing the same duties.  CID at 5-11.  The administrative judge noted that installation and construction duties are essential functions of the 802 ET position and that stationing the appellant at the Complex was modifying his duties and the essential functions of the position.[5]  CID at 8, 11.  The administrative judge considered R.N.'s declaration that based on the medical information from the removal appeal the appellant could not perform, with or without accommodation, enough installation and construction duties to advance the Agency's mission—even though the appellant maintained he was ready and willing to do installation and

_____

work in the Complex, COR work, and some installation and construction work, both with and without accommodations.  *Id.* at 7-15.  Nevertheless, we recognized, as did the administrative judge, that the 802 ET position currently involves mostly installation and construction duties, and that COR duties and work at the Complex are now performed by employees in a different job series.  *Id.*

[5] The administrative judge explained that R.N. indicated that work at the Complex is now typically performed by 346 Logistics Management Specialists, whose work does not involve the essential functions of installation and construction duties.  CID at 8.

construction work—but ultimately determined that the agency did not show that it had a strong overriding interest or compelling reason for limiting the appellant's duties solely to the Complex, and that, in fact, the agency's actions constituted a clear declaration of noncompliance with the Board's Final Order. CID at 5-16. The administrative judge thus concluded that the agency had not returned the appellant to duties consistent with his 802 ET position and had not engaged in a renewed interactive process with him to ascertain what particular accommodations, if any, he needed to perform those duties, and he granted the petition for enforcement. CID at 16-17.

In its petition for review of the compliance initial decision, the agency argues that the administrative judge incorrectly found that it did not comply with the Board's reinstatement order, Compliance Petition for Review (CPFR) File, Tab 1 at 14-21, that the compliance initial decision improperly permits the Board to "micromanage" the agency's assignment of work, *id.* at 21-23, and that the administrative judge's erroneous decision in this case "infected" the other addendum proceedings in this appeal, *id.* at 23-24.[6] The agency also submits a declaration from its human resources director discussing the appellant's backpay and related documentation. *Id.* at 26-112. The appellant filed a response, and the agency filed a reply. CPFR File, Tabs 3, 4.

## ANALYSIS

When the Board corrects a wrongful personnel action, it is required to ensure that the employee is returned, as nearly as possible, to the status quo ante. *Kerr v. National Endowment for the Arts*, 726 F.2d 730, 733 (Fed. Cir. 1984). The agency bears the burden of proving compliance with the Board's order by a preponderance of the evidence. *Vaughan v. Department of Agriculture*, 116 M.S.P.R. 319, ¶ 5 (2011); 5 C.F.R. § 1201.183(d). An agency's assertions of

---

[6] The agency submitted one petition for review for all four addendum proceedings. CPFR File, Tab 1 at 4. The petition for review almost exclusively addresses issues presented in this specific appeal.

compliance must include a clear explanation of its compliance actions supported by documentary evidence. *Vaughan*, 116 M.S.P.R. 319, ¶ 5. The appellant may rebut the agency's evidence of compliance by making specific, nonconclusory, and supported assertions of continued noncompliance. *Id.*

Restoration to the status quo ante requires that the employee be placed back in his former position or in a position substantially equivalent in scope and status to his former position. *Taylor v. Department of the Treasury*, 43 M.S.P.R. 221, 224-25 (1990). If the agency does not return the employee to his prior position and prior duties, it must show first that it has a strong overriding interest or compelling reason requiring reassignment to a different position, and second that it has reassigned the employee to a position that is substantially similar to the former position. *Gorny v. Department of the Interior*, 115 M.S.P.R. 520, ¶ 6 (2011). In analyzing such an issue, the Board must look beyond the title and grade of the positions involved and must compare the scope of the actual duties and responsibilities of the new position with those of the former position. *Id.*

<u>We agree with the administrative judge that the agency is not in compliance with the Board's order.</u>

Here, the administrative judge concluded that although the agency returned the appellant to an 802 ET position of the same title and grade, there was "no question" that it had not returned him to a position encompassing the same duties because it adamantly maintained that it would not assign the appellant installation and construction work, and, therefore, the appellant would in actuality be functioning as a 346 Logistics Management Specialist (346 LMS) instead of an 802 ET. CID at 11. The administrative judge further concluded after a thorough discussion that the agency did not show that it has a strong overriding interest or compelling reason for limiting the appellant's duties to those of a 346 LMS working at the Complex. CID at 11-16. We see no error in the administrative judge's analysis. *Crosby v. U.S. Postal Service*, 74 M.S.P.R. 98, 106 (1997) (finding no reason to disturb the administrative judge's findings when she

considered the evidence as a whole, drew appropriate inferences, and made reasoned conclusions).

On review, the agency argues that the administrative judge erred legally in finding that it did not restore the appellant to an 802 ET position with duties substantially equivalent in scope and status to those performed by other 802 ETs. CPFR File, Tab 1 at 15. It maintains that although work at the Complex—which involves support functions such as handling FedEx, cargo, and other deliveries, procuring supplies and materials for upcoming projects, and managing tool and equipment inventories—is not the same as installation and construction duties performed in the field, the administrative judge did not meaningfully assess whether these functions are nonetheless substantially equivalent in scope and status. *Id.* However, such a contention is without merit. The administrative judge explicitly and correctly cited the Board's case law explaining that in cases such as this the Board must undertake a substantive assessment of whether the actual duties and responsibilities to which the employee was returned are either the same as or substantially equivalent in scope and status to the duties and responsibilities held prior to the wrongful discharge, and he directly analyzed this issue. CID at 7-8 (citing *Kerr*, 726 F.2d at 733). The administrative judge discussed the relevant evidence and testimony related to the appellant's reinstatement and the duties of his position, addressed the agency's argument that the change in duties was justified, and explicitly found that the appellant was assigned to a different position with different duties, with a clear implicit finding that those duties were not substantially equivalent in scope and status. CID at 6-11. The agency's mere disagreement with the administrative judge's weighing of the evidence on this point does not establish a basis for review. *Broughton v. Department of Health and Human Services*, 33 M.S.P.R. 357, 359 (1987).

To this end, the agency also argues that an administrative judge with the Equal Employment Opportunity Commission (EEOC) found in a different case

that the work the appellant performed at the Complex was neither "outside his job description or his physical limits" nor "demeaning or atypical of the types of assignments" performed by other 802 ETs, thus suggesting that the appellant's current position and duties are substantially equivalent in scope and status.  CPFR File, Tab 1 at 15; CF, Tab 3 at 78.  However, not only did this EEOC case involve a separate issue, but the agency raised this argument before the administrative judge and is therefore rearguing issues already raised and properly resolved below.  CF, Tab 3 at 9, 13, 59-60; *Broughton*, 33 M.S.P.R. at 359.  Although the administrative judge did not specifically discuss the EEOC administrative judge's comment in the initial decision, an administrative judge's failure to mention all of the evidence of record does not mean that he did not consider it in reaching his decision.  *Marques v. Department of Health and Human Services*, 22 M.S.P.R. 129, 132 (1984) (recognizing that), *aff'd*, 776 F.2d 1062 (Fed. Cir. 1985) (Table).

Finally, the agency claims in this regard that the appellant's full-time assignment to the Complex does not preclude his ability to do installation and construction work because, "[a]lthough not usual," 802 ETs have performed installation and construction duties at the Complex before, such as installing shelving units, and therefore it *could* satisfy an obligation to assign the appellant some installation and construction work.  CPFR File, Tab 1 at 16.  However, not only does the agency's argument again merely reargue an issue already raised before and properly decided by the administrative judge, but we find that this contention only underscores the reasoned conclusion that the scope of the appellant's current 802 ET duties are not equivalent to the installation and construction field work performed by the other 802 ETs.

In its petition for review, the agency also argues that the administrative judge ignored newly submitted evidence and, as a result, erroneously concluded that the agency does not have a strong overriding interest or compelling reasons for not assigning the appellant work in the field.  CPFR File, Tab 1 at 17.  Specifically, the agency disputes the administrative judge's conclusion that to

accept the agency's arguments about the appellant's inability to perform the essential functions of the 802 ET position because he cannot perform enough installation and construction work and agree that it has compelling reasons to assign the appellant the duties of the 346 LMS position, he would have to conclude that the Board's Final Order was incorrect and that the appellant cannot perform the essential functions of the 802 ET position with a reasonable accommodation. *Id.*; CID at 14.  The agency alleges instead that "[t]he limited question in the underlying proceeding, and the basis of Board jurisdiction, was whether the [a]gency established the charge of inability to perform the essential functions of the position and whether the [a]gency should have offered an accommodation that would allow the [a]gency to avoid removal—not whether the [a]gency could keep [a]ppellant fully occupied in the field, an issue that the full Board refused to reopen the underlying proceedings to address."  CPFR File, Tab 1 at 17.  The agency thus argues that it was free to consider evidence as to its ability to keep the appellant fully occupied in the field, and that the administrative judge "disregarded" the new evidence that R.N. had determined that he could not keep the appellant occupied in the field and that no light duty assignments could reasonably be performed in the field. *Id.*

We disagree with the agency for several reasons.  To start, the administrative judge by no means "ignored" R.N.'s new declarations explaining that he does not believe that the appellant can perform enough installation and construction work to advance the agency's mission.  CF, Tab 11 at 50-52, Tab 12 at 6-9.  The administrative judge discussed at length R.N.'s declarations expressing concerns about the appellant's qualifications to perform such tasks, a potential disruption to workplace operations and negative employee morale, and the agency's responsibility to be an "effective steward of taxpayer money."  CID at 8-9, 11, 14-16; CF, Tab 11 at 52.  He instead found, for example, that the agency's speculative and conclusory claim that accommodating the appellant's disabilities in the field would lower the morale of his coworkers was

unconvincing and unsupported.  CID at 16.  More importantly, the administrative judge determined that the agency's arguments in total improperly sought to relitigate the conclusions in the Board's Final Order.  CID at 14.[7]  Furthermore, the Board did not previously "refuse" to reopen the proceedings to address the issue of whether the agency could keep the appellant fully occupied in the field.  CPFR File, Tab 1 at 17.  Instead, the Board denied the agency's request to solicit testimony from R.N. as to whether a "modified" installation and construction position could constitute a full-time position because we disagreed with the agency's characterization of the Board as creating a "modified" position.  Final Order at 20-21.  We specifically rejected the agency's contention that it was required to reinstate the appellant to a permanent "modified" position at the Complex because we determined that the appellant could perform 802 ET installation and construction work with and without accommodations.  Final Order at 21.

Yet, the agency has reinstated the appellant to a permanent position at the Complex anyway, contrary to reasoning in the Final Order.  We agree with the administrative judge that the agency's argument indeed represents a declaration of noncompliance and that the agency's arguments both below and on review misconstrue and misrepresent the Board's January 2024 Final Order, seek to revisit claims already rejected by the Board, and appear to represent an effort to sidestep the Board's reinstatement order.  CID at 13-14; *see also Henry v. Department of Veterans Affairs*, 108 M.S.P.R. 458, ¶ 24 (2008) (explaining that enforcement proceedings are not to be used to revisit the merits of an underlying

---

[7] The agency also argues that the administrative judge made an improper theoretical credibility determination against R.N.  CPFR File, Tab 1 at 18-19.  In the compliance initial decision, the administrative judge noted that he would not find R.N.'s claims in the declarations to be credible, largely because they were inconsistent with R.N.'s previous candid live testimony about ways in which he might accommodate an employee like the appellant, but that the administrative judge did not need to reach this point because the agency may not relitigate the merits of the appeal in a petition for enforcement.  CID at 14 n.7.  We see no issue with the administrative judge's comment.

appeal).  As the administrative judge astutely pointed out, proper compliance with the Board's Final Order could be something like a collaborative discussion between the appellant and his managers to determine the precise contours of an accommodation that could help the appellant with a particular field assignment, which, due to the nature of the work, may occur on an ongoing basis.  CID at 15. We agree with the administrative judge that the appellant's claim that he discussed ways he might perform installation and construction tasks and how his medical limitations could be accommodated with R.N. and various coworkers' sounds like an appropriate renewed interactive process contemplated by the Final Order.  *Id.*; CF, Tab 13 at 17-23.

Although it may be that after constructively working with the appellant to accommodate him the agency subsequently determines that the appellant cannot perform in the 802 ET position, or, as the administrative judge noted, the parties come to an agreement for the appellant to perform some other duties.  CID at 15. However, the agency must first at least attempt to work with the appellant and comply with the Board's order.  As the administrative judge observed, the agency may not disregard its obligations under the Rehabilitation Act.  CID at 11.  We fully concur with the administrative judge's reasoning on this point.

In this regard, the agency also contends that the compliance initial decision impermissibly permits the Board to "micromanage" the agency, allowing Board oversight of the agency to continue in perpetuity, skipping established processes such as equal employment opportunity or negotiated grievance procedures, as the appellant could challenge any accommodation or particular assignment.  CPFR File, Tab 1 at 21-23.  Similarly, the agency claims that the compliance initial decision gives the appellant "license to prematurely invoke the Board's jurisdiction" without waiting for final agency action by pursuing a new compliance action to challenge any agency effort to assess his ability to perform the essential functions of the 802 ET position.  *Id.* at 23.  The agency also

Bloom Decl. and Exhs 074

expresses concerns as to whether the appellant is qualified to perform direct installation and construction duties. *Id.* at 22.

We are not swayed by the agency's contentions. The compliance initial decision has not inserted the Board as a "micromanager" of the agency's assignment of work. The Board concluded in the removal appeal that the appellant can perform some installation and construction work with and without accommodation and that the agency engaged in disability discrimination based on its failure to provide the appellant a reasonable accommodation. Final Order at 7-18. The compliance initial decision simply requires that the agency engage in a renewed interactive process with the appellant to reach an agreement with him as to his duties as an 802 ET or appropriate accommodations, instead of unilaterally assigning him to work full-time at the Complex based on information and reasons that were rejected in the underlying appeal. CID at 17.

Lastly, the agency argues in its petition for review that the administrative judge factually erred by ignoring record evidence of the appellant's medical limitations and his prior injury on the job. CPFR File, Tab 1 at 19-21. The agency asserts that the Board stated in the Final Order that it "underst[oo]d the agency's concern that it cannot 'simply ignore' medical recommendations that put it on notice of appellant's physical limitations," and argues that it properly relied on medical evidence from the underlying proceedings to conclude that it had compelling reasons for assigning the appellant different duties. *Id.* at 19; *see also* Final Order at 13-14. The agency claims that the appellant's prior medical documentation is "replete with warnings" he could suffer further injury, that the administrative judge ignored hearing evidence from the removal appeal regarding the appellant's prior work-related injury, which is "perhaps inevitable," and that the administrative judge erroneously faulted the agency for not requesting new medical documentation before assessing its ability to keep the appellant fully occupied out in the field. CPFR File, Tab 1 at 19-21.

The agency's assertions are again unavailing for several reasons. Although the Board did indeed comment in the Final Order that the agency cannot simply ignore medical evidence of the appellant's physical limitations, we also cautioned the agency that its arguments on the whole "largely ignore[d]" medical evidence "explicitly indicat[ing] that the appellant *can* perform some installation and construction work." Final Order at 14. And we explicitly found no error in the administrative judge's finding that 802 ETs mostly perform installation and construction work and that the appellant can perform some of this work with accommodations. *Id.* at 21. The agency's assertion above is thus misleading and in opposition to the Board's final decision in this case. Additionally, the administrative judge did not erroneously fault the agency for not requesting new medical documentation from the appellant. Instead, the administrative judge contrasted the facts of this case against one in which the Board found that the agency appropriately altered the appellant's duties based on medical documentation provided upon reinstatement, noting that here there was no new medical documentation, the agency made no attempt to talk with the appellant about any accommodations he may need, and the agency unilaterally decided to assign the appellant the duties of a different position. CID at 13 (citing *Bruton v. Department of Veterans Affairs*, 112 M.S.P.R. 313, ¶¶ 8-9 (2009)). The administrative judge simply highlighted the fact that it appears the agency has done nothing to work with the appellant. Moreover, the agency's arguments regarding the appellant's medical documentation from the removal appeal and his prior injury are again directly contrary to the Board's Final Order in this case and therefore cannot support the agency's continued noncompliance with the Board's reinstatement order. It is well established that an agency cannot refuse to comply with a Board reinstatement order based on reasons that were rejected by the Board in the decision reversing the action. *See Sarver v. Department of the Treasury*, 26 M.S.P.R. 685, 688 (1985).

Finally, because we agree with the administrative judge that the agency is not in compliance with the Board's Final Order, we also disagree with the agency's assertion that the administrative judge's conclusions in the other addendum proceedings were necessarily erroneous.  CPFR File, Tab 1 at 23-24.

## ORDER

We ORDER the agency to submit to the Clerk of the Board within **60 days** of the date of this Order satisfactory evidence of compliance as described herein. This evidence shall adhere to the requirements set forth in 5 C.F.R. § 1201.183(a)(6)(i), including submission of evidence and a narrative statement of compliance. The agency must serve all parties with copies of its submissions.

The agency's submission should be filed under the new docket number assigned to the compliance referral matter, **SF-0752-22-0425-X-1**.    All subsequent filings should refer to the compliance referral docket number set forth above and should be faxed to (202) 653-7130 or mailed to the following address:

Clerk of the Board
U.S. Merit Systems Protection Board
1615 M Street, N.W.
Washington, D.C. 20419

Submissions may also be made by electronic filing at the MSPB's e-Appeal site (https://e-appeal.mspb.gov) in accordance with the Board's regulation at 5 C.F.R. § 1201.14.

The appellant may respond to the agency's evidence of compliance within 20 days of the date of service of the agency's submission.  5 C.F.R. § 1201.183(a)(8).  If the appellant does not respond to the agency's evidence of compliance, the Board may assume that he is satisfied with the agency's actions and dismiss the petition for enforcement.

The agency is reminded that, if it fails to provide adequate evidence of compliance, the responsible agency official and the agency's representative may be required to appear before the General Counsel of the Merit Systems Protection

Board to show cause why the Board should not impose sanctions for the agency's noncompliance in this case. 5 C.F.R. § 1201.183(c). The Board's authority to impose sanctions includes the authority to order that the responsible agency official "shall not be entitled to receive payment for service as an employee during any period that the order has not been complied with." 5 U.S.C. § 1204(e)(2)(A).

This Order does not constitute a final order and is therefore not subject to judicial review under 5 U.S.C. § 7703(a)(1). Upon the Board's final resolution of the remaining issues in this petition for enforcement, a final order shall be issued which shall be subject to judicial review.

FOR THE BOARD:     *Gina K. Grippando*
_____
Gina K. Grippando
Clerk of the Board

Washington, D.C.

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Service

████████████████

Served on email address registered with MSPB

Agency Representative

Electronic Service

██████████████████████

Served on email address registered with MSPB

Agency Representative

Electronic Service

████████████████

Served on email address registered with MSPB

Agency Representative

Electronic Service

██████████████

Served on email address registered with MSPB

Private Attorney

Electronic Service

Sara Bloom

Served on email address registered with MSPB

02/20/2025
_____
(Date)

*Dinh Chung*
_____
Dinh Chung
Case Management Specialist

Bloom Decl. and Exhs 080

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

██████████████          Appellant,

v.

DEPARTMENT OF
    TRANSPORTATION,
                    Agency.

DOCKET NUMBER
SF-0752-22-0425-C-2

DATE:  February 20, 2025

# THIS ORDER IS NONPRECEDENTIAL[1]

<u>Sara L. Bloom</u>, Esquire, Anchorage, Alaska, for the appellant.

██████████████, Esquire, Anchorage, Alaska, for the agency.

██████████, Miramar, Florida, for the agency.

## BEFORE

Cathy A. Harris, Chairman
Henry J. Kerner, Vice Chairman
Raymond A. Limon, Member

## ORDER

The agency has filed a petition for review of the compliance initial decision, which granted the appellant's petition for enforcement and found the agency in noncompliance with the Board's final order reversing the appellant's

---

[1]  A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

removal.  For the reasons set forth below, we DENY the agency's petition for review and AFFIRM the compliance initial decision's finding that the agency is in noncompliance with the back pay portion of the Board's final order.

## BACKGROUND

The agency issued a decision removing the appellant from his position as a FV-0802-H Engineering Technician (802 ET) based on the charge of inability to perform the essential functions of his position because of a medical condition. *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-I-1, Initial Appeal File (IAF), Tab 6 at 14-18.  The appellant retired in lieu of removal on December 22, 2020.  IAF, Tab 9 at 128-29.

On appeal, the appellant challenged the merits of the charge and raised allegations of disparate treatment disability discrimination, retaliation for making a reasonable accommodation request, and discrimination based on a denial of a reasonable accommodation.  IAF, Tabs 1, 14, 43.  The administrative judge properly found that the Board had jurisdiction over the removal action.  IAF, Tab 11.  He then issued an initial decision reversing the appellant's removal and ordering the agency to restore the appellant effective December 22, 2020.  IAF, Tab 60, Initial Decision (ID) at 47.  Specifically, the administrative judge found that the agency did not prove its charge, ID at 15-40, that the appellant proved his affirmative defense of disability discrimination based on a denial of a reasonable accommodation, ID at 40-41, and that the appellant did not establish his claim of disparate treatment disability discrimination nor his claim of retaliation for making a reasonable accommodation request, ID at 42-47.  Following the agency's petition for review, the Board issued a January 22, 2024 Final Order affirming the initial decision and again ordering the agency to reverse the appellant's removal and restore him effective December 22, 2020.  *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-I-1, Final Order (Jan. 22, 2024); *Holmes v. Department of Transportation*, MSPB Docket

No. SF-0752-22-0425-I-1, Petition for Review File, Tab 6, Final Order at 21.  As relevant here, the Final Order also ordered the agency to pay the appellant the correct amount of back pay, interest on back pay, and other required benefits.  *Id.*

On March 25, 2024, the appellant filed a petition for enforcement regarding the back pay component of the Board's January 22, 2024 Final Order.  *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-C-2, Compliance File (CF), Tab 1.[2]  He claimed that the agency had yet to pay him any back pay or provide any accounting of its back pay and benefits calculation despite his cooperation in providing the necessary information.  *Id.*

On May 30, 2024, the administrative judge issued a compliance initial decision finding the agency in noncompliance with the Board's Final Order as to the back pay requirement.  CF, Tab 17, Compliance Initial Decision (CID) at 1, 13.  The administrative judge agreed that, as of that date, the agency had not yet paid the appellant any back pay or provided any accounting.  CID at 7.  The administrative judge also considered the agency's assertion that it would pay the appellant back pay for the period between December 22, 2020, and October 31, 2021—the date that the appellant had at one time indicated he intended to retire—but that it did not believe the appellant was entitled to back pay up to the date of his reinstatement because of its conclusion that he was not "ready, willing, and able to work" during that period.  CID at 7-11; CF, Tab 5 at 12-13.  The administrative judge first rejected the agency's claim that the appellant was only due back pay up to a date he had once indicated he planned to retire, noting that Federal employees often change their retirement plans up to the date of retirement

---

[2] This petition for enforcement is one of four addendum proceedings in this appeal: *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-A-1, concerns the appellant's request for attorney's fees; *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-P-1, concerns the appellant's request for compensatory damages; and *Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-C-1, is a petition for enforcement concerning the reinstatement component of the Final Order.

and that there is no way to know what would have happened had the agency not removed the appellant.  CID at 11.

The administrative judge then rejected the agency's argument that the appellant was not entitled to back pay up to his reinstatement because he was not "ready, willing, and able to work" during that period.   CID at 11-13.  Specifically, the administrative judge addressed the agency's claim that the appellant's new supervisor, R.N., had determined based on medical documentation from the removal appeal that the appellant could not perform enough installation and construction duties with or without accommodations to advance the agency's mission and that, although it would be reinstating him as an 802 ET, it would not be assigning him installation and construction duties and would instead be assigning him full-time to warehouse duties at the "Complex."[3] CID at 7-8; CF, Tab 5 at 6-11, Tab 14 at 7-15.   The administrative judge explained that the agency had thus concluded that because the appellant "is not, and was not at the time of separation, medically capable of performing the essential installation and construction functions of the 802 ET position," he was not ready, willing, and able to work during the entirety of the period from December 22, 2020, up to his reinstatement and was therefore not entitled to backpay.  CF, Tab 5 at 9; CID at 7-8.  But the administrative judge determined that the agency's claims represented "baseline disagreement" with the Board's January 2024 Final Order finding that the appellant could perform the essential

---

[3] In the Board's January 22, 2024 Final Order, we determined that the essential functions of the 802 ET position include some Contracting Officer Representative (COR) duties, which is project coordinator work that involves monitoring Federal contractors performing installation and construction at various worksites; some work at the "Complex," a warehouse facility that Engineering Services uses to store items and build out projects; and some installation and construction work.  Final Order at 7-11.  We agreed with the administrative judge that the appellant showed he could perform work in the Complex, COR work, and some installation and construction work, both with and without accommodations.  *Id.* at 7-15.  We also recognized, as did the administrative judge, that the 802 ET position currently involves mostly installation and construction duties, and that COR duties and work at the Complex are now performed by employees in a different job series.  *Id.*

functions of the 802 ET position with a reasonable accommodation and that it inappropriately sought to revisit the merits of the removal appeal. CID at 12. The administrative judge therefore concluded that the appellant is entitled to back pay from the date of his separation through the date of reinstatement and that the agency had not paid him such back pay, and he thus granted the appellant's petition for enforcement. CID at 11-13.

The agency has filed a petition for review of the compliance initial decision. Compliance Petition for Review (CPFR) File, Tab 1. The agency filed the same petition for review in all four addendum proceedings related to the initial removal appeal, and the arguments in its petition for review almost exclusively concern issues presented in the compliance appeal related to the appellant's reinstatement. *Id.*; *see also Holmes v. Department of Transportation*, MSPB Docket No. SF-0752-22-0425-C-1. However, with respect to the instant matter, the agency briefly claims that the administrative judge erroneously required it to have "adduced new medical documentation post-hearing" for a finding that the appellant was not ready, available, and willing to work, which rendered "superfluous" the requirement that the appellant be "willing" to work. CPFR File, Tab 1 at 24. The agency also claims that because the appellant "rejected" the agency's efforts to reassign him to the Complex before his removal, he was not willing to accept duties that were "indisputably" available and is therefore not entitled to full back pay. *Id.* The agency also includes a declaration from its human resources director stating that the agency has now processed appropriate back pay for the undisputed period (December 20, 2020, until October 31, 2021) and provides supporting documentation to that effect. *Id.* at 26-112. The appellant filed a response. CPFR File, Tab 3. The agency filed a reply, again mostly discussing issues related to the appellant's reinstatement. CPFR File, Tab 4.

Bloom Decl. and Exhs 085

## ANALYSIS

When the Board corrects a wrongful personnel action, it is required to ensure that the employee is returned, as nearly as possible, to the status quo ante. *Kerr v. National Endowment for the Arts*, 726 F.2d 730, 733 (Fed. Cir. 1984). Consistent with Office of Personnel Management regulations and the Board's case law, however, an employee is not entitled to back pay for any period of time during which he was not "ready, willing, and able" to perform his duties because of an incapacitating illness or injury, or for reasons unrelated to or not caused by the unjustified or unwarranted personnel action. *King v. Department of the Navy*, 100 M.S.P.R. 116, ¶ 12 (2005), *aff'd per curiam*, 167 F. App'x 191 (Fed. Cir. 2006); 5 C.F.R. § 550.805(c). The agency bears the initial burden of proving that it has provided an appellant the appropriate amount of back pay. *King*, 100 M.S.P.R. 116, ¶ 13. When the agency produces "concrete and positive evidence, as opposed to a mere theoretical argument," that the appellant was not ready, willing, and able to work during all or part of the period during which back pay is claimed, the burden of proof shifts to the appellant to show his entitlement to back pay. *Id.* (quoting *Piccone v. United States*, 407 F.2d 866, 876 (Cl. Ct. 1969)).

<u>We agree with the administrative judge that the agency is not in compliance with
the Board's order regarding back pay.</u>

We see no error in the administrative judge's conclusion that the appellant is entitled to back pay from the date of his separation through the date of his reinstatement and that the agency's arguments to the contrary constitute inappropriate attempts to reargue the merits of the underlying removal appeal. CID at 12 (citing *Henry v. Department of Veterans Affairs*, 108 M.S.P.R. 458, ¶ 24 (2008) (explaining that enforcement proceedings are not to be used to revisit the merits of an underlying appeal)); *see also Crosby v. U.S. Postal Service*, 74 M.S.P.R. 98, 106 (1997) (finding no reason to disturb the administrative

judge's findings when she considered the evidence as a whole, drew appropriate inferences, and made reasoned conclusions on issues of credibility).

The agency's brief claims on review are without merit. The administrative judge did not require that the agency produce new medical documentation post-hearing in order to find the appellant "willing" to work during the back pay period up to his reinstatement. CPFR File, Tab 1 at 24. Instead, the administrative judge properly explained that the agency had determined that the appellant cannot work as an 802 ET based on the same medical evidence it possessed at the time of the removal to highlight the fact that the agency's arguments directly contradict the Board's Final Order, which determined that the appellant *can* perform the essential functions of the 802 ET position with accommodation. CID at 11-12. The administrative judge simply emphasized that there has been no new, intervening medical information that changed the appellant's ability to perform the 802 ET position. CID at 11-13.

We are also unpersuaded by the agency's claim that the administrative judge should not have found the appellant "ready, willing, and able" to perform his duties because the appellant "rejected" the agency's efforts to reassign him to the Complex before his removal. CPFR File, Tab 1 at 24. The agency raised this argument below, and the mere reargument of issues already raised and properly resolved by the administrative judge below does not establish a basis for review. *Broughton v. Department of Health and Human Services*, 33 M.S.P.R. 357, 359 (1987); CF, Tab 5 at 11. In any event, the agency's argument again ignores that the Board's Final Order found that the appellant can perform the essential functions of the 802 ET position with accommodation and ordered the agency to reinstate him to that position. Final Order at 21. The agency has not provided "concrete and positive evidence" that the appellant was not ready, willing, and able to work during the period during which back pay is claimed. *King*, 100 M.S.P.R. 116, ¶ 13.

Finally, the new evidence that the agency submits with its petition for review does not establish that it is in compliance with the Board's Final Order. The agency claims that it has now paid the appellant the appropriate amount of back pay and benefits for December 22, 2020, through October 31, 2021. CPFR File, Tab 1 at 26-112.[4]   However, as discussed above, we agree with the administrative judge that the appellant is entitled to back pay from December 22, 2020, through the date of his reinstatement. Therefore, the agency is still in noncompliance with the back pay portion of the Board's Final Order.

## ORDER

We ORDER the agency to submit to the Clerk of the Board within **60 days** of the date of this Order satisfactory evidence of compliance as described herein. This evidence shall adhere to the requirements set forth in 5 C.F.R. § 1201.183(a)(6)(i), including submission of evidence and a narrative statement of compliance. The agency must serve all parties with copies of its submissions.

The agency's submission should be filed under the new docket number assigned to the compliance referral matter, **SF-0752-22-0425-X-2**.   All subsequent filings should refer to the compliance referral docket number set forth above and should be faxed to (202) 653-7130 or mailed to the following address:

Clerk of the Board
U.S. Merit Systems Protection Board
1615 M Street, N.W.
Washington, D.C. 20419

Submissions may also be made by electronic filing at the MSPB's e-Appeal site (https://e-appeal.mspb.gov) in accordance with the Board's regulation at 5 C.F.R. § 1201.14.

---

[4] In his response to the agency's petition for review, the appellant questions the accounting that the agency provides. CPFR File, Tab 3 at 7 n.3. However, its unnecessary to address the appellant's concerns because we have found that the agency is still in noncompliance with the Board's Final Order.

Bloom Decl. and Exhs 088

9

The appellant may respond to the agency's evidence of compliance within 20 days of the date of service of the agency's submission. 5 C.F.R. § 1201.183(a)(8). If the appellant does not respond to the agency's evidence of compliance, the Board may assume that he is satisfied with the agency's actions and dismiss the petition for enforcement.

The agency is reminded that, if it fails to provide adequate evidence of compliance, the responsible agency official and the agency's representative may be required to appear before the General Counsel of the Merit Systems Protection Board to show cause why the Board should not impose sanctions for the agency's noncompliance in this case. 5 C.F.R. § 1201.183(c). The Board's authority to impose sanctions includes the authority to order that the responsible agency official "shall not be entitled to receive payment for service as an employee during any period that the order has not been complied with." 5 U.S.C. § 1204(e)(2)(A).

This Order does not constitute a final order and is therefore not subject to judicial review under 5 U.S.C. § 7703(a)(1). Upon the Board's final resolution of the remaining issues in this petition for enforcement, a final order shall be issued which shall be subject to judicial review.

FOR THE BOARD:                    *Gina K. Grippando*
                                  _____
                                  Gina K. Grippando
                                  Clerk of the Board

Washington, D.C.

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Service          ████████████

Served on email address registered with MSPB

Agency Representative

Electronic Service          ████████████████

Served on email address registered with MSPB

Agency Representative

Electronic Service          ████████████

Served on email address registered with MSPB

Agency Representative

Electronic Service          ██████████

Served on email address registered with MSPB

Private Attorney

Electronic Service          Sara Bloom

Served on email address registered with MSPB

Bloom Decl. and Exhs 090

| 02/20/2025 | | *Dinh Chung* |
|:---:|:---:|:---:|
| (Date) | | Dinh Chung |
| | | Case Management Specialist |

Bloom Decl. and Exhs 091

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

███████████████

Appellant,

v.

DEPARTMENT OF
TRANSPORTATION,

Agency.

DOCKET NUMBER
SF-0752-22-0425-P-1

DATE:  February 20, 2025

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

<u>Sara Bloom</u>, Esquire, Anchorage, Alaska, for the appellant.

████████████████, Esquire, Anchorage, Alaska, for the agency.

██████████████, Miramar, Florida, for the agency.

### BEFORE

Cathy A. Harris, Chairman
Henry J. Kerner, Vice Chairman
Raymond A. Limon, Member

### FINAL ORDER

The agency has filed a petition for review of the addendum initial decision,

which granted in part and denied in part the appellant's motion for compensatory

---

[1]  A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

Bloom Decl. and Exhs 092

damages and ordered the agency to pay him $25,000.00 in non-pecuniary damages.    On petition for review, the agency primarily disputes the administrative judge's initial decision in a separate addendum proceeding but also briefly reargues that compensatory damages are barred here because the agency made a good faith effort to accommodate the appellant.    Generally, we grant petitions such as this one only in the following circumstances:  the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed.    Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115).    After fully considering the filings in this appeal, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review.    Therefore, we DENY the petition for review and AFFIRM the initial decision, which is now the Board's final decision.  5 C.F.R. § 1201.113(b).

## ORDER

We concur with the administrative judge's decision to grant the appellant's motion for compensatory damages and award him $25,000.00 in non-pecuniary damages.    The agency is ORDERED to issue a check to the appellant in this amount.    The agency must complete this action no later than 20 days after the date of this decision.

We further ORDER the agency to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order.    The appellant, if not notified, should ask the agency about its progress.  *See* 5 C.F.R. § 1201.181(b).

No later than 30 days after the agency tells the appellant that it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the office that issued the initial decision in this appeal if the appellant believes that the agency did not fully carry out the Board's Order. The petition should contain specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communications with the agency. 5 C.F.R. § 1201.182(a).

## NOTICE TO THE APPELLANT REGARDING YOUR RIGHT TO REQUEST ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs. To be paid, you must meet the requirements set forth at Title 5 of the United States Code (5 U.S.C.), sections 7701(g), 1221(g), or 1214(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202, and 1201.203. If you believe you meet these requirements, you must file a motion for attorney fees and costs WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your motion for attorney fees and costs with the office that issued the initial decision on your appeal.

## NOTICE OF APPEAL RIGHTS[2]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should

---

[2] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Bloom Decl. and Exhs 095

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you _only_ if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—_including a disposition of your discrimination claims_—by filing a civil action with an appropriate U.S. district court (_not_ the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** _after you receive_ this decision. 5 U.S.C. § 7703(b)(2); _see Perry v. Merit Systems Protection Board_, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** _after your representative receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. _See_ 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of _your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** _after you receive_ this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** _after your representative receives_ this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[3]  The court of appeals must <u>receive</u> your petition for review within **60 days** of the <u>date of issuance</u> of this decision.  5 U.S.C. § 7703(b)(1)(B).

---

[3]  The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction.  The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD:    _____
*Gina K. Grippando*
Gina K. Grippando
Clerk of the Board

Washington, D.C.

Bloom Decl. and Exhs 098

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Service          ███████████████

Served on email address registered with MSPB

Agency Representative

Electronic Service          ██████████████████

Served on email address registered with MSPB

Agency Representative

Electronic Service          ███████████████

Served on email address registered with MSPB

Agency Representative

Electronic Service          █████████████

Served on email address registered with MSPB

Private Attorney

Electronic Service          Sara Bloom

Served on email address registered with MSPB

Bloom Decl. and Exhs 099

_John Hayes_

| 02/20/2025 | John Hayes |
|:----------:|:----------:|
| (Date) | |

# EXHIBIT D

### THE FITZPATRICK MATRIX
**Hourly Rates ($) for Legal Fees for Complex Federal Litigation in the District of Columbia**

| Years Exp. / Billing Yr. | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35+ | 535 | 563 | 591 | 619 | 647 | 675 | 703 | 731 | 736 | 760 | 807 | 864 |
| 34 | 534 | 562 | 590 | 618 | 646 | 674 | 702 | 729 | 734 | 758 | 805 | 862 |
| 33 | 532 | 560 | 588 | 616 | 644 | 672 | 700 | 728 | 733 | 757 | 804 | 861 |
| 32 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 726 | 730 | 754 | 801 | 858 |
| 31 | 527 | 555 | 583 | 611 | 639 | 667 | 695 | 723 | 728 | 752 | 799 | 856 |
| 30 | 524 | 552 | 580 | 608 | 636 | 664 | 692 | 720 | 725 | 749 | 795 | 851 |
| 29 | 521 | 549 | 577 | 605 | 633 | 661 | 689 | 717 | 721 | 745 | 791 | 847 |
| 28 | 517 | 545 | 573 | 601 | 629 | 657 | 685 | 713 | 717 | 741 | 787 | 843 |
| 27 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 708 | 713 | 736 | 782 | 838 |
| 26 | 508 | 536 | 564 | 592 | 620 | 648 | 676 | 704 | 708 | 731 | 776 | 831 |
| 25 | 502 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 703 | 726 | 771 | 826 |
| 24 | 497 | 525 | 553 | 581 | 609 | 637 | 665 | 693 | 697 | 720 | 765 | 819 |
| 23 | 491 | 519 | 547 | 575 | 603 | 630 | 658 | 686 | 691 | 714 | 758 | 812 |
| 22 | 484 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 684 | 707 | 751 | 804 |
| 21 | 477 | 505 | 533 | 561 | 589 | 617 | 645 | 673 | 677 | 699 | 742 | 795 |
| 20 | 470 | 498 | 526 | 553 | 581 | 609 | 637 | 665 | 670 | 692 | 735 | 787 |
| 19 | 462 | 490 | 518 | 546 | 574 | 602 | 630 | 658 | 662 | 684 | 726 | 778 |
| 18 | 453 | 481 | 509 | 537 | 565 | 593 | 621 | 649 | 653 | 675 | 717 | 768 |
| 17 | 445 | 473 | 500 | 528 | 556 | 584 | 612 | 640 | 645 | 666 | 707 | 757 |
| 16 | 435 | 463 | 491 | 519 | 547 | 575 | 603 | 631 | 635 | 656 | 697 | 746 |
| 15 | 426 | 454 | 482 | 510 | 538 | 566 | 593 | 621 | 626 | 647 | 687 | 736 |
| 14 | 416 | 443 | 471 | 499 | 527 | 555 | 583 | 611 | 615 | 635 | 674 | 722 |
| 13 | 405 | 433 | 461 | 489 | 517 | 545 | 573 | 601 | 605 | 625 | 664 | 711 |
| 12 | 394 | 422 | 450 | 478 | 506 | 534 | 562 | 590 | 594 | 614 | 652 | 698 |
| 11 | 382 | 410 | 438 | 466 | 494 | 522 | 550 | 578 | 582 | 601 | 638 | 683 |
| 10 | 371 | 399 | 427 | 455 | 483 | 510 | 538 | 566 | 570 | 589 | 625 | 669 |
| 9 | 358 | 386 | 414 | 442 | 470 | 498 | 526 | 554 | 558 | 576 | 612 | 655 |
| 8 | 345 | 373 | 401 | 429 | 457 | 485 | 513 | 541 | 545 | 563 | 598 | 640 |
| 7 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 528 | 532 | 550 | 584 | 625 |
| 6 | 319 | 347 | 375 | 403 | 431 | 458 | 486 | 514 | 518 | 535 | 568 | 608 |
| 5 | 305 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 504 | 521 | 553 | 592 |
| 4 | 290 | 318 | 346 | 374 | 402 | 430 | 458 | 486 | 489 | 505 | 536 | 574 |
| 3 | 275 | 303 | 331 | 359 | 387 | 415 | 443 | 471 | 474 | 490 | 520 | 557 |
| 2 | 260 | 287 | 315 | 343 | 371 | 399 | 427 | 455 | 458 | 473 | 502 | 538 |
| 1 | 244 | 272 | 300 | 328 | 356 | 384 | 412 | 439 | 442 | 457 | 485 | 519 |
| 0 | 227 | 255 | 283 | 311 | 339 | 367 | 395 | 423 | 426 | 440 | 467 | 500 |
| P* | 130 | 140 | 150 | 160 | 169 | 179 | 189 | 199 | 200 | 207 | 220 | 236 |

* = Paralegals/Law Clerks

*Published by the U.S. Attorney's Office for the District of Columbia, Civil Division*

Bloom Decl. and Exhs 102

Explanatory Notes

1. This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared to assist with resolving requests for attorney's fees in complex civil cases in District of Columbia federal courts handled by the Civil Division of the United States Attorney's Office for the District of Columbia. It has been developed to provide "a reliable assessment of fees charged for complex federal litigation in the District [of Columbia]," as the United States Court of Appeals for the District of Columbia Circuit urged. *DL v. District of Columbia*, 924 F.3d 585, 595 (D.C. Cir. 2019). The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, nor has it been adopted by other Department of Justice components.

2. The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees. *E.g.*, 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b). A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). The matrix is not intended for use in cases in which the hourly rate is limited by statute. *E.g.*, 28 U.S.C. § 2412(d).

3. For matters in which a prevailing party agrees to payment pursuant to this fee matrix, the United States Attorney's Office will not request that a prevailing party offer the additional evidence that the law otherwise requires. *See, e.g., Eley v. District of Columbia*, 793 F.3d 97, 104 (D.C. Cir. 2015) (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (requiring "evidence that [the] 'requested rates are in line with those prevailing in the community for similar services'")).

4. The years in the column on the left refer to an attorney's years of experience practicing law. Normally, an attorney's experience will be calculated based on the number of years since an attorney graduated from law school. If the year of law school graduation is unavailable, the year of bar passage should be used instead. Thus, an attorney who graduated from law school in the same year as the work for which compensation is sought has 0 years of experience. For all work beginning on January 1 of the calendar year following graduation (or bar admission), the attorney will have 1 year of experience. (For example, an attorney who graduated from law school on May 30 will have 0 years of experience until December 31 of that same calendar year. As of January 1, all work charged will be computed as performed by an attorney with 1 year of experience.) Adjustments may be necessary if an attorney did not follow a typical career progression or was effectively performing law clerk work. *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate).

5. The data for this matrix was gathered from the dockets of cases litigated in the U.S. District Court for the District of Columbia using the following search in July 2020 in Bloomberg Law: keywords ("motion n/5 fees AND attorney!") + filing type ("brief," "motion," or "order") + date ("May 31, 2013 – May 31, 2020" under "Entries (Docket and Documents)"). This returned a list of 781 cases. Of those, cases were excluded if there was no motion for fees filed, the motions for fees lacked necessary information, or the motions involved fees not based on hourly rates, involved rates explicitly or implicitly based on an existing fee matrix, involved rates explicitly or implicitly subject to statutory fee caps (e.g., cases subject to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)), or used lower rates prescribed by case law (*e.g., Eley*, 793 F.3d at 105 (Individuals with Disabilities in Education Act cases)). After these excisions, 86 cases, many

Bloom Decl. and Exhs 103

of which included data for multiple billers (and 2 of which only provided hourly rate data for paralegals), remained.

6.  The cases used to generate this matrix constitute complex federal litigation—which caselaw establishes as encompassing a broad range of matters tried in federal court. *E.g.*, *Reed v. District of Columbia*, 843 F.3d 517, 527-29 (D.C. Cir. 2016) (Tatel, J., concurring) (noting that cases arising under the Freedom of Information Act, Title VII, the Americans with Disabilities Act, Constitutional Amendments, antitrust statutes, and others have been deemed complex, and even "relatively small" cases can constitute complex federal litigation, as they too require "specialized legal skills" and can involve "complex organizations," such as "large companies"); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 14-16, 17 (D.D.C. 2008) (prevailing market rates for complex federal litigation should be determined by looking to "a diverse range of cases"). That the attorneys handling these cases asked the court to award the specified rates itself demonstrates that the rates were "'adequate to attract competent counsel, [while] not produc[ing] windfalls to attorneys.'" *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). As a consequence, the resulting analysis yields the "prevailing market rate[] in the relevant community" for complex litigation undertaken in federal courts in the District of Columbia. *See Blum*, 465 U.S. at 895.

7.  From these 86 complex federal cases, the following information was recorded for 2013 and beyond: hourly rate, the calendar year the rate was charged, and the number of years the lawyer was out of law school when the rate was charged (or, if law school graduation year was unavailable, years since bar passage), as defined above. If the graduation or bar passage year was not stated in a motion or its exhibits, then the lawyer's biography was researched on the internet. Although preexisting fee matrices for the District of Columbia provide for mid-year rate changes, very few lawyers in the data submitted rates that changed within a calendar year. For this reason, the matrix was modeled using one rate for each calendar year. On the occasions when a lawyer expressed an hourly rate as a range or indicated the rate had increased during the year, the midpoint of the two rates was recorded for that lawyer-year.

8.  The matrix of attorney rates is based on 675 lawyer-year data points (one data point for each year in which a lawyer charged an hourly rate) from 419 unique lawyers from 84 unique cases. The lawyer-year data points spanned from years 2013 to 2020, from $100 to $1250, and from less than one year of experience to 58 years.

9.  Paralegal/law clerk rates were also recorded. The following titles in the fee motions were included in the paralegal/law clerk data: law clerk, legal assistant, paralegal, senior legal assistant, senior paralegal, and student clerk. The paralegal/law clerk row is based on 108 paralegal-year data points from 42 unique cases. They spanned from 2013 to 2019 and from $60 to $290. (It is unclear how many unique persons are in the 108 data points because paralegals were not always identified by name.)

10. The matrix was created with separate regressions for the lawyer data and the paralegal data. For the paralegal data, simple linear least-squares regression was used with the dependent variable hourly rate and the independent variable the year the rate was charged subtracted from 2013; years were combined into one variable and subtracted from 2013 rather than modeled as separate indicator variables to constrain annual inflation to a constant, positive number. The resulting regression formula was rate =

Bloom Decl. and Exhs 104

129.8789 + 9.902107 * (year-2013).  For the lawyer data, least-squares regression was used with the dependent variable hourly rate and independent variables the year the rate was charged and the number of years of experience of the lawyer when the rate was charged.  The year the rate was charged was subtracted from 2013 and modeled linearly as with the paralegal data.  The number of years out of law school (or since year of bar passage) was modeled with both linear and squared terms, as is common in labor economics to account for non-linear wage growth (e.g., faster growth earlier in one's career than at the end of one's career).  *See, e.g.*, Jacob Mincer, *Schooling, Experience, and Earnings* (1974).  The resulting regression formula was rate = 227.319 + 16.54492 * experience - 0.2216217 * experience ^ 2 + 27.97634 * (year-2013).  Regressions were also run with log transformed rates and with a random-effect model (to account for several lawyers appearing more than once in the data), but both alternatives resulted in mostly lower rates than those reflected here; in order to minimize fee disputes, these models were therefore rejected in favor of the more generous untransformed, fixed-effect model.  Rates from one case comprised 20% of the data; the regression was also run without that case, but the resulting rates were mostly lower and therefore rejected, again to minimize fee disputes.

11. The data collected for this matrix runs through 2020.  To generate rates after 2020, an inflation adjustment (rounded to the nearest whole dollar) has been added.  The United States Attorney's Office determined that, because courts and many parties have employed the legal services index of the Consumer Price Index to adjust attorney hourly rates for inflation, this matrix would do likewise.  *E.g.*, *Salazar v. District of Columbia*, 809 F.3d 58, 64-65 (D.C. Cir. 2015); *Eley*, 793 F.3d at 101-02; *DL*, 924 F.3d at 589-90.  That was the approach followed for the years 2021 through and including 2023.  However, the Bureau of Labor Statistics has now ceased consistently publishing monthly data for the legal services index of the Consumer Price Index.  As an alternative, the legal services index of the Producer Price Index, which continues regularly to provide updated data, has been used to generate the rates for 2024.

12. This matrix was researched and prepared by Brian Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt Law School, with the help of his students.

13. This matrix and an alternative, preexisting matrix were extensively examined, and, based on that analysis, this matrix was the one selected for computation of the hourly rates for the attorneys' fees awarded in *J.T. v. District of Columbia*, 652 F. Supp. 3d 11 (D.D.C. 2023) (Howell, C.J.), and in *Brackett v. Mayorkas*, Civ. A. No. 17-0988, 2023 WL 5094872 (D.D.C. Aug. 9, 2023) (Boasberg, C.J.).

# EXHIBIT E

# LAFFEY MATRIX



| | | | Years Out of Law School * | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Adjustmt Factor** | Paralegal/ Law Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20+ | |
| 6/01/23- 5/31/24 | 1.059295 | $239 | $437 | $538 | $777 | $878 | $1057 | |
| 6/01/22- 5/31/23 | 1.085091 | $225 | $413 | $508 | $733 | $829 | $997 | |
| 6/01/21- 5/31/22 | 1.006053 | $208 | $381 | $468 | $676 | $764 | $919 | |
| 6/01/20- 5/31/21 | 1.015894 | $206 | $378 | $465 | $672 | $759 | $914 | |
| 6/01/19- 5/31/20 | 1.0049 | $203 | $372 | $458 | $661 | $747 | $899 | |
| 6/01/18- 5/31/19 | 1.0350 | $202 | $371 | $455 | $658 | $742 | $894 | |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 | |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 | |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 | |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 | |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 | |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 | |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 | |
| 6/01/10- 5/31/11 | 1.0237 | $161 | $294 | $361 | $522 | $589 | $709 | |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 | |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 | |
| 6/01/07- 5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 | |
| 6/01/06- 5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 | |
| 6/1/05- 5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 | |
| 6/1/04- 5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 | |
| 6/1/03- 6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 | |
| 6/1/02- 5/31/03 | 1.0797 | $118 | $217 | $267 | $385 | $434 | $522 | |
| 6/1/01- 5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 | |
| 6/1/00- 5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 | |
| 6/1/99- 5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 | |
| 6/1/98- 5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 | |
| 6/1/97- 5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 | |
| 6/1/96- 5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 | |
| 6/1/95- 5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 | |
| 6/1/94- 5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 | |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g., DL v. District of Columbia, 267 F.Supp.3d 55, 69 (D.D.C. 2017)

* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

ATT D(2)

# EXHIBIT F

Bloom Decl. and Exhs 108

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

**2016 MSPB 32**

Docket No. CH-1221-14-0228-W-2

## Christopher S. Scoggins,
## Appellant,
## v.
## Department of the Army,
## Agency.

September 19, 2016

<u>Rosemary Dettling</u>, Esquire, and <u>Sarah Bloom</u>, Esquire, Washington, D.C., for the appellant.

<u>W. Clay Caldwell</u>, Aberdeen Proving Ground, Maryland, for the agency.

### BEFORE

Susan Tsui Grundmann, Chairman
Mark A. Robbins, Member

## <u>OPINION AND ORDER</u>

¶1    The agency has filed a petition for review, and the appellant has filed a cross petition for review of the initial decision, which granted the appellant's request for corrective action in this individual right of action (IRA) appeal. As explained below, the agency's petition for review and the appellant's cross petition for review are DENIED, and the administrative judge's initial decision is AFFIRMED except as expressly MODIFIED by this Opinion and Order to FIND that all of the whistleblowing disclosures at issue on review are protected, to VACATE the administrative judge's findings that the agency proved by clear and convincing evidence that it would have changed the appellant's work duties and

Bloom Decl. and Exhs 109

work location and denied him security training absent his protected disclosures, and to FIND that the agency met its clear and convincing burden regarding those personnel actions for the reasons set forth in this Opinion and Order. We AFFIRM the administrative judge's decision to order corrective action regarding the appellant's proposed removal and postponed performance evaluation.

## BACKGROUND

¶2      On February 27, 2011, the agency hired the appellant as a GS-12 Security Specialist with the agency's Compliance and Surety Directorate of the Blue Grass Chemical Activity (BGCA), in Richmond, Kentucky. *Scoggins v. Department of the Army*, MSPB Docket No. CH-1221-14-0228-W-1, Initial Appeal File (IAF), Tab 1 at 1, Tab 6 at 84, 92. The BGCA is a tenant at the Blue Grass Army Depot (BGAD) and reports to the agency's Chemical Materials Activity (CMA), which is responsible for the storage of chemical weapons pending their destruction. *Scoggins v. Department of the Army*, MSPB Docket No. CH-1221-14-0228-W-2, Refiled Appeal File (RAF), Tab 8 at 17-18. The duties of the appellant's position include ensuring that the BGCA's chemical operations are conducted securely and meet all regulatory requirements, and that commanders are informed of potential problem areas. IAF, Tab 6 at 84.

¶3      The appellant filed this IRA appeal, alleging that the agency had taken several personnel actions against him in reprisal for his numerous protected whistleblowing disclosures. IAF, Tab 1, 24. Specifically, the appellant alleged that he made the following nine protected disclosures between March 2011 and June 2012:

    (1) On March 9, 2011, he reported to his supervisor, T.F.,[1] that there were drawings of intrusion detection systems (IDS) on a shared computer drive.

---

[1] Shortly before the appellant was hired, Director of Compliance and Surety S.J. was named as the interim Civilian Executive Assistant and T.F. became acting Director of

(2) On March 10, 2011, he notified T.F. and Information Security Manager B.P. that classified information and equipment were located in an unauthorized area of the Emergency Operation Center (EOC).

(3) On March 16, 2011, he notified T.F. and S.J. that employees were handling and transporting classified information without proper documentation.

(4) In April 2011, he told T.F., S.J., and T.R. that possible classified information from secret vulnerability assessments[2] was being placed on an unauthorized medium and that the information was taped for transcribing and discussed with members of the Surety Board and other personnel without clearance or a need to know the information.

(5) From April to October 2011, he informed his supervisors (K.L., S.J., T.R., and BGAD Commander Lieutenant Colonel (LTC) S.B.) that there was classified information on an unclassified medium.

(6) In April 2011, he notified T.F. and S.J. that several BGCA and BGAD personnel had unauthorized access to classified information located in the EOC.

(7) In October 2011, he notified T.F., T.R., and S.J. that there was a possible compromise of confidential duress code[3] information.

(8) On December 29, 2011, he reported to Security Specialist O.G. the unauthorized disclosure of possible classified information from previous vulnerability assessments due to the violation of Army Regulation (AR) 380‑5, Section 2‑6.

(9) In June 2012, he notified Military Intelligence Chief Warrant Officer J.H., per the Army Threat Awareness Reporting Program, of the possible unauthorized disclosure of classified information and alleged that agency managers were subjecting him to a "possible" hostile work environment.

IAF, Tab 22 at 4‑5.

---

Compliance and Surety.   IAF, Tab 21 at 20.   T.F. served in that position until June 2011, when T.R. was appointed Interim Director of Compliance and Surety.   T.R. became Director of Compliance and Surety on September 25, 2011.   *Id.* at 20-21.

[2] A vulnerability assessment is a classified document that identifies security deficiencies.  Hearing Transcript at 42-43 (testimony of the appellant).

[3] A duress code is a spoken word or number used by an individual to signal to a security guard or other appropriate personnel that he is being forced to do something under duress.  Hearing Transcript at 58-59 (testimony of the appellant).

¶4        The appellant alleged on appeal that the agency took the following actions against him in reprisal for his disclosures:

> (1) In July 2012, BGAD Commander LTC C.G. (S.B.'s successor) changed the appellant's duties and office location.
>
> (2) Beginning in July 2012, C.G., T.R., and W.W. (the latter became the appellant's supervisor following his change in duties and office location), Hearing Transcript (HT) at 586 (testimony of W.W.), denied him security training.
>
> (3) In July 2012, C.G. denied the appellant access to local classified information and restricted areas, and in October 2012, he suspended the appellant's security clearance.
>
> (4) On October 11, 2012, C.G. proposed the appellant's removal.
>
> (5) On December 18, 2012, W.W. notified the appellant that his 2012 performance evaluation would be held in abeyance pending a decision on his proposed removal.

IAF, Tab 24 at 5.

¶5        Following a hearing, the administrative judge issued an initial decision, granting the appellant's request for corrective action regarding his proposed removal and postponed performance evaluation but denying corrective action regarding the other actions.    RAF, Tab 37, Initial Decision (ID) at 31. Specifically, the administrative judge found that disclosures (2), (5), (7), and (9) were protected, but that the other disclosures were not protected, ID at 5‑16, that all of the contested actions were covered personnel actions as defined at 5 U.S.C. § 2302(a)(2)(A) except action (3), ID at 16‑19, and that the appellant's protected disclosures were contributing factors in the personnel actions, ID at 19‑21.   The administrative judge also found that the agency showed by clear and convincing evidence that it would have changed the appellant's work duties and work location and would have denied him security training absent his protected disclosures.   ID at 22‑26.  The administrative judge further found, however, that the agency failed to prove by clear and convincing evidence that it would have proposed his removal and postponed his 2012 performance evaluation in the

absence of his protected disclosures.    ID at 26‑31.    Accordingly, the administrative judge granted the appellant's request for corrective action by ordering the agency to rescind the proposed removal and to issue the appellant's 2012 performance evaluation.  ID at 31.

¶6        The agency has filed a petition for review, arguing that none of the appellant's disclosures were protected and that it demonstrated by clear and convincing evidence that it would have taken the same actions in the absence of his disclosures.  Petition for Review (PFR) File, Tab 1.  The appellant has filed a response to the petition for review and a cross petition for review, arguing that the administrative judge erred in finding that disclosures (1), (3), (4), and (6) were not protected.[4]  PFR File, Tab 3 at 16-19.  The appellant also challenges the administrative judge's findings that the agency showed by clear and convincing evidence that it would have changed his work duties and office location and would have denied him security training absent his protected disclosures.  *Id.* at 19‑25.  The agency has filed a reply to the appellant's response.  PFR File, Tab 4.  In addition, both parties have filed responses to the Board's order to submit evidence on the jurisdictional issue of whether the appellant properly exhausted his administrative remedies with the Office of Special Counsel (OSC) regarding all of the disclosures and actions raised in this appeal.  PFR File, Tabs 5‑10.

---

[4] The appellant has not specifically contested the administrative judge's finding that disclosure (8) was not protected.  Also, neither party has specifically challenged the administrative judge's findings regarding which contested actions were personnel actions under 5 U.S.C. § 2302(a)(2)(A).  Therefore, we have not further considered these issues.  *See* 5 C.F.R. § 1201.115 (stating that the Board normally will consider only issues raised in a timely filed petition for review or in a timely filed cross petition for review).

ANALYSIS

¶7       An IRA appeal is authorized by statute only in certain reprisal cases as designated in 5 U.S.C. § 1221.  *Miller v. Federal Deposit Insurance Corporation*, 122 M.S.P.R. 3, ¶ 2 (2014), *aff'd*, 626 F. App'x 261 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 1510 (2016).  All of the material events in this matter occurred before the expansion of IRA appeal rights in the Whistleblower Protection Enhancement Act of 2012 (WPEA), Pub. L. No. 112-199, 126 Stat. 1465, took effect on December 27, 2012.  *See* WPEA § 202; *Miller*, 122 M.S.P.R. 3, ¶ 2.  Thus, in this case, we will apply the pre‑WPEA standards concerning the scope of an IRA appeal.  *See Hooker v. Department of Veterans Affairs*, 120 M.S.P.R. 629, ¶¶ 10‑15 (2014).

¶8       Prior to the WPEA, an eligible individual's entitlement to seek corrective action from the Board in an IRA appeal was limited to covered personnel actions taken or proposed to be taken as a result of a prohibited personnel practice described in 5 U.S.C. § 2302(b)(8), i.e., retaliation for whistleblowing.  *Miller*, 122 M.S.P.R. 3, ¶ 2.  Under pre‑WPEA law, the Board has jurisdiction over an IRA appeal if the appellant has exhausted his administrative remedies before OSC and makes nonfrivolous allegations of the following:  (1) he engaged in whistleblowing activity by making a protected disclosure; and (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a personnel action.  *Yunus v. Department of Veterans Affairs*, 242 F.3d 1367, 1371 (Fed. Cir. 2001); *Mason v. Department of Homeland Security*, 116 M.S.P.R. 135, ¶ 7 (2011); *Rusin v. Department of the Treasury*, 92 M.S.P.R. 298, ¶ 12 (2002).  After establishing the Board's jurisdiction in a pre‑WPEA IRA appeal, the appellant then must establish a prima facie case of whistleblower retaliation by proving by preponderant evidence that he made a protected disclosure that was a contributing factor in a personnel action taken against him.  5 U.S.C. § 1221(e)(1) (2011); *Mattil v. Department of State*, 118 M.S.P.R. 662, ¶ 11

(2012). If the appellant meets that burden, then the Board shall order such corrective action as it considers appropriate unless the agency shows by clear and convincing evidence that it would have taken the same personnel action in the absence of the protected disclosure. 5 U.S.C. § 1221(e)(1)-(2) (2011); *Chambers v. Department of the Interior*, 116 M.S.P.R. 17, ¶ 12 (2011); *see Mattil*, 118 M.S.P.R. 662, ¶ 11.[5]

<u>The appellant exhausted his remedies with OSC regarding the disclosures and personnel actions that he raises in his IRA appeal.</u>

¶9     The Board may only consider those disclosures of information and those personnel actions that the appellant raised before OSC. *Mason*, 116 M.S.P.R. 135, ¶ 8. An appellant may demonstrate exhaustion through his initial OSC complaint, evidence that the original complaint was amended (including but not limited to OSC's determination letter and other letters from OSC referencing any amended allegations), and the appellant's written responses to OSC referencing the amended allegations. *Id.* Moreover, unlike its Complaints Examining Unit (CEU), OSC's Disclosure Unit (DU) does not review allegations of prohibited personnel practices, and the Board has held that making a disclosure to the DU does not satisfy the exhaustion requirement under 5 U.S.C. § 1214(a)(3). *Id.*, ¶ 16 (citing *Sabbagh v. Department of the Army*, 110 M.S.P.R. 13, ¶¶ 10-15 (2008); *Clemente v. Department of Homeland Security*, 101 M.S.P.R. 519, ¶¶ 7-13 (2006)).

---

[5] In the following analysis, we fully address the alleged disclosures and the contributing factor elements prior to addressing whether the agency met its "clear and convincing" burden. Thus, we find that the WPEA's amendments to 5 U.S.C. §§ 1214(b)(4)(B)(ii), 1221(e)(2) are immaterial to the outcome of this appeal. *See* WPEA § 114 (amending those sections to permit a finding on whether the agency met its burden only "after a finding that a protected disclosure was a contributing factor"); *Belykov v. Department of Health & Human Services*, 120 M.S.P.R. 326, ¶ 7 n.3 (2013).

¶10        Because it was unclear from the record whether the appellant had raised all of the disclosures and personnel actions at issue in this appeal before the CEU, the Board ordered him to submit evidence showing which disclosures and personnel actions he raised with that unit.  PFR File, Tab 5.  In response, the appellant asserted that he brought all of the disclosures and personnel actions at issue in this appeal to the CEU's attention via emails to the CEU investigator assigned to his complaint.  PFR File, Tab 7 at 11‑12, 22, 28.  With his response, the appellant submitted those emails along with the documents that he sent to the investigator as email attachments.  *Id.* at 34‑85.  Based on these submissions, we find that the appellant has established that he exhausted his remedies with OSC regarding the disclosures and personnel actions that he raises in this appeal.

The administrative judge correctly found that disclosures (2), (5), (7), and (9) are protected disclosures.

¶11        Pre‑WPEA law defined a protected disclosure as a disclosure of information that an appellant reasonably believes evidences a violation of any law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.  5 U.S.C. § 2302(b)(8)(A) (2011); *see, e.g.*, *Linder v. Department of Justice*, 122 M.S.P.R. 14, ¶ 12 (2014).[6]  A reasonable belief exists if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably conclude that the actions of the Government evidence one of the categories of wrongdoing listed in section 2302(b)(8)(A).  *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999); *Chavez v. Department of Veterans Affairs*, 120 M.S.P.R. 285, ¶ 18 (2013).  To establish that he made a

---

[6]  The WPEA amended the definition at 5 U.S.C. § 2302(b)(8)(A)(i) by striking "a violation" and inserting "any violation."  WPEA § 101(a)(1).  We find that this amendment does not change the result in this case.  *See Mudd v. Department of Veterans Affairs*, 120 M.S.P.R. 365, ¶ 5 n.3 (2013).

protected disclosure, the appellant need not prove that the matter disclosed actually established one of the types of wrongdoing listed under section 2302(b)(8)(A); rather, he must show that the matter disclosed was one that a reasonable person in his position would have believed evidenced any of the situations specified in 5 U.S.C. § 2302(b)(8). *Chavez*, 120 M.S.P.R. 285, ¶ 18.

¶12      In the initial decision, the administrative judge found that disclosures (2), (5), (7), and (9) were protected because the appellant reasonably believed that they evidenced a violation of Army regulations and he made those disclosures to individuals who were outside his chain of command. ID at 8, 12, 14, 16. The administrative judge found that the remaining disclosures were not protected because the appellant made those disclosures to individuals in his chain of command and he was performing an "essential job duty" by reporting possible security violations to his immediate and second-level supervisors. ID at 6-7, 10-15.

¶13      The agency argues on review that the appellant did not reasonably believe that any of his disclosures evidenced a violation of Army regulations and that, therefore, none of his disclosures were protected. PFR File, Tab 1 at 13-18. In finding that the appellant reasonably believed that he was reporting a violation of Army regulations when he made disclosures (2), (5), (7), and (9), the administrative judge considered the specific regulations implicated in each of those disclosures and the relevant documentary evidence and hearing testimony regarding those disclosures, including the appellant's testimony as to why he believed that the alleged wrongdoing he was disclosing violated Army regulations. ID at 7-8, 10-16. The agency's assertion on review that the appellant did not reasonably believe that he was disclosing violations of Army regulations constitutes mere disagreement with the administrative judge's findings, which we find no reason to disturb. *Crosby v. U.S. Postal Service*, 74 M.S.P.R. 98, 105-06 (1997) (finding no reason to disturb the administrative

judge's findings when she considered the evidence as a whole, drew appropriate inferences, and made reasoned conclusions); *Broughton v. Department of Health & Human Services*, 33 M.S.P.R. 357, 359 (1987) (same).

¶14        We also find unpersuasive the agency's argument that the appellant's disclosures were not protected because he made them as part of his normal duties. PFR File, Tab 1 at 19-21.  The WPEA clarified that disclosures made in the normal course of one's job duties are not excluded from the definition of a protected disclosure.  *See* 5 U.S.C. § 2302(f)(2).  The Board has found that this clarification of existing law applies retroactively.  *Day v. Department of Homeland Security*, 119 M.S.P.R. 589, ¶¶ 9-26 (2013).  Therefore, because the appellant reasonably believed that he was disclosing a violation of agency regulations by making disclosures (2), (5), (7) and (9), those disclosures are protected regardless of whether he made them during his normal duties.

¶15        The agency also argues that the administrative judge improperly applied a subjective, rather than an objective, standard in finding that the appellant reasonably believed that he was disclosing violations of Army regulations. PFR File, Tab 1 at 15.  It asserts that the administrative judge applied "circular reasoning" in finding that the appellant's beliefs about security violations were reasonable, *id.*, and may have assumed that the appellant had a reasonable belief simply because he said he had a reasonable belief, *id.* at 18.  The initial decision shows, however, that the administrative judge properly applied an objective standard in determining whether the appellant reasonably believed that his disclosures were protected. ID at 16.  Therefore, the agency's argument provides no basis to disturb the initial decision.

The administrative judge erred in finding that disclosures (1), (3), (4), and (6) are not protected.

¶16        In his cross petition for review, the appellant challenges the administrative judge's findings that disclosures (1), (3), (4), and (6) were not protected because reporting possible security violations to his immediate and second-level

supervisors was one of his essential job duties.   PFR File, Tab 3 at 18‑19; ID at 6‑14.  The appellant argues that these disclosures are protected even though he made them to his supervisors during the course of his normal duties.  PFR File, Tab 3 at 18‑19.

¶17        As previously noted, in *Day*, the Board determined that the WPEA clarified that a disclosure made in the course of an appellant's normal duties is not excluded from whistleblower protection.  Given the Board's decision in *Day*, we agree with the appellant that the administrative judge erred in finding that disclosures (1), (3), (4), and (6) were not protected because the appellant made these disclosures in performing his "essential job duty" of reporting suspected security violations to his first‑ and second‑level supervisors.  Accordingly, we vacate the administrative judge's finding that these disclosures were not protected because the appellant made them to his supervisors in the course of his normal duties.

¶18        Even though disclosures (1), (3), (4), and (6) are not excluded from protection because the appellant made them in the course of his normal duties, he still must show that these disclosures are otherwise protected to meet his burden that he engaged in whistleblowing activity under 5 U.S.C. § 2302(b)(8).  Therefore, we have examined these disclosures, the regulations they implicate, and the other record evidence, including, for example, the appellant's testimony that he informed T.F. and S.J. in April 2011 that some BGCA and BGAD employees in the EOC had access to classified information without proper authorization in violation of AR 380-5.[7]   HT at 50‑56 (testimony of the appellant).   Based on our review of the record, we find that the appellant

---

[7] Section 6-1 of AR 380-5 prohibits unauthorized personnel from obtaining access to sensitive or classified information.  RAF, Tab 24 at 13‑14.

12

reasonably believed that he was reporting violations of various Army regulations governing classified information when he made these disclosures.

The agency's claims of bias and denial of the opportunity to cross-examine the appellant are not persuasive.

¶19  The agency raises an apparent claim of bias on review, arguing that the administrative judge's "tone and substance" throughout much of the proceeding was "unnecessarily and inappropriately demeaning" toward agency counsel. PFR File, Tab 1 at 17 n.14. In making a claim of bias or prejudice against an administrative judge, a party must overcome the presumption of honesty and integrity that accompanies administrative adjudicators. *Oliver v. Department of Transportation*, 1 M.S.P.R. 382, 386 (1980). An administrative judge's conduct during the course of a Board proceeding warrants a new adjudication only if her comments or actions evidence "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Bieber v. Department of the Army*, 287 F.3d 1358, 1362-63 (Fed. Cir. 2002) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)); *Smets v. Department of the Navy*, 117 M.S.P.R. 164, ¶ 15 (2011), *aff'd*, 498 F. App'x 1 (Fed. Cir. 2012). The agency's allegations on review, which do not relate to any extrajudicial conduct by the administrative judge, neither overcome the presumption of honesty and integrity that accompanies an administrative judge nor establish that she showed a deep-seated favoritism or antagonism that would make fair judgment impossible.

¶20  The agency also argues on review that the administrative judge thwarted its efforts to cross-examine the appellant regarding whether he reasonably believed that he was reporting violations of Army regulations. PFR File, Tab 1 at 15-18. An administrative judge has broad discretion to control the proceedings before her. *See Key v. General Services Administration*, 60 M.S.P.R. 66, 68 (1993). A review of the hearing record does not show that the agency's cross-examination of the appellant was improperly limited, and the agency has not shown that the

administrative judge committed reversible error in this regard. *See Nero v. Department of the Treasury*, 23 M.S.P.R. 325, 327 (1984).

<u>The administrative judge correctly found that the appellant proved that his protected disclosures were a contributing factor in the personnel actions.</u>

¶21    To prevail in an IRA appeal before the Board, an appellant must prove by preponderant evidence that his disclosure was a contributing factor in a personnel action. *Chavez*, 120 M.S.P.R. 285, ¶ 27. The term "contributing factor" means any disclosure that affects an agency's decision to threaten, propose, take, or not take a personnel action regarding the individual making the disclosure. *Usharauli v. Department of Health & Human Services*, 116 M.S.P.R. 383, ¶ 31 (2011); 5 C.F.R. § 1209.4(d). The most common way of proving the contributing factor element is the "knowledge/timing test." *Chavez*, 120 M.S.P.R. 285, ¶ 27. Under that test, an appellant can prove that his disclosure was a contributing factor in a personnel action through evidence that the official taking the personnel action knew of the whistleblowing disclosure and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *Id.* Once an appellant has satisfied the knowledge/timing test, he has demonstrated that a protected disclosure was a contributing factor in a personnel action. *Gonzalez v. Department of Transportation*, 109 M.S.P.R. 250, ¶ 20 (2008).

¶22    Regarding the contributing factor element of the appellant's IRA appeal, the administrative judge found that C.G. was responsible for the personnel actions at issue and that he was "well aware" of the appellant's protected disclosure regarding the "spillage"[8] of classified information. ID at 20 (citing HT at 423‑58 (testimony of C.G.)); ID at 29 (stating that, although C.G. was not the BGAD commander at the time of the appellant's disclosures, he was well aware of them).

---

[8] Generally, "spillage" is the transfer of classified or other sensitive information into an information system that is not approved or authorized for the use of such information.

14

In that regard, the administrative judge noted that C.G. stated in an affidavit that he had asked O.G. to investigate the appellant's security concerns regarding the spillage of classified information.  ID at 20 (citing IAF, Tab 6 at 11‑15).  The administrative judge also noted that, at the conclusion of his July 2012 security inspection at the BGCA, O.G. issued a report addressing the appellant's concerns and discussed the report with C.G., who read it.  *Id.*

¶23      On review, the agency challenges the administrative judge's finding that C.G. knew of the appellant's disclosures when he took the personnel actions at issue.  The agency argues that C.G. only had a "vague knowledge" that the appellant had expressed concerns about classified information, but he was not aware of any particular disclosures.  PFR File, Tab 1 at 5; *id.* at 22 (stating that C.G. only had a vague knowledge about information relating to the email pertaining to disclosure (1)).

¶24      Assuming arguendo that C.G. was unaware of the specifics of the appellant's disclosures, the record shows that, at the time of the personnel actions in question, C.G. had a general knowledge of the appellant's allegations of wrongdoing.  In that regard, we note that in a written statement accompanying the appellant's notice of proposed removal, C.G. stated that, during an "inbrief" meeting that preceded O.G.'s July 2012 inspection, he directed O.G. to investigate the appellant's allegations regarding the storage and "spillage" of classified material.  IAF, Tab 6 at 18.  Thus, we find that the administrative judge properly found that the appellant established the knowledge prong of the knowledge/timing test.

¶25      Regarding the timing prong of the knowledge/timing test, the administrative judge found that, because the personnel actions took place "virtually immediately" after O.G. left the BGAD, they occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel actions.  ID at 20‑21.

We agree.  The disclosures at issue in this appeal occurred between March 2011 and June 2012, and the personnel actions took place between July and December 2012.  The Board has held that a personnel action that occurs within 2 years of the appellant's disclosure satisfies the timing prong of the knowledge/timing test.  *See Agoranos v. Department of Justice*, [119 M.S.P.R. 498](#), ¶ 23 (2013).  Thus, we discern no reason to disturb the administrative judge's finding that the appellant proved the contributing factor element of his appeal.

<u>Because the administrative judge correctly found that the agency's denial of the appellant's access to restricted areas and classified documents was not a covered personnel action, she improperly conducted a clear and convincing analysis regarding that action.</u>

¶26        When an appellant meets his burden to establish a prima facie case of reprisal for whistleblowing, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same personnel actions in the absence of the appellant's whistleblowing.  *Mattil*, [118 M.S.P.R. 662](#), ¶ 11; *Jenkins v. Environmental Protection Agency*, [118 M.S.P.R. 161](#), ¶ 16 (2012).  Clear and convincing evidence is "that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established."  [5 C.F.R. § 1209.4](#)(e).  In determining whether an agency has met this burden, the Board will consider the following factors:  (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.  *Carr v. Social Security Administration*, [185 F.3d 1318](#), 1323 (Fed. Cir. 1999); *Jenkins*, [118 M.S.P.R. 161](#), ¶ 16.  Our reviewing court has held that evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record and despite the evidence that

fairly detracts from that conclusion.  *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012).

¶27        As the administrative judge explained in the initial decision, on July 17‑18, 2012, O.G. conducted an inspection of the BGCA.  ID at 22.  O.G. issued a report summarizing the results of the inspection, which identified various security deficiencies, IAF, Tab 6 at 72‑81, and he notified C.G. that the appellant had made the following statement when O.G. notified him of the inspection results: "This is what the Command gets for not listening to me," *id.* at 67.  C.G. testified that O.G. informed him that the appellant had made this comment and had failed the inspection intentionally.  HT at 426 (testimony of C.G.).  The administrative judge found that the agency suspended the appellant's access to classified information and secured areas effective July 23, 2012, based on O.G.'s statements regarding the appellant.  ID at 25; IAF, Tab 6 at 71.

¶28        Notwithstanding her determination that the denial of the appellant's access to classified information and restricted areas was not a personnel action under the Whistleblower Protection Act (WPA), ID at 17‑18; *see* 5 U.S.C. § 2302(a)(2)(A), the administrative judge found that, because C.G. took this action based on his belief that the appellant intentionally wanted to hurt the Command, the agency showed by clear and convincing evidence that the agency would have taken the same action absent the appellant's whistleblowing activities, ID at 25.  Given her correct finding that the denial of the appellant's access to restricted areas and classified documents was not a personnel action under the WPA,[9] it was

---

[9] In making this finding, the administrative judge noted that the Board has held that security clearance determinations are not personnel actions under the WPA, as amended.  ID at 18 (citing *Roach v. Department of the Army*, 82 M.S.P.R. 464, ¶¶ 44-54 (1999)).  The administrative judge reasoned that, because the suspension of the appellant's access to classified documents and restricted areas effectively suspended his security clearance, those actions are not personnel actions either.  *Id.* (citing *Hesse v. Department of State*, 217 F.3d 1372, 1377 (Fed. Cir. 2000)).

inappropriate for the administrative judge to determine whether the agency proved by clear and convincing evidence that it would have taken the same action in the absence of the appellant's whistleblowing. *See Clarke v. Department of Veterans Affairs*, <u>121 M.S.P.R. 154</u>, ¶ 19 n.10 (2014) (stating that the Board may not proceed to the clear and convincing evidence test unless it has first determined that the appellant established his prima facie case), *aff'd*, 623 F. App'x 1016 (Fed. Cir. 2015). Accordingly, we vacate the administrative judge's findings that the agency proved by clear and convincing evidence that it would have denied the appellant access to restricted areas and classified documents absent his whistleblowing.

<u>The agency proved by clear and convincing evidence that it would have changed the appellant's work duties and work location and would have denied him security training absent his whistleblowing activities.</u>

¶29      The administrative judge also found that the agency proved by clear and convincing evidence that it would have changed the appellant's work duties and work location and denied him security training in the absence of his disclosures. ID at 26. In making this finding, the administrative judge reasoned that, because the appellant's position required access to classified documents and secured areas, the lack of such access necessitated a change in his duties and work location. ID at 25; IAF, Tab 6 at 91. Similarly, the administrative judge reasoned that, because the appellant was no longer performing a security function for the agency, he did not need to receive security training. ID at 25. In other words, the administrative judge found that the agency met its clear and convincing burden regarding the appellant's change in duties and work location and the denial of security training because those personnel actions were a consequence of the denial of access to classified documents and restricted areas, and the agency had met its clear and convincing evidence burden regarding that action.

¶30 Given our finding that it was inappropriate for the administrative judge to conduct a clear and convincing analysis concerning the denial of access to classified documents and restricted areas, and that such analysis was the basis for her finding that the agency met its clear and convincing burden regarding the change in the appellant's work duties and work location and the denial of security training, we find the administrative judge's clear and convincing analysis of those personnel actions problematic as well. Accordingly, we vacate the administrative judge's clear and convincing analysis regarding those actions.

¶31 Nonetheless, based on our analysis of the *Carr* factors, we agree with the administrative judge that the agency met its clear and convincing evidence burden regarding the change in the appellant's work duties and work location and the denial of security training. The third *Carr* factor is not significant, as there appears to be no evidence of similarly situated nonwhistleblowers. As for the remaining *Carr* factors, although there was some motive to retaliate against the appellant on the part of the agency officials involved in these actions (i.e., C.G., T.R., and W.W.) for his disclosures of alleged security violations, *see Whitmore*, 680 F.3d at 1371 (stating that highly critical accusations regarding an agency's conduct can be evidence of retaliatory motive), we find that the evidence in support of these actions was very strong and outweighed any motive to retaliate. As the administrative judge explained, because the appellant's position required access to classified documents and secured areas, the lack of such access necessitated a change in the appellant's work duties and location, and there was no reason for him to receive security training because he was no longer performing a security function. ID at 25; IAF, Tab 6 at 91. In addition, there is no evidence that the appellant requested training, and, in any event, the hearing testimony indicated that funds were not available for training. HT at 615‑16 (testimony of T.R.).

**The administrative judge correctly found that the agency has failed to prove by clear and convincing evidence that it would have proposed the appellant's removal and postponed his 2012 performance evaluation in the absence of his protected disclosures.**

¶32    In assessing whether the agency met its burden of showing by clear and convincing evidence that it would have proposed the appellant's removal and postponed his performance evaluation in the absence of his protected disclosures, the administrative judge considered the following four charges set forth in the notice of proposed removal:  (1) making false statements; (2) making statements with the intent to disparage the BGCA command; (3) failure to follow established rules and procedures;  and  (4) conduct  unbecoming  a  Federal  employee. ID at 26‑31; IAF, Tab 6 at 17‑20.

¶33    The administrative judge noted that the first charge was supported by two specifications, which alleged as follows:  (1) the appellant stated to O.G. that he was unaware of the requirement for courier cards;[10] and (2) the appellant denied to T.R. that he had made the comment, "This is what the Command gets for not listening to me."  ID at 26; IAF, Tab 6 at 17.  The administrative judge credited the appellant's testimony denying that he had made the statement described in the first specification, finding that it was "totally improbable" that the appellant would have made that statement, as he had brought the requirement for courier cards to management's attention as early as March 2011.  ID at 26‑27; IAF, Tab 6 at 42.    As for the second specification, the administrative judge found it reasonable that the appellant did not remember making the comments about the Command when he was interviewed by T.R.  ID at 27.

¶34    Turning to the second charge—making statements with intent to disparage the  BGCA—the  administrative  judge  noted  that  this  charge  involved  an

---

[10] A courier card is an identification card that allows an individual to transport classified information.  HT at 40 (testimony of the appellant).

August 21, 2012 email from the appellant to W.W. stating that BGCA leadership had "no reason or training to make decisions." ID at 27; IAF, Tab 6 at 38. The administrative judge found that the record does not indicate that management ever discussed the tone of the appellant's emails to his superiors with him, nor is there any evidence that the appellant created the email with the intent to disparage the BGCA Command. ID at 27 (citing HT at 625 (testimony of T.R.)).

¶35       As for the charge of failure to follow established regulations and procedures, the administrative judge noted that the charge was supported by four specifications, which alleged that the appellant had committed the following security violations: (1) failure to conduct security compliance checks as required; (2) failure to mark classified material as required; (3) failure to ensure that courier cards are used in the transportation of classified materials; and (4) deletion of an IDS drawing containing classified information without requesting a preliminary inquiry. ID at 27‑28; IAF, Tab 6 at 17. The administrative judge noted that these specifications were essentially a list of the security violations O.G. had found during his inspection, ID at 27; IAF, Tab 6 at 72‑81, and she found that each specification was related directly to the issues the appellant had raised with his superiors as potential security violations, ID at 28. The administrative judge also noted that the appellant was never counseled and received excellent performance ratings, with the exception of the period in which his performance evaluation was held in abeyance. *Id.*; IAF, Tab 22 at 22‑23, Tab 23 at 37‑41.

¶36       Regarding the charge of conduct unbecoming a Federal employee, the administrative judge noted that, in support of this charge, the agency alleged that the appellant tried to shift the blame for his failures as BGCA Security Manager by telling O.G., "This is what the Command gets for not listening to me." ID at 28; IAF, Tab 6 at 17. The administrative judge noted that T.R. investigated these comments at C.G.'s request and T.R. concluded that the appellant did not

fail the inspection deliberately.  ID at 28; IAF, Tab 23, Exhibit (Ex.) X at 7.  As for whether the appellant was responsible for the security failures identified by O.G., the administrative judge noted that T.R.'s investigation concluded that the order appointing the appellant BGCA Security Manager should have been rescinded upon the appointment of B.F. as "Command Information Security Manager" in March 2012.  ID at 29; IAF, Tab 23, Ex. X at 7.

¶37      Applying the factors set forth in *Carr*, the administrative judge found that the evidence in support of the agency's proposed removal was "extremely weak." ID at 29.  In support of this finding, the administrative judge determined that the appellant tried to perform the duties of his position by making security compliance checks and bringing security issues to his supervisors' attention.  *Id.* In that regard, the administrative judge noted that the appellant testified without contradiction that he tried to mark classified material as required, raised the issue of the courier cards, and performed the duties required of him for the issuance of those cards.  *Id.*  The administrative judge also noted that C.G. and T.R. disagreed about whether the appellant was responsible for resolving the security issues that were the subject of the failure to follow procedures charge.  *Id.* (citing HT at 497‑507 (testimony of T.R.);  HT at 601‑22 (testimony of C.G.);  IAF, Tabs 23‑24, Exs. N‑O, Q, R, X).[11]   The administrative judge noted that the

---

[11] The agency argues on review that the documents the administrative judge cited, to support her finding that T.R. disagreed with C.G. about whether the appellant was responsible for the duties in question, do not support such a finding.  PFR File, Tab 1 at 23‑24.  Based on our review of these documents, we agree with the agency that the portions of the hearing transcript the administrative judge cited do not support her conclusion that C.G. and T.R. disagreed about whether the appellant was responsible for the inspection failures.  ID at 29 (citing HT at 497‑507 (testimony of C.G.), HT at 601‑22 (testimony of T.R.)).  We find evidence of such disagreement elsewhere in the record, however.  *Compare* HT at 443 (testimony of C.G. stating that the appellant was responsible for the problems identified in the inspection), *with* IAF, Tab 23, Ex. X at 54 (T.R.'s statement that the appellant's appointment as BGCA

Interservice Support Agreement between BGCA and BGAD provides that BGAD is responsible for implementing security services and BGCA will appoint a liaison.  ID at 29‑30; IAF, Tab 23, Ex. Q at 15.  The administrative judge found that B.F., as BGAD Security Officer, was responsible for, inter alia, Intrusion Detection Systems, Security and Identification Badge Control, and personnel and information security; however, there is no evidence that the agency ever proposed discipline against B.F.  ID at 30; IAF, Tab 23, Ex. Q at 15‑16.

¶38    Turning to the second *Carr* factor, the administrative judge found that the appellant's disclosures and the reasons for his proposed removal were "inextricably intertwined" inasmuch as discipline was proposed against the appellant for the same security concerns that were the subject of his disclosures. ID at 31.  The administrative judge found that C.G. had a motive to retaliate because the appellant was charged with violating agency security procedures regarding the same concerns that he was bringing to management's attention. ID at 29; *see Whitmore*, 680 F.3d at 1371.

¶39    As for the third *Carr* factor, the administrative judge found that the agency did not show that it took similar actions against nonwhistleblowers.  ID at 29. The administrative judge therefore found that the agency failed to show by clear and convincing evidence that it would have proposed the appellant's removal and would have postponed his 2012 performance evaluation absent his whistleblowing activities.  ID at 31.

¶40    The agency challenges this finding on review, arguing that it proved all of the charges and specifications by preponderant evidence, and that the strength of its case shows that it would have proposed the appellant's removal regardless of

_____

Security Manager should have been rescinded upon B.F.'s appointment as BGAD Security Officer in March 2012).

his disclosures.[12]    PFR File, Tab 1 at 22‑25.    Other than the agency's general assertion that it proved all four charges, the agency on review does not address charges one and two.    Thus, the agency does not challenge the administrative judge's findings regarding those charges.    Based on our review of the evidence, we discern no reason to disturb the administrative judge's analysis of the first two charges or her implicit finding that the evidence in support of those charges is weak.

¶41        Regarding charge three, the agency asserts that the administrative judge refused to hold the appellant accountable for the inspection failures by ruling that he had no responsibilities beyond inspecting and reporting security violations. *Id.* at 22.    The agency asserts that this ruling is an abuse of discretion given the "overwhelming evidence" that the appellant was responsible for the inspection failures.    *Id.*    In support of this claim, the agency asserts as follows:    (1) the appellant's position description specifically states that his duties include assuring that appropriate corrective actions are taken to rectify security deficiencies, *id.* at 23; IAF, Tab 6 at 92; (2) the appellant's evaluation support form states that his duties include ensuring compliance with mandated and approved security procedures, and ensuring that the organization is fully prepared for all internal and external security audits/inspections, PFR File, Tab 1 at 23‑24 (citing IAF, Tab 6 at 86, 88); (3) several witnesses, including O.G. and C.G., testified that the appellant was responsible for the failures, *id.* at 23 (citing RAF, Tab 11 at 14); (4) during his hearing testimony, the appellant acknowledged that his duties included ensuring compliance with security procedures, *id.* at 23 (citing HT at 16

---

[12] The agency's arguments on review regarding the clear and convincing element as it pertains to the proposed removal and postponed performance evaluation are limited to the second *Carr* factor, i.e., the strength of its evidence in support of the appellant's proposed removal.    Based on our review of the record, we find no reason to disturb the administrative judge's findings regarding the remaining two *Carr* factors.

(testimony of the appellant)); and (5) a report issued by the Pentagon concluded that the security responsibilities were the appellant's primary duties and responsibilities, *id.* at 24 (citing RAF, Tab 11 at 16). Thus, the agency essentially argues that the evidence in support of removing the appellant was strong because he was responsible not only for alerting management to security violations but also for correcting them, and he failed to do so.

¶42    Even if the appellant were responsible for the security violations cited in charge three, we find that the evidence in support of proposing the appellant's removal for these violations was not strong, given his efforts to address the security failures at issue in this charge by attempting to mark classified material and ensure that personnel who transported classified information were using courier cards, as well as his performance record. We also find disingenuous the agency's assertion that those violations warranted the appellant's removal, given management's failure to address the security problems that the appellant raised. As the administrative judge noted in the initial decision, if the violations identified in this charge were serious enough to warrant the appellant's removal, it "begs the question" as to what actions his supervisors took to ensure that the security issues the appellant brought to management's attention were rectified. ID at 28.

¶43    Regarding charge four, which the agency characterizes as "the most important charge," the agency alleges that the administrative judge erred by refusing to "support the charge" based on her conclusion that the appellant did not intend to injure the Command or fail O.G.'s inspection. PFR File, Tab 1 at 22. The agency asserts that it did not charge the appellant with attempting to injure the Command or fail the inspection but, rather, with trying to shift the blame for his failures as BGCA Security Manager by telling O.G., "This is what the Command gets for not listening to me." *Id.*

¶44    Although we agree with the agency that this charge did not require proof that the appellant made the comment at issue with the intention of injuring the

Command, we disagree with the agency's apparent assertion on review that the evidence in support of charge four was strong.  Significantly, the agency did not merely allege that the appellant made the comment set forth in this charge.  Rather, it alleged that he made the comment in an effort to shift responsibility for his alleged failures to the agency.  IAF, Tab 6 at 17.  Thus, to prove this charge, the agency was required to show that the appellant made the comment with the intention of shifting responsibility for the security failures cited by O.G. to the agency.  Based on her review of the relevant evidence and testimony, the administrative judge found that the comment in question was an "off‑the‑cuff" remark that the appellant easily could have forgotten.  ID at 24.  We discern no reason to disturb this finding.  Given these circumstances, we find that the evidence does not support a finding that the appellant made this comment with the intention of shifting blame for his alleged failures to the agency.  Accordingly, we agree with the administrative judge's implicit finding that the evidence in support of this charge was weak.  ID at 28‑29; *see Crosby*, 74 M.S.P.R. at 105‑06; *Broughton*, 33 M.S.P.R. at 359.

¶45      The agency also argues on review that it showed by clear and convincing evidence that it would have proposed the appellant's removal absent his protected disclosures because his removal from the Unescorted Access Program (UAP)[13] alone warranted his removal.  PFR File, Tab 1 at 24.  The agency contends that the requirements for removing the appellant based on a charge of failure to maintain a condition of employment were clearly met in this case because his position description states that a UAP is required to maintain his position, and he admitted that he lost his UAP.  *Id.*

---

[13] The UAP allows approved individuals unescorted access inside the fence line of BGCA's Chemical Limited Area.  IAF, Tab 6 at 12.

¶46         The agency, however, did not charge the appellant with failure to maintain a condition of employment.  IAF, Tab 6 at 17‑21.  It is well established that the Board will not sustain an agency action on the basis of a charge that could have been brought but was not.  *Rodriguez v. Department of Homeland Security*, 117 M.S.P.R. 188, ¶ 8 (2011).  Consequently, the appellant's alleged failure to maintain a condition of employment does not provide a basis for disturbing the administrative judge's findings concerning the strength of the evidence in support of the agency's action.

¶47         In sum, we agree with the administrative judge that the evidence presented by the agency in support of the appellant's proposed removal was weak, the agency had a motive to retaliate against the appellant, and there is no evidence that the agency took similar actions against similarly situated employees who were not whistleblowers.  Accordingly, we find no reason to disturb the administrative judge's finding that the agency failed to prove by clear and convincing evidence that it would have proposed the appellant's removal and postponed his 2012 performance evaluation in the absence of his protected whistleblowing.

## ORDER

¶48         We ORDER the agency to rescind the proposed removal and issue the appellant's 2012 performance evaluation, along with any awards, bonuses, or similar items that result from the performance evaluation.  *See Kerr v. National Endowment for the Arts*, 726 F.2d 730 (Fed. Cir. 1984).  The agency must complete this action no later than 20 days after the date of this decision.

¶49         We also ORDER the agency to pay the appellant the correct amount of back pay, interest on back pay, and other benefits under the Back Pay Act and/or Postal Service Regulations, as appropriate, no later than 60 calendar days after the date of this decision.  We ORDER the appellant to cooperate in good faith in the agency's efforts to calculate the amount of back pay, interest, and benefits

due, and to provide all necessary information the agency requests to help it carry out the Board's Order.  If there is a dispute about the amount of back pay, interest due, and/or other benefits, we ORDER the agency to pay the appellant the undisputed amount no later than 60 calendar days after the date of this decision.

¶50     We further ORDER the agency to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order and to describe the actions it took to carry out the Board's Order.  The appellant, if not notified, should ask the agency about its progress.  *See* 5 C.F.R. § 1201.181(b).

¶51     No later than 30 days after the agency tells the appellant that it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the office that issued the initial decision in this appeal if the appellant believes that the agency did not fully carry out the Board's Order.  The petition should contain specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communications with the agency.  5 C.F.R. § 1201.182(a).

¶52     For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached.  The agency is ORDERED to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

¶53     This is the final decision of the Merit Systems Protection Board in this appeal.  Title 5 of the Code of Federal Regulations, section 1201.113(c) (5 C.F.R. § 1201.113(c)).

## NOTICE TO THE APPELLANT
## REGARDING YOUR RIGHT TO REQUEST
## ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs.  To be paid, you must meet the requirements set out at title 5 of the United States Code (U.S.C.), sections 7701(g), 1221(g), 1214(g) or 3330c(b); or 38 U.S.C. § 4324(c)(4).  The regulations may be found at 5 C.F.R. §§ 1201.201, 1202.202, and 1201.203.  If you believe you meet these requirements, you must file a motion for attorney fees WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION.  You must file your attorney fees motion with the office that issued the initial decision on your appeal.

## NOTICE TO THE APPELLANT REGARDING
## YOUR RIGHT TO REQUEST CONSEQUENTIAL AND/OR
## COMPENSATORY DAMAGES

You may be entitled to be paid by the agency for your consequential damages, including medical costs incurred, travel expenses, and any other reasonable and foreseeable consequential damages. To be paid, you must meet the requirements set out at 5 U.S.C. §§ 1214(g) or 1221(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202 and 1201.204.

In addition, the Whistleblower Protection Enhancement Act of 2012 authorized the award of compensatory damages including interest, reasonable expert witness fees, and costs. 5 U.S.C. § 1214(g)(2).

If you believe you meet these requirements, you must file a motion for consequential damages and/or compensatory damages WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your motion with the office that issued the initial decision on your appeal.

## NOTICE TO THE PARTIES

A copy of the decision will be referred to the Special Counsel "to investigate and take appropriate action under [5 U.S.C.] section 1215," based on

Bloom Decl. and Exhs 136

the determination that "there is reason to believe that a current employee may have committed a prohibited personnel practice" under 5 U.S.C. § 2302(b)(8), (b)(9)(A)(i), (b)(9)(B), (b)(9)(C), or (b)(9)(D). 5 U.S.C. § 1221(f)(3).

NOTICE TO THE APPELLANT REGARDING
YOUR FURTHER REVIEW RIGHTS

You have the right to request review of this final decision by the U.S. Court of Appeals for the Federal Circuit.

The court must receive your request for review no later than 60 calendar days after the date of this order. *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you want to request review of the Board's decision concerning your claims of prohibited personnel practices under 5 U.S.C. § 2302(b)(8), (b)(9)(A)(i), (b)(9)(B), (b)(9)(C), or (b)(9)(D), but you do not want to challenge the Board's disposition of any other claims of prohibited personnel practices, you may request the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction to review this final decision. The court of appeals must receive your petition for review within 60 days after the date of this order. *See* 5 U.S.C. § 7703(b)(1)(B) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. You may choose to request review of the Board's decision in the U.S. Court of Appeals for the Federal Circuit or any other court of appeals of competent jurisdiction, but not both. Once you choose to seek review in one court of appeals, you may be precluded from seeking review in any other court.

If you need further information about your right to appeal this decision to court, you should refer to the Federal law that gives you this right. It is found in title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff.

Dec. 27, 2012).   You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.   Additional information about other courts of appeals can be found at their respective websites, which can be accessed through http://www.uscourts.gov/Court_Locator/ CourtWebsites.aspx.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

FOR THE BOARD:


_____
Jennifer Everling
Acting Clerk of the Board

Bloom Decl. and Exhs 138



| | |
|---|---|
| | **DFAS CHECKLIST** |
| | **INFORMATION REQUIRED BY DFAS IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES OR AS ORDERED BY THE MERIT SYSTEMS PROTECTION BOARD** |

AS CHECKLIST: INFORMATION REQUIRED BY IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES

## CIVILIAN PERSONNEL OFFICE MUST NOTIFY CIVILIAN PAYROLL OFFICE VIA COMMAND LETTER WITH THE FOLLOWING:

1. Statement if Unemployment Benefits are to be deducted, with dollar amount, address and POC to send.

2. Statement that employee was counseled concerning Health Benefits and TSP and the election forms if necessary.

3. Statement concerning entitlement to overtime, night differential, shift premium, Sunday Premium, etc, with number of hours and dates for each entitlement.

4. If Back Pay Settlement was prior to conversion to DCPS (Defense Civilian Pay System), a statement certifying any lump sum payment with number of hours and amount paid and/or any severance pay that was paid with dollar amount.

5. Statement if interest is payable with beginning date of accrual.

6. Corrected Time and Attendance if applicable.

## ATTACHMENTS TO THE LETTER SHOULD BE AS FOLLOWS:

1. Copy of Settlement Agreement and/or the MSPB Order.

2. Corrected or cancelled SF 50's.

3. Election forms for Health Benefits and/or TSP if applicable.

4. Statement certified to be accurate by the employee which includes:

   a. Outside earnings with copies of W2's or statement from employer.
   b. Statement that employee was ready, willing and able to work during the period.
   c. Statement of erroneous payments employee received such as; lump sum leave, severance pay, VERA/VSIP, retirement annuity payments (if applicable) and if employee withdrew Retirement Funds.

5. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.

Bloom Decl. and Exhs 139



## NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts**.**

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

    a.  Employee name and social security number.
    b.  Detailed explanation of request.
    c.  Valid agency accounting.
    d.  Authorized signature (Table 63)
    e.  If interest is to be included.
    f.  Check mailing address.
    g.  Indicate if case is prior to conversion.  Computations must be attached.
    h.  Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected. (if applicable)

## Attachments to AD-343

1.  Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement. (if applicable)

2.  Copies of SF-50's (Personnel Actions) or list of salary adjustments/changes and amounts.

3.  Outside earnings documentation statement from agency.

4.  If employee received retirement annuity or unemployment, provide amount and address to return monies.

5.  Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)

6.  If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.

7.  If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases: (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)
    a.  Must provide same data as in 2, a-g above.
    b.  Prior to conversion computation must be provided.
    c.  Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.

Rosemary Dettling, Esq.
Pro Hac Vice
Federal Employee Legal Services Center
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 390-4741
Email: rdettling@felsc.com

Sara L. Bloom, Esq.
Admitted Pro Hac Vice
Law Office of Sara Bloom
1120 Huffman Rd Ste 24-785
Anchorage, AK 99515
Telephone: (907) 519-3613
Email: sara@907lawyer.com

Counsel for Plaintiff Roylan G. Damwyk

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROYLAN G. DAMWYK,<br><br>Plaintiff,<br><br>v.<br><br>FRANK KENDALL, III., ET AL.,<br><br>Defendants | Case No.: 2:22-cv-04424-GW-SK<br><br>**DECLARATION OF ROYLAN G. DAMWYK, PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**<br><br>**Hearing Date: March 20, 2025**<br>**Hearing Time: 10 a.m.**<br>**Ctrm: 5B**<br><br>**Honorable Hernán D. Vera**<br>**United States District Judge** |

1

# DECLARATION  OF ROYLAN G. DAMWYK

I, Roylan Damwyk, hereby swear under penalty of perjury that the following is true and correct:

1. I received Ms. Dettling's name and number from someone  I knew on the U.S. Air Force Vandenberg base.

2. When I contacted Ms. Dettling she agreed to take my case.  She charged me very little to help me with my failure to accommodate case.  I was so relieved. The stress from being forced to stay on unpaid leave affected me so detrimentally that I could not concentrate and my comprehension was deteriorating to the point I could not understand anything.

3. Before I hired Ms. Dettling for my EEOC cases, I called many attorneys in California, but I was unable to find an attorney who would take on my case. They all either said they were not familiar with the EEOC process and federal sector employment law, or they said that they would not take it on contingency.

4. When an EEOC judge was appointed, she allowed us to telecon our first court session and Ms. Dettling called in and has been helping me through every single aspect of the case, ever since.  If it were not for her dogged determination to get my case addressed properly, I would have given up. She helped with filings in federal court and helped me understand the rulings. She also represented me at trial.

5. Before she agreed to take the federal case, she had suggested I try to find a local attorney because she was not familiar with the local courts and was not licensed in California nor admitted to the Central District court.

2

6. I tried to find a local attorney again, but no one was even interested.  I called over a dozen firms in Lompoc, California where I live, and called firms in Los Angeles after I filed a complaint in federal court.

7. After trying for months to hire a local attorney and finding no one, Ms. Dettling agreed to seek admission in the federal case.  I cannot even think about where I would be if she hadn't agreed to help me.

8. I've attached a copy of the original list of attorneys I contacted to try to represent me in federal court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 13, 2025, at Lompoc, California.


*/s/ Roylan G. Damwyk*
Roylan G. Damwyk
Plaintiff

3

EXHIBIT A

no Rothschild + Alwitt   No

no Todd M. Friedman   310-982-3639

no Devadoss   888-351-0424

no Makarem + Assoc   800-610-9646

no Michael P. Ring   805-335-2230

no Sanger Swayne 807   Criminal

no Katzakian   SLO   888-774-4158

David Ocean bridge   Accident

Christina Humphrey   805-618-2924
                     L/M
no Jean Lapuyade   no   619-826-6975

no Graham Hollis   874-600-2864

7:15 5

213 - 493 - 6302    NO

NO    Abramson    Labor Group - NO

Google

Lunch

NO  Kirk + Simas    805 - 621 - 720i

NO. Answer
Noah Susan    805 - 862 - 1027

NO    Low McKinley    9/6 - 00 - 6400  NO

Bornstein Scot -    888 . 381 . 0639

NO / Chatteman    sm    805 214 - 2222

David S. Secrest    Lwp

2  AnTicori + Ricotta  83 - 805 845 - 0864

Abramson Labor Group

NO

List of Attorney's I contacted for federal court:

| | | |
|---|---|---|
| Abramson Labor Group | 213-757-2924 | 1700 W. Burbank Blvd, Burbank, Ca |
| Kirk & Simas | 805-621-7209 | 2550 Professional Parkway, Santa Maria, Ca |
| Nunn, Susan | 805-862-1027 | 1130 E. Clark Ave, Suite 150, Santa Maria, Ca |
| Low McKinley | 916-231-2400 | 2150 River Plaza Drive, Suite 250, Sacramento, Ca |
| Bernstein  Scot | 888-381-0639 | 101 Parkshore Drive, Suite 100, Folsom, CA |
| Gitterman | 805-214-8888 | 418 E. Canon Perdido St, Santa Barbara, Ca |
| David S. Secrest | | No response |
| An Ticouni & Ricotta | 805-845-0864 | 201 N. Calle Cesar Chavez, Suite 105, Santa Barbara, CA |
| California Employment Lawyers | | |
| Rothschild & Atwill | | 805-845-1190 817 Garden Street, Santa Barbara, CA |
| Todd M. Friedman | 310-982-2693 | 21031 Ventura Blvd Woodland Hills, CA |
| Devadoss | 888-351-0424 | 1629 K street, Washington, DC |
| Makarem & asso | 800-610-9646 | 11601 Wilshire Blvd, Suite 2440, Los Angeles, CA |
| Michael P. Ring | 805-335-2230 | 1234 Santa Barbara Street, Santa Barbara, Ca |
| Sanger Swayne | | No Criminal |
| Katzakiam | 888-724-4138/888-338-7992 | 3196 S. Higuera St, San Luis Obispo, CA |
| Ocean Bridge | | No Accident |
| Christina Humphry | 805-618-2924 | 1117 State St, Santa Barbara, Ca |
| Jean Lapuyade | 619-826-6975 | 5440 Morehouse Dr, Suite 3600, San Diego, CA |
| Graham Hollis | 844-600-0864 | 3555 Fifth Avenue, Suite 200 San Diego, CA |
| Kristi Rothschild | 661-268-6242 | 27 W. Anapamu St #289, Santa Barbara Ca |
| Bruce N. Anticooni | 805-699-5968 | 201 N. Calle Cesar Chavez, Suite 105, Santa Barbara, Ca |
| Eric Kingsley | 888-753-1837 | 16133 Ventura Blvd, Suite 1200, Encino, CA |
| Allen Feghali | 213-232-3028 | 725 South Figueroa St, 31st Floor, Los Angeles, CA |

Rosemary Dettling, Esq.
Pro Hac Vice
Federal Employee Legal Services Center
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 390-4741
Email: rdettling@felsc.com

Sara L. Bloom, Esq.
Admitted Pro Hac Vice
Law Office of Sara Bloom
1120 Huffman Rd Ste 24-785
Anchorage, AK 99515
Telephone: (907) 519-3613
Email: sara@907lawyer.com

Counsel for Plaintiff Roylan G. Damwyk

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROYLAN G. DAMWYK,<br><br>Plaintiff,<br><br>v.<br><br>FRANK KENDALL, III., ET AL.,<br><br>Defendants | Case No.: 2:22-cv-04424-GW-SK<br><br>**DECLARATION OF PAULA PEARLMAN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>**Hearing Date: March 20, 2025**<br>**Hearing Time: 10 a.m.**<br>**Ctrm: 5B**<br><br>**Honorable Hernán D. Vera**<br>**United States District Judge** |

I, Paula Pearlman, declare as follows:

1.    I am a member in good standing of the California State Bar. I am in private practice as principal of my own firm, Law Office of Paula Pearlman, in Los Angeles. I specialize in disability civil rights litigation. I also recently became the Legal Director of the Wage Justice Center, a non-profit law office representing low wage workers experiencing wage theft. This declaration is based upon my personal knowledge. If called to testify, I could testify competently to the facts described in this declaration.

2.    I submit this declaration in support of Plaintiffs' Motion for an Award of Attorneys Fees.

3.    In this declaration, I have been asked to address the reasonableness of the hourly rate requested by Plaintiff's Counsel for their work in the trial court in this matter.

## My Background and Experience

4.    My most recent Resume setting forth my background and experience and providing my qualifications as an attorney, including expertise in attorney's fees expert is attached hereto as Exhibit A.

5.    I have my own law firm, Law Office of Paula Pearlman. I am an experienced attorney with over 40 years of experience litigating public interest cases, including class action cases. For the past 25 years, I have worked almost exclusively to advance the civil rights of people with disabilities. I am a 1982 graduate of Southwestern Law School, Los Angeles, and was admitted to the bar in 1983. In my current private practice position, I engage in class action and impact litigation on behalf of people who face discrimination or other violations of civil rights or federal statutory protections. I provide education, training, legal counsel and advice on disability related employment and public accommodations to both individuals and to associations, such as the Employment Roundtable of Southern California. I have provided expert witness testimony about reasonable accommodations in the workplace. On February 13, 2025, I was appointed class counsel in *Judy Griffin, et al. v. City of Los Angeles*, Case No.

2:24-cv-06312 RGK-MAR (C.D. Cal. 2024), a class action of people with mobility disabilities who use or desire to use Los Angeles City public parks and park facilities, along with my co-counsel Goldstein Borgen, Dardarian & Ho, and Schneider Wallace Cottrell Konecky LLP. I am one of the attorneys who monitors the implementation of the settlement agreement in *Willits v. City of Los Angeles*, Case No. 10-cv-05782 CBM (C.D. Cal. 2010), along with these same firms.

      6.     Prior to establishing my law firm, from 2014 – 2020, I was a Senior Staff Counsel, then an Assistant Chief Counsel with the California Department of Fair Employment and Housing (DFEH), Legal Division, now known as the California Civil Rights Department. While at the Department of Fair Employment and Housing, I investigated and litigated discrimination cases, including employment, housing and public accommodations matters. With respect to attorney's fees, I was responsible for making recommendations of the rates DFEH requested in litigation matters, including conducting rates surveys, working with fee experts, co-training all Legal Division staff on recovering attorney's fees, time keeping standards, and motions for attorney's fees. I supervised between 8-12 attorneys, revamped and standardized the Department's disability accommodation processes and procedures, implemented department-wide disability accommodation training, and ensured website accessibility. I served on a statewide task force on website accessibility standardization for State of California websites. From November 2014 – May 2016, I was an Adjunct Professor of Law at Southwestern Law School. I developed, taught, and supervised students in an experiential learning course. Law students investigated two actual DFEH complaints and represented DFEH in a mandatory mediation case where the Department had found discrimination had occurred, and a lawsuit would be filed.

      7.     From 2001 – 2014, I held various positions at the Disability Rights Legal Center, a 501(c)(3) legal non-profit dedicated to eliminating disability discrimination through litigation, advocacy and education. Disability Rights Legal Center, formerly

2

Western Law Center for Disability Rights, is the oldest cross-disability center in the country, with a national reputation for significant disability cases. During the entire time I worked at the Disability Rights Legal Center, it was affiliated with Loyola Law School, Los Angeles. From 2001 – 2005, I was the Director of the Civil Rights Litigation Program, and an Adjunct Professor of Law, responsible for supervising a law school legal clinic and teaching a litigation skills course at Loyola Law School, while litigating disability discrimination cases with staff attorneys and law students. From 2006 – 2008, I was a Deputy Director and the Interim Executive Director, supervising the Litigation and Advocacy Programs, and I was also an Adjunct Professor of Law. I served as the Executive Director from 2009 – 2014 with overall responsibility for the organization, including overseeing all the legal programs, fundraising, board relations, as well as setting officewide policies about attorney's fees recovery, and rates. As the Executive Director, I was also a Visiting Associate Professor of Law, Loyola Law School, Los Angeles, teaching Disability Rights Law, Special Education Law and Policy. I also taught a course in Special Education Law at Loyola Marymount University, Los Angeles to both undergraduates, and graduate students. In addition to teaching, I supervised Disability Rights Legal Center's clinical legal programs, and participated on the law school accommodation committee and participated in faculty hiring.

8.    While at Disability Rights Legal Center, I was a Member of the U.S. Access Board, Courthouse Access Advisory Committee from 2004 – 2006. The Courthouse Access Committee developed guidance and recommendations on accessible courthouse design under the Americans with Disabilities Act and the Architectural Barriers Act.

9.    I served as a Co-Chair, Lawyer Representatives, Central District, Ninth Circuit Judicial Conference from 2008-2009, and was a Member, Lawyers Rep. Coordinating Committee, Ninth Circuit Judicial Conf. 2008-2009, and was a Lawyer

1  Representative, Central District, Ninth Circuit Judicial Conference from 2006-2008.

2      10.    I was a Supervising Attorney at the California Women's Law Center from

3  1997 – 2001, supervising and litigating gender and other types of discrimination

4  matters. I was an associate at the Law Offices of Margaret S. Henry from 1994 – 1997,

5  litigating plaintiff-side race, gender, sex and disability discrimination employment

6  cases. From 1992 – 1994, I was of Counsel at Hadsell & Stormer, and Traber &

7  Voorhees, plaintiff-side civil rights and class action employment litigation firms,

8  litigating employment cases. Prior to that, I worked at the National Immigration Law

9  Center as a staff attorney from 1989 – 1990, providing technical legal assistance to

10  lawyers on political asylum and violence against women matters, as well as authoring

11  practice materials for lawyers and the public. From 1985 – 1989, I was a staff attorney

12  at Neighborhood Legal Services of Los Angeles County, a 501(c)(3), Legal Services

13  Corporation funded agency combating poverty through individual representation,

14  impact litigation and public policy advocacy. I primarily worked in the Immigration

15  Unit, and litigated individual and class action immigration matters, including *Orantes-*

16  *Hernandez v. Meese*, 685 F.Supp. 1488 (C.D. Cal. 1988), aff'd. sub nom. *Orantes-*

17  *Hernandez v. Thornburgh,* 919 F.2d 549 (9th Cir. 1990). From 1983 – 1984, I was a

18  staff attorney at the Imperial Valley Immigration Project, Centro de Asuntos

19  Migratorios (Center for Migration Affairs) in El Centro, California, a nonprofit agency

20  providing free legal representation to Central Americans in federal immigration

21  detention litigating individual political asylum cases.

22      11.    In each of my legal positions, the organizations did not charge clients fees

23  for legal services, but rather recovered fees through fee shifting statutes for the

24  prevailing party. I was involved with all aspects of fee recovery, including, rate setting,

25  time keeping practices, and drafting motions and declarations in support of securing

26  attorney's fees, and mediations and settlement conferences.

27      12.    While the Litigation Director at Disability Rights Legal Center (DRLC),

28

4

beginning in 2001, I was initially responsible for recommending, and then as Executive Director, setting the office's annual billing rates for our fee shifting cases. To determine market rates for fee recovery purposes, it has been my practice to obtain current billing rates for lawyers of comparable skill and experience at several firms throughout the City, including board members, co-counsel and pro-bono counsel, and other friends and colleagues. I did this on an annual basis, contacting partners who were familiar with DRLC lawyers in question so that they could make an informed judgment about the comparable skill levels and year of graduation of the attorneys at their firms whose rates were used to establish DRLC billing rates. The "big law" firms' billing rates were generally higher than the civil rights practices' rates. Because the law provides for market rates, ascertaining those rates was important to maximize recovery for public interest cases.

13.    I consulted other civil rights firms and attorneys, and public interest attorneys to determine their annual rates, and to gain knowledge of what rates had been awarded with successful fee motions, including Dan Stormer, Shawna Parks, Olu Orange, and Jonathan Rotter.

14.    I also consulted with fee experts, including Richard Pearl and Carol Sobel, who shared their filed fee declarations, and court orders awarding fees, including hourly rates and reasonableness of the hours worked. Both have discussed with me market rates and factors to determine those rates, and continue to make themselves available as consultants and advisors.

15.    My practice of ascertaining, recommending and approving annual billing rates continued once I left DRLC, and worked for the State of California at what is now the Civil Rights Department, formerly DFEH. As an Assistant Chief Counsel, I followed the same practice of consulting with partners in firms, colleagues, experts, reviewing court orders, and track fee litigation to suggest our annual billing rate for fee recovery matters. In my own firm, I have followed the same process to ascertain

5

annually, hourly billing rates. At the time a case is initiated, and co-counseling agreements are signed, I follow my practice of conducting a survey of attorneys, experts and reviewing court orders to determine my annual billing rate.

16.    For this case, both Richard Pearl and Carol Sobel, recognized experts in attorney's fees motions, provided me with their most recently filed declarations, with attachments including court orders, to review to form an opinion regarding Rosemary Dettling's hourly rate and to prepare this declaration.

17.    I am not charging to provide this declaration, but I have suggested that if successful, attorneys in private civil rights practices donate to a non-profit legal organization. I believe I am qualified to provide this declaration for the civil rights bar and the non-profit legal community because of my work at the Disability Rights Legal Center, Civil Rights Department (DFEH), my private practice, as well as my clinical and doctrinal teaching experience at Loyola Law School and Southwestern Law School.

18.    I am informed that fees are being sought by this motion for Washington, DC based attorney Rosemary Dettling, the founder and lead attorney of the Federal Employee Legal Services Center. Ms. Dettling is a 1991 graduate of Notre Dame Law School, and is admitted to the D.C. and New York bars. She has been practicing employment law in various capacities since 1991, as a federal government employee representing the employer/federal agency, and in her own public interest practice representing employees in federal administrative practices such as the EEOC and U.S. Merit Systems Protection Board (MSPB), as well as litigation following an administrative determination.

19.    Ms. Dettling practices in a very specialized area of law. There are very few employment attorneys in the Los Angeles area that represent federal employees. I am regularly asked to consider a disability employment  case, or make an appropriate referral to a lawyer for a federal employee. I have found it exceedingly difficult to refer people making these inquiries to the plaintiff's employment bar because there are so

6

few attorneys that represent federal employees.

20.    Based on my review of the docket in the case, motions and orders that were provided to me and which I retrieved from Pacer, Ms. Dettling has specialized knowledge of both disability rights employment law, and federal employment practices. I am of the opinion that she is a highly skilled and experienced attorney in the area of disability rights and employment litigation.

21.    As a 1991 graduate, practicing for approximately 33-34 years, it is my understanding that Ms. Dettling is requesting an hourly rate of $1000. In my experience, the $1000/hour rate for Ms. Dettling is well within the range for the current reasonable rate for an attorney of her skill, experience and reputation in Los Angeles, if not somewhat low. My opinion is based on comparisons to rates approved for attorneys of comparable skill, experience and reputation in the Los Angeles legal market and my review of past fee awards.

22.    For example, Exhibit B is the 2023 Order in Los Angeles Superior Court awarding fees in *Contreras v. Kelly Pipe Co.*, Case No. 21STCV17933, 2023 Cal. Super. LEXIS 64818, to attorneys at Shegerian & Associates in an employment discrimination case.  The four top billing attorneys in *Contreras* and the rates approved were Carney Shegerian at $1350 an hour; Anthony Nguyen at $1100 an hour; (3) Mahru Madjidi at $900 an hour; and Bryan Kirsh at $825 an hour. *Id.,* pp. 20, 28.  The Court's decision notes the experience of each: Carney Shegerian – over 30 years; Anthony Nguyen – almost 15 years; Mahru Madjidi – 10 years; and Bryan Kirsh – 6 years. *Id.* at p.20.

23.    Another example is Exhibit C,  the order awarding attorney fees in *Paola French v. City of Los Angeles (French II)*, EDCV 20-0416 JGB (SPx) (C.D. Cal. Feb. 21, 2024).  In *French*, the Court approved fees for attorneys at the Law Office of Dale Galipo.  The approved 2023 rate for John Fattahi was $975 an hour, who is a 2006 graduate. The rate approved for him in *French II* is just under the same rate now

7

requested for Ms. Dettling, who has significantly more years of experience.

24.    Attached as Exhibit D, C.L., an individual, v. Del Amo Hospital, Inc., et al., Case No. 8:18-CV-00475-DOC (DFMX), a disability discrimination case, the court found $1000 per hour reasonable for at 28 year attorney, Christopher Knauf, a 1996 graduate. I am very familiar with Mr. Knauf's work; we worked together at Disability Rights Legal Center in 2001.

25.    Based on the foregoing, I am of the opinion that the rates sought by this motion are in line with or below the range of rates approved for attorneys of comparable experience in the Los Angeles legal market.


I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct, and that this declaration is executed in Los Angeles, California this 19th day of February 2025.



_____

Paula Pearlman

Exhibit A

## PAULA PEARLMAN

PaulaDPearlman@gmail.com  (213) 760-1340

**SUMMARY OF QUALIFICATIONS**

- **Strong executive with proven track record** – Demonstrated achievements leading to organizational efficiency and growth, collaborative partnerships, improved program delivery and increased visibility
- **Strategic thinker** – Analytical thinker recognizing systemic complexities to achieve lasting litigation and programmatic goals; committed professional with diverse experience in various functions in government, legal services, academic institutions as a law professor, and volunteer leader
- **Committed social justice advocate and attorney** – Over 30 years of experience advancing the rights of vulnerable populations:  undocumented immigrants, people with disabilities, underrepresented populations of color - in the legal, education, healthcare, carceral and housing systems
- **Diplomatic and collaborative leader** – Exceptional interpersonal skills working with academic institutions, board members, co-counsel, staff, and the public to build consensus, advance policy, and collaborate to reach common goals and make strategic decisions

**PROFESSIONAL EXPERIENCE**

**Law Office of Paula Pearlman**
*Counsel and advice in areas of housing, employment and disability accommodations; class action litigation and litigation monitoring; expert witness and workplace investigations*
Attorney                    August 2020 – Present
- Retained expert witness in disability accommodation case
- Counsel, advice on discrimination and workplace accommodation issues; litigate Title II ADA cases
- Association of Workplace Investigators (AWI) Virtual Training Institute, Aug 2021
- *Willits, et al. v. City of Los Angeles,* monitor ADA sidewalk accessibility case resulting in $30B settlement; *Judy Griffin et al v. City of Los Angeles*, filed July 2024 recreation and parks class case

**California Department of Fair Employment and Housing, Legal Division** (Currently CA Civil Rights Dept.)
*The state agency enforcing California's civil rights laws in employment, housing, education, personal rights*
Assistant Chief Counsel        Sept 2015 – July 2020
Senior Staff Counsel           Sept 2014 – Aug 2015
- Leader within the legal division regarding policies, practices, allocation of resources, legal strategies
- Supervised 15 attorneys and staff including Senior Counsel, Staff Counsel, Civil Rights Fellows and support staff investigating and litigating systemic and individual discrimination cases; hiring and evaluation responsibilities; attorneys' fees; supervise and review DFEH internal investigations
- Member of DFEH's Leadership Team: legal advisor to other divisions; General Counsel responsibilities in areas of internal EEO investigations, contracts, human resources policies and application, Skelly hearings and other personnel matters, public record act requests, application of new laws; initiate DFEH anti-bias training in disability rights, implemented ADA program and technical assistance regarding compliance
- Member of statewide working group to implement website accessibility in state government
- Facilitator training in *The Leadership Challenge*, a program of James M. Kouzes and Barry Z. Posner
- National Institute of Trial Advocacy, Trial and Deposition training (Jan, Feb. 2016)

**Disability Rights Legal Center**
*A legal non-profit eliminating disability discrimination through litigation, advocacy and education*
Executive Director                        Jan 2009 – July 2014
Deputy Director, Interim Executive Director  Jan 2007 – Dec 2008
Deputy Director, Advocacy Programs          Jan 2006 – Dec 2006
Director, Civil Rights Litigation Program   Jun 2001 – Dec 2005

Paula D. Pearlman
Page 2 of 7

- Developed strategic vision and leadership, managed communication, fundraising, administration and personnel, board relations and overall supervision of legal programs: Cancer Legal Resource Center; Civil Rights Litigation; Community, Education Advocacy; Pro Bono Program; Inland Empire; HIV Law & Policy Project
- Supervised 22 full time attorneys, administrative staff, fellows and legal externs with $3M operating budget
- Held faculty position, Loyola Law School, Loyola Marymount University, Los Angeles
- Participated and presented at AALS, ABA conferences
- Spearheaded long term strategic planning with fundraising, communication and visibility goals to ensure civil rights agenda included disability rights; identified and implemented coalitions/policy advocacy/legislative efforts in disability and civil rights; recruited pro bono attorneys/volunteers
- Litigated and negotiated systemic cases, and fee awards: sidewalk accessibility; jail and juvenile halls accessibility and access to special education; healthcare system; deaf and hard and hearing access to police and jails; set rates and filed attorneys' fees motions
- Trained public, lawyers, government staff regarding disability civil rights and unconscious bias
- Mediation certification, Center for Conflict Resolution, Loyola Law School
- Rockwood Leadership Institute/Bend the Arc's Selah Leadership Program in transformative leadership

**California Women's Law Center**
*A statewide law and policy center focusing on the civil rights of women and girls*
Supervising Attorney                         May 1997 – Jun 2001
- Member of the senior management team; engaged in development and communication strategies
- Supervised litigation and advocacy regarding gender discrimination, disability discrimination, sexual violence, family law and custodial parent issues, litigation, legislative advocacy, regulatory comments
- Authored amicus briefs, legal advocacy publications on Title IX, women's health, employment rights
- Leadership courses, Pacific Institute's Investment in Excellence provided by New Economics for Women

**Law Offices of Margaret S. Henry**
*Plaintiff-side employment litigation firm focusing on race, gender, sex and disability discrimination*
Attorney                         April 1994 - April 1997
- Represented plaintiffs in employment discrimination matters; all phases of pre-trial litigation; successful motion opposing mandatory arbitration; mediations; conducted legal education on employment issues

**Hadsell Stormer Renick & Dai, LLP (*formerly* Hadsell & Stormer, Inc.)**
*Civil rights and plaintiff-side employment and class action litigation firm*
Attorney (Contract)                         April 1993 - Oct 1994
- Represented plaintiffs in employment discrimination matters; focused on discrimination case of LGBTQ police officers; draft complaints, legal research, discovery

**Traber & Voorhees (dissolved)**
*Civil rights and plaintiff-side litigation firm specializing in employment and housing discrimination litigation*
Of Counsel                         Nov 1992 - Mar 1994
- Represented plaintiffs in individual ethnic origin and race discrimination cases in state and federal court; investigated potential cases and interviewed, prepared witness, motions and discovery practice

Paula D. Pearlman
Page 3 of 7

### National Immigration Law Center
*A national non-profit legal support center defending and advancing the rights and opportunities of low-income immigrants*

Staff Attorney (Contract)                          Oct 1989 - Jul 1990
- Provided expert legal advice and strategies to practitioners on asylum and violence against women issues
- Authored asylum and government benefits practice materials for lawyers and general public

### Neighborhood Legal Services of Los Angeles County
*A legal services agency combating poverty though individual representation, impact litigation and public policy advocacy*

Immigration Unit Coordinator/Staff Attorney        Jan 1985 - Jan 1989
- Unit coordinator/staff attorney specializing in immigration law, employment rights, and immigrant's rights to public benefits
- Worked with coalition partners to establish Coalition for Humane Immigrant Rights (CHIRLA)
  - Developed trainings and materials to inform undocumented immigrants about their rights
- Represented low-income immigrant clients in federal, state, and administrative proceedings
  - Briefed and argued immigration cases in the US Court of Appeals for the Ninth Circuit
- Co-counsel on national class action litigation preventing the immigration service from coercing Central American refugees to waive their right to apply for political asylum, *Orantes-Hernandez v. Meese*
  - Focused on coercive conditions in immigration detention centers nationwide
  - Obtained significant attorneys' fee award

### Imperial Valley Immigration Project, Centro De Asuntos Migratorios
*Nonprofit agency providing free legal representation to Central American refugees in federal immigration detention at the border in El Centro, CA*

Staff Attorney                                     Sep 1983 - Dec 1984
- Funded through the sanctuary movement, represented undocumented refugees in immigration custody seeking political asylum and other legal remedies in contested deportation proceedings and BIA appeals
- Filed, briefed and argued immigration cases in US Court of Appeals for the Ninth Circuit resulting in numerous published decisions
- Assisted with Congressional delegation investigating conditions of confinement at the detention center

### Honorable Joan Dempsey Klein
*Presiding Justice, California Court of Appeal, Second Appellate District*

Judicial Extern                                    August 1981 – December 1981
- Draft criminal law opinion for Justice Klein, founding president of the National Assn. of Women Judges

## ACADEMIC TEACHING EXPERIENCE
### Southwestern Law School
- Adjunct Professor of Law                         Nov 2014 – May 2016
Developed, taught, supervised DFEH's experiential learning course: law students investigated two DFEH complaints and represented DFEH in a mandatory mediation case with a discrimination cause finding

Paula D. Pearlman
Page 4 of 7

**Loyola Law School, Loyola Marymount University**
- Visiting Associate Professor of Law        Jan 2009 – June 2014
Taught Disability Rights Law, Special Education Law and Policy; law school accommodation committee; faculty hiring; supervised Disability Rights Legal Center's clinical legal programs
- Adjunct Professor of Law                June 2001 – Dec 2008
Supervised DRLC's clinical legal program in civil rights litigation, special education advocacy

**Loyola Marymount University, School of Education**
- Adjunct Professor                Sept 2007 – June 2011
Taught undergraduates Special Education Law and Advocacy, including mediation and negotiation skills
Developed graduate level course in special education advocacy for a newly created concentration
Administrative Leadership Program for Charter School cohort

**EDUCATION**

**SOUTHWESTERN LAW SCHOOL**
Los Angeles, CA            Juris Doctor 1982
- Chair, Environmental Law Forum, 1980 - 1982
  - Conf. Chair, Symposium on Toxic Waste (Sept 1981)
- Chair, Women's Association, 1981 - 1982

**UNIVERSITY OF CALIFORNIA, LOS ANGELES**
B.A., Philosophy 1979

**BAR ADMISSION**
Admitted to the State Bar of California (109038)
US Court of Appeals, Ninth Circuit
US District Courts: Northern, Central and Southern California Districts

**LANGUAGES**
Spanish (proficient), Hebrew (proficient), American Sign Language (beginner)

**AWARDS**
- Public Justice Foundation, Trial Lawyer of the Year Finalist, *Willits v. City of Los Angeles*, July 2017 (case resulted in a $1.4 billion settlement, the largest disability access class action settlement in U.S. history to make the City of Los Angeles's sidewalk system accessible to persons with mobility disabilities.
- Charles D. Siegal President's Award, Disability Rights Legal Center, November 2014
- St. Ignatius of Loyola Award, Loyola Law School, February 2010
- Civil Rights Hero, November 2009, California Dept. of Fair Employment and Housing
- Named "Super Lawyer" in 2009 in public interest law and class actions.
- Attorney Award of Merit, annual award by Legal Aid Association of California, April 2007
- Named "Top 75 Women Litigators" by Daily Journal, June 2006
- Recipient, Carol King Award, National Immigration Project, National Lawyers Guild, Litigation Team *Orantes-Hernandez v. Meese,* 1987 (nationwide injunction to not coerce Salvadorans to waive asylum)

Paula D. Pearlman
Page 5 of 7

**LEGAL MEMBERSHIPS/ACTIVITIES**
- Association of Workplace Investigators Virtual Training Institute for Workplace Investigators, AWI-CH Certificate (August 2021)
- American Bar Association (ABA) 14th Annual Labor & Employment Law Conference, Planning Committee, Member, Litigation track (2020)
- *Say What You Mean*: 12-Week online course in non-violent communication, Oren Jay Sofer (Fall 2020)
- National Institute of Trial Advocacy Training (NITA), Trial Skills Program, Los Angeles, CA (Jan 2016)
- NITA Deposition Skills, Deposing Expert Witness Programs, San Diego, CA (February 2016)
- Member, American Bar Association's Commission on Disability Rights (August 2011-August 2014)
    - Chair, 2014 National Conference, Los Angeles, CA; Chair, Law Student subcommittee
- Member, Legal Aid Association of California Board (2010-2014); Advocacy Committee (2011-2014)
- Chair, Employment Round Table of Southern California (ERTSC) (2010-2014)
    - Board member (2009-2010)
- Member, Presenter, Association of American Law Schools, Disability Rights, Special Education, Clinical Legal Education (2009-2014)
- Participant, Rockwood Leadership Institute/Bend the Arc's Selah Leadership Program (2008-2010)
- Co-Chair, Lawyer Representatives, Central District, Ninth Circuit Judicial Conference (2008-2009)
    - Member, Lawyers Rep. Coordinating Cmte., Ninth Circuit Judicial Conf. (2008-2009)
    - Lawyer Representative, Central District, Ninth Circuit Judicial Conference (2006-2008)
- Member, California Commission on Access to Justice, Federal Courts Committee (2007-2015)
- Member, Loyola Marymount University, Special Education Program Advisory Board (2008-2014)
- Member, U.S. Access Board, Courthouse Access Advisory Committee (2004-2006)
- Member, California State Bar Standing Committee for the Delivery of Legal Services (SCDLS) (2004-2007), Chair, Moderate Means Subcommittee (2005-2007)
- Los Angeles County Bar Association, Labor and Employment Law, Litigation sections
    - Juvenile Courts Task Force Committee Member (2006-2010)
- Certificate, Dispute Resolution Training, Loyola Law School Center for Conflict Resolution (Feb 2005)
- Member, U.S. Access Board, Courthouse Access Advisory Committee (2004 - 2006)
- California Employment Lawyers Association (1994-2003)
- National Lawyers Guild (1984-2021)
- American Immigration Lawyers Association (AILA) (1984-1994)

**COMMUNITY ACTIVITIES**
- Organizing Institute, West/Southwest Industrial Areas Foundation Summer National Training, Denver, CO (July 2024)
- Leadership Team, Temple Beth Am, Los Angeles, member organization of OneLA, affiliated with the Industrial Areas Foundation (IAF) (2015-present)
- Member, Bend the Arc, Southern California Chapter (2008-2021)
- Progressive Jewish Alliance, Statewide Board Member (2006–2008)
    - Chair, Tikkun HaMedina Committee (ballot recommendations re propositions/initiatives)
    - Southern California Regional Council Board Member (2004-2009)
- Jewish Community Centers of Greater Los Angeles, Board of Directors (2001-2003)
- Westside Jewish Community Center, Los Angeles
    - President of the Advisory Board (2001-2003); Board Member (1995-2003)
        - Successfully organized and prevented the sale of the building and closure of the Center, which continues to be operational
    - President, Nursery School Parent Advisory Board (1991-1994)

Paula D. Pearlman
Page 6 of 7

## PUBLICATIONS (partial list)

- Pearlman, Paula, Agbai, Chinyere, Butler, Branden. "40 Acres and a Mule…Broken Promises, the Persistence of Housing Segregation and Exclusion, and How to Right (Some of) These Wrongs,' CALIFORNIA REAL PROPERTY JOURNAL, Diversity Issue, Vol. 39, No.4, 2021, https://tinyurl.com/47ftjfts
- Pearlman, Paula, Kravich, Shawn. "Reassessing the Recession: Discrimination in Hiring and Firing of People with Disabilities;" Vol. 3 Los Angeles Public Interest Law Journal, 18 (2010-2012)
- Pearlman, Paula. "Consciously Overcoming Unconscious Biases Against Lawyers with Disabilities," Institute for Inclusion in the Legal Profession Review 2012: The State of Diversity and Inclusion in the Legal Profession, https://www.theiilp.com/Resources/Documents/IILPReview2012.pdf
- Pearlman, Paula, *Individuals with Cancer in the Workforce and Their Federal Rights* (*with* Peter D. Blanck, William N. Myhill, Janikke Solstad Vedeler and Joanna Morales), in WORK AND CANCER SURVIVORS 255 (2009)
- Pearlman, Paula D. "Letter to a Young Public Interest Attorney;" Vol. 1 Los Angeles Public Interest Law Journal, 325-328 (Spring 2009)
- Pearlman, Paula D. "*Aging of people with disabilities" The Legal Needs of the Aging Low-Income Population* CLEARINGHOUSE REVIEW (Sept–Oct 2008)
- California Women's Law Center
  - *Sexual Harassment at Work, Legal Information for Women in CA (*July 1998, rev. Nov 2000)
  - *Sex Discrimination and Athletics Policy Brief* (Aug 2000)
  - *Sex Discrimination and Schools Policy Brief* (July 1999)
  - *Surviving the Legal Challenges, A Resource Guide for Women with Breast Cancer* (Oct 1998)
- "A Ray of Hope: Bolaños-Hernandez v. INS," *Immigration Newsletter*, National Immigration Project, NLG
- *Immigrants' Rights Manual* (Sept 1990) National Immigration Law Center

## PRESENTATIONS (partial list)

- October 25, 2022, Employment Roundtable of Southern CA, Disability Accommodations: Navigating the Basics and Thorny Issues, part 2 (webinar).
- September 19, 2022, Employment Roundtable of Southern CA, Disability Accommodations: Navigating the Basics and Thorny Issues, part 1 (webinar).
- March 10, 2022, US Delegation Member, UK/US Disability Diversity Roundtable with Law Society of England and Wales and Institute for Inclusion in the Legal Profession (virtual).
- November 11, 2021, Panel Organizer, Preserving the Record on Appeal, ABA 14th Annual Labor and Employment Law Conference (virtual).
- Jan 25, 2019, Indian Wells, CA. Presenter, DFEH and Fair Housing Laws, California Association of Realtors, Winter Business Meeting.
- March 9, 2016, Los Angeles, CA. Plenary session panelist, Walking the Tightrope:  Recognizing, Addressing, and Accommodating Mental Disabilities at the 36th Annual Labor and Employment Law Symposium, Los Angeles County Bar Association.
- September 8, 2016, Los Angeles, CA. Panelist at LA County Comm'n. on HIV, UCLA Center for HIV Identification, Prevention, and Treatment Services, HIV Research and Community Colloquium Series Panel Title: "HIV-Based Discrimination: Law and Remedies."
- April 18-19, 2013, Baltimore, Maryland. Workshop Facilitator at National Federation for the Blind Jernigan Institute's Jacobus tenBroek Disability Law Symposium.
- September 13, 2012, UN Headquarters, New York City, New York. Panelist at Conference of States Parties to the Convention on the Rights of Persons with Disabilities. Panel Title: Engaging Social Media - Leveraging the Power of Disability.
- January 4, 2012, Wash. DC, AALS Annual Meeting, Disability Rights Section, Panelist, Disaster, Disability and Law.

Paula D. Pearlman
Page 7 of 7

- February 2012, Malibu, CA, Pepperdine Law School Special Education Law Symposium, Organizer
- May 7, 2010, Baltimore, MD, AALS Conference on Clinical Legal Education, Working with Students with Disabilities.
- November 5, 2010, Chicago, IL. Speaker at American Bar Association's Labor and Employment Conference. Topic title: "A Practical Guide to Finding and Managing Disability Accommodations."
- MCLE Speaker including Elimination of Bias in the Legal Profession, Disability Rights, Cancer Rights, Special Education Law and Advocacy, Sex Discrimination and Employment Law Issues (1994-present)
- Various dates: State Bar of California Annual Meetings: Housing Discrimination and Disabilities; US Supreme Court Round Up and Disabilities; Legal Issues Related to Cancer.
- June 27, 2009, Rancho Mirage, CA, Panelist at the National Employment Lawyers Association Annual Conference; Disability Discrimination and the new ADA Amendments.
- January 29, 2008, Chicago, IL INTIX Conference; Presentation of the Application of the Americans Disabilities Act and other disability rights laws to Performance Arts and Sports Venues including research for the Ticketing Dialogue Policies and Practices.
- February 8, 2008, Pasadena, CA Panelist at the Association of Professional Responsibility Lawyers, Mid-Year meeting; Mental Health and Legal Fitness to Practice: Is There a Principled Process, Kim D. Ringler, Paula Pearlman, Honorable Robert Childers, Richard Stephen Sandor, M.D.
- November 30, 2007, Los Angeles, CA "Ticketing Dialogue": An initiative to develop best practices and model policies related to policies regarding entertainment venues including tickets for people with disabilities.

Exhibit B

# Contreras v. Kelly Pipe Co.

Superior Court of California, County of Los Angeles

September 20, 2023, Decided

21STCV17933

**Reporter**

2023 Cal. Super. LEXIS 64818 *

PRESCILIANO CONTRERAS v. KELLY PIPE CO., LLC, et al.

**Notice:** THIS DOCUMENT INCLUDES THE ORDER OF THE COURT. OTHER MATERIALS, SUCH AS LEGAL MEMORANDA, MAY HAVE BEEN INCLUDED BY THE COURT. DOCUMENTS THAT ARE COMBINED AND FILED AS ONE DOCUMENT BY THE COURT ARE PUBLISHED AS ONE DOCUMENT.

**Judges:** [*1] Honorable Michael P. Linfield, Judge.

**Opinion by:** Michael P. Linfield

## Opinion

**NATURE OF PROCEEDINGS:** Ruling on Submitted Matter

The Court, having taken the matter under submission on 09/20/2023 for Hearing on Motion for Judgment Notwithstanding the Verdict, now rules as follows: The Court, having taken the matter under submission on 09/20/2023 for Hearing on Motion for Attorney Fees, now rules as follows: The Court, having taken the matter under submission on 09/20/2023 for Hearing on Motion - Other Motion to Request Pre-Judgment Interest, now rules as follows: The Court, having taken the matter under submission on 09/20/2023 for Hearing on Motion for New Trial, now rules as follows:

Case Number: 21STCV17933 Hearing Date: September 20, 2023 Dept: 34

SUBJECT: Motion for Judgment Notwithstanding the Verdict

Moving Party: Defendant Kelly Pipe Co., LLC

Resp. Party: Plaintiff Presciliano Contreras

SUBJECT: Motion for New Trial

Moving Party: Defendant Kelly Pipe Co., LLC

Resp. Party: Plaintiff Presciliano Contreras

SUBJECT: Motion for an Order for Pre-Judgment Interest

Moving Party: Plaintiff Presciliano Contreras

Resp. Party: Defendant Kelly Pipe Co., LLC

SUBJECT: Motion for an Award of Attorneys' Fees

Moving Party: Plaintiff [*2] Presciliano Contreras

Resp. Party: Defendant Kelly Pipe Co., LLC

The Motion for JNOV is DENIED.

The Motion for New Trial is DENIED.

The Motion for an Order for Pre-Judgment Interest is GRANTED. Pre-Judgment interest is AWARDED in favor of Plaintiff and against Defendant in the amount of $170,204.41.

Attorneys' fees are granted in the total amount of $1,649,261.25. This comprises of a lodestar of $1,047,150.00 and a multiplier of 1.575.

BACKGROUND:

On May 12, 2021, Plaintiff Presciliano Contreras

filed his Complaint against Defendants Kelly Pipe Co., LLC, JFE Shoji America, LLC, JFE Shoji America Holdings, Inc., JFE Shoji Steel American, Inc., R. Bourgeois JFE Shoji Magnetic Lamination, Inc., Art Shelton, Steve Livingston, and James Fiorillo. The causes of action arise from Plaintiff's employment with Defendants.

On September 22, 2021, by stipulation of the Parties, the Court dismissed without prejudice Defendants Art Shelton and Steve Livingston from the Complaint.

On January 18, 2022, by stipulation of the Parties, the Court dismissed without prejudice Defendants JFE Shoji America, LLC, JFE Shoji America Holdings Inc., JFE Shoji Steel America, Inc. (erroneously identified in the Complaint [*3] as JFE Shoji Steel American, Inc.), and R. Bourgeois JFE Shoji Magnetic Lamination, Inc. from the Complaint.

On January 12, 2023, the Court granted summary judgment in favor of Defendants and against Plaintiff on the fifth and sixth causes of action in the Complaint.

From June 12 to June 16, 2023, the Court held a jury trial in this matter.

On June 16, 2023, the Jury found in favor of Plaintiff and against Defendant Kelly Pipe Co. ("Defendant") on all causes of action tried: (1) age discrimination; (2) age harassment; (3) retaliation; (4) failure to prevent discrimination; (5) wrongful termination; (6) whistleblower retaliation; and (7) intentional infliction of emotional distress. The Jury further: (1) found a total of $1,300,000.00 in damages; (2) found clear and convincing evidence that Defendant acted with malice, oppression, or fraud; and (3) awarded $5,000,000.00 in punitive damages.

On July 20, 2023, Plaintiff filed: (1) Motion for an Order for Pre-Judgment Interest; and (2) Motion for an Award of Attorneys' Fees. With each of these motions, Plaintiff concurrently filed a Proposed Order. In addition, for the Motion for an Award of Attorneys' Fees, Plaintiff also filed: (1) Request [*4] for Judicial Notice; (2) Proposed Order for Request for Judicial Notice; (3) Appendix of Evidence; and (4) Notice of Lodging Federal Authorities.

On July 25, 2023, Plaintiff filed his Judicial Council Form MC-010, Memorandum of Costs (Summary).

On July 25, 2023, the Court entered Judgment in accordance with the Jury's Verdict.

On August 2, 2023, Defendant filed: (1) Statement of Non-Opposition Re: Plaintiff's Motion for an Order for Pre-Judgment Interest; and (2) Opposition to Plaintiff's Motion for an Award of Attorneys' Fees. In support of its Opposition to Plaintiff's Motion for an Award of Attorneys' Fees, Defendant concurrently filed: (1) Request for Judicial Notice; (2) Declaration of Gary Scalabrini; (3) Declaration of Michael W. Kelly; (4) Notice of Lodging Federal Authorities; and (5) Proof of Service.

On August 8, 2023, Plaintiff filed its Replies regarding the Motion for an Order for Pre-Judgment Interest and the Motion for an Award of Attorneys' Fees.

On August 9, 2023, Defendant filed: (1) Motion for Judgment Notwithstanding the Verdict ("Motion for JNOV"); and (2) Motion for New Trial. With each of the two motions, Defendant concurrently filed: (1) Declaration of Gary E. Scalabrini; [*5] (2) Proposed Order; and (3) Proof of Service.

On August 11, 2023, Defendant filed its Statement of Non-Opposition to Plaintiff's Memorandum of Costs.

On August 21, 2023, Plaintiff filed its Oppositions to the Motion for JNOV and the Motion for New Trial. With each of the Oppositions, Plaintiff concurrently filed an Appendix of Evidence.

On August 29, 2023, Defendant filed its Replies

regarding the Motion for JNOV and the Motion for New Trial.

On August 29, 2023, Plaintiff filed its Objection to Defendant's Replies regarding the Motion for JNOV and the Motion for New Trial.

On September 1, 2023, Defendant filed its Reply to Plaintiff's Objection. Defendant concurrently filed: (1) Request for Judicial Notice; and (2) Proof of Service.

ANALYSIS:

I. Motion for JNOV

A. Objection and Request for Judicial Notice

Plaintiff objects to Defendant's Reply regarding the Motion for JNOV. Defendant argues that this Reply is timely and files a Request for Judicial Notice regarding a trial order in another case.

The Court agrees with Defendant that its Reply is timely. (Reply to Objection, p. 2:6-10.) Even if this Reply were untimely, the Court would still consider it in the interests of justice.

The Court DENIES [*6] as irrelevant the Request for Judicial Notice. The Court OVERRULES the Objection.

B. Legal Standard

"The court, before the expiration of its power to rule on a motion for a new trial, either of its own motion, after five days' notice, or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made." (Code Civ. Proc., § 629, subd. (a).)

"The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. The trial judge cannot weigh the evidence, or judge the credibility of witnesses. If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied." (Hauter v. Zogarts (1975) 14 Cal.3d 104, 110, citations omitted, scrivener's error corrected.)

"A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial [*7] evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." (Brandenburg v. Pac. Gas & Elec. Co. (1946) 28 Cal.2d 282, 284, citations omitted.)

C. Discussion

Defendant moves the Court for judgment notwithstanding the Jury's Verdict on: (1) the cause of action for intentional infliction of emotional distress; and (2) punitive damages. (Motion for JNOV, p. 17:11-12.)

Defendant argues that this would be appropriate because: (1) Plaintiff presented no evidence of extreme and outrageous conduct; (2) Plaintiff presented no evidence of reckless intent to cause extreme emotional distress; (3) as a matter of law, punitive damages may not be awarded here because there was not clear and convincing evidence of malice, oppression, or fraud; and (4) the punitive damages award exceeded the constitutional maximum. (Motion for JNOV, pp. 10:20- 21, 12:14-15, 13:3, 15:15.)

Plaintiff opposes the Motion, pointing to various pieces of evidence and arguing that Defendant's cases are inapposite.

Defendant reiterates its arguments in its Reply, as well as arguing against Plaintiff's reading of case law.

The Court disagrees with Defendant's arguments.

First, Plaintiff presented evidence of (1) extreme and outrageous conduct [*8] and (2) reckless intent to cause extreme emotional distress. The Jury voted

12-0 in favor of Plaintiff on his cause of action for wrongful termination; 11-1 in favor of Plaintiff on his cause of action for age harassment; and 12-0 in favor of Plaintiff on his causes of action for retaliation. The Jury was also unanimous in finding for Plaintiff on his cause of action for IIED.

There was sufficient evidence presented to uphold each of these verdicts. In addition, Plaintiff's expert witness, Anthony Reading, testified that, as a result of Defendant's conduct, Plaintiff suffered an adjustment disorder with anxiety and major depressive disorder.

The Court need not, and will not, recount all of the evidence. It is sufficient for a motion for judgment notwithstanding the verdict that some substantial evidence supports the verdict on these grounds. (Brandenburg, supra, 28 Cal.2d at p. 284.)

Second, there has been no evidence presented to show that the jury failed to consider all of the evidence presented to it by Plaintiff and Defendant. Based upon that evidence, the Jury found clear and convincing evidence of malice, oppression, or fraud. Had this been a Court trial, the Court might have found differently. But the Court cannot weigh **[*9]** the evidence. (Hauter, supra, 14 Cal.3d at p. 110.) It is sufficient to note that substantial evidence supports the verdict on this ground.

Finally, the Jury found $1,300,000.00 in damages and, in the second, bifurcated part of the trial, awarded Plaintiff $5,000,000.00 in punitive damages. The finding of clear and convincing evidence was unanimous. Although the finding of $5,000,000.00 in punitive damages was by a vote of 9-3, the Court has no evidence whether the three dissenting votes would have imposed a higher or lower amount of punitive damages. The punitive damages award is approximately 3.85 times larger than the damages finding. While Defendant correctly notes that there are constitutional limits on punitive damages awards, this punitive damages award does not approach that limit. Further, in the punitive damages portion of the trial, evidence was presented that Defendant had net sales of $1,000,000,000.00; a net worth in 2022 of $172,000,000.00; a net worth in 2023 of $136,000,000.00; and a revolving loan of up to $160,000,000.00. Thus, substantial evidence supports this punitive damages award.

D. Conclusion

The Motion for JNOV is DENIED.

II. Motion for New Trial

A. Objection and Request for Judicial Notice

Plaintiff **[*10]** objects to Defendant's Reply regarding the Motion for New Trial. Defendant argues that this Reply is timely and files a Request for Judicial Notice regarding a trial order in another case.

The Court agrees with Defendant that the Reply is timely. (Reply to Objection, p. 2:6-10.) Even if this Reply were untimely, the Court would still consider it in the interests of justice.

The Court DENIES as irrelevant the Request for Judicial Notice. The Court OVERRULES the Objection.

B. Legal Standard

"A new trial is a re-examination of an issue of fact in the same court after a trial and decision by a jury, court, or referee." (Code Civ. Proc., § 656.)

"The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party:

…

"5. Excessive or inadequate damages.

"6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law.

…

"When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which [*11] it is granted and the court's reason or reasons for granting the new trial upon each ground stated.

"A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision.

"The order passing upon and determining the motion must be made and entered as provided in Section 660 and if the motion is granted must state the ground or grounds relied upon by the court, and may contain the specification of reasons. If an order granting such motion does not contain such specification of reasons, the court must, within 10 days after filing such order, prepare, sign and file such specification of reasons in writing with the clerk. The court shall not direct the attorney for a party to prepare either or both said order and said specification of reasons… ."

(Code Civ. Proc., § 657.)

"In ruling on such motion, in a cause tried without a jury, the court may, on such terms as may be just, change or add to the statement of decision, [*12] modify the judgment, in whole or in part, vacate the judgment, in whole or in part, and grant a new trial on all or part of the issues, or, in lieu of granting a new trial, may vacate and set aside the statement of decision and judgment and reopen the case for further proceedings and the introduction of additional evidence with the same effect as if the case had been reopened after the submission thereof and before a decision had been filed or judgment rendered. Any judgment thereafter entered shall be subject to the provisions of sections 657 and 659." (Code Civ. Proc., § 662.)

C. Discussion

Defendant moves the Court to grant a new trial if Plaintiff refuses to consent to a remittitur correcting the punitive damages award. (Motion for New Trial, p. 16:2-4.)

Defendant argues that this would be appropriate because: (1) the punitive damages award is not supported by clear and convincing evidence; and (2) the punitive damages award is excessive and unconstitutional under federal and state law. (Motion for New Trial, pp. 10:7-8, 12:2-3.)

Plaintiff disagrees, arguing that the punitive damages award is supported by such evidence and that the award is not excessive or unconstitutional.

Defendant reiterates its arguments in its Reply. [*13]

The Court disagrees with Defendant's arguments.

In order for the Court to grant a new trial upon the grounds of insufficiency of the evidence or excessive damages, the Court must weigh the evidence and be "convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657.)

Upon weighing the evidence submitted in this case, the Court is not convinced that the Jury clearly should have reached a different verdict or decision. As seen by the poll of the jury, different Jurors had different opinions on various causes of action, and the Jurors did not consistently vote one way or another. (Minute Order dated June 16, 2023, pp. 4-5.) However, the jury's verdict, including its award of $5,000,000.00 in punitive damages, was supported by substantial evidence. The Court's conclusion after reviewing the entire record, including reasonable inferences therefrom, is that the jury's verdict was sound.

D. Conclusion

The Motion for New Trial is DENIED.

III. Motion for an Order for Pre-Judgment Interest

A. Legal Standard

2023 Cal. Super. LEXIS 64818, *13

"A person who is entitled to recover damages certain, or capable of being made certain by calculation, **[\*14]** and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt… ." (Civ. Code, § 3287, subd. (a).)

"Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed." (Civ. Code, § 3287, subd. (b).)

B. Discussion

Plaintiff requests that the Court award: (1) pre-judgment interest at the rate of 7% per annum on the economic damages award of $570,938.00 from June 6, 2020 to the date of entry of judgment; and (2) pre-judgment interest at the rate of 10% per annum on the noneconomic damages award of $729,062.00 from December 12, 2022 through satisfaction of the judgment. (Motion for an Order for Pre-Judgment Interest, p. 6:15-21.)

Defendant filed a Statement of Non-Opposition, clarifying Plaintiff's motion but not substantively opposing it. (See Statement of Non-Opposition, filed 8/2/2023.)

Plaintiff calculates the first set of interest **[\*15]** at $125,262.23 and the second set of interest at $44,942.18, for a total amount of $170,204.41 in pre-judgment interest. (Reply regarding Motion for an Order for Pre-Judgment Interest, p. 2:6-15.)

C. Conclusion

The Motion for an Order for Pre-Judgment Interest is GRANTED.

Pre-Judgment interest is AWARDED in favor of Plaintiff and against Defendant in the amount of $170,204.41.

IV. Motion for an Award of Attorneys' Fees

A. Request for Judicial Notice

1. Plaintiff's Request for Judicial Notice

Plaintiff requests that the Court take judicial notice of four declarations filed in other cases.

The Court DENIES Plaintiff's Request for Judicial Notice. These items are not judicially noticeable.

2. Defendant's Request for Judicial Notice

Defendant requests that the Court take judicial notice of: (1) a table of case filing information; (2) a printout of Plaintiff's Counsel's webpage; (3) a price history report taken from the Wall Street Journal's website; and (4) a fee request submitted in another case.

The Court DENIES Defendant's Request for Judicial Notice. These items are not judicially noticeable.

B. Legal Standard

"It is an unlawful employment practice … [f]or an employer, because of the race, religious **[\*16]** creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).)

"In civil actions brought under this section, the court, in its discretion, may award to the prevailing party, including the department, reasonable attorney's fees and costs, including expert witness fees, except that, notwithstanding Section 998 of the Code of Civil Procedure, a prevailing defendant shall not be awarded fees and costs unless the court

finds the action was frivolous, unreasonable, or groundless when brought, or the plaintiff continued to litigate after it clearly became so." (Gov. Code, § 12965, subd. (c)(6).)

C. Discussion

1. The Parties' Arguments

Plaintiff moves the Court to award $2,457,612.50 in attorneys' fees, which would consist of: (1) $1,404,350.00 in [*17] lodestar attorneys' fees; and (2) a multiplier enhancement of 1.75 times the lodestar (which itself would be $1,053,263.50). (Motion for an Award of Attorneys' Fees, pp. 11:13-14, 13:19.)

Plaintiff argues: (1) that as the prevailing party, Plaintiff is entitled to attorneys' fees under the Fair Employment and Housing Act ("FEHA"); (2) that the size of the verdict should not lessen the fee award; (3) that Plaintiff's requested attorneys' fees are reasonable; and (4) that a multiplier of 1.75 times the lodestar is necessary given the contingent risk, preclusion of other work, difficulty of questions involved, and level of skill displayed in this litigation. (Motion for an Award of Attorneys' Fees, pp. 5:14, 6:1, 6:24, 11:15-16.)

Defendant disagrees, arguing: (1) that an award of attorneys' fees is not mandatory; (2) that Plaintiff's Counsel must meet its burden to demonstrate the fees requested are reasonable; (3) that Plaintiff's lodestar is substantially based on 166 "trial preparation" entries that cumulatively account for 1,030.5 attorney hours; (4) that if the Court decides to award fees, the lodestar should be reduced significantly; and (5) that the circumstances of this case do [*18] not justify a multiplier. (Opposition to Motion for an Award of Attorneys' Fees, pp. 5:12-13, 6:12-13, 8:23-24, 11:4.) Defendant argues in the alternative that the Court should award $819,888.24 in attorneys' fees, which would consist of: (1) $803,812.00 in lodestar attorneys' fees; and (2) a multiplier enhancement of 1.02 times the lodestar (which itself would be $16,076.24). (Id. at p. 16:23-24.)

In his Reply, Plaintiff argues: (1) that fee awards under FEHA should ordinarily be granted as a matter of legislative purpose; (2) that Defendant's misrepresentation of authority underscores the need for a fee award; (3) that Defendant makes misrepresentations and omissions from other fee awards; (4) that Plaintiff's entries are sufficient under the law; (5) that Defendant does not contest Plaintiff's requested hourly rates; and (6) that Defendant cannot overcome the compelling interests in awarding a multiplier. (Reply regarding Motion for an Award of Attorneys' Fees, pp. 2:8-9, 2:22, 4:10, 7:3, 8:9, 8:17.)

2. The Prevailing Party

a. Legal Standard

The relevant section of FEHA "grants the trial court discretion to award attorney fees to a prevailing party." (Chavez v. City of Los Angeles (2010) 47 Cal.4th 970, 976.) "This statute has been interpreted [*19] to mean that in a FEHA action a trial court should ordinarily award attorney fees to a prevailing plaintiff unless special circumstances would render a fee award unjust. (Ibid.)

b. Discussion

Plaintiff is indisputably the prevailing party here. The Jury found in favor of Plaintiff on all causes of action tried; found clear and convincing evidence that Defendant acted with malice, oppression, or fraud; and awarded punitive damages in favor of Plaintiff and against Defendant.

There are no circumstances here that would render a fee award unjust.

The Court exercises its discretion here to award Plaintiff attorneys' fees. (Gov. Code, § 12965, subd. (c)(6).)

3. The Method for Calculating Recovery

a. Legal Standard

"An attorney fee award under the FEHA is designed to incentivize and reward a plaintiff's attorney in a civil rights case. Trial courts first

determine a lodestar amount: the hours spent times a reasonable hourly rate. Courts may then increase the amount, usually by applying a multiplier to the lodestar. The multiplier is to compensate for extrinsic factors such as the risk of nonpayment (the contingency factor), the public interest advanced by the case, the difficulty of the issues involved, and the skill of the attorneys." **[*20]** (Caldera v. Dep't of Corr. & Rehab. (2020) 48 Cal.App.5th 601, 604, citing Ketchum v. Moses (2001) 24 Cal.4th 1122, 1135.)

b. Discussion

Although Defendant argues that no fees should be awarded, neither Party disputes that the appropriate approach for calculating recovery of attorneys' fees is the lodestar adjustment method, which involves multiplying the number of hours reasonably expended by the reasonably hourly rate. (Caldera, supra, 48 Cal.App.5th at p. 604.) Nor do the Parties dispute that consideration of a multiplier is appropriate, although Defendant argues that a multiplier is ultimately not appropriate here.

The Court uses the lodestar adjustment method here and considers whether a multiplier is appropriate.

4. Reasonableness of the Fees

a. Legal Standard

"[T]he reasonable value of attorney services is variously defined as the hourly amount to which attorneys of like skill in the area would typically be entitled." (Ketchum, supra, 24 Cal.4th at p. 1133, citation and internal quotation marks omitted.)

"[A]bsent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for all the hours reasonably spent, including those relating solely to the fee." (Ketchum, supra, at p. 1133, citation and emphases omitted.)

"The burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable. However, in challenging attorney fees as **[*21]** excessive because too many hours of work are

claimed, it is the burden of the challenging party to point to the specific items challenged, with a sufficient argument and citations to the evidence. General arguments that fees claimed are excessive, duplicative, or unrelated do not suffice." (Vines v. O'Reilly Auto Enters., LLC (2022) 74 Cal.App.5th 174, 184 [cleaned up].)

b. Discussion

i. The Hourly Rates

Plaintiff claims: (1) that Counsel Carney Shegerian charges $1,350.00 per hour; (2) that Counsel Anthony Nguyen charges $1,100.00 per hour; (3) that Counsel Mahru Madjidi charges $900.00 per hour; (4) that Counsel Bryan Kirsh charges $825.00 per hour; (5) that Counsel Iris Salem charges $600.00 per hour; (6) that Counsel Allison Norder charges $550.00 per hour; (7) that Counsel Kierston Yamamoto charges $450.00 per hour; (8) that Counsel Zalman Robles charges $450.00 per hour; and (9) that Counsel Thomas Rouston charges $450.00 per hour. (Motion for an Award of Attorneys' Fees, p. 11:7-13.

Most, but not all, of the attorneys that comprise Plaintiff's Counsel provided declarations that help explain the hourly rates they charge. (Appendix of Evidence: Decl. Shegerian, ¶ 7; Decl. Nguyen, ¶ 10; Decl. Madjidi, ¶ 11; Decl. Kirsh, ¶ 4; Decl. Norder, ¶ 4; Decl. **[*22]** Yamamoto, ¶ 4.)

Counsel Shegerian has over 30 years of experience practicing law and is considered, both by this Court and the legal community, to be an exceptional trial attorney. Counsel Nguyen has nearly 15 years of experience practicing law and has previously appeared before this Court. Counsel Madjidi has 10 years of experience practicing law. Counsel Kirsh has been an attorney for six years. Counsel Norder (who has been an attorney for less than two years) and Counsel Yamamoto (who has been an attorney for less than one year) are still entry-level attorneys. The Court does not have any information for Counsel Salem, Robles, or Rouston - even though Counsel Salem apparently charges more than Counsel Norder and Yamamoto.

This Court has previously granted Attorney Shegerian fees of $1,300/hour. Understanding that top defense counsel who are partners at major law firms charge up to $1,600/hour, the Court finds Shegerian's requested rate of $1,350/hour to be reasonable. Based upon an evaluation of the declarations submitted, the Court's understanding of the prevailing rate for attorneys of comparable skill and experience in the relevant community, and the Court's personal knowledge **[*23]** of the attorneys' skills as presented in Court, the Court lowers the hourly rates allowed to reasonable rates, as shown in the chart below.

ii. The Number of Hours

Plaintiff's Counsel Anthony Nguyen declares that 1,755.5 hours of attorney time are sought in connection with this case. (Reply regarding Motion for an Award of Attorneys' Fees, Decl. Nguyen, ¶ 14.)

Defendant specifically argues that the 1,030.5 hours spent on "trial preparation" were excessive. (Opposition to Motion for Award of Attorneys' Fees, p. 6:12-13.) Defendant proposes that only 450 hours be allowed for trial preparation. (Id. at p. 9:11-14.) Defendant does not make other arguments that specifically point to issues with the hours sought by Plaintiff's Counsel.

The Court agrees with Defendant that 1,030.5 hours spent on trial preparation is excessive, but only marginally so. This was a difficult, fact-intensive case. There was no guarantee that Plaintiff would be successful in his claims, and Plaintiff's Counsel did an excellent job trying this case. The fact that Defense Counsel only spent 376.2 hours on trial preparation in the three months leading up to trial may have contributed to the jury's verdict.

The Court will **[*24]** lessen the hours of Counsel Madjidi, Nguyen, and Norder by 75 hours, 50 hours, and 25 hours, respectively, in rough accordance with their proportionate hours spent on trial preparation. (Opposition to Motion for Award of Attorneys' Fees, p. 6:13-22.)

The Court will grant the other hours sought, as Plaintiff has met his initial burden of proof on those hours and Defendant has not met its subsequent burden to show that those hours should be reduced.

5. Multiplier to the Lodestar

a. Legal Standard

"The purpose of the multiplier is to reward the prevailing attorney with an increased fee in light of the extrinsic Ketchum factors: the importance and difficulty of the litigation; the novelty of the issues involved; the risk of nonpayment for the attorney's services (the contingency factor); the skill of the attorney in presenting the case; and the magnitude of the results obtained." (Caldera, supra, 48 Cal.App.5th at p. 607, citing Ketchum, supra, 24 Cal.4th at pp. 1132-34.)

"Of course, the trial court is not required to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors, although it retains discretion to do so in the appropriate case; moreover, the party seeking a fee enhancement bears the burden of proof." (Ketchum, supra, 24 Cal.4th at p. 1138, emphasis **[*25]** omitted.)

b. Discussion

Plaintiff requests a multiplier enhancement of 1.75. (Motion for Award of Attorneys' Fees, p. 11:15-16.)

Defendant argues that there should be no multiplier, or in the alternative only a multiplier or 1.02. (Opposition to Motion for Award of Attorneys' Fees, pp. 11:4-5, 16:19-20.)

For the reasons listed below, the Court finds that Plaintiff meets his burden regarding a multiplier enhancement.

First, Plaintiff's Counsel took this case on complete contingency. (Reply regarding Motion for Award of Attorneys' Fees, Decl. Nguyen, ¶ 16.) "The adjustment to the lodestar figure, e.g., to provide a fee enhancement reflecting the risk that the attorney

will not receive payment if the suit does not succeed, constitutes earned compensation; unlike a windfall, it is neither unexpected nor fortuitous. Rather, it is intended to approximate market-level compensation for such services, which typically includes a premium for the risk of nonpayment or delay in payment of attorney fees." (Ketchum v. Moses (2001) 24 Cal.4th 1122, 1138; accord Amaral v. Cintas Corp. No. 2 (2008) 163 Cal.App.4th 1157, 1217-18 and Taylor v. Nabors Drilling USA, LP (2014) 222 Cal.App.4th 1228, 1252.)

FEHA cases are based on statutes that are designed to protect the California consumer. If a plaintiff's attorney is paid no more than the lodestar, "competent counsel will be reluctant [*26] to accept fee award cases." (Ketchum, supra, 24 Cal.4th at p. 1133, quotation and internal quotation marks omitted.)¿

Second, the vast amount of hours reasonably incurred on this matter clearly precluded other work by Plaintiff's Counsel.

Third, discussed earlier in this Order, three members of Plaintiff's Counsel are very experienced, two of whom spent a significant amount of time on this case. Although the most experienced lawyer on the team (Counsel Shegerian) only spent 4.4 hours on this matter, Counsel Nguyen and Madjidi (who each spent hundreds of hours on this matter) are highly-skilled trial attorneys.

Fourth, there was a significant chance that Defendant would have prevailed on each of the causes of action. This was apparent from the motion for summary judgment filed in this matter, in which the Court granted summary judgment against Plaintiff on two causes of action (breach of express oral contract and breach of implied contract).

Fifth, Plaintiff's Counsel achieved excellent results for their client. Plaintiff succeeded on all causes of action tried, obtained $1,300,000.00 in damages,

and obtained $5,000,000.00 in punitive damages. The Court has no problem concluding that these results are significantly higher [*27] than they would have been without counsel of comparable skill and experience.

Sixth, in contrast to Defense Counsel, who presumably gets paid monthly, Plaintiff's Counsel have not been paid for the more than two years that this action has been pending. The normal interest rate in California is 10%, which is the equivalent of a 1.10 multiplier. Because not all of an attorney's work occurs at the beginning of any given year, the Court assumes that the work was performed more-or-less evenly throughout the course of any given year. This means a 1.05 multiplier per year is appropriate to compensate Plaintiff's Counsel for the time-value of the money that they would have been paid monthly had the case not been contingent.¿

Plaintiff's Counsel litigated this case from May 2021 through September 2023 without payment. However, at oral argument, it was indicated Plaintiff's counsel's work was not evenly distributed over the past 2½ years; rather, most of it was performed during the past year. In consideration of this delay and that the statutes under which Plaintiff sued were designed to protect workers, the Court would award a 1.075 multiplier to the lodestar indicated above just to compensate [*28] for the time value of money. This multiplier would compensate Plaintiff's Counsel for the time value of the money they would have been paid monthly had the case not been contingent.

Finally, FEHA cases are unfortunately necessary for upholding the public interest. Race and age discrimination occur far too often in our society; often such discrimination is not remedied. Our courts have long recognized the "need to encourage [attorneys] willing to challenge injustices in our society" and that "[a]dequate fee awards are perhaps the most effective means of achieving this salutary goal." (Etcheson v. FCA US LLC, (2018) 30 Cal.App.5th 831, 849, quoting Thayer v. Wells

2023 Cal. Super. LEXIS 64818, *28

Fargo Bank, N.A. (2001) 92 Cal.App.4th 819, 839.) For that reasons, Courts should not be "unduly parsimonious in the calculation of such fees." (Thayer v. Wells Fargo Bank, N.A. (2001) 92 Cal.App.4th 819, 839.)

The Court will award a multiplier enhancement of 1.575, which this Court finds appropriate given the factors considered above.

D. Conclusion

The Motion for Award of Attorneys' Fees is GRANTED in part.

Attorneys' fees are granted in the total amount of $1,649,261.25. This comprises of a lodestar of $1,047,150.00 and a multiplier of 1.575, as shown in the spreadsheet below.

Attorney's Name

Rate Requested-Hours Requested-Total Requested-Rate Granted-Hours Granted-Total Granted Carney Shegerian-$1,350.00-4.40-$5,940.00-$1,350.00-4.40-$5,940.00 [*29]

Anthony    Nguyen-$1,100.00-423.40-$465,740.00-$1,000.00-373.40-$373,400.00

Mahru    Madjidi-$900.00-579.60-$521,640.00-$750.00-504.60-$378,450.00

Bryan    Kirsh-$825.00-5.80-$4,785.00-$550.00-5.80-$3,190.00

Iris    Salem-$600.00-0.70-$420.00-$300.00-0.70-$210.00

Allison    Norder-$550.00-734.80-$404,140.00-$400.00-709.80-$283,920.00

Kierston    Yamamoto-$450.00-3.70-$1,665.00-$300.00-3.70-$1,110.00

Zalman    Robles-$450.00-2.00-$900.00-$300.00-2.00-$600.00

Thomas    Rouston-$450.00-1.10-$495.00-$300.00-1.10-$330.00

Lodestar Requested-###########

Lodestar Granted-$1,047,150.00

Percentage Allowed-1

Final Lodestar-$1,047,150.00

Multiplier-1.575

Total Fees-$1,649,261.25

Total Costs-$0.00

Total Fees and Costs Granted-$1,649,261.25

Clerk is to give notice.

Certificate of Mailing is attached.

---

**End of Document**

Exhibit C

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-0416 JGB (SPx)** | Date | February 21, 2024 |
|---|---|---|---|
| Title | ***Paola French, et al. v. City of Los Angeles, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

|  MAYNOR GALVEZ  |  Not Reported  |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:     **Order (1) GRANTING Plaintiffs' Motion for Attorneys' Fees (Dkt. No. 185); and (2) VACATING the February 26, 2024 Hearing (IN CHAMBERS)**

Before the Court is a motion for attorneys' fees filed by plaintiffs Paola French and Russell French ("Plaintiffs"). ("Motion," Dkt. No. 185.) The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motion, the Court **GRANTS** the Motion. The hearing set for February 26, 2024 is **VACATED**.

## I.    BACKGROUND

On February 28, 2020, Paola French and Russell French commenced this action against Defendants City of Los Angeles ("City") and Salvador Sanchez ("Sanchez") (collectively, "Defendants"). ("Complaint," Dkt. No. 1.) Plaintiffs alleged that Mr. Sanchez, who was an officer with the Los Angeles Police Department ("LAPD") at the time, used excessive force against them and their son Kenneth French ("Decedent," or "Kenneth") inside of a Costco warehouse store in Corona, California. (See id.) On April 1, 2020, Plaintiffs filed a first amended complaint as of right. ("FAC," Dkt. No. 10.) Following the Court's order dismissing Plaintiffs' federal causes of action (Dkt. No. 19), Plaintiffs filed a second amended complaint on July 20, 2020. ("SAC," Dkt. No. 21.) On January 8, 2021, the Court dismissed-in-part one of Plaintiffs' municipal liability claims, dismissed Plaintiffs' second municipal liability claim and negligent training, hiring, and retention claim, and granted Plaintiffs leave to amend. (Dkt. No. 45.) On January 18, 2021, Plaintiffs filed a third amended complaint, the operative complaint. ("TAC," Dkt. No. 46.)

The TAC asserted twelve causes of action: (1) unreasonable search and seizure, unlawful detention and arrest in violation of 42 U.S.C. § 1983 ("Section 1983"); (2) unreasonable search and seizure, excessive force in violation of Section 1983; (3) unreasonable search and seizure, denial of medical care in violation of Section 1983; (4) interference with familial relationship in violation of the Fourteenth Amendment's Substantive Due Process Clause and Section 1983; (5) municipal liability, unconstitutional custom, practice, or policy in violation of Section 1983; (6) false arrest/false imprisonment; (7) battery, including wrongful death; (8) negligence, including wrongful death; (9) negligent infliction of emotional distress; (10) violation of the Bane Act, Cal. Civil Code § 52.1; (11) negligent training, hiring, and retention; and (12) loss of consortium.  (See TAC.)

On October 4, 2021, the Court granted in part and denied in part the City's motion for summary judgment.  ("MSJ Order," Dkt. No. 92.)  The Court dismissed Plaintiffs' municipal liability claim (Count Five), but denied summary judgment on Plaintiffs' state law claims (Counts Six through Twelve).  (Id. at 16.)

On October 19, 2021, a jury trial began on Plaintiffs' federal and state law claims.  (Dkt. No. 106.)  On October 26, 2021, following the parties' presentation of the evidence, Plaintiffs voluntarily dismissed their Section 1983 claims for unlawful detention and arrest (Count One), denial of medical care (Count Three), and interference with familial relationship (Count Four), as well as their state law claims for false arrest/false imprisonment (Count Six) and negligent training, hiring, and retention claim (Count Eleven).  (Dkt. No. 129, 10-26-21 RT 550:4-20.)  Plaintiffs' remaining six claims were as follows: (1) excessive force under Section 1983 (Count Two), (2) battery (Count Seven), (3) negligence (Count Eight), (4) negligent infliction of emotional distress ("NIED") (Count Nine), (5) violation of the Bane Act (Count Ten), and (6) loss of consortium (Count Twelve).  (10-26-21 RT 550:21-551:13.)

The Court also heard arguments on the parties' respective motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) ("Rule 50a") on October 26, 2021. The Court granted in part and denied in part Plaintiffs' motion and denied the City's motion, ruling that (1) Mr. Sanchez's use of force was unreasonable and, therefore, excessive, and (2) Mr. Sanchez's excessive force caused Plaintiffs' and Kenneth's injuries as a matter of law.  (Id. 562:7-25.)  The Court determined that, as a result, the corresponding elements for Plaintiffs' battery, negligence, NIED, and Bane Act claims were also satisfied as a matter of law.  (Id. 562:12-16.) However, the Court found that disputed factual issues required the jury to determine whether Mr. Sanchez acted under color of state law and in the course and scope of his employment.  (Id. 563:1-3.)

On October 27, 2021, the jury returned a verdict for Plaintiffs.  ("Special Verdict," Dkt. No. 114.)  The jury answered, "Yes," to all questions: whether Mr. Sanchez acted under color of state law during the incident, whether Mr. Sanchez acted within the course and scope of his employment with the City as a peace officer during the incident, whether he negligently inflicted severe emotional distress on Plaintiffs, and whether Plaintiffs suffered loss of consortium as a

result of Mr. Sanchez's use of unreasonable force against them. (Id. at 3–4.) The jury awarded $17,002,000.00 in total damages: (1) $4,000,000.00 for Kenneth's pre-death pain and suffering and loss of life damages; (2) $4,771,000.00 in compensatory damages for Paola French; (3) $400,000.00 in loss of consortium damages for Paola French; (4) $5,431,000.00 in compensatory damages for Russell French; (5) $400,000.00 in loss of consortium damages for Russell French; and (6) $2,000,000.00 for Plaintiffs' past and future wrongful death damages. (Id. at 5–7.) On November 29, 2021, the Court entered judgment consistent with the Special Verdict. (Dkt. No. 133.)

On December 27, 2021, the City timely filed a motion for judgment as a matter of law. (See Dkt. No. 138.) On January 24, 2022, Plaintiffs filed a motion for attorneys' fees.[1] (See Dkt. No. 145.) On May 10, 2022, the Court denied the City's motion for a judgment as a matter of law and granted in part Plaintiffs motion for attorneys' fees. ("Fees Order," Dkt. No. 165.) The Court awarded Plaintiffs' counsel $1,922,931.00 in attorneys' fees. (Id.)

On June 7, 2022, the City filed a notice of appeal to the Ninth Circuit Court of Appeals. ("Fees Order Appeal," Dkt. No. 168.) On October 16, 2023, the Ninth Circuit affirmed this Court's Fees Order (Dkt. Nos. 178-180) and granted appellees' motion to transfer consideration of attorneys' fees on appeal to this Court (Dkt. No. 181).

On January 18, 2024, Plaintiffs filed this Motion. (Motion.) In support, Plaintiffs filed the following:

- Declaration of Carol A. Sobel with attached exhibits ("Sobel Decl.," Dkt. No. 185-1);
- Declaration of Dale K. Galipo with attached exhibits ("Galipo Decl.," Dkt. No. 185-21);
- Declaration of John Fattahi with attached exhibits ("Fattahi Decl.," Dkt. No. 185-25);
- Declaration of Eric Valenzuela ("Valenzuela Decl.," Dkt. No. 185-30); and
- Declaration of Renee V. Masongsong with attached exhibit ("Masongsong Decl.," Dkt. No. 185-31).

On February 5, 2024, the City opposed the Motion. ("Opposition," Dkt. No. 186.) On February 6, 2024, Plaintiffs replied. ("Reply," Dkt. No. 187.) In support, Plaintiffs filed the declaration of John Fattahi ("Fattahi Reply Decl.," Dkt. No. 187-1.)

## II.   DISCUSSION

Plaintiffs move for attorneys' fees as the prevailing party on appeal. (See Motion.) The Court considers whether the requested fees are reasonable.

---

[1] Plaintiffs initially filed the attorneys' fees motion as a motion for application to tax costs, but filed a notice of errata to clarify that it is a motion for attorneys' fees. (Dkt. No. 149.)

## A. Legal Standard

In general, courts apply the "American Rule," where "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983). Under 42 U.S.C. § 1988 ("Section 1988"), a court may, in its discretion, award reasonable attorneys' fees in a suit seeking to vindicate rights under 42 U.S.C. § 1983. Braunstein v. Ariz. Dep't of Transp., 683 F.3d 1177, 1187 (9th Cir. 2012); 42 U.S.C. § 1988(b). Plaintiffs who prevail on a Bane Act claim are also entitled to attorneys' fees. Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1112 (9th Cir. 2014) (citing Cal. Civ. Code § 52.1(h)).

The customary method of determining the reasonableness of attorneys' fees under either 42 U.S.C. § 1988 or the Bane Act is the lodestar method. Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006) (Section 1988); Chaudhry, 751 F.3d 1096 (Bane Act). Under this method, a court multiplies "the time spent" with the "reasonable hourly compensation of each attorney involved in the presentation of the case." Hensley, 461 U.S. at 433. This lodestar figure is "presumptively reasonable." Id. "The district court may then adjust [the lodestar] upward or downward based on a variety of factors." Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008). These factors include:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."

Id. Because "California law allows for a multiplier of the lodestar to compensate for the risk of contingent representation," the Ninth Circuit allows a "plaintiff [who] succeeds on both federal and state claims" to seek "the state-law multiplier." Chaudhry, 751 F.3d at 1112 (citing Ketchum v. Moses, 24 Cal. 4th 1122, 1133 (2001), and Mangold v. Cal. Pub. Utilities Comm'n, 67 F.3d 1470, 1478–79 (9th Cir. 1995)). The fee applicant holds the "burden of showing that the claimed rate and number of hours are reasonable." Blum v. Stenson, 465 U.S. 886, 897 (1984).

//
//
//
//
//
//
//

## B. Lodestar Analysis

Plaintiffs' counsel requests $596,655.00 in attorneys' fees for 395.5 hours worked. (See Reply at 3.) The requested fee amount includes time associated with drafting the Reply and represents the lodestar figure multiplied by a 1.5 enhancement, as detailed below:

| Attorney / Biller | | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 71 | $1,400.00 | $99,400.00 |
| John Fattahi | Attorney | 212.4 | $975.00 | $207,090.00 |
| Eric Valenzuela | Attorney | 44 | $800.00 | $35,200.00 |
| Renee Masongsong | Attorney | 70.1 | $800.00 | $56,080.00 |
| **SUBTOTAL** | | **395.5** | | **$397,770.00** |
| 1.5 Multiplier | | | | $198,885.00 |
| **TOTAL** | | | | **$596,655.00** |

(Reply at 3.)

The City argues that the requested fee award is unreasonable because of block-billing. (Opposition at 5.)

### 1. Previously Approved Rates

On May 10, 2022, the Court granted in part Plaintiffs' post-trial motion for attorneys' fees and awarded the following:

| Attorney / Biller | | Revised Hours | Hourly Rate | Revised Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 547.3 | $1,100.00 | $602,030.00 |
| John Fattahi | Attorney | 37.4 | $785.00 | $29,359.00 |
| Renee v. Masongsong | Attorney | 461.5 | $600.00 | $276,900.00 |
| Eric Valenzuela | Attorney | 457.8 | $700.00 | $320,460.00 |
| Alejandro Monguia | Legal Assistant | 10.9 | $200.00 | $2,180.00 |
| Karen Slyapich | Legal Assistant | 171.7 | $200.00 | $34,340.00 |
| Santiago Laurel | Legal Assistant | 32.05 | $200.00 | $6,410.00 |
| Marielle Sider | Legal Intern | 68.5 | $150.00 | $10,275.00 |
| **SUBTOTAL** | | **1,787.15** | | **$1,281,954.00** |
| 1.5 Multiplier | | | | $640,977 |
| **TOTAL** | | | | **$1,922,931.00** |

(Fees Order at 29.)

//
//
//

### 2. Hourly Rate

Reasonable fees under Section 1988 are calculated according to the prevailing market rates in the relevant legal community. <u>Gates v. Deukmejian</u>, 987 F.2d 1392, 1405 (9th Cir. 1992). Because "the relevant community is the forum in which the district court sits," <u>Prison Legal News v. Schwarzenegger</u>, 608 F.3d 446, 454 (9th Cir. 2010), the prevailing rates in the Central District of California control here. Plaintiffs request rates that are slightly higher than the Court awarded in 2022—a $300 increase per hour for Mr. Galipo; a $190 increase per hour for Mr. Fattahi; a $100 increase per hour for Mr. Valenzuela; a $200 increase per hour for Ms. Masongsong. (Motion at 10.) The City does not contest Plaintiffs' requested rates. (<u>See</u> Opposition.) Plaintiffs argue that these rates are reasonable based on two years of inflation and rate increases, along with the fact that this request pertains to appellate proceedings. (<u>Id.</u>) The Court agrees and concludes that Plaintiffs' requested rates are reasonable.

### 3. Hours Billed

Plaintiffs' counsel requests attorneys' fees for a total of 395.5 hours worked on the appeal in this case. (Reply at 3.) The City argues that these hours should be reduced because they include impermissible block billing. (Opposition at 4-6.)

The City argues that Mr. Galipo has impermissibly block-billed time. (Opposition at 4-6.) In general, courts look unfavorably on block billing in timesheets because it "does not allow the Court to scrutinize the amount of time spent performing each task." <u>Rahman v. FCA US LLC</u>, -- F. Supp. 3d --, 2022 WL 1013433, at *4 (C.D. Cal. Mar. 29, 2022) (internal citations omitted). A court may "reduc[e] or eliminat[e] certain claimed hours" based on such billing practices, but it may not "deny[] all fees." <u>Mendez v. County of San Bernardino</u>, 540 F.3d 1109, 1129 (9th Cir. 2008), <u>overruled on other grounds by</u> <u>Arizona v. ASARCO LLC</u>, 773 F.3d 1050 (9th Cir. 2014). However, a court need not reduce hours for block-billing if it can determine the reasonableness of the hours spent on each task. <u>See</u> <u>Donastorg v. City of Ontario</u>, 2021 WL 6103545, at 13–14 (C.D. Cal Sept. 2, 2021).

The City challenges Mr. Galipo's time entries for "oral argument preparation" as overbroad. (Opposition at 5.) The Court finds that Mr. Galipo's entries are reasonable and do not constitute block-billing. <u>See</u> <u>Donastorg</u>, 2021 WL 6103545, at *14 (finding reasonable Mr. Galipo's 224.8 hours billed for "trial and trial preparation" over 17 days). Thus, the Court will not reduce Mr. Galipo's hours on this basis.

### 4. Multiplier

Plaintiffs' counsel's lodestar is $397,770.00. Plaintiffs' counsel seeks a 1.5 multiplier of the lodestar to bring their total requested fee amount to $596,655.00. (Reply at 3.) The City does not contest Plaintiffs' 1.5 multiplier. (<u>See</u> Opposition.) The Court previously analyzed and approved a 1.5 multiplier in this case. (Fees Order at 29.) Accordingly, the Court applies a 1.5 multiplier to the lodestar calculation of $397,770.00 for a total award of $596,655.00.

In sum, the Court **GRANTS** the Motion as follows:

| Attorney / Biller | | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 71 | $1,400.00 | $99,400.00 |
| John Fattahi | Attorney | 212.4 | $975.00 | $207,090.00 |
| Eric Valenzuela | Attorney | 44 | $800.00 | $35,200.00 |
| Renee Masongsong | Attorney | 70.1 | $800.00 | $56,080.00 |
| **SUBTOTAL** | | **395.5** | | **$397,770.00** |
| 1.5 Multiplier | | | | $198,885.00 |
| **TOTAL** | | | | **$596,655.00** |

### III.    CONCLUSION

For the above reasons, the Court **GRANTS** Plaintiffs' Motion and **AWARDS** Plaintiffs' counsel $596,655.00 in attorneys' fees.  The February 26, 2024 hearing is **VACATED**.

**IT IS SO ORDERED.**

Exhibit D

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No. 8:18-CV-00475-DOC (DFMX)                    Date:  November 15, 2024

Title: C.L., an individual, v. Del Amo Hospital, Inc., et al.

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

_____Karlen Dubon_____                    _____Not Present_____
Courtroom Clerk                              Court Reporter

ATTORNEYS PRESENT FOR            ATTORNEYS PRESENT FOR
PLAINTIFF:                                       DEFENDANT:
None Present                                     None Present

**PROCEEDINGS (IN CHAMBERS):    ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
ATTORNEYS' FEES [307, 318]**

Before the Court is Plaintiff C.L.'s Amended Motion for Attorneys' Fees ("Motion" or "Mot.") (Dkt. 318). The Court finds this matter suitable for resolution without oral argument. Fed. R. Civ. P. 78; C.D. Cal. R. 7-15. Having reviewed the papers and considered the Parties' arguments, the Court **GRANTS IN PART** Plaintiff's Motion for Attorneys' Fees, Costs, and Expenses.

## I.    Background

Plaintiff C.L. ("Plaintiff") is clinically diagnosed with Post Traumatic Stress Disorder (PTSD), Depression, and Anxiety and uses a service dog named Aspen. Complaint ¶¶ 1-2. ("Compl.") (Dkt. 1). Aspen is trained to aid Plaintiff with her disability, including, but not limited to, interrupting Plaintiff from self-injurious behaviors, alerting Plaintiff of anxiety attack onsets and to take medication, and providing deep pressure therapy to alleviate sensory overload. *Id.* ¶ 16.

Between 2015 to present, C.L. voluntarily admitted herself to Defendant Del Amo Hospital, Inc.'s ("Defendant") inpatient mental health treatment facility. *Id.* ¶ 3.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No. 8:18-CV-00475-DOC (DFMX)                    Date: November 15, 2024

Page 2

Defendant, however, refused to allow Aspen to accompany her, which Plaintiff alleges caused her significant emotional distress, anxiety, suicidal ideation, self-injurious behaviors, etc., and incurred her outside dog boarding expenses. *Id*.

Plaintiff originally brought six causes of action:

(1) Violation of Title III of the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12181);
(2) Violation of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794);
(3) Violation of the Unruh Civil Rights Act (California Civil Code § 51);
(4) Violation of the Unfair Competition Law (California Civil Code § 17200);
(5) Negligence and negligence per se; and
(6) Intentional infliction of emotional distress.

*See generally* Compl.

Plaintiff filed her complaint on March 23, 2018. *See* Compl. The Court's Order on April 18, 2024 states that Plaintiff is the prevailing party in this action under her ADA claim. *See* Order Regarding Mootness and Permanent Injunction ("Order") (Dkt. 293). On May 6, 2024, this Court declared a permanent injunction against Defendant and ordered Defendant to allow entry of Plaintiff's service dog when Plaintiff is admitted for treatment. Permanent Injunction ("Injunction") (Dkt. 297), at 1. Plaintiff filed a Motion for Attorneys' Fees on June 26, 2024 (Dkt. 307). Plaintiff filed an Amended Motion on July 1, 2024 ("Mot.") (Dkt. 318). Defendant filed their Opposition to Plaintiff's Motion for Attorneys' Fees on September 25, 2024 ("Opp'n") (Dkt. 337), to which Plaintiff responded with the Reply in Support for Motion for Attorneys' Fees on October 16, 2024 ("Reply") (Dkt. 338).

## II.    Legal Standard

According to Section 12205 of Title 42 Public Health and Welfare, the court may award the prevailing party "reasonable attorney's fee, including litigation expenses, and costs." 42 U.S.C.A. § 12205 (2024). Because many other federal statutes protecting civil rights contain the same fee-shifting provisions, with only minor textual differences,

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No. 8:18-CV-00475-DOC (DFMX)                    Date: November 15, 2024

courts interpret fees award provisions uniformly. *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1158 (9th Cir. 2018).

First, federal courts determine what constitutes a "reasonable attorneys' fee" by calculating "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). This calculation provides an objective basis to make an initial estimate and is called the "lodestar" method. *Id.*; *see also Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010). Second, courts have discretion to adjust this amount upwards or downwards by considering various factors, including (1) the time and labor required; (2) the novelty and difficulty of the question presented; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975) (quoting *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974)); *see also Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989) (finding that although the lodestar approach is the centerpiece and main means to calculate attorney's fee awards, the *Johnson* factors are relevant in adjusting the lodestar amount).

A district court "has a great deal of discretion in determining the reasonableness of the fee." *In re Smith,* 586 F.3d 1169, 1173 (9th Cir. 2009) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992)). Where "a voluminous fee application is filed in exercising its billing judgment the district court is not required to set forth an hour-by-hour analysis of the fee request." *Gates*, 987 F.2d at 1399. In those instances, "the district court has the authority to make across-the-board percentage cuts. . . in the number of hours claimed. . . as a practical means of trimming the fat from a fee application." *In re Smith*, 586 F.3d at 1174 (quoting *Gates*, 987 F.2d at 1399). However, cutting a large percentage of the fee request "has been criticized when employed in cases where the fee applications at issue involved substantial amounts of money and where district courts failed adequately to articulate their reasons for selecting specific percentage deductions." *Gates*, 987 F.2d at 1399. "[T]he district court can impose a small reduction, no greater

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:18-CV-00475-DOC (DFMX)                    Date: November 15, 2024

Page 4

than 10 percent—a 'haircut'—based on its exercise of discretion and without a more specific explanation." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). "Though a small reduction of fees necessitates only 'cursory explanation,' anything more disparate requires 'a more specific articulation of the court's reasoning.'" *In re Smith*, 586 F.3d at 1174 (quoting *Moreno*, 534 F.3d at 1111).

### III.    Discussion

Here, Plaintiff requests an attorneys' fees award and litigation costs for a total of $2,709,313. Reply at 11. The following is a breakdown of the amount requested:

(1) Knauf Associates requests $1,451,366, which includes $1,310,140 in attorneys' fees, an additional $30,000 for the Reply fees, and $111,226 in litigation costs. *Id.*
(2) Bazelon Center requests $278,110 in attorneys' fees. *Id.*
(3) Derby, McGuinness, & Goldsmith, LLP seeks $543,019 total, which includes $522,550 in attorneys' fees and $20,469 in litigation costs. *Id.*
(4) McGuinness Law Group requests a total of $37,077, with $15,325 in attorneys' fees, $19,671 in Reply costs, and $2,081 in litigation costs. *Id.*
(5) Lastly, the Disability Rights Legal Center seeks a total of $399,741, with $397,009 in attorneys' fees and $2,732 in litigation costs. *Id.*

| Office | Fee Motion | Reply | Costs | Total |
|---|---|---|---|---|
| Knauf Associates | $1,310,140 | $30,000 | $111,226 | $1,451,366 |
| Bazelon Center | $278,110 | | | $278,110 |
| Derby, McGuinness & Goldsmith, LLP | $522,550 | | $20,469 | $543,019 |
| McGuinness Law Group, PC | $15,325 | $19,671 | $2,081 | $37,077 |
| Disability Rights Legal Center | $397,009 | | $2,732 | $399,741 |
| **Total** | $2,523,134 | $49,671 | $136,508 | $2,709,313 |

### a.  The Attorneys' Fees and Hourly Rates are Reasonable.

Plaintiff argues that its counsel's current 2024 hourly rates should be used in calculating the lodestar and that the rates and the numbers of hours spent on the litigation

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:18-CV-00475-DOC (DFMX)                    Date: November 15, 2024

Page 5

are reasonable. *See generally* Mot. Defendant alternatively argues that Plaintiff's counsel's fees and hourly rates are unreasonable and that the Court should rely on historical rates for computing the hourly rate. *See generally* Opp'n.

### i.  Plaintiff Is Entitled to Current Rates of Attorneys' Fees

The Supreme Court has held that compensation for attorneys' fees can be applied using either the current or historic hourly rates. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 284 (1989). Courts have the discretion to consider multiple factors in assessing the fee amount, including the delay in payment, adjustment for inflation, current market rates at the time the services were rendered, and totality of the circumstances. *Id.* at 274; *see also Pierce v. Cnty. of Orange,* 905 F. Supp. 2d 1017, 1035 (C.D. Cal. 2012). The length in delay of payment is a factor when deciding between current and historic rates. *Gates v. Deukmejian*, 987 F.2d 1392, 1407 (9th Cir. 1992) (holding that a delay of three years was enough to warrant a calculation of attorney's fees using current hourly rates).

Here, Plaintiff emphasizes that the litigation has lasted over six years. Mot. at 4. This litigation has consisted of pre-trial motions, trial, two Ninth Circuit appeals, and post-remand litigation. *Id*. Critically, Plaintiff's counsel has been waiting for payment for their services for over six years. Since this case involved civil rights claims and resulted in appeals on some of these claims, the totality of the circumstances supports that Plaintiff is entitled to current hourly rates.

### ii.  Plaintiff's Counsel's Hours and Hourly Rates Are Reasonable

Plaintiff's counsel's rates and hours are reasonable because of their respective expertise and experience litigating disability rights cases. *See Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008) (finding that rates were reasonable based on declarations that established that the hourly rates were similar to attorneys of comparable skill). Upon reviewing Plaintiff's counsel's billing records and declarations, this Court determines that the entries are not unnecessarily vague and instead contain sufficiently detailed explanations of counsel's activities in litigating this case. Additionally, Plaintiff's fees and costs to bring the present Motion and Reply are to be considered together in assessing attorneys' fees because the time spent establishing the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:18-CV-00475-DOC (DFMX)                    Date: November 15, 2024

Page 6

entitlement to and amount of the fee is compensable as attorneys' fees. *See Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 981 (9th Cir. 2008).

The lodestar method requires that the Court determine the number of hours reasonably spent on the litigation multiplied by the reasonable hourly rate. *Hensley*, 461 U.S. at 433. In evaluating what is a reasonable number of hours, the counsel requesting attorneys' fees bears the burden of submitting detailed time records justifying the hours claimed. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), *amended on other grounds*, 808 F.2d 1373 (9th Cir. 1987). Counsel must also prove that the hourly rates that go into the lodestar calculation are reasonable themselves. *Intel Corp. v. Terabyte Int'l*, 6 F.3d 614, 623 (9th Cir. 1993). These amounts may be reduced if the hours are duplicative, excessive, or otherwise unnecessary. *Id.*; *Hensley*, 461 U.S. at 433.

### 1. Knauf Associates

Knauf Associates seeks fees totaling $1,340,140. Reply at 11. Christopher Knauf, lead counsel and owner of Knauf Associates, has an hourly rate of $1,000. Mot. at 23. Alexandra Robertson, senior associate, has an hourly rate of $600. *Id*. Paralegal Leslie Rous has an hourly rate of $250. *Id*. Knauf Associates altogether billed 1,791 hours for this case. *See* Plaintiff's Billing Appendix at 97. That is approximately 224 eight-hour working days over the course of six years. Given the amount of pre-trial work, trial, appeals, post-trial litigation, and other issues, Plaintiff's lead counsel's commitment of 224 working days to the matter is reasonable. The hours and rates are also reasonable because Christopher Knauf runs his own firm, was Director of Litigation at Disability Rights Legal Center, is a Professor of Disability Rights Law at USC Gould School of Law, and has many other accreditations, which merit his firm's fee rate and hourly expenses. Mot. at 21.

### 2. Bazelon Center

Bazelon Center is seeking $278,110 in fees. Reply. at 11. Bazelon Center's Senior Counsel, Ira Burnim, has an hourly rate of $1,000. Mot. at 23. Jennifer Mathis, the Director of Litigation, also has an hourly rate of $1,000. *Id*. Senior Staff Attorney Lewis Bossing's hourly rate is $900. *Id*. Law fellow Julia Garrison makes $500 an hour. *Id*. Staff attorney Brit Vanneman, has an hourly rate of $500. *Id*. Another staff attorney,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. 8:18-CV-00475-DOC (DFMX)                              Date: November 15, 2024

Page 7

Anashua Dutta, makes $450 an hour. *Id*. Bazelon Center billed 408 hours total—51 eight-hour working days. *See* Plaintiff's Billing Appendix at 108. Jennifer Mathis, Julia Garrison, and Brit Vanneman managed the case before the second appeal. *Id*. Jennifer Mathis was the initial leading Bazelon attorney on this case, but Mr. Burnim took on the case after Ms. Mathis moved to the U.S. Department of Justice. Mot. At 22. Mr. Burnim graduated from Harvard Law School and focuses on complex federal litigation. *Id*. Based on the Bazelon attorneys' skills and experiences, their rates are reasonable. Based on the length of this litigation, the two appeals, and lengthy appellate briefing by Bazelon, the hours spent are reasonable.

Furthermore, Defendant argues that the rates for Bazelon Center should be adjusted to the local rate where counsel operates in Washington, D.C., not computed at Southern California lawyers' rates. Opp'n at 16. The Laffey Matrix, however, shows that Mr. Burnim's hourly rate is not excessive for attorneys of his experience because D.C. attorneys practicing for 20+ years are permitted $1050+ in hourly rates. Mr. Burnim has been practicing complex litigation since he was admitted to the Bar in 1978. *See* Declaration of Ira Burnim. Thus, his hourly rate of $1,000 is reasonable.

### 3. Derby, McGuinness, & Goldsmith, LLP

Derby, McGuinness, & Goldsmith, LLP, seeks $522,550 in fees. Reply at 11. Celia McGuinness makes $1,000 an hour and worked 492.60 hours. Anthony Goldsmith makes $1,000 an hour and worked for 16.3 hours on the matter. Mot. at 24. Senior associate Deborah Gettleman has an hourly rate of $750 and worked for 7 hours. *Id*. A paralegal, Shalishah Patrick, makes $250 an hour and worked 46.3 hours. *Id*. Ms. McGuinness is the other lead counsel on this case and has 32 years as a deputy public defender and criminal defense attorney in private practice. Mot. at 21. She is also professor of law at UC College of the Law, San Francisco. *Id*. Mr. Goldsmith graduated from USC Gould School of Law, has practiced disability rights litigation since 2006, and has testified before the California Assembly and Senate. *Id*. at 22.

### 4. McGuinness Law Group

McGuinness Law Group seeks $34,996 in fees. Reply at 11. The owner of McGuinness Law Group, Celia McGuinness, makes $1,000 an hour. Mot. at 24. She

originally worked at Derby, McGuinness & Goldsmith, LLP but opened her own firm during the course of litigation. *Id.* at 13. She remained active on the case. Paralegal Shalishah Patrick makes $250 an hour. Id. McGuinness Law Group allotted 17.5 hours to this matter. *See* Plaintiff's Billing Appendix at 171. Between Derby, McGuinness, & Goldsmith and McGuinness Law Group, Ms. McGuinness worked about 581 hours on this case as lead counsel. *See* Mot. at 19. That is about 64 eight-hour working days over the course of six years. Given her expertise, this amount of time is reasonable and efficient.

### 5.  Disability Rights Legal Center

Disability Rights Legal Center is seeking $397,009 in fees. Reply at 11. The former Director of Litigation, Christopher Knauf, has an hourly rate of $1,000. Mot. at 24. Counsel Franklin Ferguson also makes $1,000 an hour. *Id*. Three Senior Staff Attorneys, Alexandra Robertson, Brendan Hamme, and Julie Stromberg, make $600 an hour. *Id*. A Staff Attorney, Justin Reissman, has an hourly rate of $400. *Id*. The law clerks make $250 an hour. *Id*. Disability Rights Legal Center altogether worked a total of 702 hours.  *See* Mot. at 19. Christopher Knauf worked at the Disability Rights Legal Center for approximately four years before returning to private practice. Mot. at 21. Again, given the length of litigation and counsel's expertise, these rates and hours are reasonable.

### b.  Plaintiff's Lodestar Must Be Appropriately Reduced

As explained above, the Court has discretion to adjust the lodestar upwards or downwards based on the nature of the action and various factors. *See Johnson*, 488 F.2d at 717-719. Here, Plaintiff's counsel seeks attorneys' fees totaling $2,572,805. Reply at 11. Defendant argues against this amount, stating that it must be lowered because the fees are unreasonable and expensive and are supported by vague billing entries and excessive hours. *See generally* Opp'n. Additionally, Defendant states that the fact Plaintiff was not successful on four of her claims is sufficient to reduce the attorneys' fees by 66% alone. *Id.* at 8.

For the following reasons, the Court determines that the lodestar for attorneys' fees must be initially reduced by 10% based on its exercise of discretion and then another

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. 8:18-CV-00475-DOC (DFMX)                    Date: November 15, 2024

10% based on the degree of success and results achieved. *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (finding that a district court may exercise discretion in reducing lodestars by 10%, with further reductions based on clear, more specific explanations).

Under *Hensley*, the mixed success that Plaintiff had in this lawsuit must be considered in calculating the appropriate fee amount. *See Hensley*, 461 U.S. at 434 (1983). Courts look to whether the plaintiff prevailed on all or only some of the claims and whether that level of success renders the hours expended a satisfactory award. *Id.* The court has discretion to adjust the award downwards when a plaintiff fails to prevail on all claims because an award based on overall hours would be excessive. *Id.*

Here, Plaintiff prevailed on only two claims. Because she prevailed on her ADA claim, she also prevailed on her Unruh Civil Rights Act claim. Cal. Civ. Code § 51(f). However, Plaintiff did not prevail on her four other claims alleging violations of the Rehabilitation Act, Unfair Competition Law, Negligence, and Intentional Infliction of Emotional Distress. Opp'n at 8. Furthermore, Plaintiff initially sought (1) a declaration that Defendant's conduct violated the ADA, Rehabilitation Act, and Unruh Act; (2) preliminary and permanent injunctive relief to prohibit Defendant from denying admission to service animals to Plaintiff and other disabled individuals during treatment; (3) statutory and compensatory damages; (4) interest on those damages; (5) exemplary damages as permitted by law; and (6) attorneys' fees. Compl. at 6. Ultimately, this Court granted a relatively limited Permanent Injunction for Plaintiff, specifically that Defendant shall not deny entry of Plaintiff's service dog when Plaintiff is admitted for in-patient treatment at the facility. Injunction at 1.

This is not to say that Plaintiff's success on the ADA and Unruh Act claims was not substantial and notable. Defendant claims that this case's outcome conferred a benefit to Plaintiff alone and is not a deterrent to widespread civil rights violations. Opp'n at 12. However, it is worth noting that the Ninth Circuit considered a novel issue and ruled in Plaintiff's favor in this case, which opens the door for Americans to receive important mental health care with the help of their service dogs. Reply at 8.

Balancing the degree of Plaintiff's success on the multiple claims and ultimate outcome, however, the Court finds that the results she achieved do not justify the full

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:18-CV-00475-DOC (DFMX)                    Date: November 15, 2024

Page 10

number of hours sought for litigating all the claims in this action. Therefore, based on the totality of circumstances, Plaintiff's lodestar of $2,572,805 is reduced by 20% which results in a final total of $2,058,244 in attorneys' fees.

### c. Plaintiff's Litigation Costs

Plaintiff's counsel seeks $136,508 to cover reasonable deposition, expert witness, traveling, printing, and delivery costs under the ADA and Unruh Civil Rights Acts. Mot. at 25-26; Reply at 10. Defendant argues that Plaintiff did not provide any documentation for these costs pursuant to Local Rule 54-1, so in the interest of fairness, the expenses should be denied. Opp'n at 19. But, Plaintiff's counsel provided a detailed list of case-related costs to the Court.

When a federal statute forming the basis of an action has an express provision governing costs, the action is subject to that provision's control. *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1190 (9th Cir. 2001). Section 12205 of the American Disabilities Act allows a court discretion in awarding ligation expenses. 42 U.S.C.A. § 12205; *see also Green v. Mercy Hous., Inc.*, 991 F.3d 1056, 1057 (9th Cir. 2021) (finding that the ADA's fee-shifting provision states that a court may award reasonable attorney's fees, including litigation costs, to the prevailing party). After reviewing Plaintiff's counsel's costs, the Court finds them to be reasonable. A significant portion of the costs included payment of expert witnesses for reports, travel, consultation, and testimony. Defendant's arguments that the costs are unreasonably large are unavailing given the length of this litigation. Plaintiff therefore is entitled to her counsel's litigation costs of $136,508.

### IV.    Dispersal of Attorneys' Fees

The Court ORDERS Defendant to tender payment of attorneys' fees and costs within sixty (60) days of entry of this minute order.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:18-CV-00475-DOC (DFMX)                    Date: November 15, 2024

                                                             Page 11

### V.    DISPOSITION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Plaintiff's Motion and awards Plaintiff's counsel **$2,194,752** total in fees and costs.

Motion hearing set for November 18, 2024 is hereby VACATED.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11

CIVIL-GEN                                    Initials of Deputy Clerk: kdu

Rosemary Dettling, Esq.
Admitted Pro Hac Vice
Federal Employee Legal Services Center
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 390-4741
Facsimile: (202) 379-9772
Email: rdettling@felsc.com

Sara L. Bloom, Esq.
Admitted Pro Hac Vice
Law Office of Sara Bloom
1120 Huffman Rd, Ste 24-785
Anchorage, AK 99515
Telephone: (907) 519-3613
Facsimile: (907) 345-8570
Email: sara@907lawyer.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROYLAN G. DAMWYK, <br><br> Plaintiff, <br><br> v. <br><br> FRANK KENDALL, III, <br> in his official capacity <br> as the Secretary of the U.S. Air Force., <br><br> Defendant | Case No.: 2:22-cv-04424-HDV-SK <br><br> PROPOSED ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEY FEES AND COSTS <br><br> HEARING DATE: APRIL 10, 2025 <br> HEARING TIME: 10:00 A.M. <br> COURTROOM: 5B <br><br> HONORABLE HERNÁN D. VERA <br> UNITED STATES DISTRICT JUDGE |

1

2    IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Plaintiff's

3    Motion for Attorney fees is GRANTED. The Plaintiff is awarded _____ in

4    attorney fees and _____ in costs.

5

6

7    DATED:_____

8

9

10   _____
     HONORABLE HERNÁN D. VERA
11   UNITED STATES DISTRICT JUDGE

12

13

14                          Respectfully Submitted,

15                          */s/ Rosemary Dettling*
                            Rosemary Dettling, Esq.
16                          Admitted Pro Hac Vice
                            Federal Employee Legal Services Center
17                          1629 K Street, NW, Suite 300
                            Washington, DC 20006
18                          Telephone: (202) 390-4741
                            Facsimile: (202) 379-9772
19                          Email: rdettling@felsc.com

20

21

22

23

24

25

26

27

28